# Exhibit 1

| | | |
|---|---|---|
| 4 | BEYOND SYSTEMS, INC., | : Civil Action No. |
| 5 | Plaintiff, | : PJM 08-0409 |
| 6 | v. | : |
| 7 | KRAFT FOODS, INC. et al., | : Greenbelt, Maryland |
| 8 | Defendant. | : Monday, October 19, 2009 |
| 9 | _____/ | 12:05 P.M. |

TRANSCRIPT OF MOTION PROCEEDINGS
BEFORE THE HONORABLE PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFF          THOMAS M. BARBA, ESQUIRE
BEYOND SYSTEMS AND         ANTHONY ADRIAN ONORATO, ESQUIRE
HYPERTOUCH, INC.           Steptoe & Johnson, LLP
                           1330 Connecticut Avenue, N.W.
                           Washington, D.C.  20036
                           202-429-3000

                           MICHAEL STEPHEN ROTHMAN, ESQUIRE
                           Law Office of Michael S. Rothman
                           401 E. Jefferson Street, Suite 201
                           Rockville, Maryland  20850
                           301-251-9660

                           STEPHEN HOWARD RING, ESQUIRE
                           Stephen H. Ring, PC
                           506 Main Street, Suite 215
                           Gaithersburg, Maryland 20878
                           301-563-9249

OFFICIAL COURT REPORTER:  LINDA C. MARSHALL,(301) 344-3229

COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

APPEARANCES CONTINUED:

FOR THE DEFENDANTS    J. DOUGLAS BALDRIDGE, ESQUIRE
CONNEXUS CORP.        ARI NICHOLAS ROTHMAN, ESQUIRE
AND HYDRA, LLC:       LISA JOSE FALES, ESQUIRE
                      ROBERT FRIEDMAN, ESQUIRE
                      Venable, LLP
                      575 Seventh Street, NW
                      Washington, D.C.  20004
                      202-344-4000


FOR THE DEFENDANT     JOHN K. ROCHE, ESQUIRE
KRAFT FOODS, INC.:    Perkins, Coie, LLP
                      607 14th Street, NW
                      Suite 800
                      Washington, D.C.  20005
                      202-434-1627

1                    P-R-O-C-E-E-D-I-N-G-S

2           THE DEPUTY CLERK:  Civil Action Number PJM 2008-0409,

3     Beyond Systems, Inc. versus Kraft Foods, Inc., et al.  The

4     matter is before the Court for motions hearing.

5           THE COURT:  All right.  Let's go down, have ourselves

6     identified starting, I think, we're in reverse here.  I think

7     we're plaintiffs on this side.

8           MR. BARBA:  Morning, Your Honor.  Thomas Barba for

9     Beyond Systems and for Hypertouch, Inc.

10          MR. ONORATO:  Good morning, Your Honor.  Anthony

11    Onorato for plaintiff, Beyond Systems, Inc.

12          MR. BALDRIDGE:  Good morning.  Doug Baldridge from the

13    Venable Law Firm on behalf of the Defendants Connexus and Hydra.

14          MR. ROTHMAN:  Good morning, Your Honor.  Ari Rothman

15    from Venable representing Connexus and Hydra.

16          MR. ROCHE:  Good morning, Your Honor.  John Roche on

17    from Perkins, Coie on behalf of the Kraft defendants.

18          THE COURT:  For?

19          MR. ROCHE:  The Kraft defendants.

20          THE COURT:  Kraft, okay.

21          Anyone else being identified?

22          MS. FALES:  Good morning, Your Honor.  Lisa Fales from

23    Venable on behalf of Connexus and Hydra.

24          THE COURT:  Gentleman, are you in the case?  Are you

25    in the case, sir?

1    MR. FRIEDMAN:  Robert Friedman from Venable on behalf

2 of Connexus and Hydra.

3    THE COURT:  You're with Connexus and Hydra?

4    MR. FRIEDMAN:  Defendants, Your Honor.

5    THE COURT:  Okay.  Mr. Ring, are you in this case?

6    MR. RING:  Your Honor, also for the plaintiffs,

7 Stephen Ring.

8    MR. ROTHMAN:  And Mike Rothman.

9    MR. RING:  And Paul Wagner, the president of Beyond

10 Systems, Inc. is also present.

11    THE COURT:  Now, I need to tell you folks, we're

12 really late getting started.  I have a 1:00 o'clock meeting I

13 must make, so we may have to push this partly into this

14 afternoon depending on the timing, because we were supposed to

15 get started --  I was ready about 11:35 so we're pushed today.

16    Let me try and shortcut a few things.  The arguments

17 that papers not being received at this point, both denied.

18 Papers are received.

19    Beyond Systems, I want to tell you, I'm a little

20 surprised to get anything filed by you with that kind of request

21 given the accommodation that the Court has made for Beyond

22 Systems in other cases.  Let's keep that in mind.  Beyond

23 Systems has been in this court many times and has been

24 accommodated with I don't know how many extensions.

25    I'm talking to you, Mr. Ring.

1    So the idea that a paper is filed saying that somebody

2  else should not be able to file something late came with a

3  little bit of surprise to the Court.  In any event, those

4  motions are denied flat out, papers are received or however it

5  was, to strike them, I believe.

6    The motions were actually request to file, leave to

7  file the motion, the papers, supplemental papers and there were

8  oppositions filed with that; is that correct?  Am I wrong?

9    MR. BALDRIDGE:  You're correct, but I think you mean,

10  Your Honor, to say they're granted.

11    THE COURT:  Well, they're granted in that there was

12  leave -- that's fine.  There was an opposition.  The papers are

13  granted in terms of being late received.  No problem with that.

14    Now, I don't know how you want to go about this at

15  this point.  Some of these things sort of meld into one another.

16  Is there some logical progression here?

17    Go ahead, Mr. Barba.

18    MR. BARBA:  Your Honor, I guess I would suggest that

19  we argue the Hypertouch motion first, the third party, the

20  Motion to Dismiss the Third Party Complaint since that was

21  docketed just slightly first.  And so Hypertouch would speak

22  first, I think, since it's the moving party.

23    MR. BALDRIDGE:  I would see that we would only do that

24  if we want to get the cart in front of the horse.  We've got a

25  Summary Judgment Motion pending on the damages that we did

1　indeed file a few weeks after their motion, but it seems to me

2　that that naturally would be the first motion the Court wants to

3　hear about.

