IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| BEYOND SYSTEMS, INC. | : | |
| | : | |
| Plaintiff, | : | Case No. 8:08-CV-00409-PJM |
| | : | |
| v. | : | The Honorable Peter J. Messitte |
| | : | |
| KRAFT FOODS, INC., et al., | : | Magistrate Judge Charles B. Day |
| | : | |
| Defendants. | : | **REDACTED** |
| | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................ 1

II.  UNDISPUTED FACTS .............................................................................................. 3

    A.  Beyond Systems Is a Lawsuit Factory, Not a Legitimate ISP .................................... 3

    B.  BSI Captured Alleged "Spam" by Deploying "Spam Traps.\ ..................................... 5

    C.  Paul Wagner/BSI Executes the Final Steps to Manufacture This Suit ........................ 7

III. ARGUMENT ............................................................................................................. 10

    A.  BSI Lacks Standing ................................................................................................. 10

    B.  BSI Consented to Receive the Emails ...................................................................... 17

    C.  BSI's Claims are Preempted by CAN-SPAM ........................................................... 19

        1.  CAN-SPAM Preempts State Law Claims Other Than for Fraud ........................ 20

        2.  BSI's Claims Are Preempted Because They Do Not Involve Fraud .................... 24

           i.  BSI Cannot Prove Reliance .......................................................................... 24

          ii.  BSI Cannot Prove Damages Resulting from Reliance ................................... 26

         iii.  BSI Cannot Prove Any Misrepresentation as a Matter of Law ..................... 26

         iv.  BSI Cannot Prove Defendants Had Knowledge or Intent ............................. 32

    D. Many of BSI's Claims Fall Outside the Purview of the Statutes at Issue ................. 33

    E.  BSI Cannot Recover Damages Under Both State Statutes ......................................... 34

IV. CONCLUSION .......................................................................................................... 36

Defendants and Third-Party Plaintiffs Connexus Corp. and Hydra LLC respectfully submit this memorandum of law in support of their Motion for Summary Judgment.

## I.    <u>INTRODUCTION</u>

By this action, Plaintiff Beyond Systems, Inc. ("BSI") and its sole employee Paul Wagner ask this Court to validate BSI's admitted business plan of deploying "spam traps" to capture and save alleged "spam" and then sue over it to seek windfalls in statutory damages as a means of putting cash in its and its lawyers' pockets.  Indeed, "[a]ll of BSI activity sort of relates to litigation," BSI has already manufactured 25 lawsuits similar to this one, ███████████████ ████████████████████████████ and BSI is suing over thousands of emails that Paul's brother Joe Wagner, the sole employee of another sham ISP named Hypertouch, already sued over.

Tellingly, BSI has not prevailed on any of the actions it has initiated.  And, this case fares no better.  Quite simply, there is no genuine issue of material fact, and Connexus and Hydra are entitled to summary judgment as a matter of law for the following reasons.

First, BSI lacks standing.  The California and Maryland email statutes provide a limited right of action to internet service providers to redress harm caused by fraudulent emails.  Here, BSI is not an internet service provider within the purview of either statute but instead is a litigation factory that affirmatively collects emails to seek windfalls in statutory damages, an activity not covered by the statutes under which BSI sues.

Second, all of BSI's claims are barred because BSI took affirmative steps to capture all the alleged "spam" upon which its claims are based, thereby consenting to its receipt.  Among other things, Paul Wagner/BSI deployed "spam traps" to capture as much email as possible by creating email accounts that have no corresponding end user, redirecting emails intended for

others to himself knowing that the emails would be "spam," and publishing email addresses on public websites at capture "spam." Further, Joe Wagner/Hypertouch sent to Paul Wagner/BSI, and Paul Wagner/BSI expressly agreed to receive, tens of thousands of emails over which BSI now sues, and knew that such emails would be alleged "spam."

Third, BSI's claims are preempted under binding Supreme Court and Fourth Circuit precedent because BSI cannot prove common law fraud as it is must do to survive CAN-SPAM's express preemption clause. Foremost, Paul Wagner/BSI was never misled, and cannot show detrimental reliance or injury resulting from the emails. Indeed, Paul Wagner/BSI did not even try to purchase any products or services advertised in the emails much less do so as a result of any alleged falsity in the emails. Instead, after filing this lawsuit, Paul Wagner/BSI used computer programs to search for emails that he believed might be false in a desperate attempt to fabricate being misled and thus avoid losing this suit for failing to establish an essential element of common law fraud.

Fourth, many of BSI's claims fail as a matter of law even if they are not preempted because the conduct BSI alleges is not prohibited by the California or Maryland email statutes.

Finally, BSI cannot seek statutory damages under *both* the California and Maryland statutes for each email. Thus, at a minimum, Connexus and Hydra are entitled to an order limiting BSI's statutory damages to $1,000 per email.

For these reasons and as set forth more fully below, Connexus and Hydra respectfully request that the Court enter an order granting summary judgment in their favor.[1]

---

[1] Currently pending with the Court is the Motion for Partial Summary Judgment that Connexus and Hydra filed on the ground that the majority of BSI's claims are barred by applicable statutes of limitation.

## II.   UNDISPUTED FACTS

### A.   Beyond Systems Is a Lawsuit Factory, Not a Legitimate ISP.

BSI alleges that affiliates of Connexus and Hydra sent to BSI approximately 75,000 emails that violate California and Maryland law. (DE# 52 at ¶¶ 43, 48-50.)  BSI claims that it suffered $31,000 in actual damages because it used resources to receive and store these emails and millions of others unrelated to any party in this case, yet maintains that it is entitled to a staggering $150,000,000.00 in statutory damages alone ($1,000 per email in statutory damages under each statute at issue).[2]  Thus, BSI alleges, and will have to prove at trial, that each of the 75,000 emails constitutes a separate violation of each state law. (DE# 52 at ¶¶ 73, 88.)

BSI is not an internet service provider but instead is a lawsuit factory, having already manufactured 25 lawsuits seeking tens of millions of dollars in statutory damages over commercial email that Paul Wagner/BSI captured and stored. (Ex. 1,BSI's Second Response to Hydra's Interrogatory No. 6; Ex. 2, P. Wagner Dep. 1299:12-17.)  Indeed, Paul Wagner admits that "[a]ll of BSI activity sort of relates to litigation," and has spent "a good 40 hours a week at least" working on litigation and in some weeks "well over 40." (Ex. 2, P. Wagner Dep. at 30:21-31:15; 162:8-10; 628:12-629:4; Ex. 3, P. Wagner/Keynetics Dep. at 749:10-13; Ex. 4, P. Wagner/Dynamic Dep. at 5:21-6:1; 71:20-72:13.)  Despite his efforts, Paul Wagner/BSI never obtained a favorable verdict on the merits, but has managed to extort ███████ in lawsuit settlements since 2005. (Ex. 5, P. Wagner/ValueClick Dep. at 127:5-10; Ex. 6, BSI Responses to Kraft Interrogatory Nos. 12 & 14.) ████████████████████████████████████ ████████ (Ex. 6, BSI Responses to Kraft Interrogatory Nos. 12 & 14; Ex. 7, Exhibit A to BSI's Third Response to Connexus's First Set of Interrogatories.)

---

[2]   Connexus and Hydra reserve their rights to challenge the amount of this damages award if it is later imposed.

Third-Party Defendant Joe Wagner is Paul Wagner's brother, and is the sole employee and shareholder of Third-Party Defendant Hypertouch, Inc. (Ex. 8, J. Wagner Dep. at 134:22-25; 139:19-24; 142:5-7.) Like BSI, Hypertouch is not a legitimate internet service provider but is instead a lawsuit factory that affirmatively collects emails and then sues on them. (Ex. 8, J. Wagner Dep. at 168:15-169:15; 189:8-192:5; 283:12-287:22.) In fact, Joe Wagner admitted that he filed at least 41 lawsuits, and that he spent a "significant" amount of time "engaged in the pursuit of litigation or potential litigation." (Ex. 8, J. Wagner Dep. at 168:15-172:5; Ex. 9, J. Wagner/Valueclick Dep. at 35:12-17.) Although Joe Wagner/Hypertouch has recovered ███████ in litigation proceeds, Hypertouch's revenue from other sources totals about ████ ████ (Ex. 10, J. Wagner/Kraft Dep. at 110:1-112:14.)

Paul Wagner/BSI and Joe Wagner/Hypertouch manufacture lawsuits together:

> The Hypertouch "business" operated by Mr. Wagner seems primarily for his own benefit and that of his brother… [Joe] Wagner proudly proclaimed in the hearing that he has intentionally configured his email system and "service" so as to capture all "spam" sent to him and the non-operational email in-boxes on his system. He routes this "spam" to his brother for further analysis and possible claims against the malefactors.

(Ex. 11, Final Award of Arbitrator at 10-11.) In fact, the Wagners even sue over identical emails, as Paul Wagner/BSI is suing here over thousands of emails that Joe Wagner/Hypertouch already sued over. (Ex. 12, P. Wagner/Kraft Dep. at 137:17-138:4; Ex. 2, P. Wagner Dep. at 145:2-146:10; Ex. 13, J. Evans Report at 13.) And, the Wagners openly admit that they litigate to maximize recovery of statutory damages as evidenced by the following email exchange between these brothers:

> At 04:01 AM 12/3/2004 -0800, you wrote:
> >(FYI -- I called your cell phone several times tonight, but only reached
> >your voicemail.)

