EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF MARYLAND

---

BEYOND SYSTEMS, INC.,              )
          Plaintiff,     ) No. 8:08-CV-00409
    vs.                          )       PJM/CBD
KRAFT FOODS, INC., et al.,         ) VOLUME I
          Defendants.    )

---

THIS TRANSCRIPT IS CONFIDENTIAL

Deposition of KAREN NUGENT, at 2121 Avenue of the Stars, Los Angeles, California, commencing at 9:10 A.M., Friday, June 12, 2009, before Judith A. Mango, CSR No. 5584.

PAGES 1 - 145

Page 26

1   A. Primarily through the blacklistings.
2   Q. Okay. And what about -- did Vendare work
3   with any third-party vendors on compliance issues?
4   A. Yes.
5   Q. Okay. And who was that?                                  09:37
6   A. Lashback.
7   Q. Okay. And what did you do with Lashback?
8   A. They were an alerting service for, I
9   believe, suppression list abuse and I think ceding.
10  I'm not really sure. I don't remember.                      09:37
11  Q. Okay. And so you worked with them directly,
12  though?
13  A. Yes.
14  Q. Okay. And so they reported to you
15  compliance issues?                                           09:37
16  A. Some of the time. Other time -- they have a
17  software interface that I would check.
18  Q. Okay. So sometimes they reported it
19  directly to you; other times you would go to the
20  software interface to see whether or not there had           09:37
21  been reported compliance issues?
22  A. Correct.
23  Q. Okay. And, so, in addition to complaints,
24  then, and checking Spamhaus, Lashback reported
25  compliance issues to you; is that correct?                   09:38

Page 27

1    A.   Correct.
2    Q.   Okay. So when Lashback reported compliance
3    issues to you what did you do?
4         MR. ROTHMAN: Objection to form.
5         THE WITNESS: Honestly, I don't remember the        09:38
6    steps I would take, I'm sorry, once I received a
7    complaint or a report from Lashback.
8    BY MR. ONORATO:
9    Q.   Okay. Would you investigate it?
10   A.   Yes.                                              09:38
11   Q.   Okay. And how would you go about
12   investigating it?
13   A.   I honestly don't remember the steps that I
14   used to take.
15   Q.   Okay. And was there -- when you were              09:38
16   compliance manager who did you report to?
17   A.   Brett Cravatt.
18   Q.   Brett Cravatt. Okay. And did people work
19   for you?
20   A.   No.                                               09:39
21   Q.   No. So were you the only person in the
22   compliance department?
23   A.   No. I worked with Brett, who I answered to,
24   and account managers within eMarketMakers that were
25   working with their affiliates who worked with me.      09:39

Page 43

1  investigating that at all?
2      A.  No.
3      Q.  Okay.  Adam Wergeles, he was senior
4  vice-president and general counsel, according to his
5  sig block here.  Did you provide him with -- he would   10:00
6  ask you to investigate things for him?  Let me ask
7  the question that way.
8      A.  I don't remember.
9      Q.  Okay.  You don't remember working with Adam
10 Wergeles?                                               10:01
11     A.  I do remember working with him.  I don't
12 remember him asking me to investigate things.
13     Q.  Okay.  So, now, here it says that this
14 e-mail address, he had been advised that the e-mail
15 address was only being used to communicate with         10:01
16 Vendare, and then he says "We put it on our
17 suppression list and one of our publishers must be
18 using our suppression list for e-mail."
19         Can you tell me how it is that a publisher
20 would use a suppression list for e-mail purposes?       10:01
21     A.  Our suppression lists were hosted on the EMM
22 affiliate network so that we could -- our affiliates
23 could not mail to those lists.  They could use them,
24 the suppression list, to essentially scrub against
25 their own list.                                         10:02

Page 44

1  Q. But there were instances where they did
2  e-mail to suppression lists; is that right?
3  A. Yes.
4  Q. Okay. So, now, how is it that they were
5  able to then e-mail to a suppression list if that          10:02
6  suppression list was only to be used to take people's
7  names off of the e-mail list that they were supposed
8  to be mailing to?
9  A. I don't know.
10 Q. Okay. So when you investigated suppression  10:02
11 list abuse --
12 A. Right.
13 Q. -- did you find out from the affiliate how
14 it is they mailed to a suppression list instead of
15 using the suppression list for scrubbing their list?     10:02
16 A. Wait. Can you repeat the question.
17 Q. Yeah. When you were investigating
18 suppression list abuse --
19 A. Right.
20 Q. -- did you contact the affiliate to find out  10:02
21 how the affiliate would have sent e-mails to the
22 suppression list instead of using the suppression
23 list only for scrubbing against their mailing list?
24 A. I don't remember, but I would think so.
25 Q. Okay. And what would they say as to why?    10:03

Page 45

1  Do you remember any instances where they tried to
2  explain why it is that they mailed to the suppression
3  list?
4      A.   I don't remember.
5      Q.   Okay.  Now -- okay.  Do you remember doing      10:03
6  any investigation in connection with Autos.com
7  e-mails?
8      A.   No.
9      Q.   Okay.  Do you remember doing any
10 investigation in connection with this Vinton versus    10:03
11 eMarketMakers action that was filed, which is this
12 complaint?
13     A.   No.
14     Q.   Okay.  So you don't remember either working
15 with Lashback or independently investigating these     10:04
16 auto -- the Autos.com e-mails that form the basis for
17 this complaint?
18     A.   No.
19     Q.   All right.  And you don't remember doing any
20 investigation with regard to Joe Wagner or e-mails to  10:04
21 Joe Wagner?
22     A.   No.
23     Q.   All right.  So if there was an issue with
24 someone e-mailing to an address that shouldn't be
25 e-mailed to, would there be anyone else other than     10:04