## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

|  |  |
|---|---|
| BEYOND SYSTEMS, INC. | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| KRAFT FOODS, INC., *et al*. | ) |
|  | ) |
| Defendants. | ) |

Case No. 8:08-cv-00409 (PJM)(CBD)

_____)

### DECLARATION OF DR. JOHN C. KLENSIN PURSUANT TO 28 U.S.C. § 1746

I, Dr. John C. Klensin, state that:

1.      I am over 18 years of age and fully competent to testify to the facts set forth in this Declaration.

## BACKGROUND AND QUALIFICATIONS

2.      At present, I am an independent consultant.  Prior to this time, I was the Internet Architecture Vice President at AT&T, the Distinguished Engineering Fellow at MCI WorldCom, and Principal Research Scientist at MIT.  Prior to joining AT&T, while I was at MCI and then MCI WorldCom, I had lead responsibility for the design of many aspects of the internetMCI and marketplaceMCI offerings (the latter was probably the first major commercial effort in multi-vendor Internet business to consumer ecommerce) including their customer email systems.  Prior to coming to MCI in mid-1994, I was INFOODS Project Coordinator for the United Nations University and, before that, was at MIT for nearly 30 years, holding Principal Research Scientist appointments in several departments including Architecture, the Center for International Studies, and the Laboratory of Architecture and Planning.

3.      I have been involved in the design of the Internet since the inception of the predecessor ARPANET, working with the one of the key implementation groups at MIT and participating in the first design of an network-based electronic mail protocol as part of the ARPANET File Transfer Protocol in 1971.  I have been using network-based electronic mail since that time and electronic mail more generally on an almost continual basis since about 1967.

4.      I received an S.B. degree in Political Science and Mathematics from MIT, focusing on political communications, opinion polling, and measurement, in 1967.  From 1968 until 1976, I was effectively technical director of the Cambridge Project, a large MIT-Harvard project for research in computing applications in the social and behavioral sciences, and its follow-on, the Overlap Project.  That work included my early involvement with the ARPANET mentioned above, participation in the early Defense Messaging System initiative at the request of the Office of the Secretary of Defense, and development of systems used by a number of private and governmental entities (US and European) for data management and analysis (including the systems the Department of Defense used to manage fuel supplies during the oil crisis of the 1970s).  In 1976, I returned to school, completing an interdisciplinary Ph.D. at MIT in Computer Applications and Use in the Social and Policy Sciences in the spring of 1978.  After that degree was completed, I was appointed as a member of MIT's permanent research staff with the title of Principal Research Scientist, remaining at MIT with leadership responsibilities for a number of research projects at the boundary between computer science, the social and policy sciences, and statistics and data analysis until 1992.

5.      After a brief tenure with the United Nations University leading a international scientific database and data interchange project, I joined MCI in 1994, taking part of the lead in design of the user-facing aspects of internetMCI (including the first multi-store online shopping

operation on the Internet).  MCI recognized that and related work by appointment me its first Distinguished Engineering Fellow.  I left MCI (by then MCI Worldcom) late in 1999.  At the beginning of 2000, I joined AT&T Labs, taking the position of Internet Architecture Vice President.  I resigned from AT&T at the end of 2001 and have subsequently been doing consulting work in a number of areas involving Internet applications, technology, and policy.

6.      I was involved in the design and implementation of a number of electronic mail systems since the mid-1970s including the gateway systems between the BITNET/EARN network and the Internet, systems at MIT and the United Nations University, the mail system for internetMCI (several million users), and the phase-out of MCI Mail.  I made significant contributions to the design of the MIME protocol and data formats for multimedia and internationalized electronic mail and was the principal designer and later Working Group Chair of the system for extensions of the "SMTP" protocol that enabled new features and mechanisms in email transport.  The latter work included formulation and naming of the "EHLO" command that is now used in most contemporary electronic mail systems.

7.      I am the principal author and editor of the current version of the SMTP Standard for the transport of electronic mail on the Internet.  I am also one of, perhaps the, principal architect of new specifications to permit electronic mail to be sent and received using addresses that are not entirely in Latin-derived characters.

8.      I was Area Director for Applications of the Internet Engineering Task force in the mid-1990s and oversaw the definition and standardization of the "HTTP" protocol that is now the principal protocol used in the world wide web as well as a wide range of other work.

9.      I was a member of the Internet Architecture Board, which maintains general oversight of the architecture of the Internet, from 1998 through 2002 and was returned to it for an

additional two year term in 2009.  I was elected by the other members and served as the Chair of that body from 2000-2002.

