## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| _____ ) | |
| BEYOND SYSTEMS, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-CV-0409 (PJM) (CBD) |
| ) | |
| KRAFT FOODS, INC., et al. ) | |
| ) | |
| Defendants. ) | |
| _____) | |

### DECLARATION OF DR. JOHN R. LEVINE PURSUANT TO 28 U.S.C. § 1746

I, Dr. John R. Levine, declare:

1.      I am over 18 years of age and fully competent to testify to the facts set forth in this Declaration.

2.      I am currently an independent computer industry consultant and author specializing in the Internet and Internet-related issues. I lecture to and consult for numerous clients including IBM Canada, CBS Television, Minnesota Power, the American Institute of Chemical Engineers, Alex, Brown & Sons, and Hewlett-Packard.

3.      I am the chair of the Internet Research Task Force (IRTF) Anti-Spam Research Group. Since 1997, I have been a board member of the Coalition Against Unsolicited Commercial Email, an Internet user advocacy group. Also since 1997, I have run the Network Abuse Clearinghouse, also known as abuse.net, a free service that helps Internet users and service providers report and deal with abusive online behavior.

4.      I am a Senior Technical Advisor to the Messaging Anti-Abuse Working Group (MAAWG), the leading industry anti-spam forum, whose members include

- 1 -

Google, Yahoo, Microsoft, AOL, Verizon, AT&T, Openwave, and many other large

networks and mail software vendors.

5.      I have been a network manager for a private network that hosts over 300

Internet domains and web sites, totaling over 300,000 web pages, since 1995.

6.      I operate a variety of electronic mail servers for myself and approximately

1,000 other people. As part of running this service, I deal daily with issues of spam and

other email abuse.

7.      I have authored or co-authored over a dozen books on computer and

electronic mail issues including: *The Internet for Dummies* (now in its 11th edition, with

over eight million copies in print), *Internet Privacy for Dummies* (2002), *Internet Secrets*

(2d Ed. 2000), *E-mail for Dummies* (2nd Ed, 1997), and *qmail* (2004).

8.      I have been active in the computer industry for thirty years, working for

Interactive Systems Corporation. (the first commercial provider of UNIX software)

between 1979 and 1984 and Javelin Software (creators of an award winning PC modeling

tool) from 1984 to 1987. In 1989, I co-founded Segue Software, currently the leading

provider of web and client/server testing software, where I continued as a director and

consultant until the company was sold in April 2006. I received a B.A. Computer Science

with a minor in Mathematical Economics form Yale University in 1975, and a Ph.D. in

Computer Science from Yale University in 1984.

9.      I have been asked by Beyond Systems, Inc., to comment on the Motion for

Summary Judgment (MSJ) dated December 18, 2009 and the supporting Memorandum of

Law (MOL) filed by Defendants Connexus Corp. and Hydra LLC.  The organization of

my comments generally follows that of the MOL.  Most of the arguments in the MOL

simply reiterate claims that Defendants or their experts have previously made, to which I

have previously responded.  In those cases I will summarize the salient parts of my

response.

### I.     Spam Traps, Wild Cards, and Management of Small Mail Systems

10.     Pages 5 through 7 of the MOL argue, as best I can make out, that Plaintiff is to

blame for receiving Defendants' spam, as though the spam were floating freely in space, and

Plaintiff created "spam traps" to pluck them from the ether.  In reality, every e-mail message,

spam or otherwise, is sent to specific recipient e-mail addresses.  A spam trap is merely an

address that gets so much spam that it is useless for regular mail.  Like mail to any other address,

mail to a spam trap is received only because the sender addressed it to the trap, a point I expand

on below.

11.     On page 14 of the MOL, Defendants argue without basis that Plaintiff has

a duty to block all incoming spam, rather than receiving and archiving it, with

suggestions that there is something unusual and improper about receiving spam and

keeping an archive of it.  To the contrary, many systems that receive mail routinely keep

copies of incoming spam.  Google, for example, has a vast archive of spam received by

their Gmail service, and I personally have an archive containing copies of over 20 million

spam messages sent to my mail system in the past four years.  An ISP is doing nothing

improper by archiving mail.  In fact, archiving mail allows an ISP to investigate spam

complaints, facilitate the reporting of spam to other networks, fine-tune spam filtering for

customers, and ensure that in the event errors occur or mail is inadvertently routed

improperly, it can be retrieved.

