## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| BEYOND SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-0409 (PJM) (CBD) |
| | ) | |
| KRAFT FOODS, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF PETER W. RESNICK PURSUANT TO 28 U.S.C. § 1746

I, Peter W. Resnick, declare:

1.      I am over 18 years of age and fully competent to testify to the facts set forth in this Declaration.

**BACKGROUND AND QUALIFICATIONS**

2.      I have participated in the Internet Engineering Task Force ("IETF"), the international volunteer protocol standards-setting body for the Internet, since 1992, and have attended all face-to-face meetings but one since 1995.

3.      I was an appointed member of the Internet Architecture Board ("IAB"), the twelve-member technical and architectural oversight committee for the IETF and Internet protocols, from 2004 to 2006.

4.      In the course of my participation in the IETF, I have written the following Request For Comments (RFC, the numbered series of documents that contains the IETF protocol standards) documents: RFC 1339, S. Dorner, P. Resnick, "Remote Mail Checking Protocol", 29 June 1992. Status: Experimental; RFC 1896. P. Resnick, A. Walker, "The text/enriched MIME

1

Content-type", 19 February 1996. Status: Informational; RFC 2822. P. Resnick, Editor, "Internet Message Format", 24 April 2001. Status: Proposed Standard; RFC 4417. P. Resnick, P. Saint-Andre, Ed. "Report of the 2004 IAB Messaging Workshop", February 2006. Status: Informational; RFC 4469. P. Resnick, "Internet Message Access Protocol (IMAP) CATENATE Extension", April 2006. Status: Proposed Standard; RFC 5068. C. Hutzler, D. Crocker, P. Resnick, E. Allman, T. Finch. "Email Submission Operations: Access and Accountability Requirements", October 2007. Status: Best Current Practice; RFC 5322. P. Resnick, Editor, "Internet Message Format", 1 October 2008. Status: Draft Standard.

5.      I have also written the following World Wide Web Consortium (W3C) document: World Wide Web Consortium Note. E. Berman, P. Resnick, N. Shelness, "HTML Threading: Conventions for use of HTML in email", 5 January 1998. Status: NOTE.

6.      In the course of my participation in the IETF, I have also held the following chair appointments: IMAPEXT - The Internet Message Access Protocol Extension Working Group. 1999 – 2008; APEX - The Application Exchange Working Group. 2000 – 2003; BEEP - The Blocks Extensible Exchange Protocol Working Group. 2001; XMPP - Extensible Messaging and Presence Protocol Working Group. 2002 – 2004; USEFOR - Usenet Article Standard Update. 2003; FSM BOF Formal State Machine "Birds of a Feather" session. 2007; IEA BOF - Internationalizing Email Address "Birds of a Feather" session. 2003, 2004; WAE BOF - Web Authentication Enhancement "Birds of a Feather" session. 2006; PUFI BOF – Procedures Update For IETF "Birds of a Feather" session. 2008; IRI BOF – Internationalized Resource Identifiers "Birds of a Feather" session. 2009.

7.      From 1994 to the present, I have been employed by Qualcomm Incorporated, San Diego, California. Presently I am a Senior Staff Engineer.  From 2002 through the present I have

held the titles of Staff Engineer and Senior Staff Engineer in Qualcomm's Office of the Chief

Scientist where I work as a research and development engineer.  My current projects include

working with Qualcomm's IT department to help them implement Internet standard technology

for email (including anti-spam mechanisms), leading the education effort to teach engineers at

Qualcomm the proper use of open source libraries in Qualcomm products, and coordinating

IETF work at Qualcomm.  Previously in this position, I coordinated a research project between

Qualcomm and the Beckman Institute at the University of Illinois on mobile phone usability and

interaction, I participated in the Corporate Product Software Security Initiative, and I have acted

as a research programmer on a project in the field of authentication technology.

8.      In 2001, I held the title of Staff Engineer in the Qualcomm Internet Services

department.  I was a research programmer on BREW (Binary Runtime Environment for

Wireless), and I wrote prototype applications for cell phones.

9.      From 1994 through 2000, I held the titles of Engineering Intern, Engineer, Senior

Engineer, and Staff Engineer at Qualcomm.  I worked as a programmer on the "Eudora"

electronic mail (email) client.  I wrote all the text-handling routines for the "Eudora" email

client, including those for internationalization and the Hypertext Markup Language (HTML).

10.     From 1989 to 1996, I was enrolled in the Doctorate program in the Department of

Philosophy, University of Illinois Urbana-Champaign.  I left the program to work for Qualcomm

Incorporated before completing my dissertation.  During my graduate studies, I performed

research in philosophy of mind, philosophy of language, and psycholinguistics (child language

acquisition).

11.     Between 1987-1989 I earned a Master of Arts in the "Philosophy and Computer

and Systems Sciences" program at State University of New York at Binghamton. My research

was in philosophy of science, philosophy of mind, and artificial intelligence. Thesis title: "Intentionality is Phlogiston", subsequently published in (E. Dietrich, ed.) "Thinking Computers and Virtual Persons", 1994, Academic Press.  Between 1983-1987, I earned Bachelor of Arts in Biological Sciences and Bachelor of Arts in Philosophy at State University of New York at Binghamton.

**EMAIL MESSAGES**

12.      An email message contains a series of lines of text that are divided into two parts: the header section and the body. The header section contains information about the message (e.g. who sent it, when it was written, etc.), whereas the body of the message contains the actual content of the message. The header section is divided into header fields (or simply "fields"), each of which contains particular information about the message. For example, the following might be the destination field for a message:

> To: Mary Smith <mary@example.net>

13.      A field is made up of a field name (in this case the "To"), followed by a colon, followed by the field body. The field body in the above example, which specifies the destination of an email, contains what is called the "display name" (the name of the person or entity, in this case "Mary Smith") followed by the email address of the recipient of the email. The email address, which is normally in angle brackets, has a "local part" (the part before the "@" sign) and a domain (the part after the "@" sign, which I will discuss later). Although header fields are often seen by the users of email programs, they are specifically designed to be machine-readable. They appear in a particular format, and each element of the field has a well-defined syntax and meaning, as documented by RFC 5322, the "Internet Message Format" specification. Many email programs parse the fields that are to be presented to the user (like the "To:" field) and present the information in a more easy-to-view format (for instance, bold-facing the name, or

turning an email address into a button that the user may click to send a return email to that address). Email programs also use the information to do other handling on messages (e.g., to sort messages by date using the "Date:" field, or to take a message that contain pictures and display them specially).

14.     The "From:" field of an email message identifies the author of the email message. It provides the name of the author along with the author's email address. The combination of the name and the email address is referred to in RFC 5322 as a "mailbox". Every email message has a "From:" field, and it must contain at least one "mailbox". Normally, the "From:" field contains the name and email address of a human (i.e., the person who wrote the message), but that's not required; email messages can be authored by all sorts of entities (a corporation, a computer program that generates automated messages, etc.). In all cases, the "From:" field ought to contain a name and email address for whoever or whatever is the author of the message. As RFC 5322 says:

> The "From:" field specifies the author(s) of the message, that is, the mailbox(es) of the person(s) or system(s) responsible for the writing of the message.
>
> […]
>
> In all cases, the "From:" field SHOULD NOT contain any mailbox that does not belong to the author(s) of the message.

15.     This specification for the "From:" field is important operationally. Email programs (and users) rely on the fact that the "From:" field contains the name and email address of the author in order to do things like properly reply to the message, display the name of the author to the user, save the name and email address in the user's address book, filter messages to allow the user to sort through messages they want to keep or discard, etc. There is no legitimate reason to put things into the "From:" field other than the author's name and email address (again,

whether that author is a human or otherwise). The only purpose would be to thwart the recipient's ability to discover who wrote the message, to know how to reply to the message, and to sort the message according to the author information. Using false information of this sort is deceptive, both for the email program as well as its user. For example, putting a non-existent email address in a "From:" field will make it impossible for the recipient to reply to the author using their email program. Putting something other than an identifying name of the author (e.g., some sort of sentence or phrase) in the place where the author's name belongs makes it not only impossible for an email program to display the author's name properly to the recipient, but will also cause it to add the wrong information to the recipient's address book and may cause other operational problems for the recipient.

