# DECLARATION OF PETER RESNICK

# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

--------------------------------+

BEYOND SYSTEMS, INC.,                +

              Plaintiff,  +  Case No.

         v.                    + 8:08-CV-00409-PJM/CBD

KRAFT FOODS, INC., et al.,        +

           Defendants. +

--------------------------------+

Deposition of PETER W. RESNICK

Washington, D.C.

Wednesday, October 14, 2009

10:15 A.M.

Job No.:  1-165490

Volume 1, Pages 1 - 238

Reported by:  Denice Z. Lombard, CSR

DEPOSITION OF PETER W. RESNICK
CONDUCTED ON WEDNESDAY, OCTOBER 14, 2009

Page 46

1    Q    Do you have any idea what time period that was

2    in?

3    A    I don't.

4    Q    And you don't know if they're still doing that

5    today.

6    A    I don't know if they are doing it today or

7    always do it.  I have honestly no information about

8    when the use of those spam filters was.  They may have

9    done it during the course of this case.

10    Q    And is that use of spam filters in any way

11    reflected in the emails you've looked at?

12    A    Some, yes.

13    Q    Describe that for me.

14    A    Some email messages that I've looked at do

15    have header fields that correspond to SpamPal.  I've

16    seen those.  And I assume those have to do with the use

17    of the SpamPal filter.

18         I believe I've seen header fields with regard

19    to SpamAssassin, but I'm not sure that that's the case.

20    Q    What characteristics have you seen in the

21    emails that you've just described that lead you to

22    believe that SpamPal is being used?

23    A    I believe I've seen header fields on certain

24    email messages in some of the exhibits which have a

25    field name of SpamPal followed by some other data.

DEPOSITION OF PETER W. RESNICK
CONDUCTED ON WEDNESDAY, OCTOBER 14, 2009

Page 47

1      Q      Okay.  So that would be indicia to you of

2   SpamPal being in use.

3      A      At some point, yes.

4      Q      But you have no idea how it's being used.

5      A      That's correct.

6      Q      Can you describe for me briefly what your

7   understanding is of how a spam filter is configured?

8      A      There are many different spam filters, and

9   they have all sorts of different configurations.

10     Q      Okay.  So an ISP is in control essentially of

11  what they're filtering and how?  Is that fair to say?

12     A      Sometimes.  Sometimes it's at the ISP level,

13  sometimes it's at the end-user level, sometimes it's a

14  third-party service that does spam filtering.  There

15  are a bunch of different ways that that happens.

16     Q      But as an ISP, it's fair to say that BSI would

17  be in control of how emails coming through their

18  servers are getting filtered?

19            MR. ONORATO:  Objection to form.

20            THE WITNESS:  Generally speaking.

21  BY MR. ROCHE:

22     Q      You say "generally."  What are the

23  circumstances under which an ISP wouldn't have control

24  over that?

25     A      For instance, there are some ISPs which use

DEPOSITION OF PETER W. RESNICK
CONDUCTED ON WEDNESDAY, OCTOBER 14, 2009

Page 145

1      Q      Were you retained to render an opinion

2   concerning Eudora insofar as Eudora relates to the

3   emails at issue?

4      A      Yes.

5      Q      You were asked a question about a spam trap.

6   Do you recall that?

7      A      I do.

8      Q      Have you ever seen any evidence that BSI is

9   using a spam trap in this case?

10     A      No, I don't believe so.

11     Q      Okay.  You were asked some questions about the

12  routing of emails.  Is it typical for ISPS to route

13  emails from one to another?

14     A      From one ISP to another?

15     Q      Yes.

16     A      That does occur.

17     Q      Okay.  And, I mean, let me ask it this way.

18  Is that a regular function of mail transport on the

19  Internet, that one ISP will route mail to another ISP

20  for delivery to whatever end-point users there might

21  be?

22     A      Yes, that's not uncommon to happen.

23     Q      Okay.  Now, if you -- there was a lot of

24  discussion about evading spam filters today, or some

25  discussion.  If you -- is it your opinion that in

DEPOSITION OF PETER W. RESNICK
CONDUCTED ON WEDNESDAY, OCTOBER 14, 2009

Page 168

1      A     Yes, on page 5 he's talking about the

2    "Subject:" line.  On page 20 he's talking about the

3    "From:" line.

4      Q     And on page 5 he's not talking about

5    filtering; on page 20 he pretty clearly is.

6      A     I believe that's true.

7            MR. ROCHE:  That's all I got.

8                      --oOo--

9            EXAMINATION BY COUNSEL FOR

10           DEFENDANTS CONNEXUS and HYDRA

11   BY MR. ROTHMAN:

12     Q     Good afternoon, Mr. Resnick.  I'm going to ask

13   you now some questions about testimony you've already

14   given today, okay?

15     A     Okay.

16     Q     And the line of questioning pertains mostly to

17   what Mr. Onorato asked you about what happened prior to

18   that, okay?

19     A     All right.  I'll try and keep up.

20     Q     Now, Mr. Onorato asked you a question about a

21   spam trap.  Do you remember that?

22     A     I do.

23     Q     Could you define what a spam trap is?

24           MR. ONORATO:  Objection; form.  Asked and

25   answered.

Page 169

1           THE WITNESS:  I think as I described before

2     when I think of the word "spam trap" I think of an

3     email address that is -- whose sole purpose is to cause

4     spammers to send spam to it.

5     BY MR. ROTHMAN:

6           Q    How would we be able to tell in this case

7     based on the information that has been presented,

8     whether or not plaintiff set up a spam trap, using your

9     definition?

10          MR. ONORATO:  Objection to form; assumes

11    facts, calls for speculation.

12          THE WITNESS:  Now, I'm sorry, you're going to

13    have to repeat the question.

14          MR. ROTHMAN:  Sure.

15          Q    How would we be able to investigate whether

16    plaintiff set up a spam trap, using your definition of

17    spam trap?

18          A    Oh.

19          MR. ONORATO:  Same objections.

20          THE WITNESS:  I assume you would have to first

21    interview the plaintiff and discuss the question with

22    him.  You might also look for places where a particular

23    email address was distributed, used, where you wouldn't

24    expect it to be.

25          Many spam traps, as far as I understand it,

DEPOSITION OF PETER W. RESNICK
CONDUCTED ON WEDNESDAY, OCTOBER 14, 2009

Page 170

1    are email addresses placed on websites such that things

2    looking for email addresses might grab them.

3         So if you found an email address where it

4    seemed unusual, that might, in fact, be a spam trap.

5    BY MR. ROTHMAN:

6    Q    So you mean like a web crawler?  Is that what

7    you're talking about?

