UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BEYOND SYSTEMS, INC. ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 8:08-cv-00409 (PJM) |
| ) | |
| KRAFT FOODS, INC., *et al*. ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF J. JOSEPH WAGNER PURSUANT TO 28 U.S.C. § 1746**

1. Hypertouch, Inc. is a California close corporation located in San Mateo County, California. Hypertouch, Inc. has been providing email and web site hosting services for customers since 1997, approximately 5 years before the first Maryland anti-spam laws were enacted and approximately 7 years before the enactment of CAN –SPAM and California's current spam laws.

2. As I understand it, a close corporation means "A corporation owned and operated by a few individuals, often members of the same family, rather than by public shareholders. Close corporations are regulated by state close corporation statutes, which usually limit the number of shareholders to 30 or 35 shareholders and require special language in the articles of corporation. In exchange for following these requirements, state law usually permits close corporations to function more informally than regular corporations." See http://www.nolo.com/dictionary/close-corporation-term.html.

1

3. Hypertouch, Inc. was also incorporated for the design and development of next-generation haptic peripherals. A haptic peripheral is a forced feedback mechanism. A video game controller, like a joystick, that moves or vibrates in a player's hand is a simple example of a haptic peripheral. Hypertouch, Inc.'s work in this area, however, includes a focus on applications of haptic peripherals in the context of Internet mediated communication. That focus is a prime motivation for why Hypertouch, Inc. offers services as an ISP, in order to work with customers in the Internet space in which Hypertouch, Inc.'s haptic peripheral research would be applied. I am pursuing a PhD. in Mechanical Engineering at Stanford University and have been awarded a patent in an exoskeleton hand-tracking device. I have worked for years to deepen my expertise in developing haptic peripherals and robotic assistants to aid persons with disabilities.

4. Hypertouch, Inc. owns and operates mail servers, web servers, and DNS (Domain Name Service) servers that are connected to and accessed over the Internet. Hypertouch, Inc. currently owns more than half a dozen DNS, web, and mail servers, located in California and Maryland.

5. Hypertouch, Inc. employs upstream ISP providers Comcast and AT&T. All emails directed to Hypertouch, Inc.'s mail servers pass through Comcast or AT&T's network. Presumably, those providers would also have a claim against spammers and networks because the emails tax their networks as well.

6. Hypertouch, Inc.'s mail servers have hosted at least 203 email accounts assigned to at least 111 subscribers. Of those 111 subscribers, 73 are non-family/non-Hypertouch, Inc./Non-BSI. In addition, Hypertouch, Inc.'s mail servers have served

as secondary mail servers for a number of outside organizations. Therefore, the total number of subscribers served by Hypertouch, Inc. is unknown, although it is believed to be more than 400.

7. Hypertouch, Inc. has provided the Internet services for the incubation of a number of start-up companies, which were able to prosper, continuing on through venture capital funding and, in some cases, successful acquisition.

8. Hypertouch, Inc. has provided many people and their businesses with their first email address, their first website, their first Internet access – their first online participation in the information age.

9. Hypertouch, Inc. has provided Internet services for a number of non-profit organizations, a biennial international conference for rehabilitation robotics and businesses inside countries with restrictive communist governments.

10. Some customers have paid Hypertouch, Inc. for its Internet services, but most have not. Like Gmail, Yahoo Mail and Hotmail, Hypertouch, Inc. does not provide these services as a profit center from net hosting fees. Indeed, but for the burden imposed by spam, Hypertouch, Inc.'s hosting costs would be fully financed by its other outside consulting.

11. Beyond Systems has always been the owner of the Hypertouch.com domain name since it was first registered in 1997. This information is openly available in the domain registration information for Hypertouch.com.

12. "Hypertouch.com" email addresses use Hypertouch, Inc.'s California servers as its Mail Transfer Agent (MTA).

13. BSI does not own Hypertouch, Inc. and does not have any financial stake in Hypertouch, Inc. BSI does not own shares of Hypertouch, Inc. stock. Hypertouch, Inc. has never received any funding from BSI.

14. Hypertouch, Inc. converted from a DBA to Hypertouch, Inc. in 1999 with adequate capital structure. As a corporation, Hypertouch, Inc. has been in continuous operation as an ISP for 11 years and has continually expanded its customer base, as well as its hardware, software and intellectual property infrastructure.

