**Affidavit of Dr. John R. Levine in Response to Motion for Summary Judgment by Kraft et al.**

1.      I, Dr. John R. Levine, provide the following affidavit in connection with the above-referenced matter.  I have been asked by Beyond Systems, Inc., to comment on the Memorandum of Law (MOL) dated January 29, 2010, supporting Kraft's Motion for Summary Judgement, The organization of my comments generally follow that of the MOL.  Most of the arguments in the MSJ simply reiterate claims that the defendants or their experts have previously made, to which I have previously responded.  In those cases I will summarize the salient parts of my response.

## I.      Background And Experience

2.      I submit this expert report based upon my own personal knowledge, except where I state that I have information and belief, and in such cases I do so believe. I provide my opinion only on matters where I believe that I have expertise. I could and would testify competently to all the matters in this report if called upon to do so.

3.      I am currently an independent computer industry consultant and author specializing in the Internet and Internet-related issues. I lecture to and consult for numerous clients including IBM Canada, CBS Television, Minnesota Power, the American Institute of Chemical Engineers, Alex, Brown & Sons, and Hewlett-Packard.

4.      I am the chair of the Internet Research Task Force (IRTF) Anti-Spam Research Group.  Since 1997, I have been a board member of the Coalition Against Unsolicited Commercial Email, an Internet user advocacy group and since 2008 its President.  Also

since 1997, I have run the Network Abuse Clearinghouse, also known as abuse.net, a free service that helps Internet users and service providers report and deal with abusive on-line behavior.

5.    I am a Senior Technical Advisor to the Messaging Anti-Abuse Working Group (MAAWG), the leading industry anti-spam forum, whose members include Google, Yahoo, Microsoft, AOL, Verizon, AT&T, Openwave, and many other large networks and mail software vendors.

6.    I have been a network manager for a private network that hosts over 300 Internet domains and web sites, totaling over 300,000 web pages, since 1995.

7.    I have operated a variety of electronic mail servers for myself and as many as approximately 1,000 other people.  As part of running this service, I deal daily with issues of spam and other e-mail abuse.

8.    I have been active in the computer industry for thirty years, working for Interactive Systems Corporation. (the first commercial provider of UNIX software) between 1979 and 1984 and Javelin Software (creators of an award winning PC modeling tool) from 1984 to 1987.  In 1989, I co-founded Segue Software, currently the leading provider of web and client/server testing software, where I continued as a director and consultant until the company was sold in April 2006. I received a B.A. Computer Science with a minor in Mathematical Economics form Yale University in 1975, and a Ph.D. in Computer Science from Yale University in 1984.

9.    Publications in the past 10 years include:

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

A.      *Flex and bison*, O'Reilly, 2009.

B.      "Mail authentication with Domain Keys Identified Mail", parts 1 and 2,
*Virus Bulletin*, April 2009 and May 2009.

C.      "Is there any hope for e-postage?", *Virus Bulletin*, March 2009.

D.      *Mobile Internet For Dummies*, with Michael O'Farrell and others, Wiley,
2008.

E.      *The Internet for Dummies*, Wiley, multiple editions, most recent in 2007.

F.      *Windows Vista: The Complete Reference*, with Margaret Levine Young and
others, Osborne/McGraw-Hill, 2007.

G.      *Unix for Dummies* , Wiley, multiple editions, most recent in 2004.

H.      *Fighting Spam for Dummies*, with Margaret Levine Young and Ray Everett-
Church, Wiley, 2004.

I.      *qmail*, O'Reilly, 2004.

J.      *Internet Privacy for Dummies*, with Ray Everett-Church and Gregg
Stebben, Wiley, 2002.

K.      *Windows XP Home Edition: The Complete Reference*, with Margaret Levine
Young, Osborne/McGraw-Hill, 2002.

L.      *The Internet for Dummies Quick Reference*, with Arnold Reinhold, and

Margaret Levine Young, Wiley, multiple editions most recent in 2002.


M.      *Windows XP: The Complete Reference*, with Margaret Levine Young,

Osborne/McGraw-Hill, 2001.


