# EXHIBIT 1

Page 624

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

BEYOND SYSTEMS, INC., a          :
Maryland Corporation,            :
         Plaintiff,              : Civil Action
         vs.                     : Case No. CV08-01039
CONNEXUS CORP. (f/k/a            :        RGK (PLAx)
VANDARE MEDIA and NetBlue,       :
Inc.), a Delaware Corporation;   :
HYDRA MEDIA GROUP, INC., a       :
California Corporation;          :
MAILCOMPANYX (d/b/a Internet     :
Endeavors, Inc.), a Nevada       :
Corporation, including           :
SEBASTIAN BARALE, in his         :
individual capacity; and         :
Does 1 through 10, inclusive,    :
         Defendants.             :

VOLUME 3

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER

Washington, D.C.

Friday, June 5, 2009

9:47 a.m.

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME 3
CONDUCTED ON FRIDAY, JUNE 5, 2009

Page 625

1  Job No. 1-156703
2  Pages 624 through 863
3  Reported by:  Janet A. Steffan, RDR
4
5                       Deposition of
6                       PAUL A. WAGNER
7
8  Held at the offices of:
9       VENABLE, LLP
10      575 Seventh Street, Northwest
11      Washington, D.C.  20004
12      202-344-4000
13
14
15
16      Taken pursuant to the Federal Rules of Civil
17 Procedure, before Janet A. Steffan, Registered Diplomate
18 Reporter and Notary Public in and for the District of
19 Columbia.
20
21
22
23
24
25

Page 672

1    A.    Yes.

2    Q.    And Steve Ring is your lawyer in this case; right,
3    in the Beyond Systems systems versus Kraft case?

4    A.    Yes.  He's one of the attorneys.

5    Q.    Do you recall -- or strike it.

6          Did Beyond Systems file a complaint against Gevalia
7    in 2004 or 2005, or was it considering filing a complaint at
8    that time?

9    A.    Yeah.  I don't recall.  I don't recall what was up
10   with Gevalia.  I would -- I was completing, or I was writing
11   the affidavits, of course, and, and, of course, I don't know
12   how to describe -- discuss what my attorney was up to but --

13   Q.    Well, let's just talk about you.  Were you working
14   on a complaint for Gevalia in December 2004, regardless of
15   what your attorney was doing?

16   A.    Yeah.  I just -- I don't recall.  I'd have to look,
17   go over my note, look at my notes.

18   Q.    So you don't have an understanding as to why you
19   wrote Steve Ring and I are completing affidavits and
20   complaints for KWU and Gevalia?

21   A.    Not as to complaint -- a complaint against Gevalia,
22   if there was one.

23   Q.    Did Steve Ring represent HyperTouch?

24   A.    Well, there's a joint interest agreement.

25   Q.    Let me ask the question differently.  Did Steve Ring

Case 8:08-cv-00409-PJM   Document 317-2   Filed 03/15/10   Page 5 of 11
CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME 3
CONDUCTED ON FRIDAY, JUNE 5, 2009

Page 673

1   ever represent HyperTouch in a lawsuit that HyperTouch brought
2   against Gevalia or Kraft?
3       A.   I, I don't think so.
4       Q.   Who's John -- is it Fallt?
5       A.   I think that's misspelled.  It's Fallat,
6   F-A-L-L-A-T.
7       Q.   Okay.  And you wrote, what are you and John Fallat
8   up to at this point, and for which cases are you preferring we
9   postpone making contact with the defendants?  What did you
10  mean by that?
11      A.   I presume either Kennedy-Western or Kraft, and we
12  certainly were receiving Gevalia spam back in 2004, and I
13  don't know if, if a complaint was a formal legal complaint or
14  some other type of complaint.
15      Q.   Did you have an understanding that you -- or strike
16  it.
17           Did you have an understanding that your brother
18  preferred that Beyond Systems postpone making contact with KWU
19  and Gevalia in December 2004?
20      A.   Can you ask that again, please?
21      Q.   Sure.  Did you have an understanding that HyperTouch
22  preferred that Beyond Systems postpone making contact with JWU
23  -- or with KWU and Gevalia at this time?
24      A.   I asked -- I asked him if he prefer if we postpone
25  making contact with defendants, but I don't remember what,

