**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| _____ ) | |
| BEYOND SYSTEMS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 8:08-cv-00409 (PJM)(CBD) |
| ) | |
| KRAFT FOODS, INC., *et al*., ) | **REDACTED VERSION** |
| ) | |
| Connexus. ) | |
| _____) | |
| ) | |
| CONNEXUS CORP., *et al*., ) | |
| ) | |
| Third-Party Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| JAMES JOSEPH WAGNER, *et al*., ) | |
| ) | |
| Third-Party Defendants. ) | |
| _____) | |

**THIRD-PARTY DEFENDANTS' (1) OPPOSITION TO THIRD-PARTY PLAINTIFF
CONNEXUS' CROSS-MOTION FOR SUMMARY JUDGMENT; AND
(2) REPLY TO CONNEXUS' OPPOSITION TO THIRD-PARTY DEFENDANTS'
MOTION TO STRIKE AND FOR A MORE DEFINITE STATEMENT**

I.      **INTRODUCTION**

Connexus Corp. ("Connexus") and its affiliates sent 35,155 spam emails to Beyond

Systems, Inc. ("BSI"), the plaintiff in the underlying action.[1]  Connexus is responsible for the

emails:  Connexus sent the ads or else gave its affiliates the advertising and instructions for

sending the emails.  Connexus' affiliates addressed millions of emails, including thousands to

BSI, hoping to dupe people into clicking on the "free" offers or into signing up so that they could

_____

[1] Of the 35,155 emails, 28,137 are at issue in the instant case for liability purposes.

then use that address or sell it as a "lead." For each sale or lead, Connexus and its affiliate spammer split a bounty from the advertiser.

The emails sent to BSI contain information tying them to Connexus. Accordingly, BSI sued Connexus for 28,137 violations of both the Maryland and California anti-spam statutes.[2]

Connexus subsequently filed a baseless pleading for strategic purposes – a third-party complaint against an upstream ISP serving BSI, Hypertouch, Inc., and its president Joe Wagner (jointly, "Hypertouch"). Connexus asserts that if it is liable to BSI for the 28,137 spam emails that it sent, Hypertouch should be liable to Connexus for indemnification or contribution because Hypertouch, in its capacity as an ISP, routed some of Connexus' spam to BSI.

Hypertouch moved to dismiss Connexus' third-party complaint because Connexus – not Hypertouch – created and sent the emails to BSI, and is and always will be the liable party. In addition, Hypertouch is immune under the Communications Decency Act ("CDA"), which shields ISPs from liability for routing illegal emails, and is exempted from liability under Maryland and California law. [DE #82]. On October 19, 2009, this Court denied the motion to dismiss without reaching the indemnity issue, stating that it wanted the benefit of discovery before reaching a conclusion on CDA immunity.[3]

Hypertouch then answered Connexus' third-party complaint. [DE #241]. In its answer, Hypertouch asserted a counterclaim for indemnification and contribution against Connexus

---

[2] In the same action, BSI sued Hydra LLC, which has now, after two years of wasting this Court's and the parties' time and money, abandoned its defense of this litigation, thus conceding liability. On February 23, 2010, BSI filed a motion for entry of default and Third-Party Defendants Wagner/Hypertouch filed a motion to dismiss Hydra's third-party claims. [DE #301 & 302]. **As of March 14, 2010, Hydra's time to respond had expired, thus this Court should enter default and dismiss Hydra's claims.** As for Connexus' other co-Defendants, its affiliates Sebastian Barale and MailCompanyX, this Court has already entered default after they too abandoned the defense of this litigation and hid in Argentina. [Case No. 09-CV-00080 (PJM) at DE #108].

[3] "THE COURT: Let me short-cut you on that, because I don't know that I need to reach [the indemnification] issue now. I want to see whether your basic presence in the case continues or not, or whether their claim in effect goes forward. Damages we can talk about if, as and when. So don't spend a lot of time on that really right now." Oct. 19, 2009 Hr'g Tr. at 35:25-36:5.

because Connexus initiated the transmission of, and advertised in, the emails at issue, while Hypertouch did not. *Id.* Connexus then answered Hypertouch's counterclaim and asserted its own CDA immunity defense. [DE #249].

On January 6, 2010, Hypertouch filed a motion to strike Connexus' CDA defense. [DE #268]. Hypertouch argued that Connexus does not meet the requirements for CDA immunity because it is not an "interactive computer service" and because it is responsible for the content of the emails at issue in this case. On February 18, 2010, Connexus filed its opposition to Hypertouch's motion to strike, and included in the same pleading a motion for summary judgment on Hypertouch's counterclaim for indemnification and contribution. [DE #294].

Which brings us to the present brief. In order for Connexus to win summary judgment, it must show that it is indisputable that Hypertouch can never assert a counterclaim against it *for the reason that Hypertouch will be primarily liable to BSI for Connexus' spam*, and as the primarily liable party, unable as a matter of law to seek indemnification from another party. However, Connexus' motion only serves to highlight the senselessness of its third-party claims because Hypertouch can never be liable – period – for Connexus' spam:

- First, BSI sued Connexus, and does not seek to impose liability on Hypertouch;

- Second, Connexus will always be primarily liable because it created, sent, was paid and paid others for the spam at issue;

- Third, for Hypertouch to theoretically be primarily liable, Connexus must first win the underlying case and prove it has no liability to BSI, and if that happens, there will be no liability in any event for Connexus to seek to shift to Hypertouch.

Therefore, Connexus' motion seeking summary judgment that Hypertouch cannot seek indemnification *for the reason that Hypertouch is primarily liable* must be rejected.

## II.     CONNEXUS' MOTION FOR SUMMARY JUDGMENT FAILS

### A.     Hypertouch's Response To Connexus' Statement Of Undisputed Facts

Connexus uses its statement of undisputed facts to reprise factual allegations *in hac verba* from prior pleadings, most of which are immaterial to Hypertouch's counterclaim regarding Connexus' third-party indemnification claim.  Connexus' motion for summary judgment rests primarily on a legal argument that Hypertouch will never be in a position to seek indemnification or contribution from Connexus, but Connexus' arguments in favor of its motion illustrate the absurdity of its original third-party complaint.  To establish a right to indemnification, Connexus must establish that *Hypertouch* is liable *to BSI* under the Maryland and California statutes and that Hypertouch is "primarily" responsible for the emails sent to BSI, a showing that Connexus cannot make:  *viz.*, BSI has not sued Hypertouch, and Hypertouch has neither initiated the transmission, nor advertised in the emails at issue.  Even thought that is indisputable, Hypertouch counterclaimed because if Connexus can establish any liability on the part of Hypertouch to BSI with respect to these emails, Hypertouch would have a right to indemnification from Connexus because Connexus is solely responsible for the emails, and Hypertouch's role is strictly passive.

### 1.     Connexus' claims regarding Hypertouch and BSI are inaccurate, irrelevant to this motion, and disputed.

1.     Connexus' assertion that BSI and Hypertouch are "sham corporations" "set up" so that BSI and Hypertouch could initiate law suits on spam emails is not supported by the facts, is disputed, and has no relevance whatsoever to Connexus' motion concerning indemnity claims. Mot. at 4.  First, Hypertouch has been providing email and web site hosting services for customers since 1997, *five years* before the Maryland anti-spam laws were enacted and *seven years* before CAN-SPAM and California's current spam law.  J. Wagner Decl. ¶ 2; *see Hypertouch, Inc. v. Kennedy-Western Univ.*, No. C04-05203 SI, 2006 WL 648688, at *4 n.2

(N.D. Cal. Mar. 8, 2006) (rejecting argument that Hypertouch was a "professional plaintiff" that entered the ISP business for the purpose of bringing anti-spam lawsuits).  In addition to Hypertouch's ISP business, it has a significant focus on applications of haptic peripherals to aid persons with disabilities in the context of the Internet-mediated communication.  J. Wagner Decl. ¶ 3.  Working with customers in the Internet space where Hypertouch's haptic peripheral research would be applied is a prime motivation for why Hypertouch offers services as an ISP. *Id*.  In that regard, Joe Wagner has been awarded a patent in an exoskeleton hand-tracking device.  *Id*.

