UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BEYOND SYSTEMS, INC.

    Plaintiff,

    v.

KRAFT FOODS INC., *et al.*

    Defendants.

Case No.: 8:08-cv-00409-PJM

REDACTED VERSION

KRAFT DEFENDANTS'
REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  BSI LACKS STANDING.......................................................................................... 2

   A.   BSI Does Not Meet The Standing Requirements Of The CAN-SPAM Act. ..................... 2

   B.   The Uncontroverted Facts Establish That BSI Is Not A Bona Fide ISP That Has Suffered Harm From The Gevalia Email Messages. ................................................................. 4

III. BSI's Contention That It Can Bring Multiple Claims On The Same Email Is Contrary To The Law And Leads To Absurd Results. ....................................................................... 8

IV.  THE SETTLEMENT AGREEMENT BARS ALL CLAIMS. ........................................... 13

   A.   The Settlement Agreement Bars ████████████████████████
   ████████████.................................................................... 13

   B.   BSI And Hypertouch Are A Single Enterprise Under Both California And Maryland Law. ........................................................................................................... 16

V.   BSI HAS FAILED TO PROVIDE EVIDENCE OF FRAUD. ........................................... 20

   A.   BSI Does Not Even Attempt To Prove Reliance Or Harm Based On Reliance. .............. 21

   B.   BSI Cannot Prove A Material Misrepresentation. ...................................................... 21

   C.   BSI Cannot Prove That it Suffered Harm. ............................................................... 24

VI.  CONCLUSION....................................................................................................... 25

## I.    INTRODUCTION

Defendants Kraft Food, Inc., Kraft Foods Global Inc., and Vict. Th. Engwall & Co., Inc. ("Kraft") submit this reply in support of their motion for summary judgment relating to all of plaintiff's claims.  The response brief of Beyond Systems, Inc. ("BSI") confirms that there are multiple, independent reasons why the Court should grant Kraft's motion.

First, in response to Kraft's demonstration that BSI is not a bona fide ISP and thus lacks standing to bring its claims, BSI asserts that the standing requirements of the federal CAN-SPAM Act do not apply to its state law claims.  However, basic principles of federal preemption establish that just as with plaintiffs under the CAN-SPAM Act, ISPs bringing claims under state spam statutes must demonstrate that they are legitimate ISPs and are not primarily in the business of bringing spam lawsuits to collect statutory damages.  As an ISP that ███████, BSI cannot make this showing.  BSI's lack of standing also is demonstrated by its argument that mere receipt of unsolicited commercial email ("UCE") gives rise to actionable harm.  This argument, which reveals an absence of any true harm, has been rejected by courts interpreting the CAN-SPAM Act, as described below.

Second, BSI is unable to contest that it affirmatively solicited the vast majority of the UCE on which it is suing, per an agreement between Paul Wagner and his brother, Joseph Wagner.  Nowhere in its brief does BSI cite any authority for the proposition that a party can sue upon and claim damages relating to emails that it solicited and, indeed, no such authority exists.  Nor is BSI able to contest that nearly 7,000 of the emails upon which it is suing are the very same emails that were the subject of Joseph Wagner's and Hypertouch's prior suit against Kraft.  BSI fails to cite any authority that supports bringing multiple statutory claims on the same emails, and, again, there is no authority for that proposition.  Relatedly, BSI cannot dispute that

its operations are closely intermingled with those of Hypertouch, making the two entities sister

corporations.  As such, BSI is bound by the settlement agreement between Kraft and BSI, ██████

██████████

Finally, BSI is wrong in arguing that it is not required to meet the elements of common

law fraud.  That issue was settled by the Fourth Circuit in *Omega World Travel, Inc. v.

Mummagraphics,* 469 F.3d 348, 352-56 (4th Cir. 2006).  As demonstrated in Kraft's opening

brief and below, BSI has no proof of a material misrepresentation, justifiable reliance, or

actionable harm.  It thus cannot demonstrate fraud, and its claims fail as a matter of law.

## II.  BSI LACKS STANDING.

### A.  BSI Does Not Meet The Standing Requirements Of The CAN-SPAM Act.

A principal premise of BSI's Response is that the standing requirements in the federal

CAN-SPAM Act do not apply to its claims under state law.  However, this contention fails to

give effect to the Act's clear preemption of state laws.  The standing principles embodied in the

Act give a right to sue only to ISPs who suffer actual harm.  These principles are specifically

designed to prevent manufactured lawsuits like this one involving parties that affirmatively seek

and attract UCE to conjure up baseless claims of harm.  These principles apply with full force

here, and they require dismissal of BSI's state law claims.

When Congress passed the CAN-SPAM Act, "lawmakers were wary of the possibility, if

not the likelihood, that the siren song of substantial statutory damages would entice opportunistic

plaintiffs to join the fray, which would lead to undesirable results." *Gordon v. Virtumundo, Inc.,*

575 F.3d 1040, 1050 (9th Cir. 2009).  Thus, Congress determined that to bring suit, a "provider

must demonstrate that it has been 'adversely affected by a violation of . . . or a pattern or

practice that violates" the CAN-SPAM Act. *Id.* at 1052 (citations omitted).  Additionally, "[t]he

type of harm envisioned by Congress did not encompass the ordinary inconveniences experienced by consumers and end users." *Id.* at 1053. Rather, "[w]hile the harm need not be significant in the sense that it is grave or serious, the harm must be of significance to a bona fide [service] provider – something beyond the mere annoyance of spam and greater than the negligible burdens typically borne by a[] [service] provider in the ordinary course of business." *Id.* at 1053-54. In that regard, a court "should take an especially hard look at the cited harm if it suspects at the outset that a plaintiff is not operating a bona fide Internet access service...." *Id.* Hence, "evidence of what could be routine business concerns and operating costs is not alone sufficient to unlock the treasure trove of the CAN-SPAM Act's statutory damages." *Id.*

BSI acknowledges these points in its Response. It contends, however, that while the Act imposes both an "adverse effect" and a "bona fide" ISP requirement, these phrases do not appear in either the California or Maryland statutes and that the requirements are therefore inapplicable here. *See* Opposition to Connexus/Hydra Motion for Summary Judgment, at 18 (Docket No. 295). BSI's contention fails on two counts: it is contrary to the basic requirements of Article III standing and is contradicted by CAN-SPAM's preemption of state law.

