UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MARYLAND

| | |
|---|---|
| BEYOND SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> KRAFT FOODS, INC., et al., <br><br> Defendants. | Case No. 8:08-CV-00409-PJM <br><br> The Honorable Peter J. Messitte <br><br> Magistrate Judge Charles B. Day |

**WORLD AVENUE USA, LLC'S *AMICUS CURIAE* BRIEF REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to FRCP 7(b), WORLD AVENUE USA, LLC ("World Avenue"), files this *Amicus Curiae* Brief regarding the Motions for Summary Judgment filed by Defendants KRAFT FOODS GLOBAL, INC. and Vict. Th. Engwall & Co., Inc. (collectively, "Kraft"), CONNEXUS CORP. ("Connexus"), and HYDRA LLC ("Hydra"), and states as follows:

**I.     IDENTITY AND INTEREST OF *AMICUS CURIAE***

World Avenue respectfully submits this *Amicus Curiae* Brief pursuant to FRCP 7(b). World Avenue is presently embroiled in litigation before this Court with Plaintiff BEYOND SYSTEMS, INC. ("BSI") in Case No.PJM 08 cv 0921 involving issues which are in some ways virtually identical to those being litigated in this case (the "World Avenue Litigation"). World Avenue has been sued based on assertions by Plaintiff Beyond Systems, Inc. ("BSI") that it engaged in the same type of conduct that Kraft, Connexus, and Hydra allegedly participated in this action. World Avenue has a keen interest in this litigation in that the novel legal issues that will be adjudicated in this case are similar to those that will be adjudicated in the World Avenue Litigation.

## II.   SUMMARY OF THE ARGUMENT

In addition to the grounds asserted for pre-emption in Defendants' briefs, BSI's claims are specifically preempted under the Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM Act") Act of 2003 as codified in 15 U.S.C. §7701 *et seq.* based on the undisputed fact that BSI provided its "affirmative consent" within the meaning of the CAN-SPAM Act to receiving the alleged spam e-mails at issue in this case ("E-mails At Issue").

Specifically, and without limitation, BSI expressly consented to receiving a vast majority, if not all, of the E-Mails At Issue by virtue of its express agreement with its cohort, Hypertouch to receive those e-mails directly from Hypertouch.  BSI also provided "affirmative consent" within the meaning of the CAN-SPAM Act to receiving additional E-mails At Issue because those e-mails were sent as a result of BSI's "own initiative."  Specifically, it was as a result of BSI's *admitted* "own initiative" by, among other things, entering its information into Defendant's website that those e-mails were sent.

Accordingly, in view of these undisputed facts, in addition to express preemption, conflict preemption is also present in this case because while the CAN-SPAM Act contains a consent exemption, the Maryland Commercial Electronic Mail Act (§ 14-3001, et seq., Commercial Law Article, Annotated Code of Maryland) (hereinafter "Maryland Statute") does not.  This makes compliance impossible, as a legitimate business could be in full compliance with the CAN-SPAM Act by sending an e-mail to a *consenting* recipient, but still be held liable under the Maryland Statute which has no such consent exemption.[1]

---

[1] World Avenue recognizes that in *Beyond Systems, Inc. v. Keynetics, Inc., et al.*, 422 F. Supp. 2d 523 (D. MD. 2006) this Court previously rejected the proposition that the Maryland Statute was preempted by the CAN-SPAM Act, but respectfully submits that -- as discussed *infra* -- this Court's ruling was made on different grounds and prior to a key Circuit Court decision in *Gordon v. Virtumundo*, 575 F. 3d 1040 (9th Cir. 2009), finding that the *very statute upon which the Maryland Statute was based* was in fact preempted by the CAN-SPAM Act.

