**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____ )
)
BEYOND SYSTEMS, INC.,                    )
)
    Plaintiff,                              )
)
          v.                            )        Case No. 8:08-CV-00409 (PJM)
)
KRAFT FOODS INC., *et al.*,               )
)
    Defendants.                          )
_____ )


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF BEYOND SYSTEMS, INC.'S APPLICATION FOR**
<u>**DEFAULT JUDGMENT AGAINST DEFENDANT HYDRA LLC**</u>

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ........................................................................................ 2

III.  ARGUMENT .............................................................................................................. 6

    A.  Legal Standard for Entry of a Default Judgment ...................................................... 6

        1.  Plaintiff is certain to be prejudiced without a default judgment. ................ 7

        2.  The Complaint is well pled. .................................................................... 9

        3.  Plaintiff's substantive claims are meritorious. ......................................... 14

        4.  The sum of money at stake is a non-factor; the damages are prescribed by statute. ............................................................................................................. 14

        5.  There is no dispute concerning material facts........................................... 17

        6.  There is no basis to find excusable neglect............................................... 20

        7.  The policy favoring decisions on the merits is overridden by Hydra's lengthy participation in the case and brazen disregard for the Court's authority. 21

    B.  Damages of $1,000 Per Illegal Email Are Prescribed by the Anti-Spam Statutes. ...................................................................................................... 22

IV.  CONCLUSION........................................................................................................... 24

Plaintiff Beyond Systems, Inc. ("BSI"), through its undersigned counsel, respectfully submits this Memorandum of Points and Authorities in Support of BSI's Application for Default Judgment Against Defendant Hydra LLC ("Hydra") pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure.

## I.    <u>INTRODUCTION</u>

In a brazen attempt to avoid this liability, Hydra undertook a voluntary "reorganization" without giving notice to Plaintiff, the Court, or even its own attorneys.  Since this reorganization, Hydra has defied this Court's December 7, 2009 Order, and has abandoned this lawsuit, stating "[t]his litigation has no value to the company so there is no reason for the company to continue litigating."  DE# 289 at Ex. 1.  This statement makes evident that the "company" simply reincarnated itself from Hydra I to Hydra II.

At nearly the same time that it was taking actions to avoid its liabilities, Hydra's founder and CEO Zac Brandenberg was boasting to the press that his company has always been profitable, demonstrating that not only is sending spam a money maker, but running a business that ignores its liabilities is also good for the bottom line.  *See* DE# 301 at 2-3.  That business – *i.e.*, Hydra's illegal spam business – resulted in the 45,773 emails on which BSI moves for default.

Based on the well-pled allegations in Plaintiff's Second Amended Complaint, as well as the declaration and exhibits filed concurrently with this memorandum, and all other evidence presented, Plaintiff requests that the Court enter a default judgment against Hydra for $69,691,000 in statutory damages.  *See* section III.B.  A substantial damages award of $1,000 per email, as prescribed by the Maryland and California legislatures, is required by the statutory provisions that empower Internet Service Providers ("ISPs"), such as BSI, which must bear the burden of transporting, filtering, delivering and storing the millions or billions of pieces of

deceptive, junk, unwanted email advertising they receive each day or week, to bring suit.  The

legislatures of California, Maryland and 35 other states,[1] as well as the federal government, have

outlawed deceptive email advertising.  As with other states, Maryland and California have

provided a remedy to ISPs and/or ordinary recipients for the harm to their networks, diminution

of available bandwidth, reduction in time to grow their business, frequent need to upgrade

infrastructural hardware and software, the frustration of their customers, and in order to deter

illegal spamming.  Since at least 2007, when spam came to account for *95% of all email sent

everyday* over the Internet, there has been a growing need for vigorous enforcement of the anti-

spam laws.[2]

ISPs such as BSI have a statutory right to sue all the collaborators, including the

merchants who pay to be promoted in deceptive spam, the middlemen "ad networks" that

conduct the advertising in deceptive spam and which also make the advertising available through

their websites for their "affiliates" or "publishers" to send.  *See, e.g.*, Md. Com. Law § 14-

3002(b); Cal. Bus. & Prof. Code §§ 17529(j), (k), 17529.5(a).

## II.     STATEMENT OF FACTS

The crux of this case is the vexatious sending of illegal spam e-mail.  Defendant Hydra is

responsible for initiating and sending 45,773 spam e-mail messages to Plaintiff containing false,

misleading, forged and/or misrepresented information in violation of Cal. Bus. & Prof. Code §§

---

[1] Bielicki Decl. ¶ 3 and Ex. 1 (The National Conference of State Legislatures, *State Laws Relating to Unsolicited Commercial or Bulk E-mail (SPAM)*, http://www.ncsl.org/programs/lis/legislation/spamlaws02.htm (last updated Feb. 10, 2010)).

[2] Bielicki Decl. ¶ 4 and Ex. 2, Barracuda Networks Annual Spam Report (Dec. 12, 2007) *at* http://www.barracudanetworks.com/ns/news_and_events/index.php?nid=232 ("90 to 95 percent of all email sent in 2007 was spam, increasing from an estimated 85 to 90 percent of email in 2006.  This growing proportion is even more significant when compared to 2004, when the federal CAN-SPAM Act, which set parameters for sending unsolicited email and defined penalties for spammers, went into effect.  At that time spam was 70 percent of all email.  In 2001, spam accounted for only five percent of email messages.").

17529.5(a)(1), (2) and/or (3), and Md. Comm. Law §§ 14-3002(b)(i), (ii) and/or (iii).[3]  The undisputed facts of the Second Amended Complaint establish that Hydra is part of the spam advertising industry.  Hydra designs, contributes to, oversees, advertises in, sends, and facilitates the sending of spam.[4]  The spam at issue was sent or caused to be sent by Hydra from California to BSI's servers in Maryland.[5]  The spam at issue contains address information attributable to Hydra, domains attributable to Hydra, and unique creatives and campaign information designed by Hydra to track its emails and facilitate payments to collaborating spammers.[6]  The falsity and/or deception contained in the Hydra spam is more thoroughly described in section III.A.5.[7]

Perhaps most remarkable about this number is that Hydra sent 20,331 of these spam emails to BSI *after* BSI filed this lawsuit.  Hydra's spam operation is so prolific – and presumably so profitable – that even after being sued for sending spam, Hydra continued to send

---

[3] Second Am. Compl. ¶¶ 48-54, 56, 58-64; *infra* note 4.

