```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
                      SOUTHERN DIVISION
```

- - - - - - - - - - - - - - - - x
                        :

BEYOND SYSTEMS, INC.,        :
                        :

        Plaintiff,     :
                        :

     v.             :  Civil No. 2008-00409-PJM
                        :

KRAFT FOODS, INC., et al.,  :
                        :

        Defendants.    :
                        :

- - - - - - - - - - - - - - - - x  March 2, 2012

                            Greenbelt, Maryland

MOTIONS HEARING


BEFORE THE HONORABLE CHARLES B. DAY, JUDGE

APPEARANCES:

For Plaintiff Beyond Systems,
Inc., and Third-Party Defendants
James Joseph Wagner and
Hypertouch, Inc.:           JEFFREY EDWARD McFADDEN, Esq.
                       Steptoe and Johnson, LLP
                       1330 Connecticut Avenue, N.W.
                       Washington, D.C.  20036


For Defendant Connexus Corp.:   ARI NICHOLAS ROTHMAN, Esq.
                       Venable, LLP
                       575 Seventh Street, N.W.
                       Washington, D.C.  20004

For the Intervenor:          SANFORD M. SAUNDERS, JR., Esq.
                       Greenberg Traurig, LLP
                       2101 L Street, N.W.
                       Suite 1000
                       Washington, D.C.  20037


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

Audio Operator:                    Hannah Bea Merez

Transcription Company:             CompuScribe
                                   5100 Forbes Boulevard
                                   Suite 102
                                   Lanham, Maryland  20706
                                   (301) 577-5882

gaw                                                                    3

<u>I N D E X</u>

                                                                  <u>Page</u>

Motion on Behalf of Plaintiff Beyond Systems, Inc.
     By Jeffrey Edward McFadden, Esq.                              6

Argument on Behalf of the Intervenor
     By Sanford M. Saunders, Jr., Esq.                             14

Argument on Behalf of Defendant Connexus, Corp.
     By Ari Nicholas Rothman, Esq.                                 15

Rebuttal Argument
     By Jeffrey Edward McFadden, Esq.                              35

Decision of the Court                                             41

Keynote:   "---" indicates inaudible in the transcript.

1                        P R O C E E D I N G S

2              THE CLERK:  -- Docket No. PJM08-409, Beyond Systems,

3    Inc., versus Kraft Foods, Inc., et al.  We are here for the

4    purpose of a motions hearing.

5              Counsel, would you please identify yourselves for

6    the record?

7              MR. McFADDEN:  Jeffrey McFadden, Steptoe and

8    Johnson, here on behalf of the plaintiff, Beyond Systems, Inc.,

9    and the third-party defendants, Joseph Wagner and Hypertouch,

10   Inc.

11             THE COURT:  Thank you.  Welcome.

12             MR. McFADDEN:  Thank you.

13             MR. ROTHMAN:  Good morning, Your Honor.  Ari Rothman

14   from Venable representing Connexus Corp.

15             THE COURT:  Good morning.  Welcome.

16             MR. SAUNDERS:  Sandy Saunders from Greenberg Traurig

17   for non-party World Avenue.

18             THE COURT:  I see you found a place for yourself.

19             MR. SAUNDERS:  I am trying to stay out of the way.

20             THE COURT:  Okay.  Thank you.

21             All right.  Thank you all for coming down.  And give

22   me a moment, let me find my place.

23             (Pause.)

24             THE COURT:  Okay.  It looks like we have several

25   motions, which appear to me to be mirrors of each other.  But I

1   think the first one to hit was BSI's motion under ECF 439.   I

2   have read the briefing regarding that.   Then we have the

3   Connexus motion to compel under 441-2.   And I have reviewed the

4   submissions related to that.   Then we have the cross motion to

5   quash by World Avenue and others at 449.

6            Am I missing something with respect to that universe

7   of motions?

8            Hearing none --

9            MR. ROTHMAN:   Your Honor, that's correct with

10  respect to the World Avenue subpoenas.   The only thing I would

11  note is that we also filed a motion to compel a couple of days

12  ago seeking some of the same information from Beyond Systems.

13  And they are sort of ---

14           THE COURT:   There may be some overlap.   Thank you.

15  And I am aware of that motion.   I have not reviewed that

16  motion.   I apologize, if it is ripe.   I don't think yet, but we

17  will hopefully dive into some of this.

18           I understand that you all have a trial date set for

19  June 2012 dealing with the mini-trial issues, principally the

20  status of BSI as an interactive computer service provider and

21  the residency question of BSI in terms of the statutes in play,

22  and also the relationship issues with respect to BSI and

23  Hypertouch, Inc.

24           With all of that being said, I guess I need to give

25  BSI the first opportunity.

 1              MR. McFADDEN:  Thank you, Your Honor.  Good morning.

 2     Thank you for hearing us this morning.

 3              All of this really distills down, I am happy to

 4     report, to one simple issue, and that is whether the settlement

 5     agreement between BSI and World Avenue is discoverable.

 6              THE COURT:  Is that to say that the question

 7     regarding transcripts and all of that is no longer before the

 8     Court?

 9              MR. ROTHMAN:  To some extent it is.  There is a

10     question, because there was a transfer of documents after we

11     issued the subpoenas from World Avenue to Beyond Systems,

12     that my understanding now is that World Avenue no longer has.

13     And the most recent communication I had with Mr. Saunders last

14     night, which was in the middle of my prep for this hearing

15     today, suggested -- and I suggested to him that there is also

16     the question of communications reflecting what exactly was

17     transferred as a result of the settlement agreement and, in

18     particular, while World Avenue was under subpoena.

19              THE COURT:  Okay.

20              MR. ROTHMAN:  And there are reasons I can get into

21     for that.

22              THE COURT:  We will catch up with that.  But for

23     now, Mr. McFadden, you still have the floor.

24              MR. McFADDEN:  Thank you, Your Honor.  And I am

25     really not prepared to speak to that.  I don't think that is

1   really even an appropriate issue for today's hearing.  I really

2   think that the only reason we are here, and that we need to be

3   here, is whether or not the settlement agreement should be

4   produced to Connexus.

5          And that, frankly, is also the only issue really.

6   There's a couple of ancillary issues, but there is substantial

7   overlap between the current motion to compel, which Your Honor

8   has not read yet, and the motion to quash.  The reasons are --

9   why we believe that the settlement agreement should not be

10  produced are exactly the same as the reasons set forth in our

11  opposition to the motion to compel.  So I think we are going to

12  just spend in a very efficient way with the vast majority of

13  the remaining issues over discovery that remain between BSI and

14  Connexus.  And there are very few.  And the only one I think

15  that is ripe for discussion today is the settlement agreement.

16         Your Honor did note that there is going to be a

17  trial in June.  But I would also point out that -- and this was

18  in the letter I sent to Your Honor yesterday, there is going to

19  be a hearing on the 14th of March in front of Judge Messitte on

20  the issue of whether in fact the Maryland statute has any kind

21  of bonafide requirement with respect to it.  That is issue

22  number one that we are going to be arguing on the 14th.

23         The second issue is --

24         THE COURT:  Before you go too far, I don't want

25  something important to have flown over my head.  I am sorry, I

1  don't recall reading a letter from you yesterday or something

2  you sent to me yesterday.

3          THE COURT:  Well, I am sorry.  We did in fact send a

4  letter to you yesterday arguing that today's hearing should be

5  taken off calendar because -- and I will explain why.  And then

6  Connexus also sent their own letter in response.  So, Your

7  Honor, it is okay.

8          THE COURT:  Okay.

9          MR. McFADDEN:  It is okay because I am going to

10  cover that same ground right now.

11          THE COURT:  Okay.  Thank you.

12          MR. McFADDEN:  Okay.  And the reason I sent the

13  letter and the point I want to at 12 days from now the issue of

14  this whole notion of whether, under the Maryland anti-spam

15  statute, there is a requirement to show that BSI was a bonafide

16  ISP, which is not a term that you find anywhere in the statute

17  or under any case that has ever come through the statute.  And

18  I want to make clear, Your Honor, I am not here to argue that

19  today.  What I do want to say is that that is going to be

20  argued 12 days from now.

