**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

———————————————————
                          )
BEYOND SYSTEMS, INC.,        )
                          )
     Plaintiff,           )
                          )
        v.             )     Case No. 8:08-cv-00409 (PJM) (CBD)
                          )     Judge Peter J. Messitte
KRAFT FOODS, INC., *et al.*,    )
                          )
     Defendants.       )
———————————————————)
                          )
CONNEXUS CORP., *et al.*,    )
                          )
     Third-Party Plaintiffs,   )
                          )
        v.             )
                          )
JAMES JOSEPH WAGNER, *et al.*,  )
                          )
     Third-Party Defendants.   )
———————————————————)

**JOINT PRETRIAL ORDER**

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, Local Rule 106, and the Court's scheduling order at DE #440, Plaintiff Beyond Systems, Inc. ("BSI") and Defendants Kraft Foods, Inc., Kraft Foods Global Inc., Vict. Th. Engwall & Co., Inc., and Connexus Corp. ("Defendants") submit this Joint Pretrial Order for purposes of the upcoming June 19, 2012 Mini-Trial. Pursuant to Local Rule 106, Plaintiff and Defendants set forth below the items to which they could not agree.

**I.    Brief Statement of Facts That Plaintiff Proposes To Prove In Support of Claims, And Listing of Separate Legal Theories Relied Upon In Support of Each Claim**.

This is an action for statutory damages against Defendants Kraft Foods, Inc. et al. ("Kraft") and Connexus Corp. ("Connexus") for transmission of commercial electronic mail in

violation of Maryland Commercial Law §§ 14-3001, *et seq.* ("Maryland Statute"), and California Business & Professions Code §§ 17529.1, *et seq.* ("California Statute").  The Court has diversity jurisdiction under 28 U.S.C. § 1332.

In its Order at DE #440, the Court bifurcated this action into a "mini-trial" focusing on the following three issues:  (1) whether BSI is a *bona fide* "interactive computer service provider" ("ICSP") under the Maryland statute, and whether BSI is a *bona fide* "electronic mail service provider" ("EMSP") under the California statute; (2) whether BSI is a *bona fide* resident of the state of Maryland under the Maryland statute; and (3) the nature of the relationship between BSI and Third Party Defendants James Joseph Wagner and Hypertouch, Inc.

In its Order at DE #498, the Court ordered that a jury, acting in either an advisory capacity or on the merits, will return verdicts at the mini-trial in two phases:  the first phase will be limited to whether BSI satisfies the requirements of the Maryland and California statutes according to BSI's theory of the case; during the second phase, the same jury will determine whether BSI is a "bona fide" plaintiff pursuant to Defendants' theory of the case and whether BSI is a resident of the state of Maryland under the Maryland statute.  During phase two, the jury may consider the non-exhaustive factors as listed in the Order, along with additional factors as approved by the Court.

BSI will prove the following facts at trial:

1.      BSI is an "interactive computer service" provider within the meaning of the Maryland statute; i.e., that BSI is an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service, and includes a service of system that provides access to the Internet.

2.      BSI is an "electronic mail service provider" within the meaning of the California statute; i.e., that BSI provides interactive computer services, and/or is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail.

3.      BSI provides Internet services and is an interactive computer service provider.

4.      BSI provides and enables Internet access and/or hosting services and interactive computer services, including electronic mail services.

5.      BSI's services include primary and secondary email servers, web servers, domain name service ("DNS") servers, file transfer protocol ("FTP") servers, database services, e-commerce services, port forwarding, and backup services.

6.      BSI has physical control over and access to its own hardware, which it owns, houses, maintains, and configures.

7.      BSI operates its services on its own sites and pays for high-speed ISP- and/or business-level connections to its three Points of Presence in Silver Spring, Maryland, Rockville, Maryland, and the District of Columbia.

8.      BSI owns six servers at its Silver Spring point of presence, three at its Rockville point of presence, and six at its Washington, D.C., point of presence.  BSI houses various other items of equipment used for its business at these locations as well, such as several workstations, laptops, hubs, switches, network attached storage, backup drives and other media, printers, scanners, battery backups, cables, tools, A/V equipment, and server racks.

9.      BSI has hosted numerous domain names for use by BSI and/or its users and provides email accounts under some of these domain names.

10.     BSI provides electronic mailing list services to enable users and itself to send out mass-distribution newsletters to subscribers.

11.     BSI assigns IP addresses allocated to its network to clients for their use in accessing and providing services via the Internet.  With its DNS, BSI maps host names to IP addresses on behalf of clients.

12.     BSI maintains a Merchant Account with electronic payment processor Card Services International to enable online purchases.

13.     BSI has hosted interactive computer services, such as email services, for numerous corporate entities.  Clients have included Fortune 500 companies, a mental health services provider, a custom bike shop, a film production company, technology companies (including other interactive computer service providers), international conferences, sole proprietorships, hotels, boarding houses, law firms, and doctors.

14.     BSI provides DNS for the over 200 employees and volunteers of St. Luke's House, Inc. ("SLH"), as well as emergency upstream connectivity for those users during outages.  St. Luke's House provides comprehensive mental health services for adults with serious and persistent mental illness and youth with serious emotional disabilities.  BSI has also provided when needed Internet access and secondary mail services to SLH for over a decade, until last year.

15.     Since 2002, BSI has provisioned and maintained high-speed wireless Internet access and business services for the Young Woman's Christian Home, a non-profit organization housing over 100 residents.

16.     BSI currently has several paying customers for its interactive computer and electronic mail services.  BSI currently hosts email services for some of these customers,

and provides DNS and/or secondary mail server services for all of these customers.  BSI has additionally provided free interactive computer services to thousands of users who access websites hosted on BSI's networks; who receive email newsletters from BSI-supported community groups; and who use BSI-provided WiFi as a means of wirelessly accessing the Internet.

17.     The DNS servers operated by BSI currently serve numerous domain names, translating domain names meaningful to humans into the numerical identifiers (IP addresses) associated with network equipment for the purpose of locating and addressing these devices worldwide.

18.     Since installing and operating its first mail server in 1997, BSI was receiving an average of one million emails on its servers per day and now receives approximately 500,000 emails per day.

19.     BSI follows a number of protocols and steps to help its customers determine if emails are legitimate.  BSI has relied on a variety of software programs and techniques to filter mail (i.e., spam filters), including SpamAssassin, PolluStop, ClamAV, SpamPal, built-in server mechanisms, custom filters and manual and semi-automated analyses to detect and flag probable spam, and to prioritize email.  BSI then delivers all email, flagged or otherwise, to the intended recipient.

20.     BSI was established as a Maryland Corporation in 1996.

21.     BSI has always been a Maryland Corporation and remains in good standing.

22.     BSI's interactive computer service work has primarily been performed in Maryland and the District of Columbia.  Most of BSI's interactive computer services for users are performed by its automated servers in Silver Spring and Rockville, Maryland.

23.     Since 1996, BSI has always maintained its Principal Office in Maryland.

24.     Since 1996, BSI has had a Maryland registered agent.

25.     BSI's corporate address, and Principal Office, as shown in all public filings, has always been a Maryland address from its inception in 1996 to the present.

26.     BSI's Principal Office is 9501 Anchorage Place, Bethesda, Maryland 20817.  This is also the address of its resident agent, Alton Burton, CPA, and the address recorded with the Maryland State Department of Assessments and Taxation as the principal office of the corporation.

27.     Since 1996, BSI has filed all of its corporate federal, Maryland state, and Montgomery County income tax returns as a Maryland resident and never elsewhere.

28.     BSI has always paid Maryland and Montgomery County corporate income and personal property taxes and never elsewhere.

29.     BSI also regularly makes required payments to the Maryland Unemployment Insurance Fund, and makes no such payments to the District of Columbia or any other state.

30.     Since its founding, BSI has at all times maintained computer equipment at its locations in Maryland; since 1997, BSI has at all times maintained one or more mail servers at its locations in Maryland.

