## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____
                                          )
BEYOND SYSTEMS, INC.,                     )
                                          )
    Plaintiff,                            )
                                          )
        v.                              )    Case No. 8:08-cv-00409 (PJM) (CBD)
                                          )    Judge Peter J. Messitte
KRAFT FOODS, INC., *et al*.,              )
                                          )
    Defendants.                           )
_____)
                                          )
CONNEXUS CORP., *et al*.,                 )
                                          )
    Third-Party Plaintiffs,               )
                                          )
        v.                              )
                                          )
JAMES JOSEPH WAGNER, *et al*.,            )
                                          )
    Third-Party Defendants.               )
_____)


## POST-TRIAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR JUDGMENT AS A MATTER OF LAW

**TABLE OF CONTENTS**

INTRODUCTION

ARGUMENT

I.   THE PHASE ONE VERDICT IS SUFFICIENT AS A MATTER OF LAW TO ESTABLISH THAT BSI HAS STANDING UNDER THE MARYLAND AND CALIFORNIA ANTI-SPAM STATUTES. .................................................................................................... 2

A.   The Evidence Proved That BSI Provides Email Services and Enables Computer Access by Multiple Users to a Computer Service. ................................................................. 3

  1.   Paul Wagner's Testimony. ........................................................................ 4

    a.  Email Services ..................................................................................... 4

    b.  Web Services ....................................................................................... 7

    c.  Internet Access and Wireless Internet Access ........................................ 10

    d.  File Transport Protocol ("FTP") ............................................................ 11

  2.   BSI Provided Several Internet Services to St. Luke's. ................................ 12

  3.   BSI Provided Internet Services to Young Women's Christian Home. ........ 14

  4.   BSI's Expert Testimony. ........................................................................ 16

  5.   Defendants' Admitted That BSI Provides or Enables Computer Access by Multiple Users to a Computer Service, and Enables the Sending and Receiving of Email. .............. 18

II.  THERE IS NO REQUIREMENT THAT BSI PROVE THAT IT IS A "BONA FIDE" ICSP/EMSP UNDER THE MARYLAND AND CALIFORNIA STATUTES. .......................... 19

A.   Neither Maryland Nor California Law Contains the "Bona Fide" Limitation on Standing That Defendants Seek to Impose. .......................................................................... 22

B.   Limitations on Standing in Maryland's and California's General Consumer Protection Statutes Demonstrate That Both States Are Capable of Limiting Standing When They Deem It Necessary and Appropriate to Do So. ..................................................................... 24

C.   A Federal Court Sitting in Diversity Is Not Permitted to Create or Expand State Law on Public Policy Grounds That Have Not Been Clearly Articulated by the State's Courts. ......... 27

D.   Under California and Maryland Law, Courts May Not Adopt Extra-Statutory Restrictions Like the One Advanced by Defendants Here. .......................................................... 29

III.  EVEN IF DEFENDANTS' EXTRA-STATUTORY FACTORS ARE LEGALLY RELEVANT, BSI IS A "BONA FIDE" ICSP AND EMSP. ...................................................... 35

A.   The Jury's Phase-One Verdict Established That BSI Is a "Bona Fide" Plaintiff. ............ 35

B.   BSI's Litigation Activities Are Not Relevant as a Matter of Law and Policy. ................. 37

C.   The Phase Two Jury Instruction Pre-Ordained the Verdict. ............................................. 39

CONCLUSION

i

## INTRODUCTION

Defendants are responsible for sending tens of thousands unsolicited emails to BSI that BSI claims to be false and misleading in violation of the anti-spam statutes in Maryland and California. If BSI is correct, Defendants will owe tens of millions of dollars in statutory damages to BSI. The prospect of such a large payout has, BSI believes, caused this Court to question whether the Maryland and California statutes confer standing on individuals or entities that frequently litigate against spammers like Connexus and Kraft. BSI has steadfastly argued that standing under the plain meaning of the Maryland and California statutes does not turn on a plaintiff's litigation history or on its motives for suing spammers. Defendants take a different view and have steadfastly argued that BSI lacks standing because it looks less like a "bona fide" provider of Internet services and more like a "litigation factory."

The Court conducted a jury trial in June that was intended to allow each side to present its own theory of standing. Phase One was to be limited to the language of the anti-spam statutes and nothing more—BSI's theory. Phase Two would focus on various factors that Defendants claimed to be relevant to BSI's "bona fides," including BSI's history of litigation under anti-spam statutes like the ones involved here.

The trial did not go according to plan. Phase Two somehow became conflated into Phase One, and the jury was permitted to hear evidence on virtually every one of the factors that the Court had reserved for Phase Two. It turns out that it did not matter, because the jury found that BSI *was* a provider of Internet services as defined by Maryland and California law, notwithstanding Defendants efforts to paint BSI as illegitimate. The jury verdict was correct in every respect. BSI indisputably provided the services that give it standing under both Maryland

1

and California law; indeed, Defendants admitted as much in their responses to BSI's pre-trial discovery.

The only factor that was omitted from Phase One was BSI's litigation history.  That issue was then tried in Phase Two, after which the jury was instructed that it could not find that BSI was a "bona fide" provider of Internet services if it found that BSI was "primarily" or "substantially" involved in litigation.  The jury so found and thus concluded that BSI was not "bona fide."  That verdict was wrong, not only because BSI's litigation activities are irrelevant as a matter of law to its standing to sue, but also because the jury instructions effectively pre-ordained the outcome.

This post-trial brief explains why the Phase One verdict was correct and why the Phase Two verdict must be set aside.

## ARGUMENT

I.   **THE PHASE ONE VERDICT IS SUFFICIENT AS A MATTER OF LAW TO ESTABLISH THAT BSI HAS STANDING UNDER THE MARYLAND AND CALIFORNIA ANTI-SPAM STATUTES.**

Although the Court conducted a trial on the parties' competing theories of standing, BSI has argued from the outset that the plain language of the two anti-spam statutes at issue here is all that controls.  Under the statutes' plain language, BSI has standing to sue so long as it provided Internet-related services as specified in Maryland's Commercial Electronic Mail Act ("MCEMA") and California's Business and Professions Code.

The Maryland anti-spam statute unambiguously states that any person who transmits or conspires to transmit commercial email that contains false or misleading information is liable "to an interactive computer service provider, in an amount equal to the greater of $1,000 or the interactive computer service provider's actual damages."  Md. Code Ann., Comm. Law §§ 14-3002(b); 14-3003(3) (West 2012).  The statute then defines an "Interactive computer service

2

provider" ("ICSP") as "an information service, system, or access software provider that provides

or enables computer access by multiple users to a computer service" and "includes a service or

system that provides access to the Internet."  Md. Code Ann., Comm. Law § 14-3001(c)(1) & (2)

(West 2012).  The California statute provides that "[a]n electronic mail service provider" "may

bring an action against a person or entity that violates any provision of this section."  Cal. Bus. &

Prof. Code § 17529.5(b)(1)(A) (West 2012).  That statute defines an "Electronic mail service

provider" ("EMSP") as "any person, including an Internet service provider, that is an

intermediary in sending or receiving electronic mail or that provides to end users of the

electronic mail service the ability to send or receive electronic mail."  Cal. Bus. & Prof. Code

§ 17529.1(h) (West 2012).

Under these statutes, if a jury were to find that BSI is an ICSP, then BSI has standing

under Maryland law.  If a jury were to find that BSI is an EMSP, then BSI has standing under

California law.  Defendants' argument that BSI also must prove that it is a "bona fide" provider

of Internet services based on some amorphous notion of what it takes to qualify as "legitimate" is

insupportable and not rooted in any statutory language.  Here, the jury found after hearing the

evidence in Phase One of the trial that BSI was *both* an ICSP and an EMSP.  That is all that it

takes as a matter of law to establish that BSI has standing to sue for the illegal spam that

Defendants have sent and attempt to prove the falsity of those emails, and that is where the

standing inquiry should have ended as a matter of law.

### A.    The Evidence Proved That BSI Provides Email Services and Enables Computer Access by Multiple Users to a Computer Service.

BSI introduced various exhibits in Phase One of the trial, along with the testimony of

several witnesses, including Paul Wagner, the founder and President of BSI; John Clark, the

Director of Facilities and Information Technology at St. Luke's House, Inc.; Lynnita Sykes, the

Executive Director at Young Women's Christian Home; and Peter Resnick, an expert in the types of Internet-related and email related services that entities provide to Internet and email users. BSI's evidence proved that BSI provided Internet-related services that indisputably qualify it as an ICSP under Maryland law and an EMSP under California law.

        1.     <u>Paul Wagner's Testimony</u>.

After first explaining how and why he formed BSI formed in 1996, the nature of the services that BSI offered during its early work with large companies such as IBM, NASDAQ, and Motorola, and then how his company came to provide Internet connectivity between and among email clients and other users, Paul Wagner testified about a long list of interactive computer services that BSI has provided through the years:

- BSI operates servers from three points of presence in Silver Spring and Rockville, Maryland, and in Washington, DC (Trial Tr. at 6/19 P. Wagner Testimony 67:1-4); BSI built its first email server in 1997. (Trial Tr. at 6/19 P. Wagner Testimony 75:25-76:1).

- BSI established email accounts for various individuals and entities beginning in 1997. (Trial Tr. at 6/19 P. Wagner Testimony 78:17-20).

- BSI provided technology services to IBM, NASDAQ, and Motorola, using BSI's computer servers. (Trial Tr. at 6/19 P. Wagner Testimony 71:16-21). Following these contracts, BSI had built an infrastructure of servers and networks that it used to offer individuals, non-profits, and corporations a "suite of a number of different services" that it already had in place, including email, web hosting, Domain Name System service, streaming media, e-commerce, Internet access, File Transfer Protocol services (a standard for the exchange of files across a network), and wireless access. (Trial Tr. at 6/19 P. Wagner Testimony 71:25-73:23).

- BSI connects its servers to the Internet and provides services to its users via high-speed fiber-optic service, upgrading from high-speed DSL service once fiber optic became available in Silver Spring. (Trial Tr. at 6/19 P. Wagner Testimony 69:21-70:2).

        a.     <u>Email Services</u>

BSI provides email accounts to several users and acts as an intermediary in sending or receiving electronic mail and in providing to users the ability to send or receive electronic mail:

- BSI has provided a "server for both, outgoing and incoming emails for many, many individuals and other entities," providing email accounts, aliasing services, secondary mail services, and a listserv.  (Trial Tr. at 6/19 P. Wagner Testimony 74:13-21; 80:23-81:3).