4　　　　　MR. BARBA:  Either way, Your Honor.

5　　　　　THE COURT:  Well, let's go for Summary Judgment Motion

6　first.

7　　　　　Go ahead.

8　　　　　MR. BALDRIDGE:  Sir, I believe the briefs pretty much,

9　make this a clear issue for the Court.  It is a clean summary

10　judgment issue unlike many times when parties are quibbling over

11　what the facts are.  And it obviously involves this Court's

12　decision on what Statute of Limitations applies to the two

13　claims; one under the Maryland statute and one under the

14　California statute.

15　　　　　By way of very brief background, Connexus and Hydra,

16　my clients are commercial bulk e-mailers.  Beyond Systems, it

17　sounds like the Court is familiar with them.

18　　　　　THE COURT:  They've been here a lot.

19　　　　　MR. BALDRIDGE:  They essentially have no function

20　other than to file lawsuits.  In this case, they have

21　self-inflicted damages where Joe Wagner, Mr. Wagner's brother

22　sent e-mails on from California and now they're claiming

23　damages.

24　　　　　And interestingly, because we are going to talk about

25　what a penalty is, I thought the Court might want to know that

1    they claim $31,000 in actual cost associated with all spam from

2    anybody, including my clients.  Yet, they're asking the Court

3    eventually or a jury to give them $107 million in damages.

4         So, there's no doubt that there's very little actual

5    damages here, and there's a windfall trying to be realized out

6    of the statutory schemes of both California and Maryland.  In

7    any event, we have claims under the California Professional

8    Business Code 17529.5 and the Maryland Commercial Electronic

9    Mail Act 14-3001, et seq.

10        The parties' positions are very clear.  We contend as

11   has the Northern District of California and other courts

12   concluded under the California statute that the One-Year Statute

13   of Limitations applies.  We also contend that the One-Year

14   Statute of Limitations applies under the Maryland statute.

15        In both instances, Beyond Systems believes that the

16   Three-Year Statute of Limitations applies.  The impact of what

17   the Court will do here today on summary judgment is if it rules

18   as we believe it should that the one-year period applies, all

19   e-mails received by Beyond Systems through this scheme prior to

20   February 14, 2007, will be out of the case.

21        That cuts about -- and it changes daily because we're

22   getting different e-mails daily, 49,839 e-mails out of the case

23   based on the Statute of Limitations, and makes its case

24   obviously more manageable.

25        Let's look at the California statute first, because I

1  think that's the easiest one.  The only cases to look at 7529.5

2  in the context of Statute of Limitations is a Northern District

3  of California, *Hypertouch/Azoogle*; the *Balsam/Subscriber* case,

4  *Subscriberbase* case, excuse me.  Indirectly, the *Netblue* case on

5  similar issues, and every single one of them has concluded that

6  one-year Statute of Limitations applies.

7        In reaching that conclusion under 17529.5, these

8  courts cited California law.  The law they cited was this GHII

9  decision, which is an intermediate appellate court; and *Menefee*,

10  which is another California case.  And what they said is that

11  the law in California is that if you're seeking damages

12  additional to what are actual damages for purposes of Statute of

13  Limitations, that's penal under California law, and the one-year

14  Statute of Limitations applies.  It is crystal clear that that's

15  what they did in citing GHII and *Amenafee* in the Azoogle

16  decision and in the *Balsam* decision.

17        So, if you do as BSI urges, look at what you believe

18  the California Supreme Court would do in this context, you don't

19  need to look any further than *Azoogle* and *Balsam*, because they

20  cite the California Intermediate Appellate Courts, which have

21  already concluded what the test is under California law.  And

22  that is, are they seeking damages in addition to actual damages?

23        There's no question here they have quantified their

24  actual damages at 31,000.  Yet, they're seeking another what,

25  $106,670,000 divided by two, because you're in California, in

1    statutory damages which they have no basis whatsoever to concede

2    or to argue are actual in nature.  So under California, they

3    have to be penal and the one-year Statute of Limitations

4    applies.

5         Now, what do they do to try to distinguish these cases

6    that are dead on and dead against them?  Well, basically, they

7    ask the Court to ignore *Hypertouch* and *Balsam*, and then they

8    cite a bunch of inapposite Ninth Circuit cases evaluating

9    penalties and forfeiture statutes that are unrelated to this

10   internet statute.

11        In all of those cases, incidentally, Your Honor,

12   involve labor employment or ERISA, and are just rich with

13   jurisprudence out of the Supreme Court and otherwise establishes

14   what overtime wages and employment rights are, and why those are

15   actual damages in a context where an employee of disparate

16   bargaining power with difficulty in proving damages gets the

17   benefit of calling those actual damages.

18        These cases aren't anywhere near this internet context

19   where there is an actual claim to dis-quantify and a non-actual

20   claim that is purely statutory.

21        THE COURT:  What about the relevance of Maryland

22   Statute of Limitations?  This is a case decided --

23        MR. BALDRIDGE:  Okay, so we'll be going to Maryland --

24        THE COURT:  Well, but I need to understand distinction

25   between the two.  Suppose Maryland doesn't follow California,

1  what result?

2          MR. BALDRIDGE:  Suppose Maryland does not follow --

3          THE COURT:  The case law of California, is that going

4  to be dispositive of your argument regardless of what Maryland

5  might say about the Statute of Limitations?

6          MR. BALDRIDGE:  As to which one applies, Your Honor?

7          THE COURT:  Yeah.

8          MR. BALDRIDGE:  Well, I don't know, Your Honor.  That

9  was not briefed.

10          THE COURT:  Am I to understand that your argument is

11  that Maryland should apply the California Statute of

12  Limitations?

13          MR. BALDRIDGE:  That is indeed our argument.

14          THE COURT:  But Maryland doesn't have anything on that

15  particularly?  Is Maryland obliged to follow it or are you

16  saying it should follow it?