> Sorry, I went to bed early, except for a drink of water, where I
> mailed out the sample spam.
> > Wouldn't that recovery be twice as large if we teamed up?
> >I forget the logic behind his possible reluctance to sharing
> recovery…
> Tentatively, we could get $1375 per spam.  BS should get $500. So
> that's 100% of 1375, versus 50% of $1875 (i.e. = %100 of $937.5)
> or roughly 1/3 less if we split 50-50% than if we get 100% and we
> get award the max damages.
> Joe

(Ex. 14, at BSI-K0002950.)  Thus, the Wagners "benefit" from receiving and saving alleged

"spam" for lawsuits, as they have already recovered over ████████ in their litigation

endeavors. (Ex. 8, J. Wagner Dep. at 207:14-210:23; Ex. 10, J. Wagner/Kraft Dep. at 104:13-15;

Ex. 6, BSI Responses to Kraft Interrogatory Nos. 12 & 14.)

### B.   BSI Captured Alleged "Spam" by Deploying "Spam Traps."

BSI is not an innocent victim of unsolicited "spam."  Rather, Paul Wagner/BSI created

email archives called "Gold," and with his brother Joe Wagner/Hypertouch, intentionally

captured and filled the archives with as much email as possible to turn the "Gold" archives into

cash. (Ex. 2, P. Wagner Dep. 1299:12-17; Ex. 10, J. Wagner/Kraft Dep. at 91:12-92:15; 142:21-

143:1; Ex. 12, P. Wagner/Kraft Dep. at 304:3-304:16; Ex. 9, J. Wagner/ValueClick Dep. at

163:15-20; 164:19-23.)

First, Joe Wagner/Hypertouch "set up some e-mail addresses as part of its investigative

efforts to identify who the spammers are," "submitted nonsensical addresses and e-mail

addresses" to websites, and provided email addresses to opt-out lists knowing that alleged

"spam" would be sent to such addresses. (Ex. 15, J. Wagner/PrimaryAds Dep. at 118:24-120:7;

Ex. 8, J. Wagner Dep. at 460:13-462:14.)  Joe Wagner/Hypertouch then trapped emails and sent

them to Paul Wagner/BSI for lawsuits.  For instance, one of the addresses used to trap "spam" –

tellingly named "gotcha@hypertouch.com" – is at issue in the emails here, and was created by

5

Joe Wagner/Hypertouch "for –on behalf of BSI." (Ex. 2, P. Wagner Dep. at 351:7-21; Ex. 15, J. Wagner/PrimaryAds Dep. at 115:18-116:1; Ex. 5, P. Wagner/ValueClick Dep. at 134:23-135:4; Ex. 16, H17207; Ex. 17, C5535.)

Second, Paul Wagner/BSI and Joe Wagner/Hypertouch publicly published BSI email addresses on the Internet for the sole purpose of receiving alleged "spam" and filing lawsuits: "The idea that Hypertouch publishes internet mail addresses on its website was from a 2005 screen shot of its website.  And, at the time, they were required to do that by then existent California law if they wanted to be able to pursue remedies for those." (Ex. 18, 10/19/09 Hrg. Trans. at 36:14-18; Ex. 4, P. Wagner/DynamicLife Dep. at 4:10-13; 84:16-85:4.)

Third, the Wagners created "wild card" email accounts so that any email addressed to "wild card" addresses would be received and saved. (Ex. 2, P. Wagner Dep. 140:13-141:3; 354:7-11; Ex. 3, P. Wagner/Keynetics Dep. at 301:10-304:20; Ex. 5, P. Wagner/ValueClick Dep. at 117:21-118:7; Ex. 8, J. Wagner Dep. at 181:11-24; 184:6-24; 189:8-192:9; 190:7-18; 284:4-16.)  BSI's expert Klensin testified this practice is designed to trap spam. (Ex. 19, J. Klensin Dep. at 190:16-17; 196:3-10.)

Fourth, Paul Wagner/BSI redirected emails intended for others to himself knowing that they would be "spam."  For example, Peter Wagner, Paul Wagner's brother, abandoned an email account because it "was receiving so much spam that it became unusable for him," but rather than closing the account, Paul Wagner redirected and saved emails to himself and injected some of them into this case. (Ex. 2, P. Wagner Dep. at 146:11-147:2; 226:19-230:20.)

Fifth, Paul Wagner/BSI used spam filters to facilitate the receipt of emails by "white listing" addresses (white listing involves allowing spam filters to accept rather than reject

messages) instead of blocking alleged "spam." (Ex, 20, F. Cohen Dep. 533:24-540:5; Ex. 21, P. Resnick Dep. at 46:10-47:20.)

Finally, Paul Wagner/BSI agreed to receive and store all alleged "spam" that Joe Wagner/Hypertouch sent to BSI.  Specifically, Joe Wagner/Hypertouch asked Paul Wagner/BSI "Would you archive for hypertouch.com" and otherwise store "whatever e-mails," including alleged "spam" and emails addressed to domain names owned by Hypertouch, that Joe Wagner/Hypertouch would send to Paul Wagner/BSI.  (Ex. 2, P. Wagner Dep. at 88:5-15; 472:11-13; 484:8-20; 1096:1-3; Ex. 8, J. Wagner Dep. at 184:16-24; 190:3-192:20; 198:23-199:19; 301:25-302:10; 309:13-21.)  Paul Wagner/BSI "said 'yes,'" and pursuant to this agreement among brothers, Joe Wagner/Hypertouch then sent emails to Paul Wagner/BSI knowing that the emails "would include spam." (Ex. 2, P. Wagner Dep. at 9:9-15, 88:5-89:1; Ex. 8, J. Wagner Dep. at 191:25-192:20; 195:6-10; 199:16-19; 200:21-25; 205:21-24.)

(Ex. 2, P. Wagner Dep. at 9:9-15, 69:5-8; 143:1-3; 259:7-260:17; 264:16-22; 1299:12-17; Ex. 5, P. Wagner/ValueClick Dep. at 157:22-158:2; Ex. 8, J. Wagner Dep. at 253:4-9; Ex. 9, J. Wagner/ValueClick Dep. at 355:2-357:8.)  Paul Wagner testified that the "majority of the e-mails" produced in June 2008 "came through Hypertouch." (Ex. 2, P. Wagner Dep. at 142:18-144:8.)

### C.    Paul Wagner/BSI Executes the Final Steps to Manufacture This Suit.

Having captured alleged "spam" over a period of years through the carefully calculated methods described above, Paul Wagner/BSI then executed the final steps to manufacture this lawsuit.  Specifically, on February 12, 2008, Paul Wagner/BSI circulated to BSI's experts a game plan called ▮▮▮▮▮▮▮▮▮▮ (Ex. 22, KLENSIN002209.)  This game plan



With its game plan finalized, BSI then filed the original complaint against Connexus and

Hydra on February 14, 2008.  However, BSI never produced the emails in their native format(s).

Instead, in June 2008 and belatedly in May 2009, BSI produced enormous files ("MBX Files")

that contain altered, duplicative, overlapping, fragmented and spoliated items rife with

innumerable errors that do not and cannot represent any emails that may or may not have existed.

This is evidenced by, among other things:

- Paul Wagner continuously, knowingly and intentionally destroyed original emails that may or may not have existed over which it is now suing, (Ex. 23, 9/19/08 BSI Response to Connexus Interrogatory No. 1(i); Ex. 2, P. Wagner Dep. 1018:6-1019:10; 1030:2-1031:8);

- Paul Wagner/BSI duplicated thousands of emails with the result that the MBX Files contain thousands of duplicates over which BSI is suing over at the statutory rate of $2,000 per email, (Ex. 20, F. Cohen Dep. at 457:1-458:2; 530:25-531:11; 682:6-683:2);

- Paul Wagner/BSI materially and substantially altered "emails" within the MBX Files such that some items in the MBX Files are not emails at all, and such that establishing the original contents of emails is impossible, as Paul Wagner encountered "error[s]" when "processing" the emails at issue that were "anomalous and inadvertent," including "emails" that had "fragments" of other emails and "extraneous" information within them, (Ex. 2, P. Wagner Dep. at 258:4-264:22; 450:4-9; 508:16-509:9; 519:21-520:16; 523:3-12; 525:15-526:2; 551:6-553:13; 552:22-553:5; 562:10-18; 563:22-564:11);

- BSI's experts agree to the spoliation, as Dr. Klensin testified that "I knew for the reasons we discussed earlier today that neither I nor anyone else would be able to authenticate

what was going on" and described alleged emails as "fatally damaged" and "do not contain enough information to interpret them as e-mail without either speculation or other information," while Dr. Levine suggested "excluding [emails] from evidence," described printed out emails as "a mess" and "certainly not the way they would appear in a mail program" and agreed that "much of the mail contains technical flaws," and Mr. Resnick testified that items were "not as stored e-mail messages." (Ex. 19, J. Klensin Dep. at 160:4-8; 273:5-274:17; 287:21-24; Ex. 24, J. Levine Dep. at 238:8-242:25; 331:2-334:25; 397:21-398:3; 415:2-10; 423:7-428:25; Ex. 21, P. Resnick Deposition at 778:5-25.)