10.     As a long-term contributor to the design of the administrative systems for the Internet such as those for top-level domains and MIME media types, I have been heavily involved in the process of converting those systems to more formal private sector control.  I was involved in the early procedural and definitional work for DNS administration and top-level domain definitions and was part of the committee that worked out the transition of DNS-related responsibilities between USC-ISI and what became the new Internet Consortium for Assigned Names and Numbers (ICANN).  I was also selected as non-voting liaison to the ICANN Board by the Internet Engineering Task Force  after that position was created.

11.     I have served in several capacities with the Internet Corporation for Assigned Names and Numbers (ICANN), the US Government designee for administering and coordinating the Internet's primary name and address spaces.  Those roles included service on some of the advisory groups that defined ICANN and its initial structures, advisory and review panels in several specific matters, and membership in the ICANN Board of Directors and Liaison for the Internet Engineering Task Force (IETF), the Internet's primary technical standards development organization.

12.     I served as a member of the National Research Council (NRC) Committee on The Internet in the Evolving Information Infrastructure from 1998-2000 and on their Committee on Internet Navigation and the Domain Name System from 2001-2005.  I have also served on several other NRC committees in the areas of Architecture, Food Protection, and Computing and Statistics.

13.     I am a Senior Member of the IEEE, a member of the American Statistical Association and the International Association for Statistical Computing, and a Fellow of the ACM.

14.     I am also a founding co-principal investigator of the Network Start-up Resource Center project (now based at the University of Oregon), which provides technical assistance for creation of computer network connections to developing areas, and I continue as a senior advisor to that activity.

**THE STRUCTURE AND ROUTING OF ELECTRONIC MAIL**

15.     Internet Electronic Mail (email) was closely modeled on the postal mail system, with a message "envelope" containing addressing and related information and used to transport the message, formalized headers as part of the message, and so on.   The analogy is of course not exact and there are some important details where it breaks down.  The most important of them is that, under normal circumstances, envelopes sent though the post do not contain identification of the various post offices and sorting and routing facilities through which they pass.  Internet message handling systems are required to obtain and document that information and record it in "trace" information fields for each system through which the message passes to include information about the system from which it received the message.

16.     Email includes what we call a message envelope that is used to transport and deliver the message.  In general, it contains the information needed to accept messages into the Internet, transport it across the network, and deliver it to a destination.  Envelope information is also known as "SMTP information" after the usual abbreviated name of the protocol that specifies it and email transport more generally, the Simple Mail Transfer Protocol.  The most important part of that information is the delivery address (known as the forward-pointing address

or "RCPT TO" field), the sender address (known as the backward-pointing address or "MAIL FROM" field), which is roughly equivalent to a return address on an envelope, and an announcement of the identity of the sending system.  The latter, known as the "EHLO" or "HELO" field, is essentially an announcement of the identity of the sending system and might be thought of as analogous to a postmark, albeit an undated one.

17.     None of these envelope fields are authenticated or guaranteed by the Internet. Like return addresses on envelopes in the postal system, there are few if any technical impediments to their being invented by the sender or to having the sender use information that bears no relationship to the actual content or other facts of the message.  As with the postal system, false or misleading envelope information may not prevent delivery.  Indeed, its purpose may be to try to convince a recipient to open and read a message that would otherwise be filed or discarded.

**HEADER COMPONENTS: RECEIVED FIELDS AND HELO/EHLO**

18.     Just as business letters that are transmitted within an envelope normally contain header information that shows name and address information about the message author, the date, the name and address of the recipient, often the message subject, and other identifying information, electronic mail messages contain header information.  While that information in a business letter may be formatted in a number of ways, the electronic mail equivalent is highly structured and some of it is required.  Common Mail User Agents (MUAs) – programs that provide an interface between the user and the stored electronic form of electronic mail messages – display some of the header information, typically including the presumed message originator, the date, and the subject line, as part of a mailbox table of contents.   The exact information

displayed, and how it is displayed, depends on the choice of MUA and how it is configured by the user or someone acting on the user's behalf.

19.     As with the envelope information, there are no technical impediments to inventing the header information.  Unless the recipient, or someone or some system acting on his or her behalf, detects inconsistent or misleading information as handles the message in some special way as a result, fabricated information in the message headers will generally not prevent delivery.

20.     The primary trace information is stored at the top of the mail headers in what is known as a "Received:" field.  That field contains several clauses, most of which are optional. The "from" clause of the "Received:" field is one of those that are required.  That clause is normally required to contain both the domain name used in the EHLO (or HELO) command received by that server and the server's own information about the IP address from which the connection was initiated.