12.     On pages 17 and 18 of the MOL, Defendants decry Plaintiff's collection of mail in "spam traps".  A spam trap is an e-mail address that gets a lot of spam, but such traps can be created in a variety of different ways.  In Plaintiff's case, its mail system was configured to receive all mail sent to addresses in its domain that were not assigned to individual recipients.

13.     Small businesses such as Plaintiff quite commonly use such a catchall address - even if an address is misspelled, if it's addressed to the business' domain, it should be intended for someone at the business, and can be read and routed to the appropriate person, just like slightly misaddressed paper mail.  For example, I have run a server that provided mail service to about 100 small businesses in upstate New York, customers of a local web host.  I offered each of them the option of using a catchall address, and most of them did so.

14.     In Plaintiff's case, spammers sent a great deal of mail to invented or guessed addresses, so the catchall functioned as a spam trap, without any direct action by Plaintiff to make it one.  On my system, I have a domain name that has never been used for legitimate electronic mail, but gets spam from spammers who used address collection software that misinterpreted text strings that happened to include the domain name as e-mail addresses.  My domain, which I have configured to receive all mail sent to it, gets approximately 50,000 messages a day, all unsolicited, and I can easily believe that BSI would get a similar amount with no action on its part to encourage or solicit it.

15.     Defendants further criticize Plaintiff for maintaining archives of spam emails, with suggestions that there is something unusual and improper about keeping an archive of received spam. To the contrary, many systems that receive mail routinely keep

copies of incoming spam. Google, for example, has a vast archive of spam received by their Gmail service, and I personally have an archive containing copies of over 20 million spam messages received by my mail system in the past four years. An ISP is doing nothing improper by archiving mail. Archiving mail allows an ISP to investigate spam complaints, facilitate the reporting of spam to other networks, fine tune spam filtering for customers, and ensure that in the event errors occur or mail in inadvertently routed improperly, it can be retrieved.

## II.   Validity of the E-mails at Issue

16.     On pages 8 and 9 of the MOL, Defendants selectively quote from my testimony at deposition, and completely misrepresent my position with regard to the validity of Plaintiff's evidence.  Near the top of page 9, they quote my words "excluding [emails] from evidence".  When I said that, I was referring to a handful of the messages at issue, not, as they imply, to most or all of them.  I recently reviewed the mail attributed to Hydra and Connexus for the defects we were discussing at that point in the deposition, and found that they affected less than 2% of the messages at issue.

17.     I described a printout of one of the messages as "a mess", which referred to the way the mail messages were formatted in the printout.  A few moments later, in reference to the same printout, I said "[i]t would be easier to read if he had been more careful about line boundaries and formatting. It doesn't make it impossible to read, it just makes it harder to read." *See* Exhibit 24 to Defendants' MOL at 334: 5-8.

18.     When I said "much of the mail contains technical flaws," I was referring to flaws present in the mail as originally sent, presumably by Defendants' affiliates, not flaws introduced by Plaintiff.

19.     Defendants and their expert Cohen have frequently used the term "spoliation" to describe Plaintiff's handling of the email messages at issue.  My understanding of spoliation is deliberate destruction of evidence, which is not even remotely the case here.  Based on my examination, the messages have been modified in two ways.  One is the standard operation of mail servers.  For example, in his report, Cohen was shocked to discover that Plaintiff's Communigate Pro mail server adds a `Message-ID:` line to messages that don't already have one, a normal function the mail servers have performed for at least 30 years.  These changes are analogous to a secretary writing the date and a file number on incoming paper mail, and are equally innocuous and easy to recognize.  Defendants have also objected to routine mail system operations such as copying mail from one server to another, none of which change the mail in important ways.  To make a rough analogy, it is as though Plaintiff received truckloads of paper mail in its mail room, moved the mail to a warehouse to make space in the mail room, and Defendants argued that the mail was spoliated simply by not all being in the mail room.

20.     The other kind of modifications are due to scripts used by Plaintiff to extract relevant messages from its large mail archive.  Cohen has claimed that the scripts that Plaintiff used to sort and archive messages spoiled the messages, evidently because they weren't normal user mail programs.  Again this is silly; it is entirely reasonable to use scripts to sort and organize large amounts of data such as email messages.

21.     In a few cases messages are duplicated, which appears to be due to Plaintiff's system failing ("crashing") due to overload, and re-fetching the same message when it restarted.  Had the system not had to deal with a continuous tsunami of spam, it

would not have been overloaded, and would not have crashed. The messages duplicated due to crashes are present as a consequence of the spam Plaintiff received. The number of duplicates is in any event small, and as Defendants have shown, they are not hard to identify if there were to be a need to do so.