16.     Where the "From:" field specifies the author of the email message, the "Sender:" field specifies the transmitter of the email message. The absence of a "Sender:" field in a message means that the transmitter is identical to the author (that is, that the transmitter's address is identical to the one in the "From:" field). Messages may have both a "From:" field and a "Sender:" field so that the recipient can easily distinguish between who or what is responsible for the authorship of the email message and who or what is responsible for the transmission of the email message. Again, this is operationally important. Email programs and users rely on these meanings of the "From:" and "Sender:" field to properly reply to a message (by being able to contact the author or the transmitter, depending on the circumstance), to accurately display information to the user, to filter messages as desired, etc. As I stated above, intentionally putting information in the "From:" and "Sender:" fields that does not correspond to the author or transmitter, respectively, only serves to thwart the recipient's ability to discover this information easily or to evade filters that are set up to act on this information.

17.     Similarly, email programs and users also rely on the fact that the "To:" field contains the name and email address(es) of the primary recipient(s) of an email message, again, to properly display the message, filter the message, parse the address for storage in an address book, etc. There is no legitimate reason to put other than the recipient's name and email address into that field except to evade filters and obscure this information.

18.     An email message also contains one or more trace header fields (also called "Received:" header fields). Each of these fields contains information about the transfer of an email message from the originating email system (often called "the client" or colloquially the "sending system") to the receiving email system (often called "the server" or colloquially the "receiving system"). Email messages may be passed through several "relay" systems on their way from the source to the destination. Each relay system (and the destination system) along the way put a "trace record" (or "time stamp") at the top of the message with information identifying the receiving system, the sending system, and the date and time the message was received. All of this information goes into a "Received:" header field. For example:

> Received: from x.y.test ([10.5.6.7]) by example.net;
>   1 Nov 1997 1:05:43 -0600

19.     RFC 5321, the SMTP protocol specification, defines the components of the "Received:" field. The "Received:" field is composed of several "clauses". Each clause starts with a special word (like "from" or "by" or "for") followed by some data. In the above example, the "BY" clause ("by example.net") indicates that the message was received by the receiving system with the domain name "example.net". The "FROM" clause in the example indicates that the message was received from a client whose IP address was "10.5.6.7" and who gave the domain name "x.y.test" as the argument to the HELO/EHLO command when it connected to the server.

20.     By way of defining some of the above terms: When an email message is sent, the sending system connects to the receiving system using the Simple Mail Transfer Protocol or SMTP. After a connection is established, the receiving system starts the protocol by sending a code indicating that it is OK for the sending system to proceed. To continue the protocol, the sending system sends a "greeting" using the HELO command or the more modern EHLO command. Then, after the exchange of the originator address and the recipient address, the content of the email message is sent. The HELO or EHLO command sent by the sending system contains the fully-qualified domain name (FQDN) of the sending system or, at a minimum, the address literal containing the IP address of the sending system, which the receiving system is then required to record in a "Received:" field in the email message content.

21.     Each system on the Internet has a numeric Internet Protocol (IP) address, and almost all systems (and certainly those used to send and receive email across the Internet) have a domain name, a textual name to use instead of the numeric address. A domain name is a series of individual names, or "labels", separated by periods (e.g., "mailserver.example.com"). There are Internet protocols where it is permissible to use a shortened, or unqualified domain name (e.g., "mailserver"); however, SMTP requires the use of the longer, fully-qualified domain name (FQDN). A properly configured email system that is connected to the Internet should never have to use other than its own FQDN to send email.

22.     In some rare cases, an SMTP system might not have a domain name assigned to it. This happens when, for example, a personal computer that is only temporarily attached to the Internet or gets a new address assigned each time it is attached, is used to send email. In those instances, the sending system may send its numeric IP address as part of the HELO/EHLO command instead of a domain. That said, any legitimate SMTP sending system used for

commercial purposes would not have this problem and would use its assigned domain name. These fully-qualified domain names and IP addresses go into the clauses of the "Received:" field.

23.     There are specific requirements on the contents of each clause of the "Received:" field. RFC 5321 says:

> - The FROM clause, which MUST be supplied in an SMTP environment, SHOULD contain both (1) the name of the source host as presented in the EHLO command and (2) an address literal containing the IP address of the source, determined from the TCP connection.

24.     The formal syntactic definition of the FROM clause in section 4.4 of RFC 5321 (not repeated here for brevity) makes it clear that what belongs there is the domain name and/or address literal given in the SMTP HELO or EHLO command (described earlier in this declaration) followed by the actual domain name and/or IP address of the sending mail system, as determined by the receiving mail system, in parentheses. The IP address is important when the information from the HELO or EHLO command is false or otherwise not useful for traceability. Note that not putting useful traceability information into the HELO or EHLO command is a situation that should never occur for a properly configured Internet SMTP system. Even in the case of an SMTP host that uses private IP address space behind a network address translator, that system can be configured to use the domain name assigned to the public address that it will be using when it connects to the outside world.

**EMAIL CONTENTS THAT IDENTIFY THE SENDER OF THE EMAIL**

25.     Part of the purpose of the header information of an email message is to allow the recipient to identify where the email came from so that the recipient can respond or determine the origin of the email. Normally, it is relatively simple to determine the origin and path of an email message. Each email message contains "From:" and, at times, "Sender:" header fields that

contain the email address of the party or parties responsible for the authorship and transmission

of the message, as well as trace information in the form of "Received:" header fields containing

the domain names of the servers through which the message was sent. Discovering the origin and

path of an email message is normally a matter of finding the contact information for each of the

email addresses and domain names in those header fields.

26.     Legitimate commercial enterprises that send large numbers of marketing email

messages have the means and incentive to clearly identify such email messages in the header

fields of those messages and would keep easy to access records of the recipients of their email

(along with records of their business relationship with those recipients), and records of any

contractors who sent email on their behalf and to whom the contractor sent messages. This is not

the case with spam. Entities who send spam do everything possible to hide the identity of the

party or parties responsible for the authorship and transmission of a message, including using

and then discarding different domain names, using email addresses which are not easily traceable

back to a particular author or sender, having other entities transmit messages on their behalf

without properly indicating this in the header fields of the email message, hiding contact

information in graphics which are not downloaded until the message is actually opened in an

email user agent by the end user, etc.

27.     On page 31 of Defendants' memorandum, Defendant claims that the email

messages in question were "replete with accurate identifiers of the sender" and that "the alleged

inaccuracies in the headers could not have impaired the efforts of any recipient." By way of

support for these contentions, they cite my testimony where I supposedly say that advertisers

"would want to identify themselves to the recipient of the email." Resnick Decl. Ex. 1 at 303:7-

15. Of course, this statement is taken out of context, which is evident in the previous answer

where I say, "I can think of examples where advertisers would want to be identified in commercial emails, and I can think of examples where advertisers would not want to be identified in commercial emails" (*Id*. at 303:2-5). But Defendants also ignore the remainder of my testimony on this matter where my conclusion is quite the opposite of theirs: It is simply not the case that identification information in the body means that inaccuracies in the header could not have impaired efforts at identification. As Defendants admit on page 34 of their memorandum (and in apparent contradiction to their argument here on page 31), much of the falsity at issue in this case is falsity that appears in the headers. It is obvious why this true: In general, ISPs like Plaintiff do not, in the normal course of business, use tools to examine the contents of the bodies of messages for contact information, especially if that contact information is purposefully hidden in graphics and other data in the body of an email message. Information in graphics and other places in the body of the email message is normally seen only by an end user who opens and downloads the message using an email user agent. The repeated pattern of placing false information in the header fields (as I describe more fully below) is designed to evade filters and other tools that ISPs and end users employ to sort out spam from other email messages.