8    A    That's what I was referring to, yes.

9    Q    So if we were to find a list of email

10   addresses that are in the "To:" line in this case on

11   line somewhere, would that be indicative of a spam trap

12        MR. ONORATO:  Objection to form; vague and

13   ambiguous.

14        THE WITNESS:  It needn't be, but it's

15   possible.

16   BY MR. ROTHMAN:

17   Q    What else could we look for -- or strike it.

18        Did you look to see if there were any two

19   addresses on any websites in connection with this case?

20   A    I did no investigation whatsoever with regard

21   to email addresses that may or may not be spam traps.

22   Q    What else would we look for in terms of

23   determining whether plaintiff set up a spam trap?

24        MR. ONORATO:  Same objection as before; vague

25   and ambiguous, assumes facts, calls for speculation.

Page 239

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

--------------------------------+

BEYOND SYSTEMS, INC.,                +

                 Plaintiff,  +  Case No.

         v.                     + 8:08-CV-00409-PJM/CBD

KRAFT FOODS, INC., et al.,        +

               Defendants. +

--------------------------------+

Deposition of PETER W. RESNICK

Washington, D.C.

Thursday, October 15, 2009

9:40 A.M.

Job No.:  1-165491

Volume 2, Pages 239 - 463

Reported by:  Denice Z. Lombard, CSR

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

1    research what another website might have looked at --

2    looked like at some particular point in the past.

3        Q    Have you found that method to be reliable?

4        A    Generally.

5        Q    Is it your understanding that plaintiff claims

6    in this case that he used the Wayback information in

7    connection with email investigations?  Not necessarily

8    this email investigation, but email investigations

9    generally.

10       A    I have some vague recollection of mention of

11   use of the "Wayback Machine," but I don't specifically

12   know what the plaintiff used it for.

13            MR. ROTHMAN:  Okay.  Let's go through --

14            (Whereupon Defendant's Exhibit 257 was marked

15   for identification and attached to the transcript.)

16            MR. ROTHMAN:  I'm going to put before you

17   what's been marked as Exhibit 257.

18       Q    Do you see that?

19       A    I do.

20       Q    And I'm going to represent to you that I went

21   to the Wayback Machine and typed in the Web address

22   www.hypertouch.net, okay?

23       A    All right.

24       Q    And these are the results I received this

25   morning prior to your deposition.

Page 263

1      A      Okay.

2      Q      Does this look like the format that you've

3   used when you've used the Wayback Machine?

4      A      Yes, it does.

5             (Whereupon Defendant's Exhibit 258 was marked

6   for identification and attached to the transcript.)

7             MR. ROTHMAN:  Now I'm going to put before you

8   what's been marked as Exhibit 258.  And I'll represent

9   to you that I clicked on one of the links that's

10  referenced in Exhibit 257.  I don't remember which one,

11  but it will be reflected in the next exhibit.  And this

12  is what came up on my screen.  And if you could look at

13  the bottom, you see where it says, "Let's be quite

14  clear:  NONE of these email addresses have been Nor

15  should ever be 'opted in' to ANY email list"?

16            Do you see that?

17     A      I do.

18     Q      And then below that you see a bunch of names

19  like Aaron, Abigail, Adam and so forth?

20     A      I do.

21            (Whereupon Defendant's Exhibit 259 was marked

22  for identification and attached to the transcript.)

23            MR. ROTHMAN:  Okay.  Now I'm going to put

24  before you what's been marked as Exhibit 259.

25     Q      Do you have that in front of you?

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 264

1      A    I do.

2      Q    Exhibit 259 is the code underlying

3  Exhibit 258, okay?

4      A    I think I know what you mean.

5      Q    Good.  And if you could scroll -- or look

6  halfway down the first page, do you see where it says,

7  "Let's be quite clear," and then it looks like there's

8  a tag, and then the language continues, none of these

9  email addresses have ever been nor should ever be

10  "opted in . . ."?  Do you see that?

11      A    I see approximately that, yes.

12      Q    And you see below that a bunch of references,

13  it says "mailto:" for example

14  "adrianht@safemailbox.com"?

15      A    I do see that, yes.

16      Q    Is it your understanding based on how Web

17  crawlers work that a Web crawler would have picked or

18  could have picked up these email addresses by searching

19  for email addresses on the Internet?

20      A    I would say that's a possibility.

21      Q    Do you know whether any of the -- or strike

22  it.

23          Do you see where above that there's some

24  bolded language on Exhibit 259 where it says "THE

25  SENDING OF UNSOLICITED EMAIL ADVERTISING MESSAGES,

1   UNSOLICITED BULK EMAIL ADVERTISING MESSAGES . . ." and

2   so forth?  Do you see that?

3        A    I do see that.

4             MR. ONORATO:  You said bolden?

5             MR. ROTHMAN:  I'm sorry, it's all caps.  So

6   it's all caps.  It reads "THE SENDING OF UNSOLICITED

7   EMAIL ADVERTISING MESSAGES . . ." and then it

8   continues.

9             THE WITNESS:  I do see that.

10  BY MR. ROTHMAN:

11       Q    Based or your experience can you name any Web

12  crawler searching for email addresses that would have

13  picked up that information?

14       A    No.  As I said earlier, I don't have

15  information on what Web crawlers look for other than

16  email addresses.

17       Q    Okay.  Now, going -- or staying with

18  Exhibit 259 I want to show you the example of

19  adrianht@safemailbox.com.  Does that correspond to what

20  we established was the "To:" address in Exhibit 256?

21            MR. ONORATO:  Objection to form;

22  mischaracterizes the testimony.

23            THE WITNESS:  That corresponds to what we

24  talked about as what I believe to be the original

25  destination, let's call it, of that email.

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 266

1    BY MR. ROTHMAN:

2        Q    Do you know who owns the domain name

3    safemailbox.com?

4        A    I believe that was one of the domain names

5    that I was told about at the beginning that was in some

6    way associated with plaintiff, but I do not remember

7    for sure, and that may not be the case.

8        Q    If plaintiff owned the domain name

9    safemailbox.com, can you think of any reason why

10   another Internet Service Provider would be listing

11   email addresses belonging to that domain name on their

12   public websites?

13           MR. ONORATO:  Objection to form.

14           THE WITNESS:  Depending on what you mean by

15   owned, I'm sure I could think of several.  I don't know

16   what you mean by owned.

17           MR. ROTHMAN:  Let me back up a second.

18           THE WITNESS:  Okay.

19   BY MR. ROTHMAN:

20       Q    Plaintiff claims that the emails at issue in

21   this case are unsolicited emails and that he didn't

22   want them, okay?

23       A    Are you asking me to assume that or --

24       Q    Well, do you agree with that?  Is that your

25   understanding?