15. Hypertouch, Inc. has never assumed any financial obligations of BSI. Nor has BSI assumed any financial obligations of Hypertouch, Inc.

16. Hypertouch, Inc. does not benefit from BSI's financial gains and does not suffer from BSI's financial losses, except to the extent those losses would affect the cooperative business arrangement between Hypertouch, Inc. and BSI through loss of back-up service and email archiving.

17. Hypertouch, Inc. has its own accounting and banking systems.

18. If Hypertouch, Inc. ended its agreements with BSI, Hypertouch, Inc. could and would continue to function, although customer service would likely be degraded.

19. Hypertouch, Inc. does not hold itself out as a division or subsidiary of BSI, nor does it consider BSI a division or subsidiary of Hypertouch, Inc.

20. I am responsible for all of Hypertouch, Inc.'s business decisions and practices. Paul Wagner/BSI makes no decisions with regard to Hypertouch, Inc.'s business practices or policies.

21. Likewise, I do not make any of BSI's business decisions or policies. I have limited access to BSI's systems and servers and act only with BSI's permission. I

perform limited administrative functions, such as monitoring mail server performance and delivery backlogs, especially those that would impact Hypertouch, Inc.'s systems, applying security patches released by Apple or Stalker software (after applying the same to Hypertouch, Inc.'s own servers).

22. Hypertouch, Inc. and BSI do not share any common employees.

23. None of Hypertouch, Inc. officers, directors or shareholders is an officer, director or shareholder of BSI.

24. Hypertouch, Inc. and BSI have never jointly instituted litigation against any entity, have never shared litigation or settlement proceeds, and have never made any agreements for sharing litigation or settlement proceeds.

25. I have been retained as a consultant to BSI and its attorneys during a number of BSI's cases. In these matters I was asked to perform analysis on emails, aid in the technical production of exhibits and analyze evidence developed during the course of the case. For *BSI v. Kraft*, I was hired by Steptoe & Johnson LLP as a consultant and have a written agreement with that law firm.

26. Since it was founded, Hypertouch, Inc. has configured its servers to accept all email and, for various reasons, has implemented a policy never to delete emails. Hypertouch, Inc.'s virus checker and spam filter label suspect emails, unless a customer specifically requests other action. This guarantees delivery of all legitimate email, which is a major reason why many of Hypertouch, Inc.'s customers use Hypertouch, Inc.'s email service rather than other services.

27. Hypertouch, Inc. archives emails for a number of reasons, including to preserve emails that users might want, but that could be misaddressed or misrouted in the

event of mail server routing table errors. There is no technological way to delete spam automatically without also deleting legitimate, desired email. Hypertouch, Inc., as a policy, believes it is important to deliver and retain all legitimate email for its customers. Because it is physically impossible to sift through hundreds of thousands of emails every day manually in order to distinguish the legitimate emails from the spam, Hypertouch, Inc. archives all emails it receives.

28. In 2002 or 2003 the volume of email that Hypertouch, Inc.'s servers received daily had grown beyond Hypertouch, Inc.'s ability to robustly archive in a manner that would not degrade the mail servers' performance or their reliability. Therefore, Hypertouch, Inc. asked BSI, which had hardware more capable of robustly archiving emails, if BSI would archive BSI's hypertouch.com email and Hypertouch, Inc.'s customer email. BSI agreed.

29. Hypertouch, Inc. also routes copies of many customers' emails received by Hypertouch, Inc.'s servers to third party email service providers (e.g. Gmail, HotMail, and Yahoo Mail). Most of these customers' domains have existed for the better part of a decade, and 99% of the email routed on to these other ISPs is spam.

30. I believe that the 1998 California spam law required that ISPs prove that the spammer had actual notice of both Hypertouch, Inc.'s no spam policy and that its servers were located in California. Hypertouch, Inc. provided notice on its domain hypertouch.net that it prohibits spam emails, explicitly stating "NO UCE -- No Unsolicited Email". Additionally, Hypertouch, Inc. provided its California server location, along with email addresses that were explicitly opting out of receiving spam.

31. Hypertouch, Inc. has received many unsolicited spam emails over the course of time to email addresses that were illegally harvested from its web site, which has clearly stated "no spam" policies. These spam emails have caused substantial harm to Hypertouch, Inc.'s services and hardware, including decreased server response and crashes, higher bandwidth utilization, and expensive hardware and software upgrades.