N.      *Linkers and Loaders*, Morgan Kauffman, 2000.


**II.      Management of small mail systems**

10.      On pages 7 through 12 of the MOL, Kraft argues, as best I can make it out, that

the Plaintiff does not actually provide Internet Access Service, and further, that it is to

blame for receiving the Defendants' spam.

11.      Although BSI is a small service provider, there is no minimum threshold size to

be a service provider.  BSI undisputedly has some users who do receive their e-mail there.

Kraft also argues that BSI's choice to locate some of its equipment in the houses of

family members disqualifies it from being a "real" provider.  In fact, modern computers

are small enough that it is entirely reasonable to run a small provider from one's house.  I

ran mail and web servers from my home office for many years for up to a thousand mail

users, moving them out only when I spent a year abroad and nobody was home to tend

them.  Lightlink Internet, a provider in Ithaca NY which whom I have worked for over a

decade, was started in its owner's apartment, and still has significant facilities there.

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

### III.    Spam traps, wild cards, and solicited mail

12.     On pages 4 and 12 Kraft appears to argue that the defendant's spam floats freely in space, unrelated to any sender or recipient, and the Plaintiffs created "spam traps" to pluck them from the ether.  In reality, every e-mail message, spam or otherwise, is sent to specific recipient e-mail addresses.  The only reason that the Plaintiff receives a spam message, or any email message, is that the message's sender sent it to an address handled by the Plaintiff's mail system.  A "spam trap" is merely an address that gets so much spam that it is useless for regular mail.  Like mail to any other address, mail to a spam trap is received only because the sender addressed it to the trap, a point I expand on below.

13.     Defendants argue without basis that Plaintiff has a duty to block all incoming spam, rather than receiving and archiving it, with suggestions that there is something unusual and improper about receiving spam and keeping an archive of it.  To the contrary, many systems that receive mail routinely keep copies of incoming spam.  Google, for example, has a vast archive of spam received by their Gmail service, and I personally have an archive containing copies of over 20 million spam messages sent to my mail system in the past five years.  An ISP is doing nothing improper by archiving mail.  In fact, archiving mail allows an ISP to investigate spam complaints, facilitate the reporting of spam to other networks, fine tune spam filtering for customers, and ensure that in the event errors occur or mail in inadvertently routed improperly, it can be retrieved.

14.     Defendants decry Plaintiff's collection of mail in "spam traps".  A spam trap is an e-mail address that gets a lot of spam, but such traps can be created in a variety of

different ways.  In plaintiff's case, his mail system was configured to receive all mail sent to addresses in his domain that were not assigned to individual recipients, addresses that Kraft mischaracterizes as "non-operational".

15.     Small businesses such as the Plaintiff's quite commonly use a catchall address–even if an address is misspelled, if it's addressed to the the business' domain, it should be intended for someone at the business, and can be read and routed to the appropriate person, just like slightly misaddressed paper mail.  For example, I have run a server that provided mail service to about 100 small businesses in upstate New York, customers of a local web host.  I offered each of them the option of using a catchall address, and most of them did so.

16.     In Plaintiff's case, spammers sent a great deal of mail to invented or guessed addresses, so the catchall functioned as a spam trap, without any direct action by plaintiff to make it one.  On my system, I have a domain name that has never been used for legitimate electronic mail, but gets spam from spammers who used address collection software that misinterpreted text strings that happened to include the domain name as e-mail addresses.  My domain, which I have configured to receive all mail sent to it, gets approximately 50,000 messages a day, all unsolicited, and I can easily believe that Plaintiff would get a similar amount with no action on his part to encourage or solicit it.

17.     In many places Defendant attempts to draw a parallel between the present suit and *Gordon v. Virtumundo*.  This is a false equivalence for two significant reasons.  One is that unlike BSI, Gordon did not own any mail servers, but rented shared server capacity in a remote data center.  It is undisputed that BSI owns and operates its own servers, and

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

Paul Wagner has testified to the overload on those servers due to incoming spam.  The other is that unlike BSI, Gordon bought domain names specifically because they were likely to receive spam, in anticipation of filing suits.  In contrast, the Kraft-related spam in this case was sent to addresses in nine domains registered by BSI between 1997 and 2002, years before any of the spam in this case was sent, and long before any legal action was contemplated.