Page 674

1   whether he responded.
2       Q.    Do you know why you asked him that?
3       A.    Well, he and Fallat either were about to sue or
4   already in litigation at least.
5             MR. ONORATO:  Paul, let me just interrupt to say if
6   there are attorney/client communications that you're aware of,
7   I don't want you to reveal those.  There was a joint interest
8   at the time.  So if there were attorney/client communications
9   that were imparted to you under that joint interest agreement,
10  I don't want you to reveal those either.  Okay?
11            THE WITNESS:  Okay.  Yeah.  No.  I'm just stating
12  the fact that they were either about to or -- at some point
13  they sued Kennedy-Western, and --
14      Q.    HyperTouch also sued Gevalia; right?
15      A.    And Gevalia.
16      Q.    Right.  My question is:  Why were you asking them
17  whether they preferred Beyond Systems postpone making contact
18  with KWU and Gevalia?  Why did you ask them that specific
19  question?
20      A.    Off the top of my head I don't recall.  If I sat
21  long enough, I could try to recount the history of, of our, of
22  the proceedings and -- but I imagine that would overlap with
23  privileged information.  At some point I would have -- my
24  motivation for asking would have been in the context of a
25  joint interest agreement, shared legal strategy and so on.

Case 8:08-cv-00409-PJM   Document 317-2   Filed 03/15/10   Page 7 of 11
CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME 3
CONDUCTED ON FRIDAY, JUNE 5, 2009

Page 675

1  Q. Is this a written joint litigation agreement?
2  A. I think it's reflected in e- -- in some written
3  communications.
4  Q. Is it a written agreement though like a settlement
5  agreement that says "agreement" at the top and everybody signs
6  it at the end, and it's dated?
7  A. I don't recall that.
8  Q. Then you asked your brother, wouldn't it add
9  motivation to settle if we weighed in. What did you mean by
10 that?
11 A. That, that might reflect a communication I had with
12 counsel.
13 Q. I'm not asking for communications with counsel. I'm
14 asking you: What did you mean by that statement?
15 A. So excluding communication with counsel I --
16 Q. No, I'm not asking for communications with counsel.
17 I'm asking: What did you mean when you wrote, wouldn't it add
18 motivation to settle if we weighed in?
19 A. So my motivation for writing that excluding what I
20 learned from counsel I -- don't come to mind.
21 Q. So you -- you're not going to answer my question,
22 regardless of whether it came from your attorneys or not?
23 A. I mean that was my answer.
24 Q. Okay. Well, now I want you to include what counsel
25 told you. Why did you wrote (sic), wouldn't it add motivation

Page 676

1   to settle if we weighed in?
2            MR. ONORATO:  And I'm going to object and instruct
3   you not to answer to reveal attorney/client communications.
4   If you can answer without revealing attorney/client
5   communications, please do so.
6            MR. ROTHMAN:  I suggest it's waived.
7            MR. ONORATO:  Well, I'm going to disagree that it's
8   waived.  There's nothing here that reflects the nature of the
9   attorney/client communication.  If you're asking for his
10  motivation and he can answer that without revealing attorney/
11  client communications, then that's fine.
12           MR. ROTHMAN:  I mean I'm not even going to agree
13  that it's even privileged, but I want a full answer.  We'll
14  have a record here, and we'll take it up.  You know, whenever
15  you refuse to answer, we'll take it up later.
16           THE WITNESS:  Right.  I mean I just basically -- I
17  don't remember.  It certainly related to BSI's case, and, and
18  we had, obviously had a strategy in BSI's suit, and so that
19  I'm avoiding divulging the communications I had with counsel
20  on that count.
21  BY MR. ROTHMAN:
22       Q.   All right. So is it your testimony that you had a
23  joint litigation agreement concerning -- well, what was the
24  joint litigation agreement concerning?
25       A.   Well, I mean it's concerned that cases that