2.        Additionally, Hypertouch owns and operates mail servers, web servers, and DNS (Domain Name Service) servers that are connected to and accessed over the Internet.  *Id*. ¶ 4. Hypertouch currently has seven DNS, web, and mail servers in operation for customers, which are located in California and Maryland, with an additional 12 servers in reserve as backups.  *Id*. Hypertouch's mail servers have hosted at least 203 email accounts assigned to at least 111 subscribers.  *Id*. ¶ 7.  Of those 111 subscribers, 73 are non-family member/Hypertouch/BSI accounts.  *Id*.  In addition, Hypertouch's mail servers have served as secondary mail servers for a number of outside organizations.  *Id*.  Hypertouch is a small ISP and a small business providing Internet services to its customers.  *Id*. ¶ 2; *see Hypertouch, Inc.*, 2006 WL 648688, at *4.  As a consequence of being an ISP, Hypertouch receives a large amount of spam and is harmed as a result, including, *inter alia*, decreased server response and crashes, higher bandwidth utilization, and expensive hardware and software upgrades.  J. Wagner Decl. ¶ 20.

3.        Hypertouch is not a "litigation factory" as Connexus claims.  As a legitimate ISP, Hypertouch has provided the Internet services for the incubation of a number of start-up companies, which were able to prosper, continuing on through venture capital funding and, in

some cases, successful acquisition.  *Id.* ¶ 8.  Additionally, Hypertouch, Inc. has provided many people and their businesses with their first email address, their first website, their first Internet access – their first online participation in the information age.  *Id.* ¶ 9.  Some customers have paid Hypertouch, Inc. for its Internet services, but most have not.  *Id*. ¶ 11.  Like Gmail, Yahoo Mail and Hotmail, Hypertouch, Inc. does not provide these services as a profit center from net hosting fees.  Indeed, but for the burden imposed by spam, Hypertouch, Inc.'s hosting costs would be fully financed by its other outside consulting.  *Id.*[4]

4.     BSI was founded in 1996 as a small Internet Service Provider and computer consulting corporation.  P. Wagner Decl. ¶¶ 2, 22.  Like Hypertouch, BSI was founded well before the enactment of state or federal anti-spam legislation.  *Id.* ¶ 2.  Since its incorporation in 1996, BSI has engaged in the business of providing Internet-related services to the public.  *Id.* ¶¶ 2-22.  BSI provides multiple Internet-related services including, for example, email service.  *Id*. ¶ 3.  Currently, BSI receives approximately 1 million emails per day and delivers the legitimate emails to its customers.  *Id*. ¶ 25.  Besides email services, BSI also hosts web sites, DNS servers, streaming media services and e-commerce services, hosts the domains of its customers on its servers, and provides Internet-related technology consulting.  *Id.* ¶¶ 6-9, 11-15, 22; Ex. 1, P. Wagner Kraft Dep. at 24:22-28:14.  Because BSI, like Hypertouch, provides services, to customers, using its own equipment, BSI is both an "interactive computer service provider" ("ICSP") and an "electronic mail service provider" ("EMSP").  Md. Comm. Code § 14-3003(3); Cal. Bus. & Prof. Code § 17529.5(b)(1)(A)(ii).

---

[4] *See also Gordon v. Virtumundo, Inc*., 575 F.3d 1040, 1054, 1056 (9th Cir. 2009) (citing *Hypertouch*, 2006 WL 648688, noting holding "a provider of e-mail service alone [like Hypertouch], without any other services, qualifies" under CAN-SPAM; and stating Hypertouch has a sufficient "combination of operational or technical impairments" to constitute material harm and have standing).

5.      In addition to baselessly calling into question BSI's status as an ISP, Connexus

asserts that BSI is a "litigation factory," instituting at least 24 law suits against spammers.  Mot.

at 4.  Again, Connexus' statement is not supported, is disputed, and has no relevance whatsoever

to Connexus' motion concerning indemnity claims.  In reality, since the end of 2003, BSI has

filed only four suits against spammers, including the instant two actions (the *Kraft* and the

original *Connexus* action).  P. Wagner Decl. ¶ 32.  Further, Connexus continues to misleadingly

cite Mr. Wagner's testimony to suggest that the statement "all of BSI activity sort of relates to

litigation" should be construed as an admission of "illegitimacy."  Mot. at 4.  However, as Mr.

Wagner explains, "[s]ome weeks are extremely busy with doing this sort of stuff and other weeks

I'm doing consulting work or just trying to keep the service operational, updating

infrastructure…"  Ex. 2, P. Wagner C/H Dep. at 405:20-406:1.  "There is a lot of time spent

keeping servers running and restoring servers that have crashed.  And yeah, so addressing

problems as being apart from the lawsuits.  So I don't know, but it varies week by week."  *Id*. at

162:20-163:8.  P. Wagner Decl. ¶ 16 ("I work 80 to 100 hours most weeks, usually addressing

ISP-related tasks.").

## 2.      Connexus, not Hypertouch, is responsible for Connexus' spam.

6.      Connexus' assertion that Hypertouch is responsible for the spam emails received

by BSI is without merit.  Connexus' position is that it can send the false and deceptive spam, but

ISPs who transport it are liable for it, not Connexus.  BSI receives mail through several upstream

providers, including Hypertouch, to its multiple domains.  When Connexus' affiliates address an

email to "[address]@hypertouch.com," the routing information indicates the proper path to the

email's destination.  Just as emails to any entity might be sent from Google and then over

Comcast before delivery to that entity, all email destined for Hypertouch, Inc.'s servers,

including mail to domains it hosts such as OhCopyBoy.com or RehabRobotics.org, is routed first

to AT&T or Comcast, Hypertouch's two upstream providers, and then delivered to Hypertouch. J. Wagner Decl. ¶ 6.  In the case of hypertouch.com addresses, the route is also first to AT&T or Comcast, then to Hypertouch, Inc., which is the initial receipt point for BSI's hypertouch.com email.  *Id*.  Connexus has not sought indemnification from AT&T or Comcast.

7.     Incoming mail addressed to the hypertouch.com domain is filtered (as is all mail) and some is delivered by Hypertouch to users' accounts on its network, while the rest of the hypertouch.com mail continues on, automatically routed by standard routing tables as used in all servers, to BSI for filtering and delivery.  J. Wagner Decl. ¶ 26.  For other BSI-owned domains, such as castalia.net or BSI-hosted third-party domains such as colorvivofilms.com, those emails travel over other ISPs for delivery to BSI.  *Id.* ¶ 25.  This is how delivery of mail on the Internet works – like mail going through a series of post offices until it is hand delivered.  Klensin Decl. ¶¶ 15, 83, 84; Resnick Decl. ¶¶ 25-26.[5]

8.     Hypertouch and BSI have multiple independent reasons for automatically routing some mail through Hypertouch to BSI, including:  (1) BSI has infrastructure (software and hardware) better able to process and store 1 million emails per day (600,000 daily from Hypertouch); (2) to avoid losing emails when and if there may be errors in the routing tables; and (3) Hypertouch's users sometimes abandon addresses that get swamped by spam, but later learn that a legitimate email was sent to the abandoned address (Hypertouch then asks BSI to search for and retrieve such "false positives" and produces them to grateful clients); (4) BSI has always elected to configure its systems to receive all emails to the domains at which it receives any email as a matter of policy (to be able to create email addresses on the fly to give to vendors and others, to receive misaddressed but legitimate emails, etc.); and (5) to avail itself of

---

[5] Citations to the Klensin, Levine, Resnick and Shin declarations herein refer to the declarations attached to BSI's Opposition to Kraft's Motion for Summary Judgment.  [DE #309].  They are attached here as Exhibits 3, 4, 5 and 6 for the Court's convenience.