The Supreme Court has made clear that "[s]tanding to sue in any Article III court is, of course, a federal question which does not depend on the party's prior standing in state court." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985); *see also Kaiser-Flores v. Lowe's Home Centers, Inc.*, Civil No. 5:08-CV45-V, 2009 WL 762198, at *2 n.10 (W.D.N.C. Mar. 19, 2009). Hence, for purposes of evaluating Article III standing in this action, the appropriate rules for determining whether an ISP has suffered an "injury in fact" are those established by federal courts in the context of claims involving UCE. In this regard, the Ninth Circuit's decision in *Gordon* provides clear guidance. In that case, the court observed it would be "logically

incongruous to conclude that Congress endeavored to erect a uniform standard" for combating UCE, but simultaneously left states free to ignore that standard by conferring standing on entities like BSI that exist primarily for the purpose of pursuing litigation against email marketers. *Gordon*, 575 F.3d at 1063. Thus, to the extent any state law would grant standing to an ISP that is not bona fide and has not suffered actual harm from UCE, that law would be preempted in any diversity action brought in federal court.

**B.    The Uncontroverted Facts Establish That BSI Is Not A Bona Fide ISP That Has Suffered Harm From The Gevalia Email Messages.**

BSI's Response fails to refute that BSI is not a bona fide ISP.  Indeed, Paul Wagner does not contest that ███████████████████████████████████████████[1] *See* Plaintiff's Response to Defendants' Second Set of Interrogatories, at Exhibit A (Ex. 7, Roche Decl.); Plaintiff's Amended Response to Defendants' Second Set of Interrogatories, at Interrogatory No. 14 (Ex. 22, Roche Decl.).  Likewise, Joseph Wagner does not contest that from 2002-2008 Hypertouch – BSI's sister entity – ██████████████████████████ ████████████████████████████ *See* Deposition of Joe Wagner, at 111:1-10, 117:5-17 (April 28, 2009) (Ex. 5, Roche Decl.).[2]

---

[1] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[2] Joe Wagner makes the disingenuous claim that he "do[es] not view litigation against spammers as a profit generation enterprise" because Hypertouch "has donated over $100,000 in judgments or settlements" to various charities.  See Declaration of J. Joseph Wagner, at ¶ 13 (Docket No. 295-43).  However, the obvious corollary is that Hypertouch has obtained and kept approximately ████████████████████████████████████████████

BSI further admits that no customers were deceived by the emails at issue because "the vast majority" of the email addresses were never assigned to any actual human consumer. *See* Opposition to Connexus and Hydra's Motion for Summary Judgment, at 22 (Docket No. 295). Put another way, the email addresses are "spam traps" set up by BSI to collect as much alleged UCE as possible. *Gordon*, 575 F.3d at 1056 (describing "spam traps" as addresses set up "with the sole purpose of snagging as many e-mail marketing messages as possible.").[3]

Nor has BSI been adversely affected by UCE. For example, BSI claims that "the principle harm in spam is receiving the emails in the first place." *See* BSI Response, at 35. However, as stated by the Ninth Circuit in response to the same contention, this argument "contradicts the plain text of the [CAN-SPAM Act] and the legislative goal of limiting the private right of action" and has never been accepted by any court. *Gordon v. Virtumundo, Inc.*, 575 F.3d at 1053 n.11; *see also ASIS Internet Services v. Azoogle.com, Inc.*, Nos. 08-15979, 08-17779, 2009 WL 4841119, at *1 (9th Cir. Dec. 2, 2009) (unpublished) ("The mere cost of carrying SPAM emails over Plaintiff's facilities does not constitute a harm as required by the [CAN-SPAM Act]."). Under basic preemption principles, the mere receipt of suspected UCE is insufficient to establish actionable harm under CAN-SPAM. *Cf. Gordon*, 575 F.3d at 1063; *Shutts*, 472 U.S. at 804.

BSI also concedes that from 2000-2008, it expended only $███████ to address systems-related issues allegedly arising from <u>all the UCE it received (not just Gevalia UCE).</u> *See* BSI's

---

[3] BSI claims that its use of "spam traps" is perfectly legitimate, and likens itself to Microsoft, which also deploys "spam traps." *See* BSI Response, at 12-13 (Docket No. 309). In no sense is BSI like Microsoft. Unlike Microsoft, BSI (1) has few real customers (*i.e.*, only 14 persons who are not members of the Wagner family); (2) ███████ ███████ (3) is closely related to litigation mills such as Hypertouch and Jim Gordon; and (4) its President and sole employee leaves the business of running his "ISP" unattended while he sits in on 29 depositions in places all over the country in this case alone, not counting those in which he was the deponent. *See* Exhibits 22, 42 to the Declaration of Robert Friedman (Docket No. 257-31, 257-51); Declaration of Paul Wagner, at ¶ 19 (Docket No. 295-42).

Supplemental Response to Interrogatory No. 3 (Ex. 1, Roche Decl.); *see also* P. Wagner Decl. at ¶ 50 (Docket No. 295-42).  In other words, it incurred less than $4,000 per year to address all technology issues that it claims – without any direct proof – were caused by spam.  And, in all probability, Gevalia commercial emails relate to only a fraction of these alleged costs.  Notably, BSI has never had to hire additional personnel as result of its alleged UCE overload, and Paul Wagner has provided no evidence regarding the amount of time he claims to spend dealing with UCE.  Equally significant, the "problems" BSI describes are exactly the sort of business costs that "bear no inherent relationship to spam or spamming practices." *Gordon*, 575 F.3d at 1054.  On the contrary, courts "expect these issues to arise as a matter of course and for legitimate reasons as technology, online media, and Internet services continue to advance and develop." *Id.*  Additionally, $████████████████████████████████████████████████████  the last decade – the type of "routine business concerns and operating costs" of an ISP that are insufficient to unlock the "treasure trove" of statutory damages. *Id*; *see also Asis Internet Services v. Active Response Group, Inc.*, No. C07-06211 TEH, 2010 WL 519830 at *2 ("the conclusion that Plaintiffs lack standing to bring a claim under the CAN-SPAM Act is inescapable" where they alleged only $36,000 in annual expenses, plus a third of employee time devoted to spam issues).

The undisputed fact that BSI has incurred, at most, only *de minimis* costs related to UCE is enough to establish it does not meet the *Gordon* standing requirements.  But even if BSI could make the necessary showing of harm, it still would not have standing because it cannot demonstrate that it is operating as a legitimate ISP instead of a mere creator of UCE claims.

BSI's reliance on the arbitrator's conclusion in *Hypertouch v. Stamps.com* that Hypertouch had standing in a UCE suit does nothing to advance its standing argument here. *See*

BSI Response, at 10 (Docket No. 309). First, that decision was issued almost four years before *Gordon*. Moreover, while the arbitrator concluded there was standing, he was hardly enamored of Hypertouch and its bogus ISP business, as evidenced by the following statements made in support of his ultimate decision to reject all of Hypertouch's fabricated claims:

> The Hypertouch "business" operated by Mr. Wagner seems primarily for his own benefit and that of his brother.