### III. BSI'S AFFIRMATIVE CONSENT

#### A. BSI Expressly Consented To Receive A Vast Majority Of The E-mails

The record is clear. BSI *expressly consented* to receiving the bulk of the E-mails At Issue. Specifically, Paul Wagner/BSI expressly consented to receive and store "whatever e-mails", including alleged "spam" addressed to domain names owned by Hypertouch, that Hypertouch chose to forward to BSI. *See* D.E.# 257-1, Ex. 2, P. Wagner Dep. at 88:5-15; 472:11-13; 484:8-20; 1096: 1 -3; Ex. 8, J. Wagner Dep. at 184:16-24; 190:3-192:20; 198:23-199:19; 301:25-302:10; 309:13-21). Indeed, Hypertouch's principal, Joseph Wagner, confirmed BSI's affirmative consent by specifically testifying as follows:

> Q: ...[W]e talked earlier about the fact that many of the emails that are the subject of the complaint against Kraft in this case were directed from Hypertouch servers to BSI. Do you recall that discussion?
>
> A: Yes, they were routed from Hypertouch servers to BSI, yes.
>
> Q: And I just want the record to be clear about this. **Did BSI agree to receive these emails from Hypertouch at some point in time?**
>
> A: **Yes.**

*See* D.E.# 283-1, J. Wagner Dep., at 119:5-121:2. (Emphasis added).

It was pursuant to this express agreement that BSI received the vast majority of the E-mails At Issue. *See* D.E.# 257-1, Ex. 2, P. Wagner Dep. at 9:9-15, 88:1-89:1; Ex. 8, J. Wagner Dep. at 191:25-192:20; 195:6-10: 199:16-19; 200:21-25; 205:21-24). Indeed, according to Kraft's expert, John H. Evans, "the majority of Transmissions...were sent to servers for Hypertouch, not BSI." (D.E. #283, Ex. 20, p. 12).

#### B. E-mails Were Also Sent At BSI's "Own Initiative"

Additionally, the bulk of the E-mails At Issue were sent to BSI at BSI's "own initiative." Not only did BSI take the "initiative" by agreeing to receive e-mails from Hypertouch, but

3

Joseph Wagner admitted to signing up on "some webpages on Connexus' eMarketPanel site to investigate an 'incentive offer'" and that the "gotcha@hypertouch.com" address was "created for/on behalf of BSI" to trap spam. (D.E. #295, p. 9). Thus, any e-mails which were sent in response to BSI's "initiative" by first causing Hypertouch to provide the foregoing information to any of the Defendants on any of their websites, fall within the CAN-SPAM Act's consent exclusion.[2]

## IV. THE MARYLAND STATUTE IS PREEMPTED

In *Gordon*, the Ninth Circuit reviewed the CAN-SPAM Act's statutory scheme, including the "scope of federal preemption intended by Congress." *Id.* at 1045. *Gordon* explained that "The concept of preemption derives from the Supremacy Clause of the United States Constitution, which provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. U.S. Const. art. VI, cl. 2 'Consistent with that command, we have long recognized that state laws that conflict with federal law are 'without effect.'" *Id.* at 1060 (citations omitted). *Gordon* further stated that "Courts typically identify three circumstances in which federal preemption of state law exists: (1) express preemption, where Congress explicitly defines the extent to which its enactments preempt state law; (2) field preemption, where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy; and (3) conflict preemption, where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Id.* quoting *Indus. Truck Ass'n, Inc. v. Henry*, 125 F. 3d 1305 (9th Cir. 1997), *citing English v. Gen. Elec. Co.*, 496 U.S. 72, 78-80, 110 S. Ct. 2270, 110 L.Ed.2d 65

---

[2] World Avenue further joins and incorporates herein by reference the facts establishing J. Wagner's/BSI's consent as set forth in pages 5-7 and 17-19 of Connexus' and Hydra's Memorandum of Law and 21-22 and 27-28 of Kraft's Memorandum of Law. (D.E. #257-1 and D.E. # 283-1).

(1990).

A. **Express Preemption**

Express preemption "is guided by two principles about the nature of preemption. First, there is a presumption against supplanting "the historic police powers of the States" by federal legislation "unless that [is] the clear and manifest purpose of Congress....Second, the preemption analysis is guided by the "oft-repeated comment ... that the purpose of Congress is the ultimate touchstone in every preemption case." *Id.* "As a result, any understanding of the scope of a preemption statute must rest primarily on a fair understanding of *congressional purpose*," and calls for courts to consider not only the language of the statute itself but also the "statutory framework" surrounding it and the "structure and purpose of the statute as a whole." *Id.*

The CAN-SPAM Act specifically states as follows:

> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

The *only* items excluded from Congress's express preemption are "(A) State laws that are not specific to electronic mail, including State trespass, contract, or tort law; or (B) other State laws to the extent that those laws relate to *acts of fraud* or computer crime." *See 15 U.S.C. §7707(b)(2).* "Thus, the express language of §7707(b) demonstrates Congress's intent that the CAN-SPAM Act broadly preempt state regulation of commercial e-mail with limited, narrow exception. Congress carved out from preemption state laws that proscribe "falsity or deception" in commercial e-mail communications." *Gordon,* 575 F. 3d at 1061.