[4] Second Am. Compl. ¶¶ 34-36, 38-40, 45-47; Bielicki Decl. ¶ 5 and Ex. 3, Hydra's Resps. to Pl.'s First Set of Req. for Admission ("RFA") Nos. 1, 2, 3, 4, 5, 6, 13, 25, 147-153, 209 (admitting, *inter alia*, Hydra's affiliates get paid for sending emails and Hydra contracts with advertisers in connection with commercial emails; admitting Hydra and Hydra affiliates send commercial emails; "approved" Hydra "affiliates go into the Hydra Network and choose ad campaigns to send with regard to "campaigns approved for email distribution"); *Id.* at ¶ 6 andEx. 4, Hydra's Am. & Suppl. Resp. to Pl.'s First Set of Interrogs., Nos. 2 and 3 (identifying insertion orders as H00004593-4644); *Id.* at ¶ 7 and Ex. 5, Stafford Dep. at 53:9-54, 56:24-57:4; *Id.* ¶ 8 and Ex. 6, Steele Dep. at 24:24-25:11; *Id.* ¶ 9 and Ex. 7, Gadde Dep. at 43:19-46:7, 49:1-50:12; *Id.* ¶ 10 and Ex. 8, Krelle Dep. at 32:15-36:22, 78:6-24; *Id.* ¶ 11 and Ex. 9, Nugent Dep. at 43:13-45; *Id.* at ¶ 12 and Ex. 10, Whitridge Dep. at 35:17-36:8; *Id.* at ¶ 13 and Ex. 11, email from Hydra to affiliate Alchemy Digital Media (showing Hydra advertising the campaigns available on its site to its affiliates and pushing campaign recommendations); *Id.* ¶ 14 and Ex. 12, a sample Hydra campaign database page at H00004645-4647; *Id.* ¶ 15 and Ex. 13, PDF rendering of sample Hydra HTML creative from H10881 and associated source code (demonstrating Hydra's hosting of images); *see also Id.* at ¶ 16 and Ex. 14, Third Party Defendant Hypertouch, Inc.'s First Set of Requests for Admission to Hydra LLC Nos. 1-9.  These RFAs, admitting, *inter alia*, that Hydra provided content and sent the emails, and was paid and paid others for the emails, are deemed admitted by Hydra's failure to respond.  *See* Fed. R. Civ. P. 36(a)(3); *Asis Internet Servs. Inc. v. Rausch*, No. C-08-03186, 2010 WL 1838752, at *5 (N.D. Cal. 2010) (deeming admitted, including in a default setting, unanswered requests for admission under Fed. R. Civ. P. 36).

[5] Second Am. Compl. ¶¶ 25, 35, 41, 44-46, 72, 77-79, 86; *supra* note 3.

[6] Second Am. Compl. ¶¶ 38-40; *supra* note 3.

[7] This falsity and deception is also explained in the declarations filed by BSI's experts in support of BSI's Opposition To Hydra's Motion for Summary Judgment.  DE# 295-45.  For instance, John Levine describes Hydra using false "From lines."  Decl. ¶¶ 28-30.  Levine also noted that multiple Hydra messages touted products as free when they actually required a purchase of a product or service.  Decl. ¶¶ 34-35.  Peter Resnick found multiple patterns of falsity and deception in the Hydra emails.  *See* Decl. ¶¶ 55, 57-60, 62,65-67.

thousands of spam emails to the very entity that sued it for sending such spam.  *Hydra's emails continue to come in to this day*, notwithstanding any "reorganization" of the company.  For example, since March 20, 2009, when BSI last assembled emails for production to Hydra, Hydra has sent thousands of additional illegal emails to BSI, all of which contain a sales link that redirected through Hydra's server at lynxtrack.com and/or a URL with a Hydra domain, such as imglt.com.  *See* attached Declaration of Paul Wagner ¶ 18.  Between July 12 and July 30, 2010, at least 33 Hydra emails all advertising Gevalia for co-defendant Kraft were sent to BSIs domains. Each email contains Mailer ID: 15- . . .**,** which Kraft has stated designates Hydra**,** and/or sales links that re-directed to Hydras lynxtrack server.  In each email, the domains used by the spammer were registered under a false or misleading identity, such as to a proxy service.  In addition, BSI sent a reply email to one of the spam emails which bounced back (*i.e.*, could not be delivered) showing that the spammers From line is a fake, non-working email address.  *Id*. ¶ 19.

   BSI owns and operates interactive computer services that enable its customers to, among other things, access the Internet, access BSI-hosted Internet services (such as e-commerce services, database services, and backup services) and exchange e-mail.  Second Am. Compl. ¶¶ 24-25 [DE# 52].  BSI owns and maintains computers and other equipment in Maryland, including specialized computers or "servers" that process e-mail messages and otherwise support its e-mail services.  *Id*.  By virtue of the services it provides to its users, BSI is an "Electronic mail service provider" as defined in Cal. Bus. & Prof. Code § 17529.1(h),[8] and an "Interactive computer service provider" as defined in Md. Comm. Code § 14-3001(c)(1-2).[9]  In addition to

---

[8] "'Electronic mail service provider' means any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail."  Cal. Bus. & Prof. Code § 17529.1(h).

[9] "'Interactive computer service provider' means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service."  Md. Comm. Code § 14-3001(c)(1).

legitimate e-mail, BSI receives, each day, hundreds of thousands of unwanted and unsolicited commercial e-mails.  *Id.* ¶ 3.

In late 2009, after almost two years of contentious litigation, Defendant Hydra I, led by CEO Zac Brandenberg, went into voluntary receivership.  The receiver ordered the sale of Hydra LLC (Hydra I) to Hydra Group LLC, f/k/a Marlboro Investment Group, (Hydra II).  Zac Brandenberg is also the CEO of Hydra II.  *See* DE# 280 at 1, 2 (stating Venable had contacted Hydra "in December 2009" and was told that a receiver had been appointed for Hydra and had sold the assets from CEO Zac Brandenberg's old company, Hydra LLC, to his new company, Hydra Group LLC).  Soon thereafter, the press reported that Hydra had 2008 revenues of $108.6 million.[10]  Completing the sham, Brandenberg was subsequently quoted stating that Hydra has been profitable in every year since its inception.[11]

Hydra II has continued to operate the same email advertising business, running old Hydra's same affiliate network, conducting the business through Hydra's existing network, hydranetwork.com.  DE# 287 at 2 & note 1 (new Hydra spam from the week of February 1); DE# 282 at 2-3; DE# 295 at n.2 (showing new Hydra spam from February 18, 2010).

At the same time, on Dec. 7, 2009, Judge Day ruled that 20,331 Hydra emails received between the time the case was filed and March 2009 were properly at issue in this case.  *See*

---

"'Interactive computer service provider' includes a service or system that provides access to the Internet and systems operated or services offered by a library or educational institution."  *Id.* § 14-3001(c)(2).

[10] Bielicki Decl. ¶ 17 and Ex. 15 (Inc. 500 Company Profile of Hydra, available at http://www.inc.com/inc5000/2009/company-profile.html?id=200904500).