21          And so we are finally going to put to rest 12 days

22  from now the whole question of whether there has to be some

23  showing to have standing under the -- for an ISP to have

24  standing under the Maryland statute.  There is some sore of

25  bonafide requirement.  That is a notion that is borrowed from

1   the Gordon case from the Ninth Circuit.  And I —— in one of the

2   papers that Connexus submitted —— and this really is sort of

3   the gist of, for lack of a better term, Your Honor, the

4   assumptions that we all have been operating under so far with

5   respect to discovery in this case, especially with respect to

6   these three mini-trial issues.

7         This is from a hearing that was held on February 16,

8   2011.  "The Court finds that the information sought may inform

9   the Court in its assessment of statutory damages.  The

10  motivations of plaintiff, as well as those of the named

11  defendants, may be of value to the Court.  Equally true,

12  discovery of impeachment evidence is appropriate.  The

13  quantification of income derived from litigation endeavors

14  juxtaposed with those from the legitimate operation of an

15  internet service provider may influence the Court as to the

16  motives of plaintiff in light of any legislative intent."

17  And then the Court cites Gordon, the Gordon case in the Ninth

18  Circuit.

19        And then the Court goes on to say that "While the

20  statute in Gordon is not controlling here," and it is not ——

21  Gordon was the federal CAN-SPAM Act.  Here we are dealing

22  solely with the Maryland statute —— "the Court's reasoning may

23  be helpful in discerning the true harm inflicted upon Beyond

24  Systems, Inc."

25        The reason I read that is because all of those

1 possibilities proffered by the Court are all going to be

2 resolved in this hearing 12 days from now. And all my letter

3 was trying to say was this is premature. To be arguing over

4 one last increment of BSI's litigation proceeds -- and that is

5 all that is at issue here. It is the only reason that Connexus

6 wants the settlement agreement. They actually proffer three

7 reasons. We are willing to answer the other two. It is only

8 the amount of the settlement between BSI and World Avenue.

9          Our argument is first and foremost that it is

10 premature to be fighting over that today when this issue

11 whether these litigation proceeds are ultimately relevant at

12 all is going to be resolved 12 days from now. That is point

13 number one.

14          Point number two is, irrespective of how the Court

15 comes out on that, we have produced to Connexus, in addition to

16 the mountain of discovery we have given them, all the World

17 Avenue documents. In fact, as Mr. Saunders pointed out in one

18 of his papers, we actually produced more documents to Connexus

19 than we produced to World Avenue. We were ordered to produce

20 certain backup documents. But then the case settled, and we

21 never actually produced them to World Avenue. We did produce

22 them to Connexus. That is all the financial documentation, all

23 the backup, that foots all of the litigation and non-litigation

24 revenue that BSI earned from 2004 to 2010. That is seven years

25 worth of information.

1          So what Connexus has right now, to the extent that

2   the proportion of BSI's litigation revenue to its non-

3   litigation revenue is relevant, again, an issue that will be

4   decided or argued 12 days from now, they have seven years worth

5   of information.  What we are here fighting over here today is

6   2011 and the last bit of information, the last piece of

7   information, concerning litigation revenue, which was the

8   settlement number between Connexus and World Avenue.  It is

9   entirely cumulative of the seven years worth of data they

10  already have.  It is not going to materially make any

11  difference as to what proof they put on in front of the jury as

12  to the proportion of litigation and non-litigation issue.

13         So under the standard analysis the Fourth Circuit

14  and courts in the Fourth Circuit undertake with respect to

15  the -- it is not just a matter of relevance.  It is also a

16  matter -- it is a balance between relevance, need, and

17  prejudice.  I would hope that the prejudice is somewhat

18  obvious.  It is sort of a white elephant that does not really

19  come through in any of the papers before Your Honor.

20         THE COURT:  I thought you told me earlier that the

21  relevance, rather the balance, is relevance, need, harm, and

22  confidentiality.

23         MR. McFADDEN:  And prejudice.  Or harm, same word.

24  Yes, Your Honor.  Yes, that's right.  You nailed it.  That is

25  exactly the test.  I am talking about the harm.  What is the

1    harm here?  The harm is that we are going to reveal, be forced

2    to reveal, to Connexus the amount we settled the World Avenue

3    case with BSI.  That was a settlement that occurred on the eve

4    of trial, right before the very same mini trial that we are now

5    getting ready for in June of this year.

6           And the harm in revealing that settlement number to

7    our current adversary in the very same proceeding, I think, is

8    obvious.  I don't -- we, my client does not want Connexus to

9    know how much we settled the World Avenue case for.  And that

10   just gives Connexus a tremendous leg up should we at some point

11   finally get around to trying to settle this case.  And so I

12   would hope that Your Honor appreciates the harm.

13          Now, Connexus is going to say:  Well, no, we don't

14   want the number.  All we want is -- all we want is BSI's total

15   litigation revenues for 2011.  Well, that is the same number.

16   It is the same number.  So if we tell them, okay, here is our

17   total litigation revenues for 2011, they do the math, and now

18   they know, you know, even within an approximation, they know

19   how much we settled the case with World Avenue for.

20          THE COURT:  And that really, what you are talking

21   about, it really fuels any potential settlement discussions

22   between the two of you, because the question of the

23   admissibility of that number, if you will, is something for the

24   trial judge on a different standard altogether.  And I can

25   appreciate the idea that you don't want your business in the

1   street, so to speak, particularly to your adversary.  But that

2   is certainly true of every case that comes in the door, whether

3   it is a medical malpractice action or an action where one party

4   wants to get at the other person's income stream over the past

5   few years.  I do appreciate the delicacy of it.  But I can tell

6   you at this moment the persuasive argument to me has been the

7   timing issue.

8           So I have my leanings as to where I am going with

9   this.  But in the event that I weigh in favor of Connexus, it

10  may be that you made a pretty good argument about standing down

11  until at least the 12-day thing.

12          MR. McFADDEN:  Well, I appreciate that.  And I think

13  it makes eminent sense to do so.  I think it makes eminent

14  sense.  It is 12 days.  There is not going to be any prejudice

15  to Connexus waiting 12 days.

16          I would -- the last argument, and then I am going to

17  sit down, the only other argument I would make with respect to

18  the confidentiality agreement itself is we have cited numerous

19  cases in our papers, and I am not going to go into any of them,

20  you know, where Courts have recognized the importance and the

21  policy considerations protecting the settlement number between

22  two parties.  Because otherwise to just say, well, you know,

23  we're not going to respect that, it just has a chilling effect

24  on the ability of parties going forward to settle.

25          If the rule is you settle with party number one on

1    day one and then five days later party number two, who is in a

2    parallel litigation with you, gets to discover what you settled

3    to on day one, I am going to be less inclined to settle on day

4    one.  I am going to be very, you know, I am going to be less

5    inclined.  And so I think that is the policy consideration

6    underlying those cases.

7              And that is all I have, Your Honor.  And I would

8    just ask for a few minutes of rebuttal when the time comes.

9              THE COURT:  Absolutely.  And before I get to hear

10   from Mr. Rothman, I think maybe this is a wonderful pregnant

11   moment to insert World Avenue, because I really think that

12   their argument is kind of aligned with yours at this point.

13             Mr. Saunders, you have graced us today.  I will be

14   glad to hear you.

15             MR. SAUNDERS:  Your Honor, it is my understanding

16   that the only issue left between us and BSI over the subpoenas

17   for discovery is the settlement agreement.  We do not oppose

18   the disclosure of the amount.  BSI has made the decision to

19   clarify that that is the only litigation revenues they have for

20   the year.  We are still happy with that.  We thought it was

21   a -- we would prefer, obviously in a perfect world we would

22   prefer that it not be disclosed.  Characterizing the litigation

23   revenues would have been fine with us.  But that cat is out of

24   the bag.