31.     BSI was first located at 1612 Sherwood Road, Silver Spring, Maryland 20902. Since 2007, BSI has also maintained servers and equipment at 38 Maryland Avenue, Unit 333, Rockville, Maryland 20850.

32.     BSI received all the emails that give rise to its claims against the Defendants in this action on its mail servers located in Maryland at either the Silver Spring or the Rockville address.

33.     BSI's domains, including in the emails at issue, are registered with registrars using a Maryland address, which address appears in the public WHOIS registry.

34.     Since its inception in 1996, BSI has maintained business arrangements with various other interactive computer service providers to provide, enable and perform interactive computer services from or for them utilizing BSI's or their technical infrastructures.  Since Hypertouch, Inc., of California ("Hypertouch") became a "doing business as" in 1997 and continuing after its corporate formation in 1999, BSI has maintained such a business relationship with Hypertouch to provide, enable, and receive interactive computer services.  Since 2002, BSI has maintained a business arrangement with Hypertouch to receive, deliver, and retain emails for some BSI-owned domains via Hypertouch's infrastructure.

35.     BSI uses Hypertouch's secondary mail and DNS services for failover purposes and provides Hypertouch similar services.

36.     Hypertouch is not a subsidiary, division, or department of BSI.

37.     BSI controls its own finances and accounting.  BSI has separate accounting and payroll systems from Hypertouch.

38.     BSI has never assumed any financial obligations of Hypertouch.

39.     Terminating its agreements with Hypertouch would not cause BSI to cease operating.

40.     Hypertouch routes the BSI-bound mail that Hypertouch receives to BSI

automatically.  Just as Hypertouch routes mail destined for its other clients to them, it

automatically routes BSI's mail to BSI.

41.     BSI has received all emails that give rise to the underlying claims in this case on

its mail servers in real-time, routed and delivered by automated means at the time they

were initially transmitted.

**II.     Brief Statement of Facts That Each Defendant Proposes To Prove Or Rely Upon As A Defense, Together With a Listing of The Separate Legal Theories Relied Upon In Support of Each Affirmative Defense**

Defendants will not contest the first phase of the Mini-Trial ordered at ECF No. 440 (as

subsequently modified by ECF Nos. 490 and 498), namely, whether BSI meets the requirements

of the California and Maryland statutes according to BSI's theory of those statutory

requirements.  (See ECF 498 at ¶4).  Therefore, Defendants submit that the trial should be

limited to the second phase set forth in ECF No. 498, and Defendants address below the issues in

the second phase.  Defendants reserve all rights to challenge whether BSI meets the technical

requirements of the California and Maryland statutes to the extent BSI introduces evidence

concerning such technical requirements and/or to the extent such technical requirements are

relevant to the second phase of the Mini-Trial ordered at ECF No. 498.

A.     BSI Does Not Have Standing to Bring Claims as a Provider of Interactive Computer Services or Email Services Under Either The California or Maryland Statutes

1.     Defendants' position is that BSI must show that it is a genuine company

that provides Internet related services, and that it is within the class of entities that

the Maryland and California legislatures intended to protect through the

enactment of their respective anti-spam statutes.  As to the latter, Defendants

specifically contend that BSI must show that it is a true victim of unlawful

commercial email ("UCE"), makes genuine efforts to avoid or block unwanted emails as opposed to undertaking efforts to obtain as many emails as possible to sue over them for windfalls in statutory damages, and that it was injured.

2.      The facts show that BSI is not a service provider that was victimized by UCE.  Rather, BSI is a litigation factory that manufacturers lawsuits to recover as much money as possible under state anti-spam statutes, and seeks to recover multiple times for the exact same email.  BSI's owner Paul Wagner has conspired with his brother Joe Wagner (who operates Hypertouch) to first attract commercial emails to Hypertouch's servers and then to multiply its alleged harm by intentionally directing those commercial emails to BSI's servers.  BSI and Hypertouch then sue on the same commercial emails  in multiple jurisdictions.

3.      Indeed, BSI and Hypertouch maintain that a single email enables them to sue and recover four times.  According to BSI, both BSI and Hypertouch can each sue in California and Maryland provided that a single email touches both BSI's and Hypertouch's servers.

4.      Hypertouch and BSI's dealings with Kraft illustrates their scheme: In December 2004, the Wagner brothers communicated about emails allegedly sent to "Hypertouch.com" that advertised Gevalia coffee and Kennedy-Western University.  In an email to his brother titled "diversifying recovery from KWU and Gevalia," Paul Wagner proposed suing and "dividing the recovery 50%-50%."  Joe then replied: "Tentatively, we could get $1,375 per spam."  The concept outlined by Joe Wagner was that by intentionally configuring their

servers so that a single email would touch both the Hypertouch server and then the BSI server, both Hypertouch and BSI could sue on the same email.

5.     Hypertouch sued Kraft in 2005 in California Federal District Court.  On June 29, 2006, Kraft settled the dispute with Hypertouch.  As part of the Settlement Agreement, the parties included a Cooperation Clause.  This Clause provided that Hypertouch could not bring any claim based on emails it received in the future unless Kraft refused to cooperate with Hypertouch in trying to trace the sender of the offending email.  The Cooperation Clause required Hypertouch to notify and provide Kraft with a copy of the email within 20 business days of receipt.

6.     The purpose of the Cooperation Clause was to avoid future litigation with Kraft and by requiring Kraft to cooperate in the tracking down of any companies sending allegedly unlawful emails to Hypertouch that advertised Gevalia coffee products.

7.     At the same time that Kraft was entering this Settlement Agreement with Hypertouch, Hypertouch and BSI were plotting to file a second lawsuit against Kraft for the exact same emails on which Hypertouch based its suit.  Indeed, a draft complaint was already being circulated between the Wagner brothers.

8.     BSI filed its suit in 2008, two years after Hypertouch settled its claims with Kraft.  The basis of the BSI's claim was that 8,665 email that were sent to Hypertouch, which were then redirected to BSI by Hypertouch.  6,841 if these alleged emails were the exact same emails on which Hypertouch sued Kraft. Approximately 2,000 emails were new (i.e., Hypertouch had not sued Kraft on

these emails), but at no time between the settlement in 2006 to the time the email were turned over to Kraft did BSI or Hypertouch ever complain to Kraft about the emails.  Significantly, at no time did Hypertouch or BSI seek Kraft's assistance in tracking down the senders of the allegedly unlawful emails as required by the Cooperation Clause in the Settlement Agreement.

9.      Kraft is not the only Company that Hypertouch and BSI have targeted for serial litigation.  They have also targeted Connexus, Kennedy-Western University, World Avenue and others.

10.     BSI's business is litigation, but in order to have standing to file a suit, it must provide interactive computer and email services for customers.  Unlike a bona fide or legitimate service provider, BSI does nothing to develop, maintain or promote a sustainable legitimate service.  Virtually all of its efforts are devoted to litigation.

11.     To the extent that BSI provides any service, the purpose of the service is to gain access to commercial emails, which then provides the necessary input for its litigation business.

12.     For example, BSI relies on the revenue from litigation, not from operations, to sustain its business.  For all but three years from 2001-2010, its non-litigation costs far exceeded its non-litigation revenues.  Indeed, for this period, the difference between non-litigation costs and revenues was a loss of $592,000.  During that same ten-year period, BSI made $519,000 from litigation.

13.     Moreover, unlike a legitimate service provider, BSI does not try to improve, develop or promote its service.  For example, whereas there are

numerous documents explaining its business plan for litigation, there are no documents that explain its business plan as a service provider or any business development budget, other than a litigation budget.  Moreover, BSI has no marketing plan for gaining and satisfying customers.  Indeed, there is virtually no discussion of customers, customer relations or customer satisfaction.

14.     Significantly, BSI does not have any routine agreements with customers; any standard terms of use for its services; any privacy policies; no price list; and no method for customers to sign-up on line for BSI's services.