- BSI has provided email boxes/addresses for dozens of accounts of individuals, businesses, and non-profits.  (Trial Tr. at 6/19 P. Wagner Testimony 76:13-18). Because BSI hosts these addresses and provides email delivery to these inboxes, if BSI's services were to go off-line, "[p]eople who have accounts with us would not get their mail if BSI's services disappeared permanently."  (Trial Tr. at 6/19 P. Wagner Testimony 78:15-16).

- Like other email service providers such as Yahoo, Google, and AOL, BSI provides most of its email services for free, only charging some users.  (Trial Tr. at 6/20(am) P. Wagner Testimony 7:19-25).  BSI currently has paying customers and has had 20 or more paying customers for interactive services, including email for some, since 2000. (Trial Tr. at 6/20(am) P. Wagner Testimony 76:13-77:7).

BSI provides four distinct types of email services—(1) hosting email in-boxes;

(2) aliasing/forwarding;(3) secondary (back-up) services; and (4) listserv services.

- <u>In-Boxes</u>—BSI operates mail servers for sending and receiving email and hosts various e-mail accounts (mailboxes) into which emails are received and held until that user can retrieve them.  (Trial Tr. at 6/20(am) P. Wagner Testimony 9:8-14).

- By maintaining a mailbox for users, BSI's email servers "host[] e-mail for them either using one of [BSI's] domain names or one of their [the customer's] domain names to…which e-mail would be sent and held in a mailbox residing on our server."  (Trial Tr. at 6/19 P. Wagner Testimony 81:4-9) (Pl's Tr. Ex. 67).

- BSI's email clients include:

    o Solar Electric Light Company:  a non-profit that provides solar panels and batteries to small families in developing countries, "so they basically can have light in the evening.  Rather than burning, burning things at night, they can use the sunlight which is plentiful and then they can switch over to battery and have light at night."  (Trial Tr. at 6/19 P. Wagner Testimony 79:2-9).

    o Barcroft Cycles:  to multiple employees at a recumbent bicycle business located in Falls Church, VA.  (Trial Tr. at 6/19 P. Wagner Testimony 79:14-18; 80:3).

    o The After School Dance Fund.  (Trial Tr. at 6/19 P. Wagner Testimony 79:12).

    o   Colorvivo Films:  an organization of film makers based in Germany and
Switzerland, to which BSI provides a variety of services, including email.
(Trial Tr. at 6/19 P. Wagner Testimony 79:19-23).

Wagner also explained Plaintiff's Trial Exhibit 67, a multi-page snapshot of BSI mail

servers.  (Trial Tr. at 6/19 P. Wagner Testimony 80:18-83:6).  This exhibit showed email

accounts hosted by BSI at its hypertouch.com, castalia.net, and linkcenter.com domains.  (Trial

Tr. at 6/19 P. Wagner Testimony 81:10-20).  The exhibit showed "several dozen e-mail users we

had," for whom BSI "both held a mailbox for them or we provided aliasing forwarding service

for them," including, *inter alia*, "caitlinscreations.com," "barcroftcycles.com,"

"JayH@castalia.net," "Justin@castalia.net," "peter@linkercenter.net," Laura Krebs, and multiple

persons at colorvivofilms.com.  (Trial Tr. at 6/19 P. Wagner Testimony 80:24-81:20).

- <u>Aliasing/Forwarding</u>—BSI provides a means to redirect incoming email to other
accounts owned by those users.  "[I]nstead of holding the mail, it—BSI routes it on to
some other e-mail address.  So basically it's an alias or it's a substitute e-mail
address," so people with multiple email addresses can have BSI coordinate their
email accounts.  (Trial Tr. at 6/20(am) P. Wagner Testimony 9:15-10:10).

- <u>Secondary Services</u>—BSI provides back-up email services using BSI's servers.  For
example, BSI has been the secondary email service provider to Saint Luke's House
for more than a decade.  "So BSI has secondary, for example, Saint Luke's House
we've talked about secondary—their e-mail services for well over a decade, roughly a
decade.  Their mail server is down or their connectivity is out, BSI then receives mail
and holds it in a queue until their server comes back on line, and then go [sic] ahead
and routes it to them when their server is available. So that avoids mail getting lost if
there's an outage when a message is transmitted."  (Trial Tr. at 6/20(am) P. Wagner
Testimony 10:11-23).  BSI also provides secondary mail services to Rehab Robotics,
"a group of conferees concerned with using robotics as a substitute for physical
disabilities they might have," and Pronto Labels, a company that prints labels for
clothing.  (Trial Tr. at 6/20(am) P. Wagner Testimony 11:2-9, 14-17).

- <u>Listserv</u>—BSI provides a means for its users to distribute large volumes of email to
multiple email accounts, frequently in the form of newsletters.  BSI's listserv service
allows "e-mails to, a fairly large volume, thousand to go [sic] out to interested
subscribers."  It is a service where "users with a certain interest in a certain topic can
subscribe and unsubscribe, and they can receive communications either directly or
indirectly… concerning that same topic." Topics have included " cultural events,
cultural and social events, and I think political events, too."  (Trial Tr. at 6/20(am) P.
Wagner Testimony 12:7-25).  Besides running its own listserv, BSI's listserv services

have been utilized by a BSI customer called East Republic.  (Trial Tr. at 6/20(am) P. Wagner Testimony 12:7-25).

    b.  <u>Web Services</u>

  BSI also provides various web services to several clients, including:  (1) web hosting;

(2) redirection services; (3) Domain Name System ("DNS") services; (4) streaming-media

services; and (5) e-commerce services.

- <u>Web Hosting</u>—BSI "hosts" webpages by maintaining digital information on its servers.  "BSI maintains…runs… a number of web servers… BSI's server gets a request for a page like somebody wants to view triple W dot Colorvivo Films dot com.  Then BSI then serves that page, sends it back to the requester, including the various pieces or graphics or whatever that might be associated with that page." (Trial Tr. at 6/20(am) P. Wagner Testimony 15:17-16:1).  "Q: So if I type www.colorfilms.com, and all this stuff happens that you just testified about, where is my machine getting the information from that's displayed on my screen?  A: Okay. That ultimately comes from BSI, BSI's web server.  Q: And why is that?  A: And that's because that's the sole place on the Internet where it's available, and the content is sitting there just waiting for a request.  And that's one type of web service we provide."  (Trial Tr. at 6/20(am) P. Wagner Testimony 17:20-18:3).

- <u>Redirection Services</u>—BSI directs Internet users from one website to another.  "We also provide redirection services.  For example, for Young Women's Christian Home, we redirect from one website to another.  They had an older domain name that they have abandoned or at least they wanted to change their name, re-brand themselves, and so -- but they still want people, visitors to their old site to come to the new site. So they called me, in fact, their director called me a couple years ago to ask if I would help with that and so we set up a redirection service.  So when people go to triple W dot YWCH dot org, they're redirected to the new -- their new website, which is triple W dot TMHDC dot org.  Q: Who redirects it?  A: Beyond System's server redirects, redirects that."  (Trial Tr. at 6/20(am) P. Wagner Testimony 18:4-16).

- <u>DNS Services</u>—BSI provides "Domain Name System" or "DNS" service, which is the "short way of saying [that it takes] the names that you type in [to a web browser] and turn[s] them into the numerical addresses that the computers use to communicate. . . .  BSI provides DNS machines that other people can query to look up domain names."  (Trial Tr. at 6/21(am) Resnick Testimony 64:9-17).

  o BSI is currently operating a DNS server and has had a variety of DNS servers over the years.  (Trial Tr. at 6/20(am) P. Wagner Testimony 20:2-9).  DNS allows people to find resources (*e.g.*, websites, mail domains) on the Internet. (Trial Tr. at 6/20(am) P. Wagner Testimony 20:1-10).

o DNS is the "phone book" of the Internet and an "essential part of the Internet." (Trial Tr. at 6/20(am) P. Wagner Testimony 20:1-10). A DNS server "provides this translation or this mapping or look up, it performs a look up for a user who's trying to locate something by name so a name might be triple W CNN dot com or triple W YWCH dot org, Young Women's Christian Home, and so on. And BSI has a DNS server that performs this look up, acts like a phone book to help people locate resources." (Trial Tr. at 6/20(am) P. Wagner Testimony 19:21-20:1).

o "Q: Okay. How much [sic] individuals or entities does BSI provide this DNS service through your DNS server for? A: Certainly there are hundreds of known users and thousands of unknown folks who are just surfing in to visit the Young Women's Christian Home site. So thousands of users. We've hosted and provide DNS for well over a hundred domain names." (Trial Tr. at 6/20(am) P. Wagner Testimony 20:19-24).

o "Q: If anybody from the outside world types in one of those domain names, how is your server implicated, if at all? A: Well, it is an authoritative DNS server for those domains, so it has updated values that users can rely on to know where these assets [*e.g.*, web pages] are located." (Trial Tr. at 6/20(am) P. Wagner Testimony 21:2-16).

o "Q: Does -- does DNS service relate to e-mail service in any way, shape or form? A: Yes, it's -- I mean it's a critical part of e-mail and web and all the other, many other Internet services. Again it's an invisible, but critical way of locating resources and other people, and so DNS is also used when you're sending an e-mail. When you send an e-mail, your mail program likewise in simple terms will seek the IP address of -- well, it examines the domain name of the e-mail address you're sending to and then go retrieve -- do a look up of the IP address corresponding to that domain using this DNS service." (Trial Tr. at 6/20(am) P. Wagner Testimony 21:7-17).

o "We also provide outbound DNS. That's a layman's way of saying it. So, for a number of residents who are using BSI servers, not for hosting assets but for looking at other assets on the Internet. For example, Young Woman's Christian Home relies on BSI's DNS server to find all sorts of common websites and other sites on the Internet." (Trial Tr. at 6/20(pm) P. Wagner Testimony 57:20-58:1).

o BSI also provides DNS for Saint Luke's House, Barcroft Cycles, Solar Electric Light Company, and Colorvivo Films. (Trial Tr. at 6/20(am) P. Wagner Testimony 22:14-19).