17          MR. BALDRIDGE:  I tell you right now, I don't know the

18  answer to that question.  I did not even know it was an issue in

19  the case until ten minutes before you walked through the door, I

20  was handed some cases by BSI.  I saw them out in the hall.  Been

21  out there 45 minutes.  Could have given them to me then, and now

22  they're trying to argue, I believe, that Maryland Statute of

23  Limitations applies.

24          THE COURT:  Well, as I looked at your papers, I'm

25  wondering why are we talking about California law.  Why aren't

1   we talking about Maryland law here?  California may well be what

2   you say, accepting that for argument purposes, but am I

3   constrained to apply that?  Does it have any relevance to

4   Maryland?  Why would that be?

5            MR. BALDRIDGE:  Because the issue was never raised or

6   briefed until ten minutes ago, I simply don't know.

7            THE COURT:  Why do you think California law is

8   dispositive?

9            MR. BALDRIDGE:  Your Honor, I think the reason is is

10  it's going to boil down to whether Statute of Limitations in

11  this case is procedural or substantive.  That's generally what

12  the cases look at.  I haven't evaluated the issue completely.  I

13  do know that I'm not seeing cases where the California Statute

14  7529.5 is applied with the Statute of Limitations of any state

15  other than California.  That doesn't answer your question.

16           THE COURT:  Well, is the essence, though, of the claim

17  by the plaintiff that it's, the violations have occurred with

18  regard to all of these, these alleged spams, that they are

19  violative of both California and Maryland law?

20           MR. BALDRIDGE:  That's exactly what --

21           THE COURT:  All right.  So, suppose they just went

22  with Maryland law, what would be the outcome there?

23           MR. BALDRIDGE:  Well, I think if they said it was only

24  a violation of Maryland law, would not have a California statute

25  at issue, I don't know what the analysis would lead to, but I

believe that would probably be that Maryland Statute of

Limitations applies.

THE COURT:  Well --

MR. BALDRIDGE:  I can't keep up with the shell game

that's moving this issue around on this.  I don't know what the

answer is as I stand here.

THE COURT:  Okay.

MR. BALDRIDGE:  It has not been briefed.  It was never

raised.  If it's raised at all, I can only tell by the cases

handed to me a few minutes ago whether they're going to raise

it, and I don't the answer.  And if that is important to the

Court, I'd ask for the opportunity to brief it.

THE COURT:  Well, I expect that's where plaintiff

wants to go on this case.  I'm guessing.

Mr. Barba, just tell me where are you on this matter.

MR. BARBA:  Well, Your Honor, it was thoroughly

briefed in terms of the *Williams versus Standard Federal Savings

and Loan* decision in the Maryland Special Appeals Court 1988.

And that is in the briefs in this case, and we say that Maryland

has explicitly considered the issue of whether the Statute of

Limitations in cases similar to this should be three year or one

year, and has gone in the three year direction.

And they clearly articulate in that case, which is

briefed in here and is addressed by both parties, that a, that a

penalty is when the state is seeking the damages for its, for

1   its own coffers and that plaintiffs when they are suing on their

2   own behalf have a three-year Statute of Limitations.

3           The only case that we handed this morning was one we

4   just became aware on which is *Master Financial* where the

5   Maryland highest court has now explicitly adopted the *Williams*

6   statute which we argued in our briefs.

7           So the news, the only new thing is that the highest

8   Court of Maryland has now --

9           THE COURT:  Before you go any further, I guess that

10  the short question I would like an answer to is, suppose

11  California law is as Mr. Baldridge says, what does that do to

12  your case?

13          MR. BARBA:  Well, Your Honor, there are claims under

14  the California statute in this Court, and the BSI case, and

15  there are claims under the Maryland anti-spam statute.  We

16  assert that the Maryland statute should govern both, or the

17  Maryland Statute of Limitations should govern both California

18  and the Maryland claims, but it's within Your Honor's discretion

19  to decide whether the California statute should apply for the

20  California claims and the Maryland statute should apply for the

21  Maryland claims.

22          We think it's worth considering that a court in

23  Maryland, courts in Maryland apply the procedural law of

24  Maryland when deciding what the Statute of Limitations should be

25  and you know that path, I'm sure, Your Honor.

THE COURT: All right. Go ahead.

MR. BALDRIDGE: Your Honor, just so we're clear and then I'll address your question directly. I think, number one, they have not briefed the issue. They briefed the issue over whether the Maryland Statute of Limitations applies to Maryland claims. You will not find in their briefs the argument that the Maryland Statute of Limitations applies to the California claims.

You can look at their briefs. I've looked at them, and maybe one case is new, but I got three cases this morning and I can't look at them on ten minutes notice truthfully. But moving to the Maryland statute, and we can argue that applicable to both California and Maryland. They rely completely on the intermediate appellate decision in *Williams*.

And as Mr. Barba has just said, their distinction in when the one year versus the three year applies, is that the one year applies only when the state's the plaintiff seeking damages that will be recoverable and will go to the coffers of the state. That's the line they draw in saying that the one year Statute of Limitations applies only that instance.

If you look at their briefs, they don't even mention the Fourth Circuit cases in *In Re: Brown* and *Early Learning*, don't even mention the cases by name, which both involved private plaintiffs recovering civil penalties under similar statutes that did not go to the coffers of the state and in both

1   instances, the Fourth Circuit applied the one-year Statute of

2   Limitations.

3          They just simply mention it in the sentence and say,

4   they're un-reported and they're not persuasive because they

5   didn't mention *Williams*.  That's all they said.

6          The Fourth Circuit has said that the distinguishing

7   feature is not whether or not the recovery goes to the coffers

8   of the states in *In Re: Brown* and *Early Learning*, and they have

9   done nothing, nothing to distinguish those cases.

10         THE COURT:  What were the states involved in those

11  opinions?

12         MR. BALDRIDGE:  The states?

13         THE COURT:  The states.  Were they state decisions?

14         MR. BALDRIDGE:  No, these were Federal Fourth Circuit

15  --

16         THE COURT:  No, I mean, they are federal decisions,

17  but --

18         MR. BALDRIDGE:  Under the Maryland Secondary Mortgage

19  Law *In Re: Brown* and under the Maryland Retail Installment Sales

20  Act in *Early Learning*.

21         THE COURT:  All right.  So they were basically --

22  well, I have to read those.  They were trumping Maryland law or

23  were they interpreting Maryland law for the first time.

24         MR. BALDRIDGE:  They were interpreting Maryland law.

25         THE COURT:  For the first time?

1         MR. BALDRIDGE:  I don't know whether it was the first

2   time or not.