Connexus and Hydra will seek separate relief concerning these acts of spoliation but alert the Court about them now to clarify that Connexus and Hydra are not conceding the admissibility or authenticity of any of the "emails" that BSI produced.  Rather, for purposes of this motion only, Connexus and Hydra assume that the emails reflect events that BSI claims they reflect solely to avoid the Court's involvement in these complicated admissibility issues now.

Importantly, Paul Wagner/BSI admits that he was not deceived into purchasing any good or service advertised in any of the emails at issue in this case. (Ex. 2, P. Wagner Dep. at 881:25-882:7.) Further, none of BSI's alleged "customers" complained about the emails. (Ex. 23, 9/19/08 BSI Response to Connexus Interrogatory No. 1(j); Ex. 25, 9/19/08 BSI Response to Hydra Interrogatory No. 1(j).)[3]  Instead, Paul Wagner/BSI manufactured BSI's claims by using computers to "look for something I regard as false or misleading" in the emails, "searched for e-mails containing certain key words and compiled them into a separate set" and "appl[ied] certain search routines to look for false or misleading subject lines." (Ex. 2, P. Wagner Dep. at 697:11-699:3; 889:2-4; 913:21-914:1; 915:1-916:2; 916:18-917:15.)

Based on his alleged searches, Paul Wagner/BSI claims he extracted emails, and asserts the emails he searched for are unlawful because they obscure the identity of the sender. (*See, e.g,* Ex. 26, Legend for Master Spreadsheets.)  Further, and notwithstanding that Paul Wagner/BSI never used spam filters to reject emails, BSI alleges that emails are unlawful because subject

---

[3]     BSI produced affidavits of alleged customers during discovery but indicated that it will not call these witnesses at trial.  Thus, BSI will have no testifying customers at trial except for perhaps Joe Wagner/Hypertouch.

lines "contain[] extraneous characters and/or other misleading information that impairs the recipient from recognizing/filtering the email." (Id.)  BSI also alleges that statements implying a relationship with the sender, such as "If you would no longer like to receive e-mails from 60SecondCarLoan.com," are false. (Ex. 27, Connexus Supplemental Legend.)  And, BSI claims that false domain name registrations, which do not appear in the emails, somehow make the emails themselves unlawful. (Id.)  Unfortunately for BSI, however, none of its claims survive summary judgment on the undisputed facts of this case as explained more fully below.

## III.   ARGUMENT

A party is entitled to summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(c); *see also Nader v. Blair*, 549 F.3d 953, 958-59 (4th Cir. 2008).  Here, Connexus and Hydra are entitled to summary judgment because the undisputed facts of this case are that (1) BSI lacks standing because it is a lawsuit factory and not a legitimate ISP, (2) BSI consented to receive the emails, and (3) BSI's claims are preempted by CAN-SPAM because BSI cannot prove any element of common law fraud, and (4) many of BSI's claims fall outside of the purview of the statutes.  Alternatively, BSI is precluded from recovering statutory damages under both statutes for the same emails.

### A.   BSI Lacks Standing.

BSI lacks standing because it is a lawsuit factory and not legitimate ISP victimized by fraudulent email.[4]  In *Gordon*, the court held that plaintiff lacked standing as an ISP under CAN-SPAM (the federal analogue to the statutes at issue here) because plaintiff undertook efforts to receive emails over which it sued and therefore fell outside of the class of entities to which

---

[4]      Connexus and Hydra refer to "electronic mail service providers," Cal. Bus. & Prof. Code. § 17529.5(b)(1)(A), and "interactive computer service providers," Md. Comm. Law § 14-3003, as "ISPs" or "internet service providers" herein.

Congress granted a private right of action. *Gordon v. Virtumundo*, 575 F.3d 1040, 1055-1057 (9th Cir. 2009).  Among other things, plaintiff created email accounts for friends and family members, but after they abandoned those accounts, plaintiff configured his computers to receive emails sent to the "unused inboxes." *Id*. at 1045-46.  Plaintiff also "refuse[d] to implement spam filters in a typical manner or otherwise make any attempt to block allegedly unwanted spam or exclude such messages from users' e-mail inboxes." *Id*. at 1055.

The *Gordon* court acknowledged that "[t]he rising tide of spam poses an even greater problem to businesses, institutions, and other entities through network slowdowns, server crashes, and increased costs." *Id*. at 1045.  Then noting that "this is an area in which absolutist rules do not [always] lead to sensible or accurate results" and that "especially in this highly technical and evolving field, common sense not dogma is what is needed in order to explore the actual meaning of legislative enactments," the court found that plaintiff lacked standing as an ISP because it "purposefully avoided taking even minimal efforts to avoid or block spam messages.  Instead, Gordon devotes his resources to adding his clients' e-mail addresses to mailing lists and accumulating spam through a variety of means for the purpose of facilitating litigation." *Id*. at 1049, 1052 (quotations and citations omitted).  Thus, "Gordon's arguments of technical compliance with this standing component, without any regard for the overarching congressional purpose, are not compelling," as "[t]he CAN-SPAM Act was enacted to protect individuals and legitimate businesses-not to support a litigation mill for entrepreneurs like Gordon." *Id*. at 1052, 1057.  *Gordon* also held that courts should "review the individual characteristics of the plaintiffs on a case-by-case basis and make a reasoned decision whether a purported [ISP] provider is truly the type of *bona fide* [ISP] provider adversely affected by

11

commercial e-mail messaging that Congress envisioned when it enacted the CAN-SPAM Act."

*Id*. at 1055.

Justice Gould's concurring opinion in *Gordon* is particularly instructive as he found that:

[t]he most pertinent conclusion for me in this case, one that I reach after a careful evaluation of the district court's comprehensive factual findings and cogent legal analysis, is that Gordon was seeking to use the CAN-SPAM Act to build a litigation factory for his personal financial benefit . . . the ways in which Gordon inserted himself into legal controversy here require conclusions that he is not an [ISP] and that he was not adversely affected by spam. Each of these conclusions is independently sufficient to deny Gordon statutory standing to assert his claims.

*Id*. at 1066-67. Therefore, noting that the decision "focuses on language in the legislative history stating that only *bona fide* [ISPs] should have statutory standing," Justice Gould wrote that, for "a litigation factory, the purported harm is illusory and more in the nature of manufactured circumstances in an attempt to enable a claim" that "should not be tolerated absent a clear endorsement from Congress. Such claims would not likely have been recognized at common law, and Congress here wisely excluded them." *Id*. at 1068. Thus:

I would presume a *bona fide* requirement even without this legislative history because Congress provided a private right of action for CAN-SPAM violations but expressly limited it to certain individuals and entities. Given this limited private right of action, statutory standing should be denied to plaintiffs such as Gordon who purposely structure themselves to look like one of the limited entities eligible to sue but do so for the primary purpose of collecting damages and settlements from litigation. Such individuals trying to game the system do not fall into the limited class to which Congress made available a private remedy, and ordinarily they should be denied statutory standing. That the legislative history specifies *bona fide* IAS providers strengthens our conclusion that Gordon's suit should be dismissed, but the legislative history is not necessary to reach this conclusion in light of the common-law antecedents that do not favor manufactured claims.

*Id*.

The undisputed facts here overwhelmingly prove that Paul Wagner/BSI is not a legitimate ISP but instead is a litigation factory just like the plaintiff in *Gordon*. Foremost, "[a]ll of BSI activity sort of relates to litigation," litigation so predominates Paul Wagner's time that he

12

has spent "40 hours a week at least" and in some weeks "well over 40" focusing on BSI's lawsuits, and BSI's ███████████████████████████ (Ex. 2, P. Wagner Dep. at 162:8-10; Ex. 4, P. Wagner/Dynamic Dep. at 71:20-72:13; Ex. 6, BSI Responses to Kraft Interrogatory Nos. 12 & 14; Ex. 28, "Beyond Systems' Spam-Related Costs.")  Indeed, instead of attending to his alleged ISP business during the pendency of this case, Paul Wagner/BSI zigzagged across the country with counsel to attend no less than 28 depositions. (Ex. 42, BSI Deposition Chart).  Not surprisingly, <u>BSI's experts</u> could not name an ISP that has one employee that filed 25 lawsuits, and none of them had ever heard of BSI except in the context of litigation. (Ex. 21, P. Resnick Dep. at 23:16-24:4; 166:3-10, 178:21-179:1; Ex. 24, J. Levine Dep. at 8:24-10:2; 218:14-16; Ex. 19, J. Klensin Dep. at 15:21-16:4, 25:9-13; Ex. 29, D. Shin Dep. at 49:1-13.)

Paul Wagner/BSI's activities are unlike legitimate ISPs in several additional ways.  BSI has no offices (other than possibly in various homes including his own and those owned by his parents), Paul Wagner is the only BSI employee, and BSI does not engage in any marketing activities but instead relies on "word of mouth" to attract whatever business it claims it has. (Ex. 2, P. Wagner Dep. at 30:21-34:4; 36:3-7; 114:11-12; Ex. 12, P. Wagner/Kraft Dep. at 29:14-30:9; 77:9-79:3.)  Moreover, BSI does not issue any agreements, such as terms of service or privacy policies, with any customer it may have. (Ex. 2, P. Wagner Dep. at 371:10-14.)  Instead, the contracts that Paul Wagner/BSI executes are joint litigation agreements with his brother Joe Wagner/Hypertouch for litigation, and retention agreements with various attorneys, including with three separate law firms he retained on contingency for this case. (Ex. 2, P. Wagner Dep. at 126:16-19; 672:23-682:6; Ex. 12, P. Wagner/Kraft Dep. at 81:11-82:3.)