21.     The requirements under the Internet Standards (sometimes called "RFC Standards" after the name of the document series in which they are published) for the HELO argument and the EHLO argument are the same.  The two terms continue to be used interchangeably and many bulk email distribution systems continue to use HELO.  The argument to those commands is expected to be the "primary host name" (a "fully-qualified domain name") of the system sending the message or, if that domain name is unavailable for some reason, the actual host address of that system may be used.

22.     The domain name and the IP address should correspond; if they do not, many systems will assume that the client (sender) machine is behaving inappropriately although there

are certain unusual configurations (not at issue here – see paragraph 23) in which that might not be the case.

23.    Those unusual configurations reflect a reality with very large scale email sending or receiving systems (e.g., those processing tens of thousands of messages an hour) which might use multiple computers working in parallel and having different addresses while answering to (or announcing) a single name.  However there is no evidence from the messages I examined that would indicate that configurations of this type were operated by either the Defendant or the Plaintiff, so the normal pattern of relationships described above would apply.

24.    The domain name specified in the EHLO or HELO field is required not only to accurately represent the sending host, but also to be linked to information that permits identifying the operator of that host for debugging and tracing purposes.  Long-standing Internet practice, as well as specific ICANN rules, require that all domain registrations in generic top-level domains be reflected in "whois" records that are expected to include "… the contact information for the Registered Name Holder, the technical contact, and the administrative contact"[1] and for those data to be both public and accurate.

25.    As with the name and address information in "From:" header fields discussed below (see paragraph 30), there are reasons to conceal registrant information to protect personal privacy and free expression.  Those justifications do not exist for commercial traffic, where common sense suggests that a legitimate business would not want to conceal its identity and would want to be easily contacted so that its identity can be verified, products purchased, customer service queries dealt with, and so on.

---

[1] See ICANN's Generic Names Supporting Organization's Whois report at http://gnso.icann.org/issues/whois/.  See also Section 3.3 and 3.7.7 of ICANN's standard Registrar accreditation agreement at http://www.icann.org/en/registrars/ra-agreement-21may09-en.htm.

26.     A popular technique with some bulk mailers is to make up or alter the earlier

"Received:" fields, concealing the transmission origin of the messages and the path they took.

As with domain names, there is are no reason to conceal the origins of commercial email other

than to deceive the recipient or to make it more difficult to identify the actual sender.

## HEADER COMPONENTS: "FROM:" FIELD

27.     The "From:" header field is expected to identify the originator of the message and

that person's email address.  Typically this field consists of either (a) the mailbox address of the

message originator, in the form of a local name, an at-sign ("@"), and a fully-qualified domain

name, optionally surrounded by pointed brackets ("<" and ">"); or (b) a "name phrase" (more

recently, a "display name" – the terminology has changed over the years, but not the intent),

followed by a mailbox address as described above, with the mailbox address required to be

surrounded by pointed brackets.  This display name is intended to provide the normal, human-

understandable, name of the message originator, while the mailbox specifies an address.  The

obvious analogy to postal mail is a deliberate design feature of the Internet's email architecture:

delivery is usually possible with only an address, but the norm is to specify both an address and a

name.

28.     The "From:" field is expected to identify the originator of the message and to do

so accurately.  If the display name is supplied, it is expected to be consistent with the address,

with both reflecting the message originator.  Not only is this required by the relevant standards,

but there is no legitimate business or technical reason to hide that information in a commercial

message.  Common sense indicates that business senders of messages, especially messages that

recipients have requested,  will want to be properly and promptly identified (using the display

name, the mailbox address, the domain, or any combination of them) by the user and by any

message-filtering or classifying software so that they can be located and read.  Conversely, many entities that desire to deceive users or automatic mail classification systems have tried to hide or distort that information in order to avoid easy detection.

29.     The Internet mail design also provides for multiple originators (rarely used, just as similar features are rarely used for paper mail) and for someone (the "Sender") who actually causes the message to be transmitted on behalf of (or at the instruction of) the message originator.  The "Sender:" header field contains the same type of information, in the same format, as the "From:" field and would be used, e.g., if an administrative assistant were sending a message on behalf of his boss.  In general, if one party is sending mail on behalf of another, the standards expect that the originating and responsible party will be clearly identified in the "From:" field and the sending agent will be identified in the "Sender:" field.   If the "Sender:" field does not appear in the set of headers on a particular message, the person or other entity whose name and address are represented in the "From:" field is expected to be both the message originator and the actual sender.

30.     In summary, the "From:" header field is expected to contain the mailbox address and, normally, the human-understandable name of the originator of the message.  While one can easily imagine exceptions where personal privacy was an issue and consequently justified hiding some of that information, with commercial email there appears to be no reason, other than to deceive the receiver, to put information into that header field that does not correctly identify the message originator.