### III.    Plaintiff's Status as an ISP

22.    On page 13 of the MOL, Defendants note that I had never heard of BSI other than in the context of litigation, implying that means that BSI is not a legitimate ISP. There are thousands of small regional ISPs in the U.S. Like most Internet users, I am familiar with the ISPs in the area where I live (upstate New York), and with some ISPs in other areas that provide services that I use, such as server hosting. Other than that, I'd have no reason to investigate an ISP, and for the vast majority of ISPs, I have not done so. Hence, my prior familiarity or lack thereof with BSI says nothing about BSI's legitimacy.

23.    Defendants also argue on pages 10 through 16 of the MOL that Plaintiff is not an ISP due to some combination of BSI's ad-hoc mail processing system, its President's ability to spend significant time pursuing litigation, and that BSI suffered insufficient pain from the spam it received. None of these arguments hold up on closer examination. While Plaintiff's mail handling was fairly unusual, it got the job done, and nowhere does any law prescribe a threshold of technical excellence needed to qualify as an ISP. Similarly, there's no requirement that Plaintiff spend full time managing its mail system. I've personally run a mail system for a thousand users, which generally required less than an hour per week of attention, all of which could be done remotely from wherever I happened to be. There is no inconsistency between running a mail system and

having enough time to pursue other activities.  The argument that Plaintiff suffered no damage or invited all the spam is simply untrue.  Having examined the archive of mail at issue, even if Plaintiff invited mail to a few addresses, vast amounts of spam were sent to addresses clearly made up or guessed by the spammers, burdening Plaintiff with its receipt and processing.

### IV.    Fraud and Preemption

24.    On pages 27 through 30 of the MOL, Defendants argue that the false aspects of the e-mail at issue are immaterial or irrelevant.  That's simply not true.

25.    Their fraudulent aspects, many of which I detail below, are common and well known spammer tactics.  There is no legitimate reason to rotate through hundreds of varying subject lines and return addresses, or to hide recipient identities in fields intended for software version numbers.  Their only purposes are illegitimate: to evade spam filters, to trick recipients into thinking spam is legitimate mail, and to identify recipients from spam reports, even when the reports have had identities redacted.

A.    Misleading `From:` field

26. By both RFC standards documents and long standing practice, the `From:` field identifies the person or entity who authored or originated the message.  This is a practical, not a technical, definition.  A secretary might send a message on behalf of a supervisor, or a computer operator might send mail to a mailing list for his employer or a client of his employer.  In those cases, the supervisor or the employer or client requesting the mailing is identified in the `From:` field.

27. The `From:` field usually contains two parts, the e-mail address and a "friendly" comment.  For example, the `From:` line on mail I sent typically reads:

- 8 -

From: John Levine <johnl@iecc.com>

where the part in angle brackets < > is the e-mail address and the part before it is the comment. Although the comment is not interpreted by mail programs and doesn't normally affect the routing or processing of mail, it is displayed to message recipients and should identify the author or originator of the message.

28.     Every Internet e-mail message contains a `From:` header that should identify the author of the message.  Many of the messages contain `From:` lines that are patently false.

29.     In many of the Kraft, Connexus, and Hydra messages, the address on the `From:` line is a random string of letters or a random person's name, for example:

| Message | From address (Kraft messages) |
|---------|-------------------------------|
| K016550 | Gevalia <zsokUvbNqlO@UMUTTEMIZLIK.COM> |
| K016551 | Gevalia <dcQGEgNUJjo@UMUTTEMIZLIK.COM> |
| K016552 | Gevalia <MZagiuChJvU@UMUTTEMIZLIK.COM> |
| K016553 | Gevalia <mVQKAzvBTsi@UMUTTEMIZLIK.COM> |
| K016554 | Gevalia <kjBhyvFKIEe@UMUTTEMIZLIK.COM> |
| K016555 | Gevalia <fjJPATQHiFu@UMUTTEMIZLIK.COM> |
| K016556 | Gevalia <rSwJeyFqEKO@UMUTTEMIZLIK.COM> |
| K016557 | Gevalia <RYXmAlHewvO@UMUTTEMIZLIK.COM> |
| K016558 | Gevalia <hWlVexAwGuE@UMUTTEMIZLIK.COM> |
| K016559 | Gevalia <LZrbUNnpCFO@UMUTTEMIZLIK.COM> |
| K016560 | Gevalia <NUVMaOrguHE@UMUTTEMIZLIK.COM> |
| K016561 | Gevalia <StLrUXkbCvO@UMUTTEMIZLIK.COM> |
| K016562 | Gevalia <UBZRaJpIDAu@UMUTTEMIZLIK.COM> |
| K016563 | Gevalia <wlnfyYhFSJe@UMUTTEMIZLIK.COM> |
| K016564 | Gevalia <aioKUkYDcEy@UMUTTEMIZLIK.COM> |
| K016565 | Gevalia <rBviozaRyGA@UMUTTEMIZLIK.COM> |
| K016566 | Gevalia <arfwyWROoME@UMUTTEMIZLIK.COM> |
| K016567 | Gevalia <qIYSeoGKCia@UMUTTEMIZLIK.COM> |