28.     In order to retain all of the information to precisely identify the origin and path of a message sent by someone trying to evade identification would require the recipient's service provider, at the time of receipt of all messages, to use a tremendous number of resources, collecting not only the domain names and addresses attached to each message, but to query the registries of each of the domain names to get contact information and log that information, as well as to save not only the header fields and textual content of every message, but download and save every graphic associated with every piece of email. Note that this sort of overly burdensome

11

data collection requirement would mean that such data collection must be done with all email messages, not just ones that are suspected of being spam, because there is no way to determine at the time of reception that any given message is spam, especially given attempts of spammers to evade the very mechanisms designed to identify them. No service provider could be expected to expend such resources. (Indeed, it would seem utterly bizarre for a law regulating the sending of spam to increase, rather than decrease, the burden on recipient service providers to receive email messages.) Therefore, indirect means are often necessary to trace such messages back to their source, including looking up domain names identified in the email header and body to determine who owns the domain and is responsible for the email.

**ACTIVITIES OF PLAINTIFF AS AN INTERNET SERVICE PROVIDER**

29.     On page 3 of the memorandum of law of Defendants Connexus Corp. and Hydra LLC in support of their Motion for Summary Judgment, Defendants claim as an undisputed fact that Plaintiff "BSI is not an internet service provider but instead is a lawsuit factory". As described in my deposition testimony (Resnick Decl. Ex. 1 at 682:20-687:12), on Tuesday, October 27, 2009, I had the opportunity to examine the activities of computer servers operated by Plaintiff. Entirely at my direction, Plaintiff displayed the activity of processes presently running on his computer systems using common Unix commands available on the system. I observed the activities of this computer in real-time (live), watching actions that took place with regard to Simple Mail Transfer Protocol (SMTP) email traffic, Post Office Protocol (POP) email traffic and Internet Message Access Protocol (IMAP) email traffic, as well as examining File Transfer Protocol (FTP) statistics and Hyper-Text Transfer Protocol (HTTP) web server log entries. From my observations, especially given the information gleaned from watching the live email traffic, I have concluded that the activities of Plaintiff's computer systems are normal

activities associated with a small Internet Service Provider (ISP), and there was nothing in the activities that I observed to indicate that Plaintiff is other than a legitimate ISP.

**WILDCARD EMAIL ADDRESSES**

30.　　On page 6 of Defendants' memorandum, Defendant notes that Plaintiff uses "wild card" email addresses. There are many reasons that wildcard email addresses can be used and their use is quite common on Internet email systems. When I refer to a "wildcard email address", I am referring to the ability to configure a receiving system to receive email messages addressed to an email address that partially matches a particular address. For example, I might have a wildcard email address of "resnick-*@example.com". Such an email address would accept email addressed to "resnick-work@example.com", "resnick-ietf@example.com", etc. Wildcard email addresses can be made to match a part or the whole of the address.

31.　　As I said, there are many reasons to use wildcard email addresses. In the example above, wildcards can be used to distinguish different roles: People from work might send email to "resnick-work@example.com", whereas IETF colleagues would send to "resnick-ietf@example.com." Wildcard addresses are also used to receive messages with accidental misspellings in the address. So, a company might wish to receive and store messages addressed to "castomerservice@example.com" even though the correct address is "customerservice@example.com". A company might even wish to receive mail addressed to "helpdesk@example.com" even if the correct address is "techsupport@example.com". In order to accomplish the latter (i.e., preserving even completely misdirected email), the company would be required to receive and store all email messages, and therefore would use a wildcard that matched any left-hand side of an email address. Using a wildcard address to receive email does not mean that the email addresses that make their way to the recipient through that wildcard

process are not "real" email addresses. They correspond to a mailbox, which is the definition of what an address is.

32.     Some Internet Service Providers (ISPs) do not "block" (that is, refuse to accept) email messages when they are sent to email addresses that do not match specific email addresses, even in the absence of wildcard addresses. For security reasons, it is often unacceptable to reveal to the sending system the existence or non-existence of a specific email address. Rejecting email gives an attacker valuable information as to potentially valid account names on the receiving system and the general topology of the receiving system's environment that can be later used to break into the system. In addition, the rejecting of email messages may cause unintended recipients to receive non-delivery reports: Because some spammers use other people's email addresses instead of their own email address as part of the SMTP protocol exchange, non-delivery reports might end up being sent not to the spammer, but instead to an innocent third party.

33.     If an ISP does not "block" emails for the reasons discussed above, the ISP has already used system resources, even if the message is not stored. From the standpoint of an Internet Service Provider, a good deal of the harm from spam is complete as soon as the connection occurs between the sending system and the ISP's receiving system, the connection is made, and an email message is transmitted. Once that process occurs, the costs associated with the need for high bandwidth to receive that email and other email like it has been incurred, some amount of network time has been used, and receiving system time has been used. Additionally, if the receiving system also stores messages to deal with those that might be misdirected, then spam messages will also have to be stored and storage resources will be spent on those as well.

**FILTERING MESSAGES**

34.    Many email systems, both at the transport level and at the user level, employ filters to categorize email messages, sometimes to remove unwanted messages and to allow through desirable messages on behalf of the recipient. Filters may simply remove certain messages before the user is able to see them, or may rate the message as more or less likely to be undesirable, allowing the user to remove only those over a certain rating, or allow the user to review messages with those ratings. Bulk email senders employ several techniques to evade these filters. A few of them include the following.

35.    Many filters look for particular words or phrases in "Subject:" header field and block, or mark as spam, messages with those terms. Bulk senders often purposely misspell words, or surround the words with punctuation to avoid detection. For instance, a filter that looked for the term "coffee" might be fooled by a "Subject:" that included the word "c0ffee" (using the numeral zero instead of the letter "o"), "c-o-f-f-e-e" (punctuation between each letter), "c o f f e e" (spaces between each letter), or "coffee*maker" (making sure that the word "coffee" is not surrounded by white space, thereby making it indistinguishable as a single word). Defendants' claim on page 28 of their memorandum, where they say, "allegations that subject lines are false allege nothing more than immaterial errors", is simply incorrect. The repeated patterns of these sorts of items in "Subject:" fields have no legitimate purpose other than what they are designed to do: evade filters and otherwise avoid detection.

36.    Conversely, many filters look for particular words, either in the "Subject:" field or in the display name of a "From:" field, and allow messages through based on those terms. A bulk sender may include those terms simply to get a filter to let a message pass through even if the rest of the message is undesirable.

37.     Email users normally wish to have replies to messages they have previously sent shown to them and filters can be configured to mark replies so that the recipient can easily identify them. Almost all reply messages have a "Subject:" field that begins with "Re: ". Some filters have been set up to always identify messages where the "Subject:" field begins with "Re: " as less likely to be spam. Some bulk emailers have taken to putting "Re: " at the beginning of the "Subject:" field to fool such filters.

38.     Many filters keep a list of "known bad addresses". That is, they keep track of addresses that appear in the "From:" field of messages that the user has indicated are undesirable. A filter might additionally keep a list of "known bad domains", where all addresses that appear in the "From:" field which have a domain name in the list, regardless of whatever is to the left of the "@" sign, are considered undesirable. To evade such filters, bulk emailers often use randomly generated email addresses, including using random domain names that will not have been previously marked by the recipient as "bad".

39.     Automated systems that send email often do not include a display name in the address fields of messages. To avoid messages from such systems, many filters watch for address fields with missing display names. To avoid these filters, bulk mailers will put random (often familiar sounding) names in the display name in order to evade these filters.

40.     Of course, the most used filter is the "manual filter": As noted earlier, almost all mail user agents have a "mailbox view", where the user sees a list of messages, normally displaying the display name of the author (the display name info from the "From:" field of the message that excludes the email address), the date the message was sent, and the subject of the message from the "Subject:" field. Users are then able to scan through their messages and decide which messages are desirable and which should be discarded without first having to download

16

and display the entire body content of the message. In order to evade the user's ability to hand

filter messages, bulk emailers will often use "Subject:" fields that contain phrases which would

be of interest to the user, even if they have nothing to do with the contents of the message.

Alternatively, bulk emailers often put familiar sounding, though fictitious, names in the display

name of the "From:" field to make the recipient believe that the message came from a real

person. Often, these names come from generated lists of relatively common first names and last

names, combined randomly so that patterns don't emerge that can be automatedly filtered later.