Page 267

1      A    Generally speaking, yes, I think that's right.

2      Q    Is it your understanding that plaintiff has

3  claimed that the recipient email addresses are

4  confidential?

5      A    That which recipient email addresses are

6  confidential?

7      Q    The addresses in the "To:" lines in the emails

8  at issue.

9      A    That plaintiff is claiming that those

10 addresses are confidential?  No, I'm not aware of that.

11     Q    Can you name any Internet Service Providers

12 that post email addresses on their publicly-available

13 websites that they do not want to receive unsolicited

14 emails to?

15          MR. ONORATO:  Objection to form.

16          THE WITNESS:  Yes, I'm quite sure.

17 BY MR. ROTHMAN:

18     Q    Okay.  What ISPs?

19     A    Again, depending on what you mean, I've

20 certainly seen Web pages from, for instance, Google

21 which have email addresses on them, and I would presume

22 that some of those email addresses Google, as an ISP,

23 does not wish to have unsolicited commercial email sent

24 to them.

25     Q    My question was unclear.  In your example did

Page 268

1    Google put those messages on the Web for the specific

2    purpose of announcing to the world "Do not send email

3    to these email addresses"?

4        A    Oh, I don't know for sure, although I believe

5    it may be the case that I know of ISPs which put email

6    addresses of the sort, but I'm not positive.

7        Q    So you can't name any ISPs sitting here today

8    that would do that, right?

9        A    Certainly not offhand.

10       Q    If an ISP knew about the Web crawler

11   technology, they certainly wouldn't put email addresses

12   on their Web sites?

13           MR. ONORATO:  Objection to form; assumes

14   facts, vague and ambiguous, calls for speculation.

15           THE WITNESS:  I don't think that's true.

16   BY MR. ROTHMAN:

17       Q    Okay.  Why not?

18       A    Well, I certainly know from my own experience

19   that the possibility of getting unsolicited commercial

20   email might be outweighed by the convenience of having

21   email addresses available on a website that someone

22   might be able to click on or use for other purposes.

23       Q    You're talking about for other purposes, and

24   I'm talking about for the sole purpose of -- all right.

25   Strike it.

1        Assume that the sole purpose of putting the

2   email addresses on the Internet is to avoid receiving

3   any email to those email addresses, okay?

4        MR. ONORATO:  So what's the question?

5   BY MR. ROTHMAN:

6     Q    Well, do you understand that assumption?

7     A    I think so.

8     Q    Now, if an Internet Service Provider

9   understands the Web crawler technology, would it be

10  wise for that Internet Service Provider to list email

11  addresses on a Web page where the purpose of listing

12  those email addresses is to not receive emails to those

13  addresses?

14       MR. ONORATO:  Objection to form; vague and

15  ambiguous, calls for speculation, assumes facts.

16       THE WITNESS:  Yes, I think I can think of

17  exactly why a service provider might want to put email

18  addresses on a Web page for the specific purpose of

19  listing those addresses that they do not want to

20  receive unsolicited commercial email.

21  BY MR. ROTHMAN:

22    Q    And they're aware of the Web crawler

23  technology.

24    A    And they're aware of the Web crawler

25  technology.

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 270

1       Q      Okay.  Can you explain what you mean?

2       A      If an ISP wishes to enhance its spam filtering

3   by identifying messages going to particular addresses

4   that it does not want unsolicited commercial email

5   going to, and it finds that those addresses are used

6   for unsolicited commercial email, it could better

7   identify particular IP addresses, particular domain

8   names such that it could collect that information for

9   later use.

10      Q      And enhancing spam filters would be of benefit

11  to that Internet Service Provider, correct?

12             MR. ONORATO:  Objection to form.

13             THE WITNESS:  It can be.  It has benefits

14  perhaps in and of itself.  It has secondary benefits

15  potentially.

16  BY MR. ROTHMAN:

17      Q      What are the other reasons why an ISP would

18  place email addresses on a Web page that it does not

19  want to receive email to?

20             MR. ONORATO:  Objection to form.

21             THE WITNESS:  Again, as I said before -- maybe

22  you should --

23  BY MR. ROTHMAN:

24      Q      Other than the example you just gave of an ISP

25  wishing to enhance its spam filters, what are the other

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 271

1    reasons why an Internet Service Provider might do this?

2              MR. ONORATO:  Objection to form.

3              THE WITNESS:  Again, going back to your

4    original hypothetical that they are putting these email

5    addresses on a Web page, they specifically do not want

6    unsolicited commercial email, and the reason for

7    putting them on the Web page is to identify them as

8    email addresses not wanting unsolicited commercial

9    email.

10             One of the other uses I can think of is that

11   they wish to identify, for purposes of logging and

12   purposes of identification for later either sending

13   complaints or potentially identifying for legal

14   purposes, that those specific email addresses were used

15   for unsolicited commercial email.

16   BY MR. ROTHMAN:

17        Q    Spam trap?

18             MR. ONORATO:  Objection to form.

19             THE WITNESS:  If I understand the use of that

20   term, yes, generally that's I think what is referred to

21   as a spam trap.

22   BY MR. ROTHMAN:

23        Q    Okay.  What are the other reasons that you can

24   think of?

25        A    I can't think of any other reasons off the top

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 272

1    of my head, although I'm not precluding that there

2    aren't any.  I just haven't thought about the issue in

3    depth other than now.

4              MR. ROTHMAN:  I'm going to put before you what

5    the court reporter will mark as 260.

6              (Whereupon, Defendant's Exhibit 260 was marked

7    for identification and attached to the transcript.)

8    BY MR. ROTHMAN:

9         Q    Do you have it in front of you?

10        A    I do.

11        Q    Do you see where it says "X-Original-To:" And

12   then there's an email address

13   "julianht@safemailbox.com"?

14        A    I do.

15        Q    Is it fair to say that

16   julianht@safemailbox.com is the original email address

17   in the "To:" line that was added by the sender?

18        A    No.

19        Q    Okay.  Tell me why not?

20        A    I do not see a to field in this email message

21   that I believe was, as you put it, added by the sender.

22        Q    What do you mean by that?

23        A    The only "To:" field I see in this message, if

24   I'm not mistaken, is a "To:" field up above called --

25   which has the contents of support@beyondsys.net.

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 301

1    using, okay?

2    BY MR. ROTHMAN:

3        Q    Do opt-out claims reflect who initiated the

4    transmission of the email?

5            MR. ONORATO:  Objection to form.

6            THE WITNESS:  An opt-out claim I suppose might

7    have information that indicated in some way the person

8    or entity who initiated the transmission of the email.