32. The email address "Gotcha@hypertouch.com" was found on a web page containing a notice that stated plainly: "NO UCE -- No Unsolicited Email" to any address associated with the web page. This was not in any way a solicitation to receive spam.

33. I have never solicited commercial email as Kraft claims.

34. Hypertouch, Inc. has never employed spam traps as Kraft claims.

35. I have used opt-out mechanisms to reduce the spam I receive and to investigate spammers. For example, after I created a test opt-out email address and opted out from receiving spam from Kraft, I found that the test opt-out address began receiving spam regularly. Because the test opt-out address had never been used for any purpose other than to opt out from receiving Kraft's spam, I surmised that Kraft had somehow released the test opt-out address to its spammers.

36. In the course of investigating spam, I occasionally clicked through the spam's landing page. This requires the submission of a name and physical address. For example, I submitted a person named "None Given" residing at "Fake Address, Fake City" on the Internet form. Entering some information was required to research the legitimacy of Connexus's offer emails. The email address I used was nonsense@example.com, which never resulted in spam being sent to a

hypertouch.com or other BSI-owned email address. Example.com is reserved by the Internet Engineering Task Force as a non-working example domain. "'Example.com' is used in a generic and vendor-neutral manner." (http://en.wikipedia.org/wiki/Example.com.) There is no way for Hypertouch, Inc. to generate spam to BSI's or Hypertouch, Inc.'s domains by using such non-working, nonsensical email addresses.

37. I do not view litigation against spammers as a profit generation enterprise. To date, Hypertouch, Inc. and I have donated over $100,000 in judgments or settlements to the Darfur Stove Project, Second Harvest Food Bank, and the San Francisco Coalition on Homelessness. Hypertouch, Inc. has also declined large settlement offers by companies who use illegal spam, but later accepted smaller settlements that included corrective behavior by the defendant.

38. A number of customers of Hypertouch, Inc. had received Gevalia spam prior to the Hypertouch, Inc. lawsuit against Kraft. I understood that the settlement in that case released all claims by Hypertouch, Inc. arising from Gevalia spam. Release of any possible claims by other ISPs was never discussed during settlement talks to my knowledge, although Kraft clearly knew that Hypertouch, Inc. served as an ISP and that the emails could ultimately be received by other ISPs.

39. One of Kraft's affiliate marketing networks, Hydra, repeatedly engaged spammers who sent spam to Hypertouch, Inc.'s servers. On December 28, 2006, I sent an email to Hydra asking for them to give the identity of one of their spammers who had been sending Hydra spam to Hypertouch, Inc.'s servers. I had to contact Hydra because was impossible to identify the spammer from the email my servers received. Hydra's

8

CTO, Barry Collier, answered with: "The information you are requesting is confidential, and is not something that we will divulge to outside parties....asbolutely [sic] out of the question." (JWW0004397.)

40. Not only did Hydra thwart all attempts to identify their spammers, I found out that Hydra had later proactively changed the domain registration of LynxTrack.com to be privately registered to conceal Hydra's identity, as well as their spammers' identities, from spam recipients.

41. In January 2008, I sent complaint to Hydra about another unidentifiable Hydra spammer, again asking for Hydra to identify what, I believe, legally cannot be hidden, the identity of the sender of their spam. Hydra would not identify them and, indeed, Hydra did not even deign to reply.

42. Additionally, I complained to Kraft in November 2004 regarding spam emails sent by MailCompanyX that were being sent to Hypertouch, Inc.'s servers, ultimately escalating to my speaking with Kraft's chief counsel, Marty Gorman. I continued receiving Gevalia spam on Hypertouch, Inc.'s servers. In February 2005, I began receiving large volumes of MailCompanyX spam promoting Gevalia. I spoke with Marty Gorman again. These spam emails, promoting Gevalia, were sent through Connexus (at the time, Vendare).

I, James Joseph Wagner, declare and state:

I am President of HYPERTOUCH, INC. All matters set forth herein are within my personal knowledge. The information contained above is drawn from pertinent business records and from my own knowledge and information, and based thereon I believe the information contained in these responses is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

March 5, 2010                              _____
                                                            James Joseph Wagner