### IV.        BSI, Hypertouch, and routine conveyance

18.        On pages 16 through 22, Kraft argues that the Plaintiff cannot sue for messages that were routed through a mail server belonging to Hypertouch, either because the mail was addressed to Hypertouch, or because the mail was solicited from Hypertouch.  Neither argument stands up under examination.

19.        Internet e-mail is a "store and forward" system, designed from the beginning to allow messages to be routed from computer to computer on their way to the ultimate recipient.  This principle is well enough established that the CAN SPAM law calls it out as "Routine Conveyance".  BSI called upon Hypertouch to handle its incoming mail since Hypertouch's servers were better able to deal with the large load of incoming mail.  Hypertouch then routed the mail to BSI at a rate that BSI could handle.  This is not an unusual way to configure mail systems.  I handle incoming mail for several friends the same way, my more capable server receives the mail, and then routes it to them.  In BSI's case, the mail legitimately passed through both Hypertouch and BSI, and both were

Case 8:08-cv-00409-PJM   Document 309-54   Filed 03/05/10   Page 8 of 23

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

affected by the flood of spam addressed to BSI.

20.    The argument that BSI "solicited" mail from Hypertouch willfully misunderstands Routine Conveyance.  The unsolicited mail that BSI received was addressed to BSI by spammers, and its route through Hypertouch didn't change that.

## V.    Kraft's affiliate policies

21.    Kraft argues that it exercises supervision over its affiliates.  Kraft's expert Hirschman has analyzed Gevalia's nominal mail marketing practices, but makes no effort to determine whether their actual practices match their nominal ones which, regrettably, they do not.

22.    Hirschman makes an extensive survey of the history of e-mail legislation and of documents that describe Gevalia's purported marketing practices and finds the practices consistent with industry norms.  But that is irrelevant since Gevalia does not actually do what those documents claim they do.

23.    In his report, Hirschman noted that Gevalia requires that their name appear in the From: line of each advertising message.  I examined two of the Plaintiff's archives, "Kraft_20050214-20080526_Bt.mbx" and "Kraft Emails 20080527-20081106-Bates Labeled.mbx" which together include 11,113 messages with unique Bates numbers.  I searched for messages that contain Gevalia's name in the body of the message, but do not have their name on the From: line, and found that 7,844 of the 11,113 messages do not

comply with Gevalia's putative practices.

24.     Hirschman described Gevalia's nominal opt-out and complaint practices.  In my experience, Gevalia does not effectively supervise their affiliates, and have a long history of continuing to send mail to people who have opted out or complained.  In 2005, long before I had any contact with the Plaintiff or its attorneys, I said in an interview transcribed at http://www.naturalnews.com/018093_spam_anti-spam.html:

> The only large company I know of that has [a credible] connection to spam is Kraft, with their Gevalia coffee -- overpriced Swedish gourmet coffee. They have a longstanding history of hiring dodgy emailers to send spam, and I'm pretty sure sometime in the next couple years somebody's going to collect enough Gevalia spam to go back and actually file suit against Kraft, which will of course be an excellent suit, because they have lots of money if they lose.

(Note: "a credible" was mistranscribed by the interviewer as "an incredible", but it is clear from context what I said.)  Gevalia was well known in the industry both for spamming and for abusive practices such as sending spam to addresses on its "suppression" list.

25.     Since Hirschman made no effort to verify Gevalia's compliance or lack thereof with their nominal practices, his report has no practical bearing on the matter at hand.


**VI.     Affiliate Networks**

26.     All of the mail at issue appears to have been sent by Kraft's affiliates, rather than by Kraft directly.

27.     An affiliate network needs to know how many of the emails its affiliates are sending are yielding click-throughs, and to audit the payment information provided to it

Case 8:08-cv-00409-PJM   Document 309-54   Filed 03/05/10   Page 10 of 23

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

by those parties whose products and services are being advertised through the affiliate network. It does this with tracking links, web URLs that contain encoded strings to identify the affiliate, advertising campaign, and advertiser. There is no other plausible purpose for such a tracking link, and the e-mails at issue are full of tracking links.