Page 677

1    HyperTouch and BSI, or it concerned defendants that HyperTouch
2    and BSI both had, had in mind or, and the attorneys who were
3    using to defend us against the abuse at the hands of these
4    defendant -- these eventual defendants.
5         Q.   Okay.  And those defendants would be Gevalia and
6    KWU?
7         A.   Yes.
8         Q.   Are there any other defendants?
9         A.   Well, so again, I don't know if Gevalia was the
10   actual defendant at that time to BSI.
11        Q.   It might have been Kraft?
12        A.   Or, you know, even Kraft, because BSI, I believe,
13   did not sue Kraft until 2008.
14        Q.   Right.  So what were the defendants that are covered
15   under this agreement?  Was it KWU and --
16        A.   Well, so Kraft was a defendant to HyperTouch.  So,
17   so, again, Kennedy-Western and, and Kraft.
18        Q.   Okay.  What other defendants are covered under this
19   agreement?
20        A.   The various Does who might have assisted
21   Kennedy-Western and Kraft.
22        Q.   What other defendants?
23        A.   I can't think of any other right now.
24        Q.   Was Vandare a defendant or covered under this
25   agreement?

Page 678

1    A.    I can't recall.  They might have been resolved with
2  Kennedy-Western spam actually.
3    Q.    You don't recall sitting here today, do you?
4    A.    I don't recall, yeah.
5    Q.    What about Hydra?  Were they covered under this
6  agreement?
7    A.    I don't recall.
8    Q.    What about NetBlue?  Do you recall if they were
9  covered under this agreement?
10   A.    Yeah.  I'm not sure.
11   Q.    When did you enter into this agreement?
12   A.    I think it was in 2004.
13   Q.    And is that an ongoing agreement that still exists
14 today?
15   A.    No.  There are other agreements in place today.
16   Q.    Okay.  When did this agreement end?
17   A.    I don't remember the exact date off the top of my
18 head.  I can certainly look, look that up or try to find that
19 for you.
20   Q.    And who are the parties to the agreement?
21   A.    I believe it's HyperTouch, Beyond Systems and their
22 counsel.  I don't know if -- I don't know if counsel was a
23 party but --
24   Q.    Anybody else?
25   A.    They were involved.

Case 8:08-cv-00409-PJM   Document 317-2   Filed 03/15/10   Page 11 of 11
CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER - VOLUME 3
CONDUCTED ON FRIDAY, JUNE 5, 2009

Page 679

1    Q.    Anybody else?

2    A.    Not that I can think of.

3    Q.    Has Beyond Systems ever entered into a joint
4    litigation agreement with HyperTouch concerning Hydramedia?

5    A.    I believe there's a joint interest agreement at
6    present with HyperTouch relating to Hydramedia.

7    Q.    Okay.  And what -- what's the substance of that
8    agreement?  Why did you enter into it and what's your
9    understanding, if you have one, as to why HyperTouch entered
10   into it?

11         MR. ONORATO:  Objection to form and objection to the
12   extent that that calls for attorney/client communications.

13         THE WITNESS:  Well, non-attorney-wise, HyperTouch
14   receives a lot of the e-mails that are at issue as to Hydra
15   first.  It's the -- it provides internet services to BSI, and
16   so it, it routes e-mail at the hypertouch.com domain name that
17   come from Hydra's, or Hydra's affiliates.  So it has facts
18   about the, about the case that BSI basically couldn't obtain
19   otherwise, including the HELO verifications and so on.

20   BY MR. ROTHMAN:

21   Q.    All right.  Well, why did you enter into an
22   agreement with HyperTouch that concerns Hydra?

23         MR. ONORATO:  Objection to form.

24         THE WITNESS:  That may or may not have resulted from
25   advice from counsel.