Hypertouch's more robust inbound MTA services and server monitoring.  P. Wagner Decl. ¶¶ 27-28, 39; J. Wagner Decl. ¶ 3.

9.      That Hypertouch's mail servers "accept all mail" (legitimate and spam email) does not make Hypertouch responsible for emails initiated by Connexus and does not indicate that Hypertouch and BSI are "litigation factories."  Hypertouch and BSI store all mail for various reasons, including for the security of their users and to prevent legitimate mail from being lost or bounced to a different ISP.  P. Wagner Decl. ¶¶ 26-27; J. Wagner Decl. ¶¶ 14-15.  Emails Connexus addressed and sent to BSI's domains were routed to BSI as they should have been and were received, filtered, processed and stored.  These functions are normal and proper.  Levine Decl. ¶¶ 19-20; Klensin Decl. ¶¶ 83-84.  Connexus' allegation that Hypertouch should block emails as opposed to receiving all emails is misplaced and disputed, as blocking is generally regarded as a bad idea for security reasons.[6]  Resnick Decl. ¶¶ 39, 49; Klensin Decl. ¶¶ 50, 51, 54; Levine Decl. ¶ 13.  Whether an ISP delivers spam to subscribers or sends the message back to its sender, the ISP faces essentially the same burden – it must determine what the message is and where it should be sent.  Resnick Decl. ¶ 40; Klensin Decl. ¶¶ 48, 51, 55.  In short, it is entirely appropriate, if not preferable, for an ISP to accept all email and not reject suspected spam in order not to lose legitimate email, bounce spam to other innocent parties, or provide spammers information as to what addresses are valid or invalid.  Klensin Decl. ¶¶ 50, 51, 54; Levine Decl. ¶¶ 13-16; Resnick Decl. ¶¶ 37-39.

10.     Connexus asserts that Hypertouch used "spam traps" to gather "as much [spam] email as possible" and then forwarded it on to BSI.  Mot. at 5.  This statement is blatantly false. With regard to use of alleged "spam traps," the legitimacy of tools such as opt-outs and wildcard

_____

[6] The Maryland statute expressly provides that an ISP "may block" and not be held liable for doing so, obviously meaning that an ISP may choose not to block.  Md. Comm. Code § 14-3002(d).

addresses, is discussed in detail in BSI's Opposition to Hydra and Connexus' Motion for

Summary Judgment.  *See* DE #295 at section III(¶¶ 9-13).  In any event, Connexus provides no

factual support that BSI or Hypertouch took any affirmative actions to attract spam or that any of

the emails at issue are the result of such actions.  *In fact, all of the emails at issue in this case are*

*unsolicited – neither BSI nor Hypertouch ever opted-in or signed up for a single email.*  P.

Wagner Decl. ¶¶ 28-29; J. Wagner Decl. ¶¶ 21-22.  BSI did not set up any accounts for the

purpose of receiving spam.  P. Wagner Decl. ¶ 29; Ex. 7, Resnick Dep. at 145:8-10 ("Q Have

you ever seen any evidence that BSI is using a spam trap in this case?  A No, I don't believe

so.").  Resnick Decl. ¶¶ 50-54.  Although this allegation is baseless, Connexus ignores the fact

that spam trapping is a common and acceptable industry practice used by, for example,

Microsoft.  Surely no one would contend that Microsoft's status as an "email service provider" is

negated because it uses spam traps – 130,000 of them in fact.[7]  The FTC relies upon Microsoft's

spam traps in its prosecution of spammers.[8]

       11.     Finally, Connexus accuses Paul Wagner/BSI of receiving and storing emails from

Hypertouch in order to sue upon them.  Mot. at 5-6.  Again, Connexus' allegation is unfounded

and untrue.  BSI stores all emails that it receives, whether they "come through" Hypertouch or

some other provider, such as Comcast or AT&T.  P. Wagner Decl. ¶ 26.  BSI retains emails for

various reasons, including:  (1) because it cannot distinguish in any reliable, automated way what

is spam versus what is a desired email; (2) "rejecting" emails signals to the sender that the

destination email address does not accept email, which allows persistent bulk emailers to

---

[7] "Microsoft maintains more than 130,000 MSN Hotmail 'trap' accounts to investigate patterns within spam."
http://www.microsoft.com/presspass/features/2005/oct05/10-27Zombie.mspx (Ex. 8).  As of Nov. 2008, Microsoft
has filed 92 spam lawsuits and "over 200 legal actions" against spammers.  *See*
http://download.microsoft.com/download/2/2/D/22DFC1E7-0260-4AF7-8B81-
D3D17ADA5A05/TwC_Elites_Support_for_CAN_SPAM_Nov08.docx

[8] *See, e.g.*, *FTC v. Kinion*, Case No. 05C 6737, n.6 (N.D. Ill.) (brief attached as Ex. 9).

determine which email addresses are accepted by process of elimination; and (3) "bouncing" along with a notice of undeliverability/undesirability to the purported sender of the email is ineffective at stopping spam or figuring out who is sending it.  Bouncing similarly alerts spammers to legitimate, high-priority addresses as opposed to bad ones so they target those valid addresses for even more spam.  *Id.* ¶¶ 26-27.  These are all legitimate and proper reasons for an ISP to store emails it receives on its servers.  *See supra* ¶ 9; Klensin Decl. ¶¶ 50, 51, 54; Levine Decl. ¶¶ 13-16; Resnick Decl. ¶¶ 37-39.

### 3. Connexus advertises and collaborates in the spam.

12.     Connexus claims that it is not liable for the emails at issue in this case because it did not "send" the emails and that it is not responsible for the emails' content.  Mot. at 6-8.  What Connexus would like the Court to believe is that it is free to promote, create, advertise in, sponsor, run an entire network of affiliates, and profit from spam emails without maintaining any responsibility for the emails' illegal content or the behavior of the spammers with which it contracts.  The fact is Connexus contracts with merchants to provide creative content of emails to affiliates and in many instances *is itself the merchant* through its NetBlue entity and eMarketPlace program.  *See infra* section III.  Connexus also aggressively markets itself as a creator of creative content on its website.  *See id.*  Connexus receives payment from the merchant when the customer takes the specified action on the merchant's website – be it a sale, providing a "lead," signing up for an offer, or something more.  Connexus works with clients to design the advertising in the emails, and then make the advertising available to its legion of "affiliates" through its password-protected websites.[9]  Connexus also pays its affiliate spammers when they

---

[9] Ex. 12, Son Dep. at 65:22-67:7; Ex. 13, Gadde Dep. at 21:5-22:13.

send emails resulting in sales or leads.[10]  All these practices make Connexus responsible for the illegal practices of its spammers and the illegal content of the emails on which its business relies. *See infra* section III.