> \*       \*       \*

> The evidence presented at the hearing demonstrates that Hypertouch provides email connectivity service for four individuals: Mr. Wagner; an attorney [in exchange for free advice]; a hotel in Vietnam [in exchange for free rooms when he travels there]; and Mr. Wagner's brother [who reviews the inbound email to determine if it is "spam"].

> \*       \*       \*

> The "internet access service" and "electronic mail service" activities of Hypertouch appear minimal, and it seems highly doubtful that either Congress or the state legislature had Mr. Wagner and Hypertouch in mind when they adopted their respective legislative enactments.

*In re Hypertouch, Inc. v. Stamps.com*, AAA No. 74 117 00953 04 SUBR, Final Award of Arbitrator, at 10-11 (Jan. 5, 2006) (Ex. 20, Roche Decl.) (Docket No. 283-25). Second, the arbitrator applied the same standing test for both Hypertouch's claims under the California statute and its claims under the CAN-SPAM Act. That approach is consistent with the point Kraft makes above, namely, that the standing analysis required under federal law – as now represented by *Gordon* and related cases – applies to state law claims.

Similarly, BSI's reliance on the Ninth Circuit's citation in *Gordon* to the district court's opinion in *Hypertouch, Inc. v. Kennedy-Western University* also does not advance its argument relating to standing. *See* BSI Response, at 25 n.21 (Docket No. 309) (citing *Gordon*, 575 F.3d at 1051, 1054, 1056). The critical, indisputable fact presented here – that Hypertouch ▮▮▮▮▮▮▮

██████████████ – was not before the court in *Kennedy-Western University*. That fact

certainly would have changed the Ninth Circuit's view of that case, as demonstrated by the full

quotation from *Gordon*:

> Since at least 2004, Gordon has held no employment. He has
> never been compensated for any of his purported Internet services,
> and his only income source has come from monetary settlements
> from his anti-spam litigation campaign. Likewise, his company,
> Omni, generates no revenue and is financed strictly through these
> lawsuits against e-mail marketers. . . . Gordon's status is uniquely
> relevant to the statutory standing question here. *Cf. Hypertouch*,
> 2006 WL 648688, at *4 n.2 (rejecting defendant's argument that
> Hypertouch was a "professional plaintiff" that entered the ISP
> business for the sole purpose of bringing anti-spam lawsuits).

*Gordon*, 575 F.3d at 1056 (emphasis added).

In sum, BSI's brief fails to dispute the two points that are at the core of Kraft's argument

that BSI lacks standing. First, there is no dispute that the CAN-SPAM Act and state laws

regulating UCE cannot be used as a vehicle for pursuing statutory damages by entities whose

primary business is to attract UCE for the specific purpose of pursuing such damages. Second,

the undisputed facts relating to BSI – including the numerous spam lawsuits it has brought and

the fact that ██████████████████ – establish that BSI is an entity that is

primarily in the business of litigation and pursuing statutory damages. As such, it does not have

standing.

## III.   BSI's Contention That It Can Bring Multiple Claims On The Same Email Is Contrary To The Law And Leads To Absurd Results.

If there were any question that BSI's business is the boundless pursuit of litigation and

statutory damages, BSI erases any doubt when it contends that it can not only sue on emails

forwarded by one Wagner brother to the other, but that it can sue multiple times on the very

same emails.[4]  In this regard, BSI does not contest the following facts:

- Many of the emails at issue in this case were received by Hypertouch servers and then redirected to BSI pursuant to an agreement between the companies in order to archive them for future use.  *See* Declaration of John H. Evans, at ¶¶ 5-9 ("Evans Decl.") (Docket No. 283-36); Declaration of Paul Wagner, at ¶¶ 38-42 (Docket No. 309-45); Deposition of Joe Wagner, at 69:11-72:22 (Apr. 28, 2009) (Ex. 5, Roche Decl.) (Docket No. 283-10).

- BSI agreed to this arrangement despite Hypertouch's belief that at least 99% of the emails sent to the addresses in question are UCE.  *See* Deposition of Joe Wagner, at 192:6-16, 195:8-16 & 213:24 – 214:5 (Ex. 5, Roche Decl.) (Docket No. 283-10).

- As described by Joseph Wagner, the premise underlying this arrangement was that Hypertouch and BSI could each sue and recover on emails that Hypertouch received and then routed to BSI.  *See* Deposition of Joe Wagner, at 159:6-161:22 (Apr. 28, 2009) (Ex. 5, Roche Decl.).

- This routing of emails, as described by Joseph Wagner, would make both Hypertouch and BSI recipients of the same emails and would permit each party to sue Kraft for statutory damages based on those emails.  *Id.*

- In fact, BSI/Hypertouch are carrying out their scheme in this very case, as BSI does not deny that Hypertouch previously sued Kraft over at least 6,841 of the exact same emails that are at issue here.  *See* Evans Decl., at ¶ 7 (Docket No. 283-36).[5]

Unable to contest these facts, BSI asserts that they are immaterial.  BSI's Response, at 27

(Docket No. 309).  But these facts are not only material, they are dispositive as to the emails

deliberately routed from Hypertouch to BSI – from Joseph Wagner to his brother.

BSI's assertion that these facts are immaterial also conflicts with the express language of

the statutes at issue.  BSI is not the recipient of emails sent to Hypertouch servers, and when

---

[4] In addition to suing Kraft twice on the same email, it is also suing Hydra on some of these same emails.  Thus, it is attempting to recover three times for the same email.

[5] BSI claims that this is an "irrelevant and/or disputed" fact, but then cites no record evidence that would actually dispute this statement.  *See* BSI's Response, at 14, ¶ 22 (Docket No. 309).

Hypertouch routes those emails to BSI per agreement between the Wagner brothers, those emails are not "unsolicited" in any sense of the word. For BSI's argument to have any merit, it is necessary to assume that the UCE statutes are intended to permit entities to deliberately exchange UCE between each other just to generate claims for statutory damages. Of course, BSI cannot point to any statutory language or legislative history to support that absurd result.

BSI's claim that it can sue on emails that Joseph Wagner forwarded to his brother also ignores several important facts that further demonstrate why the claim is untenable. Under BSI's theory, an ISP would be able to daisy-chain servers and multiply claims indefinitely based on a single email. However, the gamesmanship on which BSI's and Hypertouch's lawsuit is founded hits a brick wall in the form of the legal requirements that for an email to be actionable, it must be (i) received by the recipient from the alleged spammer, not from a third party that forwarded it per an agreement with the recipient; and (ii) unsolicited, in the sense that the recipient must not have agreed to receive it. BSI's claims violate each of these requirements. The purpose of the state statutes and the federal CAN-SPAM Act is to prevent spammers from sending unlawful commercial email to people who do not want it. That purpose obviously is not advanced through permitting a suit by a party who asks another party – his brother – to send suspected UCE. Moreover, the notion that parties can sue multiple times on the same emails completely undermines the specific limits on statutory damages contained in the statutes. Those limits are per-email limits, but BSI's theory of being able to sue multiple times on the same email would create a virtually unlimited penalty per email.