"Significantly, Congress intended this standard to regulate commercial e-mail messaging practices "on a nationwide basis." *Id., quoting* 15 U.S.C. §7701(b)(1). "It was because the

5

patchwork of state laws had proven ineffective that Congress sought to implement "one national standard," S. Rep. No. 108-102 at 21, applicable across jurisdictions." *Id.* Thus, "The CAN-SPAM Act was designed to ensure that "legitimate businesses would not have to guess at the meaning of various state laws when their advertising campaigns ventured into cyberspace." *Id., citing Kleffman v. Vonage Holdings Corp.,* No. 07-2406, 2007 WL 1518650, at *3 (C.D.Cal. May 23, 2007) (concluding that the CAN-SPAM Act preempted California state law claims).

After independently analyzing the CAN-SPAM Act's test, structure and legislative purpose, the *Gordon* court reached "the same conclusion as the district court and the Fourth Circuit, and interpret the CAN-SPAM Act's express preemption clause in a manner that preserves Congress's intended purpose-i.e., to regulate commercial e-mail "on a nationwide basis," 15 U.S.C. §7701(b)(1), and to save from preemption only "statutes, regulations, or rules that target *fraud or deception,*" S. Rep. No. 108-102, at 21 (emphasis added)." *Id.* at 1061-62. In *Gordon*, the Ninth Circuit held that Washington's Statute -- upon which the Maryland Statute was "modeled" -- was expressly preempted by the CAN-SPAM Act and, in so doing, held as follows:

> It would be logically incongruous to conclude that Congress endeavored to erect a uniform standard but simultaneously left states and local lawmakers free to manipulate that standard to create more burdensome regulation. We are compelled to adopt a reading of the preemption clause that conforms with the statute's structure as a whole and the stated legislative purpose. *See 15 U.S.C. §7701(b)(1).* The CAN-SPAM Act established a national standard, but left the individual states free to extend traditional tort theories such as claims arising from fraud or deception to commercial e-mail communication. To find otherwise would create "an exception to preemption [that] swallow[s] the rule and undermine[s] the regulatory balance that Congress established," *Omega,* 469 F. 3d at 356, and which would once again subject legitimate businesses to inconsistent and possibly incompatible state regulations.

*Id.*

As this Court has recognized, the Maryland Statute was modeled after the Washington Statute which the *Gordon* court specifically found to be expressly preempted by the CAN-SPAM Act. *See Keynetics*, 422 F. Supp. at 532 (recognizing that "The legislative history reveals that the Maryland General Assembly modeled MCEMA on the Washington law...") (citations omitted). Accordingly, as in *Gordon*, express preemption should also be found in this case with respect to the Maryland Statute.

B.  **Conflict Preemption**

In addition to express preemption, conflict preemption is also present based on the undisputed facts of this case. As set forth above, federal preemption of state law also exists "where it is impossible to comply with both state and federal requirements..." *Id. quoting Idus. Truck Ass'n, Inc. v. Henry*, 125 F. 3d 1305 (9th Cir. 1997), *citing English v. Gen. Elec. Co.*, 496 U.S. 72, 78-80, 110 S. Ct. 2270, 110 L.Ed.2d 65 (1990). Here, the CAN-SPAM Act has a consent requirement which is absent from the Maryland Statute. Thus, under the undisputed facts of this case, it would be impossible to comply with both the Maryland Statute and the CAN-SPAM Act. Among other things, in this case while the senders were in full compliance under the CAN-SPAM Act, they nevertheless may be held liable under the Maryland Statute despite BSI's affirmatively consenting to receiving, and indeed, deliberately seeking out, the E-mails At Issue.[3] Putting aside the injustice of rewarding one who deliberately injures himself in order to qualify for the reward, conflict preemption is the solution to the burden BSI has inflicted on the judicial system of the United States District Court for the Southern District of Maryland, and private defendant litigants, with BSI's multiple lawsuits over thousands of e-mails it went

---

[3] The Maryland Commercial Electronic Mail Act "provides for a private right of action to seek redress for tortious injury arising from the receipt of misleading or fraudulent, *unsolicited*, commercial e-mail," *Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 16 (2005), but the consent exemption explicitly contained in the CAN-SPAM Act is absent from the Maryland statute.