[11] Bielicki Decl. ¶ 18 and Ex. 16, January 26, 2010 Young Money interview with Zac Brandenberg, available at http://www.youngmoney.com/entrepreneur/secrets-behind-zac-brandenburgs-online-ad-network-hydra/.  *See also Id.* at ¶ 19 and Ex. 17, Interview with Zac Brandenberg, available at http://www.retireat21.com/blog/zac-brandenberg-interview-ceo-of-hydra-networks-reveals-his-success-secrets# (Oct. 26 2009) (Brandenberg stating "It's better to be profitable today, than perfect tomorrow."); *see also Id.* at ¶ 20 and Ex. 18, press release regarding Adknowledge-Hydra merger, available at http://www.hydragroup.com/press/10/adknowledge-acquires-hydra-leading-cpa-affiliate-network.html (Hydra describing its acquirer as having money to spare:  "Featured on CNBC as 'the next Google,' Adknowledge is profitable with annual revenues in excess of $250 million.").

December 7, 2009 Hrg. Tr. before Magistrate Judge Day at 30:18-19, 57:23-25.  These emails

are in addition to the 25,475 produced by BSI at the outset of the case.  Hydra refused to produce

any discovery as to the 20,331 emails, including refusing to produce after Judge Day's ruling.

Then, on January 22, 2010 Venable moved to withdraw as Hydra's counsel and informed

Hydra that it must have new counsel enter an appearance by February 22, 2010, or it would be

subject to the dismissal of its claims and/or default judgment on claims against it.  DE# 280, 280-

1.  Hydra did not retain new counsel.  In fact, "Hydra [] advised Venable that it will not retain

new counsel."  DE# 289 at 2.  Moreover, Hydra stated that "[t]his litigation has no value to the

company so there is no reason for the company to continue litigating."  *Id*. at Ex. 1.  The Venable

withdrawal request was granted on March 5, 2010.  DE# 308.

On June 14, 2010, Judge Messitte ordered in open court that Plaintiff's motion for entry

of default as to Hydra was granted, and directed the Clerk to enter default against Hydra.  June

14, 2010 Hrg. Tr. at 7:21-25.  On July 16, 2010, the Clerk entered the default.  DE# 370.

Plaintiff now submits its Application for Entry of Default Judgment against Defendant Hydra.

## III.   ARGUMENT

### A.   Legal Standard for Entry of a Default Judgment

It is within the discretion of a court to grant a default judgment upon the application of a

plaintiff.  *Dow v. Jones*, 232 F. Supp. 491, 494 (D. Md. 2002).  Factors courts have considered in

granting a default judgment include:  (1) the possibility of prejudice to the plaintiff; (2) the

merits of plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of

money at stake in the action; (5) the possibility of a dispute concerning material facts; (6)

whether the default was due to excusable neglect, and; (7) the strong policy underlying the

Federal Rules of Civil Procedure favoring decisions on the merits.  *See Scott v. Wells Fargo*

*Home Mortg., Inc.*, No. 2:02-cv-789, 2003 U.S. Dist. LEXIS 26011, at *14-15 (E.D. Va. Jan. 14,

2003) (citing *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) and 6 Moore's Federal

Practice P55-05[2], at 55-24 to 55-26)) (attached hereto as Exhibit 1 to Appendix of Cases Not

Generally Reported).

Here, all factors favor entry of the default judgment.

### 1.    Plaintiff is certain to be prejudiced without a default judgment.

Failure to enter a default judgment against Hydra will prejudice BSI in several ways.

First, and most unfair, not entering a default judgment will effectively grant Hydra a victory on

the merits via Hydra's studied disregard for the authority and jurisdiction of this Court.  Our

legal system does not permit litigants to grant themselves a free pass.  A default is appropriate

here because Hydra has not retained new counsel as required by the Local Rules, and is

particularly appropriate since it has stated that it will not be retaining counsel or continuing on

with the litigation.  *See SEC v. Lawbaugh*, 359 F. Supp. 2d. 418, 421 (D. Md. 2005) (default

judgment entered when "adversary process has been halted because of an essentially

unresponsive party").[12]

Secondly, denial of this Application will prejudice BSI by effectively foreclosing it from

recovering damages from Hydra for its spam – which continues to be sent unabated.  *See New

York v. Green*, 420 F.3d. 99, 110 (2d Cir. 2005) (holding increased difficulty of recovery is a

---

[12] In addition, because Hydra has not complied with this Court's Order on Plaintiff's motion to compel [DE# 190], and has made clear that it will not comply with this Court's Dec. 7, 2009 order [DE# 248], sanctions under Fed. R. Civ. P. 37(b)(2)(A) are warranted, including a default. Fed. R. Civ. P. 37(b)(2)(A)(vi); *see* DE# 264 (Plaintiff's Motion for Order Enforcing This Court's December 7, 2009 Ruling Regarding Emails in this Case).  Further, Rule 37(b)(2) provides that where a party "fails to obey an order to provide or permit discovery," "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *Wash., D.C. Cement Masons Welfare Fund v. Rapid Response Constr., Inc.*, No. 08-3434, 2009 U.S. Dist. LEXIS 93021, at *5-6 (D. Md. Oct. 6, 2009) (quoting Fed. R. Civ. P. 37(b)(2)(C)).  The monetary sanction is mandatory and is "in lieu of or in addition to the orders designated by [Rule] 37(b)(2)(A)-(E)."  Paul W. Grimm, Charles S. Fax & Paul Mark Sandler, *Discovery Problems and their Solutions* at 274 (2005).

prejudice factor in a default determination); *District Council 16 N. Cal. Health & Welfare Trust Fund v. Garfias*, No. 3:2009-CV-03801, 2010 U.S. Dist. LEXIS 45968, at *19 (N.D. Cal. [May 11, 2010) (finding prejudice where denial of default judgment would make it unlikely that plaintiffs would recover damages) (attached hereto as Exhibit 2 to Appendix of Cases Not Generally Reported). Hydra's "reorganization" is likely to be used as a barrier to collecting on a judgment, thus likely requiring hundreds more hours of attorney time, filing of a new action in California, and substantial discovery into the fraud perpetrated by Hydra. Also, between the Court's direction to the Clerk to enter default and the filing of this motion, Hydra "merged" with or was acquired by another spamming outfit called AdKnowledge, potentially creating a second fraudulent conveyance as to this claim and another layer of complexity for Plaintiff to unravel before it can collect any damages.[13]  The sooner such action can commence, the greater the possibility of BSI recovering before Hydra squanders its assets or conducts another sham "reorganization" to shield itself from liability for its illegal spamming.

Finally, an award of damages at this time is appropriate.  On July 28, 2009, this Court in BSI's lawsuit against MailCompanyX and Sebastian Barale issued an Order of Judgment of Default as to liability only against those Defendants and deferred entering judgment as to damages.  Case No. 09-CV-00080 (PJM) at DE# 122.  At this point, however, now that this Court in the *Kraft* matter has denied Defendants' summary judgment motions on issues of liability and damages, it is now capable of entering judgment as to damages.  Moreover, prompt judgment against Hydra including damages is necessary to protect BSI's right to eventually recover such an award.[14]  Just as MailCompanyX and Sebastian Barale went into hiding in

---

[13] Bielicki Decl. Ex. 18.