25             We don't oppose the disclosure of that.  It can

1   still be made confidential under the confidentiality agreement

2   that is in this court.  We do have much stronger feelings about

3   the terms and the other aspects that went to the settlement

4   agreement.  The Court in prior rulings both in this case and in

5   our case has required that BSI turn over revenue amounts, but

6   not turn over the settlement agreements themselves.  We went

7   down this path in the World Avenue case.  And we would ask that

8   the Court stick with that pattern and leave the rest of the

9   agreement as outside the scope of discovery.  It is the

10  financial issues that are relevant to what the parties are

11  doing.  And we don't see any basis for the non-financial terms

12  to be disclosed.

13          So we would just ask -- we ask the Court to be

14  consistent in that regard.  Beyond that, we don't have any

15  opposition to that number.

16          THE COURT:  Okay.  Thank you.

17          MR. SAUNDERS:  If BSI wants to raise any other

18  issues, I can address them after they do.

19          THE COURT:  Certainly.

20          Mr. Rothman, the stage has been set for you in more

21  ways than one.  So by all means.

22          MR. ROTHMAN:  Thank you, Your Honor.  I will respond

23  to both of their arguments at the same time.  I will address

24  the timing issue first.

25          Just to put this in context, the reason why Beyond

1   Systems filed the motion to strike, it was as a result of Judge

2   Messitte issuing an order requiring us to brief whether or not

3   the three mini-trial issues should be tried to a jury or to a

4   judge.  Beyond Systems approached us and asked us if they could

5   also brief this issue.  I mean, they were going to brief it

6   anyway, so we weren't going to say no.  And so for efficiency

7   purposes we consenting to a briefing schedule that allowed them

8   to raise the issue that he just identified, judge, jury, and

9   the burden of proof.

10          Subsequently, plaintiff filed a motion with Judge

11  Messitte requesting that the Court defer ruling on, among other

12  things, discovery disputes until after resolution of discovery

13  disputes pending in this court.  We opposed that motion,

14  explained that there would be prejudice to us by waiting, given

15  that we are already -- I mean, now we are in March.  Our expert

16  disclosures are due in a few weeks.  And then we are full-blown

17  mini trial prep.  And suggested that the Court could rule on

18  discovery motions as and when it sees fit.

19          Judge Messitte agreed with us and denied plaintiff's

20  motion outright via paperless order ECF No. 473.  So to us that

21  was a clear statement that the discovery issues can and should

22  be ruled on as the Court sees fit, notwithstanding whatever

23  arguments they made in their motion to strike.

24          I want to come back to whether or not we have all

25  World Avenue documents, because we spent a lot of time focusing

1   on the settlement agreement.  So I want to hit that first.

2          The argument that is made is that the 2011

3   information is cumulative.  It is not cumulative.  Actually, I

4   don't know if it is cumulative.  I don't know the amount.  If

5   the amount exceeds everything they got in the past, when you

6   add it all up and you compare that to even less revenue that

7   they generated from supposed ISP activities, that's not

8   cumulative.  That shows exactly what we have been contending

9   all along.

10         The other reason why the World Avenue settlement

11  number is relevant is because of the relationship and how that

12  lawsuit came to pass and the similarities with this case.  In

13  both cases, Hypertouch -- and we fight over the verb all the

14  time -- re-routed, route, sent, forwarded, whatever it is, the

15  e-mails from a California server to Beyond Systems in Maryland,

16  Beyond Systems sues Kraft.  They sued us in California before

17  it was transferred here.  They sue World Avenue, all within

18  weeks of each other.  They had this game plan document, which

19  we have the redacted form, I suppose, that shows all these

20  lawsuit efforts that they were going through.  And lo and

21  behold, that is exactly what happened in the World Avenue case

22  in August of last year.  Same setup, same parties, same

23  lawyers, same court.  To us, it is not cumulative, but we truly

24  don't know if it is cumulative or not.  But we want that, we

25  want to know the number.

1          And we also want to know what Joe Wagner benefitted,

2    or how he benefitted, from this whole scheme.  So if he was a

3    signatory to that agreement, if he got paid off for e-mails

4    that he routed to Beyond Systems, that shows in mini-trial

5    issue number three, the relationship between the parties,

6    whether or not, as Messitte put it in his order, they really

7    are in the business of manufacturing lawsuits and causing harm

8    to themselves.

9          And so that -- and it couldn't be clearer that that

10   is what is going on here.  This falls perfectly in line with

11   what we have been saying all along.  And it goes to e-mails

12   that happened or were sent in 2005.  So even though it was

13   revenue that was generating in 2011, it goes back to the same

14   time period that the Court has already deemed as discoverable.

15         Mr. McFadden said that the harm is obvious.  It is

16   not obvious to us.  One way to deal with this issue is to

17   produce a redacted form of the settlement agreement.  We don't

18   want -- if there are business practices issues with World

19   Avenue, we are not interested in those at all.  We would be

20   happy just taking the numbers for the Wagners, and everything

21   else can be redacted with the possible exception of how

22   documents were to be handled in transfer, which I will get to

23   in a moment.

24         And if they want to produce it as attorneys' eyes

25   only so that we don't show it to our client, we will have to

 1   show it to them at trial, and we will have to show it to our

 2   experts before trial, but if they want to hold it over as

 3   attorneys' only, we will be willing to do that, too.  We are

 4   not trying to get an unfair leg on settlement discussions.

 5   There haven't been settlement discussions maybe in two, three

 6   years.  The subject has not even been broached.  But that

 7   should eliminate plaintiff's issue about my client knowing what

 8   number was settled for.  And, again, we would agree to treat

 9   that as attorneys' eyes only until trial, when it goes, you

10   know, into the public record.

11            THE COURT:  I am really perplexed as to how that

12   might work.  You would know the numbers.  Your client would

13   not.

14            MR. ROTHMAN:  Right.

15            THE COURT:  You are engaged in settlement

16   discussions.  And do you just give the client a no, no, not

17   yet, not yet?

18            MR. ROTHMAN:  We have done -- I have had to do that

19   before in a big antitrust case, where revenue information was

20   produced from our adversary.  There were discussions going on

21   in that case.  And I couldn't tell them what this company's

22   revenues were.

23            THE COURT:  Okay.

24            MR. ROTHMAN:  And that case settled.

25            There is also, with respect to the expectation of

 1 | confidentiality, there could not have been any expectation of

 2 | confidentiality as to the litigation revenues when they entered

 3 | into this agreement.  They entered into this agreement in

 4 | August of 2011.  That is almost two years after Your Honor

 5 | issued the court order in this case in October of 2009

 6 | compelling Beyond Systems to provide its litigation revenues

 7 | through the present.

 8 | That was also after World Avenue compelled that very

 9 | same information from Beyond Systems in the World Avenue case

10 | in this court, as well.  So the idea that they went into the

11 | settlement discussions thinking that this would be covered and

12 | nobody would ever find out about it, much less in the

13 | litigation where it is at issue, it doesn't make sense to us.

14 | And we submit that there could not have been any legitimate

15 | expectation of confidentiality.

16 | In terms of admissibility, we agree it is for the

17 | trial judge to decide whether it is admissible.  We think it

18 | is.  Maybe parts of it will be; maybe parts of it won't be.

19 | The issue for our motion is whether or not it is discoverable,

20 | and we think it is.

21 | The financial terms, we are fine -- you know,

22 | whatever World Avenue is taking whatever actions or inactions,

23 | we don't care about that, as I explained.  So we are happy not

24 | seeing the parts of the record on that.

25 | In terms of the chilling effect, I mean, there might

1    be a chilling effect for a company that is engaged in filing a

2    lot of lawsuits, which we say Beyond Systems, that is exactly

3    what it is.  So I could see the argument as to why they don't

4    want that information out there.  They filed this suit.  They

5    filed the World Avenue suit.  They filed the Kraft suit before

6    Connexus got merged into the Kraft suit.  They filed scores of

7    other suits.  That's the risk that they take.