15.     BSI's customers are primarily family members of Paul Wagner and his lawyer.  For example, William Wagner, Paul Wagner's father, was BSI's highest revenue-generating customer in 2003 and its only paying customer in 2005.  Steve Ring, who is pursuing claims on behalf of BSI was BSI's largest client in 2007.

16.     Furthermore, unlike a real business that is trying to provide a real service to real customers, BSI has no employees other than Paul Wagner, and the majority of Mr. Wagner's time is spent on litigation; BSI has very limited infrastructure; it has no offices; and its servers are primarily located in Paul Wagner's home and the home of his parents.  BSI also does not maintain adequate accounting records.

17.     Also, unlike a real service provider concerned that unwanted emails is burdening its customers, BSI does not attempt to filter unwanted emails.  Indeed, BSI could have easily filtered or blocked unwanted emails from Kraft or anyone else, but elected not to.

18.     Moreover, instead of filtering unwanted emails, BSI actually attracts, collects and then multiplies the emails with the help of his brother, Joe Wagner, and Joe's company Hypertouch.

19.     BSI's operation is simply not consistent with an operation that is concerned with customers and customer service.

B.     <u>BSI Does Not Have Standing As A Maryland Resident</u>

20.     In this case, BSI has the burden to show that the Maryland Statute applies because the emails were "sent to an electronic mail address that the sender knows or should have known is held by a resident of the state of Maryland."  Md. Comm. Law. § 14-3002(b)(1).  Although the word "resident" is not defined in the statutes, it is appropriate to look to dictionaries for help in determining whether a word in a statute has a plain or common meaning.  The dictionary definition of "resident" is plain - "one who resides in a place."

21.     None of the emails over which BSI sues were sent to any Maryland resident.  Instead, the emails were sent to misaddressed email address and/or to email addresses that nobody used to send and receive email.  Therefore, the emails were not sent to any Maryland resident inasmuch as none of the emails were sent to any BSI user or customer who used the email address to send and receive email.  Instead, BSI configured its computers so that it would receive and store all emails addressed to misaddressed email address and/or to email addresses that nobody used to send email for no purpose other than to collect emails for lawsuits.  Therefore, the emails were not sent to any Maryland resident.

22.     Even assuming that the emails were sent to BSI, BSI is not a resident of Maryland for purposes of the Maryland statute.  To the extent BSI conducts any business, BSI does so out of Paul Wagner's home in Washington D.C.

23.     BSI's claim that it operates from 1612 Sherwood Road, Silver Spring Maryland and from an apartment on Maryland Avenue in Rockville, Maryland, is belied by at least the following facts:  The Sherwood address is the personal address of Paul Wagner's parents.  This address houses computers that have no monitor, keyboard or mouse attached to them and are only accessed remotely via an administrative password.   Neither BSI nor Paul Wagner's parents have applied for a license or zoning variance to operate a business out of this house.  BSI does not own the Sherwood Road residence, does not have a lease to put servers in the Sherwood Road residence, and does not pay rent or provide any other financial compensation to Paul Wagner's parents for having its purported commercial equipment located in the house.

24.     With respect to the Maryland Avenue address in Rockville, this is a residential condominium that also belongs to Paul Wagner's parents and the condominium bylaws prohibit the operation of a business.

25.     BSI has also opened a mailbox at a UPS store in Wheaton, Maryland in 2003 or 2004.  Neither BSI nor Paul Wagner conduct any business out of this location.  UPS forwards mail from this address to Paul Wagner's Washington D.C. home.

26.     In 2011, BSI registered its address as 9501 Anchorage Place in Bethesda, Maryland as its principal place of business.  This is the residence of Alton Burton,

BSI's accountant and lawyer.  BSI does not keep any equipment at Anchorage Place.

27.     The only meaningful location out of which BSI through Paul Wagner conducts business in Washington, D.C.

28.     BSI parked servers in Maryland for the sole purpose of invoking the Maryland statute.

C.     <u>BSI And Hypertouch Act In Concert To Bring These Lawsuits, And Hypertouch Forwards Email Sent And Received By It To BSI In Order To Manufacture Claims</u>

29.     Like BSI, Hypertouch knowingly configures its servers to invite commercial emails from senders and locations after determining that they are not directed to identified users.  Hypertouch then redirects or sends the email it has received to BSI.

30.     BSI and Hypertouch then both file suit on the same commercial emails, and they closely coordinate their efforts.  For example, the Wagner brothers consult with each other on their respective lawsuits and each has testified as an expert for the other; Paul Wagner and BSI and Joe Wagner and Hypertouch have joint litigation agreements with various attorneys.

31.     Moreover, Joe Wagner created email addresses that appeared on Hypertouch's website and are designed so that they attract emails.  Once the emails was captured by Hypertouch, Joe Wagner sent them to BSI in order for BSI to bring suit.

32.     In addition to coordinating their efforts, BSI and Hypertouch share IP addresses, servers and the server software running on the machines.

33.     They jointly meet with their joint attorneys on litigation strategy.

34.     The emails over which BSI sues in this case were not sent to any email address used by any user to send and receive email.  Rather, the emails were misaddressed and sent to "nonsensical" email addresses, and directed by BSI and/or its sister company Hypertouch to one or more mailboxes that BSI used to archive emails for litigation.  Therefore, the emails were not sent to an electronic email address held by any resident much less one "held by a resident of the State [of Maryland]" under MCEMA.

35.     BSI's failure to establish that the email addresses were held by a resident of Maryland alone defeats BSI's summary judgment motion, and indeed mandates summary judgment in Connexus's favor.  However, even assuming the subject email addresses were held by BSI, BSI is not a Maryland resident under MCEMA.  At a minimum, and as this Court has ruled no less than four times, factual disputes exists as to whether BSI is a Maryland resident that preclude granting summary judgment.  For these reasons, and given that trial starts in less than a week, the Court should deny BSI's motion and allow the trier of fact to determine whether BSI is a Maryland resident for purposes of MCEMA.

## III.   Similar Statements as to any Counterclaim, Cross Claim, or Third-Party Claim.

BSI has no counterclaim, cross claim, or third-party claim at this time.  Because the mini-trial does not address the merits of the claims at issue, BSI reserves the right to bring any counterclaim, cross claim, or third-party claim at a subsequent stage of the litigation.  Connexus has pending third-party claims against Hypertouch and Joe Wagner.  However, those third-party claims are not being tried during the June 2012 mini-trial.  Therefore, Connexus will submit a separate statement concerning its third-party claims should this case proceed to trial on the merits.

**IV.     Any Amendments Required of the Pleadings**

BSI has no amendments to its pleadings at this time.  Because the mini-trial does not address the merits of the claims at issue, BSI reserves the right to amend its pleadings at a subsequent stage of the litigation.  Connexus has pending third-party claims against Hypertouch and Joe Wagner.  However, Connexus has no amendments to its third-party complaint at this time.  Because the mini-trial does not address the merits of the claims at issue, Connexus reserves the right to amend its pleadings at a subsequent stage of the litigation.

**V.     Any Issue in the Pleadings That Is to Be Abandoned**

Neither BSI nor Defendants have issues in its pleadings that will be abandoned at this time.  Because the mini-trial does not address the merits of the claims at issue, the parties reserve the right to address the issue of abandoning issues in the pleadings at a subsequent stage of the litigation.

**VI.     Stipulated Facts or Requested Stipulations of Facts**

    **A.     Plaintiff's Requested Stipulated Facts:**

Plaintiff does not stipulate to any of Defendants' requested stipulations of facts.