• <u>Streaming Media – Live/Recorded Events</u>—BSI allows users to "stream" audio or video of live or recorded events over the Internet using BSI's servers.

o "[A]nd the two common [streaming media] services we provide, we provide live broadcast of events where we're actually on-site somewhere where some event is taking place, and we send a stream of video or audio to our server which then distributes it to many different viewers that might be interested in observing the event from afar."  (Trial Tr. at 6/20(am) P. Wagner Testimony 23:1-8).

o BSI has provided streaming video for Salsa Web, which is a group that "organized conferences with salsa dancers at Latin dance conferences around the Western Hemisphere through Toronto to Puerto Rico.  And so we broadcast live these events as they were taking place."  (Trial Tr. at 6/20(am) P. Wagner Testimony 23:12-16).

o BSI has provided streaming media services to Box of Rocks, which is an "online radio company so we set up an audio stream for them and they paid us for that to broadcast all -- to folks around the world, their radio shows."  (Trial Tr. at 6/20(am) P. Wagner Testimony 23:17-20).

o In addition, "BSI served a website called Latin dancer dot com," which provided "an instructional video on-line of Latin dance instructions…so you could actually play the clip and do it in slow motion and reverse and see in detail how these various Latin dance moves are performed."  (Trial Tr. at 6/20(am) P. Wagner Testimony 24:12-17).

o Wagner also gave the example of streaming weddings and speeches:  "[BSI] broadcast one of my brother's wedding in Belize", allowing "friends and relatives[to watch] the event."  (Trial Tr. at 6/20(am) P. Wagner Testimony 23:21-24:2).

• E-commerce Services—BSI enables users to conduct business online, *e.g.*, to give and receive donations, using BSI's servers.

o "[E]-commerce is basically conducting financial transactions electronically on the Internet typically, and so BSI has provided for well over ten years, I'll say roughly ten years, [BSI has provided] the ability to make online purchases which it provides to various clients using either credit cards, debit cards or electronic checks."  (Trial Tr. at 6/20(am) P. Wagner Testimony 25:4-9).

o "BSI handles a secure session where it actually takes [the remote web user's] name and address and calculates the amount and possible sales tax and conveys the information to a credit card processor and then sends you back to a 'thank you' page or 'sorry declined' page."  (Trial Tr. at 6/20(am) P. Wagner Testimony 26:7-19).

o BSI has "a merchant account with Card Services International that allows us to charge charge cards like that, and the funds then go into BSI's business checking account, and then we in turn, you know, have contracts with [S]alsa

9

[W]eb and others to return those funds minus, typically minus some fee that
Card Services charge and BSI sometimes charges."  (Trial Tr. at 6/20(am) P.
Wagner Testimony 27:7-13).

o   For Salsa Web, BSI also provided streaming services "so that attendees from
    around the world could register and attend these conferences.  BSI provided e-
    commerce services and allow [sic] them to make dozens and dozens of
    purchases, maybe hundreds of purchases of tickets and various items,
    workshops and so on."  (Trial Tr. at 6/20(am) P. Wagner Testimony 25:10-
    15).

o   "We provided [e-commerce services] for Saint Luke's House, we provided . . .
    the ability to accept donations."  (Trial Tr. at 6/20(am) P. Wagner Testimony
    25:19-20).

o   In addition, BSI is "presently engaged with a candidate for Congress who's
    running in Virginia, in the Eighth District, so we're providing a site there for
    him as well to accept donations."  (Trial Tr. at 6/20(am) P. Wagner Testimony
    25:25-26:3).

c.   <u>Internet Access and Wireless Internet Access</u>

BSI also provided Internet access to people in and around Maryland, a classic

ICSP/EMSP function.  Wagner testified that:

- BSI "provides an actual channel of communications, provides or enables such a
  channel to – for people to reach the rest of the Internet."  (Trial Tr. at 6/20(am) P.
  Wagner Testimony 28:22-24).

- "So BSI has done that with – when we got the T1 line, for example, we were able –
  we had so much bandwidth we were able to then provide connectivity to Saint Luke's
  House, putting them on the Internet for the first time.  They might have had local e-
  mail within the organization, but they were not on the Internet.  This is late '90's, '97
  or so.  And we were able to connect them relatively high speed through a full-time
  connection to us, and we went out to the Internet through an even bigger pipe, and
  suddenly they're all online, and it, I believe really was a help for them."  (Trial Tr. at
  6/20(am) P. Wagner Testimony 29:11-20).

- "And so they are downstream from us, Saint Luke's is downstream from us, and they
  had a router on their side which provided to route traffic to us, and we in turn routed
  it to Metro Net, who in turn routed it to other – bigger provider in the greater
  Internet."  (Trial Tr. at 6/20(am) P. Wagner Testimony 30:9-13).

- "Q: Are there any other individuals or entities that you provided Internet access to,
  including wireless access?  A: Yeah, a couple others come to mind, there's Solar
  Electric Light Company.  The same time we put Saint Luke's House online, we also

put the Solar Electric Light Company online, they're in Bethesda."  (Trial Tr. at 6/20(am) P. Wagner Testimony 30:22-31:2).

- "Another one comes to mind, the Young Women's Christian Home, and there we did not provide the upstream connectivity, but we – Q: Slow down, slow down. You said you didn't do what?  A: We did not provide the upstream connectivity, but we provided the clients access to their local area network, which is part of the Internet, so we're providing each client, 120 residents access to the Internet itself, to their local network and enabling the connection to the next level, all the way up to remote levels in the Internet."  (Trial Tr. at 6/20(am) P. Wagner Testimony 31:8-17).

- BSI "set up the local connectivity so that local access to each other and to their printers and their work stations and the work room and also to the -- to the wireless routers we'd set up and on to the Internet."  (Trial Tr. at 6/20(am) P. Wagner Testimony 32:6-9).

- "Q: With respect to most of the business that BSI does, most of the Internet services that it offers[, a]re you the company that actually attaches people to the phone lines and to the fiberoptic lines?  Are you the person that does that?  A: Yes, I am essentially.  Q: And in what respect?  A: I mean, oftentimes it's wireless, so the Young Woman's Christian Home I work with, you know, probably a hundred residents or many, many dozens of residents one at a time connecting them to the Local Area Network which BSI had set up, and then they can reach – communicate with each other.  They can interact with each other. They can interact with the computer – the printers, print servers there, the office computers.  And then they can also get out to the greater Internet and they can interact with other users and services out on the Net."  (Trial Tr. at 6/20(pm) P. Wagner Testimony 58:2-18).

  d.  <u>File Transport Protocol ("FTP")</u>

  Another Internet service that BSI provides is "file transport protocol" or "FTP."  "[I]t's one of numerous protocols available on the Internet, and it is a way of allowing . . . users to easily place an asset [*e.g.*, computer file] at some public site online that others can access." (Trial Tr. at 6/20(am) P. Wagner Testimony 33:8-12):

- "Q: And BSI provides [FTP]? A: Yes.  Q: Can you identify anybody to whom you've provided it?  A: Critical Exposure, which is a small non-profit based in D.C., they give cameras to school kids to take pictures of deteriorated schools as a means of advocacy and to have a voice.  So they wanted to share files with one another when they are in and out of the office, and so with this service they can upload documents to a server that they can all see when they wanted to, and then other staff can download files, and so they can put files together."  (Trial Tr. at 6/20(am) P. Wagner Testimony 34:2-35:1).

11

- "Q: And what role did BSI servers play in this whole file transfer protocol, what -- specifically what role do you play? A: Okay, well, our servers, I have high availability, and they're running typically 24 by 7, and they're again operating the specialized software, whether it's FTP software or wiki or other software that will enable the services to be performed, and so people then can interact with one another. It's another type of interactive computer service that BSI is providing or enabling." (Trial Tr. at 6/20(am) P. Wagner Testimony 34:19-35:1).

 2. <u>BSI Provided Several Internet Services to St. Luke's.</u>

John Clark, the Director of Facilities and Information Technology at St. Luke's House, Inc., testified about the many Internet-related services that BSI has provided to St. Luke's House over the years. Clark has been the manager of information technology at St. Luke's from 1997-2012. (Trial Tr. at 6/20(pm) Clark Testimony 62:9-14). "St. Luke's House is a nonprofit organization that deals with the chronically mentally ill adult population in Montgomery County." (Trial Tr. at 6/20(pm) Clark Testimony 63:23-64:2). St. Luke's currently employs between 150 and 200 full-time and volunteer staff members. (Trial Tr. at 6/20(pm) Clark Testimony 63:7-12).

Clark testified that St. Luke's first began offering e-mail service in approximately 1998 or 1999. At that time, BSI donated a modem, allowed St. Luke's access to BSI's ISDN line, and provided advice regarding St. Luke's email service needs. (Trial Tr. at 6/20(pm) Clark Testimony 67:10-24; 68:6-69:8). St. Luke's used BSI's ISDN connection to connect to the Internet from approximately 1998-2002. (Trial Tr. at 6/20(pm) Clark Testimony 69:12-17).

Clark further testified about how BSI enabled St. Luke's email service beginning in 1998:

- All of St. Luke's employees have email addresses provided by St. Luke's, and currently there are approximately 200 St. Luke's employees with St. Luke's e-mail addresses. (Trial Tr. at 6/20(pm) Clark Testimony 69:19-70:1; 70:8-71:3).

- When St. Luke's first began providing email services to its employees, there were approximately 70 employees who held St. Luke's e-mail addresses. (Trial Tr. at 6/20(pm) Clark Testimony 70:2-7).

- BSI's servers are involved in the transmission of email to recipients at St. Luke's email addresses because BSI's DNS servers direct email messages addressed to St. Luke's employees to the St. Luke's email servers.  (Trial Tr. at 6/20(pm) Clark Testimony 71:15-72:13; 72:14-73:18).

- BSI first began providing this DNS service to St. Luke's in approximately 1998, and continues to provide it to present.  (Trial Tr. at 6/20(pm) Clark Testimony 78:19-79:15).

- Beginning in 2010, St. Luke's began using the spam-filtering service "Postini" to filter spam from its incoming email.  (Trial Tr. at 6/20(pm) Clark Testimony 80:19-81:6; 81:18-21).  BSI's DNS servers continue to play a role in St. Luke's email services even after the implementation of the Postini service.  Email addressed to recipients at St. Luke's accounts is directed by BSI's DNS servers to Postini so that it can be filtered before arriving on St. Luke's mail servers.  (Trial Tr. at 6/20(pm) Clark Testimony 80:25-81:17).

- For the 14 years to present that BSI has provided DNS service to St. Luke's, BSI had only one service outage, lasting approximately 8 hours.  (Trial Tr. at 6/20(pm) Clark Testimony 86:6-22).

- BSI also provides back-up services to ensure that St. Luke's continues to receive DNS services without interruption.  (Trial Tr. at 6/20(pm) Clark Testimony 87:1-12).

- If not for BSI's DNS service, St. Luke's email service would not function.  (Trial Tr. at 6/20(pm) Clark Testimony 87:16-19; 88:16-18).

- From 1998 to 2010, BSI also provided secondary email service to St. Luke's so that Mr. Clark was "confident . . . when [his] server was down that [he] never lost e-mail." (Trial Tr. at 6/20(pm) Clark Testimony 84:9-19).