3         THE COURT:  Well, here's the issue really.  I mean, in

4   the end, on any kind of substantive Maryland law, the federal

5   courts are bound by those, obviously, those decisions.  If it's

6   a federal court interpreting what it thinks Maryland law would

7   probably be, just as a matter of practice, a later Maryland

8   Court of -- even Special Appeals opinion would trump that.  So I

9   need to sort of see in sequence where these opinions lie.  I

10  can't answer that on the fly because I haven't read your cases

11  either.

12        MR. BALDRIDGE:  Interestingly enough, they are all

13  1988 decisions, so I don't know which one came later.  But the

14  bottom line is in both the Fourth Circuit decisions, they are

15  looking at Maryland law in deciding which Maryland Statute of

16  Limitations --

17        THE COURT:  Okay, but the point is it's the Federal

18  Court interpreting Maryland law.  There's no federal

19  constitution here that says, this is what must be done.  It's

20  the federal court reading its view of the Maryland law.  When

21  the Maryland courts finally talk about it, this Court is obliged

22  to follow what the Maryland courts say, not what the Fourth

23  Circuit said, if they were interpreting Maryland law earlier.

24  That's the progression.

25        So you may be citing '88 cases that really don't

1   really apply, but I'll have to look at them.  I can't decide

2   that, obviously, as you argue it now.

3        MR. BALDRIDGE:  And regardless of your obligation to

4   follow, none of these cases actually are looking at the MCMA.

5        THE COURT:  Later legislation, I understand that.

6        MR. BALDRIDGE:  It's all helpful, obviously, but it's

7   not necessarily binding on this Court.

8        Now, also in citing *Williams* they ignore that in the

9   *Williams* case, the plaintiff had waived the right to the

10  punitive element or the penal element; that's treble damages.

11  So the Court was not facing on the facts of that case in

12  *Williams* the same situation that it faces here where there is

13  both an actual damages claim and a statutory damages claim.

14       If you'll note in BSI's interrogatory response, they

15  do concede that the Maryland statute relieves them of showing

16  actual damages, so there is an admission in our view that we

17  don't have actual damages at issue here.  We have something else

18  and the Court needs to decide what that something else is, and

19  if that something else is, in fact, penal, we are in the

20  one-year Statute of Limitations.

21       And then I think if you look at the *Natural Design*

22  *versus Rouse* case, which is Maryland Supreme Court.  That case

23  holds that --

24       THE COURT:  Court of Appeals.

25       MR. BALDRIDGE:  Yeah, Court of Appeals.  That case

holds that an award of treble damages under the Maryland
Anti-Trust Statute is penal, even when the plaintiff is a
private party.

So, I think that's probably your best guidance from
the Maryland Court of Appeals as to what Maryland would do in
this context, although again it doesn't involve the statute
before the Court.

Finally, and I think we're well-briefed and I
encourage you to look at everything, make a decision based on
that. But the last thing is *Williams* says that the meaning of
the terms "penalty and forfeiture" are far from inflexible and
depend on the context in which they are used.

Now, I think you got to look at the context of this
case. We don't have a situation in this case where the
plaintiff does not know its actual damages. They're $31,000.
The context within which we're dealing is a situation where
there is absolutely no dispute that 106 million of what they're
seeking here is just windfall. It's pure windfall. Doesn't
come anywhere near damages. This is a company that hasn't made
a million dollars in five years, and they're claiming
106 million in damages.

So the context within, which we're in, that has to be
something penal, punitive, fine, forfeiture; you call it what it
is within the context of this case.

THE COURT: All right. Mr. Barba, are you going to

1   argue?

2         MR. BARBA: Thank you, Your Honor.

3         The first thing I'll say is that the *Master Financial*

4   *versus Crowder* decision of the Maryland Court of Appeals, I

5   think, trumps the Maryland issue. The highest court has spoken.

6   It has adopted the *Williams* case as the law of Maryland, and the

7   deficiency that Mr. Baldridge mentioned with respect to the

8   *Williams* case, with the waiver of punitive damages did not exist

9   in *Master Financial*, so that issue no longer exist as an

10   impediment, if it was.

11         The Maryland Special Court of Appeals concluded over

12   20 years ago that Section 5107 applies only to suits brought on

13   behalf of the state to enforce the states penal laws for its

14   financial benefit. And I think that's the key question for the

15   Court to consider under Maryland and under the new case.

16         The *Williams* Court went to a great deal of trouble to

17   track the issue historically back in Maryland for hundreds of

18   years and has said that, you know, Maryland policy is that if

19   the proceeds go to the, to the state, that it's penal; if the

20   proceeds go to the individual litigants, then they are not.

21         So, when you read the Maryland Anti-Spam Statute, it's

22   clear that it says either/or liquidated, or actual damages are

23   available to the plaintiff. Liquidated damages are a form of

24   remedial damage and actual damage says each of them are remedial

25   in nature and neither of them is punitive, and that's how we

1  read the statute and think under *Williams* the Court should read

2  the statute also.

3      The California law is much more difficult, I think.

4  And as Mr. Baldridge indicated, the, the courts are all over the

5  place in California in the intermediate courts.  The California

6  Supreme Court has not spoken with respect to whether a

7  three-year or one-year Statute of Limitation should apply to the

8  California Anti-Spam law.  But in fact, we urge Your Honor to

9  look at the California Ninth Circuit Court of Appeals decisions

10 that have over a very long period of time tried to answer the

11 question of penal versus remedial in the California context, and

12 examining various cases.

13      And so, set forth in our, in our brief, you'll see

14 references to the *Culver, Rivera* and *Stone* decisions, each of

15 them following the U.S. Supreme Court's decision *in Huntington*

16 from 1892, which is actually the same foundational statute, or

17 foundational Supreme Court case that the Maryland Courts have

18 always looked to to talk about whether a particular statute is

19 penal or remedial.

20      And when you look at the Ninth Circuit's perch going

21 from 1892 to 1944 in *Culver*, to 1984 in *Rivera*, and then the

22 California Supreme Court's recent case in *Kenneth Cole*, all of

23 these briefed to Your Honor --

24      THE COURT:  But now you are conceding that the

25 California based claims are, would be regulated by the

1    California analysis on that issue, or now are you saying that

2    maybe Maryland law would apply?