13

BSI's experts agree that BSI is not running a robust ISP.  BSI expert Klensin testified that BSI's "plaintiffs are not running what I would consider a very high quality robust professional quality mail server operation," and the best thing BSI expert Klensin said about BSI and Hypertouch was that they are "slightly above amateurs." (Ex. 19, J. Klensin Dep. at 58:18-60:1; 251:24-252:4.)  Joe Wagner/Hypertouch's sending of emails to Paul Wagner/BSI is also inconsistent with the normal operation of an ISP, as BSI expert Resnick testified that "[t]he use of SMTP-level forwarding in the way that BSI seems to be handling mail with Hypertouch addresses is – I'm trying to think of a good word other than unique, but it's unique.  It's not the standard setup.  It's different than you would see in most commercial enterprises, as I understand it." (Ex. 21, P. Resnick Dep. at 26:24-28:12.)  Likewise, saving all emails indefinitely for lawsuits is inconsistent with normal ISP practices, as Joe Wagner/Hypertouch admitted that "I did not know of another ISP [other than BSI] that would be willing to archive that much e-mail flow without what I presume would be exorbitantly expensive." (Ex. 12, P. Wagner/Kraft Dep. at 91:12-15; Ex. 10, J. Wagner/Kraft Dep. at 142:21-143:1; Ex. 9, J. Wagner/ValueClick Dep. at 163:15-20; 164:19-23.)  Indeed, BSI experts Klensin and Resnick testified that they could not name an ISP that saves indefinitely all emails it receives. (Ex. 19, J. Klensin Dep. at 149:2-13; Ex. 21, P. Resnick Dep. at 340:17-22; 627:22-628:3.)

BSI does not deploy spam filters like a legitimate ISP either.  *Gordon* held that "We expect a legitimate service provider to . . . take reasonable precautions, such as implementing spam filters, as part of its normal operations." *Gordon*, 575 F.3d at 1054.  Yet, Paul Wagner/BSI admitted that BSI does not ███████████████████████ nd finds rejecting emails "distasteful" even though he knows how to block emails. (Ex. 3, P. Wagner/Keynetics Dep. at 705:4-706:15; P. Wagner Dep. at 348:8-12; 349:7-11; 1197:12-13.)  In fact, Paul Wagner/BSI

<u>intentionally facilitated</u> reception of emails as described herein, and Joe Wagner/Hypertouch confirmed that "BSI is archiving all the e-mails and is not doing any filtering based on what the results of that spam filter would be to the best of my knowledge." (Ex. 15, J. Wagner/PrimaryAds Dep. at 86:2-89:1.)

It is also undisputed that BSI was not damaged like a traditional ISP.  BSI does not allege that it lost a single customer resulting from the emails.  And, although BSI alleges "loss of staff time," Paul Wagner is the only BSI employee, has not hired any other personnel, has had plenty of time to attend depositions around the country in this and others cases, and failed to keep records indicating how much time was allegedly "lost" in any event. (Ex. 2, P. Wagner Dep. at 1051:13-1052:10; *Gordon,* 575 F.3d at 1055 (plaintiff lacked standing as an ISP where he "has not hired additional personnel"); *ASIS Internet Services v. Optin Global, Inc.,* Nos. 17779 & 15979 at 2 (9th Cir. Dec. 2, 2009) (affirming summary judgment under CAN-SPAM where plaintiff had "no records detailing employee time") (attached hereto as Ex. 30).  Moreover, BSI alleges that "spam" interferes with bandwidth utilization and that it caused "decreased server response and crashes," yet it is undisputed that "the burdens [plaintiff] complains of are almost exclusively self-imposed and purposefully undertaken" because BSI invited the emails as described herein. *Gordon*, 575 F.3d at 1054, 1057; *see also ASIS* at *2 ("mere cost of carrying SPAM emails over Plaintiff's facilities does not constitute a harm as required by [CAN-SPAM]").  Indeed, Paul Wagner/BSI accepted as much email as possible and purchased computer equipment for the specific purpose of saving alleged "spam." (Ex. 2, P. Wagner Dep. 354:7-11; 1299:12-17; 1000:10-1011:25; Ex. 5, P. Wagner/ValueClick Dep. at 117:21-118:7.)

Moreover, BSI cannot prove actual damages even assuming they exist.  BSI seeks $31,011.05 for <u>all</u> emails BSI received and <u>not</u> just those at issue here, and "BSI cannot

apporticon as to Connexus, Hydra, or anyone else, the damages set forth in the 'Beyond Systems'

Spam-Related Costs." (Ex. 28, "Beyond Systems' Spam-Related Costs"; Ex. 31, 3/25/09 J.

Kneedler email; Ex. 2, P. Wagner Dep. at 987:22-989:1; 992:1-995:22.)  And, Paul Wagner

admitted that he has no evidence reflecting bandwidth utilization or alleged "spam" loads. (Ex. 2,

P. Wagner Dep. at 1034:15-1044:4.)

In light of these undisputed facts, BSI is not an ISP within the purview of the California

or Maryland statutes.  According to its lead sponsor, the Maryland email statute is designed to

"give[] victims the right to go to court to seek damages[.]" (Ex. 32, Statement of Sen.

Teitelbaum.)  Similarly, the California legislature found that "problems" caused by "spam"

include "lost productivity" and the cost of "additional equipment, software, and manpower." Cal.

Bus. & Prof. Code § 17529.  Here, however, BSI is not "truly the type of *bona fide* [ISP]" that

the legislatures intended to protect but instead is a mere opportunistic plaintiff seeking a windfall

in statutory damages that "purposefully avoided taking even minimal efforts to avoid or block

spam messages," "expends time and resources seeking out and capturing massive volumes of

spam, which he collects and then organizes for use in his prolific lawsuits," and sets " 'spam

traps' with the sole purpose of snagging as many e-mail marketing messages as possible."

*Gordon*, 575 F.3d at 1056.  Thus, conferring ISP status on BSI would allow sham ISPs to seek

windfalls in statutory damages by merely running mail servers to trap alleged "spam," a distorted

and unintended use of the statutes and a colossal waste of this Court's valuable resources.  The

Court should reject BSI's effort to grossly contort the statutes and grant Defendants' summary

judgment motion for this reason alone. *Comm'r v. Brown*, 380 U.S. 563, 571 (U.S. 1965)

("Unquestionably the courts, in interpreting a statute, have some scope for adopting a restricted

rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute.")

### B. BSI Consented to Receive the Emails.

Connexus and Hydra are entitled to summary judgment because BSI consented to receive and save emails to manufacture lawsuits including this one.  California law is clear:  "He who consents to an act is not wronged by it." Cal. Civ. Code. § 3515.  In turn, § 3515 is "a codification of the maxim *volenti non fit injuria*, which is a basic tenet of our jurisprudence.  It precludes the maintenance of an action for a wrong by one who has 'consented to the act which has occasioned his loss.'" *Pinney & Topliff v. Chrysler Corp.*, 176 F. Supp. 801, 810 (S.D. Cal. 1959) (applying California law) (citing *Edward Brown & Sons v. San Francisco*, 223 P.2d 231, 235 (Cal. 1950)).  Thus, "[o]ne cannot deliberately incur an obvious risk of personal injury, especially when preventive measures are at hand, and then hold the author of the danger for the ensuing injury." *Hedding v. Pearson*, 173 P.2d 382, 385 (Cal. App. 1946).  And, Maryland law is equally clear:  "[t]hose who, with full knowledge, assent to the invasion of their interests may not complain." *Janelsins v. Button*, 648 A.2d 1039, 1042 (Md. Ct. Spec. App. 1994) (plaintiff cannot recover for battery where the plaintiff consented to it) (citing *McQuiggan v. Boy Scouts of America*, 536 A.2d 137 (1988)). Consent "may be manifested by action or inaction and need not be communicated to the actor." Restatement 2d of Torts, § 892.

*Gordon* is instructive, as it noted that "it is highly significant that the burdens Gordon complains of are almost exclusively self-imposed and purposefully undertaken." *Gordon*, 575 F.3d at 1057.  Thus, *Gordon* found that plaintiff "claimed harms almost exclusively relate to litigation preparation, not to the operation of a *bona fide* service," and that plaintiff was not adversely affected and therefore lacked standing. *Id*. at 1056.  Likewise, Justice Gould found that

17

the common law "did not develop remedies for people who gratuitously created circumstances that would support a legal claim and acted with the chief aim of collecting a damage award," and that although plaintiff sued under a federal statute, "on close examination, many distinctions between common law and statutory law disappear." *Id*. at 1067-68.