**HEADER COMPONENTS: "TO:" AND "CC:" FIELDS**

31.     The header recipient fields ("To:" and "Cc:") follow the same conventions as the header "From:" field, in that their content is either a simple mailbox address or a display name

("name phrase") and mailbox.  Inconsistency of the information in these fields is a common

symptom of addresses being automatically collected ("harvested") from web pages and other

sources, or simply made up (a "dictionary attack"),  rather than being supplied by the user

through some "opt in" process.  Harvesting and dictionary attacks are common spammer tactics.


## HEADER COMPONENTS: SUBJECT LINE

32.     The "Subject" header field is formally optional but is used in most messages on

the Internet and considered sufficiently important that some message filtering systems will

consider a message without a Subject header to be suspect.

33.     As with its postal mail equivalent, normal readers expect the Subject field to be

accurate and to accurately reflect the content and subject matter of the message.   As with other

header fields, message originators who are sending messages that the recipients want to receive

and who want to maximize the odds that those messages will be received (e.g., not misclassified)

and read have considerable incentives to make the "Subject" header fields as clear and indicative

of actual message content as possible.  Conversely, those who want to try to deceive mail

classification systems and users into opening and reading unwanted materials have considerable

incentive to put information into these fields that will appear to be interesting or enticing, no

matter how irrelevant to message content.

## FALSITY

34.     For a commercial email message, I consider any mechanisms whose intent was to

prevent the user, or filtering or classification systems acting on the user's behalf, from easily and

correctly identifying the message originator, sender, or systems being used as being misleading

(and intended to mislead).

35.     When the message envelope and headers do not identify the message originator and systems used to transmit it in a clear and straightforward way, we must examine the reasons why that might be the case.  In some cases, there are reasonable explanations.  However, just as a fraudulent or marginal mail-order business might use a misleading name and an address not easily associated with the company in the return address of a postal envelope and otherwise try to make the envelope appear to be something it is not, there is no reason for a legitimate business to use a large number of quickly-changing domain names (see paragraph 38) or domain names that do not have "whois" registration records that unambiguously point to the company and contain correct contact information, unless the intent is to mislead users into opening the message, mislead user filters designed to classify unwanted messages into not classifying it as junk, or to evade "opt-out" or other identification requirements.

36.     For electronic mail, the use of domain names that cannot easily be verified with regard to identifying information about the message origin is, itself, misleading and, for commercial email, indicative of intent to make it more difficult to determine the origin of the messages (as well as helping to evade filters).  As mentioned in paragraph 24 above, there are firm requirements that domain name registrants disclose identifying and contact information and make that information public.

37.     In my experience, there is no reason for a business that is sending commercial email (bulk or otherwise) to try to hide its identity and contact information in this way other than to mislead recipients about the actual originator of the message.

38.     In addition to concealing ownership and contact information associated with domain names, a popular technique to avoid identification of senders and defeat anti-spam filters

based on message origin is to rapidly rotate the domain names (and sometimes user names and addresses) used in sending messages.

39.     It is common, for example, for bulk emailers to use Subject lines that are completely unrelated to, and hence misrepresent, the actual content of the message.

40.     Message creation dates, which are required by the standards, may be falsified or omitted entirely.

41.     Many mail-reading client programs (including the popular Microsoft Outlook program) only show the user the display name by default, hiding the actual address.  That behavior makes a display name that accurately reflects the address in the header field (be it "From:", "To:", or others) even more important and, conversely, the incentives even higher for a spammer to use a misleading display names to trick users or bypass filters

42.     Even the address information associated with the primary receiver (the "To:" field) may be falsified or invented: many bulk mailers use addresses harvested from other locations without permission of the owner and others attempt to determine them by algorithm or dictionaries of common names.  Both tend to make up display names in order to defeat mechanisms that check for them since these names are rarely captured accurately by address harvesting mechanisms or dictionary techniques.  The use of dictionary techniques can also be deduced when messages are sent to addresses that are never actually used to originate email or to receive legitimate and desired messages.

43.     Evidence of harvesting and dictionary techniques appears in many Defendant messages, even though most of those same messages make the explicit claim that the recipient had opted-in to the messages.