| Message | From address (Connexus messages) |
|---------|----------------------------------|
| C015619 | Vonage<Wallace.lhlv@makenuoffers.com> |
| C015620 | Vonage<Symmes.lhlv@makenuoffers.com> |
| C015621 | Vonage<Anderson.lhlv@makenuoffers.com> |
| C015622 | Vonage<Trimmer.lhlv@makenuoffers.com> |
| C015624 | Vonage<Whitlock.lhlv@makenuoffers.com> |

C015625     Vonage<Churchill.lhlv@makenuoffers.com>
C015626     Vonage<Clayton.lhlv@makenuoffers.com>
C015627     Vonage<Wear.lhlv@makenuoffers.com>
C015628     Vonage<Bayley.lhlv@makenuoffers.com>
C015629     Vonage<Brooks.jzfz@habaricompanies.com>
C015630     Vonage<Trowbridge.jzfz@habaricompanies.com>
C015631     Vonage<Record.jzfz@habaricompanies.com>
C015632     Vonage<Gunton.jzfz@habaricompanies.com>
C015633     Vonage<Bloomer.jzfz@habaricompanies.com>
C015634     Vonage<VanAlen.jzfz@habaricompanies.com>
C015635     Vonage<Rust.jzfz@habaricompanies.com>
C015636     Vonage<Johnson.wywz@greatpower-marketing.com>
C015642     Vonage<Howell.wywz@greatpower-marketing.com>
C015647     Vonage<Hoes.wywz@greatpower-marketing.com>
C015648     Vonage<Longworth.wywz@greatpower-marketing.com>
C015650     Vonage<Fitch.vjjw@marketsrvz.com>
C015651     Vonage<Hilton.jwwx@hnsxweb1.com>
C015652     Vonage<Pope.vjjw@marketsrvz.com>
C015653     Vonage<Armstrong.jwwx@hnsxweb1.com>
C015654     Vonage<Weir.jwwx@hnsxweb1.com>
C015655     Vonage<Weir.jwwx@hnsxweb1.com>
C015656     Vonage<France.jwwx@hnsxweb1.com>
C015657     Vonage<Lane.jwwx@hnsxweb1.com>
C015671     "Vonage" <rPc5bbDc@commonoak.com>
C015676     Vonage<Jones.hjhw@gnbconnect.com>
C015677     Vonage<Malone.hjhw@gnbconnect.com>
C015678     Vonage<Lacey.ygwz@denedia.freeimagine.com>
C015679     Vonage<Mahieu.ygwz@denedia.freeimagine.com>
C015680     Vonage<Ramage.ygwz@denedia.freeimagine.com>
C015681     Vonage<Holbrook.ygwz@denedia.freeimagine.com>
C015682     Vonage<Kerr.ygwz@denedia.freeimagine.com>
C015683     Vonage<Johns.ygwz@denedia.freeimagine.com>
C015684     Vonage<Eisenhower.ygwz@denedia.freeimagine.com>
C015685     Vonage<Emmons.ygwz@denedia.freeimagine.com>
C015686     Vonage<Poyntz.ygwz@denedia.freeimagine.com>
C015687     Vonage<Colgan.jyy@cnimservices.com>
C015688     Vonage<Lacy.jyy@cnimservices.com>
C015689     Vonage<Perry.wfz@hlateral.com>
C015690     Vonage<Caldwell.jyy@cnimservices.com>
C015691     Vonage<Light.jyy@cnimservices.com>
C015692     Vonage<Glasgow.wfz@hlateral.com>
C015693     Vonage<Russell.jyy@cnimservices.com>
C015694     Vonage<Mccallum.jyy@cnimservices.com>
C015695     Vonage<Boyd.jyy@cnimservices.com>
C015696     Vonage<Singleton.jyy@cnimservices.com>
C015697     Vonage<Sayre.jyy@cnimservices.com>