    41.     Attempting to evade a filter is quite simply an attempt to deceive both the

computer program that a user has employed as well as the user of that program.

    42.     On pages 6 and 7 of Defendants' memorandum, Defendants claim that Plaintiff

"used spam filters to facilitate the receipt of emails by 'white listing' addresses…instead of

blocking alleged 'spam'" and cited my deposition testimony at 46:10-47:20 in support of their

claim. On the contrary, while it is certainly true that Plaintiff did not "block" email messages that

are at issue in this case (since, if they had, there would be no such exhibits), my testimony solely

described the use of the "SpamPal" spam filtering tool by Plaintiff and does not indicate

anything about whether Plaintiff used a "white listing" feature. (In fact, I found only 6

occurrences of email messages that have any indication that a white listing feature in SpamPal

was used, and in none of those cases was there any indication that Plaintiff used this feature to

"facilitate" the receipt of these email messages.) However, Defendants have also misconstrued

the bulk of my testimony and reports in this case with regard to filters. It is simply not the case

that the only function of filters is to either facilitate or block the receipt of emails. Many spam

filters simply categorize and mark email messages for later processing. While that processing

sometimes involves blocking, more often it involves particular kinds of display or placement of

email messages into special storage locations. Blocking messages using spam filters runs the risk of accidentally blocking messages that are not spam, and therefore many spam filters are configured to save suspected spam for later review instead of discarding messages outright.

**RELIABILITY OF PLAINTIFF'S EXHIBITS**

43.     On page 8 of Defendants' memorandum, Defendants claim (as an "undisputed fact") that Plaintiff "never produced the emails in their native format(s)" and that Plaintiff's email exhibits "contain altered, duplicative, overlapping, fragmented and spoliated items rife with innumerable errors that do not and cannot represent any emails that may or may not have existed". Defendants then go on in page 9 to cite my testimony in support of these claims. Defendants take five words of my testimony ("not as stored e-mail message", Resnick Decl. Ex. 1 at 778:17) out of context and proceed to completely reverse the conclusion I provided in deposition and in my reports: Though I agreed that a few of the exhibits cited do not start with header fields (and therefore such an exhibit is not a single email message "as stored"), those exhibits do in fact contain within them email messages (that is, there is extraneous data *in addition to* the email message in these exhibits), that these particular exhibits can be analyzed and the email message identified, and with regard to the entire body of exhibits that I examined that "the vast majority of these exhibits are easily analyzed and can be used to reach reasonable conclusions" (*Id*. at 743:18-20). Errors cited by Defendants are not at all "innumerable" and the bulk of the email messages I examined in this case do not contain any alterations, duplications, overlaps, fragmentation, or deleted information (what Defendants' expert refers to as "spoliation"). In fact, as I testified in deposition (*Id.* at 708:5-718:17), none of the examples that Defendants' expert identifies as "spoliation" (that is, the intentional destruction of information) are "spoliation" at all. Additionally, as I testified, in several of the exhibits presented by

Defendants to me (and, as I understand it, other experts in this case) at deposition that contained supposed "errors", many of these "errors" were apparently artifacts of Defendants' processing and printing of the exhibits (*Id*. at 470:1-472:11).

44.     Defendants' assertion that the email exhibits are not "in their native format(s)" simply misstates the facts. There are many storage formats used for email messages and none of them is "native". As email messages move from the originator's mail user agent program to the originator's mail submission system, and then to assorted mail transport systems on the Internet, and then to the recipient's mail delivery system, and then to the recipient's mail user agent program, transformations occur at each step along the way and different storage formats are used by each of the systems involved. And again, as I testified in deposition (Resnick Decl. Ex. 1 at 708:5-718:17), Defendants' expert incorrectly uses the term "spoliation" (that is, the intentional destruction of information) to describe instances of these transformations. For example, Defendants' expert considers the mere act of transferring messages from Plaintiff's mail delivery system to Plaintiff's mail user agent program a case of "spoliation", apparently because the two systems use different storage formats, even though all of the information present in the email message is preserved in either storage format. There is nothing unusual or problematic about these sorts of message transfers and the use of these different storage formats, and Defendants' use of the word "spoliation" to describe such transfers and changes in storage formats misrepresents the facts.

45.     I have seen nothing in Plaintiff's exhibits to indicate to me that the vast majority of them are other than wholly reliable records of email messages received by Plaintiff.

**CONSENT TO RECEIVE EMAIL MESSAGES**

46.     On page 18 of Defendants' memorandum, Defendants claim that "it is undisputed that Paul Wagner/BSI consented to receive emails" at issue in this case, and then go on to cite my deposition testimony (Resnick Decl. Ex. 1 at 168:23-169:4) in support of this claim. First, it is clear that my deposition testimony as cited does not, in itself, lend any support to this claim. The testimony was simply a definition of a spam trap:

> Q     Could you define what a spam trap is?
>
> THE WITNESS: I think as I described before when I think of the word "spam trap" I think of an email address that is -- whose sole purpose is to cause spammers to send spam to it.

47.     Not only does this not support Defendants' claim that Plaintiff consented to receive email messages from Defendants, my opinion is exactly contrary to this claim: In my opinion, Plaintiff did not give consent to receive unsolicited commercial email messages from Defendants. What Defendants refer to as a "spam trap" is a web page shown to me during deposition as exhibits 257, 258, 259, and 305. As I testified in deposition, in addition to stating a specific policy that no unsolicited commercial email be sent to addresses in the "hypertouch.net" and "hypertouch.com" domains, the page also lists email addresses which have been "opted out" of receiving commercial email (Resnick Decl. Ex. 1 at 905:3-909:7). In my opinion, these exhibits appear to explicitly deny consent to receive email messages so addressed.

48.     Furthermore, on page 19 of Defendants' memorandum, they state that I testified that:

> …publishing BSI email addresses on websites is "what is referred to as a spam trap," as "[m]any spam traps, as far as I understand it, are email addresses placed on websites such that things looking for email addresses might grab them."
>
> Resnick Decl. Ex. 1 at 169:2-170:4; 262:16-272:3.

49.     In fact, that completely mischaracterizes my testimony, and I testified to exactly the opposite of what Defendants claim:

> Q       Have you ever seen any evidence that BSI is using a spam trap in this case?
>
> A       No, I don't believe so.
>
> Resnick Decl. Ex. 1 at 145:8-10.

50.     In the deposition testimony cited in Defendants' memorandum, I specifically said that a spam trap was an email address "whose sole purpose was to cause spammers to send spam to it." I did not at any time find that the web page in question had email addresses whose sole purpose was to cause spammers to send unsolicited commercial email to them.

## FALSITY AND THE *GORDON* CASE

51.     On page 32 of Defendants' memorandum, Defendants assert that Plaintiff's claims regarding false information in the display name portion of the "From:" field and "To:" field of an email message are "tantamount to labeling requirements and are thus preempted by CAN-SPAM." They continue:

> Indeed, *Gordon* rejected the very claim that BSI seeks to advance here through its expert Resnick, as Resnick testified that he previously provided expert testimony in *Gordon* concerning the 'From:' header field, and agreed that BSI's allegations here are 'essentially the same argument' made by the plaintiff and rejected in *Gordon*."

52.     Defendants misstate my testimony in this case, misconstrue my testimony in *Gordon*, and therefore incorrectly conclude that the claims in *Gordon* are analogous to the claims in the present case. First, I never claimed in my deposition that BSI's allegations were "essentially the same argument" as those in the *Gordon* case. In fact, those words are not mine, but those of the questioner, and I never agreed that it was "the same argument". (I was not actually given a chance to answer the question during my deposition.) On the contrary, in

*Gordon*, I was specifically asked to respond to a single specific question regarding the "From:" field:  Do the RFC specifications define what belongs in the display name portion of a "From:" field? As I testified in that case, the RFC in question does define what belongs in the display name, and I so testified. However, *Gordon* stopped there and did not ask me to opine on whether particular display names in header fields gave false, misleading, or misrepresenting information with regard to origin or transmission path of the email message. Unlike in *Gordon*, in this case I am giving testimony that information in the display name of these header fields is not simply false, but is designed to obscure the actual origin and transmission path of the message in order evade email message filters, deceive computer programs and the users who employ them, and otherwise prevent easy evaluation and categorization of these email messages.