9    BY MR. ROTHMAN:

10       Q    Is that always the case?

11           MR. ONORATO:  Objection to form.

12           THE WITNESS:  Not as far as I know.

13           MR. ROTHMAN:  Right.

14       Q    Are you familiar with companies that are hired

15   for the specific purpose of handling opt-outs?

16       A    I'm not personally familiar with those

17   companies or the operation of those companies.

18       Q    Do you know whether they exist?

19       A    As a general statement I have a general

20   understanding that those might exist, but I don't have

21   particular knowledge of them.

22       Q    Is the opt out -- or strike it.

23            Is somebody's request to opt out the same as

24   somebody complaining about an email message?

25           MR. ONORATO:  Object to form.

DEPOSITION OF PETER W. RESNICK, VOLUME 2
CONDUCTED ON THURSDAY, OCTOBER 15, 2009

Page 303

1   hypothetical.

2        THE WITNESS:  I can think of examples where

3   advertisers would want to be identified in commercial

4   emails, and I can think of examples where advertisers

5   would not want to be identified in commercial emails.

6   BY MR. ROTHMAN:

7        Q    Can you give me an example of where a

8   commercial advertiser would want to be identified in an

9   email?

10       A    And I would claim this as a lay opinion.  An

11  advertiser who wanted the recipient of an email to

12  identify them as associated with the product being sold

13  and wanted to identify contact information for them in

14  order to obtain the product being sold would want to

15  identify themselves to the recipient of the email.

16       Q    Yesterday -- or actually strike it.

17            You know what a privacy service is, right,

18  with respect to registration of domain names?

19       A    I do.

20       Q    Are those illegal?

21       A    Not so far --

22            MR. ONORATO:  Objection to the extent it calls

23  for a legal conclusion.

24            THE WITNESS:  Not as far as I know.

25  BY MR. ROTHMAN:

Page 464

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3    - - - - - - - - - - - - - -x

4    BEYOND SYSTEMS, INC.,          :

5              Plaintiff,           :

6    v.                            : Case No. 8:08-CV-00409

7                                  : PJM/CBD

8    KRAFT FOODS, INC., et al.,    :

9              Defendants.          :

10    - - - - - - - - - - - - - -x

11

12

13                   Deposition of

14                 PETER W. RESNICK

15                  Washington, DC

16            Monday, October 26, 2009

17                    9:40 a.m.

18

19

20

21

22    Job No.:  1-166358

23    Pages 464 through 674, Volume III

24    Reported by:  Rebecca L. Stonerock, RPR

25

DEPOSITION OF PETER W. RESNICK, VOLUME III
CONDUCTED ON MONDAY, OCTOBER 26, 2009

Page 470

1          I spoke to Mr. Onorato late on Friday to

2     let him know that I had done some review and found

3     that many of the exhibits which involved e-mails -- so

4     e-mail messages that were presented to me as exhibits

5     had some problems in that new lines were removed from

6     the exhibits.  They didn't accurately portray the

7     blank lines that were in the original exhibits that I

8     was given by counsel.

9          So I went through all of them over the

10    weekend.  I identified to Mr. Onorato one of them on

11    Friday and over the weekend went over and found that

12    none of the blank lines existed in the exhibits that I

13    was shown.  And so I wanted to make sure that that was

14    clear to them, and to you for that matter.  Beyond

15    that we didn't have any conversations about the

16    deposition itself.

17         Q    What did you mean by "original" in your

18    last answer?

19         A    The ones that I was given by counsel.

20         Q    Okay.  And what is the significance of the

21    new lines missing?

22         A    Well, there were a couple of places in my

23    testimony during the deposition where I was asked,

24    "Can you take a look at this message?  Do you see

25    anything unusual?"  And one of the things that I saw

Page 471

1    that was unusual was, for instance, a missing blank

2    line between the header section and the body of the

3    messages.  So I guess importantly I can't stand by

4    that testimony.  That doesn't represent the e-mail

5    messages that I examined during my analysis.  It's

6    certainly true of what I was presented as an exhibit,

7    but those don't match.

8         Q    Okay.  Does that affect any other portions

9    of your testimony in that the new lines were missing?

10        A    I don't think so.  I tried to review as

11   much of my testimony with regard to the exhibits as I

12   could.  I believe there were only a few places

13   throughout where I had mentioned the lack of blank

14   lines as being unusual.  But I haven't gone through

15   thoroughly enough to know line for line whether that's

16   true.

17        Q    Now, how do you know that the new lines

18   were missing in the exhibits?

19        A    I took a look at the exhibits that came

20   with the copy of the deposition because I remembered

21   those new lines as being missing in the exhibits, went

22   back and took a look at the mailboxes I was given by

23   counsel to do my analysis on in the case, did

24   comparisons and noticed that the lines were missing.

25        Q    Okay.  How do you know that the new lines

Page 472

```
 1    were not missing in the mailbox files that were

 2    provided to Connexus and Hydra?

 3         A    That I do not know.  That I do not know.

 4    The number of new lines missing in the exhibits --

 5    they are throughout -- seems like some sort of

 6    production error.  So whether that's an error in the

 7    production that was made to you or what you produced

 8    when you printed them out, I don't know when that

 9    change occurred.  But certainly between the time that

10    I looked at the messages and you printed them out

11    something changed in there.

12         Q    Did you notice anything else going through

13    your deposition testimony that you needed to correct?

14         A    I didn't offhand.  I noticed a couple of

15    things that I thought, well, I could have given a more

16    precise answer, but nothing that comes to mind that I

17    thought, "Oh, I have to correct that immediately."

18         Q    Okay.  Why did counsel ask you to review

19    the Shin deposition?

20         A    I don't know that I was told why in

21    particular -- oh, no, I do know.  It was mentioned

22    that I should look at the Shin deposition and the

23    Jones deposition because those were about, at least in

24    part, a similar topic; that is, some of the

25    information from the database.  And because some of my
```

Page 675

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3     - - - - - - - - - - - - - -x

4     BEYOND SYSTEMS, INC.,         :

5                  Plaintiff,    :

6     v.                          : Case No. 8:08-CV-00409

7                                 : PJM/CBD

8     KRAFT FOODS, INC., et al., :

9                  Defendants.    :

10    - - - - - - - - - - - - - -x

11

12

13                    Deposition of

14                 PETER W. RESNICK

15                  Washington, DC

16             Tuesday, October 27, 2009

17                    9:44 a.m.

18

19

20

21

22    Job No.:  1-166359

23    Pages 675 through 894, Volume IV

24    Reported by:  Rebecca L. Stonerock, RPR

25

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 682

1    Mr. Wagner uses.  I haven't had a chance to review

2    those in detail, but I did look over them.  Nothing

3    jumped out as terribly unusual, but I had a look at

4    them.