28. Both legitimate and illegitimate advertisers use affiliates, but their practices are very different. For many years I have been a member of affiliate programs for well known advertisers such as Amazon.com, the online bookstore, and Orbitz, the online travel agent. In their programs, the identities of the advertiser and the affiliate are always clear, they use consistent domain names registered with clear identifying information, and the links from the affiliates to the advertiser or the affiliate network are straightforward.

29. In the mail I have examined for this case, the links frequently rotated through multiple domain names, names that have either been abandoned or are registered through proxy services to hide the identity of the actual owner. For the mails at issue, it is my opinion that the affiliate programs have been structured to hide the identities of the affiliate and network, and to impair the ability of mail recipients to identify the responsible parties.

30. Even if an email message is sent by an affiliate, the advertiser and affiliate network remain responsible for the message. I understand that Kraft made content available to its affiliates that is found in many of the messages advertising Gevalia coffee. Hydra and Connexus made image content available from its image servers to the senders of commercial email and tracked the results of the email traffic its affiliates sent out on its behalf and on the behalf of any other parties who aided in the distribution of that email.

In my opinion, Kraft is responsible for initiating any email using templates that it made available to their affiliates in their affiliate networks, or sent with advertisements that allow recipients to buy Kraft's products.

31.     Kraft is responsible for the content it accepts for transmission through its networks and which affiliates its accepts into its network who then further distribute that content. Most importantly, Kraft gets a financial benefit from email advertising its products.

32.     Ultimately, the only way to curb abusive commercial email practices is to ensure that the parties who are responsible for advertising the email, for causing the email to be transmitted, and who profit as a result of the email being transmitted are held responsible for that email content. Allowing Kraft to ignore abuses occurring through its distribution networks would truly turn a blind eye to the problem of spam email violations. They are in control of the affiliates they allow in their networks and the steps they take to ensure that their affiliates and any of their sub-affiliates do not abuse commercial email. Thus, Kraft must be held responsible for the wrongdoing of its business associates.


**VII.     Falsity in the e-mail at issue**

33.     Kraft argues that the false aspects of the e-mail at issue are immaterial or irrelevant.  That's simply not true.  On page 22 of the MOL they misrepresent my testimony at deposition, asserting that I said that "Gevalia promotions were of high quality and true."  What I actually said was that in my experience, that the offer of a free coffee pot was true, so the message subject lines that made such an offer were "by and

large OK."  In that context I said nothing about the rest of the Gevalia mail, and as I

describe below, the mail contains many false and misleading elements.

34.     Their fraudulent aspects, many of which I detail below, are common and well

known spammer tactics.  There is no legitimate reason to rotate through hundreds of

varying subject lines and return addresses, or to hide recipient identities in fields intended

for software version numbers.  Their only purposes are illegitimate: to evade spam filters,

to trick recipients into thinking spam is legitimate mail, and to identify recipients from

spam reports, even when the reports have had identities redacted.

35.     I have examined a mail archive in a file called

"Kraft_20081107-20090331_Bt.mbx", containing 7,457 messages attributed to Kraft,

with Bates numbers from K011121 to K018577.  Approximately 100 of the messages

have random author addresses such as:

> From: Gevalia@domainname.com <wzDuokGbXLE@QUICKCIVIC.INFO>
> From: Gevalia@domainname.com <rMBeuDhkQwy@QUICKCIVIC.INFO>
> From: Gevalia Gourmet Coffee Starter Kit <sIvrALRqkMi@NOWANDLATERADSSITE.INFO>
> From: Gevalia Gourmet Coffee Starter Kit <MdhlemiyXuO@NOWANDLATERADSSITE.INFO>
> From: Gevalia <zsokUvbNqlO@UMUTTEMIZLIK.COM>
> From: Gevalia <zdnHUKskZFI@taximan.info>

The random names serve no legitimate purpose, but are intended to confuse and mislead

human recipients and software spam filters.