13.    Connexus contracts with "spammers," whom it calls affiliates, to send emails.[11] The affiliates go into Connexus' websites and receive the advertising content, instructions and payout information.[12]  *See infra* section III.  They also receive Subject lines and From lines for use in the ads – content alleged to be false and deceptive, as well as tracking/sales links, and opt-out links.[13]  The affiliates then send the emails to lists of addresses generally several million names long.[14]  Connexus typically hosts the images on its servers, meaning that when the email is received and opened, the image the recipient sees – *i.e.*, the pictures in the advertising in the email – are downloaded by the recipient's computer directly from Connexus' servers.[15]  The emails contain tracking/sales links, which, when you click on them, direct and re-direct you across the Internet, through a series of servers – from the spammer's, to Connexus', and then to the advertiser's site.  The path to the advertiser's site necessarily includes a stop through Connexus' servers so that it can record, using encoded information in the tracking/sales links, which affiliate sent that email, which campaign the email is a part of, and which advertiser

---

[10] Ex. 10, Connexus' Resps. to Pl.'s First Set of Req. for Admission ("RFA") Nos. 3 & 4 (admitting Connexus' affiliates get paid for sending emails and Connexus contracts with advertisers in connection with commercial emails); Ex. 11, Connexus' Am. & Suppl. Resp. to Pl.'s First Set of Interrogs., Nos. 2 & 3 (identifying insertion orders as C00000399-723, C00012274-12436, C00012836-12849, C00012852-12855, C00012863-12866).

[11] Ex. 10, Connexus' Resps. to RFA Nos. 2, 25 (admitting Connexus' affiliates send commercial emails; "approved" Connexus "affiliates go into the Connexus Network and choose ad campaigns to send with regard to "campaigns approved for email distribution") Ex. 13, Gadde Dep. at 49:1-50:12.

[12] *Id.*; Ex. 14, Nugent Dep. at 43:13-45:4; Ex. 13, Gadde Dep. at 49:1-50:12.

[13] Ex. 13, Gadde Dep. at 21:5-22:13.

[14] For example, Connexus' affiliate MailCompanyX (against which this Court has entered a default in Case No. 09-00080 (PJM)) has over 300 *million* email addresses in its database.  Shin Decl. ¶ 12; Ex. 10, Connexus' Resps. to Pl.'s First Req. for Admissions No. 72.

[15] Ex. 13, Gadde Dep. at 49:3-10.

sponsored that campaign.  From there, the recipient is directed to the advertiser's site.  If he buys something or provides a lead or takes whatever action is required under the parties' contract, the advertiser's site fires a "pixel" – *i.e.*, sends a message back to Connexus telling it that the action was consummated, and noting the affiliate's ID and the campaign ID.[16]  With this information, Connexus knows how much it is owed from the advertiser for generating "x number" of leads at "$y" per lead, how much money it in turn owes the affiliate – and what Connexus' cut is.[17] Email advertising is virtually free to send, a fact that has led to abuses by spam purveyors who are indifferent to the complaints and costs spam generates because the abuses increase the number of mailboxes penetrated, and therefore profits.

14.     Connexus does not passively route emails, as it would have this Court believe. Connexus has a specialized, custom delivery platform called Partner Portal through which it provides creative material, ad copy and elements of the headers such as the Subject and From lines, tracking and analysis on the performance of the email campaigns, controls access to its advertising campaigns, controls suppression lists (and thus to an extent who receives the emails), and provides instructions to its affiliates.  *See infra* section III.  Connexus also controls access to its custom Partner Portal, thus controlling the affiliates that use it.  *See id.*  Most importantly, perhaps, Connexus profits from organizing the content of the emails and from contracting with spammers to send them.  *See id.*  As the initiators and purveyors of illegal spam emails, Connexus and its partners are liable for those spam emails.

15.     Connexus admits it created some of the email ads on its own behalf.  Mot. at 7 note 2.  Connexus then throughout its motion attempts to claim it is still entitled to summary

---

[16] Ex. 10, Connexus' Resps. to RFA No. 13.

[17] Ex. 10, Connexus' Resps. to RFA Nos. 5 & 6 (admitting Connexus assigns an identification number to each affiliate and advertiser); Ex. 13, Gadde Dep. at 43:19-46:7.

judgment on *certain* of the emails – but it never does the favor of identifying which emails it admits to creating and which it is seeking summary judgment on.  While this is quite telling of its faulty theory and why its motion fails generally, it is also untrue because Connexus is the party responsible for putting together the pieces of all the emails at issue and sending them, or providing those pieces to its affiliates.  *See supra* ¶¶ 12-14 & *infra* section III.

16.     Connexus provided the Subject and From lines in over 95% of the emails at issue. *See infra* section III.  BSI in its interrogatory responses to Connexus, identified 25,606 instances in the emails at issue of false, misleading, falsified, misrepresented and/or forged information in the From line, and 22,068 instances in the emails at issue of false or misleading Subject lines, for a total of 47,674 violations of the Maryland and/or California statutes in the 28,137 emails at issue.  (Ex. 20 is an excerpts from BSI's responses to Connexus Interrogatory No. 1).[18]

### B.     Argument

Connexus has failed to meet either its factual or legal burden:  (1) Hypertouch is not collaterally estopped from bringing its counterclaim; (2) Hypertouch has properly pled indemnification as a counterclaim; and (3) Hypertouch has alleged, and the evidence supports, an indemnification counterclaim.  Further, because Connexus' motion for summary judgment on Hypertouch's counterclaim must fail, Hypertouch's motion to strike Connexus' CDA defense to Hypertouch's counterclaims remains pertinent and must be granted because Connexus cannot qualify for CDA immunity as a matter of law.

---

[18] Multiple forms of violative From lines are at issue but counted here is only the "FRNb" (From name) violations asserted by BSI, and the "SUB" (Subject line) violations.  The complete version of BSI's responses to Connexus Interrogatory 1 are being provided to the Court electronically because of the voluminous size of the document.

**1.      Hypertouch would not be "collaterally" estopped from bringing its counterclaim because it is not a party to the underlying case and cannot be found to be liable in it.**

Connexus contends that Hypertouch's counterclaim will only accrue if Hypertouch was found to be primarily responsible in the underlying action, Mot. at 12, but Hypertouch is not a party to the underlying action and cannot be found "liable" in it.  If *Connexus* is not found liable to *BSI* in the underlying action, Connexus' third-party indemnification claim fails.  If *Connexus* is found liable to *BSI*, Connexus will have to establish in the third-party action that Hypertouch shares some of Connexus' liability to BSI, and in that inconceivable case, Hypertouch's counterclaim would be pertinent.

Connexus ignores the factual and legal realities which prevent its argument from succeeding.  For Hypertouch to be found liable, the fact finder would have to conclude that the emails at issue were illegal under the Maryland and California statutes.  However, because there is no dispute that Connexus, *not Hypertouch*, created and sent the emails, if the emails are illegal, it is *Connexus* that will be primarily responsible.[19]  Ex. 12, Son Dep. at 60:9-18, 65:23-66:07. *See Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 133 F. Supp. 2d 747, 772 (D. Md. 2001) (wrongdoer was primarily responsible when his actions "created th[e] situation in the first place"); *Glover v. Johns-Manville Corp.*, 525 F. Supp. 894, 906 (E.D. Va. 1979) (manufacturer's indemnification claim was precluded because it was actively negligent where it "created the hazard by developing and distributing products carrying a latent danger," thereby "set[ting] in motion" events which were the basis of the action).