Moreover, there is no support for BSI/Hypertouch's theory that an ISP has a claim under the UCE laws merely because an email hit one of its servers in transit. *Gordon*, 575 F.3d at 1053 n.11 ("No court has adopted this position, and we reject it as well."); *ASIS Internet Services*,

2009 WL 4841119, at *1 ("The mere cost of carrying SPAM emails over Plaintiff's facilities does not constitute a harm as required by the [CAN-SPAM Act]."). This makes good sense, because, otherwise, bogus ISPs seeking to game the system would daisy-chain their servers as described above. *Cf. Gordon*, 575 F.3d at 1067-68 (Gould, J., concurring) (there is no remedy under the law "for people who gratuitously create[] circumstances that would support a legal claim and act[] with the chief aim of collecting a damage award"). Indeed, BSI's attempt to double-collect validates the dire predictions in *Gordon*.

Contrary to BSI's claim, the redirection of the emails from Hypertouch is not a perfectly normal business practice for someone that is trying to avoid UCE. In making this argument, BSI asks the court to put aside common sense. BSI purports to abhor spam, yet, it admits to setting up a routing scheme to collect spam and to review it for litigation purposes. Moreover, BSI admits to believing that 99% of the email forwarded to it by Hypertouch is spam sent to nonfunctioning addresses.[6]  Surely, this routing scheme is not a "normal" practice for a party attempting to avoid UCE.

Additionally, BSI's attempt to draw an analogy between its relationship with Hypertouch and a consumer's relationship with Comcast, AOL or Google is facially absurd. Those companies, unlike Hypertouch, are not one-man enterprises whose profits depend on litigation and whose only employee is routinely retained as an expert in BSI's UCE lawsuits. *See* Declaration of J. Joseph Wagner, at ¶ 25 (Docket No. 309-47); Deposition of Joe Wagner, at 111:1-10, 117:5-17 (April 28, 2009) (Ex. 5, Roche Decl.). Moreover, the CEOs of Comcast, AOL and Google do not exchange emails with BSI ruminating over whether they can maximize

---

[6] *See* Deposition of Joe Wagner, at 69:11-73:1-3 (Apr. 28, 2009) (Ex. 5, Roche Decl.); *In re Hypertouch, Inc. v. Stamps.com,* Final Award of Arbitrator, at 11 (Ex. 20, Roche Decl.).

UCE litigation profits through separate lawsuits or by teaming as plaintiffs and "sharing [the] recovery." *See* BSI Production Document No. BSI-K0002950-2951 (Ex. 10, Roche Decl.).

BSI also mischaracterizes its experts' testimony on whether the re-routing of email through Hypertouch is normal. *See* BSI's Response, at 29 (Docket No. 309). For example, paragraphs 64-70 of the Klensin declaration speak to whether BSI properly preserved the emails it received, not to whether the redirection of emails from Hypertouch to BSI is "legitimate and normal." *See* Klensin Decl., ¶¶ 64-70 (Docket No. 309-48). The only example Dr. Levine can offer is his own handling of "incoming mail for several friends," which again tells the Court nothing about whether it is a normal practice for ISPs to route and store emails for each other in the same fashion as the Wagner brothers. *See* Levine Decl., at ¶ 19 (Docket No. 309-54). Finally, Mr. Resnick vaguely describes businesses that serve "a customer's domain" and universities that provide email addresses for alumni as entities that route email in ways that are analogous to the Wagner brothers. *See* Resnick Decl., ¶ 55 (Docket No. 309-55). One assumes that if the routing and storing of emails between BSI/Hypertouch were in fact so "legitimate and normal in the industry," BSI's experts could have provided at least one example of two other ISPs that route emails to each other in a similar fashion and store them free of charge.[7]

Even on summary judgment, the Court is not required to draw unreasonable inferences in favor of the non-moving party. *Wootton Enterprises, Inc. v. Subaru of America, Inc.*, 134 F.Supp.2d 698, 703 (D. Md. 2001) (on summary judgment the Court need not indulge a party's

---

[7] Their inability to do so speaks volumes, and in fact reveals that BSI/Hypertouch's routing and free storing of massive email loads for one another is anything but normal. *See, e.g.,* Deposition of Joe Wagner, at 91:5-15 (Apr. 28, 2009) (Ex. 5, Roche Decl.) (Hypertouch has BSI store emails for it because Joe Wagner "d[oes] not know of another ISP that would be willing to archive that much e-mail flow without what I presume would be exorbitantly expensive [sic]."); Klensin Depo. at 30:23-31:3 ("As I looked at the messages which I did inspect, I saw things passing through more servers than I would normally have expected had things been optimized the way I would optimize them if I was designing an email system.") (Exhibit 1 to Supplemental Roche Declaration).

"reliance on fanciful and unreasonable inferences in assessing whether it has generated evidence sufficient to avoid summary judgment.").

## IV.   THE SETTLEMENT AGREEMENT BARS ALL CLAIMS.

BSI either concedes or does not dispute the following critical facts:  (i) approximately half of the emails at issue were transferred from Hypertouch to BSI through an agreement between the two companies;[8] (ii) at least 6,841 of those email messages were the basis of Hypertouch's claim against Kraft, which Kraft settled;[9] (iii) the Settlement Agreement provided that ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ . . . .";[10] (iv) BSI knew of the Hypertouch suit and advised Hypertouch in that suit;[11] and, most importantly, (v) BSI is attempting to double-recover on the same emails for which Hypertouch has already recovered.

### A.   The Settlement Agreement ████████████████████████████ ████████████

BSI incorrectly asserts that the Settlement Agreement only applies to Hypertouch.  In fact, the Settlement Agreement ██████████████████████████████████████████ ████████████████████████████████████████████████████████████, ████████████████████████████████████████████████████████████

---

[8] See BSI Response, at 24, ¶ 43 (Docket No. 309).

[9] BSI claims that this is an "irrelevant and/or disputed" fact, but then cites no record evidence that would actually dispute this statement.  See BSI's Response, at 14, ¶ 22 (Docket No. 309).

[10] See Settlement Agreement, at ¶ 2 (Ex. 13, Roche Decl.) (Docket No. 283-18).

[11] See BSI Production Documents BSI-K0002933, 2950-53 (Exs. 10-12 Roche Decl.) (Docket Nos. 283-15 through 283-17).

[12] See Settlement Agreement, at ¶ 2 (Ex. 13, Roche Decl.) (Docket No. 283-18).