7

out of its way to receive.

Specifically, the federal CAN-SPAM Act exempts an alleged spam sender from liability where the recipient has consented to receiving the alleged spam. *See* 15 U.S.C. §7704. The uniform prohibition of spam that applies to *all* e-mails transmitted in the United States is set forth in 15 U.S.C. §7704(a)(1) which provides as follows:

> (1) Prohibition of false or misleading transmission information
>
> It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph--
>
> (A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;
>
> (B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and
>
> (C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

That uniform prohibition, however, has the following express exemption, which exemption is absent from the Maryland Statute[4]:

> Paragraph (1) does not apply to the transmission of an electronic mail message if the recipient has given prior affirmative consent to receipt of the message.

*See* 15 U.S.C. §7702(d)(2).

---

[4] BSI agrees that consent is not a requirement under the Maryland Statute. (D.E. # 295, p. 28).

The term "Affirmative Consent" is specifically defined to include the following under the CAN-SPAM Act:

> The term "affirmative consent", when used with respect to a commercial electronic mail message, means that--
>
> (A) the recipient *expressly consented to receive the message*, either in response to a clear and conspicuous request for such consent *or at the recipient's own initiative*...

See 15 U.S.C. §7702(1).

Unlike this case, *Keynetics* did not involve a factual record before the Court demonstrating "affirmative consent" and resulting conflict preemption. The facts of the instant case have developed a unique record demonstrating that BSI consented to receiving the vast majority of the E-mails At Issue, both by causing them to be sent to BSI at its "own initiative" *and* by expressly agreeing with Hypertouch to have Hypertouch forward them to BSI from California to Maryland. And, while under the CAN-SPAM Act none of those e-mails are actionable -- because Congress does not want the Courts occupied by litigants who created their own injury to seek money -- they may nevertheless be actionable under the Maryland Statute.

If the Maryland Statute is not preempted on these facts, then litigation factories like BSI will continue trapping legitimate businesses by providing consent -- as BSI did in this case -- then turning around and suing under the Maryland Statute, which has no consent exemption. Moreover, if conflict preemption is not found to exist under these facts, then the "national standard" which Congress established will be negated leaving legitimate businesses "left to guess at the meaning of various state laws", a result which Congress clearly did not intend.

## V. CONCLUSION

There is no dispute in this case that BSI provided affirmative consent within the meaning of the CAN-SPAM Act to receiving the vast majority, if not all, of the E-mails At Issue. First,

BSI expressly agreed to receive the vast majority of the E-mails At Issue from its cohort, Hypertouch. *See* D.E.# 283-1, J. Wagner Dep., at 119:5-121:2. Second, there is no dispute that those e-mails, as well as many other E-mails At Issue, were sent to BSI at BSI's "own initiative." Thus, under the CAN-SPAM Act -- which preempts the Maryland Statute under both express and conflict preemption -- none of those e-mails are actionable.

The Court should accordingly enter summary judgment as to all E-mails At Issue meeting either or both of these criteria, and permit only such further proceedings as may be necessary to determine whether any of the E-mails At Issue were not the result of either 1) affirmative consent given by BSI to Hypertouch to send the e-mails from California to BSI in Maryland, or 2) otherwise sent to BSI at BSI's own initiative.

DATED: April 8, 2010

                Respectfully submitted,

                *Attorneys for World Avenue USA, LLC*

                GREENBERG TRAURIG, LLP

                      /s/
                Sanford M. Saunders, Jr., Esq.
                USDC, MD #4734
                saunderss@gtlaw.com
                GREENBERG TRAURIG, LLP
                2101 L Street, NW, Suite 1000
                Washington, DC 20037
                Telephone: 202-331-3100
                Facsimile: 202-331-3101