[14] Mail Company X is owned by Barale, who defaulted, appeared to set aside the default and then ran off to Argentina and defaulted again.  In light of the Court's determinations at summary judgment in the *Kraft* matter, the

Argentina, in December 2009, Zac Brandenberg "moved" Hydra's assets to Hydra II, a company

he also runs.  Hydra then refused to participate in this suit.  DE# 280 at 2.  In order to pursue a

fraudulent conveyance or other recovery actions against the current and previous owners and

Hydra, and to avoid the prejudice of holding an uncollectable judgment, BSI deserves a

judgment that includes damages.  Time is of the essence in relation to the owners who left the

business as they may be inclined to squander the funds or do as Mr. Barale did and hide off-

shore.  Time is also of the essence as to action against Hydra because it has already taken action

to avoid responsibility in this suit and will likely take further action to avoid payments once BSI

holds an enforceable judgment.  Time is further of the essence as Hydra was sold yet again, in a

transaction that was reported on June 21, 2010.  Delaying a damages judgment when Hydra has

already demonstrated a willingness to attempt to evade liability prejudices BSI and its chances of

recovering damages.

### 2.    The Complaint is well pled.

"The defendant, by his default, admits the plaintiff's well pleaded allegations of fact, is

concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus

established."  *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001).

BSI has properly pled its claims against Hydra because the Complaint adequately

describes Hydra's illegal email advertising activities.  BSI alleged that Hydra and/or its agents

violated California law by sending or causing to be sent more than 28,000 – in fact, 45,773 –

commercial e-mail advertisements from California to BSI, which contained or were accompanied

by falsified, misrepresented, or forged header information, contained false or misleading

information about their origin or transmission path, and/or had a subject line likely to mislead a

---

time is now right for the Court to enter damages against Barale and MailCompanyX.  As such, Plaintiff has
concurrently filed a Motion to Open that case and to Assess Damages.

recipient or the capacity, tendency or effect of deceiving the recipient, in violation of Cal. Bus. & Prof. Code §§ 17529.5(a)(1), (2) and/or (3).[15]  Second Am. Compl. ¶¶ 34-36, 38-40, 41, 44-54, 56, 58-64, 75-89; *supra* notes 4 & 7.

Further, BSI has alleged that Hydra and/or its agents violated Maryland law by initiating the transmission, conspiring with another person or persons to initiate the transmission, and/or assisting in the transmission of more than 28,000 – in fact, 45,773 – commercial electronic mail messages to BSI in Maryland, which contained false and/or misleading information about the origin or the transmission path of the e-mail, and/or which contained false and/or misleading information in the subject line that had the capacity, tendency, or effect of deceiving the recipient, in violation of Md. Comm. Code § 14-3002.  Second Am. Compl. ¶¶ 25, 34-36, 38-40, 41, 44-54, 56, 58-64, 66-74; *supra* notes 4 & 7.

Specifically, Plaintiff alleged all the necessary elements of the statutory causes of action. First, Cal. Bus. & Prof. § 17529.5(b)(1)(A)(ii) provides that an "electronic mail service provider" may bring an action.  BSI is an electronic mail service provider.  Second Am. Compl. ¶¶ 1, 24. Second, Cal. Bus. & Prof. Code § 17529.5(a) states that "[i]t is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address" if:

> (1) The e-mail advertisement contains or is accompanied by a third-party's domain name without the permission of the third party; (2) The e-mail advertisement contains or is accompanied by

---

[15] Since this lawsuit was filed, Hydra has sent thousands of additional illegal emails to BSI.  The current total of spam emails attributable to Hydra is 45,773, not including the thousands of additional illegal emails to BSI, all of which contain a sales link that redirected through Hydra's server at lynxtrack.com and/or a URL with a Hydra domain, such as imglt.com.  *See* Wagner Decl. ¶ 18.  Between July 12 and July 30, 2010, at least 33 Hydra emails all advertising Gevalia for co-defendant Kraft were sent to BSIs domains. Each email contains Mailer ID: 15- . . ., which Kraft has stated designates Hydra, and/or sales links that re-directed to Hydras lynxtrack server.  In each email, the domains used by the spammer were registered under a false or misleading identity, such as to a proxy service.  In addition, BSI sent a reply email to one of the spam emails which bounced back (*i.e.*, could not be delivered) showing that the spammers From line is a fake, non-working email address.  *Id.* ¶ 19.

> falsified, misrepresented, or forged header information; . . . . [or]
> (3) The e-mail advertisement has a subject line that a person knows
> would be likely to mislead a recipient, acting reasonably under the
> circumstances, about a material fact regarding the contents or
> subject matter of the message.

Cal. Bus. & Prof. Code § 17529.5(a). Hydra sent or caused to be sent the email advertisements

at issue here, Second Am. Compl. ¶¶ 34-36, 38-40; *supra* note 4, from California, *id*. ¶¶ 35, 41,

46, 77-79, 86; *supra* note 4. Third, the Hydra emails at issue violate California law because they

were accompanied by falsified, misrepresented, or forged header information, and had subject

lines that a person knew would be likely to mislead a recipient acting reasonably under the

circumstances about a material fact regarding the contents or subject matter of the message. *Id*.

¶¶ 48-54, 56, 58-64; *supra* notes 4 & 7.

        With regard to Maryland law, first, BSI is an "interactive computer service provider" as

defined in the statute. *Id*. ¶ 24. Second, under Maryland Commercial Code § 14-3002(b):

> [a] person may not initiate the transmission, conspire with another
> person to initiate the transmission, or assist in the transmission of
> commercial electronic mail, that: (1) Is from a computer in the
> State or is sent to an electronic mail address that the sender knows
> or should have known is held by a resident of the State; and (2)(i)
> Uses a third party's Internet domain name or electronic mail
> address without the permission of the third party; (ii) Contains
> false or misleading information about the origin or the
> transmission path of the commercial electronic mail; or  (iii)
> Contains false or misleading information in the subject line that
> has the capacity, tendency, or effect of deceiving the recipient.

Hydra sent the emails at issue, conspired with others to send or initiate and/or assisted in the

transmission of the commercial email. Second Am. Compl. ¶¶ 34-36, 38-40; *supra* note 4.

These emails were sent to BSI's domains in Maryland, *id*. ¶¶ 25, 41, 44, 45, 72, and Hydra was

on notice that the transmissions were to email addresses held by a resident of Maryland because

the domains in the email addresses were accurately registered to BSI in Maryland, as can readily

be ascertained from publicly available Whois lookup services. Pursuant to Maryland

Commercial Code § 14-3002(c), "[a] person is presumed to know that the intended recipient of commercial electronic mail is a resident of the State if the information is available on request from the registrant of the Internet domain name contained in the recipient's electronic mail address." *Id*. ¶ 72. Third, the Hydra emails at issue violate the statute because they contain false or misleading information about the origin or the transmission path of the commercial electronic mail, and contain false or misleading information in the subject line that has the capacity, tendency, or effect of deceiving the recipient. *Id*. ¶¶ 48-54, 56, 58-64; *supra* notes 4 & 7.