8            I mean, if that is their business, then I don't see

9    how the chilling effect would even be relevant here.  Moreover,

10   the cases we cited, which largely went unrebutted, if there is

11   discoverable information in the settlement agreement, then it

12   has to be produced.  And that is where -- there is a consistent

13   line of cases on that.  And that is especially true where there

14   is already a protective order in this case.

15           The second issue I just want to touch upon briefly.

16   And this was -- I raised this with Sandy last night.  Again,

17   as -- and it was late.  I am reading it on my Blackberry.  It

18   was 9:00 o'clock, as I had just landed.  We don't know if we

19   have all the World Avenue documents.  We have Beyond Systems

20   saying we have them.  We have World Avenue saying that they

21   gave certain documents to World Avenue.  But I know I am

22   missing stuff.

23           Alternatively, I don't know if I am missing stuff.

24   And I can give a couple examples.  One of them is certain

25   inspections, videotape inspections, that occurred in the World

1   Avenue case.  We received from Beyond Systems certain

2   inspections.  We also received -- wait.  I think I just -- I

3   don't know what I just said.  We received from Beyond Systems

4   certain videotaped inspections.  We also received slip sheets

5   from Beyond Systems indicating that videotaped inspections had

6   been produced.

7          We asked Mr. McFadden:  Did you produce these to us?

8   Because we have no way of knowing if the videotaped inspections

9   they received were the ones on the slip sheets.  He said he

10  wouldn't tell us, because we filed a motion to compel two days

11  ago, even though that motion to compel doesn't cover the

12  videotaped inspections.

13         To the extent there is documentation showing exactly

14  what was transferred from World Avenue to Beyond Systems, we

15  want to know what that is.  The same thing holds true for the

16  Paul Wagner and Joe Wagner videotape depositions.  Beyond

17  Systems says they don't have them.  I was told by World Avenue

18  that that information was transferred to Beyond Systems.

19         So how do I -- I mean, why am I stuck in he middle

20  of this?  All I want is the information.  Somebody has to have

21  it.  World Avenue says it doesn't have it.  I cannot compel

22  something they don't have.  But what I can compel and what I am

23  hoping I can get is any documentation, contemporaneous

24  documentation, showing what was transferred by World Avenue to

25  Beyond Systems and when, especially since we know because we

1    followed a letter in our papers that information was

2    transferred from World Avenue to Beyond Systems while World

3    Avenue was under subpoena by us.

4           And, you know, that bothers us.  But their response

5    is that Beyond Systems was insisting on it and threatening to

6    file lawsuits over breach of the confidentiality provisions.

7    And I might be getting the wording ready, but there was some

8    sensitivity there.

9           So the second issue for us is I need some way to

10   check to make sure that I actually have everything that they

11   are supposed to give me.  And the only way I think I can get

12   this at this point, since World Avenue no longer has the

13   confidential information in its case, is if there is any

14   letters, e-mails, and those sorts of things showing exactly

15   what was transferred.  That's all.  And I think we have

16   narrowed the controversy considerably since we first brought

17   this to the Court's attention.

18          THE COURT:  Okay.  Thank you.

19          Before I hear from Mr. McFadden, let me go to the

20   bull in the ring for now.  I am distressed in hearing that

21   maybe there was a transfer of materials after a subpoena had

22   been served.  Help me.

23          MR. SAUNDERS:  Your Honor, we were, at the same

24   time, we were subject to a protective order in our case that

25   required the instruction or a return of confidential materials

1  that were produced in the litigation at the conclusion or with

2  the settlement.  We felt compelled to comply with that

3  protective order --

4            THE COURT:  Well, it was a protective order.

5            MR. SAUNDERS:  -- and the instructions in there.

6            THE COURT:  There was a protective order.  I get

7  that.

8            MR. SAUNDERS:  Right, which had a --

9            THE COURT:  But there was also a subpoena.

10           M. SAUNDERS:  Right.  It was conflicting -- now, we

11  complied with the protective order before we got the subpoena

12  in that we did destroy -- well, BSI expressed a preference that

13  we destroy those materials.  And we agreed to do that even

14  though there were settlement discussions.  So absent an order

15  from the Court, I cannot give the Court any protected --

16           THE COURT:  Well, surely you know I wouldn't be

17  raising a stink about documents destroyed consistent with a

18  protective order before the receipt of a subpoena.

19           MR. SAUNDERS:  Right.  So after the receipt of the

20  subpoena, in trying to decide what to do, we talked to BSI.

21  And we then took what was covered by the protective order that

22  we still had.  And I can explain to the Court what happened.

23  We received a copy from the court reporter of our expert's

24  deposition transcript.  At that time that was the only copy.

25  We didn't have any copies of it, because we had destroyed it.

1    It was replete with confidential information.  And it was just

2    easier, instead of trying to pull out the individual pages, we

3    destroyed the transcript.

4            When we received that, that was what triggered it.

5    We said what do we do with it now.  At that point then we went

6    back and double checked our files to see if anything had been

7    missed.  We found some other materials that were confidential.

8    We spoke to BSI and had an agreement with BSI that they would

9    maintain those documents.  And we would return them to them.

10   And consistent with Rule 45, where the rule protects third

11   parties from burden of producing materials when it is easier to

12   get them from one of the parties in the case -- they were still

13   involved in discovery.  It was their materials.  So we went

14   them back.  And we copied Connexus contemporaneously with doing

15   it.  We sent the cover letter.  There was no index.  I can't

16   tell you everything that was in I think what wound up being a

17   total of two or three boxes.  But we notified Connexus at the

18   time that simultaneous to sending them to BSI and with the

19   understanding that BSI would maintain those.  And if they were

20   subject -- if they were ordered to produce them in this case,

21   that they would do so.

22           There were no World Avenue proprietary materials in

23   there.  And there has been no destruction of World Avenue

24   materials in connection with the mini trial since the receipt

25   of the subpoena.

 1          So that is where we stand.  We have looked at --

 2   Mr. Rothman sent us a list of the inspections.  And in the slip

 3   sheets that BSI produced, Your Honor will remember those are

 4   the slip sheets that we put when we produced the materials that

 5   Your Honor looked at in my little black book, you know,

 6   approximately a year ago in court.  So if they produced the

 7   disks that went with the slip sheets, they have them.

 8          But I don't know.  I would have to ask BSI that.  I

 9   didn't physically make the production.  If they -- and I don't

10   know whether those were sent afterwards.  I mean, those were

11   the slip sheets we prepared contemporaneously during the

12   litigation.  And that was how we produced them to BSI at the

13   time.  So they -- but my understanding is, and Connexus can

14   correct me if I am wrong, they don't really care whether they

15   get them as an original production or as a subsequent

16   production.  They just want to know what inspections took

17   place.  We went through them.  It appears to represent all the

18   inspections that we did.

19          So if they had the disk, that's it.  The same thing

20   with the deposition transcripts for the non-party witnesses.

21   We have an issue of -- there were questions raised about the

22   video parts of Joe Wagner's deposition.  I am told by my CS

23   that those were destroyed when we did our initial compliance,

24   before we received the subpoena.  And we don't -- there were no

25   copies, there were no disks or video copies, of the transcripts

1   that were among what was returned when we sent documents back

2   to BSI.  Whether there was a copy, they do recall there was in

3   all likelihood another copy, the physical copy, of the

4   deposition itself, but not the disk because that was with the

5   original.  And also, we had deleted those from our files when

6   we were complying, consistent with the protective order.

7          And, again, I think I can say this without violating

8   the terms of the confidentiality agreement.  But yes, there is

9   a -- there is reference to the protective order in the

10  settlement agreement.  So there is a crossover there.  But

11  absent the Court ordering me to do so, I am not -- I would

12  prefer not to start talking about terms and run the risk of

13  violating the settlement agreement.

14         As to Mr. Rothman -- so we don't have any of the

15  documents left.  And anything we had at the time we were

16  subpoenaed, it is our understanding that we sent them back.  We

17  notified Connexus.  And we sent them a copy of the cover letter

18  to BSI.  And our understanding from representations for BSI

19  counsel is they maintain those boxes and to the extent

20  responsive they have produced those.  So anything we had, you

21  know, Connexus should have it.