    1.    BSI provides information, system, or access software services to multiple individuals.

    2.    BSI provides or enables computer access to multiple users.

    3.    BSI provides Internet access to multiple users.

    4.    BSI provides multiple users with the ability to access the Internet.

    5.    BSI enables multiple users to access the Internet.

    6.    BSI has facilitated the sending and receiving of electronic mail to multiple users.

    7.    BSI enables multiple users to send and receive electronic mail.

8.      BSI provides email access to multiple users.

9.      BSI provides a service that permits multiple users to send email.

10.     BSI provides a service that permits multiple users to receive email.

11.     BSI hosts domains for its multiple users.

12.     BSI is an "intermediary" in sending or receiving electronic mail.

13.     BSI operates a list service that provides the distribution of electronic newsletters to multiple subscribers.

14.     BSI is incorporated in the state of Maryland.

15.     BSI owns an Internet Merchant Account.

16.     BSI has provided e-commerce services for multiple individuals.

17.     BSI owns its own servers and computer equipment.

18.     BSI hosts DNS (domain name service) servers.

19.     BSI has hosted websites for businesses on its servers.

20.     BSI has hosted websites for individuals on its servers.

21.     BSI has hosted domains for businesses on its servers.

22.     BSI has hosted domains for individuals on its servers.

23.     BSI provides streaming media services.

24.     BSI purchases its own equipment.

25.     BSI has purchased hardware upgrades.

26.     BSI has purchased software upgrades.

27.     BSI owns multiple domain names.

28.     BSI hosts domains on servers that it owns.

29.     BSI provided interactive computer services and electronic mail services to multiple users at St. Lukes's House.

30.     BSI has hosted multiple domain names.

31.     BSI provides or enables wired or wireless Internet connectivity to multiple users.

32.     Hypertouch was incorporated in California in 1999.

33.     BSI was incorporated in Maryland in 1996.

34.     Paul Wagner has physical control over and access to hardware that BSI owns.

35.     James Joseph Wagner has physical control and access to the hardware that Hypertouch owns.

36.     Other interactive computer or email service providers use litigation as a tool to combat spam.

37.     Spam email constitutes a large proportion of email received by BSI as a proportion of all email received by BSI, just as it does for interactive computer service providers elsewhere.

38.     It is a standard industry custom to provide email and interactive computer services free of charge.

39.     Routine conveyance is a standard routing practice between interactive computer service providers.

40.     Email routed between interactive computer service providers during the course of routine conveyance typically includes a large proportion that is spam.

**B.      Defendants' Requested Stipulations of Facts:**

Defendants do not stipulate to Plaintiff's requested stipulations of facts.

1.      From 2001 to the present, BSI has generated more revenue through litigation than by providing services to customers through its internet or email operations.

2.      BSI has no business plan for operating as an interactive computer service provider or email service provider.

3.      BSI has no privacy policies with respect to users of its services.

4.      BSI and Hypertouch intentionally configured their servers so that alleged unlawful emails sent to the domain Hypertouch.com would be received first by Hypertouch servers and then that same alleged unlawful emails would be automatically sent or redirected to BSI's servers.

5.      The majority of alleged unlawful emails on which BSI originally sued Kraft in 2008 was the same alleged unlawful emails for which Hypertouch sued Kraft in 2006 and which alleged unlawful emails fell within the Kraft/Hypertouch Settlement Agreement.

6.      Neither Hypertouch nor BSI ever complied with the Cooperation Clause in the Hypertouch Settlement Agreement that required that Kraft be notified within 20 days of the receipt of allegedly unlawful alleged unlawful emails.

## VII.   Details of the Damages Claimed or Any Other Relief Sought As of the Date of The Pretrial Conference

Because the mini-trial does not address damages, BSI reserves the right to amend its response at a subsequent stage of the litigation.  BSI seeks statutory damages as provided in the Maryland and California statutes for each email for which Defendants are found to be liable.

## VIII.  Exhibits and Demonstrative Exhibits

A.     Plaintiff's Exhibit and Demonstrative Exhibit List:

1.      BSI Articles of Incorporation, BSI0038236-238

2.      Live demonstration of BSI interactive computer service provider activity and electronic mail service provider activity

3.      Screen shots of BSI server activity from October 2009, BSI0034852-865; BSI0034866-907; BSI0034908-923; BSI0034924-928; BSI0034929; BSI0034930-952.

4.      BSI tax filings, BSI0021221-234; BSI0021320-345; BSI0021346-371; BSI0021372-398; BSI0021399-431; BSI0021432-458; BSI0021459-483; BSI0021486-518.

5.      Pervasiveness of spam slide

6.      Internet structure/post office analogy

7.      Internet structure – actual

8.      CA/MD spam law definitions

9.      California and Maryland statute legislative history

10.     What qualifies as an interactive computer service provider in Maryland?

11.     Does BSI qualify as a Maryland interactive computer service provider?

12.     What qualifies as an electronic mail service provider in California?

13.     Does BSI qualify as a California electronic mail service provider

14.     List of small interactive computer service providers

15.     List of players

16.     BSI timeline

17.     Infrastructure of an interactive computer service provider

18.     List of BSI services

19.     List of BSI customers

20.     BSI/Hypertouch relationship

21.     List of spam cases filed by other interactive computer service providers

22.     List of Maryland resident qualifiers for BSI

23.     BSI network connectivity diagram, BSI0021291-293.

24.     BSI domain name registrations, BSI0034823-825; BSI0034826-828.

25.     BSI customer invoices, BSI0034545-559; BSI0020744; BSI0020745; BSI0020748; BSI0020749; BSI0020750; BSI0020751.

26.     BSI WHOIS information; BSI0004414-415; BSI0038212-214; BSI0038239-240; BSI0045869; BSI0045862-863; BSI0045858-859; BSI0045846-847; BSI0045848-849; BSI0045852-853; BSI0045901-902.

27.     Press articles re: other interactive computer service providers suing under anti-spam statutes

28.     BSI users' declarations, BSI0034539; BSI0034540-541; BSI0034542-543.

29.     Hypertouch users' declarations, BSI0024168-170.

30.     BSI users' correspondence re: email archiving, BSI0030904.

31.     Correspondence from P. Wagner to Megapath, BSI0021294-298.

32.     Invoices and documentation of payments for BSI's service from Speakeasy and other upstream providers, BSI21311-312; BSI0034560-564.

33.     BSI Credit Card statements from 2004-2009, BSI0022339-344; BSI0022360-364; BSI0022365-379; BSI0022380-384; BSI0022400-404; BSI0022420-426; BSI0022427-441; BSI22442-446, BSI0022447-461; BSI0022462-466.

34.     Screenshot of BSI's account on Speakeasy's web page, BSI0034691-692.

35.     Server diagram, showing BSI service for the mail.stlukeshouse.com domain via BSI's mail.linkcenter.net server; BSI0020753.

36.     Screenshot of BSI account on Maryland Dep't of Assessments and Taxation website, BSI0021243-244.

37.     Email correspondence re: services BSI provided to St. Luke's House, BSI0020756-811.

38.     Email correspondence re: BSI's e-commerce services to St. Luke's House, BSI0034953-956.

39.     Email correspondence re: BSI's services to Young Women's Christian Hospital, BSI0021995-2245.

40.     Email correspondence re: services provided by BSI, BSI0008135-136.

41.     Speakeasy's terms of service, BSI0021299-310.

42.     BSI's invoices to YWCH, BSI0002843-846.

43.     Table of BSI's Non-Litigation expenses, BSI0022566-580.

44.     Compilation of BSI's invoices for both upstream connectivity and hardware, BSI0031577-2019.

45.     Email excerpts, showing BSI's web-hosting services for Barcroft Bicycles, BSI0021519-867.

46.     Hybrid Report of Paul Wagner

47.     Slide explaining Domain Name Service system

48.     Screen shots of BSI customer email accounts, BSI0034696-702

49.     Email correspondence with BSI customer, BSI0008126

50.       Whois lookup for domain name stlukeshouse.com, BSI0035035-037

51.       Email correspondence with BSI customer St. Luke's House, BSI0044221-291

52.       Service signups for BSI customers, BSI0034544-536

53.       Court's Amended Order (DE # 498)

54.       Connexus Opp to Motion to Strike & Draft Order (DE # 456)

55.       TIA-942 Data Center Standard Summary

56.       Public articles and press releases discussing spam cases filed by other interactive computer service providers:

a.       "AOL declares victory in spam suit settlement," USA Today. April 3, 2002.  Available at: http://www.usatoday.com/tech/news/2002/04/03/aol-spam.htm

b.       "Earthlink Wins $25 Million in Spam Suit," by Christopher Saunders.  July 22, 2002.  Available at: http://www.internetnews.com/IAR/article.php/1430591/Earthlink+Wins+25+Million+in+Spam+Suit.htm

c.       "Former 'Spam King' pays MS $7m to settle lawsuit," by John Leyden.  August 9, 2005.  Available at: http://www.theregister.co.uk/2005/08/09/richter_ms_settlement/

d.       "Who's been sued under CAN-SPAM?" by Al Iverson.  October 25, 2006.  Available at:

e.       http://www.spamresource.com/2006/10/whos-been-sued-under-can-spam.html

f.       "Big Four ISPs File First Major Can Spam Suits," by Janis Mara. March 10, 2004.  Available at:

g.       http://www.clickz.com/clickz/news/1694624/big-four-isps-file-first-major-can-spam-suits (March 2004)

h.       "AOL Files Spam Suits," by Brian Morrissey.  April 15, 2003. Available at: http://www.esecurityplanet.com/trends/article.php/2190881/AOL-Files-Spam-Suits.htm

i.       "Target Spam:  NY AG, Microsoft File $38M Suits," Ryan Naraine.  December 18, 2003.  Available at:

http://www.clickz.com/clickz/news/1715016/target-spam-ny-ag-microsoft-file-usd38m-suits

**j.**　　　"First Can Spam Suit Filed," by Ron Miller.  March 5, 2004.  Available at:  http://www.clickz.com/clickz/news/1711129/first-can-spam-suit-filed

**k.**　　　"Iowa ISP Wins $1 Billion in Spam Suit," by John P. Mello Jr.  December 21, 2004.  Available at:  http://www.technewsworld.com/story/Iowa-ISP-Wins-1-Billion-in-Spam-Suit-39143.html

**l.**　　　"Microsoft awarded $4 million in spam suit," by Matt Hines.  July 16, 2004.  Available at:

**m.**　　http://news.cnet.com/Microsoft-awarded-4-million-in-spam-suit/2100-1014_3-5272776.html

**n.**　　　"Microsoft Files More Anti-Spam Lawsuits in Conjunction With Leading ISPs," by Microsoft News Center.  October 28, 2004.  Available at:  http://www.microsoft.com/en-us/news/press/2004/oct04/10-28canspamfollowuppr.aspx

**o.**　　　"EarthLink puts stop to 'Alabama spammers'," by Matt Hines.  January 26, 2005.  Available at:  http://news.cnet.com/EarthLink-puts-stop-to-Alabama-spammers/2100-7348_3-5551566.html

**p.**　　　"Strigl's Verizon Wireless Vows To Slice SMS Spam," by Dan Frommer.  November 23, 2005.  Available at:  http://www.forbes.com/2005/11/23/verizon-wireless-strigl-cx_df_1123autofacescan12.html

**q.**　　　"Verizon Sues Text Spammers," by Lisa Lerer.  September 26, 2006.  Available at:  http://www.forbes.com/2006/09/29/spam-suit-verizon-cx-tech-intel-cx_ll_0929spamsuit.html

**r.**　　　"Washington Settles State's First Can-Spam Suit," by Ken Magill.  May 24, 2006.  Available at:  http://chiefmarketer.com/news/washington-settles-state-s-first-can-spam-suit

**s.**　　　"Who's been sued under CAN-SPAM?" by Al Iverson.  October 25, 2006.  Available at:

**t.**　　　http://www.spamresource.com/2006/10/whos-been-sued-under-can-spam.html (2006)

**u.**      "Verizon Wireless Settles Spam Suit," by Susan Rush.  July 25, 2006.  Available at:  http://www.spamfighter.com/News-6141-Verizon-Wireless-Settles-Spam-Suit.htm

**v.**      "e360Insight, LLC. v Comcast Corporation," by Mickey Chandler.  January 22, 2008.  Available at:  http://www.spamsuite.com/node/352

**w.**      "Comcast and e360 settle lawsuit," by Laura in Legal at Word to the Wise.  January 19, 2010.  Available at:  http://blog.wordtothewise.com/2010/01/comcast-and-e360-settle-lawsuit/

**x.**      "Yahoo files suit against 'lottery' spammers," by Lottery Post.  May 27, 2008

**y.**      http://www.lotterypost.com/news/175693

**z.**      "Yahoo wins $610m lawsuit against lottery spammers," by Shaun Nichols.  December 8, 2011.  Available at:  http://www.v3.co.uk/v3-uk/news/2131006/yahoo-wins-usd610m-suit-lottery-spammers

**aa.**      "Yahoo wins $610m lawsuit against lottery spammers," by Shaun Nichols.  May 5, 2009.  Available at:  http://www.pcmag.com/article2/0,2817,2346542,00.asp

**bb.**      "Verizon Settles Spam Suit," by The Associated Press.  February 11, 2009.  Available at:  http://www.cbsnews.com/8301-205_162-527365.html

**cc.**      "Spam lawsuits: new and old," by Laura in Legal at Word to the Wise.  June 17, 2010.  Available at:  http://blog.wordtothewise.com/2010/06/spam-lawsuits-new-and-old/

**dd.**      "Microsoft spam suit involves old nemesis," by John P. Mello Jr.  June 22, 1010.  Available at:  http://www.allspammedup.com/2010/06/microsoft-spam-suit-involves-old-nemesis/

**ee.**      "$236m judgment lands on mom and pop spam shop," by Dan Goodin.  October 8, 2008.  Available at:  http://www.theregister.co.uk/2008/10/08/mom_and_pop_spammer_judgement/

**ff.**      "Judges Can Spam Suit Against Epic," by Wendy Davis.  December 4, 2009.  Available at:

**gg.**      http://www.mediapost.com/publications/article/118525/judges-can-spam-suit-against-epic.html

**hh.** "Spammers ordered to pay tiny ISP whopping $2.6m," by Dan Goodin. May 6, 2010. Available at: http://www.theregister.co.uk/2010/05/06/spam_judgment/

**ii.** "Veteran spam suit troll plaintiff calls it quits," by Dan Goodin. September 14, 2010. Available at: http://www.theregister.co.uk/2010/09/14/asis_calls_it_quits/

**jj.** "Yahoo! Wins $610 Million Trademark Infringement and CAN-SPAM Award Over Nigerian Advance Fee Fraud Suit," by Joseph DiCioccio. December 15, 2011. Available at:

**kk.** http://www.copyrighttrademarkmatters.com/2011/12/15/yahoo-wins-610-million-trademark-infringement-and-can-spam-award-over-nigerian-advance-fee-fraud-suit/

**B.**    Defendants' Exhibit and Demonstrative Exhibit List:

Defendants attached hereto as Exhibit 1 their preliminary exhibit and demonstrative exhibit list.

**IX.    Witness Lists**

**A.**    Plaintiff's Witness List

Plaintiff intends to call:

1.    Paul Wagner (Hybrid Fact/Expert)
1837 R Street NW
Washington, DC 20009

2.    Lynnita-Renee Sykes (BSI Customer)
2351 Eisenhower Avenue #1001
Alexandria, VA  22314

3.    John Clark (BSI Customer)
6040 Southport Drive
Bethesda, MD 20814
(301) 896-4238

Plaintiff may call:

4.    Dr. James Joseph Wagner (President of Hypertouch)
17 Greenfield Street
Lowell MA 01851
(650) 714-8419

**B.**     Defendant's Witness List:

Defendants intent to call:

1.     Paul Wagner[1]**
1837 R Street NW
Washington, DC 20009

2.     Dr. James Joseph Wagner ** (President of Hypertouch)
17 Greenfield Street
Lowell, MA 01851
(650) 714-8419

3.     Steven Wagner**
6125 Durbin Road
Bethesda, MD 20817

4.     William Wagner**
38 Maryland Avenue, Unit 333
Rockville, MD 20850

5.     Lynnita-Renee Sykes**
2351 Eisenhower Avenue #1001
Alexandria, VA  22314

6.     John Thomas Clark**
6040 Southport Drive
Bethesda, MD 20814
(301) 896-4238

Defendants May Call:

7.     Diane Wagner**
38 Maryland Avenue, Unit 333
Rockville, MD 20850

8.     Lorraine Lisiecki**
2810 Summerfield Road
Falls Church, VA 22042

9.     John Levine**
24 Washington St.
Trumansburg, NY 14886

---

[1] As counsel for Joe Wagner and Hypertouch previously represented to counsel for defendants, Joe Wagner will appear at trial regardless of whether BSI calls him, as defendants expressed that they need to call Joe Wagner live at trial.