BSI provides other critical services to support St. Luke's 150 to 200 staff members.

BSI's DNS servers:

- Enable St. Luke's staff members to access email remotely from St. Luke's' ten staff offices throughout Montgomery County using Microsoft Outlook's Web Access. (Trial Tr. at 6/20(pm) Clark Testimony 74:3-75:3, 76:1-13).

- Are also used when staff members access the St. Luke's network remotely using Remote Desktop software or over VPN.  (Trial Tr. at 6/20(pm) Clark Testimony 74:12-75:25; 76:14-25).

- Are used to route mail for Dataprise's email bagging service, a "service that catches all of our e-mail in the event that my e-mail server on site goes down."  In the event of a failure of St. Luke's on-site e-mail servers, BSI's DNS servers are configured to recognize that those mail servers are not responding and to route St. Luke's email to

Dataprise's email bagging servers.  (Trial Tr. at 6/20(pm) Clark Testimony 83:11-84:11).

During the past 10 years, BSI also has provided e-commerce services to process payments and registration for St. Luke's fundraising events online through St. Luke's website (Trial Tr. at 6/20(pm) Clark Testimony 77:4-78:4); hosted St. Luke's web site for a brief period in the early 2000s (Trial Tr. at 6/20(pm) Clark Testimony 78:5-18); and has consulted to St. Luke's on technology issues (Trial Tr. at 6/20(pm) Clark Testimony 79:18-80:18), including assisting St. Luke's in setting up its network in 2009 when its router, provided by Verizon, failed.  BSI loaned St. Luke's a wireless internet router and installed it, so that St. Luke's network could continue to operate.  (Trial Tr. at 6/20(pm) Clark Testimony 84:24-86:5).

Clark underscored the importance of BSI to St. Luke's and its 150 to 200 staff members:

> Q. So if I unplug the primary DNS and unplug the backup DNS, would St. Luke's House be able to send or receive any e-mail from within –
>
> A. I'd be dead in the water.
>
> Q. If BSI didn't provide this DNS service to St. Luke's House, would St. Luke's House have to get it elsewhere?
>
> A. We would have to get it elsewhere, and it would also cost us money.  And being a nonprofit, that's not a good thing sometimes.

(Trial Tr. at 6/20(pm) Clark Testimony 87:1-88:1).

### 3. BSI Provided Internet Services to Young Women's Christian Home.

Lynnita Sykes, the Executive Director of Young Woman's Christian Home ("YWCH") in Washington, D.C., a nonprofit organization that provides housing to women ages 18 to 35, also testified about the Internet- and email-related services that BSI has provided to her organization during the past eleven years.  (Trial Tr. at 6/20(pm) Sykes Testimony 106:11-17).  YWCH can accommodate 120 residents.  (Trial Tr. at 6/20(pm) Sykes Testimony 109:18-22).  YWCH

14

provides Internet access to its 120 residents as well as its 15 to 20 staff members.  (Trial Tr. at 6/20(pm) Sykes Testimony 112:1-10).  As one of her duties, Sykes responds to issues relating to maintenance at the facilities, including the residents' Internet access.  (Trial Tr. at 6/20(pm) Sykes Testimony 108:18-109:2).

After initially providing dial-up access, YWCH began accepting proposals to provide wireless Internet service in 2001.  (Trial Tr. at 6/20(pm) Sykes Testimony 110:23-111:14; 111:25-112:10).  In late 2001, BSI was selected and set up wireless Internet access throughout the YWCH campus so that residents at the facility could connect wirelessly to the Internet. (Trial Tr. at 6/20(pm) Sykes Testimony 112:22-114:7; 114:11-25).  Sykes testified as follows:

- YWCH's wireless network relied on Verizon to supply the Internet connection, but BSI configured the wireless network that enabled the YWCH residents to connect via the Verizon upstream connection.  (Trial Tr. at 6/20(pm) Sykes Testimony  114:23-115:8).

- BSI also handled the initial setup of users' computers so that they could access the network.  (Trial Tr. at 6/20(pm) Sykes Testimony 116:10-18; 117:9-16).

- In 2010, due to increased usage, YWCH's wireless network began experiencing connectivity problems.  (Trial Tr. at 6/20(pm) Sykes Testimony 119:24-120:4). YWCH contacted another vendor, Terrapin Information Services, that was providing it with other IT-related services to see if Terrapin could improve the network's performance.  Terrapin told YWCH that the network would always have these issues. (Trial Tr. at 6/20(pm) Sykes Testimony 120:4-12).  Thereafter, YWCH contacted BSI to see whether BSI could improve the network.  (Trial Tr. at 6/20(pm) Sykes Testimony 120:12-21; Trial Tr. at 6/21(am) Sykes Testimony 19:14-22).  BSI gave YWCH a proposal to improve the network and to add additional wireless access points to improve connectivity, which YWCH accepted.  (Trial Tr. at 6/21(am) Sykes Testimony 19:23-21:11).  "And BSI gave us the best proposal . . . and we have no connectivity issues now. . . .  Q: So tell me what BSI did with regard to the wireless network?  A: Basically, we got a whole lot of new wireless access points.  And depending on our -- our building is like in the shape of a E, kind of, and there are corner rooms that have more issues than others, and Paul was able to put in some wireless access points in those areas, as well as downstairs in our basement area, and so that the residents as well can use the Internet outside, can access the Internet outside.  So basically, for this age group that are so tech savvy and that the Internet is like their pen or their pencil, they can access the Internet anywhere in our building 24/7."  (Trial Tr. at 6/21(am) Sykes Testimony 20:7-21:2).

15

- And, since 2011, BSI has been utilizing upgrades it implemented to remotely monitor YWCH's network to make sure it stays up and running.  (Trial Tr. at 6/21(am) Sykes Testimony 45:24-46:11).

In addition to providing and enabling Internet access to YWCH's 120 residents and 15 to 20 staff members during the last 10-plus years, BSI briefly hosted YWCH's original website. (Trial Tr. at 6/20(pm) Sykes Testimony 118:7-9).  In late 2009-early 2010, YWCH changed the domain name for its website from ywch.org to tmhdc.org (Trial Tr. at 6/20(pm) Sykes Testimony 117:21-118:17), and BSI has provided YWCH with redirection service, using BSI's servers to redirect users from the old web site to the new one (Trial Tr. at 6/20(pm) Sykes Testimony 118:21-119:17; 120:20-23).  Sykes testified that this service was important because YWCH does not know how many organizations still list their old web site and that the redirection ensures that the many organizations that refer young women to YWCH for housing are still able to do so, and therefore the redirection would continue for the next three to five years.  (Trial Tr. at 6/20(pm) Sykes Testimony 119:1-20).

        4.     <u>BSI's Expert Testimony.</u>

BSI's expert, Peter Resnick, also testified that the Internet-related services that BSI provides to its users enable computer access by multiple users to a computer service and enable the sending and receiving of email.

Resnick is a member of the governing bodies that set the rules for how email and other traffic moves across the Internet.  He is the author of the document that defines the email format standard, the architect of the Eudora email program, an expert on Internet protocols, and is one of the top dozen most knowledgeable people in the world on the details of email protocols. (Trial Tr. at 6/21(am) Resnick Testimony 52:13-58:6).  Defendants did not challenge Resnick's qualifications.

Resnick was in the courtroom throughout Phase One of the trial, and he observed the testimony of Paul Wagner, John Clark, and Lynnita Sykes and considered all of the documentary evidence regarding the services that BSI has provided to its users since 1996.  Resnick kept a list of these services during trial, a list that was displayed to the jury and used by Mr. Resnick during his testimony.  (Trial Tr. at 6/21(am) Resnick Testimony 63:10-64:23).  In addition, Resnick testified that in 2009, and again in 2012, he viewed, in real-time, web access, email traffic, and DNS activity on BSI's network – *i.e.*, incoming and outgoing computer traffic on BSI's servers.  (Trial Tr. at 6/21(am) Resnick Testimony 85:11-86:2).  In the course of that real-time viewing of the digital information traversing BSI's servers, he witnessed web activity, email activity, and DNS activity.  (Trial Tr. at 6/21(am) Resnick Testimony 86:11-21).

At trial, Resnick was shown screen-captures of the BSI server traffic logs from June 20, 2012, and was asked to explain what the snapshots revealed about the types of services that BSI was providing to its customers.  Resnick testified that he saw an external email server querying BSI's server to obtain the address of the Saint Luke's mail server.  (Trial Tr. at 6/21(am) Resnick Testimony 89:6-8).  "There are the folks at Saint Luke's House who want to receive their mail, obviously.  There are the folks out there on the Internet that want to send mail.  All of those folks have to query BSI servers to send the mail."  (Trial Tr. at 6/21(am) Resnick Testimony 90:25-91:4).

In addition, Resnick testified about the Internet traffic to and from YWCH (Trial Tr. at 6/21(am) Resnick Testimony 92:6-96:21), as well as the email traffic to and from Colorvivo Films.  (Trial Tr. at 6/21(pm) Resnick Testimony 12:9-14:1).

In conclusion, Resnick opined that BSI is an ICSP and EMSP, as those terms are defined by their respective statutes:

17

Q. Okay. Now is it your opinion, sir -- based on all of the evidence that you have heard at this trial and any other evidence that you reviewed in the course of forming your expert opinions in this case, is it your opinion that BSI is an Interactive Computer Service Provider under the definitions I've put on this screen here [the Maryland statutory definition of ICSP and the California statutory definition of EMSP]?

A. Yes. The services that I've heard about that BSI provides and that I've seen evidence of that BSI provides fit under these definitions of Interactive Computer Service Provider.

Q. Thank you. And, sir, based on your professional opinion as an expert in this case, is it your opinion -- does BSI, based on all of the evidence you've heard in this case and any other evidence you considered in the course of your service as an expert in this case, is BSI an Electronic Mail Service Provider pursuant to this under this definition?

A. Absolutely. The service that I've heard about and observed with regard to their mailbox service, with regard to their secondary e-mail service, these are all things that would fall under the definition that you provided me here of Electronic Mail Service Provider.

(Trial Tr. at 6/21(pm) Resnick Testimony 24:3-24).

5.      Defendants Admitted That BSI Provides or Enables Computer Access by Multiple Users to a Computer Service, and Enables the Sending and Receiving of Email.