3        MR. BARBA:  I'm not conceding that, Your Honor.  My

4    primary position is that this Court should apply Maryland law to

5    the California claims because it's entitled to do so.  There are

6    courts in the state of Maryland and in this District Court who

7    have done the same thing, to look at the Maryland Statute of

8    Limitations as a procedural issue and apply Maryland law in

9    deciding what the Statute of Limitations should be under claims

10   of a foreign state.

11       It becomes trickier when the states -- I think what

12   you see in the decisions is it becomes much trickier when each

13   of the two states' Statutes of Limitations disagree with each

14   other.  So if the result would be a different Statute of

15   Limitations, say there was a four-year Statute of Limitations in

16   California but a three-year in Maryland, that makes the job of

17   the Court harder when it's judging the procedural issue.

18       But luckily in this case, the California has the same

19   issue.  They have the three-year Statute of Limitations for

20   remedial, one year for penal; and Maryland has three-year

21   Statute of Limitations for remedial and one year for penal.

22       So in applying Maryland law, there's no prejudice to

23   the parties in changing the applicable Statute of Limitations.

24   It's just the principle of which one to select.  And since the

25   test emanates from the same Supreme Court case that has been

followed by various courts in California and in the Ninth

Circuit, and here in Maryland with the highest court of

Maryland, we think that the Court would be less burdened and it

would be within its rights to apply the Maryland statute.

THE COURT:  All right.  Anything more on that issue,

Mr. Baldridge?  You want to respond?

MR. BALDRIDGE:  I just have a couple words.  I just

note that the *Master Financial* case, which Mr. Barba says

resolves issues dated June 9th, 2009, this is the case handed to

me right before the hearing.  Don't know why it was held from me

while I was out in the hall.  Maybe I could respond more

thoroughly if I had received it timely with some degree of

courtesy.

The second issue I would say is that, again, look at

the briefs.  There's been no argument that the Maryland Statute

of Limitations applies to California claims.  It's never been

contended.  Everything has been briefed otherwise.  This is a

brand new argument.  I don't know when it was developed, but it

was dropped upon us right before the hearing.

I do note, though, that Master Financial, although if

the Court finds it to be an important decision, I would like the

opportunity to brief it, but I will --

THE COURT:  I'll give you two weeks to do that,

because I'm going to have to take this issue under advisement

anyway.  I can't decide it today anyway.  So you can file it

1    within two weeks, 14 days, a supplemental response.  And you can

2    reply within ten days after.

3          MR. BARBA:  Thank you, Your Honor.

4          THE COURT:  All right.  Nothing more on that issue.

5    Let's go to the motions relative to the third-party complaint,

6    and we have a Motion to Dismiss that I believe.

7          MR. BARBA:  Yes, Your Honor.  Thomas Barba appearing

8    for Hypertouch, Inc.  With respect to Hypertouch's Motion to

9    Dismiss the Amended Third-Party Complaint for Indemnification

10   brought by primarily responsible defendants Connexus and Hydra

11   Media.  Hypertouch moves to dismiss because it asserts that it's

12   immune under the Communications Decency Act, and furthermore

13   that it's not a proper target of an indemnification claim under

14   Maryland law.

15         Your Honor, I think you're familiar from prior

16   decisions with the *Zeran* standard, which is the Fourth Circuit

17   test for whether the Communications Decency Act applies with

18   respect to a particular set of facts.

19         In this situation, Hypertouch, Inc. is a California

20   company.  It's an internet service provider and it has a

21   business arrangement with Beyond Systems, Inc. whereby it routes

22   the internet mail messages from Hypertouch's facilities in Menlo

23   Park, California to Beyond Systems' facilities in Maryland.

24   That is a business arrangement between the two parties and

25   Beyond Systems is -- Hypertouch in this case is no different

than, in our view, than any other internet service provider who is routing mail messages through a corporate arrangement.

The, the *Zeran versus AOL* has a three-prong test. First, the defendant must be a provider or user of interactive computer services. A holding that the provider will be liable to make service providers liable for information originating from a third party has to be applicable. And then the information in question must be provided by, under their information content provider.

Boiling this down, Your Honor, the Communications Decency Act is intended to protect internet service providers for gaining liability for doing their job of passing electronic mail and other information as a pipeline provider. That's what Hypertouch is doing in this case. It does not add content, amend content, change the electronic mail messages, exercise editorial authority. It has an agreement to move the e-mail that comes for BSI's purposes in California and to send that e-mail to Maryland, and it does that.

So under the Communications Decency Act, it is --

THE COURT: Do they go out looking for potential spam and send it to BSI?

MR. BARBA: No, Hypertouch's only obligation is to, in essence, raise the BSI flag on the internet. So when e-mail is directed to internet service provider like Beyond Systems, it has to ask to have its mail delivered somewhere. So it sets up

1    its account so that all its mail flows into a central point,

2    just like AOL does, just like anybody else does who is an ISP.

3            So, the way Beyond Systems operates is that it asks

4    Hypertouch who has the facilities to do it to be the receipt

5    point for its mail, and then it routes that mail ISP to ISP here

6    to Maryland.

7            THE COURT:  Is it your contention that all the alleged

8    spam in this case was really directed toward BSI independently

9    of Hypertouch?  It just happened to fall into their lap?

10           MR. BARBA:  Well, it is directed to BSI, Your Honor,

11    because BSI is the owner of the domain Hypertouch.com.  So any

12    e-mail which is directed to Hypertouch.com is directed to a

13    BSI-owned facility.  So Hypertouch is -- and the names can be

14    confusing here.  So Hypertouch, Inc. owned by Mr. Wagner's

15    brother in California, is its own company.  It's called

16    Hypertouch, Inc., but the Hypertouch.com domain is owned by BSI

17    in Maryland.

18           THE COURT:  How do they come to get 50,000 plus spam

19    messages?  That's a big number.

20           MR. BARBA:  Well, it's actually millions per day.

21    It's just 50,000 plus pertain to these particular defendants,

22    and spam -- you know, it's well understood that spam comprises

23    over 95 percent of all e-mail sent.  So, it's not a surprise

24    that there'd be this much spam coming addressed to

25    Hypertouch.com, just like there's spam addressed the U.S. Courts

1  or to Steptoe and Johnson, or to Venable.