Here, it is undisputed that Paul Wagner/BSI consented to receive emails through the "spam traps" discussed in Section II(B) above.  And, <u>BSI's own experts</u> agree:

> Q.   Do you know if Beyond Systems used spam traps to reject e-mail?
> A.    My general understanding is that Beyond Systems has not decided to reject e-mail but just decided to store it.
> Q.   Do you know if Beyond Systems used wild cards to reject e-mails?
> A.   My general understanding is that Beyond Systems -- Same answer.
> Q.   Do you know if Beyond Systems used wild cards to act as a spam detector?
> A.    If by "detector" you mean in real time, I think probably not.  But it's the answer to the question you just asked.
> Q.   Do you know if Beyond Systems used wild cards to filter spam?
> A.    As part of their real-time filtering activity?  As I said, I don't believe that they were actively trying to reject spam from those mailboxes.

(Ex. 19, J. Klensin Dep. at 192:20-193:15.)  Further, as to email addresses that Joe Wagner/Hypertouch used to trap and send emails to Paul Wagner/BSI, BSI expert Klensin explained that such addresses are used to "deliberately and carefully unsubscribe[] from mailing lists in order to act as a detector" for "spam trap mailboxes." (Ex. 19, J. Klensin Dep. at 190:16-191:7.)  BSI expert Resnick agreed:  "when I think of the word 'spam trap' I think of an email address that is -- whose sole purpose is to cause spammers to send spam to it." (Ex. 21, P. Resnick Dep. at 168:23-169:4.)

BSI expert Klensin also testified that using catch-all/wild-card accounts can be considered a "deliberate spam trap" and that there is "no real difference" between "spam trap" and "wild cards," while BSI expert Levine testified that BSI used a "catch-all" email address that prevented emails from being "rejected or . . . go[ing] into a spam filter." (Ex. 19, J. Klensin Dep. at 190:16-17; 196:3-10; 196:4-10; Ex. 24, J. Levine Dep. at 220:14-19.)  Likewise, BSI expert

Resnick testified that publishing BSI email addresses on websites is "what is referred to as a spam trap," as "[m]any spam traps, as far as I understand it, are email addresses placed on websites such that things looking for email addresses might grab them." (Ex. 21, P. Resnick Dep. at 169:2-170:4; 262:16-272:3.)  And, as if setting "spam traps" was not enough, Paul Wagner/BSI consented to receive and store "whatever e-mails," including alleged "spam" addressed to domain names owned by Hypertouch, that Joe Wagner/Hypertouch sent to Paul Wagner/BSI. (Ex. 2, P. Wagner Dep. at 484:8-20.)  Thus, as BSI expert Levine admitted, "If you've asked for it, it's not spam." (Ex. 33, John Levine, THE INTERNET FOR DUMMIES p. 203.)

It is also undisputed that Paul Wagner/BSI had "preventive measures at hand" to avoid receiving emails. *Hedding*, 173 P.2d at 385.  BSI expert Levine testified that ISPs know how to reject emails, while BSI expert Klensin testified it is "almost impossible to design a mail server which cannot accept only messages destined for particular [email] addresses" and that the "conventional wisdom today is one is better off rejecting" instead of accepting all emails. (Ex. 24, J. Levine Dep. at 107:15-108:20; Ex. 19, J. Klensin Dep. at 73:23-25; 75:9-16.)  Further, Paul Wagner/BSI could have eliminated the "spam traps" by configuring BSI mail servers to not accept mail to the "wild card" accounts and to non-existent users, telling his brother Joe Wagner/Hypertouch to stop sending him "spam," or deploying spam filters rather than soliciting and saving emails indefinitely as explained above.

For these reasons, it is undisputed that Paul Wagner/BSI affirmatively invited the emails and did absolutely nothing to stop receiving them despite having the knowledge and ability to do so.  Thus, BSI consented to receive the emails, thereby barring BSI's claims as a matter of law.

### C.    <u>BSI's Claims are Preempted by CAN-SPAM.</u>

CAN-SPAM expressly preempts state law claims involving commercial email other than those for fraud. 15 U.S.C. § 7707(b)(1); *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469

F.3d 348 (4th Cir. 2006); *see also Gordon*, 575 F.3d 1040.  BSI's claims cannot survive

summary judgment because BSI cannot prove fraud on the undisputed facts of this case.

> 1.  **CAN-SPAM Preempts State Law Claims Other Than for Fraud.**

The Supreme Court has "long recognized that state laws that conflict with federal law are

without effect," and that "a statute's pre-emptive effect is guided by the rule that the purpose of

Congress is the ultimate touchstone in every pre-emption case." *Altria Group, Inc. v. Good*, 129

S. Ct. 538, 543 (2008) (citations and internal quotations omitted).  Thus, "Congress may indicate

pre-emptive intent through a statute's express language or through its structure and purpose," and

"[p]re-emptive intent may also be inferred if the scope of the statute indicates that Congress

intended federal law to occupy the legislative field, or if there is an actual conflict between state

and federal law." *Id.* (citations omitted).  Accordingly, long standing Supreme Court precedent

bars claims that are expressly preempted by the plain language of federal statutes. *Am. Airlines v.

Wolens*, 513 U.S. 219, 223, 228 (1995) (claims barred under express preemption clause in

federal Airline Deregulation Act); *Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1003 (2008) (claims

barred under express preemption clause in Medical Device Amendments of 1976).

Congress enacted CAN-SPAM to create "one national standard" to replace the

inconsistent patchwork of state laws governing commercial email:

> Many States have enacted legislation intended to regulate or reduce
> unsolicited commercial electronic mail, but these statutes impose different
> standards and requirements.  As a result, they do not appear to have been
> successful in addressing the problems associated with unsolicited
> commercial electronic mail, in part because, since an electronic mail
> address does not specify a geographic location, it can be extremely
> difficult for law-abiding businesses to know with which of these disparate
> statutes they are required to comply.

15 U.S.C. § 7701(a)(11); S. Rep. No. 108-102, at 21 (2003).  Thus, to avoid inconsistent state

"standards and requirements," Congress created a uniform standard for commercial emails, and

enacted an express preemption clause in CAN-SPAM stating that CAN-SPAM "supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1).

The Fourth Circuit holds that CAN-SPAM preempts state claims other than for fraud. *Omega*, 469 F.3d at 354.  In *Omega*, plaintiff/ISP alleged that defendant violated a Oklahoma statute prohibiting email that "misrepresents any information in identifying the point of origin or the transmission path of the electronic mail message" by sending emails that (1) claimed a prior relationship between the sender and recipient by stating "that the recipient had signed up for the [advertiser's] mailing list" when the plaintiff alleged that it had not, (2) contained the domain name "FL-Broadcast.net" in the "From:" line which was not "linked" to the advertiser's cruise.com website, and (3) contained an inoperable email address "Cruisedeals@cruise.com" in the "From:" address. *Id.* at 350-53.  Plaintiff also argued that the state statute imposed a strict liability standard, that any false information in the email regardless of its materiality resulted in liability, and that its claims survived preemption. *Id*. at 353, 355-56.

Finding that "Congress evidently believed that it would be undesirable to make all errors in commercial e-mails actionable," the Fourth Circuit rejected the "strict liability standard imposed by a state such as Oklahoma" because it "would become a de facto national standard, with all the burdens that imposed, even though the CAN-SPAM Act indicates that Congress believed a less demanding standard would best balance the competing interests at stake" and "because allowing a state to attach liability to bare immaterial error in commercial e-mails would be inconsistent with the federal Act's preemption text and structure." *Omega*, 469 F.3d at 359.

Thus, because the plaintiff's "reading of the 'falsity or deception' exception would thus permit an exception to preemption to swallow the rule and undermine the regulatory balance that Congress established, [the plaintiff's] reading of the exception is not compatible with the structure of the CAN-SPAM Act as a whole." *Omega*, 469 F.3d at 355-56.

The Fourth Circuit then found that CAN-SPAM's express preemption clause saved only fraud claims from preemption. Specifically, the Fourth Circuit construed the term "deception" in CAN-SPAM's preemption clause as requiring "more than bare error," and interpreted the term "falsity" as referring "to traditionally tortious or wrongful conduct." *Id.* Since the "preemption clause links 'falsity' with 'deception' – one of the several tort actions based upon misrepresentations," the Fourth Circuit concluded that "Congress was operating in the vein of tort when it drafted the preemption clause's exceptions, and intended falsity to refer to other torts involving misrepresentations, rather than to sweep up errors that do not sound in tort," and to find otherwise would "upset the Act's careful balance" and would create a "loophole so broad that it would virtually swallow the preemption clause itself." *Id.* at 354-55. In light of its interpretation of CAN-SPAM's preemption clause and congressional intent, the Fourth Circuit held that CAN-SPAM preempted plaintiff's claims because they did not sound in fraud, as the ISP's claims were "not limited to inaccuracies in transmission information that were material, led to detrimental reliance by the recipient, and were made by a sender who intended that the misstatements be acted upon." *Id.* at 353.