44.     Defendants also attempt to set a new standard for falsity: whether the information is misleading in a way that would affect a reader's decision as to whether or not to purchase a product.   It appears to me as a layman that such an interpretation is logically unsupportable under the statutes, if only because it would make it impossible for a message that does not make an offer of a product for sale to be spam.   From a technical standpoint, it would require that any message classification technique that attempted to detect probably-misleading information would be required to open the message and perform natural language text analysis on it, ignoring any other hints.   The difficulty and cost of doing that would change the relevant cost-benefit business decision analysis in most cases (see paragraph 47ff.)  in the direction of delivering far more unsolicited messages to users, diminishing the utility of electronic mail and preventing the very techniques –message rejection or classification as "junk" that Defendants appear to believe is required and, if effective, makes a message irrelevant from a spam standpoint, in other parts of their Motion.

**MESSAGE CLASSIFICATION TECHNIQUES:  SCANNERS, FILTERS, AND "TRAPS"**

45.     There are huge quantities of unsolicited email on the Internet today, with common estimates ranging from 75% to 95% of total email traffic.   The mere existence of this quantity of unwanted traffic imposes significant burdens on those — both ISPs and end users and enterprises — who operate server systems that receive mail.  Even if such an operator could somehow magically distinguish between wanted and unwanted messages ("spam" or otherwise) at the time a connection was opened to deliver it, costs would still be incurred for additional bandwidth and server capacity above and beyond that required to receive and process desired mail.   These burdens are presumably at least a large part of the reason why various jurisdictions have created

statutes or regulations that restrict or prohibit the sending of such messages and provide for redress if they are sent: the only way to eliminate the costs of receiving and processing unwanted messages is for those messages to not be sent.   Certainly one cannot make the assertion that, in operating an email system with sufficient capacity to receive legitimate messages in spite of the volume of undesired ones, an ISP or other enterprise is soliciting those undesired messages, but defendant appear in some of their arguments to take exactly that position.

46.     The technical community involved in trying to identify spam-style messages and reduce its effect on users has developed a vocabulary for talking about the measures involved that reflects an engineering style and occasionally a certain odd sense of humor.   Trying to read legal interpretations into those terms merely increases confusion.   For example, the term "filter" may be used, not only for processes that block messages out but for ones that merely identify messages and supply that additional information to the proposed recipient.   The term "trap" may imply a mechanism for capturing messages that are sent and that meet certain criteria: "to build a trap does not imply a desire to receive spam, or acceptance of the spam, only part of a mechanism for identifying and capturing spam that is being sent to, and received by, one's mail servers.   As a crude analogy, while I might keep mouse traps in my house in the hope of snagging any mice would might somehow bypass other mechanisms and get in, my deployment of those traps is certainly not a wish for more mice in my house (trapped or otherwise).

47.     In our current world, an ISP or mail-receiving enterprise has to make decisions about what to do about the volume of spam.   Those decisions are driven by both business and technical factors.   One can, for example, decide to spend processing resources doing message classification during message delivery so as to be able to reject inappropriate messages early, can accept all messages and later "bounce" those that are considered inappropriate, or adopt mixtures

of those two strategies.  Over the years, the conventional wisdom in the technical community has shifted from "better to receive and process" to "better to immediately reject when possible", mostly because of the risk of what has become known as "blowback" – spreading spam by sending error messages to incorrect destinations.   At the same time, that shift generally applies only to rejecting messages because of incorrect addresses or similar factors that are immediately obvious to the receiving system: when faced with mail that is deliverable but whose content in problematic, many enterprises and most ISPs will choose to accept the message and deliver it to the user, possibly identifying it as probable spam with special inserted headers or placing it in a special folder (often known as "junk" or the equivalent).  Because of the risk of false positives in spam-detection procedures, some have concluded that they have no choice other than to deliver any message that can possibly be delivered (possibly adding scores or other estimates of how likely the message is to be spam) and let the recipient make the final decision about disposition. Deposit a message in a "likely junk" folder is delivery nonetheless, albeit with a special kind of scoring: while there may be a significant difference to the user, to the ISP, exactly the same costs of receiving the message, processing and evaluating it, and depositing it in a folder are incurred for spam as are incurred for legitimate mail.    At the same time, many would-be recipients expect ISPs to somehow perform that classification function to "protect them" from spam.   That expectation actually increases the costs to the ISP as a consequence of receiving the spam because delivery without any evaluation process would be less expensive.

48.    The evaluation process is based on many different techniques, with different ISPs using different ones of them in different combinations.   There are no established industry standards for classifying and filtering email, partially because such standards would simply enable the spammers to design methods to evade the standardized techniques and apply their

methods to all ISPs.  What we see instead is an "arms race"-like situation, in which new countermeasures by ISPs and enterprises are met with newer counter-countermeasures by spammers, after which the cycle repeats and escalates.  Some spammer techniques have fallen into disuse because the countermeasures were good enough, but that observation doesn't reduce the costs of maintaining those countermeasures.   Not only is the volume of spam much higher today than it was a decade ago, but because of increasingly effective techniques to avoid detection, the resources needed to effectively identify and classify messages have increased on a per-message basis.