C015698        Vonage<Sayre.jyy@cnimservices.com>
C015699        Vonage<Gladding.wfz@hlateral.com>
C015700        Vonage<Dall.jyy@cnimservices.com>
C015701        Vonage<Milhous.jyy@cnimservices.com>

*Message*        *From address (Hydra messages)*
H014905        TrueAutoPrices<Pont@hostadapted.com>
H014906        TrueAutoPrices<Endsley@hostadapted.com>
H014907        TrueAutoPrices<Greeke@hostadapted.com>
H014908        TrueAutoPrices<Warner@hostadapted.com>
H014910        TrueAutoPrices<Grey@hostadapted.com>
H014912        TrueAutoPrices<Alcock@hostadapted.com>
H014961        TrueAutoPrices<Rudolph@hostadapted.com>
H014962        TrueAutoPrices<Blue@hostadapted.com>
H014963        TrueAutoPrices<Milhous@hostadapted.com>
H014964        TrueAutoPrices<Lillie@hostadapted.com>
H014966        TrueAutoPrices<Perkins@hostadapted.com>
H014968        TrueAutoPrices<Temple@hostadapted.com>
H014969        TrueAutoPrices<Schlossberg@hostadapted.com>
H014970        TrueAutoPrices<Macomson@hostadapted.com>
H014979        TrueAutoPrices<Cooke@hostadapted.com>
H014981        TrueAutoPrices<Mckee@hostadapted.com>
H014998        TrueAutoPrices<Umfreville@hostadapted.com>
H015011        TrueAutoPrices<Glasscock@hostadapted.com>
H015012        TrueAutoPrices<Putthoff@hostadapted.com>
H015013        TrueAutoPrices<Harrod@hostadapted.com>
H015014        TrueAutoPrices<Estes@hostadapted.com>
H015015        TrueAutoPrices<Bradford@hostadapted.com>
H015273        TrueAutoPrices<Alberye@hostadapted.com>
H015274        TrueAutoPrices<Weeks@hostadapted.com>
H015275        TrueAutoPrices<Bloomer@hostadapted.com>
H015276        TrueAutoPrices<Chapman@hostadapted.com>
H015277        TrueAutoPrices<Holbrook@hostadapted.com>
H015282        TrueAutoPrices<Hedge@hostadapted.com>
H015284        TrueAutoPrices<Snelgrove@hostadapted.com>
H015285        TrueAutoPrices<Bush@hostadapted.com>
H015286        TrueAutoPrices<Christian@hostadapted.com>
H015288        TrueAutoPrices<Strode@hostadapted.com>
H015289        TrueAutoPrices<Weir@hostadapted.com>
H015291        TrueAutoPrices<Mitchell@hostadapted.com>
H015294        TrueAutoPrices<Anderson@hostadapted.com>
H015386        TrueAutoPrices<Fithian@alch.floppynic.com>
H015388        TrueAutoPrices<Winskill@alch.floppynic.com>
H015389        TrueAutoPrices<Cleveland@alch.floppynic.com>
H015390        TrueAutoPrices<Woodworth@alch.floppynic.com>
H016273        TrueAutoPrices<Reagan@hostadapted.com>

H016904        TrueAutoPrices<Dewolfe@denedia.fanradin.com>
H016905        TrueAutoPrices<Saxton@denedia.fanradin.com>
H016912        TrueAutoPrices<Whitney@denedia.fanradin.com>
H016916        TrueAutoPrices<Robbins@denedia.fanradin.com>
H016918        TrueAutoPrices<Livingston@denedia.fanradin.com>
H016920        TrueAutoPricesRhodes@denedia.fanradin.com

Many other messages have similar randomized addresses; these are a sample.

30.     Randomized `From:` addresses are a common spammer tactic to evade

mail filters that attempt to recognize spam from unwanted senders.  When the addresses

use people's names, it is also an attempt to make human recipients think that the message

is a personal message from an actual person.