**FALSITY WITH REGARD TO THE DESTINATION**

53.     On page 33 of Defendants' memorandum, Defendants claim that "the 'To' fields pertain to the recipient of the email as opposed to the sender, transmission path or origin". However, as I have described, the "To:" field of an email message describes the destination of the email message, and certainly the destination contains information about the transmission path of the message. A canonical example would be the case of a mailing list: People subscribed to a mailing list often see things like "listname@example.com" in the "To:" header field of a message that they receive, indicating that the email message was received by way of a mailing list, not sent directly to the recipient. Insofar as false information in the "To:" field of a message is there to evade filters or otherwise obscure information about the path of the message to the recipient or the ISP, my opinion is that the "To:" field contains false and/or misleading information as to the transmission path of the message.

**INFORMATION ON ORIGIN OR TRANSMISSION PATH IN THE EMAIL BODY**

54.     On page 34 of Defendants' memorandum, Defendants claim that "nothing in the email body pertains to the origin or transmission path of the email, as BSI expert Resnick testified that 'the origin is generally reflected in the originator fields' in email headers". While I do stand by my statement that the origin is generally reflected in the originator fields, Defendants' assertion that nothing in the email body pertains to the origin or transmission path completely misstates my testimony. In fact, I testified that "opt-out" information in the bodies of email messages "might have information that indicated in some way the person or entity who initiated the transmission of the email." Resnick Decl. Ex. 1 at 301:6-8.

**PATTERNS OF FALSITY IN THE PROVIDED EXHIBITS**

55.     I have reviewed the email messages provided to me for different false, misleading, or misrepresenting information contained in the header section of the email messages as it pertains to the origin, transmission path, or authorship of the email message, or as it might be used to evade filters. I have reviewed several mailbox files: Kraft_20050214-20080526_Bt.mbx (henceforth "Kraft"), Connexus_20050215-20080531_Bt.mbx (henceforth "Connexus"), Hydra_20050215-20080531_Bt.mbx (henceforth "Hydra"), "Hydra-AB 20081104-20090320.mbx" (and a substantially identical copy called "AB-Hydra_20081104-20090320_Bt.mbx", henceforth "Hydra 2008-2009"), "Hydra-AccelerateBiz October 2008 Emails.mbx" (henceforth "Hydra 2008"), and "Kraft_20081107-20090331_Bt.mbx" (henceforth "Kraft 2008-2009"). The following are patterns I have discovered during that analysis in the time allotted to me. The list of patterns is by no means exhaustive of all patterns in these mailboxes.

56.     In making these determinations, I have taken as an assumption Plaintiff's assertion that certain domain names were in use by Plaintiff, his contractors, his business

associates, or his agents at the time the subject emails were received. These include the top-level

domains "hypertouch.com", "reasonabledoubt.com", "beyondsystems.net", and "hasit.com".

Also note that the only determinations I have made with regard to false, misleading, or

misrepresenting information are based entirely on the text of the email exhibits provided. In

particular, I have done no research into the domain name registration for, seen any of the

configurations for, nor spoken with or gotten written statements from the owners of the sending

servers in question. My conclusions are based solely on the contents of the messages in question.

### *General patterns*

57.     In my analyses, I found some general patterns of false, misleading, or

misrepresenting information in the header sections of the provided messages. Although

comprehensive lists of these patterns are too difficult to collect in reasonable time because of the

nature of these patterns, I will discuss each of the patterns with a few examples.

58.     The first pattern that I noted is the use of descriptive phrases in the display name

of the "From:" field. As I described above, RFC 5322 dictates that the "From:" field should have

the name and email address of the author of the message. This is so that the recipient can easily

identify the author of the message, even without downloading and viewing the entire body

content of the message. Even if the descriptive phrase is somehow relevant to the content of the

message, putting a descriptive phrase into the display name instead of a name for the author

(which, as I stated early, might be a person or other entity) is false and misrepresenting because

the recipient still must open the message to determine the actual author. Note that this is not

simply a matter of desiring the email message to have a correct name for the sake of not being

false (what Defendants refer to on page 27 of their memorandum as "mere immaterial errors").

Rather, entities that send unsolicited commercial email use these descriptive phrases instead of

names to hide their identities from users who might use different kinds of filters and email programs to sort through their mail. These descriptive phrases are designed to obscure the origin of the message from users and the email software they employ, and it is the repeated pattern of such uses that indicates that these are not "simple" or "isolated" errors. For example, a large percentage of email messages in the "Hydra" mailbox (e.g., H002180 through H002188, which have the author's display name as "Big and Beautiful") and the "Connexus" mailbox (e.g., CC28111 through C28118, which have the display name as "Value-Based Dating"), and a significant number in the "Kraft" mailbox (e.g., K007327 through K007332, which have the display name as "GiveAway Free Coffee") each have this feature. I found it interesting in passing that most of these descriptive phrases are two or three words, normally with the first letter of each word capitalized. This may be an attempt to evade filters (as discussed earlier) by making the phrases look like human names to an automated checker.

59.     The second pattern that I noted in all three sets of email messages is the use of apparent company names in the display name of the "From:" field that have no apparent relationship to the email address in the "From:" field. For example, In the "Connexus" email messages, approximately 2701 email messages (including C011712 through C013111) all have "Apple Store" as the display name in the "From:" field, but the email address in each case contains one of several domain names (e.g., WEWANTPRODUCTTESTERS.INFO, YOUROPINIONWANTED.INFO, etc.) which do not seem to correspond to the display name. If there is no business (or other) relationship between "Apple Store" (which I take to be associated with Apple Computer, Inc.) and the owner of the email addresses in those messages, or if neither the display name nor the email address corresponds to the author of the email message, I would conclude that this info is false, misleading, and misrepresentative.

60.     I have found many messages in the "Hydra" and "Kraft" mailboxes in which the display name in the "From:" field is, for example, "Gevalia", "Gevalia Coffee", "Gevalia Kaffe", and some similar names. An examination of the bodies of some of these messages indicates that the email messages may have been authored by an entity named "Gevalia". However, the email addresses themselves are not obviously associated with an entity named "Gevalia". As I said earlier, I have not researched the owners of the domain names in the email messages in this case, but insofar as the email address in the "From:" field of these messages does not correspond to an entity named in the display name of the "From:" field, I would still consider these messages false, misleading, or misrepresentative, notwithstanding the display name corresponding to some entity mentioned in the body of the email message. Again, as RFC 5322 indicates, the "From:" field should only indicate the author of the email message and the "Sender:" field should indicate the transmitter of the message (if it is different). If an entity (corporate or otherwise) using the name "Gevalia" wants to claim authorship of the message, the name and email address of that entity belongs in the "From:" field of the email message. If a different entity is taking responsibility for the transmission of the email message, that entity's name and email address belong in "Sender:" field.

### *Specific patterns*

61.     A pattern of information in the emails in question is the use of what might be called "human sounding names" in the "From:" field of the messages. I have tried to do as comprehensive a search as time allowed for individual messages fitting this pattern, and I have listed Bates numbers for these messages I have found in the "Kraft" email messages below, but the list should not be taken as exhaustive. I have found 6,434 of these messages from the "Kraft" email messages: K000601 through K001314, K001323 through K001351, K001353 through

K001636, K001638 through K003096, K003098 through K003258, K003261 through K003441, K003579 through K003584, K003586 through K003657, K003659 through K003677, K003679 through K003777, K003779 through K004131, K004138 through K004239, K004241 through K004597, K004599 through K004998, K005005 through K005400, K005402 through K005721, K005723 through K005764, K005768 through K005810, K005814 through K005901, K005914 through K006439, K006472, K006473, K006475 through K006700, K006702 through K007231, K007529, K007690, K007691, K007714, K007770, K007875, K007876, K007878 through K007880, K007884, K007887, K007889, K007893, K007896, K007916, K007917, K007927, K007999, K008023, K008637, K008649, and K008964 through K009286. (I have also found many examples of such messages in the "Connexus" email messages.) They all follow a pattern of having a display name containing a first name and last name, apparently randomly chosen, with the first letter of each capitalized, and the entire display name enclosed in quotes. Those same two names are concatenated and used for the local part of the email address. In each of these cases of using "human sounding names", the email messages were sent in short succession from machines in particular blocks of IP addresses (therefore, likely owned by the same organization), used a small number of domain names, yet all of the display names and all of the local parts of the email addresses are unique and each have human sounding names. My opinion is that none of these names correspond to real people, but rather are from an automated system and that the names are all randomly generated from lists of real first and last names in order to mislead the recipient into believing that these messages came from a real human.