5         We also reviewed a document that I had

6    received earlier which I had not had an opportunity to

7    look at which was a graphical depiction of different

8    services between Hypertouch and BSI as far as mail

9    services go and went over that.

10        Mr. Wagner -- and actually Joe Wagner

11   joined us on the phone at some point to describe the

12   different entities there.  I had some questions about

13   it and we went through that.  And I believe I also

14   looked at a topology document which I had previously

15   seen and asked a question or two about.

16        Q    What other documents did you look at?

17        A    That was it for last night.  The

18   CommuniGate Pro configuration files and the two

19   topology documents or architecture documents.

20        This morning I also met with Mr. Onorato,

21   Mr. Barba, Ms. Newton and Paul Wagner and was able to

22   see some of the -- I don't know what to call them --

23   current server activity by looking at some of the log

24   messages his servers were running today to see

25   different user accounts being used, to see e-mail

Page 683

1    messages coming in, going out, to see web server

2    access.  And I reviewed those in the -- Mr. Wagner

3    brought in a computer and displayed things on the

4    screen in my direction so that I could review some of

5    the actions of his server -- or one of his servers, in

6    any event.

7          Q    That was this morning?

8          A    That was this morning.

9          Q    And Mr. Wagner is sitting right here right

10   next to you?

11         A    That's correct.

12              MR. ROTHMAN:  Okay.  I need printouts of

13        what was shown to Mr. Resnick.

14              MR. ONORATO:  Okay.

15              MR. ROTHMAN:  Is there a way to do that

16        today?  Or you could e-mail them to me and I could

17        print them out during the deposition.

18              MR. ONORATO:  Tom Barba is working on that,

19        putting them together.  So they'll be e-mailed

20        today or soon.

21              MR. ROTHMAN:  I need to ask him questions

22        about it.

23              MR. ONORATO:  Right.  I mean, if we need to

24        reconvene for that, fine, but I'll get them to you

25        as soon as I can.

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 684

1    BY MR. ROTHMAN:

2         Q    Did your review of any of the documents

3    that you described affect any of the testimony that

4    you've given in this case?

5         A    I don't believe so.

6         Q    Let's talk about these documents in reverse

7    order.  The current log activity, what exactly were

8    you looking at?

9         A    So I looked at a couple of things.

10   Mr. Wagner used -- and I don't know if you would like

11   me to describe the specific commands he used to

12   display what was of interest to me.

13        Q    I want to know what the contents are first

14   and then we can go backwards to see --

15        A    That sounds fine.  So the contents of one

16   of the log files I was looking at was a bunch of

17   network activity.  So it consisted of mostly SMTP

18   traffic, the actions of incoming e-mails and outgoing

19   e-mails, it showed some POP server traffic -- so user

20   machines logging in and retrieving e-mail -- and it

21   showed some -- one instance I remember of IMAP

22   traffic.  That is a different mail protocol to log in

23   and retrieve.

24             The data that I saw, I looked at it with

25   several different views.  That is, as it was coming

Page 685

1    through I asked Mr. Wagner to limit it to particular

2    kinds of traffic every so often, so I saw it all

3    streaming by at one point and then I asked him to

4    limit it to particular kinds and he was able to type a

5    command to limit the view so that I could only see

6    particular things.  And I reviewed in the smaller so

7    that I could see some specific things that I was

8    looking for.

9              And I also took a look at some -- I think I

10   described web server logs to see activities that had

11   gone on.  And of the web server logs I viewed a couple

12   of things that had recently been in the web server

13   log, and the same was true, an FTP statistic screen.

14   So I didn't actually see the log entries on the FTP

15   statistics.

16        Q   Why were you shown these materials, if you

17   know?

18        A   We had discussed the question of

19   Mr. Wagner's activities as an Internet service

20   provider.  And as it was described to me, there was

21   some question that I might be asked at some point

22   about Mr. Wagner's activities, and at deposition over

23   the past few days I have been asked different

24   questions about that, and so I believe counsel thought

25   it was a good idea for me to examine some of this

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 686

1    information, you know, on my own for my own -- for my

2    own edification.

3         Q    And that was in light of your deposition

4    testimony?

5         A    I believe it was in part in light of my

6    deposition testimony.  I don't know what other -- what

7    other information counsel might have used to decide

8    that it was a good idea for me to review this.

9         Q    And this was current information?

10        A    I'm not sure --

11        Q    Was this current information with respect

12   to the log and web files --

13        A    Yes, this was information as the server was

14   actually performing its current activities.

15        Q    And what activities did you observe going

16   on?

17        A    I think I described them, and if you want

18   me to be more specific I can.

19        Q    Let me get more specific?

20        A    Please.

21        Q    What about specific user accounts?  Did he

22   show you specific user accounts, give you the names of

23   those people?

24        A    I was shown the domain names of those

25   people.  There was some discussion between the

Page 687

1    attorneys and Mr. Wagner about certain confidentiality

2    issues, so the actual user names were masked off.  I

3    saw the command that was used to do that.  It was use

4    of a tail command to show the log as it was being

5    generated and a sed command to mask off the user name

6    portions.  I saw how that was done to make sure that

7    it was only masking that portion.

8              And so the user name portions of the

9    accounts were masked off, but I did see the domain

10   names associated with each of the accounts as they

11   were logging into and out of the server, and the IP

12   addresses from which they were connecting.

13        Q    We'll wait until we get those documents to

14   ask further questions about them --

15        A    No problem.

16        Q    -- and why they're being produced at this

17   late date.  So I don't know the answers to those.  I

18   have to wait and see what those say.

19              As to the topology document that you

20   referenced, why were you shown that, if you know?

21        A    I believe as part of the discussion of

22   Mr. Wagner's activities as an Internet service

23   provider, and before we were able to look at the logs

24   this morning, last night -- these documents had been

25   given to me quite some time ago.  I was asked whether

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 708

1         A    I was provided several scripts.  I may be

2    able to discover from those scripts something more

3    definitive than what I was able to do in the -- just

4    the short time I was able to look at them right now.

5         Q    Let's go to Exhibit 248.

6              (Exhibit 248 referenced.)

7         A    All right.  I've got it.

8    BY MR. ROTHMAN:

9         Q    On page 36 you write, "In Cohen-C page 77,

10   he introduces a discussion from plaintiff's deposition

11   about special characters, but identifies no such

12   special characters himself and, therefore, concludes

13   that there must be spoliation.  This is completely

14   supposition on his part and he presents no example of

15   spoliation."  Do you see that?

16        A    I do, although I believe it's pronounced

17   "spoliation."  But yes, that's fine.