36.     Nearly all of the messages say "You have received this advertisement because you

have registered with (Publisher List Name Entered Here)."  The string "Publisher List

Name Entered Here" appears literally in the message, possibly because the sender

neglected to enter the name of a list that he bought, or more likely because the sender had

Case 8:08-cv-00409-PJM   Document 309-54   Filed 03/05/10   Page 13 of 23

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

no list and invented possible recipient addresses, a common spamming technique known as a dictionary attack.  The addresses the spam was sent to included lukeht@safemailbox.com, jocelynht@safemailbox.com, gabrielht@safemailbox.com, caitlinht@safemailbox.com, brookeht@safemailbox.com, briannaht@safemailbox.com, alexandriaht@safemailbox.com, mariahht@safemailbox.com, lydiaht@safemailbox.com, johnht@safemailbox.com, haileyht@safemailbox.com, and elijahht@safemailbox.com. In my opinion, the presence of the invented addresses with the false statement that the recipient had registered is misleading.

37.    *Misleading From: fields:* By both RFC standards documents and long standing practice, the `From:` field identifies the person or entity who authored or originated the message.  This is a practical, not a technical definition.  A secretary might send a message on behalf of a supervisor, or a computer operator might send mail to a mailing list for his employer or a client of his employer.  In those cases, the supervisor or the employer or client requesting the mailing is identified in the `From:` field.

38.    The `From:` field usually contains two parts, the e-mail address and a "friendly" comment.  For example, the `From:` line on mail I sent typically reads:

        From: John Levine <johnl@iecc.com>

where the part in angle brackets < > is the e-mail address and the part before it is the comment.  Although the comment is not interpreted by mail programs and doesn't normally affect the routing or processing of mail, it is displayed to message recipients and

should identify the author or originator of the message.

39.     Every Internet e-mail message contains a `From:` header that should identify the author of the message.  Many of the messages contain `From:` lines that are patently false.

40.     In many of the Kraft messages, the address on the `From:` line is a random string of letters or a random person's name, for example:

| Message | From address (Kraft messages) |
|---------|-------------------------------|
| K016550 | Gevalia <zsokUvbNqlO@UMUTTEMIZLIK.COM> |
| K016551 | Gevalia <dcQGEgNUJjo@UMUTTEMIZLIK.COM> |
| K016552 | Gevalia <MZagiuChJvU@UMUTTEMIZLIK.COM> |
| K016553 | Gevalia <mVQKAzvBTsi@UMUTTEMIZLIK.COM> |
| K016554 | Gevalia <kjBhyvFKIEe@UMUTTEMIZLIK.COM> |
| K016555 | Gevalia <fjJPATQHiFu@UMUTTEMIZLIK.COM> |
| K016556 | Gevalia <rSwJeyFqEKO@UMUTTEMIZLIK.COM> |
| K016557 | Gevalia <RYXmAlHewvO@UMUTTEMIZLIK.COM> |
| K016558 | Gevalia <hWlVexAwGuE@UMUTTEMIZLIK.COM> |
| K016559 | Gevalia <LZrbUNnpCFO@UMUTTEMIZLIK.COM> |
| K016560 | Gevalia <NUVMaOrguHE@UMUTTEMIZLIK.COM> |
| K016561 | Gevalia <StLrUXkbCvO@UMUTTEMIZLIK.COM> |
| K016562 | Gevalia <UBZRaJpIDAu@UMUTTEMIZLIK.COM> |
| K016563 | Gevalia <wlnfyYhFSJe@UMUTTEMIZLIK.COM> |
| K016564 | Gevalia <aioKUkYDcEy@UMUTTEMIZLIK.COM> |
| K016565 | Gevalia <rBviozaRyGA@UMUTTEMIZLIK.COM> |
| K016566 | Gevalia <arfwyWROoME@UMUTTEMIZLIK.COM> |
| K016567 | Gevalia <qIYSeoGKCia@UMUTTEMIZLIK.COM> |

Many other messages have similar randomized addresses; these are a sample.