Unlike Connexus, which is responsible for the creation and dissemination of millions of illegal spam emails, Hypertouch merely routinely routed the Connexus emails, along with

---

[19] Likewise, as discussed below, since, as an actual ISP, Hypertouch clearly qualifies for CDA immunity, there is no way Connexus would qualify for CDA immunity, and Hypertouch would not.  Thus, Connexus' immunity argument would fail to relieve it of liability, unless Hypertouch was also relieved of liability.

thousands of other emails (approximately 600,000 per day), as all ISPs do.  Emails to "hypertouch.com" email addresses use Hypertouch, Inc.'s California servers as its Mail Transfer Agent (MTA).  J. Wagner Decl. ¶ 13.  When Connexus' affiliates address an email to "[address]@hypertouch.com" – as it did with 27,247 emails in this case – the email is routed first to AT&T or Comcast, Hypertouch's two upstream providers, and then delivered to Hypertouch. *See supra* section II(A)(¶ 6).  Incoming mail addressed to that domain is filtered (as is all mail) and some is delivered by Hypertouch to users' accounts on its network, while the rest of the hypertouch.com mail continues on, automatically routed by standard routing tables (common to all servers) to BSI for filtering and delivery.  *Id*. ¶¶ 6-7.  For *other* BSI-owned domains, such as castalia.net or BSI-hosted third-party domains such as colorvivofilms.com, those emails travel over *other* ISPs for delivery to BSI, *id.* ¶ 7 – as was the case with 890 emails in this case.  Very telling of the meritless nature of Connexus' third-party claim, is the fact that Connexus does not seek indemnification from AT&T, Comcast, or BSI's upstream providers for their having relayed Connexus' spam to BSI.

Thus, if the emails are illegal, it will be Connexus who is responsible.  On the other hand, if the emails are found to be legal, neither Connexus nor Hypertouch will have any liability.  It makes absolutely no sense that the emails would be found to be illegal, yet Connexus, as the originator and sender of the emails, would escape liability, while a mere mailman would bear full (or any) responsibility.

This web of blame exposes the absurdity of Connexus' third-party claims.  Connexus claims in support of its indemnification claim that "[b]ut for the actions of Joe Wagner/Hypertouch in sending or causing to be sent the Hypertouch Emails, Beyond Systems would not have received the Hypertouch Emails, would have no claim under the Maryland or

California statutes, and would not have suffered any of its alleged damages claimed in its lawsuit as to the Hypertouch Emails."  DE #74, Connexus/Hydra Third Party Compl. at ¶ 25.  This argument defies logic, when it goes without saying that *but for Connexus' creation of the emails*, neither Hypertouch nor anyone else, could have been harmed by them.

Further, while Connexus is quick to blame Hypertouch, it stops short of blaming others similarly situated.  Connexus does not bring a counterclaim against AT&T or Comcast, ISPs that first delivered the emails at issue to Hypertouch, or, very tellingly, against Connexus' own affiliates such as MailCompanyX and Barale, to which thousands of emails at issue are attributable.[20]  Under Connexus' theory, if Hypertouch is liable, every ISP or affiliate that served as a link in the delivery of the emails is responsible.  However, suing AT&T or Comcast or MailCompanyX does not fit with Connexus' litigation strategy of harassing the Wagners (and indeed, Connexus must be aware that ISPs are not liable under the Maryland and California statutes).

Connexus will always be the first and strongest link in the chain of responsibility.  Thus, Connexus, will always be primarily liable, and Hypertouch's counterclaims will not be collaterally estopped.  However, if the Court were to somehow determine that despite Connexus sending the emails, Hypertouch is liable to BSI, then Hypertouch's counterclaim for indemnification against Connexus for the emails would stand.[21]

>           **2.       Hypertouch has properly asserted a counterclaim for indemnification.**

Connexus argues that because Hypertouch's counterclaim for indemnification is defensive in nature it is really a mistakenly designated affirmative defense.  Mot. at 8-9.

---

[20] *See also* Ex. 6 (Shin Decl. ¶¶ 16-29).

[21] To avoid further expending resources unnecessarily on this absurd finger pointing, Hypertouch is moving concurrently to bifurcate all third-party claims and stay discovery pending resolution of the underlying action, under Fed. R. Civ. P. 42(b).

Connexus does not cite any controlling authority on this point for the simple reason that the law clearly indicates that counterclaims for contribution and indemnification, which are by their very nature defensive, are proper.  Mot. at 9 (citing Districts of Connecticut and Colorado cases); *Logan v. JKV Real Estate Servs.*, 414 F.3d 507, 517 (4th Cir. 2005) (applying Maryland law, allowing counterclaim for contribution); *Gross v. Weingarten*, 217 F.3d 208, 225 (4th Cir. 2000) (reversing dismissal of indemnification and contribution counterclaims); *see also Index Fund, Inc. v. Hagopian*, 91 F.R.D. 599, 605 (S.D.N.Y. 1981) ("Indeed, the recent trend has been to permit counterclaims for contribution and, by implication, for indemnification, under Rule 13(a), in order to facilitate the litigation of all of the claims arising from the same occurrences in the same lawsuit.").  Thus, even though Hypertouch's indemnification counterclaim is defensive and seeks to "diminish or nullify" Hypertouch's damages, it is a properly pleaded counterclaim under applicable law.

Connexus relies heavily on a District of Colorado case which held that recoupment could not be pled as a counterclaim because it was "purely defensive."  Mot. at 9 (citing *MidAmerican Commc'ns Corp. v. U.S. W. Commc'ns, Inc.*, 857 F. Supp. 772, 773-74 (D. Colo. 1994)). However, Connexus' argument hits a brick wall:  in the Fourth Circuit, such defensive claims are properly brought as counterclaims.  *Vaughan v. Recall Total Info. Mgmt.*, 217 Fed. Appx. 211, 223 (4th Cir. 2007) ("Under Rule 13 of the Federal Rules of Civil Procedure, a counterclaim now encompasses both set-off and recoupment.") (internal citations omitted); *Md. Port Admin. v. SS Am. Legend*, 453 F. Supp. 584, 590 (D. Md. 1978) (recognizing as valid, "counterclaim asserted defensively in recoupment, for the purpose of defeating or diminishing a state's recovery"); *Holloway v. Chrysler Credit Corp.*, 246 A.2d 265, 266 (Md. 1968) ("[A]ny party against whom a claim has been asserted [can] plead as a counterclaim any claim he has against any opposing

party. . . .   Although the words "recoupment" and "set-off" are not used, the Rule is broad

enough to cover both").

Further, as the cases cited by Connexus show, mislabeling a defense (which is not an

issue here) is not a basis for summary judgment anyway.  Mot. at 8-9.  Rather, Fed. R. Civ. P.

8(c)(2) requires that the Court treat the pleading as though it were correctly designated.  Fed. R.

Civ. P. 8(c)(2) ("If a party mistakenly designates a defense as a counterclaim, or a counterclaim

as a defense, the court must, if justice requires, treat the pleading as though it were correctly

designated. . . ."); *see Reiter v. Cooper*, 507 U.S. 258, 263 (1993) ("[I]t makes no difference that

petitioners may have mistakenly designated their counterclaims as defenses, since Federal Rule

of Civil Procedure 8(c) provides that 'the court on terms, if justice so requires, shall treat the

pleading as if there had been a proper designation.'"); *MidAmerican Commc'ns, Corp.*, 857 F.

Supp. at 774 (re-designating as defense rather than dismissing counterclaim).  However, again,

none of that matters because in the Fourth Circuit, as elsewhere, indemnification clearly can be

asserted as a counterclaim.

### 3.     Hypertouch alleges and proves all elements of indemnification.

Connexus argues that Hypertouch's indemnification claim fails because Hypertouch has

not alleged that Connexus is primarily liable to BSI.  Mot. at 11.  Rather, Connexus' straw-

grasping, form-over-substance argument fails because there is no such requirement and

Hypertouch did plead Connexus is liable in any event.

Claims for relief need only contain "a short and plain statement of the claim showing that

the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Indeed, Rule 7 defines the pleadings a

court may examine to determine whether a plaintiff has stated a claim; these include, but are not

limited to, complaints, answers and answers designated as counterclaims.  Fed. R. Civ. P. 7(a).