. . . ,"[13]

BSI and Hypertouch admit that BSI has an agreement with Hypertouch for purposes of collecting and storing the emails sent to Hypertouch on which Hypertouch has sued. Declaration of Paul Wagner, at ¶¶ 38-42 (Docket No. 309-45); Declaration of J. Wagner, at ¶ 28 (Docket No. 309-47). Indeed, as explained above, these emails would never have reached BSI but for Hypertouch's actions. As found by the arbitrator in *In re Hypertouch, Inc.,* Joe Wagner "routes this [UCE] to his brother [Paul Wagner] for further analysis and possible claims against the malefactors." Final Award of Arbitrator, at 11 (Docket No. 83-10) (Ex. 20, Roche Decl.). Accordingly, BSI and Paul Wagner are acting as Hypertouch's admitted "agents" and "representatives" for purposes of receiving, storing and analyzing emails sent to Hypertouch. This is not conjecture – it is what both Hypertouch's and BSI's principals have admitted and other tribunals have found. Thus, the Settlement Agreement ███████████████████.

BSI does not even attempt to dispute that its claims arise from or relate to the Hypertouch Action "or electronic mail advertising Gevalia products" because they are the <u>same</u> claims based on the <u>same</u> email messages. Accordingly, the Settlement Agreement ███████████
███████████████████████████

---

[13] *See* Settlement Agreement, at ¶ 2 (Ex. 13, Roche Decl.) (Docket No. 283-18). BSI attempts to argue that it can double-recover on emails sent to Hypertouch because it registered the Hypertouch domain and email sent to Hypertouch.com was therefore addressed to "BSI by Kraft's spammers." BSI Response, at 14, ¶ 22 (Docket No. 309). Not only does this contention defy common sense, it is inconsistent with Hypertouch's pleadings in its suit against Kraft. In that case, Hypertouch repeatedly pled that email addressed to the domain name "Hypertouch.com" were sent to "Plaintiff" (*i.e.,* Hypertouch), not to BSI. For example, Hypertouch repeatedly alleged that "the Defendants and/or their agents sent electronic mail to Plaintiff that [included false addresses, etc.] . . . ." *See Hypertouch v. Kraft,* No. C05 01589, First Amended Complaint, at ¶¶ 16-20, 25-26 (Ex. 4, Supplemental Roche Decl.). Hypertouch pled that it "received", or was the intended "recipient" of, the electronic mail. *Id.* at ¶¶ 12, 14, 19. BSI cannot now claim that it was the true intended recipient in order to avoid the Settlement Agreement.

For the same reasons, BSI's claims based on email sent to Hypertouch after the

Settlement Agreement was entered into are also barred.  *See* Kraft Brief at 38 (Docket No. 283-

1).  BSI's only response to this argument, found in footnote 40 of its Response Brief, is that the

███████████████████████  But the statute cited does not apply here, because the Settlement

Agreement ██████████████████████████████████████████████████████████

The California Civil Code §1668 provides that

> All contracts which have for their object, directly or indirectly, to
> exempt any one from responsibility for his own fraud, or willful
> injury to the person or property of another, or violation of law,
> whether willful or negligent, are against the policy of the law.

It is well settled that "Section 1668 is not strictly applied.  Despite its prohibition of an

exemption from liability for future acts of 'negligence,' section 1668 does not *per se* prohibit a

contractual release of future liability for ordinary negligence unless the 'public interest' is

involved or unless a statute expressly forbids it."  *Farnham v. Superior Court (Sequoia Holdings,*

*Inc.)*, 60 Cal. App. 4th 69, 74, 70 Cal. Rptr. 2d 85 (Cal. App. 2 Dist., 1997)(citing cases).  The

issue for the court in *Farnham* was whether an agreement releasing future claims against one

party but not another was void under Section 1668.  The court concluded that it was not because

the injured party retained redress against at least one party.  The court reasoned that "we do not

believe it is our job as judges to "'sit as a super-personnel department that reexamines an entity's

business decisions' . . . ."  *Id.* at 78 (omitting citations).

Here, as in *Farnham*, Hypertouch ██████████████████████████████████████

Under the Settlement Agreement, Hypertouch (represented by Chadbourne & Park LLP) and

Kraft agreed tha ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*See* Settlement Agreement, at ¶ 3.c (Ex. 13, Roche Decl.) (Docket No. 283-18).  Hypertouch

expressly ███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████" *Id.* at ¶ 3.a.  There is simply no basis for applying Section 1668 to this

Settlement Agreement.

      Moreover, Hypertouch has never████████████████████████████

████████████████.  For that reason, neither Hypertouch nor

BSI can bring a claim on those email messages. ███████████████is also

significant because it demonstrates that Hypertouch and BSI were not truly interested in stopping

the allegedly unlawful email.

**B.**    **<u>BSI And Hypertouch Are A Single Enterprise Under Both California And
Maryland Law.</u>**

      BSI incorrectly asserts that federal courts sitting in diversity must apply the law of the

forum state to alter ego analysis.  *See* BSI Response, at 46 (Docket No. 309).  That is not what

the cases actually hold.[14]  The correct rule is that federal courts sitting in diversity resolve choice

of law rules in accordance with the substantive law that a Maryland court would apply, and

under Maryland law, contractual choice of law provisions are enforced unless "application of the

law of the chosen state would be contrary to a fundamental policy of a state . . . ." *National*

---

[14] BSI's cases do not establish a per *se rule* as claimed, particularly where a contractual choice of law provision is involved.  *See, e.g., A.B. Engineering Co. v. RSH Intern., Inc.,* 626 F.Supp. 1259, 1263 (D. Md. 1986) (applying Maryland and Florida law to alter ego analysis); *Sunnyside Development Co., LLC v. Opsys Ltd.,* No. C 05-0553 MHP, 2005 WL 1876106, at *3 (N.D. Cal. Aug. 8, 2005) ("As there is no relevant contractual choice of law provision, the choice of law issue turns on whether the law of the forum state or the law of CDT's place of incorporation should govern the alter-ego inquiry."); *Mobius Management Systems, Inc. v. Technologic Software Concepts, Inc.,* No. 02 Civ. 2820(RWS), 2002 WL 31106409, at *3 (S.D.N.Y. Sept. 20, 2002).

*Glass, Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 610-11 (1994); *Three M Enterprises,*

*Inc. v. Texas D.A.R. Enterprises, Inc.*, 368 F.Supp.2d 450, 457 (D. Md. 2005).

Here, there is a clear ██████████████████████████████████

█████████████████████████████████████████

Settlement Agreement.  *See* Settlement Agreement, at ¶ 8.h (Ex. 13, Roche Decl.) (Docket No.