In addition, with specific regard to the falsity in the emails, Plaintiff has also alleged:

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI that contained or were accompanied by falsified, misrepresented and/or forged header information. Second Am. Compl. ¶ 48. This includes, for example, that the e-mail arrived at the BSI servers bearing false information concerning the identities of the computers sending the e-mails. When an e-mail arrives, the transmitting computer sends a "HELO," which is a parameter typically showing the computer's name and/or IP address so as to identify to the recipient computer who is sending the e-mail and where it came from. In the case of these e-mails, the identities of the sending computers given in the HELO did not match the IP addresses of the sending computer. *Id*. ¶¶ 49, 52.

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI containing false, misrepresented and/or forged header information because the e-mails contained one or more fictitious, false and/or misleading names in the "From:" lines of the message headers. Hydra and/or its agents, attempted to mislead recipients by using different fictitious people's names in the "From:" lines of the message headers. *Id*. ¶ 53.

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI containing false, misrepresented and/or forged header information in that Hydra and/or its agents, used many false domain names in the sender addresses. E-mail sent with many domain names was designed by Hydra and/or its agents, to mislead the recipients of the messages, mask the identity of the true sender of the e-mail, and to deceive recipients and spam filters into *not* blocking the messages. *Id*. ¶ 56. By using multiple domain names and IP addresses, Hydra and/or its agents were able to disguise the actual source of the e-mail, and to trick ISPs by "spreading out" the total volume of e-mail, thus reducing the volume sent from

*each* domain name and IP address, and thus preventing spam filters which react to large volumes of e-mail from a single source.[16]  *Id.* ¶ 57.

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI containing false, misrepresented and/or forged header information because the e-mails included domain names which were registered to false, non-existent entities, as well as entities using false addresses and/or false telephone numbers. Over 500 illegal e-mails were sent by a single spammer under multiple domain names with a penchant for registering hundreds of throw-away domain names, using fake names, addresses and/or proxy services in the registration record (a.k.a. the "Whois data") for the domain to conceal its identity.  Hydra and/or its agents, included false domain names and/or domain names associated with false contact information so as to mask the true identity of the senders, and to prevent complaining parties from contacting them.  *Id.* ¶ 58.

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI containing a reply address that was not and/or could not be functional because the return address was connected with an invalid domain name or non-working account.  *Id.* ¶ 59.

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI containing false, misrepresented and/or forged information in the message body itself.  An e-mail not only bears statement(s) "about the origin" in terms of the origin's location, but can also bear statement(s) "about the origin" in terms of the origin's relationship to the recipient.  That is, these e-mails falsely claim to have been generated and sent to the recipient because the recipient requested the e-mail.  The e-mails falsely indicate the recipient requested to receive the e-mail. *Id.* ¶ 60;

- That Hydra and/or its agents initiated and sent commercial e-mail advertisements to BSI containing false, misrepresented and/or forged information in the subject lines.  This includes, for example, stating that the e-mail recipient had won a "Free" Gift.  The subject lines were designed by Hydra and/or its agents, to deceive or attempt to deceive the recipient, and were likely to mislead a recipient. *Id.* ¶ 62.

- That these e-mails have harmed and continue to harm BSI by interfering with BSI's business operations, requiring the application of time, money and technological resources to handle the spam.  Among the adverse affects to BSI that high spam loads have caused are decreased server response and crashes, higher bandwidth utilization, forced upgrades of expensive hardware and software, frustration of subscribers, and loss of staff time.  To the extent these

---

[16] The FTC, in its December 2005 report to Congress, identified sending e-mails with many domain names and IP addresses as a deceptive means of avoiding ISPs' filters.  *See* Bielicki Decl. ¶ 21 and Ex. 19, Fed. Trade Comm'n, *Effectiveness and Enforcement of the CAN-SPAM Act: A Report to Congress* A-3 & n.74 (2005), *available at* http://www.ftc.gov/reports/canspam05/051220canspamrptpdf.)

thousands of e-mails consume disk space, drain the processing power of BSI's computer equipment, and stress BSI's network infrastructure, those resources are not available to serve subscribers or perform other tasks. Spam is BSI's subscribers' number one complaint. *Id.* ¶ 65.

Based on the well-pled allegations in the Second Amended Complaint, Hydra is liable under the Maryland and California statutes for illegal emails sent to BSI.

### 3.    Plaintiff's substantive claims are meritorious.

The merits of BSI's substantive claims are fully supported by the written discovery and evidence adduced from Hydra and the attached declaration of BSI's president and owner.[17]

Hydra or its agents sent or caused to be sent from California 45,773 emails to BSI's domains in Maryland that contained falsity or deception in violation of Cal. Bus. & Prof. Code §§ 17529.5(a)(1), (2) and/or (3) and/or Md. Comm. Code §§ 14-3002(b)(i), (ii) and/or (iii) as explained above.[18] These 45,773 emails are attributable to Hydra because they contain: (1) address information attributable to Hydra, (2) domains attributable to Hydra, and (3) unique creatives and campaign information designed by Hydra to track its emails and facilitate payments to collaborating spammers. *See* Declaration of Paul Wagner ¶¶ 8-16; *see also* Declaration of John Levine DE# 295-45 ¶¶ 45, 47-50 (discussing attribution of spam and Hydra emails specifically).

Each of these emails contains at least one form (and in most cases, several forms) of the falsity or deception as described above and in section III.A.5.

### 4.    The sum of money at stake is not a relevant factor in this case; the damages are prescribed by statute.

---

[17] *See also* Bielicki Decl. Ex. 14, Third Party Defendant Hypertouch, Inc.'s First Set of Requests for Admission to Hydra LLC Nos. 1-9. These RFAs, admitting, *inter alia*, that Hydra provided content and sent the emails, and was paid and paid others for the emails, are deemed admitted by Hydra's failure to respond. *See* Fed. R. Civ. P. 36(a)(3); *Asis Internet Servs. Inc. v. Rausch*, No. 08-03186, 2010 WL 1838752, at *5 (N.D. Cal. 2010) (deeming admitted, including in a default setting, unanswered requests for admission under Fed. R. Civ. P. 36).

[18] *See supra* notes 4 & 7 and accompanying text.

The California and Maryland legislatures definitively determined that statutory damages are necessary to compensate ISPs and effectuate the purposes of the statutes.  Furthermore, substantial damages are warranted here in light of the brazen and unending stream of spam that Hydra spews forth – including over 20,000 pieces of spam that Hydra has sent to BSI *after this lawsuit was filed* – and Hydra's defiance of this Court.[19]  In addition, statutory damages ("liquidated damages" under the California statute) are generally provided for where, as here, damages are difficult to quantify.  *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707-08 (1945) (liquidated damages are compensation for damages otherwise "too obscure and difficult of proof.").  And, there is a presumption favoring the award of statutory liquidated damages. *Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 637 (D. Md. 2005) (internal cites omitted).