22         And as to the -- just to clarify what I had said to

23  Mr. Rothman, because he was on the plane, I didn't say BSI --

24  BSI never threatened to sue us over this.  What I said to him

25  was my client was emphatic with us about complying with the

1   protective order.  Because given BSI's litigious nature and

2   given what the client had gone through, as Your Honor was only

3   painfully aware, for the prior three years, the client did not

4   want to be in a position where BSI could claim it was in breach

5   and did not want to be in a position where BSI might have a

6   cause of action against the client or where BSI might have a

7   claim that it could undo the settlement and resurrect its

8   claims against us.  We were -- the client's goal out of the

9   settlement was to have peace.  Not just a stand-down, but to

10  have peace for its lifetime.

11          So we were trying to be as efficient as humanly

12  possibly in complying with the protective order and disposing

13  of the documents.  If we have something and Connexus could not

14  get it from BSI, we are willing to -- you know, we have never

15  refused to produce it.  But at this point, we don't have it.

16          THE COURT:  Okay.  Thank you.

17          MR. ROTHMAN:  Your Honor, may I respond just to the

18  timeline really quickly?

19          THE COURT:  Go right ahead.

20          MR. ROTHMAN:  Just so we are all on the same page,

21  on May 6, 2011, before this issue ever came up, our case was

22  stayed.  At that same time -- I am sorry.  It was May 16, 2011.

23  I notified World Avenue by e-mail that I was going to subpoena

24  their documents regarding the World Avenue, regarding the mini-

25  trial issues, as soon as the Court lifted the stay, if they

1   didn't settle.

2          So they were on notice when they entered into that

3   agreement that I was going to subpoena those records.  Zero

4   question.  I have it right here.  I can file it.  I can hand it

5   up, whatever it is.  May 16, 2011, at 6:58 p.m.

6          So once the stay was lifted, we moved as quickly as

7   we could.  The more problematic issue, though, is I am hearing

8   a lot of if Beyond Systems got the disks, then Connexus got

9   them, if Beyond Systems produced them, or other things that

10  sort of don't make it clear that we have everything or even was

11  transferred or destroyed.

12         What I also did not hear was that there are no

13  documents showing exactly what was destroyed or transferred.

14  It is those documents that I need.  Because then I can go to

15  Beyond Systems and say:  Hey, World Avenue is saying they

16  transferred these specific documents and they destroyed these

17  specific documents.  Do you have those?  Because I don't have

18  them.

19         That's what I need.

20         THE COURT:  Now that is what I thought I heard

21  Mr. Saunders indicate, that there was a transmittal, a cover

22  letter or something.  Maybe I misheard it, but I thought he was

23  saying there was some kind of articulation of what was being

24  returned to BSI.  And to the extent that that happened, he was

25  providing you with copies.  Is that incorrect?

 1              MR. ROTHMAN:  There is one that I have.  It is at

 2   docket entry 442-6.  And this is how vague it is.  "Pursuant to

 3   our discussion with Steptoe and Johnson, enclosed please find

 4   additional confidential documents not accounting for in our

 5   original compliance with the protective order.  We understand

 6   that BSI will maintain these copies until issues concerning

 7   BSI's motion for protective order in the Kraft litigation are

 8   resolved."

 9              What documents are those?

10              THE COURT:  That's inadequate.

11              MR. ROTHMAN:  And so -- and we were trying to get

12   this information -- this is also clear in our submission --

13   since September or August.  Well, they wouldn't tell us because

14   for whatever reason they wouldn't get on the phone and meet and

15   confer with us.

16              THE COURT:  They shouldn't.

17              MR. ROTHMAN:  Steve Ring wouldn't tell us either.

18   And so we are on this wild goose chase to figure out who has

19   what.  And now, as a result of this hearing, more questions

20   have been raised than have been answered.  And that bothers us,

21   given that we are this far along in the discovery process.

22              Also in terms of, you know, us being given

23   everything by Beyond Systems, they are still rolling out their

24   production.  This should have been very simple.  All they had

25   to do was turn over everything that was produced after the

1   Court ordered the mini trial, because at that point all other

2   discovery had been stayed with maybe a couple other exceptions

3   that we weren't pressing them on.

4          It should have taken a week, maybe two.  They told

5   us in November that they would produce everything by December

6   15.  It is now March 2 and we still don't have everything.  So

7   we need to figure out what else is out there and what else is

8   missing, so we can plan accordingly.

9          The last issue is on the protective order.  And we

10  have also laid this out in our papers.  I don't want to be

11  presumptuous in terms of figuring out or saying what the Court

12  ordered and what the Court didn't.  But as an outsider looking

13  at that docket, what happened is, is a protective order called

14  version A was submitted and approved.  Version B was then filed

15  by Steve Ring.  Version B is the one that has the language that

16  says dockets must be returned and destroyed at the conclusion

17  of the litigation upon request by the party.  There is nothing

18  on that World Avenue docket that says the Court approved that

19  protective order.

20          THE COURT:  Okay.  Thank you.

21          Mr. McFadden, I know you are itching, but I think we

22  have a tight issue.  And I need to probably hear one more time

23  from Mr. Saunders.

24          MR. McFADDEN:  Okay.  But I can --

25          THE COURT:  You can help, I am sure.

1          MR. McFADDEN:  I can help.  And I may be able to

2  diffuse this whole thing very quickly.

3          THE COURT:  Let me hear from Mr. Saunders one last

4  time.  This will be his last opportunity.

5          MR. McFADDEN:  Sure.  Of course.

6          THE COURT:  And then we will come back to you.

7          MR. McFADDEN:  Absolutely, Your Honor.

8          MR. SAUNDERS:  Your Honor, the cover letter, we have

9  two cover letters.  Mr. Rothman cited one.  There is a second

10  one dated November 18, 2011, which we returned documents twice

11  to BSI, both times notifying Mr. Rothman.  It was either

12  yesterday or the day before was the first time we ever heard a

13  question about an index or asked for specifics.  So that is a

14  new issue as to asking for details of the specific documents

15  that were sent back.

16          We have been clear from the beginning that -- and

17  there should be no question.  We don't, I want to be clear, we

18  don't have that index.  And Mr. Rothman saying that is a new

19  question, I will be unequivocal on the record, I don't have a

20  list.  It was massive.  And we were under -- and we felt we

21  were under an obligation to comply with that court order.  It

22  is our understanding that that court order was filed and that

23  there could be clarification from BSI as to what happened with

24  the filing of that court order.

25          But it is -- we don't have them.  And there is no

1    issue that BSI did tell us in advance, I mean, that Connexus

2    said that a subpoena was coming, that when we settled we were

3    under the obligation, or we felt we were under the obligation,

4    of the protective order.

5          We also did discuss the issue with BSI.  Again, that

6    was -- there was discussions about what to do, about how

7    documents would be treated.  But, again, that was part of

8    settlement negotiations absent an order from the Court.  I am

9    hesitant to go into the specifics.

10         THE COURT:  Oh, don't go there.  I do want you to

11   address the last argument raised, last matter raised, by

12   Mr. Rothman.  And that is the operation -- that the agreement

13   that you are operating under is not the one approved by the

14   Court.

15         MR. SAUNDERS:  My recollection of this -- and now we

16   are going back three years, Your Honor -- there was a problem

17   with the filing.  And BSI and the division of labor -- BSI

18   filed it.  Mr. Ring filed the wrong version and then corrected

19   it.  I don't remember exactly what he did.  I can tell you that

20   that was -- everybody was functioning under that understanding

21   as to what the protective order was.  And we -- that

22   explanation, I think -- my recollection is somebody -- it is in

23   the papers.  And it was explained in those papers.  I will let

24   BSI address it, because we didn't handle it.  BSI handled it.

25   We thought they fixed it.  And we thought that was our

1   obligation.