(607) 330-5711

10.     John Klensin**
        P.O. Box 400197
        Cambridge, MA 02140

11.     Sandy Saunders
        Greenberg Traurig, LLP
        2101 L Street, N.W., Suite 1000
        Washington, D.C.  20037
        (202) 331-3100

12.     Nicoleta Timofti
        Greenberg Traurig, LLP
        2101 L Street, N.W., Suite 1000
        Washington, D.C.  20037
        (202) 331-3100

13.     Nolan C. Church
        9411 Gumtree Park Street
        Capitol Heights, MD 20743
        (301) 350-3181

14.     Witnesses to authenticate videos if the parties cannot agree on
        authentication

15.     Witnesses on Plaintiff's list that are not identified above**

The use of "**" above denotes that the witness is adverse to Defendants in that the witness is an opposing party, family member of an opposing party, an expert proposed by an opposing party, and/or a customer of an opposing party.  Therefore, Defendants suggest that they be allowed to treat these witnesses as adverse witnesses and phrase questions to these witnesses accordingly.

X.      **Expert Lists**

        **A.**     Plaintiff's Experts

               Plaintiff intends to call:

               1.      Paul Wagner (Hybrid Fact/Expert)

2.      Peter Resnick (Expert on email systems, the Internet, and interactive computer service providers)
503 West Indiana Avenue
Urbana, IL 61801
(217) 337-1905

Plaintiff may call:

1.      John Levine (Expert on email systems, the Internet, and interactive computer service providers)
24 Washington St.
Trumansburg, NY 14886
(607) 330-5711

**B.**    Defendants' Experts

Defendants intend to call:

1.      John Evans (expert on email transmissions from Hypertouch to BSI on which Hypertouch previously sued; computer and email forensics)
120 South LaSalle St., Ste. 1200
Chicago, IL 60603

2.      Willis Marti (expert on the Internet, ISP's, electronic mail configuration)
1103 Dominik Dr.
College Station, TX 77840

3.      Fred Cohen (expert on the Internet, electronic mail configuration)
572 Leona Dr.
Livermore, CA 94550

## XI.    Deposition Designations

**A.**    Plaintiff's Designations:

None

**B.**    Defendants' Designations:

Defendants designate the deposition testimony set forth on Exhibit 2 attached hereto.

Defendants reserve the right to designate the deposition testimony of John Levine to the extent BSI does not produce him live at trial.

**XII.    Other Pretrial Relief, including Pending Motions**

The parties agree to provide each other 24- hour notice before witnesses are called to testify at trial.

**A.**      Plaintiff's Pretrial Relief:

Plaintiff objects to the following items in the Defendants' sections of this Pretrial Order:

1.   Plaintiff does not agree that Defendants are in fact conceding phase one of the Mini-Trial, as they purport to do in their proposed pre-trial order. While supposedly not contesting phase one, Defendants state that they "reserve all rights to challenge whether BSI meets the technical requirements of the California and Maryland statutes to the extent BSI introduces evidence concerning such technical requirements and/or to the extent such technical requirements are relevant to the second phase of the Mini-Trial ordered at ECF No. 498." Defendants also summarily rejected all proposed stipulations of fact, including those based on the statutory language and those based on their own answers to Plaintiff's court-sponsored Requests for Admissions for the Mini Trial. If Defendants are actually not contesting phase one, they need to state which factual points they are conceding. Plaintiff does not agree with the Defendants' proposal to limit the trial to phase two issues. Instead, the trial should proceed as initially scheduled by the Court in ECF #498.

2.   Plaintiff disagrees that Defendants should be allowed to treat BSI customers and members of the Wagner family as "adverse to Defendants." There is no basis or evidence in the record to suggest that these witnesses

would be hostile to Defendants, and Defendants should not presumptively be allowed to treat them as such.

3.   Plaintiff objects to and disagrees with any portion of Defendants' Proposed Pretrial Order  proposing jury instructions or relief related to BSI's or its counsel's supposed "destruction of documents" following the settlement of the *World Avenue* litigation, which was, in fact, a routine document destruction in accordance with the Protective Order governing the handling of confidential materials in that case.  Despite having been repeatedly advised by counsel to both BSI and World Avenue that each and every one of the originals of any such documents remains in BSI's and/or Hypertouch's possession, custody, or control (i.e., no document has been literally "destroyed"), Defendants nonetheless insist on creating, through baseless, scandalous, *ad hominem* accusations, a sideshow intended to leverage Defendants' position in the litigation and to distract the Court from the merits.  This is not the first time Defendants have resorted to such tactics; the first resulted in the Court striking the entirety of Defendants' pleading, and a similar result should follow here.  To the extent Defendants' bombast reduces to a complaint of being unsure whether every single document produced in the *World Avenue* litigation has been produced here, the only appropriate relief would have been a timely-filed motion to compel, and not the draconian, utterly unjustified relief Defendants seek here.  Even so, it is difficult to imagine what document could possibly exist (not one of which, Defendants have

identified to us) that would make a material difference on the *500 documents* they have already identified as exhibits in this case.

    4.   Defendants' objection to Plaintiff's proposed exhibit list is premature, as the parties have not yet had their mutual exchange of trial exhibits per Local Rule 106.7(b).  This review will take place prior to the pretrial conference on June 14, 2012.

**B.**    Defendants' Pretrial Relief:

    1.   Jury Instructions/Adverse Inference and Other Relief Resulting from Destruction of Evidence

Connexus seeks jury instructions containing adverse inferences and other relief because BSI, with the assistance of its counsel in this case, instructed third-parties to destroy evidence that BSI and its counsel knew Defendants would need to defend themselves in the Mini-Trial without taking adequate measures to ensure all of such evidence would be preserved and timely produced to Connexus.  Specifically, counsel for BSI, Joe Wagner and Hypertouch negotiated a provision in the BSI/World Avenue Settlement Agreement that required World Avenue and its counsel, Greenberg Traurig, to destroy certain documents, including documents that BSI, Joe Wagner and Hypertouch produced to World Avenue, related the mini-trial in that case.  The June 5, 2012 deposition of World Avenue's counsel (Greenberg Traurig) ordered by Magistrate Judge Day confirms that the documents destroyed are relevant to the Mini-Trial in this case.

The only excuse offered by counsel for BSI, Joe Wagner, and Hypertouch is that they represented that their clients maintained all documents their clients produced to World Avenue, and that BSI, Joe Wagner, and Hypertouch, produced them to Connexus in this case.  However, the facts are that Connexus is missing documents, including documents identified by World

Avenue on its mini-trial trial exhibit list which are necessarily relevant to the Mini-Trial in this case.  Alternatively, Connexus cannot verify that it has all of the relevant documents, as there is no way Connexus can verify the completeness of the document productions (Greenberg Traurig did not create a list or other record of what it destroyed).  Although BSI's counsel recently offered to search for and produce documents that Connexus cannot locate and/or believes it is missing, BSI's offer is too late and was only made after Connexus engaged in discovery, and participated in several rounds of briefing and two hearings, to discover the extent of document destruction and who was responsible for such destruction.