Defendants' responses to BSI's requests for admissions, published to the jury, confirm that BSI has statutory standing.  Defendants admitted that BSI (i) provides computer access services and Internet access and the ability to access the Internet; (ii) facilitated the sending and receiving of electronic mail and email access; (iii) hosted domains; (iv) provided e-commerce services; (v)  hosts DNS servers; (vi) hosted websites for businesses and individuals; (vii) provided streaming media; and (viii) provided computer services to the hundreds of users at St. Luke's House.  (Trial Tr. at 6/22 8:6-36:18).  In short, Defendants admitted that BSI is an ICSP and an EMSP.

## II.   THERE IS NO REQUIREMENT THAT BSI PROVE THAT IT IS A "BONA FIDE" ICSP/EMSP UNDER THE MARYLAND AND CALIFORNIA STATUTES.

Like Coleridge's albatross,[1] the issue whether BSI is a "bona fide" provider of Internet-related services has hung about the neck of these proceedings for the past three years.  Its presence has permitted Defendants to take massive discovery from BSI, Hypertouch, and Joe Wagner, virtually unfettered in scope, and to litigate a series of factual issues regarding BSI's litigation history and anti-spam advocacy that have no relevance to BSI's standing under the applicable law.

At bottom, however, the "bona fide" issue is a red herring.  BSI's claims arise from two state statutes, and BSI's standing is governed exclusively by the plain meaning of those two statutes.  From the inception of this litigation, the only relevant question has thus been whether BSI provides the interactive computer or electronic mail services required by the legislatures of Maryland and California.  The jury's Phase One verdict conclusively establishes that it does, as demonstrated above, and, therefore, that it has standing to sue under the Maryland and California anti-spam statutes.

Defendants argue that BSI does not have standing, notwithstanding the overwhelming evidence that it provides the Internet-related services that are specified by the governing statutes.  Rather, Defendants claim that because BSI does not exhibit the attributes of other Internet Service Providers, and because it spends a good deal of time litigating anti-spam cases, it is not a "bona fide" plaintiff and should not be allowed to recover.  Indeed, Defendants proposed a laundry list of "factors" that it wanted the jury to consider in deciding whether BSI was a "bona fide" provider of Internet-related services (DE 456).  But none of these "factors" is found anywhere in the text or legislative history of the state statutes or in any case interpreting the

---

[1] Samuel Taylor Coleridge, *The Rime of the Ancient Mariner* (Dover 1970) (1798).

standing requirements of those statutes.  The "bona fide" requirement is, put simply, not

cognizable under the law that applies to this case.  To require BSI to satisfy extra-statutory

criteria before it has standing is wrong as a matter of law for two reasons.

*First*, under established rules of statutory construction, courts are bound to interpret

statutes according to their plain meaning and are not permitted to impose a different meaning

based on nothing found in the statute or its legislature history.  And this is so even if a party (or a

court) may disagree with the outcome.  Focusing on the plain language of a statute when

deciding who has standing to enforce it ensures that courts will give effect to the legislative

intent as embodied in the statute itself.  It also ensures, under basic concepts of separation of

powers, that important policy decisions remain with legislatures, not courts.  *See Gollust v.*

*Mendell*, 501 U.S. 115, 127 (1991) (stating that "we will not read any further condition into the

statute" where the plaintiffs satisfied the statute's standing requirements as defined by the "text

of the statute"); *Dunn v. Borta*, 369 F.3d 421, 430 (4th Cir. 2004) ("[B]ecause the causes of

action under Section 10(b) and Rule 10b-5 are implied, the responsibility of defining those

claims rests with the courts.  In this dispute, however, the cause of action has been created by the

Virginia General Assembly and codified at 13.1-522 of the Act.  It would be inappropriate for us

to augment a Virginia cause of action with a requirement that does not appear on the face of the

statute.").

*Second*, a federal court sitting in diversity should refrain from imposing additional,

substantive requirements on grounds of public policy; rather, federal courts are bound to interpret

and apply state statutes as the highest courts of the relevant state or states have or would likely

construe and apply them.  Here, both states' high courts have expressly disavowed the authority

to impose the sort of limitation on a plaintiff's statutory standing that Defendants attempt to

accomplish here.  The decision whether entities like BSI should have standing to bring suit to

curb the scourge of illegal spam in Maryland and California has important ramifications for the

enforcement of those states' anti-spam laws.  And the means by which the Maryland General

Assembly and the California Legislature chose to enforce their consumer protection laws—

including who is permitted to pursue private rights of action under those laws—is exclusively a

question of state policy from which a federal court sitting in diversity must keep its distance.  Of

course, if the Maryland or California legislatures were to determine at some point that the broad

private enforcement that they authorized is unworkable or inadvisable, then they will be free to

amend their laws and narrow the class of claimants.  But as these two statutes now stand, that is

not what these states have chosen.  It is not for this Court to cast aside Maryland's and

California's legislative choices based on what it or Defendants believe may be better policy.

A. **Neither Maryland Nor California Law Contains the "Bona Fide" Limitation on Standing That Defendants Seek to Impose.**

A federal court sitting in diversity is required to follow state rules of statutory construction as applied by the courts of the relevant state. *Volvo Trademark Holding Aktiebolaget v. Clark Machinery Co.*, 510 F.3d 474, 482 (4th Cir. 2007). When construing statutes, Maryland and California courts have consistently adhered to the "plain meaning" rule that prohibits courts from fashioning a view of the law that finds no mooring in the statutory text. *E.g.*, *State v. Brantner*, 758 A.2d 84, 88 (Md. 2000) ("We approach [statutory interpretation] by seeking to discern the intent of the Legislature in enacting the statute . . . neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used."); *Burden v. Snowden*, 828 P.2d 672, 674 (Cal. 1992) ("Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute. . . ."); *Jarrow Formulas, Inc. v. LaMarche*, 74 P.3d 737, 741-42 (Cal. 2003) ("'The plain language of the statute establishes what was intended by the Legislature.'") (quoting *People v. Statum*, 50 P.3d 355, 359 (Cal. 2002)).

Under this basic rule, if the plain meaning of the statutory text provides the answer, that ends the inquiry. *See, e.g.*, *Guttman v. Wells Fargo Bank*, 26 A.3d 856, 860 (Md. 2011); *Chesapeake & Potomac Tel. Co. of Md. v. Dir. of Fin. for Mayor & City Council of Baltimore*, 683 A.2d 512, 517 (Md. 1996) ("[W]hen the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there," and a court "may not construe [a] statute with 'forced or subtle interpretations' that limit or extend its application.") (quoting *Condon v. State*, 632 A.2d 753, 755 (Md. 1993)); *People v. Gardeley*, 927 P.2d 713, 723 (Cal. 1996) ("When the language of a statute is 'clear and unambiguous' . . . 'there is no need for construction, and courts should not indulge in it."); *see also Cal. Teachers*

*Ass'n v. Governing Bd. of Rialto Unified School Dist.*, 927 P.2d 1175, 1177 (Cal. 1997) (holding

court "'has no power to rewrite the statute so as to make it conform to a presumed intention

which is not expressed'") (quoting *Seaboard Acceptance Corp. v. Shay*, 5 P.2d 882, 884 (Cal.

1931)); *Sears, Roebuck & Co. v. Gussin*, 714 A.2d 188, 193 (Md. 1998) ("Courts may not create

ambiguity in a statute where none exists, nor as a general rule, 'surmise a legislative intention

contrary to the plain language of a statute or insert exceptions not made by the legislature.'").

        Both the Maryland and California anti-spam statutes define, in plain terms, those

individuals and entities that have standing to bring a private enforcement action.  MCEMA

authorizes an "Interactive computer service provider" to sue under the Act and defines an ICSP

as "an information services, system, or access software provider that provides or enables access

by multiple users to a computer service" and "includes a service or system that provides access

to the Internet."  Md. Code Ann., Comm. Law § 14-3001(c)(1) & (2) (West 2012).  The

California statute permits an "Electronic mail service provider" to sue under the statute and

defines an EMSP as "any person, including an Internet service provider, that is an intermediary

in sending or receiving electronic mail or that provides to end users of the electronic mail service

the ability to send or receive electronic mail."  Cal. Bus. & Prod. Code §§ 17529.5(b)(1)(A);

17529.1(h) (West 2012).  Under these statutes, BSI's standing as an ICSP and EMSP is

determined *solely* by whether it provides interactive computer and electronic mail services.  The

provision of services is the linchpin of standing, and in light of the jury's verdict in Phase One of

the trial, it should be conclusively established that BSI provides those services.  That ends the

inquiry.

**B.      Limitations on Standing in Maryland's and California's General Consumer Protection Statutes Demonstrate That Both States Are Capable of Limiting Standing When They Deem It Necessary and Appropriate to Do So.**

The legislatures of Maryland and California are well aware of how to limit standing in cases where they deem it appropriate to do so.  Indeed, both states have done just that in connection with other consumer protection laws.  That they have *not* imposed any such limitation on standing under their anti-spam statutes can have only one meaning:  they did not intend standing to be limited.  That legislative choice is binding on this Court.  "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.  In like manner, where the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.  The use of different terms within related statutes generally implies that different meanings were intended.").  *Toler v. Motor Vehicle Admin.*, 817 A.2d 229, 235 (Md. 2003) (quoting 2A Norman J. Singer, Sutherland Statutes and Statutory Construction § 46.06 (6th ed. 2000)).  Likewise, California law also holds that "'[i]t is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.'"  *Los Angeles Metro. Transp. Auth. v. Alameda*, 264 P.3d 579, 584 (Cal. 2011) (quoting *In re Jennings*, 95 P.3d 906, 917 (Cal. 2004)).

The Maryland general consumer protection statute limits standing in the case of private litigants to those who suffer actual injury.  That distinction is important.  In *Lloyd v. General Motors Corp.*, 916 A.2d 257, 280 (Md. 2007), the Maryland Court of Appeals discussed the significance of the General Assembly's decision to impose different requirements for public and private enforcement of the state's general Consumer Protection Act.  While that Act permits

public enforcement in cases where no consumer has in fact been misled, deceived, or damaged as a result of the prohibited practice, Md. Code Ann., Comm. Law § 13-302 (West 2012), the legislature amended the standing provision to limit private enforcement to those consumers who have sustained actual injury or loss as a result of the challenged practice, Md. Code Ann., Comm. Law § 13-408(a) (West 2012).  The Court of Appeals explained that the purpose in limiting the private remedy in this manner—a limitation that the legislature deliberately imposed by amending the text of the statute—was "'to prevent aggressive consumers who were not personally harmed by the prohibited conduct . . . from instituting suit as self-constituted private attorneys general over relatively minor statutory violations.'"  *Lloyd*, 916 A.2d at 280 (quoting *Citaramanis v. Hallowell*, 613 A.2d 964, 968 (Md. 1992)).