2  THE COURT:  Does Hypertouch do anything besides work

3  with BSI?

4  MR. BARBA:  Sure, Your Honor.  Hypertouch is a company

5  in California that works in the area of haptic peripherals.

6  It's owner is a graduate doctoral degree candidate from Stanford

7  and he works in the area of creating artificial intelligence and

8  artificial limbs with sensory perception.

9  He is an internet advocate, internet -- has his own

10  internet service provider operation, has its own customers and

11  services those customers.  So he is an ISP in his own right, and

12  his brother here in Maryland is an ISP --

13  THE COURT:  You're asking for judgment as a matter of

14  law in effect on that proposition?

15  MR. BARBA:  Well, I think you don't have to reach

16  those points other than looking at the, at the third-party

17  complaint.  The Amended Third-Party Complaint in of itself

18  alleges all these facts.  And so you take those facts as true.

19  I shouldn't say all these facts, because I was

20  answering your question, Your Honor, but there are sufficient

21  facts in the Amended Third-Party Complaint to make all the

22  points necessary under the Communications Decency Act rule in

23  Hypertouch's favor.

24  THE COURT:  Well, is there some question about whether

25  these defendants really are bona fide internet service provider,

1   and whether they aren't in effect in league with BSI to kind of

2   manufacture lawsuits?  I mean, that's one of the allegations.

3   And I must tell you in candor, BSI has litigated a lot in this

4   court, and I don't know what else BSI does besides file these

5   suits, but it did raise a flag with me to see them back here yet

6   again with other claims, and I'm wondering what else they do

7   besides file lawsuits.

8           MR. BARBA:  Well, they are an internet service

9   provider and they have customers, and they service those

10  customers, Your Honor.  They meet the standards for an ISP under

11  the Communications Decency Act, and under the anti-spam statutes

12  both.  That is, that they have facilities --

13          THE COURT:  Well, let me put the question to you this

14  way:  Suppose they do meet technically some definitions, but in

15  fact it could be established in the course of discovery that

16  they really had an understanding with BSI to try and call all

17  these potential spam messages and feed them to BSI so that BSI

18  could file lawsuits based on them, which is what they're saying.

19  Suppose they could put that out there in the record before a

20  trier of fact.  Don't you think that that might affect the

21  finding of the bona fides of your client?

22          MR. BARBA:  It's certainly an issue which has been

23  brought up by our opponents in the lawsuit, Your Honor, but in

24  fact both companies have subscribers and both --

25          THE COURT:  Yeah, but you're here for Motion for

 1   Summary Judgment.  That's where we are now.  I'm not saying you

 2   don't prevail on that point.  At some point you're asking me as

 3   a matter of law now to dismiss the complaint.  And I'm really

 4   raising with you is there maybe some issue here that really in

 5   fairness needs to be discovered and litigated.

 6          MR. BARBA:  Well, Your Honor, I think there's enough

 7   for you to grant the motion.  I think the facts won't change

 8   after discovery.  I know it's going to be, likely be hotly

 9   disputed, but the definition is simple under the CDA.  "Any

10   information service system or access software provider that

11   provides or enables computer access by multiple users to a

12   computer server, including specifically a service or system that

13   provides access to the internet."  And --

14          THE COURT:  Slow down a little bit for the reporter to

15   stay with you.

16          MR. BARBA:  I'm sorry.  I do that.

17          Should I read again?

18          "Any information service system or access software

19   provider that provides or enables computer access by multiple

20   users to a computer server, including specifically a service or

21   system that provides access to the internet."  And so what I'm

22   saying, Your Honor, is that Hypertouch clearly meets that

23   standard.  It has been found by other courts to meet that

24   standard.  So, I think under the CDA analysis, you're within

25   your rights if you decided to do so.

1          THE COURT:  Have's they been so found on, after -- on

2   the basis of a Motion for Summary Judgment or after discovery,

3   or what?

4          MR. BARBA:  Well, there's a decision, *Hypertouch*

5   *versus Kennedy-Western*, which we've cited in our briefs, Your

6   Honor, where in a contested proceeding they were found --

7          THE COURT:  In a contested proceeding?

8          MR. BARBA:  Yes, Your Honor.

9          THE COURT:  Not on summary judgment.

10         MR. BARBA:  I think that's correct.

11         THE COURT:  Well, all right.  We'll see.

12         MR. BARBA:  I'm not positive, Your Honor.

13         THE COURT:  All right.  That's the key issue right

14  now, whether there's going to be a contested proceeding or

15  whether it goes out on, as a matter of law.

16         MR. BARBA:  It wasn't default judgment.  It was on a

17  motion, Your Honor, I'm pretty sure.

18         THE COURT:  All right.  You want to hear response on

19  this or --

20         MR. BARBA:  Sure, Your Honor.

21         THE COURT:  All right.  Mr. Rothman.

22         MR. ROTHMAN:  Yes, thank you, Your Honor.  I want to

23  preface what I'm about to say by the fact that I'm mindful that

24  we're on a Motion to Dismiss, and that we're not really supposed

25  to go outside the record.  But in response to plaintiff or

1 Hypertouch's counsel, I sort of have to do that to put things

2 into perspective and to let you know where this is going.

3       The first thing as regarding the CDA is that the facts

4 in this case, and we'll be able to show this in discovery and

5 we've actually put some of it before the Court, is that

6 Hypertouch is not acting as an intermediary like AOL was in

7 *Zeran*.  What happened here is that Hypertouch asked plaintiff,

8 will you archive for Hypertouch.com.

9       Included in that request or maybe it morphed into

10 something else.  The record is a little bit unclear about that.

11 But what that eventually morphed into was an agreement whereby

12 Hypertouch would route to plaintiff e-mails addressed to other

13 domain names owned by Hypertouch.  And so in that sense, there

14 is no credible argument that any of those e-mails were intended

15 for the plaintiff.