Likewise, *Gordon* held that claims with "no basis in traditional tort theories" are preempted by CAN-SPAM's express preemption clause. *Gordon*, 575 F.3d at 1064. There, the plaintiff/alleged ISP claimed that emails violated Washington's email statute (upon which the Maryland statute is based) because the "From" lines referred to the subject matter of the emails,

such as "CriminalJustice@vm-mail.com," instead of the individual(s) who sent the messages. *Id.*
at 1063.  Like *Omega*, *Gordon* held that Congress intended the terms "falsity or deception" to
refer to " 'traditionally tortious or wrongful conduct.' " *Id.* at 1062 (citing *Omega*, 469 F.3d at
354 and 15 U.S.C. § 7707(b)(2).)  Thus, CAN-SPAM left states only "free to extend traditional
tort theories such as claims arising from fraud or deception" and that "[i]t would be logically
incongruous to conclude that Congress endeavored to erect a uniform standard but
simultaneously left states and local lawmakers free to manipulate that standard to create more
burdensome regulation." *Id.* at 1063 (citing *Omega*, 469 F.3d at 356.)  As to plaintiff's specific
claims, *Gordon* held that there was nothing "inherently deceptive in [the defendant's] use of
fanciful domain names, and since a "From" line does not need to contain the name of the sender
under CAN-SPAM, "[t]o the extent such a content or labeling requirement may exist under state
law, it is clearly subject to preemption." *Id.* at 1063-1064 (*citing* S. Rep. No. 108-102, at 21.)

At least one court adopted *Omega*'s reasoning in rejecting claims by Joe
Wagner/Hypertouch similar to BSI's claims here.  In *Valueclick*, Hypertouch, represented by the
same counsel that represents BSI here, alleged that defendants sent emails with (1) "fictitious
people's names," "different quoted name[s]," "different domain names," and "False, non-existent
entities," in the 'From:' lines;" (2) non-functioning reply addresses; (3) "false, misrepresented
and/or forged information in the subject lines;" and (4) "HELO [that] did not match the IP
addresses of the transmitting computers." (Ex. 34, *Hypertouch v. Valueclick Complaint* at ¶¶ 38,
39, 40, 41, 43, 44, 45.)  Following *Omega*, the court granted defendants summary judgment
because CAN-SPAM "preempts state law claims, including California laws, unless such claims
are for 'common law fraud or deceit'" and "[a]ccordingly, any claim must be based on fraud."
(Ex. 35, *Hypertouch v. Valueclick*, No. LC081000 at 22 (Cal. Sup. Court. Jun. 16, 2009).)

23

### 2.    BSI's Claims Are Preempted Because They Do Not Involve Fraud.

Like his brother's claims, Paul Wagner/BSI's claims cannot survive summary judgment under the Fourth Circuit's binding decision in *Omega* because BSI cannot prove any of the required elements of common law fraud much less all of them as it must do:  (1) a misrepresentation; (2) the falsity of which was known to the Defendants and made by the Defendants with intent to defraud; (3) justifiable reliance on the misrepresentation; and (4) actionable damages as a result of relying on the misrepresentation. *Omega*, 469 F.3d at 353; *Maryland Environmental Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (Md. 2002); *Alliance Mortgage Co. v. Rothwell,* 10 Cal.4th 1226, 1239 (Cal. 1995) (internal citation omitted).

### i.    BSI Cannot Prove Reliance.

"Absent reliance, [a plaintiff] cannot prevail on his fraud claim." *Ford v. McGraw*, 124 Md. App. 560, 586 (Md. Ct. Spec. App. 1999); *Hohe v. San Diego Unified Sch. Dist.*, 224 Cal.App.3d 1559, 1565 (Cal. Ct. App. 1990).  Further, "actual reliance occurs only when the plaintiff reposes confidence in the truth of the relevant representation, and acts upon this confidence." *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal.App.4th 798, 808 (Cal. App. 2007).  For example, plaintiff failed to establish reliance in *Buckland* because she "suspected respondents' packaging and marketing contained false and misleading advertising, and she relied on this suspicion in deciding to buy the products as potential targets for litigation." *Buckland*, 155 Cal.App.4th at 807-08; *see also McGraw*, 124 Md. App. at 584-587 (rejecting fraud claim where plaintiff knew car was used and thus did not rely on statement that car was new.)

Likewise, the court noted in Joe Wagner/Hypertouch's defeat in the *Valueclick* litigation that courts do "not sanction lawsuits for fraudulent misrepresentations brought by persons who, rather than having been deceived, act for the sole purpose of bringing a lawsuit against 'potential

24

targets for litigation.'" (Ex. 35, *Hypertouch v. Valueclick* at 11 (citations and quotations

omitted)).  Thus, the court dismissed Hypertouch's suit against Valueclick because:

> Plaintiff admits that neither it nor its end users relied on the alleged false or deceptive information contained in a single Asserted Email . . . .  Wagner testified on behalf of Plaintiff that he could not identify any action that he or any receipient [sic] of the Asserted Emails took, or refrained from taking, as a result of the purportedly 'false' information contained in the emails. . . .  Likewise, Wagner could not identify a single email that he or any other recipient relied on or was deceived by (or even read). . . .  In fact, Plaintiff admits that over 43,600 of the emails at issue were sent to non-existent email addresses associated with 'dummy' or 'test' accounts, and not to any end user.

(*Id.* at 19.)

Here, Paul Wagner/BSI did not detrimentally rely on anything in the emails, as Paul

Wagner did not attempt to purchase any goods offered by the emails. (Ex. 2, P. Wagner Dep. at

881:19-882:7.)  Indeed, <u>none</u> of BSI's alleged customers complained about any of the emails

over which BSI sues. (Ex. 2, P. Wagner Dep. at 614:16-616:16.)  In fact, the emails at issue were

not sent to any human being at all but instead were "misaddressed" and addressed to "random e-

mail addresses." (Ex. 2, P. Wagner Dep. 140:13-141:3; Ex. 8, J. Wagner Dep. at 181:11-24;

184:6-24; 189:8-192:9; 190:7-18; 284:4-16.)  And, like his brother Joe Wagner/Hypertouch in

the *Valueclick* litigation and the plaintiff in *Buckland*, Paul Wagner/BSI affirmatively sought

misleading information by searching "for something I regard as false or misleading" and

"appl[ied] certain search routines to look for false or misleading subject lines" to manufacture

this suit. (Ex. 2, P. Wagner Dep. at 698:21-699:3; 889:2-4; 913:21-914:1; 915:1-916:2; 916:22-

23.)  Thus, Paul Wagner/BSI lacks "the requisite confidence in the truth and material

completeness of the[] representations, and cannot establish actual reliance for the purpose of

[his] fraud claims." *Buckland*, 155 Cal.App.4th at 808-809; Ex. 35, *Hypertouch v. Valueclick* at

18; *Gordon*, 575 F.3d at 1064 (rejecting plaintiff's claims where he admitted "he was not in any

way misled or deceived.")

### ii.      BSI Cannot Prove Damages Resulting from Reliance.

BSI cannot show that it suffered damages proximately caused by reliance on any misrepresentation.  "Deception without resulting loss is not actionable fraud." *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal.App.4th 1807, 1818 (Cal. Dist. Ct. App. 1996) (internal citations omitted); *Hoang v. Reunion.com, Inc.*, 2008 WL 5423226 at *4 (N.D. Cal. Dec. 23, 2008) (dismissing plaintiff's spam complaint for failure to allege that "plaintiffs actually incurred an injury as a result of his or her having taken some action in reliance on defendant's asserted use of false header information"); *Hale Trucks of Maryland, LLC v. Volvo Trucks of North America, Inc.*, 224 F. Supp. 2d 1010, 1032 (D. Md. 2002) (actionable fraud requires reliance on a misrepresentation and "compensable injury" resulting from such reliance) (applying Maryland law) (internal citations omitted).

Here, Paul Wagner/BSI did not suffer any actionable injuries resulting from reliance on them, as Paul Wagner admitted that he did not attempt to purchase any goods or services offered by the emails. (Ex. 2, P. Wagner Dep. at 881:19-882:7.)  Rather, BSI claims that it suffered injuries because the emails contributed to the overall volume of emails processed by its servers, but such alleged damages do not constitute damage resulting from alleged falsity about goods or services contained in the emails.  And, BSI's claims that its servers were damaged are unproven in all events as explained in Section III(A) above.  Thus, BSI cannot prove damages resulting from detrimental reliance and therefore its claims cannot survive summary judgment.

### iii.      BSI Cannot Prove Any Misrepresentation as a Matter of Law.

BSI cannot prove any misrepresentation that survives preemption because (1) BSI's allegations of falsity do not relate to a consumer's decision to purchase goods or services, (2) the

emails are (or were) "chock full" of information identifying the participants in the emails, and (3) BSI's claims are preempted to the extent BSI seeks to impose "labeling requirements."

**BSI's Allegations of Falsity Involve Mere Immaterial Errors.** To survive preemption, the Fourth Circuit holds that state law claims involving commercial email must be based on actual fraud as opposed to "immaterial," "isolated," "simple," or "bare errors." *Omega*, 469 F.3d at 354-55, 359. Further, "[a] 'material' misrepresentation or practice" is one "which is likely to affect a consumer's choice of or conduct regarding a product," and the "net impression" of an entire email must govern the interpretation of any individual representation. (Ex. 36, *FTC Policy Statement on Deception*, *citing D.L. Blair*, 82 F.T.C. 234, 255, 256 (1973) (a "headline" cannot be misleading if the text of the message "eliminate[s] any false impression stemming from the headline".) Thus, "a false representation which cannot possibly affect the intrinsic merits of a business transaction must necessarily be immaterial because reliance upon it could not produce injury in a legal sense." *Hill v. Wrather*, 158 Cal.App.2d 818, 824 (Cal. Dist. Ct. App. 1958).