49.     Perhaps obviously, one of those business decisions is whether to try to minimize total costs by getting rid of undesired messages as quickly as possible (as suggested below, that may not be immediate except for a very small number of cases) or to try to reduce the costs of protective and classification measures by instituting legal actions under appropriate statutes in the hope of stopping (or considerably reducing) the amount of spam at the source, i.e., by discouraging it from being sent.   Ultimately, the latter approach is the only way to reduce the otherwise ever-increasing costs for additional bandwidth to tolerate spam in addition to legitimate connections and of filtering and classifying messages.   The observation that some ISPs (and mail-receiving enterprises) are unwilling or unable, even temporarily, to invest the resources to both handle the incoming spam load for the relatively short term and to try to use means clearly contemplated by various statutes to stop spam production and sending at the source cannot reasonably be taken as suggesting that ISPs who make that sort of decision about the long term are somehow behaving badly.

50.     Many current techniques for classifying messages depend on recognition of patterns in those messages.  Some of those patterns are mentioned elsewhere in this Declaration.

They can range from the trivial (e.g., misleading or deceptive mismatches between a mailbox address and a display name or a display name that is entirely missing)  to recognizing behaviors specific to particular bulk-mail sending tools (e.g., in the case of messages at issue in this case, frequent appearances of phrases like "insert publisher name here").   Doing that detection requires that someone, or some system, capture and study the actual messages looking for those patterns.   The methods of capturing all messages that are not deliverable to a known user (a so-called "wildcard") or of setting up specific mailboxes that have never been used to send or solicit mail of any sort (a "spam trap") are well-known and established in the industry.   A message that arrives in the associated mailboxes might just be an error in spelling or typing by a live user (in which case an extremely diligent mail-receiving site might want to study it, determine the correct address, and deliver it), but it is statistically much more likely to be an unsolicited spam message with the address  derived from a dictionary or similar attack.   Not only can such a message be studied for characteristics that will help to identify and classify others, but messages with similar content but destined for user mailboxes can be classified as likely spam based on the similarities to the "trapped" message alone.   Several large mail service providers, including Microsoft ("hotmail") have indicated that they use just such a technique, with a large number of mailboxes that are used only as "spam traps", as one of their tools.

**INVITING MAIL, RETAINING MAIL, AND KEEPING MAIL RECORDS**

51.     Against the backdrop of the necessity of receiving mail in order to classify it, of delivering spam (or suspect) mail to recipient mail folders (whether "inbox", "junk", or otherwise), and of maintaining records of message, some of the positions taken by Defendants are contradictory or even nonsensical.  They apparently argue that, if Plaintiff is able to detect

unsolicited messages and reject them, that failure to do so increases Plaintiff costs, may constitute inviting that traffic, and should bar Plaintiff from this litigation.   For the reasons discussed above, Plaintiff's main costs are incurred as soon as a message arrives and must be processed by Plaintiff's mail servers.   Messages can be safely rejected only when they are incorrectly addressed; Defendants distort my observation that rejection is usually the preferred practice today to apply to rejection for any characteristic that might cause a message to be classified as "probable spam" even if other considerations require its delivery.   Conversely, if all "possible spam" messages could somehow be  rejected at transmission time, Defendant would presumably argue that Plaintiff had no basis for complaint because the messages themselves could not be produced and exhibited.

52.     Because of the problems posed by false positives in message classification and of discarding messages as a result, most messages that can be classified as possible spam on the basis of their headers or content are, as discussed above (see paragraph 47) actually delivered to user folders with the classification information added or rerouted to special "junk" folders as part of the delivery process.  "Classify and deliver" is even more important for an ISP than for a mail-receiving enterprise: the latter might be able to adopt rules for discarding questionable messages while ISPs are under some obligation to deliver anything that might possibly be a user-desired message.  Defendants argue that the added header information needed to carry the classifications and the traces left by the rerouting somehow damage the messages.  That claim is nearly equivalent to  claiming that Plaintiff cannot try to classify messages as spam, or capture messages that are so classified (for either delivery, study and filter-improvement, or both) without giving up any ability to recover under the statutes but, again, their "if they can filter, they are required to filter" position contradicts that one.

**ORIGINATOR IDENTIFICATION**

53.     Independent of the contact information issues, companies who are not attempting to be deceptive typically try to establish strong corporate and brand identities.  The use of a consistent Internet domain name helps with predictability as well as filtering.  By contrast, shifting or rotating domain names on a frequent basis, especially when most or all of the names use hidden registration information, is misleading.  That pattern can be even more misleading to users when the domain names used have commonsense interpretations that are very different from the product being advertised.