B.     Misleading Subject lines

31. Every e-mail message contains a `Subject:` line that describes the subject of

the message.  Many of the messages contain `Subject:` lines that appear to be, at the

least, misleading.  For example, many of the Connexus messages include subjects such

as:

C002826        A Complimentary Apple iBook
C003281        An Apple iBook at no cost?  Participate Now
C004614        Apple iBook - no charge
C004615        Apple iBook - No Charge
C004618        Apple iBook at no charge - Limited Time Offer
C004630        Apple iBook at no cost?
C004642        Apple iBook Laptop- trial giveaway
C006787        Claim your Apple iBook Laptop Computer
C007979        Claim your Complimentary Apple iBook Laptop
C008194        Electronics Site offers you a complimentary Apple iBook
C008198        Do you Qualify for a Free iBook?
C008201        Do you Qualify for a iBook at No Cost?
C008202        Do you Qualify for a iBook for Free?
C008203        Do you qualify for a no cost iBook Notebook Computer?
C008381        Electronics Special Promotion - Get a Complimentary Apple iBook
C009461        Get a Complimentary Apple iBook
C009469        Get a Complimentary Apple iBook
C014175        iBook - no charge
C014179        iBook at no charge

C014189        iBook Promotion
C014262        Interested in an Apple iBook at no cost?  Participate Now
C014925        Need an Apple? Get an iBook on us!
C016663        Test & Keep an Apple iBook Laptop - Product Testers Wanted
C027333        Your Free Apple iBook

32.    Each of these subject lines appears in several messages, a total of over 200

messages.  In my experience, promotions such as these require the consumer to buy a

variety of products or services, and the computer was not in fact free.

33.    Other subject lines are deceptive in other ways.  For example, message

C016568 includes the subject line "Stock Mogul Newsletter", and message C008127

includes the subject line "Small Investments to Small Fortunes?" but both are stock touts

in pump and dump schemes.

34.    Many of the Hydra messages include subjects such as:

H005421        Free designer bag worth 1000. Choice of three styles
H005432        Free hip-hop ringtone. Ciara, Cassidy, Mario, Fat Joe, Mariah+
H005499        Get 10 Free Ringtones
H009734        Open your six Free Bottles of Wine with a Free Wine Opener

35.    In my experience, promotions such as these require the consumer to buy a

variety of products or services, and the offered product was not in fact free.

C.    Invented addresses and false opt-in claims

36. I have examined 7,457 messages attributed to Kraft, with Bates numbers from

K011121 to K018577.  Approximately 100 of the messages have random author

addresses such as:

From: Gevalia@domainname.com <wzDuokGbXLE@QUICKCIVIC.INFO>
From: Gevalia@domainname.com <rMBeuDhkQwy@QUICKCIVIC.INFO>
From: Gevalia Gourmet Coffee Starter Kit <sIvrALRqkMi@NOWANDLATERADSSITE.INFO>
From: Gevalia Gourmet Coffee Starter Kit <MdhlemiyXuO@NOWANDLATERADSSITE.INFO>
From: Gevalia <zsokUvbNqlO@UMUTTEMIZLIK.COM>
From: Gevalia zdnHUKskZFI@taximan.info

The random names serve no legitimate purpose, but are intended to confuse and mislead human recipients and software spam filters.

37.     Nearly all of the messages say "You have received this advertisement because you have registered with (Publisher List Name Entered Here)."  The string "Publisher List Name Entered Here" appears literally in the message, possibly because the sender neglected to enter the name of a list that he bought, or more likely because the sender had no list and invented possible recipient addresses, a common spamming technique known as a dictionary attack.  The addresses the spam was sent to included lukeht@safemailbox.com, jocelynht@safemailbox.com, gabrielht@safemailbox.com, caitlinht@safemailbox.com, brookeht@safemailbox.com, briannaht@safemailbox.com, alexandriaht@safemailbox.com, mariahht@safemailbox.com, lydiaht@safemailbox.com, johnht@safemailbox.com, haileyht@safemailbox.com, and elijahht@safemailbox.com. In my opinion, the presence of the invented addresses with the false statement that the recipient had registered is misleading.

D.     Falsified `X-Mailer:` headers

38. Messages contain a variety of other headers that are of use primarily to mail administrators and are not visible other than by use of a ``show all headers'' feature.  One of the administrative headers is `X-Mailer:` .

39. User-level e-mail software often adds headers of its own to identify the software in use. The `X-Mailer:` header typically identifies the mail program with a user created the message.  To the extent that a message's headers fail to follow these conventions, with `X-Mailer:` headers that do not identify the software in use, the email contains false or misleading information.