62.    I have also found messages where the top-level domain name (i.e., what is often ".com" or ".net") given in the HELO or EHLO command, as recorded in the earliest "Received:" field, was entirely numeric. Again, not claiming that the list is exhaustive, I have found 1518

occurrences in the "Hydra" email messages: H000472 through H000482, H000486, H000491,

H000492, H000647, H000648, H000662, H000694 through H000744, H000748, H000751

through H000754, H000756, H000757, H000759 through H000844, H000903, H000905 through

H000922, H000924 through H000934, H000936 through H000951, H000954 through H000956,

H000959 through H000964, H000986, H001049 through H001105, H001109, H001118 through

H001133, H001156 through H001159, H001170, H001197, H001198, H001244, H001246,

H001401, H001411, H001613, H001632 through H001663, H001692, H001757, H001770

through H001789, H001792 through H001802, H001875, H001876, H001892, H002071 through

H002073, H002259, H002272, H002273, H002275, H002276, H002283, H002286 through

H002289, H002375 through H002393, H002409 through H002419, H002463 through H002466,

H002474, H002484 through H002498, H002500, H002503, H002533 through H002535,

H002537 through H002539, H002541 through H002545, H002547 through H002562, H002564

through H002677, H002679 through H002827, H002829 through H002874, H002932 through

H002943, H002945 through H002972, H002974, H002975, H002990, H002994, H003006,

H003009, H003019, H003049 through H003067, H003086 through H003090, H003092,

H003127 through H003130, H003133 through H003136, H003324, H003340 through H003350,

H003388, H003389, H003393 through H003396, H003417 through H003421, H003423 through

H003428, H003430 through H003432, H003436, H003439, H003441 through H003489,

H003491 through H003610, H003768, H003769, H003997 through H003999, H004018 through

H004041, H004073 through H004090, H004092 through H004096, H004140, H004164,

H004217 through H004221, H004234, H004427, H004590 through H004592, H004751 through

H004754, H004804 through H004807, H005012, H005020, H005021, H005036, H005037,

H005140, H005147, H005345 through H005347, H005349, H005392 through H005395,

H005405, H005549, H005552, H005554, H005604, H005651, H005657, H005728 through

H005731, H005733 through H005736, H005859, H005862, H005873, H005877 through

H005879, H005964, H005965, H006074 through H006077, H006084, H006154, H006244,

H006245, H006784, H007000, H007008, H007009, H007012 through H007030, H007163,

H007166, H007243, H007311, H007349, H007508, H007546, H007557, H007977 through

H007985, H008160, H008371, H008420, H008423, H008426, H008434, H008715 through

H008728, H009028 through H009030, H009062 through H009064, H009104 through H009106,

H009109 through H009115, H009117, H009118, H009120, H009121, H009136, H009139,

H009140, H009142, H009143, H009217, H009222, H009272, H009282, H009294, H009295,

H009298, H009305, H009308, H009311 through H009316, H009330, H009372, H009410,

H009733, H009960, H010030, H010037, H010038, H010042, H010044, H010045, H010048,

H010049, H010055, H010056, H010058, H010059, H010063, H010064, H010066, H010071,

H010075, H010081, H010118, H010136, H010159, H010162 through H010164, H010167,

H010179, H010180, H010182 through H010184, H010186 through H010190, H010608 through

H010611, H010627 through H010643, H010653 through H010665, H010709, H010732,

H010733, H010769, H010805 through H010810, H010821 through H010824, H010945,

H010946, H010959, H010960, H010999, H011003, H011005 through H011007, H011009,

H011055, H011059, H011068, H011221 through H011223, H011233, H011276, H011426

through H011429, H011448, H011449, H011453, H011454, H011456 through H011459,

H011529, H011594 through H011597, H011862 through H011867, H011870, H011871,

H011875 through H011879, H011882 through H011885, H011887, H011889, H011892,

H011895, H011896, H011898, H011994, H011997, H012001, H012005, H012007, H012014,

H012015, H012017 through H012020, H012024 through H012029, H012031, H012033,

H012401, H012442, H012732, H013140 through H013143, H013237 through H013240, H013732, H013733, H013735, H013738, H013739, H013741, H013744, H013746 through H013748, H013751 through H013754, H013756, H013757, H013760 through H013764, H013768, H013771, H013787, H013795, H013812 through H013816, H013876, H013878, H013880, H013882, H013885, H013887, H013890, H013891, H013893, H013897, H013900, H013901, H013904, H013909 through H013915, H013917, H013924, H015400, H016430, H016432, H016433, H016510, H016725, H017143, H017619, H017710, H018085, H018171, H018173, H018238, H018863, H019391, and H019836; 7 occurrences of such messages in the "Connexus" email messages: C005521, C014944, C014946, C015542, C016636, C016638, and C024436; and 4 occurrences in the "Kraft" email messages: K000016, K000090, K000098, and K000099. Entirely numeric top-level domain names are not permissible in the domain name system. Clearly the HELO argument is false. However, I also believe it is misleading and misrepresents the email's point of transmission path, since the purpose of the HELO argument is to easily identify the sender to the recipient. In each case, the sender SMTP was configured with a domain name that could not possibly identify any legitimate SMTP sender.

63.     Similar to putting a random (though human sounding) name in the display name of the "From:" field is to put something similar in the display name of the "To:" field. Again, not claiming that the list is exhaustive, I have found a pattern of putting a random human sounding first name in the display name of the "To:" field in 6437 messages in the "Kraft" email messages: K001334, K001335, K001337 through K001340, K001354 through K001356, K001358, K001361 through K001367, K001371 through K001376, K001382 through K001384, K001387, K001390 through K001391, K001396, K001401 through K001403, K001405, K001409, K001418, K001420 through K001426, K001430 through K001431, K001433 through

K001438, K001447, K001451 through K001452, K001454 through K001455, K001457 through

K001460, K001469 through K001470, K001472 through K001474, K001479, K001482 through

K001484, K001496 through K001497, K001502 through K001503, K001506 through K001508,

K001510 through K001512, K001515, K001517 through K001518, K001520, K001525,

K001529, K001555, K001575 through K001580, K001582 through K001583, K001593 through

K001595, K001597, K001599, K001601 through K001604, K001610 through K001612,

K001615 through K001617, K001626 through K001627, K001631, K001635 through K001636,

K001669, K001678 through K001681, K001683 through K001684, K001686 through K001687,

K001703, K001726 through K001727, K001733 through K001734, K001741, K003579 through

K004014, K004032, K004034, K004051, K004057 through K004063, K004068 through

K004069, K004109, K004118, K004138 through K004175, K004177 through K004239,

K004241 through K004685, K005005 through K005764, K005768 through K005810, K005814

through K005901, K008029, K008031 through K008032, K008034 through K008035, K008038

through K008039, K008578, K008604, K008621 through K008622, K009953, K010050,

K001323 through K001333, K001336, K001341 through K001353, K001357, K001359 through

K001360, K001368 through K001370, K001377 through K001381, K001385 through K001386,

K001388 through K001389, K001392 through K001395, K001397 through K001400, K001404,

K001406 through K001408, K001410 through K001417, K001419, K001427 through K001429,

K001432, K001439 through K001446, K001448 through K001450, K001453, K001456,

K001461 through K001468, K001471, K001475 through K001478, K001480 through K001481,

K001485 through K001495, K001498 through K001501, K001504 through K001505, K001509,