18        Q    I'm going to put before you what we'll mark

19   as Exhibit 275, which is the relevant portions, I

20   believe, of the item C report.

21             (Exhibit 275 was marked for identification

22        and attached to the deposition transcript.)

23   BY MR. ROTHMAN:

24        Q    And you might need to reference that.  Now,

25   my question for you is is your claim in your report

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 709

1    that Cohen doesn't identify any special characters or

2    plaintiff doesn't identify any special characters?

3         A    My reading of the section of Cohen's

4    report that you gave me, and it appears on page 76 in

5    the version you gave me -- I'm not sure why my page

6    numbering was different in my report, but I believe I

7    am saying that Cohen does not identify the special

8    characters.

9         Q    Okay.  And isn't Dr. Cohen in his report

10   referencing plaintiff's testimony about special

11   characters and stating that it was plaintiff that

12   didn't identify the special characters?

13        A    I think you've misunderstood what I've

14   written in my report.

15        Q    Okay.  Well, please explain it to me.

16   Because it appears that you're claiming that Dr. Cohen

17   is making the claim about special characters when it

18   was the plaintiff making the claim about the special

19   characters.

20        A    So in my report, if you go back up to the

21   top of the paragraph before the bullets, it says,

22   "Dr. Cohen refers to the use of Eudora mailbox format

23   and its use of 'From' separators as 'spoliation.'  As

24   I have described, there is no such spoliation.

25   However, Dr. Cohen also uses several other examples to

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 710

1    claim that the exhibits have experienced spoliation."

2    And I'll stop there for the moment.

3            So my examples in the bullets are to show

4    that there are things that Dr. Cohen claims are

5    spoliation.  So in the bullet that we were talking

6    about, what I'm saying is Dr. Cohen looks at

7    plaintiff's deposition and finds that plaintiff is

8    claiming there are special characters.  Dr. Cohen

9    finds no special characters.  I agree that Dr. Cohen

10   finds no special characters.  But Dr. Cohen concludes

11   that because plaintiff claimed there were special

12   characters and he found none, the only other

13   explanation for what occurred that plaintiff referred

14   to in his deposition was spoliation.

15       Q    Okay.  Where does he say that?

16       A    So if you take a look at what is on page --

17   what is marked as page 76 of 275, Dr. Cohen says,

18   "Plaintiff asserts in plaintiff P 561 that, 'The

19   earlier e-mail that had, like the earlier exhibit, one

20   or more special characters or binary characters,'

21   'caused this to be merged with the e-mail from,' as an

22   explanation for the concatenation of multiple

23   e-mail-like sequences into a single body of an

24   e-mail-like sequence.  However, this explanation is

25   almost certainly untrue for the following reasons."

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 711

1          And in the third bullet he says, "In

2     examining item C I found no such special characters

3     other than end-of-line characters described earlier,

4     and these differ between items C and H while the

5     apparent spoliation persists in both items."

6          Q    Okay.  So you're interpreting his statement

7     to mean the lack of special characters means

8     spoliation?

9          A    That is how I interpreted his claim that

10    because there were no special characters as plaintiff

11    described, there must be spoliation that occurred to

12    result in the exhibits appearing as they do.

13         Q    Do you think it's a reasonable conclusion

14    that all he's saying here is that it's untrue that

15    there were special characters here and that he's just

16    referring to spoliation in items C and H as he has

17    been generally in the -- in the text of his reports as

18    opposed to the lack of special characters?  In other

19    words, it's an interpretation issue?

20         A    I'm sorry, that was a very long question

21    and I got lost in what you said.

22         Q    Sure.  My question is simply is isn't he

23    just pointing out that the plaintiff claim was untrue

24    with respect to special characters?  Isn't that the

25    trust of what he's saying here, or do you disagree

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 712

1   with that interpretation?

2       A   I certainly agree with the first part that

3   he's saying there are no subspecial characters.

4       Q   And that plaintiff's claim is untrue about

5   that?

6       A   And that his -- and that plaintiff's claim

7   is untrue about that.  He claims that.  That's

8   certainly the case.

9       Q   And do you agree with that?

10      A   I don't know that I concluded one way or

11  the other about special characters, and I can't

12  remember sitting here right now whether I did that

13  review at the time of my report.

14          But I don't agree that that's all that he's

15  saying here.  I think what he's saying in totality

16  with all of the bullet points below this particular

17  paragraph that he wrote starting on page 76 and going

18  onto page 77 is that the lack of explanation that is

19  satisfactory to him from plaintiff's definition

20  confirms his conclusion that there was spoliation in

21  the exhibits.  And I'm saying in my report that I

22  disagree with that series of conclusions on his part,

23  that because plaintiff did not properly explain this,

24  therefore his conclusion that there was spoliation is

25  therefore true.

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 713

1          Q    Okay.  That's your interpretation of his

2     report, right?

3          A    That's my interpretation of his report.

4          Q    Let's go back to Exhibit 248.

5          A    Is this it?  I've already got it, yes.

6     Sorry.

7          Q    Okay.  In the first full paragraph you used

8     the phrase "flatly wrong" in many instances.  Do you

9     see that?

10         A    I'm sorry, I have no idea where you're

11    referring.

12         Q    Page 36.

13         A    Page 36.  We're still on 36.  Sorry.

14         Q    And other than the examples you've provided

15    in your reports, what are the other instances where

16    you believe that Dr. Cohen is flatly wrong?

17         A    And, I'm sorry, the question was other than

18    instances that I've cited in the report, are there any

19    other instances?

20         Q    Yes.  I want an exhaustive list.

21         A    I don't know that I could give you an

22    exhaustive list sitting here today.  And I think as I

23    said in my report, given the length of Dr. Cohen's

24    report to begin with, it was very difficult to prepare

25    even a partial list of things that I found problematic

Page 714

1    in his report.  I could, given the time, I'm sure, try

2    to come up with an exhaustive list, but I certainty

3    can't come up with one right now.

4         Q   Can you give me a list, best you can

5    sitting here today, other than what you've described

6    in your reports?

7         A   I have not looked at Dr. Cohen's report C

8    or H in quite some time.  I don't have any memory

9    right now of particulars other than what I could

10   refresh my memory from my report there are.

11        Q   Okay.  And on page 36, next paragraph, the

12   end right before the first bullet you state, "The

13   entirety of these examples is at follows."  Do you see

14   that?

15        A   I do see that.

16        Q   Okay.  What are the examples you're trying

17   to portray here?

18        A   When I say, "The entirety of these

19   examples," I believe I'm referring to, and I'll go

20   back and review the paragraph, Dr. Cohen's examples.