41.     Randomized `From:` addresses are a common spammer tactic to evade mail filters that attempt to recognize spam from unwanted senders.  When the addresses use people's names, it is also an attempt to make human recipients

think that the message is a personal message from an actual person.

42.     *Invented addresses and false opt-in claims:* I have exampled 7,457

messages attributed to Kraft, with Bates numbers from K011121 to K018577.

Approximately 100 of the messages have random author addresses such as:


      From: Gevalia@domainname.com <wzDuokGbXLE@QUICKCIVIC.INFO>
      From: Gevalia@domainname.com <rMBeuDhkQwy@QUICKCIVIC.INFO>
      From: Gevalia Gourmet Coffee Starter Kit <sIvrALRqkMi@NOWANDLATERADSSITE.INFO>
      From: Gevalia Gourmet Coffee Starter Kit <MdhlemiyXuO@NOWANDLATERADSSITE.INFO
      From: Gevalia <zsokUvbNqlO@UMUTTEMIZLIK.COM>
      From: Gevalia <zdnHUKskZFI@taximan.info>

The random names serve no legitimate purpose, but are intended to confuse and mislead

human recipients and software spam filters.

43.     *Misleading X-Mailer headers:* Messages K000871,  K000872,  K008188,

K008281, K008283, K008564-65, K008569, K008587, K008603, K008624, K008637,

K008649, K008964, K009603-04, K009614-35, K009640-48, K009653-70, and others, a

total of 84 messages, contain X-Mailer: headers that identify the mailer as, variously:


      Microsoft Office Outlook 11
      Microsoft Outlook Express 6.00.2800.1106
      Microsoft Outlook Express 6.00.2800.1123
      Microsoft Outlook Express 6.00.2800.1807
      Microsoft Outlook Express 6.00.2900.2180
      Microsoft Outlook Express 6.00.2900.2869

44.     Microsoft Office Outlook and Outlook Express are popular desktop mail

programs used to send and receive individual mail messages.  It is utterly implausible that

they could have been used to send the large amounts of mail at issue in this case, but it is

quite common for spam to include fake Outlook or Outlook Express mail headers to trick

humans or software into thinking that the mail is individual correspondence rather than bulk mail.

45.     Furthermore, over 6000 of the messages contain `X-Mailer:` lines that purport to be software version numbers, such as:

> Version 5.01.9544.9849
> Version 5.03.3814.3687

46.     In these messages, the four digit numbers (9544, 9849, 3814, and 3687 in the examples above) are different in each message.  Software does not change from one message to the next--a single version of a single program is used to send all the mail in a session, whether an individual user's mail session or a million message spam run.  The unique numbers in these messages serve not to identify the mailer, but on the contrary to identify the recipient of the message, to allow the mailer to recover the recipient from redacted spam complaints.  Since the `X-Mailer:` header in these messages does not describe the software used to send the message, it is misleading information about the origin of the messages.  It further misleads message recipients who would falsely assume that they could protect their own privacy by redacting the addresses from copies of spam sent in complaints.

## VIII.   Identifying the Senders and Advertisers of Emails

47.     Many of the emails in question include advertising images that do not render in whole or in part.  Nonetheless, it is often possible to identify the responsible advertisers.

48.     First, it is not atypical for emails not to render.  It is common practice for

Case 8:08-cv-00409-PJM   Document 309-54   Filed 03/05/10   Page 17 of 23

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

commercial email advertisements to include HTML code within the body of the email

that includes the URL, or web address, for the image server from which a specific

graphical image or images can be retrieved to populate the body of the email.  Image

rendering from those image servers is not performed at the time the mail is received by an

ISP, nor at the time the mail a user picks up the mail from the ISP and transfers it to his or

her own computer.  Rather, image rendering is done by the individual user's mail program

at the time the user opens and looks at a message.  End users often have security settings

that do not allow HTML images in email to load or render without an affirmative step by

the end user.  It depends on the settings that an end user opts to use on his or her email

software.  If the images are no longer available on the image server for a particular email,

those images will no longer render in the email regardless of whether the end user's mail

program did or did not render the images at any prior point in time.