As such, courts look to allegations in the aggregate to determine whether a party has stated a

claim.  *See e.g.*, *Estate of Powell v. United States*, 166 F. Supp. 2d 468, 478 (W.D. Va. 2001) (finding party's "amended answer and counterclaim contain allegations from which it is possible to infer" the elements of a cause of action) (internal citations omitted); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1326 (3d ed. 2004) (stating it would be "reasonable" "to allow a district court to consider prior statements not expressly incorporated in determining whether a claim for relief is stated, particularly when the nature of the material suggests that is what was intended.").  Here, there can be absolutely no doubt Hypertouch provided a clear statement of its entitlement to relief and no doubt that Connexus understands the nature of the claims against it since they mirror the very claims Connexus asserts.

Second, Hypertouch *has* alleged that Connexus is actively negligent and primarily responsible.  DE #241 at Affirmative Defenses ¶ 14 ("Any and all violations and/or damages alleged by Third-Party Plaintiffs were caused by the conduct of persons or entities with regard to whom Third-Party Plaintiffs are legally responsible, and/or by the conduct of persons or entities with regard to whom Third-Party Defendants are not legally responsible, and not by any alleged conduct on the part of Third-Party Defendants."); *see also* DE #82 at 18 (discussing Connexus and Hydra's active negligence and primary responsibility).  Hypertouch's factual allegations in its counterclaim and in its prior pleadings give far more than adequate notice of the acts alleged and the basis for Connexus' liability.  Hypertouch's allegations in its counterclaim are consistent with the "short and plain statement" required by the federal rules, and no further notice is required.  *See, e.g.*, *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992) (stating complaints are to be construed liberally; the court "should ask whether relief is possible under any set of facts that could be established consistent with the allegations.").  "The liberal concepts of notice pleading embodied in the Federal Rules do not require the pleading of legal theories."

*Hanson v. Hoffman*, 628 F.2d 42, 53 (D.C. Cir. 1980); *see also Shah v. Inter-Continental Hotel Chicago Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002) (holding that plaintiffs are not required to identify the federal or state law in a complaint, which may be discovered by interrogatories *or through briefing*).  This approach is consistent with the purpose of the complaint under a notice pleading system, which is "to advise the other party of the event being sued upon. . ."  5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1202 (3d ed. 2004).[22]  Given these principles of procedure, Hypertouch's counterclaim adequately states a claim for indemnification.  Connexus' argument that simply because Hypertouch's pleading did not restate allegations found in its Answer (in the same document as its counterclaim) is wrong as a matter of law and contrary to the spirit of the Federal Rules.

Moreover, Connexus fails to recognize the difference between the motion to dismiss and motion for summary judgment standards.  In ruling on a motion for summary judgment, the Court is not limited to the pleadings, but must also consider "the discovery and disclosure materials on file, and any affidavits."  Fed. R. Civ. P. 56(c)(2); *see*, *e.g.*, *Utica Mut. Ins. v. Way of the Cross Church of Christ, Inc.*, 219 F. Supp. 2d 663, 667 (D. Md. 2002) (in ruling on motion for summary judgment on indemnity claim, court considered depositions and declarations).[23] Regardless of what Hypertouch has or has not pleaded in its counterclaim, it has presented sufficient evidence to show that Connexus is primarily liable to BSI, including herein.  For instance, Connexus' (formerly Vendare) own employees admitted in deposition to creating Subject lines and From lines in the emails, as well as suggesting creative content and ad copy

---

[22] Moreover, "specifying an incorrect theory is not fatal." *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992); *see also* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1219 (3d ed. 2004).

[23] Two of the cases upon which Defendant relies are inapposite as they concern motions to dismiss, which apply a different standard. *See Pyramid Condo. Ass'n v. Morgan*, 606 F. Supp. 592 (D. Md. 1985); *S. Md. Oil Co. v. Tex. Co.*, 203 F. Supp. 449 (D. Md. 1962).

content in the emails it provided to its affiliate network.  Ex. 12, Son Dep. at 60:9-18, 65:23-

66:07; *see also infra* section III.  In fact, one of Connexus' divisions, eMarketMakers, created its

own creatives and ad copy content and provided it to publishers.  *Id.* at 105:24-107:7; *see also*

*infra* section III.

Connexus also argues that Hypertouch's indemnity claim fails because Hypertouch has

not alleged that it is secondarily liable.  Mot. at 11.  This is not a necessary allegation, as

Connexus would surely agree.  Hypertouch, like Connexus in its indemnity claim, denied

liability, and then alleged that if liability is found, it is entitled to indemnification.  Neither

Connexus nor Hypertouch alleged that they are secondarily liable, as such an allegation is

unnecessary.  *Compare* DE #74 at ¶ 26 ("Neither Connexus nor Hydra sent or caused to be sent

to Beyond Systems the Hypertouch Emails, and they are not liable to Beyond Systems under any

legal theory alleged against them as to the Hypertouch emails") *with* DE #241 at Counterclaim ¶

3 ("Third-Party Defendants have answered, denying any violation of California Business &

Professions Code § 17529.5 or Maryland Commercial Law Code § 14-3002; any liability to

Beyond Systems for violation of these statutes; or any liability to Connexus or Hydra for

Indemnity or Contribution."); *compare* DE #74 at ¶ 27 ("To the extent that Connexus and Hydra

may be found liable for any cause of action sounding in tort as to the Hypertouch Emails,

Connexus and Hydra are entitled to indemnification from Joe Wagner and Hypertouch under

Maryland law and/or such other common law principles as the Court may find applicable.") *with*

DE #241 at Counterclaim ¶ 4 ("To the extent that Third-Party Defendants are found liable for

any cause of action as to the C/H Emails, Hypertouch and Wagner are entitled to indemnification

from Connexus and Hydra under Maryland law and/or such other common law principles as the

Court may find applicable.").  An allegation of secondary liability is not required to sustain an indemnification claim, but could be made out from the pleadings in any event.

Hypertouch's pleadings and the evidence easily satisfy the elements of indemnification under Maryland law.  The Maryland Court of Appeals has characterized the right to indemnity as "[a] person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability."  *Pulte Home Corp. v. Parex, Inc.*, 942 A.2d 722, 731 (Md. 2008) (quoting Restatement of Restitution, § 96); *Marroquin v. Canales*, 505 F. Supp. 2d 283, 300 (D. Md. 2007) ("Indemnification at law is appropriate when one party's role is so passive or secondary that it would be inequitable to require that party to sustain any of the burden of judgment.").  As discussed above, the evidence shows that Connexus created, advertised in and sponsored emails addressed to BSI – a role anything but "passive or secondary."  Hypertouch's role, on the other hand, was analogous to a mailman delivering mail – Hypertouch had no responsibility for the content inside the envelope nor did it alter the content, it just delivered it, as it neutrally does for all mail it handles.  For these reasons, Connexus' motion for summary judgment on Hypertouch's counterclaim fails.

## III.   HYPERTOUCH'S MOTION TO STRIKE IS NOT MOOT, AND SHOULD BE GRANTED BECAUSE CONNEXUS DOES NOT QUALIFY FOR CDA IMMUNITY.

Hypertouch's Motion to Strike is not moot since, as discussed above, Connexus' Motion for Summary Judgment must be denied.  Just as Connexus' third-party claims against Hypertouch are baseless, so is Connexus' assertion of immunity under § 230 of the Communications Decency Act.  Connexus tries to skirt not raising CDA as a defense except to

the third-party counterclaim.[24]   Mot. at 13 note 4.  But, the transparent reason why it did not

dawn on Connexus to raise it is because there is no support – and Connexus cites none – for

finding a company in Connexus' position immune for its spam.  Connexus simply does not meet

the requirements of CDA immunity because it is not an interactive computer service and is an

information content provider with respect to the emails at issue.[25]

First, BSI has alleged that Connexus provided 25,606 false or deceptive From lines, and

22,068 false or misleading Subject lines – *illegal content covering 26,853 of the 28,137 emails at*

*issue, or over 95%.*  So, putting aside Connexus' role as an information content provider (and

thus entity ineligible for CDA immunity) arising from its active creation, collaboration and

sponsorship of the emails as discussed below, Connexus directly contributed illegal content in

most every case.  In addition, Connexus admits it created some number of the email ads for its

own advertising purposes, and as a result would have no immunity.  Mot. at 7 note 2.