283-18).  Moreover, BSI offers no argument that California law, with respect to alter ego, is

contrary to any fundamental policy of Maryland.  *See* BSI Response, at 49 (Docket No. 309).

Regardless, BSI concedes there is no difference between the ownership and control

standards used under Maryland and California alter-ego analysis.  *See* BSI Response, at 48-49

(Docket No. 309).  Central to the analysis under both states' laws is the principle that substance

trumps form "when necessary to prevent fraud or to enforce a paramount equity."  *Hildreth v.*

*Tidewater Equipment Company, Inc.*, 378 Md. 724, 733, 838 A.2d 1204 (Md. App. 2003); *Las*

*Palmas Associates v. Las Palmas Center Associates*, 235 Cal. App. 3d 1220, 1249 (1991).

Courts handle the issue of whether it is appropriate to treat multiple entities as one in order "to

enforce paramount equity" on a case-by-case basis.  *Hildreth*, 378 Md. at 733.  The relevant

factors include whether (i) the corporation is used as a mere shield for the perpetration of a fraud

or avoidance of a legal obligation; and (ii) with respect to the transaction at issue, one

corporation dominates the other.  *Id.* at 734-35.  Regardless of whether California or Maryland

law is applied, the result is the same:  BSI and Hypertouch are using their separate corporate

structures to perpetrate a fraud and avoid a legal obligation, and BSI effectively dominates

Hypertouch with respect to the use of the domain Hypertouch.com, which is central to BSI's

claims.

As for BSI's claim that Kraft has not alleged any fraudulent or inequitable conduct on

BSI/Hypertouch's part under either Maryland or California alter-ego analysis, pages 16-21 and

37-41 of Kraft's Motion for Summary Judgment amply explain the scheme by which Hypertouch

(1) settled its lawsuit with Kraft ████████; (2) ████████████████████████

████████████████████████████████████████████████████████

████████████; and (3) immediately assisted its sister corporation in its ongoing

preparations to sue Kraft over the exact same emails and many that Hypertouch allegedly

received thereafter, which Hypertouch had also coincidentally redirected to BSI. If this does not

constitute abuse of the corporate form to further some fraudulent or inequitable scheme, one is

hard-pressed to imagine what conduct would.[15]

As for ownership or control, central to this issue is the name Hypertouch and the domain

Hypertouch.com. "Hypertouch" is used to identify the company owned by Joe Wagner. In fact,

it is undisputed that Joe Wagner holds the trademark to that name. *See* Ex. 28, Roche Decl.

(Docket No. 283-33). As a result of cooperation between Hypertouch and BSI, BSI has come to

own the domain name Hypertouch.com, but that domain name is used to identify Hypertouch's,

not BSI's, corporate Web site. *See* Deposition of Joe Wagner, at 96:14-97:3 (August 16, 2005),

at 142:20 – 144:14 (October 7, 2008), at 213:17-214:8 (Apr. 28, 2009) (Ex. 5, Roche Decl.).

That domain name is used for Hypertouch's customer-facing email point-of-contact

(info2009@hypertouch.com) and is used to provide email service to its supposed customers. *See*

Ex. 3, Supplemental Roche Decl.; BSI's Interrogatory Responses, at Interrogatory No. 7 (Docket

---

[15] BSI's assertion in footnote 43 of its brief that Kraft is the wrongdoer here and cannot seek equity from the court is baseless. Kraft is not trying to avoid responsibility. It settled these claims once. ████████████████████
████████████████████████████████████████████████████████

No. 79-2) ("Both BSI and Hypertouch users have hypertouch.com email addresses") (Ex. 16, Roche Decl.). Because Hypertouch is not in the business of providing goods or services at a traditional brick and mortar storefront and does not engage in any marketing,[16] the domain name "www.hypertouch.com" is the face of the company in terms of its interaction with potential customers and is therefore its most valuable corporate asset.[17] BSI's own expert, Dr. John C. Klensin, agrees and has stated that legitimate companies "obtain domain names and make considerable investments in building a brand around them." *See* Expert Report of John C. Klensin, at ¶ 33 (May 29, 2009) (Ex. 2, Supplemental Roche Decl.). Indeed, Dr. Klensin has opined that a company's domain name is the functional equivalent of its corporate name and, therefore, "[c]hanging the domain name is about as big a step as changing the company name." *See* Deposition of John C. Klensin, at 95:24-25 (Sept. 24, 2009) (Ex. 1, Supplemental Roche Decl.).

Thus, Hypertouch could not have pursued its claims against Kraft for email sent to addresses with "Hypertouch.com" without the cooperation and agreement of BSI. More importantly, BSI has the ability to control Hypertouch by withdrawing permission for Hypertouch to continue using the Hypertouch.com domain. BSI could thereby eliminate Hypertouch from the Internet, thus extinguishing any brand name recognition Hypertouch might enjoy and making it impossible for current or potential customers to determine how to find

---

[16] *See* J. Wagner Dep. at 96:14-97:9 (Aug. 16, 2005) (Ex. 5, Roche Decl.) (Docket No. 283-10).

[17] *See, e.g., OBH, Inc. v. Spotlight Magazine, Inc.,* 86 F.Supp.2d 176, 181 (W.D.N.Y. 2000) (a domain name that contains a company's corporate name is a valuable asset because it increases the likelihood that customers will be able to visit the company's site rather than the Web site of a competitor); *Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 499 (E.D. Va. 1999) (same); *see also Kremen v. Cohen,* 337 F.3d 1024, 1030 (9th Cir. 2003) (same).

Hypertouch or subscribe to its "services."[18]  In sum, BSI has the power to effectively stamp Hypertouch out of existence.

Furthermore, Hypertouch also depends on its free use of BSI's servers in order to store vast quantities of email, a critical service that is otherwise too expensive for Hypertouch to obtain by any other means. *See* J. Wagner Dep. at 91:3-94:7 (Ex. 5 to Roche Decl.) (Docket No. 283-10); J. Wagner Decl., at ¶ 5 (Docket No. 299-1).  In addition, Hypertouch can access BSI's servers independent of BSI at any time in order to pull emails off of those servers. *See* Deposition of Paul Wagner, 91:12 – 92:15 (May 11, 2009), at 198:10 – 200:9 (June 15, 2009) (Ex. 3, Roche Decl.).  Thus, BSI could severely cripple its sister corporation simply by shutting off the free, unfettered access that Hypertouch enjoys to BSI's hardware.  These facts, combined with BSI's ownership of Hypertouch.com, demonstrate the profound degree of ownership/control that BSI wields over Hypertouch.