The California legislature has prescribed damages of $1,000 per illegal email plus actual damages.[20]  Similarly, the Maryland legislature has prescribed damages of $1,000 per illegal email.[21]  Hydra violated the law at least 45,773 times – in any other scenario, such deliberate,

---

[19] Rule 54(c) of the Federal Rules of Civil Procedure provides that "[a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment."  The judgment requested by BSI is the same in kind as the relief requested in the Complaint.  BSI sought $1,000 per email in statutory damages under Md. Com. Law § 14-3003 (Second Am. Compl. Prayer ¶ A), and $1,000 per email in statutory damages under Cal. Bus. & Prof. Code § 17529.5(b)(1)(B) (Second Am. Compl. Prayer ¶ C).  Plaintiff initially attributed over 25,000 emails to Hydra, but stated in the complaint that "The claims asserted in Count I [and Count II] are ongoing and include emails that may be received as Defendants may continue to send them, and as new information is discovered, up to the time of entry of a final nonappealable judgment."  Second Am. Compl. ¶¶ 71, 81.  Since the Complaint was filed, Hydra has sent thousands more illegal emails and this Court has Ordered that 20,331 additional emails are properly in this case.  December 7, 2009 Hrg. Tr. before Magistrate Judge Day at 30:18-19, 57:23-25.  Therefore, Plaintiff seeks relief on 45,773 emails that were sent to it by Hydra as these emails were appropriately demanded in BSI's prayer for relief.

[20] California Business & Professions Code § 17529.5(b)(2)(B) provides that ISPs such as BSI  "may recover either or both of the following: (i) Actual damages. (ii) Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of this section, up to one million dollars ($1,000,000) per incident."

[21] Maryland Commercial Code § 14-3003 provides that "[a] person who violates this subtitle is liable for reasonable attorney's fees and for damages: . . . (3) To an interactive computer service provider, in an amount equal to the greater of $1,000 or the interactive computer service provider's actual damages."  Md. Comm. Code § 14-3003(3).

repeated, egregious and ongoing violations would likely result in much more serious consequences than a fine. Further, Hydra was aware it was violating the law.[22]  It is counter-intuitive that Hydra should not be held responsible for its actions *because* it repeated its actions so many thousand times.  *See also* notes 10 & 11 and accompanying text.

Furthermore, this is not a mere technical default where the defaulter simply missed a deadline or there was a potential deficiency in receipt of the suit.  Hydra actively participated in this suit with the assistance of counsel for over two years.  It was most certainly aware of the potential liability it was facing.  *See* Wright & Miller, 10 Fed. Prac. & Proc. Civ. § 2663 (3rd ed. 1998) (default damages are limited to what is demanded in the pleading so that the defendant can choose whether it is worthwhile to "expend the time energy and money necessary to defend the action.").  In light of this knowledge, Hydra has affirmatively stated that it will no longer participate in this lawsuit.  Other courts have found that failing to participate in even the initial stages of the judicial process justifies large damages awards.  *See Phillip Morris U.S.A. Inc. v. Castworld Prods.*, 219 F.R.D. 494, 500 (C.D. Cal.. 2003) (failure to participate justified $2,000,000 statutory damages award); *Craigslist, Inc. v. Naturemarket Inc.*, No. No. C 08-5065 PJH, 694 F.Supp.2d 1039, at *1060 (N.D. Cal. 2010) (refusal to respond to allegations justified a $1,177,827 award).  Here, Hydra forced BSI and counsel to undertake thousands of hours of

---

[22] Hydra's compliance manager John Stafford wrote in May 2008:

> In the past 90 days, Hydra has recorded 6,319 Failure to Honor Unsubscribe violations.  Deduct 944 for a faulty suppression list for campaign 6495 and allow an overly-generous 30% deduction for errors, and the final count comes to 3,763, or 42 violations per day.  Next are the counts for Suppression List Abuse, the most serious of violations; Missing or malfunctioning Unsubscribe Options; Deceptive Subject Lines; and Deceptive From Lines.  During the same 90-day period, Hydra was held accountable for 244 Suppression List Abuse Violations; 1,054 Missing or malfunctioning Unsubscribe Mechanisms; 374 Deceptive Subject Lines and 280 Deceptive From Lines.

Bielicki Decl. ¶ 22 and Ex. 20, H00001696-1701.  That's at least 3,763 reported possible violations of federal law over just a 90-day period, some 42 per day.

work before it decided to walk away because the "litigation has no value to the company so there is no reason for the company to continue litigating." Failure to enter a default judgment effectively grants Hydra a victory on the merits of this case based upon its utter disregard for the authority and jurisdiction of this Court. It was Hydra's decision to walk away from this action. It is counter-intuitive to not hold Hydra responsible for its actions *because* of the large size of the ensuing liability.

### 5. There is no dispute concerning material facts.

There can be no dispute as to material facts because "[u]pon default, the well-pled allegations in a complaint as to liability are taken as true . . . ." *Disney Enters., Inc. v. Delane*, 446 F. Supp. 2d 402, 405 (D. Md. 2006); *see Ohio Cent. R.R. Co. v. Cent. Trust Co. of N.Y.*, 133 U.S. 83, 90-91 (1890) (by defaulting the allegations in the complaint are deemed true). Furthermore, many of these facts are deemed admitted via Hydra's failure to respond to the attached requests for admission. *See* Fed. R. Civ. P. 36(a)(3); *Asis Internet Servs. Inc. v. Rausch*, No. No. C-08-03186 EDL, 2010 WL 1838752, at *5 (N.D. Cal. 2010) (deeming admitted, including in a default setting, unanswered requests for admission under Fed. R. Civ. P. 36). By failing to continue to participate in this case, Hydra has forfeited its right to dispute material facts. *Ohio Cent. R.R. Co.*, 133 U.S. at 90-91.

The substantive merits of Plaintiff's claims are supported by information linking Hydra to the emails at issue as discussed in sections III.A.2 and 3. In addition, relevant to the falsity in the emails is the fact that spamming is intentional conduct. *Aitken v. Communs. Workers of Am.*, 496 F. Supp. 2d 653, 660 (E.D. Va. 2007) ("Spamming is intentional conduct essentially directed at, among others, servers and their owners."); *see also* note 26. *The intentional nature of spamming underscores that the falsity in the emails is purposeful – not random or accidental –*

*and designed to trick filters and trick the viewers of the emails.*  The emails contain purposeful falsity in numerous forms:

(1) falsified, misrepresented or forged header information – to evade spam filters, dupe the recipient into opening the email, and making it difficult to identify the actual sender of the email;

(2) false or misleading information about the origin or the transmission path, including false information about the identities of the computers sending the email – to evade spam filters and to hide the identity of the sender;

(3) subject lines that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or the subject matter of the message – such as touting a free product when there were significant conditions attached to receiving the product;