2          THE COURT:  What were the two ECF numbers with

3   respect to those protective orders, Mr. Rothman?

4          MR. ROTHMAN:  Yes.  I am looking at them.  It looks

5   like one of them was 87-3, which is Exhibit 13 to docket entry

6   441-2.  So on the ECF it is page 139 of 189 of docket entry

7   441-2.  And then Exhibit 14 is the docket.  And I am trying to

8   find the protective order.

9          THE COURT:  I am going to ask you to stand down on

10  that one for a moment, because you have already lost me.  But I

11  was about to go to Mr. McFadden, but I will give him a moment

12  to -- I didn't think I was going to have to bring up my ECF

13  equipment, but I just might have to.

14         MR. ROTHMAN:  It might have started at 87- -- I

15  can't really tell from this because the stamp was over the top.

16         THE COURT:  Well, I may come back to that in a

17  minute.  I don't know yet.

18         MR. ROTHMAN:  Yes.  I will look for it.

19         THE COURT:  Okay.

20         MR. SAUNDERS:  Your Honor, I have in front of me the

21  correct version with -- and it is document 94-1 filed August

22  13, 2009, nine pages.

23         THE COURT:  94-1.  And that was approved by the

24  Court when?

25         MR. SAUNDERS:  Well, I am not sure, Your Honor.  I

1    know it was filed.  That is the copy that I have with me.

2             THE COURT:  I am looking for whichever one was filed

3    and then whichever one was approved by the Court, because that

4    is the one the parties were operating under.

5             As long overdue and promised, Mr. McFadden, you have

6    the floor.

7             MR. McFADDEN:  Thank you, Your Honor.

8             Let me put to rest the two issues, the only two

9    specifics that Mr. Rothman has identified that give rise to his

10   concerns.  The first has to do with the match up between the

11   slip sheets and the videos.  And answer is yes, we produced

12   both.  We produced the video separately as zip files because

13   they are so big.  And then we produced the slip sheets that we

14   got from World Avenue.  And they match.  So that is the answer

15   to that question.

16            With respect to the videotaped depositions of Joe

17   and Paul Wagner, those were too expensive to order at the time.

18   Our clients did not order them.  So we don't have copies of

19   them.  The court reporter and the videographer may still have

20   copies of them, but we don't.

21            So those are the two answers to the questions.  The

22   second can be easily resolved by contacting the court reporter

23   to see if the videotape still exists.  But we don't have them,

24   because we didn't order them back, way back when, when those

25   videotape depositions were taken in the World Avenue case.

1              So those are the two answers to the two questions.

2              Now returning to the issue of the settlement

3    agreement, I just have a couple of quick points.  If the Court

4    wants to determine whether or not -- I still continue to submit

5    to the Court that 80 percent of Mr. Rothman's argument has to

6    do with the issue of whether this is relevant or not.  And

7    that, again, is an issue that is going to be decided.  All this

8    business about Joe Wagner and what the third mini-trial issue

9    really means, the relationship between Joe and Paul Wagner,

10   that is all going to be decided at this hearing in 12 days,

11   also.

12             So all of the justifications that Mr. Rothman keeps

13   sort of articulating as givens in this case are not givens at

14   all.  And that is all going to be resolved in 12 days.

15             If the Court wants to determine whether or not, as

16   sort of a fallback, whether this really is a cumulative number,

17   we will submit the number to the Court in camera.  And the

18   Court can decide comparing it to the seven years of data from

19   2004 to 2010 whether it is cumulative or not.

20             In terms of the expectation of confidentiality, of

21   course we expected the information to remain confidential.  The

22   prior order of the Court was to provide litigation revenues.

23   And we had preserved every objection to that and preserved

24   every right to argue, as we are going to do in 12 days, that

25   none of that information is relevant.

1          So when we entered into the settlement agreement

2     with World Avenue and requested all those, and negotiated

3     heavily all of those confidentiality requirements, we

4     absolutely expected them to remain confidential and to remain

5     in force.

6          And again, if in 12 days or 14 days Judge Messitte

7     says no, that information is relevant and it has to be produced

8     and we are ordered to produce it, we will produce it.

9          Last is this notion of a chilling effect.  The

10    Maryland legislature gave that anti-spam statute to small ISPs

11    like BSI as one of the tools at its disposal to fight spam.

12    BSI, unlike Google, unlike AOL, does not have tens of millions

13    of dollars in revenue to buy Postini and other sophisticated

14    spam traps.  One of the few tools at its disposal to combat

15    spam is this statute.

16         And if, in the course of settling disagreements and

17    disputes, civil litigation on the basis of that statute, if, as

18    a regular course, small ISPs like BSI are required to give up

19    that information, I submit that that undermines one of the

20    purposes of the statute.  So I would again encourage Your Honor

21    to wait, just to put off this issue of this last data point,

22    this last settlement with World Avenue, until after the hearing

23    in front of Judge Messitte.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

 1              MR. ROTHMAN:  Your Honor, I have an opportunity to

 2     pull the docket entries.

 3              THE COURT:  Okay.  I am getting closer to being able

 4     to view such.  I suspect that this was more than a year ago.

 5              MR. ROTHMAN:  Yes.  It looks like August of 2009.  I

 6     am in -- docket entry 92 was the first joint motion for

 7     protective order.  Ninety-four was the corrected version.  That

 8     is the one that Mr. Saunders pointed out.  And 97 is the

 9     paperless order granting 92 motion for protective orders, the

10     first one.

11              THE COURT:  Ninety-seven, you say?

12              MR. ROTHMAN:  Ninety-seven.

13              THE COURT:  Ninety-seven, unless I have the wrong --

14              MR. ROTHMAN:  Do you want me to hand up the printout

15     from --

16              THE COURT:  I am looking at the ECF docket at the

17     moment, and it looks like ECF 97 is a response to a motion.  I

18     see --

19              MR. ROTHMAN:  August 26, 2009?

20              THE COURT:  No.  That is April of 2009.  What case

21     number is this?

22              MR. ROTHMAN:  Oh, I am sorry.  This is the World

23     Avenue case.

24              THE COURT:  That is --

25              MR. ROTHMAN:  So it is --

1          THE COURT:  -- my fault.  That is 08, what case

2     number?

3          MR. ROTHMAN:  08-cv-00921.

4          THE COURT:  And you are directing me to number 97.

5          MR. ROTHMAN:  Correct.

6          THE COURT:  Yes.  I do have that.  And it is 92 that

7     this -- thank you.

8          MR. ROTHMAN:  And I would also like to say that this

9     is the first time, since we teed up this issue in August or

10    September, that I have heard the word destroy come out of

11    Mr. Saunders's mouth.  When we were trying to tee up this

12    issue back in September and August, he would not get on the

13    phone with me.  He would not get on to confer with Steptoe.

14    And he sent me these cryptic e-mails like "You know what

15    happened to the documents.  They were covered under the

16    protective order."

17         I mean, I never got a clear and unequivocal

18    statement.  And that is a complete waste of time.  If he had

19    told me they were destroyed from the outset, we would be having

20    a much different conversation.

21         That is all I have to say on that issue.  Thank you.

22         THE COURT:  Okay.  Thank you.

23         Give me a moment, please.

24         (Pause.)

25         THE COURT:  Uh-oh.  There is more incoming --

1          MR. SAUNDERS:  Well, Your Honor, given Mr. Rothman's

2     last statement, I feel compelled to respond.

3          THE COURT:  Well, let me give you something,

4     hopefully, that will give you some ease.  I understand that

5     there is a great deal of litigation between World Avenue, BSI.

6     There is a confidentiality agreement.  There is believed to be

7     a protective order.  You and your client don't want to say

8     anything that is going to disturb it.

9          MR. SAUNDERS:  That's right.  And I would point out

10    this is --- saying we were returning the documents.  We

11    obviously told them -- we filed a motion to quash.  We have

12    been clear that we didn't have certain things.  We were told

13    you have to be -- this is sort of protective order 101, that

14    they contain provisions to deal with after the case as to what

15    happens with them and that they were covered by a protective

16    order.  There is no question about that.