In response to the subpoenas Connexus served on World Avenue and Greenberg Traurig which Connexus sought to enforce, Magistrate Judge Day found that Connexus had a right "to determine that what it received [from BSI and Hypertouch] or has not received is still out there. And if not, then who is responsible for its disappearance."  (Ex. 3, 3/2/12 Hrg. Trans. at 44:17-46:10.)  Indeed, the case law is that "there is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, nor is there an absolute rule providing that the party must first seek those documents from an opposing party before seeking them from a non-party." *Software Rights Archive, LLC v. Google Inc.*, 2009 WL 1438249, at *2 (D. Del. May 21, 2009) (citations and quotations omitted).  Such a requirement "would unduly burden the discovery process by permitting wasteful controversy over whether a party actually has the documents and whether they are exactly the same as those sought." *Byrnes v. Jetnet Corp.*, 111 F.R.D. 68, 73 (M.D.N.C. 1986).  Thus, "production from a third party will be compelled in the face of an argument that the 'same' documents could be obtained from a party, because there is reason to believe that the files of the third party may contain different versions of documents, additional material, or perhaps, significant omissions." *Viacom Int'l, Inc.*

*v. YouTube, Inc.*, 2008 WL 3876142, at *3 (N.D. Cal. Aug. 18, 2008) (internal quotations and citations omitted). BSI, Hypertouch, and Joe Wagner stripped Connexus of its discovery rights to obtain documents from World Avenue and Greenberg Traurig, and now Connexus has no way to verify what BSI and Hypertouch produced is complete.

BSI and its counsel had an obligation to notify Connexus that World Avenue would destroy documents relevant to this case so that Connexus could obtain them. *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001) ("If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.") BSI and its counsel did not do so. Instead, it ordered the destruction and then refused to provide any meaningful information until after several rounds of briefing and two hearings before Magistrate Judge Day.

Connexus and its counsel also are troubled by the following events which underscore why Connexus sought documents from World Avenue in the first instance:

- When Connexus's counsel, in September 2011, attempted to obtain information about the disposition of the documents, counsel for BSI, Joe Wagner, and Hypertouch represented that "we weren't involved, we were not signatories" to the World Avenue Settlement Agreement which requires World Avenue to destroy documents, and that "Steptoe is not a party to the [World Avenue] litigation. Steptoe does not represent BSI in that [the World Avenue] litigation." (Ex. 4, 9/6/11 Meet and Confer Trans. at 6:10-12; 13:4-21.) Documents produced on June 4, 2012, by Greenberg Traurig, and deposition testimony elicited from Greenberg Traurig on June 5, 2012, prove that BSI's counsel in this case (Steptoe & Johnson) in fact negotiated the very provision in the agreement that requires document destruction. (*See, e.g.*, Ex. 5 hereto.)

- After the Greenberg Traurig deposition and after Connexus indicated to BSI's counsel that Connexus would seek relief outlined herein, BSI's counsel sent an email to Connexus's counsel attaching additional documents that should have been produced long ago, and in that email and a call that same day conceded that at least some of the documents had not been previously produced. (Ex. 6, 6/7/12 J. McFadden Email.)

- Connexus understands that the parties executed the World Avenue Settlement Agreement on or about August 5, 2011, and that World Avenue and its counsel destroyed the majority of the documents by August 9, 2011. As of September 6, 2011, BSI's counsel had not obtained copies of the documents that its clients produced to World Avenue which would include copies of the documents that World Avenue and its counsel destroyed. (Ex. 4, 9/6/11 Meet and Confer Trans. at 6:17-19.) That is, as of September 6, 2011, BSI's counsel had not obtained the very documents that it knew World Avenue and its counsel destroyed and would be relevant in this case. It is unclear, to this day, whether Steptoe and Johnson ever obtained the actual bates-numbered versions of documents produced to World Avenue or whether its clients preserved those documents, or whether BSI, Joe Wagner, and Hypertouch, and their counsel, attempted to reconstruct the document production.

- It took over seven months for BSI, Joe Wagner, and Hypertouch to complete its document productions, including the documents that they produced to World Avenue (Connexus received the latest production in late May 2012 although it is unclear whether these documents also were produced to World Avenue). If BSI, Joe Wagner, and Hypertouch maintained the documents they produced in the World Avenue, then it would have taken just a few days to reproduce them to Connexus and not several months. Alternatively, BSI, Joe Wagner, and Hypertouch slow-rolled the production to prejudice Connexus's ability to prepare for trial as the last production was received on June 7, 2012.

- The protective order in the World Avenue Litigation did not require World Avenue or its counsel to destroy a single document unless the parties agreed to destruction. Rather, the protective order required the return of certain documents. BSI, Joe Wagner, and Hypertouch, and their counsel, were prohibited from requiring destruction of evidence relevant to this case.

- BSI, Joe Wagner, Hypertouch, and its counsel have been sanctioned no less than twelve times for discovery and other misconduct in this and related cases.

Connexus also seeks the attorneys' fees and costs that it was forced to spend over the last

nine months to discover the extent of the document destruction efforts (such investigation is

continuing). Upon learning that BSI settled its case with World Avenue in August 2011,

Connexus immediately sought the documents from World Avenue and its counsel. Both World

Avenue's counsel and counsel for BSI, Joe Wagner, and Hypertouch, refused to provide any

meaningful information about the disposition of documents, and then forced several rounds of

briefing spanning hundreds of pages and two hearings before Magistrate Judge Day during

which he ordered World Avenue's counsel to appear for a deposition.  Connexus only learned

the full extent of the document destruction efforts and Steptoe & Johnson's involvement after

World Avenue's counsel produced documents on June 1 and June 4, and appeared for the

deposition ordered by Magistrate Judge Day on June 5.

 The conduct that transpired must be sanctioned.  Despite its express representations that

"we weren't involved," Steptoe & Johnson negotiated the World Avenue Settlement Agreement

that required World Avenue and its counsel to destroy evidence relevant to the Mini-Trial; BSI,

Joe Wagner and Hypertouch, and their counsel, knew that the Settlement Agreement required

World Avenue to destroy evidence relevant to the Mini-Trial; BSI, Joe Wagner and Hypertouch,

and their counsel, refused to provide any meaningful information about it when asked.  Instead,

BSI's counsel represented that it was not involved in the agreement, and forced Connexus to

spend thousands of dollars to obtain information that BSI, Joe Wagner, Hypertouch, and its

counsel should have produced at the outset.  Further, Connexus is missing documents that it

needs to prepare for trial; alternatively, Connexus does not know whether it is missing

documents because documents continue to be produced (the latest production was made on June

7, 2012) and it cannot locate other documents.  As a condition to proceeding with the mini-trial,

BSI and its counsel should be ordered to pay Connexus's attorneys fees and costs associated

resulting from this misconduct.

 Finally, BSI's counsel threatened sanctions against Connexus and its counsel for raising

this matter with the Court.  Undersigned counsel cannot fathom how it could be sanctioned in

these circumstances.  Connexus also notes that the circumstances and confusion all could have

been avoided had BSI and its counsel complied with its obligations and disclose at the outset its

involvement and knowledge about the destruction of documents instead of forcing Connexus and

the Court to engage in several rounds of briefing and two hearings to obtain this basic information.

        2.        Exclusion of Certain Exhibits

Under the automatic exclusion rule set forth in FRCP 37(c)(1), Defendants object to the use by BSI at trial of any late-produced documents and things, and any compilation, summary, demonstrative, or other exhibit, that relies on such late-produced documents and things. Connexus also objects, under FRE 1006, FRCPs 26 and 37, and LR 107, to the use by BSI at trial of any exhibit that it refused to make available upon request by Defendants.

The exhibits to which Defendants object on one or both of the foregoing grounds are:

Ex. 2:  "Live demonstration of BSI interactive computer service provider activity and electronic mail service provider activity."  In addition to the above, Defendants have no way to prepare to cross-examine BSI about this exhibit since it is a "live" demonstration.

Ex. 5:  "Pervasiveness of spam slide."

Ex. 6:  "Internet structure/post office analogy."