In contrast, Maryland's anti-spam law does not impose *any* requirement of actual harm and allows ICSPs and email recipients to bring suit for statutory damages even if they have not suffered actual injury or harm.  Md. Code Ann., Comm. Law § 14-3002(b)(iii) (West 2012) (statute is violated as long as the misleading information "has the capacity, tendency, or effect of deceiving the recipient," with no requirement that the recipient actually be deceived); § 14-3003 (recipients and ICSPs permitted to sue for either statutory damages or actual damages); Md. Gen. Assemb., Econ. Matters Comm., Floor Rep., H.B. 915, at 2 (2002) (noting that violation occurs "regardless of whether a consumer in fact has been misled, deceived, or damaged as a result of the practice").  *See* Ex. 1 at 2. The focus of the Act is the "*conduct of spammers in targeting [Maryland] consumers*.  The choice to send UCE [unsolicited commercial email] all over the country, invoking the probability that it will be received by Maryland residents, is [Defendant] First Choice's 'business decision.'"  *MaryCle, LLC v. First Choice Internet, Inc.*, 166 Md. App.

25

481, 523; 890 A.2d 818, 842-43 (Md. 2006) (quoting *Ferguson v. Friendfinders, Inc.,* 94 Cal.

App. 4th 1255, 1265 (Cal. Ct. App. 2002)).

Maryland cases construing the MCEMA have since underscored these legislative

priorities and goals.  As one court observed, MCEMA was passed "to curb the dissemination of

false or misleading information through unsolicited, commercial e-mail, as a deceptive business

practice."  *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 16, 878 A.2d 567 (Md.

2005).  In *MaryCLE*, the Maryland Attorney General filed an *amicus* brief addressing the

purpose of MCEMA.  There, the state attorney general stated:

> The General Assembly has declared consumer protection to be
> "one of the major issues which confront all levels of government,"
> Md. Code Ann., Comm. Law § 13-102(a)(1), and has called for
> "strong protective and preventive steps" to "assist the public in
> obtaining relief" from unlawful consumer practices, *id.*, § 13-
> 102(b)(3). To that end, in 2002 the General Assembly adopted the
> Maryland Commercial Electronic Mail Act, Md. Code Ann.,
> Comm. Law §§ 14-3001 - 14-3003, to provide a remedy for
> unauthorized, false or misleading commercial electronic mail
> transmissions ("e-mail"), sometimes known as "spam."

(emphasis added).  *See* Ex. 2, *Amicus Brief of the Attorney General* in *MaryCLE*.  Accordingly,

the "Maryland legislature created a private cause of action to further the state's financial and

social goals in reducing the number of deceptive emails . . . ."  *MaryCLE*, 166 Md. App. at 513.[2]

California's anti-spam and general consumer protection statutes reflect this same

distinction.  The standing provision in California's anti-spam statute expressly permits EMSPs

and recipients to sue to recover "either or both of" actual damages or liquidated damages of

$1,000 per violation.  Thus, even plaintiffs that are not harmed have standing to sue.  Cal. Bus. &

---

[2] *See also* Ex. 3, Maryland Senate Press Release regarding SB 538 noting that MCEMA was adopted as a
consumer protection measure. ("You should vote for this bill to give Internet consumers a law they can
use to seek damages from commercial email spammers.  This law has worked effectively in the State of
Washington.").  The *Amicus* also noted that Maryland elected to "model[] the Act after Washington's
similar statute," the same WA-CEMA that Gordon sued under and that the Ninth Circuit held conferred
standing to him. *See* Ex. 2 at 4.

Prof. Code § 17529.5(b)(1)(B)(i)-(ii) (West 2012).  By contrast, the private right of action under California's general consumer protection statute, Cal. Bus. & Prof. Code § 17204, was amended by ballot initiative in 2004 to limit private standing only to those "person[s] who ha[ve] suffered injury in fact and [have] lost money or property as a result of . . . unfair competition."  Cal. Initiative Measure, Prop. 64, § 3 (approved by voters Nov. 2, 2004).  As set forth in the ballot initiative, the purpose of the change in the law was to curb abuses by private attorneys who misused the consumer protection statute to "file frivolous lawsuits as a means of generating attorney's fees without creating a corresponding public benefit."  Cal. Initiative Measure, Prop. 64, § 1 (approved by voters Nov. 2, 2004); *see Angelucci v. Century Supper Club*, 158 P.3d 718, 728 n.10 (Cal. 2007) (explaining history of amendment of consumer protection statute's standing provision to curb perceived abuses by private attorneys general).  No such limitation was ever imposed on the standing provisions found in the anti-spam statute, however.

To credit Defendants' argument that BSI has standing only if it is able to prove matters beyond the basic requirements of the anti-spam statutes—or only if it proves that it is not too litigious—is to place a limitation on standing that neither the Maryland nor the California legislatures saw fit to do.  There is only one appropriate means to accomplish the limitation on standing that Defendants advocate here—legislative enactment.  That Maryland and California have shown themselves perfectly able to limit standing when they deem it necessary to do so provides yet more support for BSI's position that its standing is merely a matter of the services that it provides.

### C.     A Federal Court Sitting in Diversity Is Not Permitted to Create or Expand State Law on Public Policy Grounds That Have Not Been Clearly Articulated by the State's Courts.

Since the 1930s, it is obvious that a federal court exercising diversity jurisdiction over a state law claim must "ascertain from all available data what the state law is and apply it rather

27

than to prescribe a different rule, however superior it may appear from a viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 78 (1938)).  The Fourth Circuit has held that the *Erie* doctrine not only binds federal courts to apply clearly-controlling state court holdings that were reached on identical facts, but that is also forbids federal courts from extending or expanding state law on public policy grounds that have not been clearly articulated by the state's courts.  Defendants' effort to impose a "bona fide" requirement here is precisely the kind of extension or expansion of state law on policy grounds that is forbidden.

"[S]itting in diversity, a federal court 'should not create or expand [a] State's public policy.'"  *Time Warner Entm't-Advance / Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 706 F.3d 304, 313-14 (4th Cir. 2007) (quoting *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995)).  In *Time Warner*, the Fourth Circuit held that "[i]f . . . the North Carolina legislature [has] elected not to regulate [certain conduct], it is not the place of a federal court sitting in diversity to jump in and do so as a predicted extension of state common law."  *Id.* at 314.  The appellate court emphasized further that (as with Maryland and California courts) "North Carolina courts have been traditionally reluctant to tread on what are regarded as legislative prerogatives. . . . '[C]ourts have no right to usurp legislative power and by judicial decrees formulate a public policy not declared by the Legislature.'"  *Id.* at 314 (quoting *Duke Power Co. v. Blue Ridge Elec. Membership Corp.*, 122 S.E.2d 782, 784 (N.C. 1961)).  *See St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995) ("[T]he federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy. . . .  Thus, we will not attempt to decide

28

the public policy of the State of Virginia absent a clear and dominant articulation of that policy

by the Commonwealth herself."); *Harbor Court Assoc. v. Leo A. Daly Co.*, 179 F.3d 147, 153

(4th Cir. 1999) ("[O]ur task as a court sitting in diversity is to 'rule upon state law as it exists and

[not to] surmise or suggest its expansion.'") (quoting *Burris Chem., Inc. v. USX Corp.*, 10 F.3d

243, 247 (4th Cir. 1993)).

Defendants can cite to no Maryland or California case in support of their proposed "bona

fide" requirement, nor could they, given that the two states' statutes contain no such express or

implicit limitation.  This Court should not impose that requirement, unless it is prepared to create

a new rule of law that would plainly alter Maryland's and California's public policy.

> **D.    Under California and Maryland Law, Courts May Not Adopt Extra-Statutory Restrictions Like the One Advanced by Defendants Here.**

At bottom, Defendants argue that BSI lacks standing based on its view that BSI is not a

legitimate operation and engages in abusive litigation for financial gain.  Def.'s Opp. to Mot. to

Strike (DE 456) at 3 (Dec. 12, 2011) ("[BSI's] suggestion that the Maryland and California

legislatures authorized opportunistic and uninjured ISPs like BSI to collect emails and sue for

millions of dollars over them is outright ridiculous.").  Even if the record had established what

Defendants claim—that BSI is an opportunistic plaintiff that has not suffered any real injury—it

would be legally irrelevant.  The California Supreme Court has already held that such a fact

provides *no legal basis* for denying a plaintiff standing to bring a statutory claim that is allowed

by the plain text of the statute.  In *Munson v. Del Taco, Inc.*, a disability discrimination case

brought under California's Unruh Civil Rights Act, the defendants sought to require that the

plaintiff prove intentional discrimination to recover.  208 P.3d 623, 632 (Cal. 2009).  Although

the text of the statute did not set forth any requirement of intentional discrimination, the

defendants argued it was necessary "to suppress abusive litigation by serial plaintiffs or attorneys

seeking only financial gain." *Id.* The court rejected that argument and held that even though the

it shared the defendant's concerns to some degree,

> [those concerns] 'do not supply a justification for our inserting
> additional elements of proof into the cause of action defined by the
> statute.  It is for the Legislature (or the People through the
> initiative process) to determine whether to alter the statutory
> elements of proof to afford business establishments protection
> against abusive private legal actions and settlement tactics.  It is for
> the Legislature, too, to consider whether limitations on the current
> statutory private cause of action might unduly weaken enforcement
> of the Act or place unwarranted barriers in the way of those
> persons who suffer discrimination and whose interests were
> intended to be served by the Act. . . .'  Even if we agreed with
> defendant that adding an intent requirement to the Unruh Civil
> Rights Act would be warranted to curb abuse, we would not be
> free to substitute our own judgment for that of the Legislature.

*Id.* at 633-34 (quoting *Angelucci*, 158 P.3d at 729).

That holding is dispositive of the "bona fide" issue in this case and constitutes binding

precedent.  "A state's highest court need not have previously decided a case with identical facts

for state law to be clear.  It is enough that a fair reading of a decision by a state's highest court

directs one to a particular conclusion."  *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997,

1002 (4th Cir. 1998).  Like the defendant in *Munson*, Defendants ask this Court to impose an

additional element—the "bona fide" requirement—on the ground that it would be "outright

ridiculous" to allow allegedly opportunistic litigants like BSI to bring claims under state anti-

spam statutes.  That argument holds no water under *Munson*, even if the Court shared

Defendants' view.

Maryland courts also have held that the judiciary may not impose additional

requirements, unless they are firmly grounded in the statutory text.  In *Greenbelt Homes, Inc. v.