16       So, again, this is an agreement that they reached

17 where --

18       THE COURT:  They, now, let's be clear.  The plaintiff

19 BSI?

20       MR. ROTHMAN:  Yes.

21       THE COURT:  And Hypertouch, all right.  Go ahead.

22       MR. BALDRIDGE:  Right, Hypertouch asked plaintiff,

23 will you archive the mail and Beyond Systems said, yes.  And in

24 fact, and we put this in, I think it's Exhibit Three, which is

25 Joe Wagner's deposition transcript at Pages 301 and 302,

Hypertouch admits that Beyond Systems is the one doing the service for Hypertouch and not AOL doing service for the customer. They don't have the exact line -- it's not lined up right as is necessary for the CDA to apply.

And the CDA, the Communications Decency Act was intended to insulate the true intermediary from liability. Those just aren't the facts here. So, that's one point I wanted make, and it's also a factual issue which we don't believe can be addressed on a Motion to Dismiss.

The other issue that was raised, excuse me, is Hypertouch doesn't change the content. We actually don't know that. That's another hotly contested issue in this case. We've had several days of deposition. Our expert has put forth a thousand pages of expert reports on this. Plaintiff has admitted, or Beyond Systems has admitted there are certain alterations that are going on in these e-mails as they come in to Hypertouch and end up with Beyond Systems, and the full extent of those alterations is unknown.

We don't know it sitting here today. We're getting all kinds of different stories. What's undisputed is that there are alterations, and we do not know the full extent of those alterations or even get the tip of the iceberg back when we filed the third-party complaint in March, but we certainly have enough of a basis to allege that now through an amended pleading.

1          Now, you also asked, does Hypertouch do anything to

2    attract this spam?  The answer is, yes.  There's two things that

3    we know of, one of which we just discovered last week through

4    plaintiff expert, Resnick.  And what they did, what Hypertouch

5    did some years ago is published on its internet website, I don't

6    know if it's dozens or hundreds, but it's a lot of e-mail

7    addresses that belong or are somehow associated with Beyond

8    Systems.

9          And what that does is is that broadcasts to the

10   e-mailers of the world, these are existing e-mail addresses and

11   there's these automated things, for lack of a better word,

12   they're called web crawlers, that go around and pick up these

13   addresses.  There's no question that that is a spam trap.

14   Plaintiff's expert admitted, that is a spam trap, and that is

15   something that Hypertouch did.  So, there are indications, at

16   least with respect to that, that show that Hypertouch is

17   attracting these e-mail.

18          The other thing that Hypertouch and plaintiff does,

19   for that matter, is they configure their mail servers to receive

20   anything that comes before the "at" signal in the domain name.

21   So you could lean on your keyboard and it would end up in one of

22   their e-mail boxes and then they save it indefinitely.  And

23   these are saved in e-mail archives.  Plaintiff refers to them as

24   gold in a deposition exhibit, and then he goes and calls these

25   e-mails from those archives.

1    THE COURT:  He being who?

2    MR. ROTHMAN:  Paul Wagner, the plaintiff.

3    So, there are things that discovery will show and has

4 shown that Hypertouch and plaintiff are doing things to attract

5 these e-mails.

6    Now, the other issue, and I think it's clear from our

7 briefs, is that Connexus and Hydra aren't seeking to hold

8 Hypertouch liable for the content of these e-mails.  In other

9 words, we're not saying that they created the ad copy and are

10 responsible for some false claim that appears in that e-mail or

11 what have you.

12    In fact, the contents aren't really even at issue in

13 this lawsuit, because plaintiff didn't download them.  In other

14 words, plaintiff has these e-mails, but he never downloaded the

15 images associated with those e-mails.  He instead requested that

16 we provide them in discovery.  So the content really isn't the

17 issue.  What the issue is, is the e-mails are caused to be sent

18 by Hypertouch.  It's the causation element.

19    It's not expressed in the statute, but it's a

20 statutory tort.  There has to be a causation element there.  And

21 we are contending that Hypertouch is the one that is causing

22 these e-mails to be sent to plaintiff.  Plaintiff itself is

23 causing these e-mails to be sent to plaintiff.  They had this

24 agreement where they knew that they would get these e-mails and

25 it would be at least, 99 -- I think at various years it was 95.

1   I think as the years progressed, it went up somewhere between 99

2   and a hundred percent.  They knew they were going to get them.

3           So this isn't a situation where there's a defamatory

4   statement in an e-mail and somebody is trying to hold somebody

5   liable for the actions of the defamatory statement.  That's not

6   what's going on here.

7           You also don't have the intermediary sending that

8   defamatory statement to the party.  In this case, Hypertouch is

9   not acting -- act as intermediary.  Beyond Systems is doing

10  Hypertouch the service.

11          And then, of course, as Your Honor correctly pointed

12  out, we don't believe that Hypertouch is within the class of

13  entities that the CDA designed to protect.  The CDA was designed

14  to protect intermediaries, so that intermediaries would not get

15  hit for, you know, claims like defamation, tortious interference

16  with contract, those sorts of things.

17          If Hypertouch is immune from liability, then that is

18  akin to saying, if you run a mail server, no matter what you do

19  with it, you can do anything you want with it without

20  repercussions.  That can't be what Congress intended.  And we've

21  cited cases, *Doe versus New York*, I believe is one of them, *Doe*

22  *versus New York*, because if that were the result, then according

23  to *Doe versus New York*, doing so would exempt virtually all

24  internet use from liability expanding the statute's reached

25  beyond that which Congress intended.  And that's exactly what

1   they're asking you to do.

2        We also filed with respect to this Motion the *Gordon*

3   *versus Virtumondo* case, Ninth Circuit case which basically said,

4   there isn't a black and white test for this.  You really have to

5   delve into the facts.  And are the facts such that the plaintiff

6   is within the class of entities that the statutes were designed

7   to protect.

8        *Farron versus Echostar*, another case we cite in our

9   brief.  Same issue.  They want the black and white test.  We say

10  the black white test isn't appropriate, and it requires a

11  factual inquiry into what's really going on here.

12       So, for all these reasons and as you can tell, I

13  raised a lot of factual issues, we think that this motion should

14  at least be deferred and additional discovery undertaken so that

15  we have a full factual record before making a decision on this

16  issue.

17       THE COURT:  All right.  Mr. Barba.

18       MR. BARBA:  Your Honor, I know you have to leave.

19  I'll be very fast, if I might.

20       THE COURT:  Go ahead.  Sure.

21       MR. BARBA:  Thank you.

22       I failed to address in my opening argument the part of

23  the briefs regarding whether or not indemnification claim can

24  lie in the state of Maryland in this circumstance.