Here, BSI's allegations of falsity have nothing to do with a consumer's decision to purchase anything. For example, Paul Wagner/BSI alleges that using a name other than his own in the "To" field is unlawful because it suggests that "the sender knows the recipient." (Ex. 2, P. Wagner Dep. at 587:13-19; Ex. 26, Legend for Master Spreadsheets.) Thus, according to Paul Wagner/BSI, an email with "gotcha@hypertouch.com" instead of "Paul Wagner" in the "To" field is confusing because "at a glance I would see and assume that the person knows me because there's a quoted name in the 'To:' field," even though "on further examination I see there's actually just the e-mail address" as opposed to his name, and notwithstanding that Joe Wagner/Hypertouch used the "gotcha" email address to trap spam. (Ex. 2, P. Wagner Dep. at 350:9-14; 351:11-21; 440:13-441:4.) Therefore, according to Paul Wagner/BSI, "To" fields

contain information about the intended <u>recipient</u> of the email and have nothing to do with

material terms a consumer might consider when deciding to purchase goods or services.

Likewise, BSI's allegations that subject lines are false allege nothing more than

immaterial errors, as BSI/Paul Wagner is suing over a subject line with "a comma in it before it

says 'which soda do you prefer'?" because "I think a comma is -- constitutes misleading

information," and another stating "worlds fastest life policy" because " 'worlds' seems to be

missing an apostrophe after the D." (Ex. 2, P. Wagner Dep. at 595:4-9; 946:18-947:5).  Paul

Wagner also claims that "Send Mothers Day Flowers and Gifts Starting at 29.95" is false

because "Mother's Day is missing an apostrophe." (Id. at 941:17-942:7).[5]

BSI's allegations that domain names in emails were falsely registered, and that the use of

ISP domain names (such as "aol.com") in emails, are not actionable misrepresentations either

because consumers do not use domain name registrations to decide whether or not to purchase

goods advertised in emails.  Indeed, BSI's counsel conceded "that Plaintiff hasn't claimed that

these are fraud in conjunction with ISPs forbidding the use of their domains in conjunction with

spam," and federal law (18 U.S.C. § 1037(a)(4)) already regulates the use of domain name

registrations in all events. (Ex. 20, F. Cohen Dep. 894:9-12.)  Similarly, BSI's allegations that

statements in emails falsely imply a relationship with the sender, such as "If you would no longer

like to receive e-mails from 60SecondCarLoan.com," do not relate to a consumer's decision to

purchase goods or services.  Indeed, *Omega* held almost identical content in emails "was

preempted because it bears no arguable relationship to the subject matter [common law fraud]

excepted from preemption in the CAN-SPAM Act." *Omega*, 469 F.3d at 353, n1.  And, BSI's

---

[5]     Paul Wagner/BSI has not shown, and cannot show, that the emails have false subject lines in any event because Paul Wagner/BSI failed to obtain images associated with tens of thousands of the emails and failed to investigate links to determine the accuracy of the subject lines. (Ex. 2, P. Wagner Dep. at 200:5-11; 287:20-291:6; 917:22-923:1; 955:2-7; 962:10-23.)  Moreover, not a single BSI customer complained about any of the emails in all events as explained in Section II(C) and III(C)(2)(i) herein.

claims involving "From" fields are preempted because simply alleging that the headers contained "incomplete" information has "no basis in traditional tort theories and therefore [falls] beyond the ambit of the exception language in the CAN-SPAM Act's express preemption clause." *Gordon*, 575 F.3d at 1064.

Finally, BSI's claims concerning the HELO/EHLO fields, which merely reflect interactions between computers, do not survive preemption either because these fields are never seen by ordinary consumers and therefore are immaterial to a consumer's decision to purchase goods or services.  (Ex. 19, J. Klensin Dep. at 70:11-71:3; Ex. 24, J. Levine Dep. at 319:10-12; Ex. 21, P. Resnick Dep. at 224:20-225:2.)  Thus, having "been through the history of both this matter and the previous BSI-Keynetics matter," BSI expert Klensin (the author of HELO protocol) is "[v]ery, very skeptical about bringing a lot of emphasis on the content of the HELO field or its falsity." (Ex. 19, J. Klensin Dep. at 301:16-23.)  Indeed, there are many reasons why HELO/EHLO information might be incorrect, as Klensin testified that "[f]rom the messages I have sampled and inspected, there does not appear to be a pattern of abuse of the arguments to HELO/EHLO that cannot be explained by ordinary protocol variations." (Ex. 37 J. Klensin 1st Report at ¶4; Ex. 19, J. Klensin Dep. at 302:23-303:9.)  Likewise, Paul Wagner/BSI and Joe Wagner/Hypertouch admitted that false HELOs can happen for many reasons other than to deceive, and has even sent to Paul Wagner/BSI false HELO information yet Paul Wagner/BSI is not suing Joe Wagner/Hypertouch. (Ex. 9, J. Wagner/ValueClick Dep. at 629:1-16; 640:10-641:3; Ex. 2, P. Wagner Dep. at 464:14-466:7.)  And, not surprisingly, BSI's HELO claims have already been rejected, as the court in *Hypertouch v. Valueclick* held that Hypertouch's HELO claims were preempted by CAN-SPAM, and the arbitrator in a separate case filed by Joe Wagner/Hypertouch rejected Hypertouch's HELO claims because the defendant "established a

number of valid reasons" why HELO information might not "resolve" to the IP address. (Ex. 35, *Hypertouch v. Valueclick* at 18-19; (Ex. 11, *Hypertouch, Inc. v. Stamps.com, Inc.*, AAA No. 7411700943 04 SUBR (Am. Arb. Assoc'n. Jan. 6, 2006) at 18 n.20.)

For all of these reasons, BSI's claims constitute no more than immaterial errors and are therefore preempted because they "cannot possibly affect the intrinsic merits of a business transaction." *Hill*, 158 Cal.App.2d at 824; *Omega*, 469 F.3d at 354-55.

**The Emails are "Chock Full" of Identification Information.**   The Fourth Circuit holds that CAN-SPAM preempts allegations of falsity and deception where emails are "chock full" of ways to identify the products for sale and the advertisers. *Omega*, 469 F.3d at 357.  Thus, *Omega* held that plaintiff's claims were preempted because the emails were "replete with accurate identifiers of the sender," as they contained an unsubscribe link and a separate link to the Cruise.com website, and displayed a mailing address for the company. *Id.* at 357-358. Accordingly, an email is not "materially false or misleading" if the email allows the recipient to "identify, locate, or respond to" the sender or the person on whose behalf the email was sent to " 'investigate [an] alleged violation.' " *Id.* at 357.

Here, Paul Wagner/BSI contends he found "conclusive evidence" attributing the emails to Connexus and Hydra, and that there are many ways "to find out who" sent the emails, including by reviewing "visible features" and identifying "unique characteristics" on the face of the emails, and by researching domain name registrations, IP addresses, and sales links.[6] (Ex. 2, P. Wagner Dep. at 202:18-206:9; 413:1-7; 715:2-717:17; 779:22-780:19; Ex. 26, Legend for Master Spreadsheets; Ex. 38, Legend re: 18,497 Hydra Emails; Ex. 39, 6/19/09 P. Wagner Declaration ¶¶ 11, 14.)  Indeed, BSI purports to attribute the emails to Defendants "based on,

---

[6]      Connexus and Hydra do not concede that the emails are actually attributable to them because BSI deleted original emails, materially altered others, and engaged in other acts of spoliation referenced in Section II(C).

among other things, that the email promoted or utilized a Defendant-owned domain, that the email linked to Defendant's server(s), and the email advertised a Defendant-owned landing page." (Ex. 23, Second Response to Connexus Corp.'s First Set of Interrogatories at 1(a).)  Paul Wagner/BSI also identified specific company mailing addresses on the face of the emails, and "had a list of trade names and domain names associated with Connexus and searched for those." (Ex. 2, P. Wagner Dep. at 259:7-22; 264:16-22; 766:19-24; 788:4-13; 789:9-15.)  BSI expert Levine also testified that numerous emails identified the senders, advertisers, and affiliates involved with the emails. (Ex. 40 6/1/09 J. Levine Report at ¶¶ 18-20, 37, 40; Ex. 24, J. Levine Dep. at 68:20-69:9; 69:23-70:14; 87:4-14; 89:19-23; 202:8-11; 451:22-452:15.)

BSI's purported ability to attribute the emails makes sense because, even according to Paul Wagner, the purpose of the emails was to "induce people to conduct a sale or make a purchase," and that to make a purchase the email recipient must "interact with the seller" and "it doesn't make sense to me that someone would send an e-mail with images or image links to some random product they didn't have some knowledge or connection with." (Ex. 2, P. Wagner Dep. at 906:7-16; 719:24-720:2.)  Thus, BSI expert Resnick testified that an advertiser of an email selling products "would want to identify themselves to the recipient of the email." (Ex. 21, P. Resnick Dep. at 303:7-15.)  And, as the Fourth Circuit held, "[t]hese references come as little surprise, because the [emails] were sales pitches intended to induce recipients" to purchase products. *Omega*, 469 F.3d at 358.  Thus, as in *Omega*, the emails were "replete with accurate identifiers of the sender" and "the alleged inaccuracies in the headers could not have impaired the efforts of any recipient." *Id.*

*BSI's Claims Seeking to Impose Labeling Requirements are Preempted*.  BSI's claims are preempted because BSI seeks to impose "labeling requirements."  Under CAN-SPAM, "a

State law requiring some or all commercial e-mail to carry specific types of labels, or to follow a certain format or contain specified content, would be preempted." *Gordon*, 575 F.3d at 1064 (*quoting* S. Rep. No. 108-102, at 21.))