54.     More generally, companies that are truthfully interested in having their messages reach only those who have asked to receive them and who continue to desire to receive them will not attempt to evade filters or obscure information.  Among such companies, it has become common in the last few years to supply hints with messages about how to avoid having those messages discarded (or classified as "junk") by anti-spam filters, e.g., by adding specific "From:" field information to address books.  These patterns of establishing brand identity and trying to ensure that recipients can identify desired messages are not present in the messages sent by the Defendants.

55.     Claims are made in most of the messages sampled about the relationship between the message originator or distributor (e.g., how the recipient address was obtained).  "Opt-out" information is also offered and claimed to be effective, i.e., that people will not be sent further mailings if they so request.  In many cases, those claims can be evaluated on a technical basis.  In particular, the use of obviously made-up components of recipient addresses (either in the mailbox or in a display name) are strong indications that the address was not obtained by some

voluntary process directly from the recipient.  A pattern of incoming messages continuing for months or years after opt-out requests are sent is inconsistent with those requests being honored in a systematic and effective way, making the message claim that one can opt-out by following the instructions in the message false.

56.     Messages containing statements indicating that the recipient "registered" to receive them, thereby opting in (*see, e.g.*, SPAM-K011121) can also be deceptive because they suggest falsely that the recipient has solicited the unsolicited email.  Using the Kraft emails as an example, the mail distributor did not even bother to fill a list name into what was presumably a template supplied to them.  In SPAM-K011121 and many other messages, we see "You have received this advertisement because you have registered with (Publisher List Name Entered Here).  If you believe this e-mail message was sent in error or if you would like to stop receiving e-mail advertisements from (Publisher List Name Entered Here), follow the opt-out instructions below."  This type of statement, without even the publisher name filled in, fairly obviously does not represent a careful extract from a legitimate list of recipients registered to receive the messages.


**OTHER FILTER-FRUSTRATING TECHNIQUES**

57.     Anti-spam filters, and filtering methods, have evolved over time, but all are essentially collections of heuristics that either reject particular message sources or try to detect bulk or hostile messages (or particularly important messages) and give them special treatment. Some try to "learn" from patterns of message content or information about senders or their addresses, others rely on user-specified rules, and still others use patterns of messages received (e.g., detecting "bulk" empirically).  (See paragraph 52 for a related discussion.)

58.     When organizations produce mailings to lists of users who have asked to receive the mail, they typically take or recommend measures to reduce the odds that filters will accidentally delete or misfile their messages.  Those measures usually include making their messages as predictable as possible: keeping sender address (the mailbox name including the domain and the display name) very stable, using a predictable format for Subject lines, using the recipient's correct name in the display name field as well as using a correct mailbox address, addressing the user by name in the body of the message, and asking the user to include the distribution list sender address in an address book, thereby making it a known address.

59.     The behavior of bulk emailers seeking to evade filters is the exact opposite of many of those methods, combined with tactics to confuse any filters that exist.  For example, if there is reason to believe that filters are being set up to identify messages coming from a particular address or domain, the emailer seeking to defeat the filters may try to use a large number of "sender" domains in the "From:" field and perhaps in "click here to purchase" URLs in the message, changing them frequently so that new domains are in use by the time the filters adapt to the old ones.  Similarly, Subject header line formats may be varied in order to prevent filters from rejecting messages based on patterns in them.   Other bulk emailers may use mail sending machines in different locations on the Internet, with different addresses, in order to bypass filtering based on the sending address.


**STORAGE AND PROCESSING OF THE EMAILS**

60.     Defendants criticize Plaintiff for not retaining and presenting messages in standard "mbox" format.  There is no Standard that requires a particular format, nor is there a standard for the "mbox" format itself.  Because those Standards do not exist and the

requirements proposed by Defendants are not recognized by email system developers, the format that these reports attempt to impose is equivalent to requiring that Plaintiff operate mail-receiving and storage systems chosen by the Defendants, an obviously unreasonable demand.

61.     Once a message is transferred from the system that receives it from the Internet to the system on the user or client computer, it must be stored locally (even if only temporarily in some systems).  Its choice of formats is independent of that used in the message storage system, but typical mail user agent (MUA) systems, including Eudora, Microsoft Outlook and Outlook Express, and others, although not all of them, use some variation on one of two traditional formats.  One of the two formats involve storing all messages in a single file separated by some delimiter or identifying string (sometimes called a "fence").  The other stores on message per file, organizing the message folder as a directory folder of some sort.   However, different MUAs will often use different variations on those traditional formats.