40. Over 24,000 of the Connexus messages contain X-Mailer: lines that purport to be software version numbers, such as:

| Message | Header |
| --- | --- |
| C001019 | X-Mailer: Version 5.01.9399.7141 |
| C001020 | X-Mailer: Version 5.03.9008.9905 |
| C001021 | X-Mailer: Version 5.03.4406.1288 |
| C001022 | X-Mailer: Version 5.01.9399.6593 |
| C001023 | X-Mailer: Version 5.01.9400.8041 |

41.    In these messages, the four digit numbers (9399, 7141, 9009, 9905, and so forth in the examples above) are different in each message.  Software does not change from one message to the next--a single version of a single program is used to send all the mail in a session, whether an individual user's mail session or a million message spam run.  The unique numbers in these messages serve not to identify the mailer, but on the contrary to identify the recipient of the message, to allow the mailer to recover the recipient from spam complaints.  Since the X-Mailer: header in these messages does not describe the software used to send the message, it is misleading information about the origin of the messages.  It further misleads message recipients who would falsely assume that they could protect their own privacy by redacting the addresses from copies of spam sent in complaints.

### V.    Identifying the Senders and Advertisers of Emails

42.    Many of the emails in question include advertising images that do not render in whole or in part.  Nonetheless, it is often possible to identify the responsible advertisers.

43.    First, it is not atypical for emails not to render.  It is common practice for commercial email advertisements to include html code within the body of the email that includes the URL, or web address, for the image server from which a specific graphical

- 15 -

image or images can be retrieved to populate the body of the email.  Image rendering

from those image servers is not performed at the time the mail is received by an ISP, nor

at the time the mail a user picks up the mail from the ISP and transfers it to his or her

own computer.  Rather, image rendering is done by the individual user's mail program at

the time the user opens and looks at a message.  End users often have security settings

that do not allow html images in email to load or render without an affirmative step by

the end user.  It depends on the settings that an end user opts to use on his or her email

software.  If the images are no longer available on the image server for a particular email,

those images will no longer render in the email regardless of whether the end user's mail

program did or did not render the images at any prior point in time.

44.     It is absurd to claim that a recipient must open each email to render the

images that it includes, and store an image of that email in its full rendered version in

order to have an actionable piece of spam.  Requiring rendered images would make it

impractical for consumers or ISPs to take action against senders of spam, directly

contrary to the purpose of anti-spam statutes such as the CAN SPAM Act of 2003 and

compatible state laws, and would impose overwhelming technical and economic burdens

and costs on ISPs.

45.     Even when images for a commercial email no longer render, it is still often

possible to determine who the advertiser or advertisers of that email were.  It is possible

to determine the various parties involved in advertising in a particular email, including

the spammer that sent the mail, the affiliate network or networks involved in its

transmission, and the company whose products or services are advertised through the

commercial email, by looking, for example, at the domains appearing in the email, the

links, the coding, the file names in the email, complaints generated by an advertising campaign, the opt-out links, and the opt-out CAN-SPAM postal mailing address.

46.      For example, the messages advertising Kraft's Gevalia coffee refer to Gevalia in the subject line, and have other textual references to Gevalia in the message, including Gevalia's postal addresses in Milford DE and Huntington WV.  There is no question what these messages are advertising and who will benefit if the recipient places an order.

### VI.      Tracking Links and Cloaked Domain Registrations

47.      A number of the emails at issue in this lawsuit include within them html code with identifiable tracking links from Hydra and Connexus. Message H001215 through H001218 (identified by the Bates numbers applied by Plaintiff) contain html code with a link to http://www.lynxtrack.com/afclick.php?o=2190&b=fhcfg68h&p=1418&l=1, and H001438 and H001439 contains html code with a link to http://www.lynxtrack.com/afclick.php?o=1568&b=mg08bgcp&p=5509&s=CMS&l=1.  The WHOIS information for lynxtrack.com is cloaked, but it is my understanding that the domain belongs to Hydra, and technical details confirm that: the numeric IP address of the www.lynxtrack.com server is located in a range of IP addresses assigned to Hydra.  Approximately 500 messages include lynxtrack tracking links.

48.      The message identified as C000013 contains a variety of image links including http://www.emarketmakers.com/images/email/emm/free/babygiftcard_01.jpg and http://www.emarketmakers.com/images/email/emm/free/mp-600x183.gif.  I recently fetched the two images that those links refer to.  The first is an image of a baby sitting in

a grassy field with text advertising a "$1000 Baby Gift Card", and the second is 17 lines

of small print describing "participation & eligibility requirements." The domain

emarketmakers.com, according to public WHOIS information, belongs to Connexus,

which means that any images on an emarketmakers.com server are hosted by Connexus.