K001513 through K001514, K001516, K001519, K001521 through K001524, K001526 through

K001528, K001530 through K001554, K001556 through K001574, K001581, K001584 through

K001592, K001596, K001598, K001600, K001605 through K001609, K001613 through

K001614, K001618 through K001625, K001628 through K001630, K001632 through K001634,

K001637 through K001668, K001670 through K001677, K001682, K001685, K001688 through

K001702, K001704 through K001725, K001728 through K001732, K001735 through K001740,

K001742 through K001743, K009258, K000601 through K001314, K001744 through K003258,

K003261 through K003441, K004015 through K004031, K004033, K004035 through K004050,

K004052 through K004056, K004064 through K004067, K004070 through K004108, K004110

through K004117, K004119 through K004131, K004686 through K004998, K005914 through

K006099, K006101 through K006439, K006472 through K007231, K004176, K006100,

K007300, and K007495. I have also found this pattern in 22395 messages in the "Connexus"

mailbox: C000014 through C000536, C000545 through C002192, C002236 through C002734,

C002736, C002737, C003316 through C004613, C004674 through C004683, C004704 through

C005517, C005731 through C006562, C006565, C006678, C006683 through C006712,

C006798 through C007977, C008392 through C008802, C008851, C008949 through C009426,

C009516 through C009555, C009858, C010020 through C011707, C011712 through C013111,

C013305 through C013334, C013400 through C014150, C014343 through C014347, C014776,

C015094 through C015110, C015113 through C015522, C015805 through C016117, C016120

through C016129, C016766 through C017608, C017610 through C021240, C021284 through

C021613, C021676 through C022989, C023005 through C024274, C024864 through C024904,

C025017 through C025519, C025526 through C026029, C026493 through C027319, C027364

through C028100, and C028102. I have concluded that these names were randomly generated

and put into the display name of the messages in an effort to evade email filters and deceive the

recipient into believing that the intended recipient of the email message was an actual person. Therefore, I find these patterns to be false, misleading, and misrepresenting.

64.     With regard to the "Hydra 2008-2009" mailbox: Of the 18,497 email messages in this mailbox, there are only 145 messages in which the display name of the "From:" field and the local part of the email address (i.e., the portion on the left of the "@" sign) in the "From:" field are not identical. Of those, 91 use the string "noreply" for the local part of the email address (H029370, H040479, H039621, H045352, H035917, H035918, H035919, H036869, H036870, H036871, H036627, H044091, H045146, H044177, H044521, H029371, H035446, H035447, H029726, H040478, H033574, H033692, H033710, H029369, H027546, H033071, H027664, H045484, H044901, H045408, H035448, H036630, H036631, H044755, H044914, H035916, H028577, H045583, H045599, H032166, H032167, H032238, H045493, H045515, H037112, H040473, H036389, H036390, H035566, H029490, H029608, H030812, H036628, H036629, H029134, H045659, H032087, H034752, H034753, H034754, H044869, H027428, H045740, H029016, H035915, H036625, H036626, H036634, H034989, H034711, H034716, H034751, H028898, H044912, H034279, H034280, H036633, H035920, H045751, H029372, H044885, H031696, H036632, H039850, H044828, H027424, H045467, H045506, H045606, H045781, H044913), and 52 of them follow a particular pattern of removing the blank spaces that appear in the display name and using the resultant string as the local part of the email address (H040471, H040472, H040474, H040475, H040477, H044107, H044108, H044439, H044518, H044615, H044679, H044930, H044944, H044953, H044959, H044974, H044976, H044980, H045107, H045114, H045116, H045144, H045145, H045184, H045186, H045197, H045200, H045206, H045207, H045226, H045228, H045229, H045253, H045257, H045273, H045292, H045300, H045331, H045354, H045365, H045373, H045376, H045387, H045391, H045432, H045438,

H045505, H045538, H045546, H045567, H045580, H045617). All of the other 18,352 email messages in this mailbox have the display name of the "From:" field identical to the local part of the email address of the "From:" field.

65.     The 91 messages with the string "noreply" as the local part of the email address are false and misleading with regard to the origin of the message. None of the display names of these messages make any indication of the author of the message, but rather contain information about the content of the message. As I explained above, an important purpose of this field is to give the recipient (or an intermediary on behalf of the recipient) the ability to identify the author of the message without having to download and open the entire message. The display names in these messages do not permit this to happen. Furthermore, "noreply" as the local part of the email address is interesting in and of itself. Similar email addresses are used in "From:" fields of email messages, but in my experience they are most often used by automated systems that send messages specifically requested by the recipient (for example, when receipts of purchase are sent via email from commercial web sites, or when notifications are sent for specific recipient requested events, like shipping and flight information). In the context of these messages, which are apparently solicitations for product sales, I can only conclude that the use of "noreply" is an attempt by the author to thwart the recipient from being able to determine the origin of the message without first examining all of its contents.

66.     Other messages in the "Hydra 2008-2009" mailbox appear to have properties similar to those in the "Kraft", "Connexus", and "Hydra" mailboxes. For example, the display names (and the local parts, since they are identical in most of these examples) often contain descriptive phrases instead of an identifiable name of a person or system that authored the message. For example, 144 messages (H035273 through H035301, H036872, H036887 through

H036893, H036925 through H036935, H036969 through H036979, H037329, H037339 through

H037342, H037357 through H037362, H037380 through H037383, H037419 through H037433,

H038518, H038548 through H038561, H038608 through H038622, H044012, H044033,

H044054, H044089, H044132, H044245, H044255, H044370, H044461, H044538, H044684,

H044737, H044799, H044989, H045055, H045121, H045219, H045266, H045319, H045344,

H045400, H045448, H045578, H045657, H045738) all have the display name (and local part)

"GevaliaCoffeeOffer", and 93 messages (H031483 through H031488, H031518 through

H031525, H031562 through H033483, H033513 through H033520, H033557 through H033573,

H034536 through H034541, H034571 through H034578, H034615 through H034631) all have

the display name (and local part) "TryFreeShakes". Although such names may describe what the

email is about, they do not indicate to the recipient which person or system originated the

message without further investigating by opening the message and downloading its contents. For

all of the reasons I cited earlier, I conclude that this is a false and misleading use of such display

names. As another example, there are many messages that have as their display names (and local

parts) what appear to be corporate identities. For example, 43 messages (H044786, H044788,

H044789, H044880, H044882, H044883, H044925, H044927, H044928, H044991, H044993,

H044994, H045057, H045059, H045060, H045124, H045177, H045180, H045181, H045221,

H045223, H045224, H045268, H045270, H045271, H045307, H045309, H045310, H045321,

H045323, H045324, H045346, H045348, H045349, H045402, H045404, H045405, H045450,

H045452, H045453, H045533, H045535, H045536) have the display name (and local part) of

"A.A.R.P.", which would indicate that the author of the message is (or is doing business as) the

AARP (formerly American Association of Retired Persons) organization, and 115 messages

(H029961 - H029988, H032754 - H032782, H034162 - H034190, H035798 - H035826) have a

display name (and local part) of "The.Wall.Street.Journal", which would indicate that the author

of the message is (or is doing business as) the newspaper of the same name. However, the

domain name portions of these "From:" email addresses do not appear (on their faces) to be

associated with either the A.A.R.P or the Wall Street Journal. Again, as I stated above, if there

exists no business (or other) relationship between those entities and the author and/or transmitter

of these email messages, I would obviously conclude that this is false, misrepresenting, and

misleading information as to the origin of these messages. However, even in the case where there

is a relationship between the author and/or transmitter of these messages and the entity in the

display name or local part, I would still conclude that this kind of combination of the display

name and the domain name of the email address was misrepresenting, misleading, and false as to

the origin of the message: If a recipient were to rely on the information that a particular message

came from (for example) the A.A.R.P, insofar as they used an email filter that allowed messages

through if they contained the string "A.A.R.P.", the recipient would potentially need to receive

the entire message and potentially download associated content from a sender that was not in fact

the A.A.R.P. in order to discover that the message was not from the organization known to the

recipient. As I indicated earlier, there is a standard way to represent that an email is authored by

one party and transmitted by another; the author's name and email address go in the "From:"

field, and the transmitter's name and email address go in the "Sender:" field. By combining the

different pieces of information (the display name of one entity and the domain name of another),

it serves to obscure the responsible parties, circumvent filters designed to determine the origin of

messages, and mislead the recipient as to the origin of the message.