21   So --

22        Q   Examples of what, though?

23        A   So the paragraph begins, "Dr. Cohen refers

24   to the use of Eudora mailbox format and its use of

25   'From' separators as 'spoliation.'  As I have

Page 715

1   described above, there is no such spoliation.

2   However, Dr. Cohen also uses several other examples to

3   claim that the exhibits have experienced spoliation.

4   The entirety of these examples," the ones that

5   Dr. Cohen uses to claim that the exhibits have

6   experienced spoliation, "are as follows."

7        Q    Okay.  So just so we're clear, what do you

8   mean by "spoliation" when you use that word?

9        A    I believe -- I don't commonly use that

10  word.  I believe that as best as I was able to, I

11  stuck to the use of the word "spoliation" as Dr. Cohen

12  did in his report.  I was trying to assess, just from

13  the dictionary definition of spoliation and how

14  Dr. Cohen was using it, what it meant in these -- in

15  this regard.

16       Q    Okay.  So you're using Dr. Cohen's use of

17  the phrase "spoliation" when you're coming up with

18  your examples that are set forth on pages 36, 37 --

19  where does it end?  Where does your discussion end?

20       A    Let me start by saying these are not my

21  examples.  I am taking -- these are the examples from

22  Dr. Cohen's report.

23       Q    Okay.  So using your understanding of what

24  he calls "spoliation," you're calling out his

25  examples?

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 716

1        A    That's right.  I'm explaining what I --
2    what my interpretation of his examples means, whether
3    they constitute spoliation as far as he describes it.
4        Q    Okay.  So if he found more examples of
5    spoliation than you found, that wouldn't be
6    inconsistent with the bullets that you set forth
7    starting on page 36, would it?
8             MR. ONORATO:  Objection to form.
9        A    If he had more instances of spoliation in
10   his report than the ones that I identified in his
11   report or if he found instances of spoliation outside
12   of his report, obviously I didn't respond to them
13   here.  I identified in these bullets the instances of
14   spoliation that he identified in this section starting
15   on page 60 of his report and on through -- I identify
16   60, 77, 84 and page 92.
17       Q    And that was based on Dr. Cohen's use of
18   the word "spoliation" in his report?
19       A    I believe so.  Again, I'm going from memory
20   of when I wrote this and when I read his record.
21       Q    Okay.  So he could very well have described
22   spoliation in his reports but didn't use that word
23   "spoliation," right?
24            MR. ONORATO:  Objection to form.
25       A    Anything is possible.  I don't know whether

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 717

1  he intended to say "spoliation" and didn't or intended

2  something different and identified it differently.

3  These were specific examples of spoliation that he

4  laid out in his report that I am responding to showing

5  his examples and describing why I thought those

6  examples were inapplicable in some way.

7       Q   Is it fair to say that he would know better

8  than you what the examples are of spoliation that he

9  put in his report?

10      A   I don't know how to answer what Dr. Cohen

11  does and doesn't know about his report.  I can tell

12  you what I reviewed in his report and what he said in

13  his report.  Whether he meant something different,

14  that may be the case.  But this was my review of his

15  report.  I don't know how to answer the question of

16  whether he knows it better.

17      Q   Well, is the author of the report more

18  authoritative than somebody reading it?

19          MR. ONORATO:  Objection to form.

20      A   I'm quite sure Dr. Cohen had in mind

21  certain things when he wrote the report and I'm sure

22  he's authoritative as to what he meant in his report.

23  And I'm sure he can give a much more complete

24  explanation, although I will say that when I -- when I

25  sat in on Dr. Cohen's deposition he did not seem to be

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 718

1    very quick to call up from his memory what was in his

2    report.

3         Q    Was he asked about spoliation?

4         A    I think he was asked several questions

5    about spoliation during his report [sic].

6         Q    And did he describe spoliation that you did

7    not include in your examples?

8         A    Not that I remember in his deposition.

9         Q    If Dr. Cohen disagreed with you that these

10   were the only examples of spoliation that he wrote

11   about in his report, would you have any basis to agree

12   or disagree with him?

13            MR. ONORATO:   Objection to form.

14        A    If Dr. Cohen showed me other examples of

15   spoliation in his report, I certainly would be open to

16   reading those and I certainly wouldn't disagree that

17   such things existed.

18        Q    Okay.  If you could go to page 38.

19        A    Still on 248?

20        Q    Yes.

21        A    I'm there.

22        Q    You write, "I will point out other cases

23   where Dr. Cohen simply does not do a professional

24   analysis on the data because he solely depends on the

25   tools he is using like grep and sed and the like

DEPOSITION OF PETER W. RESNICK, VOLUME IV
CONDUCTED TUESDAY, OCTOBER 27, 2009

Page 743

1    And I here in this paragraph am talking about, if we

2    go back to the beginning of the paragraph the question

3    of what resending a message is, what relaying a

4    message is and what forwarding a message is.  With

5    regard to relaying, resending, forwarding, there's

6    nothing that the plaintiff did that I found unusual or

7    problematic.

8              Now, there are unusual exhibits that

9    plaintiff participated in, did, when he was processing

10   the messages, but that's not what this message was

11   talking about.  So I don't know that I would use the

12   same terminology.

13        Q    To describe the exhibits?

14        A    To describe the exhibits.

15        Q    Let's go to Exhibit 248, page 38.

16        A    I have it in front of me.

17        Q    All right.  And there's a sentence about a

18   third of the way down that reads, "In my opinion, the

19   vast majority of these exhibits are easily analyzed

20   and can be used to reach reasonable conclusions."  Do

21   you see that?

22        A    I do.

23        Q    Can you quantify "vast majority"?

24        A    Certainly not sitting here today I couldn't

25   count up what I meant by "vast majority."  I don't

Page 778

1  Exhibit Number, another Bates number, all of the

2  things that I would consider e-mail messages had the

3  appropriate header information, et cetera, as I

4  continue in the -- as I continue in the paragraph.

5      Q   Does that mean there were some things in

6  the mailbox files that were not e-mail messages as far

7  as you could tell?

8      A   I think I said as much a few sentences

9  previous, that things that did not have header fields

10 I did not consider e-mail messages.

11     Q   I see.

12     A   So I believe I said -- let me find the

13 place again.

14     Q   Maybe six or seven lines above that.

15     A   Yeah.  "Dr. Cohen notes that there are

16 seven such items."  And I continue, "I certainly agree

17 that these are not as stored e-mail messages."  So the

18 items that do not contain headers that he had

19 identified.  I certainly agree that those particular

20 items as stored are not e-mail messages.  They do in

21 fact contain within them because of that parsing error

22 that I described an e-mail message that has all of the

23 header fields, but above that prior to that "From"

24 separator without the new line before it might be

25 additional data.