49.     It is absurd to claim that a recipient must open each email to render the images

that it includes, and store an image of that email in its full rendered version in order to

have an actionable piece of spam.  Requiring rendered images would make it impractical

for consumers or ISPs to take action against senders of spam, directly contrary to the

purpose of anti-spam statutes such as the CAN SPAM Act of 2003 and compatible state

laws, and would impose overwhelming technical and economic burdens and costs on

ISPs.

50.     Even when images for a commercial email no longer render, it is still often

possible to determine who the advertiser or advertisers of that email were.  It is possible

to determine the various parties involved in advertising in a particular email, including the

Case 8:08-cv-00409-PJM   Document 309-54   Filed 03/05/10   Page 18 of 23

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

spammer that sent the mail, the affiliate network or networks involved in its transmission, and the company whose products or services are advertised through the commercial email, by looking, for example, at the domains appearing in the email, the links, the coding, the file names in the email, complaints generated by an advertising campaign, the opt-out links, and the opt-out CAN-SPAM postal mailing address.

51.     The messages advertising Kraft's Gevalia coffee generally refer to Gevalia in the subject line, and have other textual references to Gevalia in the message, including Gevalia's postal addresses in Milford DE and Huntington WV.  There is no question what these messages are advertising and who will benefit if the recipient places an order. Nonetheless, although it is possible for human users to recognize the mail as being from Gevalia, the structure of the messages is clearly designed to evade automated mail filters and sneak into users' mailboxes.  Kraft's affiliates sent mail from return addresses in over a thousand nonsense domains, such as 7bet.net, a-ok5.com, aaplith.com, abaninv.net, abkabrabra.com, abreumaybe.com, acceptableaward.com, adnapmihc.com, aerobench.com, affleckyaso.com, aggressive-triggers.com, aheeping.com, ahoke.surpriseinternet.com, aidamildenhallhost.com, aimingpert.com, airtecportugal.com, akakiak.com, allmkntg.com, allnightl0ng.info, alphasell.com, amazingoffernew.com, and amfam.com.  These domains had no use other than to confuse recipients, both software and human, and to make it harder to tell the sender to stop.  Had Kraft actually wanted to know when recipients objected to receiving its ads, it could have required that ads include a From: or Reply-To: address at Kraft's own gevalia.com, or at a domain operated by a contracted list management company, so they could directly receive and act on

Case 8:08-cv-00409-PJM   Document 309-54   Filed 03/05/10   Page 19 of 23

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

complaints and opt-out requests.  This is standard industry practice, and Kraft is, to my

knowledge, unique among major advertisers in not doing so.


**IX.     Plaintiff's comparisons of spam and defendant creatives**

52.     The Plaintiff's president has performed an extensive comparison of the creative

templates provided by the defendants to their affiliates to the spam produced in evidence,

and has found substantial correspondence between the templates and the e-mail messages

at issue.  In particular, he observed that the mailers typically used the subject lines and

image links in the templates verbatim, while changing the click-through links to provide

for auditing the commissions paid, to hide the identity of the ultimate beneficiary of the

advertisement, or for other reasons.  Hence he looked for messages that match subject

lines and groups of image links in order to identify matches with the templates.  Having

looked at a sample of templates and e-mail, I agree that this analysis technique is an

effective way to find messages derived from the templates.  I have spot checked his

results and concur that many of the messages do indeed match the subject lines, image

links, and the structure of the bodies of the templates, including e-mail advertisement

"creatives" provided by Connexus that advertise Kraft's Gevalia coffee.

53.     The creatives are templates for affiliates to use in their e-mail, not typically used

without some customization.  The customization may include modification of the links in

the message to use domain names available to the affiliate, addition of affiliate-specific

tracking links, and affiliate-specific opt-out language.