Nonetheless, Connexus argues it can still assert CDA immunity with respect to certain

emails, citing *Carafano v. Metrosplash.com*, 339 F.3d 1119, 1123 (9th Cir. 2003) and *Anthony v.*

*Yahoo, Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006).  Mot. at 7 note 2, 16.  However, those

cases and others show that it is plaintiff's factual allegations which control which content is "at

issue" for purposes of CDA immunity.  *See Carafano*, 339 F.3d at 1125 (content "at issue,"

plaintiff's personal information, was what plaintiff alleged); *Anthony*, 421 F. Supp. 2d at 1263

("The critical issue is whether eBay acted as an information content provider with respect to the

---

[24] Connexus did not assert this defense as to BSI's underlying action, but rather asserted it only after Hypertouch asserted it.

[25] Further, as an actual ISP, Hypertouch obviously more readily satisfies the requirements for CDA immunity.  Thus, if the Court finds that Connexus is immune, it must also find that Hypertouch is immune, in which case, none of the third-party claims would survive.  This circular finger pointing illustrates Connexus' tactics to distract the Court from the real issues.

information that *appellants* claim is false or misleading") (emphasis added).[26]  In its claim for

indemnification, Hypertouch has alleged that Connexus is liable based on its contribution to *all*

of the emails at issue in the litigation arising from its direct contribution or active involvement.

*See* DE #241 at ¶ 14, Counterclaim ¶ 4.  Because this comes to the Court through Connexus'

motion for summary judgment, the Court must make all inferences in Hypertouch's favor.

Second, Connexus argues that it engaged in a "publisher's traditional editorial functions"

with respect to the content of the emails.  Mot. at 17.  However, the evidence clearly shows that

Connexus was far more involved in the creation, collaboration and sponsorship of the emails.[27]

*See MCW v. Badbusinessbureau.com*, No. 3:02-CV-2727-G, 2004 U.S. Dist. LEXIS 6678, at

*23-24 (N.D. Tex. Apr. 19, 2004) (denying CDA immunity where defendant "actively

encourage[d], instruct[ed], and participate[d]" in content).  Unlike the interactive computer

service providers in the cases cited by Connexus, Connexus actively participated and encouraged

the illegal activity at issue by itself advertising in the emails[28]; controlling who could send the

emails[29]; providing content,[30] instructions on sending,[31] payout information,[32] suppression lists[33]

---

[26] *See also Doe v. SexSearch*, 502 F. Supp. 2d 719, 725 (D. Ohio 2007) (the CDA "only grants immunity when *the information that forms the basis for the state law claim* has been provided by 'another information content provider.'") (emphasis added); *Gentry v. Ebay, Inc.*, 121 Cal. Rptr. 2d 703, 717 n.11 (Cal. Ct. App. 2002) (issue was whether defendant "create[d] or develop[ed] the content for which *appellants seek to hold it liable*") (emphasis added).

[27] *E.g.*, Ex. 12, Son Dep. at 60:9-18 (Connexus, formerly Vendare, often collaborated with advertisers on creative content); 65:23-66:07 (Vendare provided subject lines and from lines for emails its publishers mailed); and 105:24-107:7 (eMarketMakers created creative content and ad copy for its own promotions, which it provided to publishers who emailed eMarketMakers' promotions).

[28] *See infra* pp. 28-30.

[29] *See, e.g.*, Ex. 15, Owen Dep. at 38:13-24; *supra* note 11.

[30] *See, e.g.*, Ex. 15, Owen Dep. at 39:8-23, 141:25-142:23; Ex. 13, Gadde Dep. at 21:5-22:13,

[31] *See, e.g.*, Ex. 15, Owen Dep. at 37:7-38:24. .

[32] *See, e.g.,* Ex. 12, Son Dep. at 161:20-162:17.

[33] *See, e.g.,* Ex. 13, Gadde Dep. at 95:15-96:15.

– which allowed it to control, in part, who the emails were sent to; tracking the emails and the

campaign's performance[34]; and distributing the money after taking its cut.[35]

Connexus' neck-deep involvement in the business of creating, promoting and sending

spam is readily gleaned from its own website.[36]  As part of its spamming business, Connexus

clearly states that it creates content for its customers:

- "[O]ur in-house marketing and design team **can develop custom creatives tailored to your target audience** to enhance volume and performance."[37]

- "Our proprietary, self-service publisher management platform enables you to easily select, implement, and track the offers that best fit your needs. **Or, you can let us do the work! Our proprietary ad server features advanced targeting capabilities to match the right ad from the best campaigns to deliver the highest yields on your inventory…. [L]et us create a custom profile that matches your users**."[38]

- "Let our team of marketing experts work for you! Since Traffic Marketplace owns and operates nearly 100 of our own sites, **we know what it's like to produce online creatives that engage consumers and design compelling user experiences that drive results**. **And since we control these sites, we can produce custom programs unlike any other network**."[39]

In fact, Connexus *has the creatives for the emails at issue in its files*.  BSI matched the content of

the emails at issue to the creatives provided by Connexus and found that 24,585 of the 28,137

emails contain images that match images from Connexus' files by name, and that 5,641 of the

6,423 MailCompanyX emails sent through Connexus for Kraft match the HTML creatives

---

[34] *See, e.g.*, *infra* pp. 28-29.

[35] *See, e.g.*, *supra* note 10.

[36] Traffic Marketplace is a business unit of Connexus; thus, the Traffic Marketplace links below are part of Connexus' business.  *See* http://connexuscorp.com/solutions html ("Connexus is comprised of two business units, Traffic Marketplace and FirstLook.").

[37]  *See* http://www.trafficmarketplace.com/advertisers_what/leadgeneration_page html (emphasis added).

[38] *See* http://www.trafficmarketplace.com/publishers/systemandtech_page html (emphasis added).

[39] *See* http://www.trafficmarketplace.com/advertisers_what/custommarketing_page.html (emphasis added).

produced by Connexus promoting Gevalia.[40]  P. Wagner Decl. ¶ 34.  Thus, Connexus

aggressively markets itself as a creator of information content, continues to control that content

in its files, and admits to creating content in the emails at issue.  Mot. at 7 note 2.  It should not

now be able to claim that it has immunity for its involvement.

As is indicated in its marketing, Connexus' level of involvement in encouraging and

supporting the illegal activity goes far beyond serving as an "intermediar[y] for other parties'

potentially injurious messages."  *See Blumenthal v. Drudge*, 992 F. Supp. 44, 51 (D.D.C. 1998).

Rather, Connexus was heavily involved in every step of the process and in working with its

affiliates.  Ex. 16, Agadjanian Dep. at 29:2-18 ("It's a lot of handholding and making sure they

are, you know, running the offers that we thought were appropriate and the offers that we

thought would convert well for them as well as for us.").  In fact, Connexus proactively pitches

the campaigns to its affiliates to push new advertising through its account representatives and

through the Partner Portal website.  Ex. 15, Owen Dep. 86:12-87:10; Ex. 16, Agadjanian Dep. at

29:2-18 ("You know, we had obviously quite a few affiliates.  We made sure we stayed in touch

with them on a regular basis.  We would contact them, follow up with them.  If they ran any

offers for us, we would follow up to make sure it performed for them as well as for us.  *If we had

new offers that we had brought in, we communicated to them if we thought that it would be a

good fit for them.  You know, it's not just a you sit back and you let the affiliates do what they

want to do*.").