## V.    BSI HAS FAILED TO PROVIDE EVIDENCE OF FRAUD.

By arguing that it does not have to prove the elements of common law fraud, BSI is asking this Court to ignore both the Fourth Circuit's decision in *Omega* and the Ninth Circuit's decision in *Gordon*.[19]  There is simply no way to harmonize the holdings in those cases with BSI's argument.

---

[18] This argument assumes for the moment that Hypertouch is a legitimate company that actually cares about attracting customers, as opposed to a mere front for the Wagner brothers' real line of business, *i.e.*, filing lawsuits.

[19] *Omega*, 469 F.3d at 353 (noting that the Oklahoma statute at issue "seems to reach beyond common law fraud or deceit" and "[b]y its terms, the statute is not limited to inaccuracies in transmission information that were material, led to detrimental reliance by the recipient, and were made by a sender who intended that the misstatements be acted upon and either knew them to be inaccurate or was reckless about their truth.") (citing *Rogers v. Meiser*, 68 P.3d 967, 977 (Okla. 2003) (requiring those elements for Oklahoma fraud action); *Gordon*, 575 F.3d at 1063 ("The CAN-SPAM Act established a national standard, but left the individual states free to extend traditional tort theories such as claims arising from fraud or deception to commercial e-mail communication.") (citing *Omega*).  BSI's entire argument to the contrary is cribbed from the court's decision in *Asis Internet Servs. v. Consumerbargaingiveaways*,

BSI attempts to distance itself from these cases because it cannot prove the elements of common law fraud. Instead, BSI advocates that the Court adopt a theory of strict liability – *i.e.*, any technical inaccuracy within an email is false or misleading even though no one relies on it or suffers any damage – in order to reap a windfall. Both the *Omega* and *Gordon* courts, however, anticipated this type of scheme and rejected it in long and detailed opinions.

BSI has the burden on the elements of fraud, and under Fed. R. Civ. P. 56, it must come forward with sufficient evidence to establish that there is an issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 319-328, 106 S.Ct. 2548 (1986); *Cray Communications, Inc. v. Novatel Computer Systems*, 33 F.3d 390 (4th Cir. 1994) (granting summary judgment where counter-plaintiff failed to come forward with sufficient evidence in support of its claims).

### A.   BSI Does Not Even Attempt To Prove Reliance Or Harm Based On Reliance.

BSI argues that it does not have to prove justifiable reliance or that it suffered harm based on reliance. *See* BSI's Opposition, at 42-45 (Docket No. 309). Instead, it argues that these elements of fraud are not required, which conflicts directly with *Omega* and *Gordon*. For this reason alone, Kraft is entitled to summary judgment under *Celotex* and its progeny.

### B.   BSI Cannot Prove A Material Misrepresentation.

BSI's assertion that any falsity is "inherently material" would effectively gut fraud law in all 50 states and the CAN-SPAM Act itself. It is black letter law that for a misrepresentation to be actionable it must be material. Restatement (Second) of Torts § 538 (1977). Moreover, the CAN-SPAM Act itself requires that the header information be "materially false or materially

---

which is the only case BSI cites. *See* BSI's Opposition to Connexus and Hydra's Motion for Summary Judgment, at 32 (Docket No. 295) (citing 622 F. Supp. 2d 935, 942 (N.D. Cal. 2009)). However, *Asis* is not instructive because it was decided on April 17, 2009, four months <u>before</u> the *Gordon* decision came out.

misleading" to be actionable.  15 U.S.C. § 7704(a)(1).  Thus, the law requires a showing of materiality, and BSI has failed to make this showing.

Black's defines a "material representation" as follows: "Representation relating to matter which is so substantial and important as to influence party to whom made is material."  Black's Law Dictionary 880 (5th ed. 1979); *see also Tytel v. Massachusetts Mut. Life Ins. Co.*, 1995 WL 551268, at *7 (Md. App. Mar. 29, 1995) (a material fact is "one which would influence the decision of a reasonable person.").  Thus, for the header information to be materially false or misleading, it must be so substantial as to influence BSI.  If the information was irrelevant to BSI, then it necessarily was not material.  *Tytel*, 1995 WL at *7.

Here, BSI did not care about the information in the header.  It was not trying to stop the email messages; it was harvesting them for litigation purposes.  The clearest proof of this is that BSI never attempted to contact Kraft to stop receiving Gevalia email, or to opt-out of receiving any Gevalia advertisements.  *See* Deposition of Joe Wagner, at 81:18-82:14 (Apr. 28, 2009) (Ex. 5, Roche Decl.); Deposition of P. Wagner, at 257:1-260:21 (June 15, 2009) (Ex. 3, Roche Decl.).  For this reason, BSI's argument that anything in an email that could impair the ability of a recipient to identify the sender must be material is without merit.  *See* Opposition to Kraft's Motion for Summary Judgment, at 35 (Docket No. 309).

More importantly, with respect to Kraft, there is nothing in Gevalia email advertisements that would impair the ability of BSI to identify Kraft.  Kraft's expert, John Evans, described the typical Gevalia email advertisement in his Report.  *See* Evans Report, at 3-4, 14-19 (Ex. 15, Roche Decl.) (Docket No. 283-20).  Exhibit E1 to his Report is an example of such an email. *See* Ex. 5, Supp. Roche Decl.  Most of that email clearly references Gevalia in the "From" line, and all the emails contain a physical address at the bottom and an email address to which

complaints or questions can be sent.[20]  The actual email would have live links that, if clicked

upon, would take the recipient to the Gevalia Web site.  There, the recipient would be informed

of other methods for contacting Kraft.  *Id.*  BSI cannot credibly claim that it could not have

identified or contacted Kraft with this information.  In fact, when asked in his deposition, one of

BSI's experts conceded that Kraft could easily be identified and contacted:

> Q:  I'm asking, if you saw this ad, do you think you would be able
> to contact Gevalia?
>
> A:  It seems likely.
>
> Q:  Okay. Mr. Wagner is claiming he received ads from Gevalia,
> actual Gevalia ads.  Would he have been able to contact Gevalia?
>
> A:  Probably.

*See* Levine Depo. at 121: 9-15 (Ex. 6, Supp. Roche Decl.).

BSI's argument – that the email messages were materially misleading because if one hit

"Reply" it would not take the recipient to Kraft – is baseless.  Kraft could not be reached through

the "Reply" button because it was not the sender; instead, it is the advertiser.  Moreover, there is

nothing in any statue that requires the recipient to be able to contact either the sender or the

advertiser by hitting the "Reply" button.  To argue that even though there are multiple easy and

obvious ways to contact Kraft to order product, complain about product, complain about the

email advertisement, and opt out from receiving further email, Kraft should be liable for millions

in damages because BSI could not use its "Reply" button, is simply frivolous.[21]

---

[20] BSI suggests that because the physical address contained in the email is to a facility operated by a Kraft contractor (Client Logic), the address is misleading. *See* Opposition to Kraft's Motion for Summary Judgment, at 18 (Docket No. 309). Kraft hired Client Logic for the specific purpose of managing complaints and questions regarding Gevalia and there is nothing unlawful about hiring a vendor to perform these services.