(4) subject lines that have the capacity, tendency, or effect of deceiving the recipient – such as claiming to offer free items that are not actually free;

(5) fictitious, false, and/or misleading names in the "From:" lines used to by-pass spam filters and mislead recipients of those emails;

(6) false or deceptively registered domain names in the sender address – to mislead the recipients of the messages, mask the identity of the true sender, and deceive recipients and spam filters into not blocking or isolating messages;

(7) use of large volumes of rotating domain names and IP addresses – identified by the Federal Trade Commission as a means to disguise the actual source of the email, reducing the

volume sent from each domain name and IP address, and thus evade spam filters which react to large volumes of email from a single source;[23]

(8) domain names registered to false, or non-existent entities, as well as entities using false addresses and/or false telephone numbers (such as an office on the "fourth floor" of a building in Miami that happens to be a three story building) – to mask the true identity of the senders and to prevent complaining parties from contacting them;

(9) reply addresses connected to invalid domain names or non-working accounts – to mask the true identity of the senders and to prevent complaining parties from contacting them;

(10) false or misleading information about the origin or transmission path in the body of the email itself such as stating that the recipient requested the email when that was not the case and other false opt-in information such as stating: "You have received this advertisement because you have registered with (Publisher List Name Entered here)," or provide the name of a Publisher List to which BSI had never opted-in – to deceive the recipient into believing there was a pre-existing relationship with the sender.

The falsity associated with each individual email is catalogued in BSI's response to Hydra's Interrogatory No. 1. *See* Wagner Decl. ¶ 17.

This falsity and deception is also explained in the declarations filed by BSI's experts in support of BSI's Opposition To Hydra's Motion for Summary Judgment.  DE# 295.  For instance, John Levine describes Hydra using false "From lines."  DE# 295 at Levine Decl. ¶¶ 28-30.  Levine also noted that multiple Hydra messages touted products as free when they actually required a purchase of a product or service.  DE# 295 at Levine Decl. ¶¶ 34-35.  Peter Resnick

---

[23] *See supra* n.10.

found multiple patterns of falsity and deception in the Hydra emails.  DE# 295-46 at Resnick

Decl. ¶¶ 55, 57-60, 62,65-67.

### 6.        There is no basis to find excusable neglect.

Default judgment against Hydra is warranted because the entry of default against this

Defendant did not result from excusable neglect.  Venable notified Hydra of the need for it to be

represented in this case by February 22, 2010.  *See supra* at 2-3.  After Venable's withdrawal

from this action was granted, Hydra failed to retain new counsel and even stated that it had no

intention to do so.  Because of this failure to defend, the Court entered default against Hydra.

*See, e.g.*, *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993) ("It has been the law for

the better part of two centuries . . . that a corporation may appear in the federal courts only

through licensed counsel."); *see also Pritchard v. Lubman*, 20 Fed. Appx. 133, 133-34 (4th Cir.

2001) (per curiam) ("it is well settled that a corporation must be represented by an attorney in

federal court").  This willful act to disregard the requirement to be represented by counsel does

not amount to excusable neglect.  *See also* notes 10 & 11 and accompanying text.

The Supreme Court has held that excusable neglect is an equitable determination that

should take into account all reasonable factors, including, the danger of prejudice, the length of

delay and its impact upon judicial proceedings, and the reason for the delay.  *Pioneer Inv. Servs.*

*Co. v. Brunswick Assocs.*, 507 U.S. 380, 394 (1993).  The Fourth Circuit has also given guidance

holding that when a party is at fault, it "must defend its conduct in order to show excusable

neglect."  *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 811 (4th

Cir. 1988).

There is no reason, equitable or otherwise, that defends Hydra's conduct in this case as it

has decided to cease participating in the matter.  The prejudice that this causes to BSI is

explained in section III.A.1.  The delay is itself is prejudicial; failure to enter this default

judgment will mean that BSI might not collect damages, or only after mounting significant additional legal hurdles.

After two years of contentious and expensive litigation, Hydra has simply abandoned this action and dared the Court to hold it accountable. There is no way that Hydra's inaction can be attributed to excusable neglect.

**7.     The policy favoring decisions on the merits is overridden by Hydra's lengthy participation in the case and brazen disregard for the Court's authority.**

The Fourth Circuit recognizes that it is within the court's discretion to grant default judgment when a defendant does not respond or defend its case. *Park Corp. v. Lexington Ins. Co.*, 812 F. 2d. 894, 896 (4th Cir. 1987). This Court has applied that guidance to find that "default judgment is available when the 'adversary process has been halted because of an essentially unresponsive party.'" *SEC v. Lawbaugh*, 359 F. Supp. 2d. at 421; *Monge v. Portofinio Ristorante*, No. Civil No. 09-3144-WDQ, 2010 WL 1759556, at *3 (D. Md. 2010) (default judgment granted when defendant failed to respond to complaint for four months). *Augusta* also holds that the need for judicial efficiency when a party is inactive and fails to respond can trump the interest in reaching a decision on the merits. *Augusta Fiberglass Coatings, Inc.*, 843 F.2d at 811.

Here, Hydra for over two years actively litigated the case and was represented by the same counsel as represents co-Defendant Connexus. That counsel has been in contact with Hydra since the time Hydra withdrew as evidenced by the communications submitted to the Court warning Hydra of the impending default. This Court has stated where a defendant began to litigate but then was "unresponsive" that "Defendant has had ample notice of impending judgment by default, but has taken no action whatsoever. Entry of default judgment is therefore clearly appropriate." *Lawbaugh*, 359 F. Supp. at 422. Similarly, Hydra was notified by its

withdrawing counsel that failure to obtain new representation could result in a default judgment. Hydra refused to do so and proceeded to not comply with pending discovery obligations or to respond to any of the numerous motions filed against it since its last filing on Feb. 4, 2010.

**B.      Damages of $1,000 Per Illegal Email Are Prescribed by the Anti-Spam Statutes.**

The California and Maryland legislatures gave ISPs like BSI the right to bring these claims and have authorized statutory damages for violations of their statutes. The statutes prescribe damages of $1,000 per email. *See supra* notes 23-24.

This case was filed on February 14, 2008. All 45,773 emails at issue are actionable under Maryland's three-year statute of limitations, *i.e.*, are dated not earlier than February 14, 2005. That results in $45,773,000 in liability to BSI. In addition, 23,918 of the 45,773 are actionable if a one-year statute of limitations, *i.e.*, are dated not earlier than February 14, 2007, were to apply under California law, as this Court has held in this case.[24] That results in an additional $23,918,000 in liability to BSI, for a total of $69,691,000 in statutory damages.

The language of both statutes indicates that the damages are not discretionary. Other courts have recognized that there is no discretion in awarding similar statutory damages in anti-spam cases. *See Microsoft Corp. v. JDO Media, Inc.*, No. 04-0515, 2005 WL 1838609, at *3 (W.D. Wash. Aug. 1, 2005) (awarding maximum statutory damages of $24,125,000 under Washington's anti-spam law because "[g]iven the statutory language of CEMA, the court finds it

---

[24] Plaintiff disagrees with the ruling holding that California would apply a one-year statute of limitations and reserves its right, as appropriate, to seek additional damages from this Court for the Hydra emails which would qualify under a three-year statute of limitations should this Court alter its conclusion.