17         And today is the first time I am hearing now some

18    allegation that I played hide the ball with any information and

19    disclosing something ---.  That was not our -- and we never

20    heard that before.  We would have answered the question.

21         THE COURT:  First of all, I think that one of the

22    issues that was raised in the briefing papers was whether BSI

23    has a sufficient privacy interest or standing to challenge the

24    subpoenas issued by Connexus.  I find that they do.  BSI has a

25    whole lot riding on this.  And I think it was summed up best by

 1  Mr. McFadden in one of his latter remarks with respect to the

 2  effort that went into negotiating either the settlement

 3  agreement or the confidentiality agreements or some of the

 4  other items that have been filed on record with this Court.

 5          Everything that is in play relates to BSI's

 6  litigation interest, if not more.  So information regarding

 7  BSI's confidential settlements and related documents, the

 8  stream of income and other items I think are obviously

 9  important, sufficient to raise proper standing on their behalf

10  with respect to this matter.

11          I did pick up in the briefing papers there was some

12  concern about the burden of the subpoena as it was originally

13  drafted and how that would pose a burden, if you will, to World

14  Avenue.  I have not heard that in argument because I think we

15  are beyond many of the privilege issues that were running

16  through some of the other requests that were the subject of

17  that subpoena.  it may be that the parties worked that out.

18  And to the extent you have, I applaud that.

19          As Connexus has limited all these requests and

20  issues relevant to the mini trial, I think that the topics that

21  have been sought by way of subpoena are appropriate.

22          As to the deposition transcripts and exhibits that

23  is request number one and the exhibits thereof to each witness,

24  I don't think that these are reasonably calculated to lead to

25  discovery of admissible evidence.  I do think that they are

1    obtainable by Connexus.  And yes, I find that the claims and

2    the defenses in the World Avenue litigation are uniquely

3    similar to the claims and defenses that are at play here.  I

4    think that the mini-trial topics are nearly identical.  And

5    here, Connexus is only seeking documents that were in World

6    Avenue's possession, which were not produced.  No real claim of

7    privilege attaching to those matters.

8              There is no claim that BSI, or no claim by BSI that

9    the information depicted in those transcripts should enjoy

10   "protection" from this defendant.  It may be that BSI is

11   entitled for protection or confidentially as against the world,

12   but as it relates to these mini-trial issues, though, it should

13   not apply to Connexus.

14             And there have been no real objections made by BSI

15   as to these materials.  If these materials were in the hands of

16   World Avenue, I would require their production by World Avenue.

17   Sadly, they have been conveyed to BSI.  BSI is to convey these

18   materials.  BSI has indicated that it has conveyed these

19   materials.  The problem is one of verification, which hopefully

20   I will touch upon soon.

21             I assume that the parties have abandoned the

22   concerns set forth in request number six, which deals with the

23   items and the filings made under seal.

24             MR. ROTHMAN:  Your Honor, we have abandoned them as

25   to World Avenue because we understand that World Avenue does

1   not have them.  We have not abandoned them as to Beyond

2   Systems.  In fact, that is in our motion to compel from this

3   past Wednesday because there are still some that are

4   outstanding.  So if World Avenue doesn't have them, there is

5   only so much we can do.

6               THE COURT:  And I will wait for that to get really

7   get teed up in a moment.

8               As to the settlement agreement, I side with BSI as

9   to the agreement itself.  I don't think that the agreement

10  itself is reasonably calculated to lead to the discovery of

11  admissible evidence.  So I am not going to require World Avenue

12  to produce that.  But the consideration that is the

13  underpinning of that agreement.  The financial payments paid or

14  payable to BSI or in the other direction I think inform the

15  question of BSI's status as an internet service provider.  I

16  have previously made such a determination.  And there is no

17  basis for change on this record.  But production of settlement

18  agreement documents is not required beyond that limited issue

19  that is in play.

20              I am going to require World Avenue to comply with

21  the subpoena and to provide the financial particulars of that

22  settlement agreement.  I will put that in on hold until after

23  the hearing in 12 days.  If BSI is able to persuade the Court

24  that that is not in play, that order is moot.  However, in the

25  event it is still in play, Connexus is entitled to all monies

1    that were paid to BSI and to anyone else with respect to that

2    litigation.  I don't care if they have a personal name, a

3    corporate name, if it is couched as an expense, or whatever the

4    matter may be.  But that will hopefully inform some of the or

5    one of the mini-trial issues here.

6            Again, I do not see the applicability of any

7    privilege with respect to that information that cannot be

8    pierced here.

9            There is a chilling effect, as was argued by

10   plaintiff.  The chilling effect is this information is put out

11   there for the public to see.  But I believe that there is a

12   protective order in place here.  And if it's not, I am going to

13   make sure that Connexus is not to reveal this information to

14   anyone outside of this litigation.  I am not going to tie your

15   hands with respect to your client at this time, but that will

16   not be important until the 12 days have passed.

17           I am not so happy about the transfer of materials

18   from World Avenue to BSI.  I appreciate that World Avenue is

19   between a rock and a hard place.  So in retrospect I can

20   certainly think of something and a few different things that

21   it could have done.  It could have prepared a list of things

22   being transmitted, but not convey that list to Connexus at

23   that time.

24           Of course, it is easy for me to say that because I

25   am not paying the bill for the preparation of all those

 1   documents.  And I suspect there is a host, maybe a couple of

 2   tractor-trailer loads, of things that -- well, maybe not that

 3   much, but a lot of things that were going in that direction

 4   and/or being destroyed.  But with my retrospectroscope I

 5   would say that World Avenue should have sought court

 6   protection and/or direction as to what to do, because you were

 7   under an order, if you will, or at least an agreement to

 8   destroy and/or return, but you were also under a subpoena to

 9   provide.

10         Something about it I don't like, but I cannot say

11   that I don't like it enough so that World Avenue or their

12   representative would be in a heap of trouble.  But Connexus

13   still needs the ability to determine that what it received or

14   has not received is still out there.  And if not, then who is

15   responsible for its disappearance?

16         So Connexus needs to depose someone from your shop,

17   Mr. Saunders.  They will have the keys to that kingdom.  You

18   will have to have a -- I don't know if it is going to be a

19   30(b)(6), but it is something of that tune, where if the

20   person or persons who have knowledge or can be educated as to

21   the best knowledge available from the producing party, be it

22   your client or be it your firm, these materials, have at it.

23   This is a bad place to be.  And at a minimum, I don't know

24   what has happened so far, but at a minimum BSI is now on a

25   litigation to hold notice from the Court.  Nothing else gets

 1  destroyed.  Nothing.

 2         So the real difficulty right now is to recreate what

 3  has been returned and for Connexus to have some ability to

 4  determine what has been produced and whether that has been

 5  fully compliant.

 6         Now, there is a whole motion to compel issue between

 7  the two of you, and that is kind of typical.  But to Connexus

 8  ace up its sleeve was get them from World Avenue, so that it

 9  wouldn't be making noises like it has in its briefing papers

10  about the credibility of either a party or counsel.  I am

11  hoping to never get into that.  But that is what the Court is

12  here to resolve sometimes.

13         So I am hopeful that we have addressed all of the

14  issues, but I do need to be advised if there is something that

15  I am missing, overlooking, or being a little too crazy about.

16  So I will start with Connexus first.

17         MR. ROTHMAN:  No, Your Honor.  We appreciate your

18  time.  The only thing I would note is that there are other

19  issues in the motion to compel that we filed Wednesday.  I am

20  not asking for a ruling or anything like that.  I just want to

21  note that nothing that has happened here today, other than the

22  settlement agreements and the litigation proceeds, has been

23  mooted.  There are other issues.

24         THE COURT:  Okay.  Thank you.

25         Mr. McFadden?

1          MR. McFADDEN:  Nothing further, Your Honor.  Thank

2   you very much.