Ex. 7:  "Internet structure – actual."

Ex. 9:  "California and Maryland statute legislative history."

Ex. 10: "What qualifies as an interactive computer service provider in Maryland?"

Ex. 11: "Does BSI qualify as a Maryland interactive computer service provider?"

Ex. 12: "What qualifies as an electronic mail service provider in California?"

Ex. 13: "Does BSI qualify as a California electronic mail service provider."

Ex. 14: "List of small interactive computer service providers."

Ex. 15: "List of players."

Ex. 16: "BSI timeline."

Ex. 17: "Infrastructure of an interactive computer service provider."

Ex. 18: "List of BSI services."

Ex. 19: "List of BSI customers."

Ex. 20: "BSI/Hypertouch relationship."

Ex. 21: "List of spam cases filed by other interactive computer service providers."

Ex. 22: "List of Maryland resident qualifiers for BSI."

Ex. 27: "Press articles re: other interactive computer service providers suing under anti-spam statutes."

Ex. 28: "BSI users' declarations, BSI0034539; BSI0034540-541; BSI0034542-543." Connexus also objects to these declarations because they are hearsay falling under no hearsay exception, and because BSI previously agreed it would not use testimony from these witnesses when Connexus and BSI resolved a FRCP 37 motion that Connexus filed.

Ex. 47: "Slide explaining Domain Name Service system."

Ex. 56: "Public articles and press releases discussing spam cases filed by other interactive computer service providers."

Defendants object to the following exhibits because they are hearsay and do not fall

under any hearsay exception:

Ex. 29: "Hypertouch users' declarations."

Ex. 30: "BSI users' correspondence re: email archiving."

Ex. 31: "Correspondence from P. Wagner to Megapath."

Ex. 37: "Email correspondence re: services BSI provided to St. Luke's House."

Ex. 38: "Email correspondence re: BSI's e-commerce services to St. Luke's House."

Ex. 39: "Email correspondence re: BSI's services to Young Women's Christian Hospital."

Ex. 40: "Email correspondence re: services provided by BSI."

Ex. 41: "Speakeasy's terms of service."

Ex. 45: "Email excerpts, showing BSI's web-hosting services for Barcroft Bicycles, BSI0021519-867."

Ex. 46: "Hybrid Report of Paul Wagner."

Ex. 49: "Email correspondence with BSI customer."

Ex. 51: "Email correspondence with BSI customer St. Luke's House."

Ex. 56: "Public articles and press releases discussing spam cases filed by other interactive computer service providers."

Connexus reserves all rights to lodge any and all objections it has to the admissibility of any exhibit BSI may seek to introduce into evidence at trial.

### 3.        Litigation Revenues

BSI committed to produce, but had not produced, its updated litigation revenues that Magistrate Judge Day previously ordered.   Defendants request that the Court order BSI to produce its updated litigation revenue information within twenty four hours (24) or dismiss its case.  Such information must include the revenues it generated resulting from BSI's settlement with World Avenue.  Magistrate Judge Day during the March 2, 2012, hearing in this matter found that this information is discoverable for purposes of the Mini-Trial.

### 4.        Motions in Limine

Defendants filed the following two motions *in limine* which are pending with the Court:

a) ECF No. 528:  Motion to Preclude Plaintiff from Referring to Connexus and Kraft Emails as "Spam" or "UCE"; and

b) ECF No. 529:  Motion to Preclude Plaintiff's Experts from Rendering Legal Opinions.

## XIII.   Any Other Matter Added by the Court

None

Date:  June 12, 2012                                  Respectfully submitted,

_____/s/_____                        _____/s/  Darrell J. Graham (with permission)
Thomas M. Barba (D. Md. Bar No. 28487)               Darrell J. Graham
Roger W. Yoerges (D. Md. Bar No. 14088)              Peter S. Roeser
Jeffrey E. McFadden (D. Md. Bar No. 8738)            John E. Bucheit
John J. Duffy (D. Md. Bar No. 28613)                 ROESER, BUCHEIT & GRAHAM
STEPTOE & JOHNSON LLP                                LLC
1330 Connecticut Ave., NW                            20 N. Wacker Dr., Ste. 1330
Washington, D.C.  20036                              Chicago, IL 60606
T: 202-429-3000                                      (312) 922-1200
F: 202-429-3902                                      dgraham@rbglegal.com
tbarba@steptoe.com                                   proeser@rbglegal.com
ryoerges@steptoe.com                                 jbucheit@rbglegal.com
jmcfadden@steptoe.com
jduffy@steptoe.com                                   Barry J. Reingold (USDC-MD Bar No. 06490)
                                                     John M. Devaney *(Pro Hac Vice)*
Anthony A. Onorato (D. Md. Bar No. 28622)            John K. Roche *(Pro Hac Vice)*
STEPTOE & JOHNSON LLP                                PERKINS COIE LLP
1114 Avenue of the Americas                          607 14th Street NW, Suite 800
New York, NY  10036                                  Washington DC 20005-2003
T: 212-506-3900                                      T: 202-434-1613
F: 212-506-3950                                      F: 202-434-1690
tonorato@steptoe.com                                 jroche@perkinscoie.com
*Counsel for Plaintiff Beyond Systems, Inc. and*     breingold@perkinscoie.com
*Third-Party Defendants James Joseph Wagner*         jdevaney@perkinscoie.com
*and Hypertouch, Inc.*

*Of Counsel:*                                        *Counsel for Defendants Kraft Foods Inc., Kraft*
 Stephen H. Ring (USDC-MD Bar No. 00405)             *Foods Global, Inc. & Vict. Th. Engwall & Co.*
 Law Offices of Stephen H. Ring, P.C.
 506 Main Street, Suite 215
 Gaithersburg, Maryland  20878                       _____/s/ Ari N. Rothman (with permission)
 T: 301-563-9249                                      J. Douglas Baldridge (US DC-MD Bar No.
 F: 301-563-9639                                      11023)
 shr@ringlaw.us                                       Lisa Jose Fales (US DC-MD Bar No. 08141)
                                                      Ari N. Rothman (US DC-MD Bar No. 17560)
                                                      VENABLE LLP
 Mike Rothman (USDC-MD Bar No. 14568)                 575 Seventh Street, N.W.
 Law Office of Michael S. Rothman                     Washington, D.C.  20004
 401 E. Jefferson Street, Suite 201                   (202) 344-4000
 Rockville, MD  20850                                 (202) 344-8300 (Facsimile)
 T: 301-251-9660
 F: 301-251-9610                                      *Counsel for Defendant Connexus Corp.*
 mike@mikerothman.com

*Counsel for Plaintiff Beyond Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2012, the foregoing JOINT PRETRIAL

ORDER was served via federal express on the below-named parties:

Barry J. Reingold
John M. Devaney
John K. Roche
PERKINS COIE LLP
700 Thirteenth Street N.W.
Washington, D.C.
20005-3960
(202) 654-6200 (Telephone)
(202) 654-6211 (Facsimile)
jroche@perkinscoie.com
breingold@perkinscoie.com
jdevaney@perkinscoie.com

Darrell J. Graham
Peter S. Roeser
John E. Bucheit
ROESER, BUCHEIT & GRAHAM LLC
20 N. Wacker Dr., Ste. 1330
Chicago, IL 60606
(312) 922-1200
dgraham@rbglegal.com
proeser@rbglegal.com
jbucheit@rbglegal.com

*Counsel for Defendants Kraft Foods Inc.,
Kraft Foods Global Inc., and Vict. Th.
Engwall & Co., Inc.*

J. Douglas Baldridge
Lisa Jose Fales
Ari N. Rothman
VENABLE LLP
575 7th Street NW
Washington, D.C.  20004
(202) 344-4000 (Telephone)
(202) 344-8300 (Facsimile)
jdbaldridge@venable.com
ljfales@venable.com
anrothman@venable.com

*Counsel for Defendant Connexus
Corp.*

_____
                /s/
             Jennifer M. Newton