Nyman Realty, Inc.*, 426 A.2d 394, 401 (Md. App. 1981), a case brought under the Maryland

Antitrust Act, Md. Comm. Law Code Ann. § 11-202(a)(2), the defendant asked the Court of

Special Appeals to impose an additional requirement of injury to the general public as an element of the plaintiff's standing to proceed with its statutory claim for relief.  The court declined, because the statute's text permitted "'[a] person whose business or property has been injured or threatened with injury by a violation of [the Act] to maintain an action. . . .  Absent from this section is any suggestion that injury to the general public is an element of a cause of action under the Act." *Id.* (citing Md. Comm. Law. Code Ann. § 11-209(b)(2)).  The court rejected the defendants' argument that the Act's purpose of protecting the general public required the court to imply an additional element of injury to the general public; "[t]he legislature has chosen to achieve that purpose in part by authorizing suits under the Act by individuals harmed by its violation. . . .  Thus, we do not regard the general purpose of the Act as imposing requirements in addition to those expressly set forth under § 11-209(b)(2)." *Id.* at 402.  Like the California Supreme Court's decision in *Munson*, *Greenbelt Homes* is dispositive of the "bona fide" issue.[3]

The principles of statutory construction and separation of powers that are at the root of BSI's argument here are not limited to issues of statutory standing.  Rather, they reflect broad proscriptions under Maryland and California law against judicial amendment to statutes based on a court's view as to how the statute might best achieve certain public policy choices and outcomes.  While Defendants contend that the result dictated by the plain meaning of the two statutes in this case would be inequitable or unwise as a matter of public policy, governing law

---

[3] *See also Consol. Constr. Servs., Inc. v. Simpson*, 813 A.2d 260, 271 (Md. 2002) (holding that a court may not use its rule making power to alter the substantive elements of a statutory cause of action, and stating that, "[a]s we have indicated, attachment and garnishment proceedings are creatures of statute.  As such the substance of the statute, so long as constitutional issues are not present, is the province of the Legislature and not the courts. . . .  When we added contingent property or credits by rule, we added a substantive element to a statutory cause of action.  In so doing we exceeded our rule making authority."); *State v. Brantner*, 758 A.2d 84, 88 (Md. 2000) ("We shall not add an element to the statute to make criminal what otherwise would not be, or to give to the statute a meaning that it does not have.").

directs that *only* the state legislatures are empowered to make such determinations.  A court may

not deviate from the plain meaning of a legislative enactment "merely because the Court believes

that the legislature's purpose would have been more effectively advanced by an additional

provision."  *Johnson v. Mayor & City Council of Baltimore*, 874 A.2d 439, 451 (Md. 2005) ("we

are not free to rewrite a statute") (quoting *United States v. Streidel*, 620 A.2d 905, 914 (Md.

2003)).  If there is any doubt, that doubt should be resolved by further legislative action, not by

judicial intervention.

In *Dep't of Econ. and Employment Devel. v. Taylor*, for example, the Maryland Court of

Special Appeals refused to impose a restriction on a plaintiff's statutory right to recover benefits,

despite the government's argument that following the plain reading of the statute would work an

inequitable result.  671 A.2d 523, 536-37 (Md. App. 1996), *aff'd*, 690 A.2d 508 (Md. 1997).  The

plain language of the statute permitted the plaintiff to recover notwithstanding that she was

arguably "at fault" for her unemployment, an outcome that the government did not condone.  *See

id*. at 530, 532-33.  The Court of Special Appeals held that it lacked the power to impose an

equitable restriction on the plaintiff's right to recover that was not provided for in the statute's

plain text.  The court explained that "[a] litigant who asks us to ignore the plain language of the

statute bears an 'exceptionally heavy burden'" and "must show that it is 'manifest' that the

legislature could not possibly have meant what it said in that language."  *Id.* at 532 (quoting

*Union Bank v. Wolas*, 502 U.S. 151, 156 (1991) and *State v. Bricker*, 581 A.2d 9, 12

(Md. 1990)).  The court expressly rejected the government's public policy argument that

allowing the claimant to collect benefits under the facts of that case would be unjust,

admonishing that

> [t]he problem with the argument is that the Board is directing it to
> the wrong branch of government. . . .  Recognizing the doctrine of

> constructive voluntary leaving would require us to rewrite the
> statute to add a new disqualification provision that the General
> Assembly did not see fit to include.  It is the function of the
> General Assembly to address the policy issues proffered by
> appellant and determine whether to adopt the doctrine of
> constructive voluntary leaving. . . .  We must view the law as it is,
> and not as we might wish it to be.

*Id*. at 537.

The same outcome was reached in *Johnson v. Mayor and City Council of Baltimore*,
874 A.2d 439 (Md. 2005).  There, the court declined to expand the scope of recovery expressly
provided for in Maryland's workmen's compensation statute, holding that "[w]hile [the result
dictated by the statute's text] may seem unfair to some, the Court is not free to ignore the
statutory requirements in order to remedy any perceived unfairness."  *Id*. at 451.  "[T]he
Legislature must be the body to remedy any unfairness in the Worker's Compensation Act,
should they consider it necessary. . . .  'Some of the present provisions may be inequitable.  To
consider this, is also outside the scope of our duties.  The enactment is made in pursuance of the
police power . . .  and the details must be left to the judgment of the Legislature, unless some
basic right is infringed.'"  *Id.* at 452 (quoting *Paul v. Glidden*, 39 A.2d 544, 546 (Md. 1944)).

California appellate courts also have relied on the separation of powers in the same way.
In *Los Angeles County Metro. Transp. Auth. v. Alameda*, 264 P.3d 579, 586-87 (Cal. 2011), the
California Supreme Court rejected the state transportation authority's effort to deviate from the
plain meaning of the statute at issue and held that to weigh public policy considerations goes
beyond the permissible limits of the judicial role.  The court stated:

> [T]his policy argument, like MTA's others, "is best directed to the
> Legislature, which can study the various policy and factual
> questions and decide what rules are best for society.  Our role here
> is to interpret the statute[s] [as they are written], not to establish
> policy.  The latter role is for the legislature. . . ."  Whether placing
> this obligation principally on the plaintiff is, as a matter of public
> policy, "sufficiently effective is not for us to say.  If the Legislature

33

> believes it necessary or desirable to impose [a greater obligation on
> property owners], it can do so.  But we believe that had it already
> intended to do so, it would have used clearer language than was
> found in" the existing statutes. . . . "[D]ue respect for the power of
> the Legislature and for the separation of powers' requires us to
> 'follow the public policy choices actually discernible from the
> Legislature's statutory enactments."

*Id.* (quoting *Carrisales v. Dep't of Corrections*, 988 P.2d 1083, 1088 (Cal. 1999), *superseded by statute*, Cal. Gov't Code § 12940(j)(3) (West 2012) and *Cal. Teacher Ass'n v. Bd. of Rialto Unified School Dist.*, 927 P.2d 1175, 1189 (Cal. 1997)); *see also People v. Knowles*, 217 P.2d 1, 3 (Cal. 1950) (Traynor, J.) ("Reasonable men may regard the [plain meaning of a] statute as unwise; if they do they should address their doubts to the Legislature.  It is not for the courts to nullify a statute merely because it may be unwise.").

In the course of this litigation, the Court has had occasion to express its concerns about the potential outcome flowing from the plain meaning of the Maryland and California anti-spam statutes, including the wisdom of permitting small ICSPs or EMSPs like BSI to engage in frequent litigation that could conceivably allow them to collect millions of dollars in statutory damages because they were sent false and deceptive emails.  Irrespective of the merit of those concerns, however, the controlling law makes clear that a court is not free to usurp the powers of the legislature by imposing requirements where none exist.  If the Maryland and California legislatures determine that enforcement of their anti-spam laws by private attorneys general is bad policy, then they are free to amend those statutes, just as they have done with other statutes.  Thus far, however, neither legislature has done so, and courts are not permitted "to mould the statute[s] in accordance with [their] notions of justice[.]"  *Amalgamated Cas. Ins. Co. v. Helms*, 212 A.2d 311, 315-16 (Md. 1965) (quoting *Schmeizl v. Schmeizl*, 46 A.2d 619, 621 (Md. 1946)).

34

Defendants' argument that BSI must prove that it is a "bona fide" plaintiff must be rejected as a matter of law.

## III.   EVEN IF DEFENDANTS' EXTRA-STATUTORY FACTORS ARE LEGALLY RELEVANT, BSI IS A "BONA FIDE" ICSP AND EMSP.

### A.   The Jury's Phase-One Verdict Established That BSI Is a "Bona Fide" Plaintiff.

At the outset of the trial, BSI understandably believed that Phase One was going to be limited to whether BSI was an ICSP and an EMSP under the plain language of the MCEMA and the California Business and Professions Code.  That is, after all, what this Court's order setting the trial structure clearly stated.  DE 498 at ¶¶ 4-6. When Phase One concluded, however, something quite different had occurred—all but one of Defendants' so-called "bona fide" factors had been presented to the jury in one fashion or another.  Moreover, the Phase One instructions expressly allowed the jury to consider *everything* that had been reserved for Phase Two, with the sole exception of BSI's litigation history.

Evidence purportedly relevant to virtually every one of the "bona fide" factors included:

- Customer base and how BSI acquired those customers: Extensive questioning of Paul Wagner regarding his customers, how he acquired them, and his relationship to those customers.  (Trial Tr. at 6/20(am) P. Wagner Testimony 72:24-99:25).

- Types of services provided: Discussing the various types of services that BSI provides and trying to show that they were not in the nature of an ICSP or EMSP. (Trial Tr. at 6/20(am) P. Wagner Testimony 40-42, 77-85, 92-93, 96:16-23, 98:14-99:17).

- Location and type of offices (use of residences vs. use of leased/owned commercial office space): Extensive questioning of Paul Wagner regarding BSI's offices, locations, and equipment.  (Trial Tr. at 6/20(am) P. Wagner Testimony 51:23-72:23).

- Organization and configuration of computer equipment:  Testimony of Willis Marti, Defendants' "ISP expert," about "BSI's organization and configuration of computer equipment."  (Trial Tr. at 6/22 72:10-77:5).

- <u>Types and uses of software used to deliver/transfer emails</u>: Testimony of Marti about "the software that ISPs use to deliver and transfer e-mails." (Trial Tr. at 6/22 77:6-78:23, 100:18-21).

- <u>Existence or non-existence of privacy policies, terms of service, and customer agreements</u>: Testimony of Willis Marti (Trial Tr. at 6/22 78:24-80:6) (privacy policies); 80:20-83:22 (terms of service); 80:7-82:19 (uptime policies); 83:23-84:24 (acceptable use policies)).

- <u>Hiring and use of employees</u>: Cross-examination of Paul Wagner regarding BSI employees. (Trial Tr. at 6/20(am) 49:14-51:22).