25       THE COURT:  Let me short-cut you on that, because I

1    don't know that I need to reach that issue now.  I want to see

2    whether your basic presence in the case continues or not, or

3    whether their claim in effect goes forward.  Damages we can talk

4    about if, as and when.  So don't spend a lot of time on that

5    really right now.

6            MR. BARBA:  That's fine, Your Honor.  Then I would

7    just say that the *Pyramid Condo* case is the one that I would

8    encourage you to look at.

9            The arrangement that we're talking about, that

10    Mr. Rothman is talking about, and that we've been talking about

11    between Hypertouch and BSI long predated any of the anti-spam

12    statutes.  This is clearly not contrived to find spam to sue on.

13    It's a pre-existing business relationship.

14            The idea that Hypertouch publishes internet mail

15    addresses on its website was from a 2005 screen shot of its

16    website.  And at the time, they were required to do that by then

17    existent California law if they wanted to be able to pursue

18    remedies for those.

19            So they put boldly for all to see those internet

20    e-mail addresses that they were declaring to be off limits

21    merely in compliance with law, and was in their legal compliance

22    portion of the website.

23            That's all I have, Your Honor.

24            THE COURT:  All right.  You don't need to reply,

25    Mr. Rothman, on this.

1          MR. ROTHMAN:  Thank you, Your Honor.

2          THE COURT:  All right.  I can give you this decision

3    from the bench.  The Court considers the Motion to Dismiss or in

4    the alternative, Partial Motion to Dismiss by Wagner and

5    Hypertouch, Inc.

6          Just by way of background, the Court hasn't recited

7    this previously, but this is a case in which Beyond Systems,

8    Inc., plaintiff, a server that receives and delivers e-mails to

9    its original business subscribers has brought suit again Kraft,

10   Engwall, and certain John Does, alleging that the defendants

11   violated both Maryland and California Anti-Spam Statutes by

12   conspiring to transmit thousands of unsolicited spam e-mails

13   advertising Gevalia, G-E-V-A-L-I-A.

14         Kraft owns Gevalia, the brand name, and Engwall, a

15   subsidiary of Kraft.  Kraft owns the domain names Gevalia.com,

16   and Join Gevalia.com which Engwall uses for online promotions.

17         In the Second Amended Complaint, the plaintiff alleges

18   that Connexus Corporation and Hydra Media Group assisted the

19   defendants in sending Gevalia e-mails from California to

20   Maryland.

21         There are further allegations about how the violations

22   occurred, but there are some 50,000 plus e-mails that are

23   allegedly in play.

24         According to discovery that's taken place so far, in

25   excess of 90 percent of the e-mails were sourced to Joe Wagner

1  and Hypertouch, Inc.  Connexus and Hydra have filed a

2  third-party complaint against Paul Wagner and Hypertouch,

3  Hypertouch seeking indemnification contribution.

4       The allegation is that Paul Wagner is the brother of

5  Joe Wagner, who is the owner of Hypertouch, and the Third-party

6  Complaint essentially alleges that Wagner asked BSI to receive

7  and store e-mails that were to be received by Wagner/Hypertouch,

8  and a high percentage of the e-mails that BSI agreed to receive

9  in excess of 90 percent allegedly were spam.

10      Connexus and Hydra have contended in the litigation

11  that BSI received these e-mails because of wrongful conduct of

12  Wagner/Hypertouch.  And again, the suggestion is that the Wagner

13  brothers are in the business of manufacturing lawsuits and that

14  Hypertouch is merely a facade, or an arrangement whereby Joe

15  Wagner can operate.  And it has been apparently established in

16  discovery that Joe Wagner has filed multiple lawsuits relating

17  to spam.

18      The essential claim, as I said, is that this Motion to

19  Dismiss should be granted, because they're preempted by the

20  Communications Decency Act, and barred by Maryland and

21  California statutes.  There's an elaborate discussion about how

22  the Communications Decency Act immunizes someone such as

23  Hypertouch from liability, because of their status as a provider

24  or user of interactive computer service, and this would make

25  service providers liable for information originating with a

third-party user of the service.  Citing the *Zeran versus America Online* case at 129 F.3d 327 at 330 in particular, a Fourth Circuit case from 1997.

Again, this is a Motion to Dismiss or Partial Motion to Dismiss, but the allegations are that Joe Wagner, Hypertouch sent BSI virtually all the e-mails to go forward with this lawsuit and that Joe Wagner has admitted on deposition filing at least 16 lawsuits in his personal capacity, and 25 in Hypertouch's name; that according to the third-party plaintiffs, the Communication Decency Act does not preempt claims against such as Hypertouch in this third-party complaint.

And again, that is -- essentially it's something of an answer that the plaintiff itself has manufactured this litigation, perhaps even invited this, this spam to be sent to it so that it could file litigation.

And the ultimate issue, in fact, is whether Hypertouch is an interactive computer service provider under the CDA.  And there's arguments that Hypertouch have added to the original content of the e-mails.

In short, the suggestion is by the third-party plaintiff that all the arguments raised by the third-party defendants are factual issues that cannot be resolved on a Motion to Dismiss, and the Court agrees that the Motion to Dismiss in whole or part is denied, and that discovery should go forward on that point as appropriate, and we'll see where we are

1  as to that.

2        Now, Mr. Rothman, something more you want to say on

3  that?

4        MR. ROTHMAN:  I'm sorry?

5        THE COURT:  You were sort of leaning forward with

6  anticipation like you wanted to say something.

7        MR. ROTHMAN:  No, thank you, Your Honor.

8        THE COURT:  Okay.  Well, I'll deny the motion, enter

9  an order today.  The other motion that we heard, I'll give, as I

10  said, two weeks to the defendants to respond to the case that,

11  the *Master Financial* case that was filed the last minute, ten

12  days to reply by the plaintiff.

13        Now, is there anything else we have before us this

14  morning?

15        MR. BALDRIDGE:  No, Your Honor.

16        MR. ONORATO:  No, Your Honor.

17        THE COURT:  All right.  So we made it at 1:01 or 1:02.

18        All right.  Thank you, counsel.

19     (Recess at 1:01 p.m.)

20

21

22

23

24

25