Here, BSI seeks to require that "To" fields in emails contain the name of the recipient instead of a phrase pertaining to the contents of the email like "Book Lover" for a book advertisement, as "the quoted name should contain the identity of a person associated with that mailbox … me or Paul Wagner." (Ex. 2 P. Wagner Dep. at 439:16-440:5.)  Likewise, BSI claims that emails must identify the sender in the "From" fields, and that emails must not identify the subject matter of the email in the "From" field (for example, "Gevalia" in an email advertising Kraft's Gevalia coffee brand). (Ex. 26, Legend for Master Spreadsheets.)  However, these claims are tantamount to labeling requirements and are thus preempted by CAN-SPAM.  Indeed, *Gordon* rejected the very claim that BSI seeks to advance here through its expert Resnick, as Resnick testified that he previously provided expert testimony in *Gordon* concerning the "From:" header field," and agreed that BSI's allegations here are "essentially the same argument" made by the plaintiff and rejected in *Gordon*. (Ex. 21, P. Resnick Dep. at 20:4-6; 21:3-23:14.)  Thus, BSI's claims fail because they seek to impose labeling requirements that CAN-SPAM preempts.

### iv. BSI Cannot Prove Defendants Had Knowledge or Intent.

Finally, and as in Joe Wagner/Hypertouch's claims against *Valueclick*, there is no evidence showing that Connexus or Hydra had knowledge or intent to deceive.  Thus, BSI's claims fail for this additional reason. *See, e.g.*, *Hypertouch v. Valueclick* (rejecting Hypertouch's claims for failure to produce any evidence of an intent to deceive) (attached hereto as Ex. 35); *Anderson v. Deloitte & Touch*, 56 Cal. App. 4th 1468, 1476 (Cal. Ct. App. 1997) (dismissing fraud claim because defendant had no "knowledge of falsity"); *ASIS Internet Services v. Optin*

*Global, Inc.,* Nos. 17779 & 15979 (9th Cir. Dec. 2, 2009) (affirming summary judgment where

defendant did not knowingly send or procure unlawful emails) (attached hereto as Ex. 30).

* * *

For all of these reasons, BSI's claims are preempted and cannot survive summary

judgment.

### D.      Many of BSI's Claims Fall Outside the Purview of the Statutes at Issue.

Connexus and Hydra are entitled to summary judgment because many of BSI's claims

fall outside the purview of the statutes and therefore fail as a matter of law.  The Maryland

statute prohibits emails that "contain[] false or misleading information about the origin or the

transmission path of the commercial electronic mail." Md. Comm. Law. § 14-3002(b).

Likewise, Cal. Bus. & Prof. Code § 17529(i) focuses on the <u>origin</u> of emails, as "[m]any

spammers have become so adept at masking their tracks that they are rarely found."

Here, BSI's "To" claims fail because the "To" fields pertain to the <u>recipient</u> of the email

as opposed to the sender, transmission path or origin, as BSI expert Levine testified "I don't

think [the To: line] would tell me anything about who sent [the email] one way or the other. (Ex.

24, J. Levine Dep. at 446:3-4; Ex. 21, P. Resnick Dep. at 299:8-15; 345:22-350:3.)

Likewise, BSI's allegations concerning false domain name registrations fail because

domain name registrations are <u>not</u> part of the emails themselves, and the California and

Maryland statutes regulate <u>only</u> emails. Cal. Bus. & Prof. Code § 17529.5; Md. Comm. Law.

§ 14-3002(b).  For this same reason, BSI's claim that privately registered domain names are

unlawful also fails.  Indeed, private registration services are perfectly legal even according to

BSI's own experts, and the FTC's CAN-SPAM regulations expressly permit a sender to

"includ[e] in a commercial email message a post office box or private mailbox." (Ex. 41, 73

Federal Register at 29654; Ex. 21, Resnick Dep. at 303:17-24; Ex. 24, J. Levine Dep. at 128:5-

33

10.)  And, Paul Wagner/BSI engaged in the same practice that it contends is unlawful, as Paul Wagner/BSI used a "UPS Store" as BSI's "business" address on domain registrations. (Ex. 12, P. Wagner/Kraft Dep. at 117:3-20; 118:17-121:6.)  Paul Wagner/BSI cannot credibly complain about a practice in which BSI has engaged.

All of BSI's claims about false statements in the bodies of emails also fail because the statutes regulate only the headers of emails. Cal. Bus. & Prof. Code § 17529.5; Md. Comm. Law. § 14-3002(b). (Ex. 24, J. Levine Dep. at 509:8-512:1.)  And, even if the statutes regulated email bodies, nothing in the email body pertains to the origin or transmission path of the email, as BSI expert Resnick testified that "the origin is generally reflected in the originator fields" in email headers while BSI expert Klensin testified "I don't believe in general I would reflect a transmission path in an opt-out claim" in an email body. (Ex. 21, P. Resnick Dep. at 304:20-305:8; 308:10-12; Ex. 19, J. Klensin Dep. at 109:14 -15.)

Finally, BSI's "From" field claims fail because neither statute prohibits using multiple identities, requires a sender field, or regulates quoted names in conjunction with email addresses or multiple originating IP addresses.  In fact, Paul Wagner/BSI and BSI's experts use multiple domain names in their business. (*See* Ex. 2, P. Wagner Dep. at 7:15-17; 224:8-9; 637:20-21; Ex. 19, J. Klensin Dep. at 64:6-65:23; Ex. 24, J. Levine Dep. at 225:1-2; 445:4-6.)

For all of these reasons, the foregoing claims fall outside the purview of the statutes and fail as a matter of law.

**E.      BSI Cannot Recover Damages Under Both State Statutes**.

The Court should reject BSI's impermissible attempt to extort $1,000 per email under each state statute because BSI cannot, as a matter of law, recover twice for a single alleged injury.  California and Maryland follow the "one wrong, one recovery" rule which precludes a

party from obtaining double recovery for a single injury. *Montgomery Ward & Co., Inc. v. Cliser*, 298 A.2d 16, 26-27 (Md. 1972) ("the law does not permit double satisfaction for a single injury[]" and "a person is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event.") (citations omitted); *Fassberg Construction Co. v. Housing Authority of the City of Los Angeles,* 152 Cal. App. 4th 720, 759-60 (Cal. Ct. App. 2007) (where two awards punish "essentially the same conduct" a plaintiff cannot recover both).  And, "where the social objectives pursued by two categories of damages sought in one cause of action are the same, an award for both would create a double recovery." *L.A. County Metro. Transp. Auth. v. Superior Court,* 123 Cal. App. 4th 261, 268 (Cal. Ct. App. 2004).

For example, the Ninth Circuit in *Chevron* barred plaintiffs from pursuing an antitrust claim and breach of good faith claim that were predicated on anti-competitive price posting which resulted in the same harm (underpayment to the City for oil). *California v. Chevron Corp*, 872 F.2d 1410, 1414 (9th Cir. 1989).  In so holding, the Ninth Circuit instructed the lower court to "take all necessary steps to ensure that the plaintiff is not permitted double recovery for what are essentially two different claims for the same injury." *Id.*  Similarly, in *Rachel,* plaintiff's claims for fraud, breach of contract, and unjust enrichment were based on the same injury – the markup of an invoice – and court observed that "pleading several different theories or causes of action does not transform a single injury into multiple injuries." *United States v. Rachel*, 289 F. Supp. 2d 688, 697-98 (D. Md. 2003) (*vacated on other grounds*) (citations omitted).

Here, the California and Maryland statutes address the same social objective, proscribe identical conduct, and seek to redress the same injuries. Cal. Bus. & Prof. Code § 17529.5(a); Md. Comm. Law § 14-3002.  Indeed, BSI's claims under the statutes are predicated on <u>identical</u> alleged conduct and <u>identical</u> emails. (Id. at ¶¶ 69-70, 81-82.)  Thus, just as the court in *Chevron*

precluded the plaintiffs from pursuing two claims predicated on same conduct of defendants

(anti-competitive price posting) and the *Rachel* court barred plaintiffs from maintaining multiple

causes of action based on the same injury (the markup of an invoice), this Court should bar BSI

from seeking double recovery and enter an order limiting BSI to recovering $1,000 per email.

**IV.   CONCLUSION**

For these reasons, Connexus and Hydra respectfully request that the Court enter summary

judgment in their favor.

Respectfully submitted,

Dated:  December 18, 2009

_____/s/_____
J. Douglas Baldridge, US DC-MD Bar No. 11023
Lisa Jose Fales, US DC-MD Bar No. 08141
Ari N. Rothman, US DC-MD Bar No. 17560
Robert A. Friedman, US DC-MD Bar No. 28864
VENABLE LLP
575 7th Street, N.W.
Washington, DC  20004-1601
(202) 344-4000 (phone)
(202) 344-8300 (fax)
jdbaldridge@venable.com
ljfales@venable.com
anrothman@venable.com
rafriedman@venable.com
*Attorneys for Connexus Corp. and Hydra LLC*