62.     In summary, there is no standard format for the storage of messages.  Formats inevitably differ between storage in (or on behalf of) a mail-receiving system and storage in (or on behalf of) mail user agents.  They differ significantly within those groups as well.  Complaints by the Defendant's experts that messages were not stored and presented in what they believe to be the standard format exhibit ignorance on their parts, not a defect by the Plaintiff.

63.     With regard to complaints that Plaintiff did not capture and archive emails with their associated graphic images, there are at least two difficulties with trying to require that such material be captured.  First, it is unreasonable.  Requiring that a user open those files and inspect them to discover whether the message contains important or required information or is deceptive would be equivalent to requiring the reader of a print advertisement to read, not only the fine

print, but material referenced from the fine print, in order to find the disclaimers.  Second, following such links and opening the images exposes the user/recipient to risks that go far beyond the costs of receiving spam, risks that include "web bugs" that compromise privacy, viruses, and other malware.  Even such non-specialist publications as *Consumer Reports* now recommend avoiding clicking on or otherwise using such links as an elementary precaution.

64.     The messages were collected and stored by Mail User Agents in a consistent format that, from my examination, preserves all important information in the messages and headers themselves.  They were annotated by Plaintiff as aids in message analysis and presentation.  One can, of course, theorize that the message storage formats and annotation methods permitted some unidentified and entirely hypothetical third party, perhaps a commercial competitor of the Defendants or perhaps an interested Martian, to tamper with the messages in a way that altered them to implicate the Defendants.  There is, of course, no evidence to cause one to believe that any such tampering had occurred, only speculation that it might have because there is no conclusive proof that it did not.  In fact, the evidence I have reviewed strongly suggests that no tampering has occurred.


**SPOLIATION OF RELEVANT MESSAGES**

65.     Defendants suggest that some significant quantity of the messages preserved by Plaintiffs were spoiled beyond recognition of the original email messages as sent, citing my comments when handed printouts of those messages during the deposition (see pages 10 and 11 of 38 in the Summary Judgment Motion).  In reality, the messages presented to me exhibited two problems, one quite minor in my opinion and one very significant.   The minor one is that Plaintiff wrote programs to scan through this very large collection of messages, identify message

boundaries, and assign reference numbers.  For certain patterns of messages (especially those with very long internal attachments), those programs failed and became confused.   Correcting the programs caused the messages to be separated appropriately.    Much more important, proper handling of message header information and the separation of headers from message body text depends critically on the presence or absence of blank lines (a critical separator) and of leading blank characters in lines of fields that are "wrapped" into multiple lines. Without that information, accurate analysis of headers and messages is impossible, as I indicated in my deposition.   Examination of the messages as supplied to Defendants in comparison to the printouts they should me indicates, as I suspected and indicated was possible during the deposition, that the procedures the Defendants used to print those excerpts out eliminated critical blank lines and did some line wrapping that was not present in the original and was, consequently, not properly delimited.   The only evidence I've been able to find of message spoliation that actually loses or distorts important information was performed by Defendants in preparing those printouts.


## ISP REQUIREMENTS

66.    Defendants have questioned whether Plaintiff is actually an ISP and raised questions about the quality of their operations.  The latter have been partially based on my deposition testimony, but distorts both my statements and my intent.   The only practical definition of an ISP is someone who provides Internet services to customers.  Just as there are small neighborhood grocery stores as well as multi-state supermarket chains, there are small ISPs and large ISPs.  No one reasonable expects the smaller and larger members of either group to

behave or be organized in the same way:  for example, the supermarket chain may have dedicated shipping and receiving departments while the person who works the cash register at the neighborhood grocery may also be in charge of packing and unpacking boxes.  Similarly, a very large ISP may have a dedicated and highly skilled operations staff available 24 hours a day and seven days a week while a smaller one may rely on the principals or a small, multi-purpose staff who are available only by pager outside normal working hours.  These differences do not make the neighborhood store "not a grocery store" (although it may not  be a large supermarket with a presence in several states), nor does it make a small ISP "not an ISP" (even if it is not a giant provider with direct national or international presence).    Defendant's observations that Plaintiff does not operate the way I have found many large-scale, international, ISPs operate demonstrates nothing other than that Plaintiff is not a large-scale, international, ISP.  That does not make them someone "not an ISP", any more than the neighborhood store is not in the grocery business because they don't maintain a large and separate receiving department.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of February, 2010.

By: John C. Klensin

[Document emailed; ink signature forthcoming]