Approximately 2200 of the messages contain links to emarketmakers.com.

  49.   Similarly, message H00001 contains an image link to

http://www.imglt.com/i/lt/5294/em1.gif, and message H000002 contains an image link to

http://www.imglt.com/i/lt/1615/bluerazronly_emc_d31.jpg. I recently fetched both

images. The first is an image of an airplane with text offering free flights on Jetblue, and

the second is an image of a mobile phone with text offering a free Motorola RAZR

phone. The WHOIS information for imglt.com is "cloaked", showing the address of a

privacy service rather than the actual owner, but I am informed that the domain

imglt.com belongs to Hydra, and technical details confirm that fact: e-mail for imglt.com

is handled by mailer.hydragroup.com. Hence images on an imglt.com server are hosted

by Hydra. Approximately 25,000 of the messages contain links to imglt.com.

  50.   The WHOIS information for LYNXTRACK.COM and

HYDRAGROUP.COM, two domains used in tracking links, are cloaked by a private

registration service. Each domain's WHOIS states "This listing is a Whois Privacy

Customer." Dotster provides a private registration service called privacypost.com,

described at http://www.dotster.com/products/domains/private. The Privacypost home

page at http://www.privacypost.com contains a REGISTRATION AGREEMENT link,

leading to a lengthy registration agreement. Section 10 of that agreement is the

Acceptable Use Policy, which enumerates a variety of activities forbidden to the

registrants.  Item G says the registrant agrees to:

> not Transmit any unsolicited or unauthorized advertising, promotional materials, "junk mail", "spam", "chain letters", "pyramid schemes", or any other form of solicitation…

## VII.   Affiliate Networks

51.     All of the mail at issue appears to have been sent by affiliates of Defendants, rather than by Defendants directly.

52.     An affiliate network needs to know how many of the emails its affiliates are sending are yielding click-throughs, and to audit the payment information provided to it by those parties whose products and services are being advertised through the affiliate network.  It does this with tracking links, web URLs that contain encoded strings to identify the affiliate, advertising campaign, and advertiser.  There is no other plausible purpose for such a tracking link, and the e-mails at issue are full of tracking links.

53.     Both legitimate and illegitimate advertisers use affiliates, but their practices are very different.  For many years I have been a member of affiliate programs for well known advertisers such as Amazon.com, the online bookstore, and Orbitz, the online travel agent.  In their programs, the identities of the advertiser and the affiliate are always clear, they use consistent domain names registered with clear identifying information, and the links from the affiliates to the advertiser or the affiliate network are straightforward.

54.     In the mail I have examined for this case, the links frequently rotated through multiple domain names, names that have either been abandoned or are registered through proxy services to hide the identity of the actual owner.  For the mails at issue, it is my opinion that the affiliate programs have been structured to hide the identities of the affiliate and network, and to impair the ability of mail recipients to identify the

responsible parties.

55.     Even if an email message is sent by an affiliate, the advertiser and affiliate network remain responsible for the message. I understand that Kraft made content available to its affiliates that is found in many of the messages advertising Gevalia coffee. Hydra and Connexus made image content available from its image servers to the senders of commercial email and tracked the results of the email traffic its affiliates sent out on its behalf and on the behalf of any other parties who aided in the distribution of that email. In my opinion, Kraft, Hydra and Connexus are responsible for initiating any email using templates that they made available to their affiliates in their affiliate networks.

56.     Hydra and Connexus are responsible for the content they accept for transmission through their networks and which affiliates they accept into their network who then further distribute that content. Most importantly, Kraft gets a financial benefit from email advertising its products, and Hydra and Connexus get a financial benefit as a result of making such content available on their networks and facilitating the transmission of commercial emails with their tracking links and using their image server content.

57.     Ultimately, the only way to curb abusive commercial email practices is to ensure that those parties who are responsible for advertising the email, for causing the email to be transmitted, and who profit as a result of the email being transmitted are held responsible for that email content. Allowing Kraft, Hydra, and Connexus to ignore abuses occurring through their distribution networks would truly turn a blind eye to the problem of spam email violations. They ultimately are in control of the affiliates they allow in their networks and the steps they take to ensure that their affiliates and any of their sub-affiliates do not abuse commercial email. Thus, Kraft, Hydra, and Connexus must be held

responsible for the wrongdoing of their business associates.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Executed this 18th day of February, 2010, at San Francisco CA


By: _____
Dr. John R. Levine