   67.    With regard to the "Hydra 2008" mailbox: This mailbox contains data that is

similar to the "Hydra 2008-2009" mailbox. In particular, 1172 of the 1834 messages in the

mailbox have "From:" field email addresses where the display name is identical to the local part. Of the remainder, 144 have a local part of "noreply" (which I discussed earlier) and 510 have a local part of "info". Many of the display names throughout the mailbox are descriptive phrases, which are problematic for the reasons outlined above. With regard to those messages that have a local part of "info", there are some obvious examples of false, misleading, or misrepresenting information in the display name. For instance, there are five messages (H025853, H025863, H025869, H025881, H025883) that use the email address "info@augustamx.com" in the "From:" field. However, they each use a different display name (respectively: "Dr. David Lee Anderson", "Designer Handbag", "Learn to earn on YouTube", "Advanced Green Tea", and "Gevalia"). Certainly a few of those names are descriptions of the contents of the message rather than the name of an entity that authored the message. However, it is certainly reasonable to conclude that Dr. David Lee Anderson (if such a human actually exists) is not the same as, nor uses the same e-mail address as, any entity purporting to be "Gevalia". Of the 510 messages that used a local part of "info", I found 80 different domain names used in the email addresses, each of which used multiple (in one case as many as 23) different display names. I conclude that such messages are false, misleading, and misrepresenting with regard to the origin of the messages.

68.     With regard to the "Kraft 2008-2009" mailbox: The email messages in this mailbox use a relatively small number of different display names ("CoffeeByGevalia", "Gevalia", "gevalia", "Gevalia  Lovers  Kit", "Gevalia Coffee Promotion", "Gevalia Gourmet Coffee Starter Kit", "Gevalia Kaffe", "Gevalia@domainname.com", "GevaliaCoffee", "GevaliaCoffeeOffer", "GevaliaCoffeeSet", "Gevaliadomainnamecom", "GevaliaGifts", "GevaliaGourmetKaffe", "GevaliaHolidayOffer", "GevaliaKaffe", "GevaliaKaffeGift", "GevaliaSpecialGift", "GevaliaSS", "Gourmet Coffe Gift", "Gourmet Mornings",

"GourmetKaffe", "Great Deals with Coffee", "HolydaysCoffee4You", "Taste The Gevalia Coffee"), and the vast majority of messages in the mailbox use a display name containing the word "Gevalia" in some form. As noted previously, some of these are descriptive of the message contents rather than identifying of the author of the message, which are problematic for the reasons stated earlier. In addition, of the messages using "gevalia" (starting with a lowercase "g") as the display name, 86 of them use completely unique local parts in the "From:" field email address, each of them composed of an apparently random string of characters from 6 to 11 characters in length, which I conclude is a use of false, misleading, and misrepresenting information as to the origin of the message in order to avoid message filters. However, the vast majority of email messages follow a pattern of using an identical display name and local part and rotating through different IP addresses and domain names. For example, 46 of the messages that use "GevaliaCoffee" as the display name and the local part (K018572, K018378, K018379, K018380, K018478, K018479, K018480, K018392, K018393, K018394, K018489, K018490, K018491, K018317, K018318, K018407, K018320, K018321, K018322, K018323, K018324, K018325, K018517, K018518, K018519, K018531, K018532, K018533, K018543, K018544, K018545, K018368, K018470, K018471, K018472, K018551, K018576, K018430, K018431, K018432, K018443, K018444, K018445, K018463, K018464, K018465) were all sent by systems with IP addresses in the range of "174.142.27.17" through "174.142.27.30". Each different IP address used a different domain name. This is indicative to me of an attempt to evade filters and otherwise mislead recipients as to the origin of the email message, and I therefore conclude that this information (like many equivalent examples in this mailbox) is misleading and misrepresentative of the origin of the messages.

**DATABASE DATA**

69.     I was provided with a series of files that were described to me by Plaintiff's

counsel as database files from systems used to transmit email messages. The files initially

provided were "aolers 20090311 1041.sql", "ion 20090312 1158.sql", "extranet 20090311 1505-

0001_1-28", "mail-0001.sql", "SRE 20090311 1108.sql", "mail_BSI-Hyp_records.txt", and

"domains.txt". After reviewing the Expert Report of David Shin with regard to these files, I

asked Plaintiff's counsel to have Mr. Shin extract the data from the  extranet.orders table where

he found similarities between the "id" field of that table and the "Connexus" mailbox. I was

provided with an Excel spreadsheet containing these extractions and have since analyzed the data

in this spreadsheet by comparing it to the data from the "Connexus" mailbox. In summary, I

conclude that this data further supports my earlier statements concerning the email messages in

the "Connexus" mailbox. Further, I conclude that this data amply demonstrates that Defendants'

assertion on page 8 of their memorandum that the email message exhibits in this case "do not

and cannot represent any emails that may or may not have existed" are false and without merit.

70.     For each of the "id" numbers from the extract of the extranet database that I

examined, I was able to find a series of messages in the "Connexus" mailbox that contained the

"id" number as part of an HTML link in the body of each message, and for every one of those

messages, the "Subject:" field of the message was identical to one of the strings in the

corresponding "subject" fields in the extract of the database, and the "Date:" field and

"Received:" field date of the message were within one day of the "date_to_send" field in the

extract of the database. Importantly, of the 28,137 messages in the "Connexus" mailbox,  28,074

of them had data in the body which had exactly the form "site/0000" followed by a four digit

number that exactly corresponded to one of the "id" numbers from the extract of the extranet

database. Of those, 24,304 of them had "Subject:" fields that were substantially identical to the

data in the corresponding "subject" field in the extract of the extranet database, and the "Date:"

field of each of those messages and the date on which each of those messages was delivered to

Plaintiff as recorded in the earliest "Received:" fields are within one day of the "date_to_send"

field in the extract of the extranet database. By way of example (so as not to have to list all of the

24,304 messages, although I am prepared to provide exhaustive analysis):

- 267 email messages (Bates numbers C006798 through C006859, C008949 through

  C008998, C025017 through C025107, and C025526 through C025589) have the string

  "site/00002258" in the body of the message. Each of those messages has a "Subject:"

  field containing one of "Claim your brand new cell phone", "FREE Moto RAZR Flipping

  - Open", "WOW! FREE Moto RAZR Flipping ", or "Yes, you're reading correctly. Moto

  RAZR for FREE.", and each has a "Date:" field and the earliest "Received:" field

  containing the date 24 February 2005. In the extract of the extranet database file, the line

  containing the "id" number 2258 has a "date_to_send" field of "2005-02-24 10:00:00"

  and a "subject" field of "Claim your brand new cell phone FREE Moto RAZR Flipping -

  Open WOW! FREE Moto RAZR Flipping  Yes, you're reading correctly. Moto RAZR

  for FREE."

- 196 email messages (Bates numbers C008556 through C008652 and C015292 through

  C015390) have the string "site/00002507" in the body of the message. Each of those

  messages has a "Subject:" field containing either "Emergency Help with Your Bills Is

  Here" or  "Please Read - Emergency Help with Your Bills Is Here", and each has a

  "Date:" field and the earliest "Received:" field containing the date 23 March 2005. In the

  extract of the extranet database file, the line containing the "id" number 2507 has a

"date_to_send" field of "2005-03-23 13:00:00" and a "subject" field of "Emergency Help with Your Bills Is Here Please Read - Emergency Help with Your Bills Is Here".

71.     My conclusion is that at least 24,304 of the 28,137 email messages provided to me in the "Connexus" mailbox were created and sent by someone using the database from which Mr. Shin extracted the data.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 19th day of February, 2010, at Hyderabad, India.

By: _Peter W. Resnick_

Peter W. Resnick