Page 895

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MARYLAND

3     - - - - - - - - - - - - - -x

4     BEYOND SYSTEMS, INC.,        :

5                    Plaintiff,    :

6     v.                           : Case No. 8:08-CV-00409

7                                  : PJM/CBD

8     KRAFT FOODS, INC., et al., :

9                    Defendants.   :

10    - - - - - - - - - - - - - -x

11

12

13                 Telephonic Deposition of

14                 PETER W. RESNICK

15                   Washington, DC

16              Thursday, November 5, 2009

17                      1:22 p.m.

18

19

20

21

22    Job No.:  10-167790

23    Pages 895 through 950, Volume V

24    Reported by:  Rebecca L. Stonerock, RPR

25

Page 905

1   "view source" command do those names or addresses

2   appear.

3        Q    Okay.  Now, I want to ask if you would take

4   a look at 258, please.

5        A    All right.  I've got that in front of me.

6        Q    Okay.  And 258 says -- and tell me if I've

7   read this correctly -- "Hypertouch provides custom

8   Internet services including remote monitoring,

9   maintenance, backups and upgrades of computer systems

10  around the world.  We offer turnkey"?

11       A    I --

12       Q    Sorry.

13       A    I'm sorry, I was just about to say I see

14  that sentence.

15       Q    Okay.  Great.  What I want to do is I want

16  to call your attention a little bit further down the

17  page to the legal notice of e-mail policy.

18       A    I see that.  I see that.

19       Q    And it says, "First and foremost:  NO UCE.

20  No spam.  Hypertouch Inc. servers are located in the

21  states of California and Maryland which have a number

22  of laws prohibiting spam."  Do you see that?

23       A    I do.

24       Q    And then it says, "The sending of any

25  unsolicited email advertising messages, unsolicited

Page 906

1    bulk email advertising messages and all other forms of

2    email abuse are to Hypertouch.com, Hypertouch.net or

3    other domains owned, hosted or managed by Hypertouch

4    Inc. are expressly forbidden."  Do you see that?

5         A    I do see that.

6         Q    Okay.  And then it says, "If a domain's

7    primary DNS servers is one of Hypertouch's servers,

8    e.g. dns1.Hypertouch.com, then it is pretty obvious we

9    own, host or manage it.  In addition to other

10    penalties including those given below, such messages

11    will result in the imposition of civil liability

12    against you in accordance with Cal. Bus. & Prof. Code

13    Section 17500 et seq."  Do you see that?

14         A    I do see all of that.

15         Q    Okay.  And then the next paragraph is,

16    "Second:  opted out email addresses."  And I want to

17    call your attention to the bold capitalized text here

18    where it says, "THE SENDING OF UNSOLICITED EMAIL

19    ADVERTISING MESSAGES, UNSOLICITED BULK EMAIL

20    ADVERTISING MESSAGES AND/OR ALL OTHER FORMS OF EMAIL

21    ABUSE TO ANY OF THE EMAIL ADDRESSES IN THE

22    HYPERTOUCH.NET DOMAIN, INCLUDING THOSE SHOWN ON THIS

23    PAGE, IS EXPRESSLY AND EXPLICITLY PROHIBITED.  THE

24    SENDING OF EMAIL TO ANY OF THESE EMAIL ADDRESSES

25    CONSTITUTES AGREEMENT TO PAY HYPERTOUCH INC. $500 PER

Page 907

1    EMAIL ADDRESS USED PER MESSAGE."

2            And then it says, "Let's be quite clear:

3    NONE of these email addresses have been nor should

4    ever be 'opted in' to ANY email list."  Do you see

5    that?

6        A    I do see all of that.

7        Q    Okay.  And so to your mind, does this

8    constitute a clear and adequate notice that Hypertouch

9    expressly prohibits the sending of spam to its domain?

10           MR. ROTHMAN:  Objection to form, lacks

11       foundation, calls for speculation.  Objecting to

12       the extent it calls for a legal conclusion.

13       A    To my lay reading of this information,

14   absolutely this forbids the sending of what I would

15   generally consider to be spam to any of those e-mail

16   addresses.

17           MR. ONORATO:  Okay.  That's, I think, all

18       the questions that I have.  Let me just check my

19       notes.

20           Okay.  Yeah, I think that's all I have.

21   If -- Ari, if you're ready to, go ahead.

22           MR. ROTHMAN:  I am.  Does everybody have

23       the exhibits before I start?

24           (Discussion off the record.)

25           EXAMINATION OF PETER W. RESNICK

Page 908

```
 1   BY MR. ROTHMAN:

 2       Q   Mr. Resnick, let's stay with -- actually

 3   can you go to Exhibit 259, which is an exhibit that

 4   the plaintiff sent you for purposes of this

 5   deposition?

 6           (Exhibit 259 was referenced.)

 7       A   I do have that exhibit in front of me.

 8       Q   Okay.  At the bottom of page 1 there's a

 9   series of e-mail addresses involving the

10   safemailbox.com e-mail address or domain name.  Do you

11   see that?

12       A   I see that.

13       Q   Now, when you read that in light of 258,

14   the first page, the paragraph that reads, "The sending

15   of any unsolicited email advertising messages,

16   unsolicited bulk email advertising messages and all

17   other forms of email abuse are to Hypertouch.com,

18   Hypertouch.net or other domains owned, hosted or

19   managed by Hypertouch Inc. are expressly forbidden,"

20   given the two documents in front of you, is it a fair

21   inference that the safemailbox.com domain name is a

22   domain name that is owned, hosted or managed by

23   Hypertouch?

24           MR. ONORATO:  Objection to form, vague and

25       ambiguous.
```

Page 909

1        A    I'm not completely sure because the e-mail

2    addresses listed in that section of 259 seem to be

3    addressed by the second paragraph of the legal notice

4    where it says, "Second:  opted out email addresses."

5    But I think there's a possibility that they are either

6    owned -- that safemailbox.com is either owned, hosted

7    or managed by Hypertouch.

8        Q    Can you think of any legitimate reason why

9    the domain name safemailbox.com would appear next to

10   those e-mail addresses if that domain name was not

11   owned, managed or registered by Hypertouch?

12             MR. ONORATO:  Objection to form, lacks

13         foundation, vague and ambiguous, assumes facts.

14       A    I could, you know, certainly imagine that

15   safemailbox was associated in some way with

16   Hypertouch, although did not meet specifically those

17   criteria.

18       Q    Okay.  Going through the examination of

19   Exhibits 257, 258 and 259, does any of your testimony

20   today that you gave today with respect to those

21   exhibits cause you to want to change anything you said

22   with respect to these same exhibits in your prior

23   deposition?

24       A    I --

25             MR. ONORATO:  Objection to form, vague and