54.     If the customization is performed using an HTML editor program, as the affiliates

appear to have done, the editor program often makes other minor changes to the HTML

that do not affect the message's appearance to the user.  An HTML message is in effect a

series of instructions to a user's mail program that tell it what to display when the user

opens the message.  White space within the instructions is disregarded, as is the order of

options within an individual instruction, and upper/lower case variations of an instruction.

For example, these two instructions would be equivalent:

> <img height=100 width=200 src="imagefile.jpg">
>
> <IMG
>  SRC="imagefile.jpg"
>  WIDTH=200
>  HEIGHT=100 >

55.     For the purposes of matching an e-mail message with a creative, these

differences can and should be ignored.  Each creative has many distinctive

characteristics including the names of the image files it includes and the

sequence of elements that control the layout of the message on the screen.

These characteristics make it possible to reliably match a creative with

messages derived from that creative.

56.     Since it would be impractical to match up the thousands of messages

BSI received by hand, BSI wrote some program scripts to aid the comparison.

I have reviewed BSI's scripts *match_msg_bodies8.perl*,

*match_msg_bodies9.perl*, and *match_msg_bodies11.perl*.  Upon comparing

the scripts, it was evident that the "8" script was a preliminary version of the

"9" script, to which BSI subsequently added more features to become the "11"

script, so I looked in detail at the latter two scripts.

57.     Each script reads a sequence of pairs of creatives and e-mail messages, and for each pair, performs a sequence of modifications on the creative and e-mail to put each in a standard form, then compares the standard forms. The modifications, which are well-documented in the scripts, are intended to account for the effects of the affiliate's modifications described above. The modifications include converting sequences of white space to a single newline, putting HTML instructions in consistent lower case, standardizing the order of options within an HTML instruction, removing affiliates' tracking links, fixing minor technical coding errors in the creatives, and other similar modifications. I have reviewed all of the modifications performed by BSI's script, and concur that they are a reasonable way to account for changes that an affiliate would make while retaining the key distinctive features of a creative.

58.     Once the creative and e-mail message are put in standard form, the script does a straightforward comparison of the two and reports the number of sequential matching lines, if any.

59.     BSI provided the results of the comparison of a Connexus creative known as C12896_row190 (the 190th row in a spreadsheet known as C12896) including the standardized form of the messages. The standardized form of many of the messages were identical, so that the 6423 messages after standardization became only three variants. I have looked at each of the three variants, which are recognizably the same HTML messages as the creative

they match, with the same image file names and the same layout.

60.     In my opinion, BSI's matching process is a reasonable and reliable

way to identify e-mail messages that are based on the defendants' creatives.


## X.     Third Party Privacy Protection Services

61.     ICANN is the organization entrusted with managing the top level

domains used on the Internet (e.g., .com, .org, .net).  It delegates management

of those domains to registries and registrars with whom it has specific

contractual agreements.  A true and correct copy of the Registrar

Accreditation Agreement in from 2001 to May 2009, and the updated

agreement in effect since May 2009, are available as

http://www.icann.org/en/registrars/agreements.html.  Those agreements

require that a registrar publish the name and postal address of the Registered

Name Holder with respect to each domain it registers, as well as additional

required information.  See Section 3.3.1.6 of each agreement.

62.     A third party privacy protection service allows a person to use a

domain name, while protecting his or her privacy by not publishing his or her

identity and address as required by ICANN.  Rather, the third party privacy

service is listed as the "Registered Name Holder" for purposes of ICANN.

Consequently, in my experience, legitimate third party privacy protection

services always require that their users not use domains registered with them

for purposes of sending spam emails.  Otherwise, spammers would be able to

Levine Affidavit re Kraft MSJ (BSI vs. Kraft et al.)

spam indiscriminately using domains with identifying features hidden from

public notice.  To extent that spammers do use privacy protection services as

the Registered Name Holder for domains used in spam, such conduct

constitutes an abusive practice designed to mislead the public.

Dated: 5 March 2010                                Respectfully submitted,

_____

Dr. John R. Levine

PO Box 727
Trumansburg NY 14886
(607) 330-5711
johnl@taugh.com

Revision date: 2010/03/05 14:23:52 (1.3)