Once the affiliate enters Partner Portal, he is presented with numerous ad campaigns as

well as restrictions, guidelines, payouts, campaign information and the goal of the campaign.

Ex. 15, Owen Dep. 37:7-40:6; 39:8-23; 86:12-88:19; 115:2-16 ("They make – they can view

---

[40] Connexus has still not produced all the images as ordered by this Court in July 2009.  [DE #190].  The images still missing are identified in paragraph 35 of Paul Wagner's declaration.

campaigns that are available for them to advertise or run.  We post it.  It's like a listing system. . .
[w]e just list all the different advertisements that we have from our advertisers.  *And we list
restrictions, guidelines, you know, the payout, the, you know, campaign itself, what's the goal of
the campaign.  Looks basically just like a list, like a – kind of like a Chinese menu of just
campaigns that they can pick up from*.").

In addition to pitching to its affiliates, Connexus also provides feedback and analysis on
advertisers' creatives and makes suggestions regarding what campaigns might perform better.
Ex. 15, Owen 44:3-46:9 ("we analyze everything"); Ex. 16, Agadjanian Dep. 30:7-32:9.
Connexus provides feedback on the specific creatives as well.  Ex. 15, Owen Dep. 44:3-46:9;
88:14-19; 109:20-110:9 ██████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████; *see Fair Hous. Council v.
Roommates.com, LLC*, 521 F.3d 1157, 1166-67 (9th Cir. 2008) (holding no CDA immunity for
defendant who took part in developing illegal content by "collaborative effort" with users).

As part of this analytical recommendation process, when affiliates report poorly
performing campaigns, Connexus recommends improved Subject and From lines.  *Id.* at 141:25-
142:23.  *See Roommates*, 521 F.3d at 1163 ("Congress sought to immunize the removal of user-
generated content, not the *creation* of content") (citing H.R. Rep. No. 104-458 (1996) (Conf.
Rep.)).  And these Subject and From lines are in many instances one of the false and deceptive

facets of the emails at issue.  *See supra* section II(A)(¶ 16).  This level of involvement far exceeds the traditional passive publisher's role.

In addition to the above, Connexus is heavily involved in the advertising in so far as it receives complaints from advertisers, ISPs, and from its third-party monitoring service LashBack, which provides reports of violations of anti-spam statutes.  For example, from March 31, 2008, through September 16, 2008, LashBack reported to Connexus, *a total of 3,250 reported possible violations of federal law*, including:  1,699 reports of "Suppression List Abuse," 1,081 reports of "Failure to Unsubscribe," 140 reports of "No Postal Address," 59 reports of "Bad Unsubscribe," 24 reports of "Deceptive Subject Lines," and 247 reports of "Deceptive From Lines."[41]  Connexus purports to conduct compliance, something the traditional publisher has no role in.  Yet, Connexus continues to use the same spammers and send the same campaigns to the same addresses.

Further, Connexus approves the publishers in its network, thus controlling who sends its ad campaigns from its custom Partner Portal.  Ex. 15, Owen Dep. 38:13-24; *e.g.*, Ex. 18, C00002680-82.[42]  This again goes beyond a publisher's passive role and shows that Connexus is actively involved in each step in the process of creating the illegal emails at issue.

The bottom line is that Connexus provided content to its affiliates, hosted images, tracked, controlled and advertised in the emails at issue.  An excerpt from Connexus' campaign database showing the information associated with one of the campaigns received by BSI is illustrative:

---

[41] Ex. 17, C00002815-C0002882.

[42] (Connexus Account Manager: "I was hoping you could approve this publisher as the [sic] are unable to lift the private in the registry but…I can assure you that they are…legit."  Connexus Compliance: "While I know it's not that hard for them to sign in their account and release that information I need to follow SOP's.  I am going to approve according to you…that they are legit.").





[*Note that the HTML creative continues on.  See* Ex. 19, Excerpt of C12897.txt].

As shown in the excerpt from Connexus' campaign database for its campaign enticing people

with allegedly "free" offers to ███████████████████████████████████



---

[43] Netblue is a Connexus entity.

[44] EmarketPanel is Connexus' internal advertising program that it distributes through its own eMarketMakers affiliate network.  Ex. 16, Agadjanian Dep. 78:3-80:11; Ex. 12, Son. Dep. 101:10-19; 119:3-9.



This is yet another illustration making clear that Connexus' involvement in the emails goes far

beyond the traditional publisher's role.  Therefore, its CDA immunity defense fails as a matter of

law.[45]

## IV.    CONCLUSION

For the foregoing reasons, Connexus' Motion for Summary Judgment on Hypertouch's

Counterclaim should be denied, and Hypertouch's Motion to Strike should be granted.


Respectfully Submitted,


_____/s/_____
Thomas M. Barba (US DC-MD Bar No. 28487)
John J. Duffy (US DC-MD Bar No. 28613)
Jennie L. Kneedler (US DC-MD Bar No. 28617)
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C.  20036
T: 202-429-3000
F: 202-429-3902
tbarba@steptoe.com
jduffy@steptoe.com
jkneedler@steptoe.com

Anthony A. Onorato (US DC-MD Bar No. 28622)
STEPTOE & JOHNSON LLP

---

[45] Moreover, when the Court considers Congress' intent in enacting § 230 of the CDA, it is clear that denying immunity to and imposing liability on entities like Connexus that promote spam for profit is consistent with the CDA goals of promoting the continued development of the Internet and encouraging interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material.  47 U.S.C. § 230(b)(1), (4); *see also* 141 Cong. Rec. H8469-70 (statements of Reps. Cox, Wyden, and Barton); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *Blumenthal*, 992 F. Supp. at 52; *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003).  Rather than promote the development of the Internet, Connexus impedes the development of the Internet by imposing costs on ISPs that are ultimately passed on to the users of the Internet, requiring businesses to expend resources on filtering unsolicited email, and generally creating a nuisance with its unwanted, misleading, illegal emails that so many Internet users find offensive.

750 Seventh Ave.
New York, NY  10019
T: 212-506-3900
F: 212-506-3950
tonorato@steptoe.com

*Counsel for Third-Party Defendants James Joseph*
*Wagner and Hypertouch, Inc.*

Date:  March 18, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March, 2010, the foregoing *Third-Party*

*Defendants' (1) Opposition to Third-Party Plaintiff Connexus' Cross-Motion for Summary*

*Judgment; and (2) Reply to Connexus' Opposition to Third-Party Defendants' Motion to Strike*

*and For a More Definite Statement* was filed electronically via the Court's CM/ECF system, and

served electronically on the below-named parties via the Court's electronic notification system:


Barry J. Reingold (USDC-MD Bar No. 06490)
John M. Devaney (*Pro Hac Vice*)
John K. Roche (*Pro Hac Vice*)
PERKINS COIE LLP
607 14th Street NW, Suite 800
Washington DC 20005-2003
202-434-1613 (Telephone)
202-434-1690 (Facsimile)
jroche@perkinscoie.com
breingold@perkinscoie.com
jdevaney@perkinscoie.com

Darrell J. Graham
Law Offices of Darrell J. Graham, LLC
53 W. Jackson Boulevard
Suite 1334
Chicago, IL 60604

*Counsel for Defendants Kraft Foods Inc., Kraft*
*Foods Global and Vict. Th. Engwall & Co.*

J. Douglas Baldridge
Lisa Jose Fales
Ari N. Rothman
VENABLE LLP
575 7th Street NW
Washington, DC  20004
(202) 344-4000 (Telephone)
(202) 344-8300 (Facsimile)
jbaldridge @venable.com
ljfales@venable.com
anrothman@venable.com

*Counsel for Defendant and Third-Party*
*Plaintiff Connexus Corp.*


_____
Thomas M. Barba