[21] CAN-SPAM, 15 U.S.C.A. §7704(a)(3)(A), only requires that the email message have a method of opting out of receiving future email messages. All legitimate Gevalia email advertisements had functioning links to opt out from further Gevalia advertisements and to send complaints. *See* Ex. 5, Supp. Roche Decl. In any event, to the extent

As for the affiliates who sent the email messages, they too could be traced as explained in John Evans' Report. *See* Evans Report, at 15-19 (Ex. 15, Roche Decl.) (Docket No. 283-20). Because BSI is attempting to hold Kraft liable for the email messages at issue, then materiality ought to relate to whether Kraft can be identified and traced and not the affiliate.[22]

### C.   BSI Cannot Prove That it Suffered Harm.

BSI concedes that neither Paul Wagner nor any other human being was ever actually deceived by any of the emails at issue. *See* Opposition to Connexus and Hydra's Motion for Summary Judgment, at 15, 22 (Docket No. 295); Opposition to Kraft's Motion for Summary Judgment, at 42 (Docket No. 309). Thus, BSI can allege no harm from any allegedly false or misleading statements in the emails or their subject lines.

Instead, BSI claims that it suffered harm in "receiving the emails in the first place." *See* BSI's Opposition, at 35 (Docket No. 309). However, as described above, that is not the type of harm recognized by the UCE laws and BSI's argument has never been accepted by any court. *Gordon* 575 F.3d at 1053 n.11; *ASIS Internet Services*, 2009 WL 4841119, at *1.

Furthermore, BSI has never had to hire additional personnel as result of its alleged UCE overload, and Paul Wagner has no evidence of the time he allegedly spends responding to UCE.

---

BSI complains that Kraft's opt-out mechanisms do not work, those claims are unquestionably preempted. *Omega*, 469 F.3d at 353 n.1 ("Mummagraphics also alleged that the appellees violated an Oklahoma provision requiring senders of unsolicited commercial e-mails to comply with certain opt-out requests. *See* Okla. Stat. tit. 15, § 776.6E. We agree with the district court that this provision was preempted because it bears no arguable relationship to the subject matter excepted from preemption in the CAN-SPAM Act.").

[22] Contrary to BSI's contention, *United States v. Kilbride*, 584 F.3d 1240 (9th Cir. 2009), does not support its claim against Kraft. *See* BSI's Opposition, at 37, 42 (Docket No. 309). First, *Kilbride* involved the prosecution of a distributor of pornographic email advertisements who did everything he could to hide his true identify. Here, Kraft is selling coffee products and has done everything it can to identify Kraft and make it easy for recipients of the advertisements to reach Kraft. Second, *Kilrbride* involved the violation of a statute that made it a crime to provide false information in registering email accounts used to send pornographic advertisements. *Id.* at 1256. That statute is not involved here. Moreover, BSI has not even alleged that Kraft registered an email address or domain name or that any such registration contained false information.

Moreover, as described above, the costs BSI has allegedly incurred because of supposed

systems-related demands caused by UCE are a paltry 1.9% of BSI's alleged total expenditures

from 2000-2008.  These are exactly the sort of business costs that "bear no inherent relationship

to spam or spamming practices."  *Gordon*, 575 F.3d at 1054.

BSI also admits it could easily avoid receiving Gevalia email by, for example, filtering

for emails that contain the word "Gevalia" in their "from" lines, yet it chooses not to.  *See*

Deposition of Paul Wagner, at 229:4-230:8 (June 15, 2009) (Ex. 3, Roche Decl.).  An ISP who

"purposefully avoid[s] taking even minimal efforts to avoid or block spam messages" cannot

then claim to have been harmed by those very same emails.  *Gordon*, 575 F.3d at 1052.

## VI.   CONCLUSION

For the reasons stated, Kraft respectfully requests that the Court put an end to the serial

litigation mill that is Hypertouch and BSI and enter summary judgment for the Kraft defendants.

Respectfully submitted,

DATED:  March 29, 2010                                    /s/
                                            _____
                                            John K. Roche (USDC-MD Bar No. 17531)
                                            John M. Devaney (*Pro Hac Vice*)
                                            PERKINS COIE LLP
                                            607 14th Street, N.W., Suite 800
                                            Washington, D.C. 20005-2003
                                            (202) 434-1627
                                            (202) 654-9106 (facsimile)
                                            jdevaney@perkinscoie.com
                                            jroche@perkinscoie.com

                                            Darrell J. Graham (*Pro Hac Vice*)
                                            THE LAW OFFICE OF DARRELL J.
                                            GRAHAM, LLC
                                            53 W. Jackson Blvd., Suite 1334
                                            Chicago, IL  60604
                                            (312) 922-4533
                                            (312) 922-4757 (facsimile)

dgraham@djgrahamlaw.com

*Attorneys for Defendants Kraft Foods Inc.,*
*Kraft Foods Global Inc., and Vict. Th. Engwall*
*& Co., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following individuals:

Anthony Cavanaugh
Thomas M. Barba
John J. Duffy
Anthony A. Onorato
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C.  20036
(202) 429-3000
(202) 429-3902 (facsimile)
acavanaugh@steptoe.com
tbarba@steptoe.com
jduffy@steptoe.com
tonorato@steptoe.com

Stephen H. Ring
Law Offices of Stephen H. Ring, P. C.
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
301-563-9249
301-563-9639 (fax)
shr@ringlaw.us

Mike Rothman
Law Office of Michael S. Rothman
401 E. Jefferson St., Suite 201
Rockville, MD  20850
(301) 251-9660
(301) 251-9610 (facsimile)
mike@mikerothman.com

*Attorneys for Plaintiff Beyond Systems, Inc.*

J. Douglas Baldridge
Lisa Jose Fales
Ari N. Rothman
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1601
(202) 344-4000 (phone)
(202) 344-8300 (fax)
jdbaldridge@venable.com
ljfales@venable.com
anrothman@venable.com

*Attorneys for Defendants Connexus Corp.*

/s/

John K. Roche (USDC-MD Bar No. 17531)
John M. Devaney (*Pro Hac Vice*)
PERKINS COIE LLP
607 14th Street, N.W., Suite 800
Washington, D.C. 20005-2003
(202) 434-1624
(202) 654-9106 (facsimile)
jdevaney@perkinscoie.com
jroche@perkinscoie.com

*Attorneys for Defendants Kraft Foods Inc., Kraft Foods Global Inc., and Vict. Th. Engwall & Co., Inc.*