Pursuant to the Court's ruling that a three-year statute of limitations applies to the Maryland claims, 29 emails pre-dating February 14, 2005 have been removed from the set produced to Hydra and are not included in the emails before the Court.

has no discretion in the amount of damages it awards.").  And, mitigation is not a factor here for purposes of California law.[25]

Further, numerous courts have awarded the full amount of very substantial damages in similar anti-spam cases.  *E.g.*, *Facebook, Inc. v. Guerbuez*, No. C08 03889 JF HRL, 2008 U.S. Dist. LEXIS 108921, at *1 (N.D. Cal. Nov. 21, 2008) (ordering $436,638,600 in statutory damages for violations of CAN-SPAM) (attached hereto as Exhibit 3 to Appendix of Cases Not Generally Reported); *MySpace, Inc. v. Wallace*, No. 2:07-cv-01929, 2008 WL 1766714, at *5 (C.D. Cal. May 29, 2008) (ordering statutory damages against two defendants of $160,390,200 and $233,777,500 for violations of CAN-SPAM); *Am. Online v. Smith*, No. 05-0344, 2006 WL 181674, at *3 (E.D. Va. Jan. 24, 2006) (awarding maximum amount of statutory damages under Virginia's anti-spam law); *Kramer v. Cash Link Sys.*, No. 3-03-CV-80109, 2004 WL 2952561, at *7 (S.D. Iowa Dec. 17, 2004) (ordering statutory damages against three defendants of $360,000,000, $720,000,000 and $140,000 for violations of Iowa's anti-spam law, RICO, and the Iowa Ongoing Criminal Conduct Act); *Walton v. Mueller*, 180 Cal. App. 4th 161, 164 (Cal. Ct. App. 2009) (involving entry of judgment against defendant of $40,000 for 400 violations of Cal. Bus. & Prof. Code § 17529.5).

---

[25] California § 17529.5(b)(2) does state that "[i]f the court finds that the defendant established and implemented, with due care, practices and procedures reasonably designed to effectively prevent unsolicited commercial e-mail advertisements that are in violation of this section, the court shall reduce the liquidated damages recoverable . . . to a maximum of one hundred dollars ($100) for each unsolicited commercial e-mail advertisement . . ."

No due care can be found here because, among other things, (1) Hydra continued to send illegal emails throughout the course of this litigation and continues to this day; (2) based on the multiple types of falsity intentionally used by Hydra and the 45,773 illegal emails sent by Hydra; (3) the fact that BSI has given ample notice it does not want Hydra's emails and notice of the domains it owns which are receiving the email, which could easily be put on Hydra's do not mail list, yet Hydra ignores that notice and information.  *See also supra* note 22.  Therefore, there is no basis to award less than the maximum per email.

In addition, the total amount of damages to be awarded under California law does not implicate the maximum damages limit defined as "up to one million dollars ($1,000,000) per incident" (*see supra* note 20) where "incident" means "a single transmission or delivery" because no single transmission is at issue.  The emails at issue were sent in separate transmissions.

IV.    **<u>CONCLUSION</u>**

For the reasons stated above, BSI respectfully requests that the Court issue an Order

entering judgment in favor of BSI and against Hydra, in the amount of $69,691,000.

Date:    August 12, 2010                        Respectfully submitted,

                                        _____/s/_____
                                        Thomas M. Barba (US DC-MD Bar No. 28487)
                                        John J. Duffy (US DC-MD Bar No. 28613)
                                        Scott Bielicki (US DC-MD Bar No. 29162)
                                        STEPTOE & JOHNSON LLP
                                        1330 Connecticut Ave., NW
                                        Washington, D.C.  20036
                                        T: 202-429-3000
                                        F: 202-429-3902
                                        tbarba@steptoe.com
                                        jduffy@steptoe.com
                                        sbielicki@steptoe.com

                                        Anthony A. Onorato (US DC-MD Bar No. 28622)
                                        STEPTOE & JOHNSON LLP
                                        750 Seventh Avenue
                                        New York, NY  10019
                                        T: 212-506-3900
                                        F: 212-506-3950
                                        tonorato@steptoe.com

                                        Of Counsel:

                                        Stephen H. Ring (USDC-MD Bar No. 00405)
                                        Law Offices of Stephen H. Ring, P. C.
                                        20300 Seneca Meadows Parkway, Suite 200
                                        Germantown MD 20876
                                        T: 301-540-8180
                                        F: 301-540-8195
                                        Mike Rothman (USDC-MD Bar No. 14568)
                                        Law Office of Michael S. Rothman
                                        401 E. Jefferson Street, Suite 201
                                        Rockville, MD  20850
                                        T: 301-251-9660
                                        F: 301-251-9610
                                        mike@mikerothman.com

                                        *Counsel for Plaintiff Beyond Systems, Inc.*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing *Plaintiff Beyond Systems, Inc.'s Application for Default Judgment Against Defendant Hydra LLC; the Memorandum of Points and Authorities in Support thereof; proposed Order; Declaration of Scott T. Bielicki and exhibits thereto; Declaration of Paul A. Wagner and exhibits thereto; and Appendix of Cases Not Generally Reported*, was filed electronically in accordance with the Court's CM/ECF procedures, and served on the below-named parties in the manners indicated:

VIA Court's CM/ECF Notification:

Barry J. Reingold (USDC-MD Bar No. 06490)
John M. Devaney (*Pro Hac Vice*)
John K. Roche (*Pro Hac Vice*)
PERKINS COIE LLP
607 14th Street NW, Suite 800
Washington DC 20005-2003
202-434-1613 (Telephone)
202-434-1690 (Facsimile)
jroche@perkinscoie.com
breingold@perkinscoie.com
jdevaney@perkinscoie.com

Darrell J. Graham
Law Offices of Darrell J. Graham, LLC
53 W. Jackson Boulevard
Suite 1334
Chicago, IL 60604

*Counsel for Defendants Kraft Foods Inc., Kraft Foods Global and Vict. Th. Engwall & Co.*

VIA Court's CM/ECF Notification:

J. Douglas Baldridge
Lisa Jose Fales
Ari N. Rothman
VENABLE LLP
575 7th Street NW
Washington, DC  20004
(202) 344-4000 (Telephone)
(202) 344-8300 (Facsimile)
jbaldridge @venable.com
ljfales@venable.com
anrothman@venable.com

*Counsel for Defendant Connexus Corp.*

VIA Federal Express and U.S. Mail:

Hydra LLC
800 Wilshire Boulevard, 2nd Floor
Beverly Hills, CA 90211
(Last Known Address)

_____/s/_____

Thomas M. Barba