3          THE COURT:  Okay.  Mr. Saunders?

4          MR. SAUNDERS:  Your Honor, two things.  One, we did

5   not, because of how the issues narrowed themselves to a couple

6   of deposition videos and the videos of the home inspection, we

7   were not waiving any argument about the burden.  The burden of

8   responding to the subpoena, as originally drafted, would have

9   been enormous.

10          THE COURT:  Yes, it would have been.  And you have

11   my favor on that side.

12          MR. SAUNDERS:  And that is -- you know, that was one

13   of the reasons why we filed and said:  All the materials you

14   seek from us, or 99.9 percent, are BSI materials.  And you are

15   in litigation.  And the case law is really clear that if you

16   can get them from the party, then go to the party and leave the

17   third party alone for what clearly would be an undue burden.

18   So --

19          THE COURT:  I think that is true except for when it

20   is brought to the Court's attention and the party is asking for

21   the Court's assistance.  Then the Court has discretion to go in

22   a different direction.

23          MR. SAUNDERS:  Your Honor, that's right.  I just

24   wanted -- and the Court could rule it because -- that's right.

25   I just want to point out that we are not waiving that.  And at

 1   the time, that was a very relevant issue, because at the time

 2   it wasn't just send us, you know, some deposition transcripts

 3   and a couple videos.  It was a broader thing.  The parties had

 4   worked together, and they worked it out.  And they whittled it

 5   down.

 6          The other issue on what we sent and what was

 7   returned, I mean, there will be some -- we can identify some of

 8   it now.  There will be some difficulty because of the passage

 9   of time.  And I would point out again, Your Honor, if that

10   question had been asked when this issue first came up, and we

11   sent -- let's put it in context.  You know, it is the old

12   question of why didn't we tell them.  Because nobody asked

13   us.

14          And that -- in going back to October of last year,

15   when we sent the letter copying Venable saying "We're returning

16   documents to BSI," nobody said:  Whoa.  Wait a minute.  Don't

17   do it.  Hold on or at least can you tell us what you are

18   sending them?  Nobody asked us that then.  I mean, the first

19   time we are being asked that is either yesterday or the day

20   before.

21          So it is a little tough.  It is going to be tough

22   for somebody to remember precisely the pages.  I mean, I can

23   give you some generalities.  I know most of the stuff.  And I

24   will put it on the record.  Most of the stuff is --

25          THE COURT:  Basically you are saying there was radio

1   silence from November until the motion was filed.

2            MR. SAUNDERS:  There was a little bit of back and

3   forth.  But, you know, there was no request of send us or tell

4   us what you returned.  There was no request of don't do it.

5   What are you doing?  There was no complaint.

6            And I can state for the record that -- my

7   understanding is for one of the two times the majority of the

8   materials related to our expert witness, Dr. Krawetz, on those

9   materials.  Now I have had a conversation.  And we are talking

10  about the materials that we returned.  We are talking about, I

11  think, two or three boxes.  And one of the issues -- and as

12  Your Honor said, if --- are going to stand up and make

13  representations, and the Court is taken by that -- you know, I

14  have had conversations with BSI's counsel about the integrity

15  of what we returned and would hope that that becomes relevant,

16  as well.  Because it was done with the understanding that these

17  files were going to be maintained.  And that is why we copy

18  everybody.

19           THE COURT:  No.  I know that.

20           MR. SAUNDERS:  I appreciate what Your Honor is

21  saying, but we weren't trying to just pop up and wait and then

22  say, oh, we did this.  And I would appreciate from BSI, they

23  can put a lot of this issue to bed, because it is real simple.

24  You know, to the extent there is anything responsive in those

25  boxes, from our standpoint we don't care.  Give them the

 1  boxes.

 2           THE COURT:  The problem right now is that to the

 3  extent that there is questions about what is missing, what has

 4  been destroyed, Connexus is in a spot where World Avenue is

 5  pointing the finger at BSI and BSI very may well point the

 6  finger back at World Avenue.  I am not saying that that is

 7  happening, but when the cookies come up missing, if there is

 8  more than one kid in the house, it wasn't me, it wasn't me,

 9  the famous it wasn't me person, and it should not be on

10  Connexus.

11           MR. SAUNDERS:  Your Honor, I will also put on the

12  record to the extent there have been questions about the

13  questions to Dr. Krawetz's deposition, which you didn't get, we

14  didn't get them either.

15           THE COURT:  Well --

16           MR. SAUNDERS:  I mean, I defended that deposition.

17  I did not keep all of the papers that were -- we gave the

18  exhibits to the court reporter.  And then the case settled.  So

19  we never got --

20           THE COURT:  Well, it very well may be that Connexus

21  is going to be able to get some answers pursuant to the court

22  order.  That is, we didn't have this, never had it.  We had

23  that, but we destroyed it before the subpoena arrived, or after

24  the subpoena arrived, we sent it over to BSI.  And the rest of

25  the stuff -- the rest of the conflict may be resolved as we get

1    through the motion to compel thicket.  I don't know.  But there

2    is going to be a little extra pain still until you all -- until

3    we get to the bottom of this problem.

4              But I thank you for that.

5              Mr. McFadden, I don't know if I gave you an

6    opportunity to weigh in on any subject at this point.

7              MR. McFADDEN:  You did, Your Honor.  I have nothing

8    further.  But I would add one thing, and that is that the only

9    thing that troubles me a little about this issue between

10   Connexus and BSI and this notion of having a check, you know, a

11   verification check, is they cited two examples that give rise

12   to their concern about whether they in fact have everything or

13   not.  I put both of those to rest.  So why are we creating this

14   huge process over, from my perspective, an issue that I just

15   put to rest and doesn't exist, other than a nebulous concern

16   that Connexus has?

17             THE COURT:  Well, I have heard you made the

18   representation, but I thought that was all -- that was the

19   whole entirety of Mr. Rothman's position; that is, I still

20   cannot tell what was what.  But go ahead.

21             MR. ROTHMAN:  There are two more examples.  I asked

22   Mr. Saunders -- we sent him a list of deposition transcripts

23   that we received from Beyond Systems.  I asked him, "Are these

24   everybody or all the witnesses that were deposed?"  He said, "I

25   think so."

 1          Well, I mean, how do we know who was deposed in that

 2   case unless one of them tells us?  How do we know that

 3   everything they gave us are all the deposition transcripts?

 4   You know, we don't know the answer to that.

 5          We also filed with the Court an index of documents

 6   that was produced.  I mean, if we have to keep going down this

 7   road, I think -- it is 459-4.  On April 11, 2011, according to

 8   this index that was pulled out of a Krawetz deposition, or not

 9   deposition, his backup expert materials, there were some

10   hundred thousand pages, not of Hypertouch, of BSI's documents

11   produced after that date.  We don't have a hundred thousand

12   pages from them with respect to the mini-trial issues.

13          So the fact that we are having these questions, we

14   need to get answers.  And I think the Court has resolved how we

15   are going to get those answers.  It is just a check.

16          THE COURT:  Well, it is a lot of work being created

17   as we go through this.  But I appreciate the parties' efforts

18   to work out as much as you, because you did an awful lot

19   here.

20          And my last point would have been I agree with

21   Mr. Saunders with respect to the burden that would have been in

22   play here.  And his case is settled.  To the extent that he

23   would have to be producing and spending a lot of time making

24   privilege review over documents and stuff like that, it was my

25   intention to kind of shut that down.  And we would have to do

1  something else to figure out the right answers.

2            But I think in terms of what is before me today, I

3  am hoping that there is enough that you all can move forward on

4  it.

5            So I want to thank you all for your time.  Wish you

6  well.

7            MR. ROTHMAN:  Thank you, Your Honor.

8            MR. SAUNDERS:  Thank you, Your Honor.

9            MR. McFADDEN:  Thank you, Your Honor.

10            THE CLERK:  All rise.  This Honorable Court now

11  stands adjourned

12            (Whereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


 /s/   Gail A. Williams                     March 7, 2012
Gail A. Williams                                Date
Certified Transcriber
Certificate No.:  CET**D-434