- <u>Bookkeeping and billing practices</u>: Testimony of Willis Marti, Trial Tr. at 6/22 84:25-88:13.

- <u>Accounting practices</u>: Testimony of Willis Marti, Trial Tr. at 6/22 84:25-88:13.

- <u>Implementation of security/fire prevention methods</u>: Cross-examination of Paul Wagner regarding BSI's fire extinguishers (Trial Tr. at 6/20(am) 56:17-57:22); Testimony of Willis Marti regarding BSI's fire suppression systems (Trial Tr. at 6/22 50:23-51:5, 95:23-98:6); Cross-examination of Paul Wagner on BSI security (Trial Tr. at 6/20(am) 100:1-101:2); Testimony of Willis Marti regarding BSI security (Trial Tr. at 6/22 55:17-57:2).

- <u>Use of "wildcard" email addresses</u>: Cross-examination of Paul Wagner. (Trial Tr. at 6/20(pm) 38:25-41:1).

- <u>Reasons for email archiving</u>: Cross-examination of Paul Wagner regarding BSI storage of emails (Trial Tr. at 6/20(am) 46:8-49:13); Testimony of Willis Marti (Trial Tr. at 6/22 71:17-72:6)).

- <u>Efforts to prevent or stop receipt of alleged spam (*i.e.*, use of spam filters and blocking efforts)</u>: cross examination of Paul Wagner regarding knowingly seeking spam (Trial Tr. at 6/20(pm) 39-50) and about "the methods that BSI used to prevent or block spam." (Trial Tr. at 6/22 64-67, 70-71).

- <u>Customer complaints</u>: Testimony of Willis Marti regarding BSI service failures. (Trial Tr. at 6/22 80:19-82:5, 97:14-98:6).

Defendants also included an additional list of factors that was later added to the Phase

One jury instructions (*see* Ex. 4):

- <u>Digital security of data and redundancy</u>: Testimony of Willis Marti regarding digital security (Trial Tr. at 6/22 61:9-63:14); testimony of Willis Marti regarding redundancy (Trial Tr. at 6/22 81:4-82:19).

- <u>Commercial insurance</u>: Testimony of Willis Marti regarding insurance (Trial Tr. at 6/22 57:12-58:1).

- <u>Incident response plan</u>: Testimony of Willis Marti regarding incident response (Trial Tr. at 6/22 58:2-61:5).

- <u>Structured cabling</u>: Testimony of Willis Marti regarding structured cabling (Trial Tr. at 6/22 74:18-77:5).

Needless to say, Defendants' objective in shoe-horning this evidence into Phase One was to paint BSI in as negative a light as possible, hoping that the jury would find that BSI was not an ICSP or an EMSP at the threshold.  What Defendants failed to take into account is that, by successfully convincing the Court that the jury was required to consider most every one of the "bona fide" factors in Phase One, a jury verdict in BSI's favor in that phase would effectively mean that the jury also found that BSI was a "bona fide" plaintiff.  That is precisely what happened here, and, unless BSI's litigation history is dispositive of the "bona fide" issue standing alone—and it cannot be, as demonstrated next—BSI has standing even under Defendants' theory of the case.

### B.    BSI's Litigation Activities Are Not Relevant as a Matter of Law and Policy.

However the Court and the parties may have envisioned this trial at the start, it is indisputable that, by the end, BSI's litigation activities had become the *only* factor against which the jury measured BSI's "bona fides."  The evidence that Defendants adduced during Phase Two made that abundantly clear.  The entirety of Joe Wagner's direct examination on the first day of Phase Two was devoted to questions about BSI's litigation activities.  (*See* Trial Tr. at 6/26 J. Wagner Examination 47:14-141:9, 152:1-186:14; 6/27 J. Wagner Examination 13:6-37:25).  The direct examination of Steve Wagner also was about BSI's litigation.  (*See* Trial Tr. at 6/26 S. Wagner Examination 143:20-151:16).  And Paul Wagner was recalled in Phase Two to testify about BSI litigation activities.  (*See* Trial Tr. at 6/27 P. Wagner Examination 88:16-126:20).

37

Jury Instruction No. 18 also confirmed that Phase Two was about nothing other than BSI's litigation activities:  "An entity is not a *bona fide* ICSP or EMSP if it primarily or substantially engages in bringing anti-spam litigation." *See* Ex. 5, Phase II Jury Instructions. [4]

There is no basis whatsoever for tying BSI's litigation activities to BSI's standing. Indeed, doing so is wrong as a matter of law for three reasons.

*First*, the same reasons for rejecting Defendants' effort to superimpose a "bona fide" requirement based on *any* extra-statutory factors apply with even greater force to the attempt to tie standing to past or current litigation history.  Nothing in the plain meaning of the Maryland or California statutes (or in their legislative histories) disqualifies a litigious ICSP or EMSP from suing an illegal spammer.  Indeed, those statutes give standing to *anyone* who receives illegal spam without any restriction on how frequently they may sue or what their motives may be in suing.

*Second*, there is no generally applicable rule of law in Maryland or California that premises standing on a plaintiff's prior litigation activities.

*Third*, it makes no sense to tie an ICSP's or EMSP's litigation activities to standing.  If it were otherwise, then a party's use of the anti-spam laws would eventually work to deprive it of the right to sue under those very laws.  That makes no sense and would be bad policy.  Indeed, as this Court has held, the lack of public resources to enforce anti-spam statutes provided Maryland lawmakers with s a perfectly sensible reason for conferring standing on a broad class of private plaintiffs.  *See BSI v. Keynetics, Inc.*, 422 F. Supp. 2d 523, 535-36 (D. Md. 2006) ("Granting individual recipients of spam the right to bring individual actions by holding out the possibility

---

[4] There are also reasons why Jury Instruction 18 is defective.  For example, because it is written in the disjunctive and conflates two statutes, a jury finding that BSI was a "bona fide" ICSP but not a "bona fide" EMSP would nevertheless be required to find that BSI was neither.

of substantial statutory damages for each transgression is a far more effective and efficient way
to put the State's anti-spam policy into practice.").

### C.      The Phase Two Jury Instruction Pre-Ordained the Verdict.

The Court's Phase Two jury instruction compounded the impropriety of tying BSI's
litigation activities to its "bona fides" as a plaintiff because they effectively pre-ordained the
verdict.  By narrowly focusing the jury exclusively on the period during which BSI was actively
engaged in litigation against several alleged spammers—2005 through 2011—and then directing
the jury to find that BSI is not a "bona fide" provider of services if it found that BSI was
"primarily" or "substantially" involved in litigation, the instruction guaranteed the outcome.
That is wrong.

*First*, there was no valid basis to limit the jury's consideration to the period between 2005
and 2011.  To be sure, as BSI's discovery responses revealed, that was the only period during
which BSI had litigation revenues.  But BSI was in existence for *nine* years prior to entering into
anti-spam suit settlements, and during that time—as the evidence indisputably proved—it was
involved in providing all kinds of Internet-related services.  While the Court allowed BSI to
point this out during closing argument, the instructions themselves gave the jury no guidance on
how that fact should be considered.  Rather, it honed in on the "litigation years," and directed the
jury to find against BSI if it found that BSI was substantially or primarily involved in litigation.

*Second*, the instruction's reliance on terms like "substantially" and "primarily" is not only
impermissibly vague, but it also fails to account for the fact that BSI is basically a one-man
operation.  When the company decided to pursue its rights under anti-spam statutes, it
necessarily meant that its owner, Paul Wagner, was going to be spending a great deal of his time

and resources enforcing his company's rights—maybe even a "substantial" amount of his time.[5] His decision to do so, however, resulted in disqualifying BSI from being a "bona fide" provider of Internet services under the instruction that the Court gave, precisely because the instruction focused on the very time that BSI was litigating.  In effect, BSI was not acting in good faith, according the jury instruction, because it chose to enforce its rights.  That is wrong as a matter of law.

*Third*, the instruction failed to put litigation in context.  Never did the Court advise the jury to consider whether BSI's efforts to halt spam were consistent with rendering services as an ICSP or EMSP, a position for which BSI adduced substantial evidence in Phase Two.[6]

## CONCLUSION

For these reasons, the Court should confirm the Phase One verdict,  hold that BSI has standing under the Maryland and California anti-spam statutes, and enter judgment as a matter of law for BSI on the Phase Two Verdict.

---

[5] There was, of course, no evidence that BSI had stopped providing Internet-related services when it began to file lawsuits against Defendants and other spammers or that BSI's services had been interrupted or diminished as a result of BSI's litigation activities.  Indeed, once a small ICSP or EMSP like BSI is up and running, there is relatively little to do to keep it running, outside of tending to the odious effects of illegal spam.

[6] For example, Joe Wagner testified how in his experience, some spammers were "[s]topped cold" by lawsuits and how nothing is as effective as litigation at stopping spam.  (Trial Tr. at 6/27(am) J. Wagner Testimony 72:22-79:16; *see* Trial Tr. at 6/20(pm) P. Wagner Testimony 48:23-49:1).

Date:  October 1, 2012                          Respectfully submitted,


_____/s/_____          *Of Counsel:*
Thomas M. Barba (D. Md. Bar No. 28487)
Roger W. Yoerges (D. Md. Bar No. 14088)          Stephen H. Ring (USDC-MD Bar No. 00405)
Jeffrey E. McFadden (D. Md. Bar No. 8738)        Law Offices of Stephen H. Ring, P.C.
John J. Duffy (D. Md. Bar No. 28613)             506 Main Street, Suite 215
STEPTOE & JOHNSON LLP                            Gaithersburg, Maryland  20878
1330 Connecticut Ave., NW                        T: 301-563-9249
Washington, D.C.  20036                          F: 301-563-9639
T: 202-429-3000                                  shr@ringlaw.us
F: 202-429-3902
tbarba@steptoe.com                               Mike Rothman (USDC-MD Bar No. 14568)
ryoerges@steptoe.com                             Law Office of Michael S. Rothman
jmcfadden@steptoe.com                            401 E. Jefferson Street, Suite 201
jduffy@steptoe.com                               Rockville, MD  20850
                                                 T: 301-251-9660
                                                 F: 301-251-9610
Anthony A. Onorato (D. Md. Bar No. 28622)        mike@mikerothman.com
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas                      *Counsel for Plaintiff Beyond Systems, Inc.*
New York, NY  10036
T: 212-506-3900
F: 212-506-3950
tonorato@steptoe.com

*Counsel for Plaintiff Beyond Systems, Inc. and*
*Third-Party Defendants James Joseph Wagner*
*and Hypertouch, Inc.*


41