IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| BEYOND SYSTEMS, INC., | : | |
| | : | Case No. 8:08-CV-00409-PJM |
| Plaintiff, | : | |
| | : | |
| v. | : | The Honorable Peter J. Messitte |
| | : | |
| KRAFT FOODS, INC., et al., | : | Magistrate Judge Charles B. Day |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**DEFENDANT CONNEXUS CORP.'S JOINDER IN KRAFT FOOD INC.'S
POST TRIAL MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL
POST TRIAL MOTION FOR SUMMARY JUDGMENT AS TO CONSENT**

Defendant Connexus Corp. joins Defendant Kraft Foods Inc.'s Post Trial Motion for Summary Judgment, and agrees that judgment should be entered against Plaintiff Beyond Systems, Inc. ("BSI") for the reasons stated therein.  Judgment should also be entered against BSI for the additional reason that BSI consented to receive the e-mails over which it sues, thereby precluding BSI from recovering against Connexus as a matter of law.

**I.      INTRODUCTION**

California and Maryland law are clear:  A person who knowingly consents to the infliction of an alleged harm may not later complain.  The undisputed facts of the case demonstrate that BSI knowingly consented to receive the e-mails over which it sues by entering into an agreement with Third-Party Defendant Hypertouch, Inc. (owned by Joe Wagner) to send as much spam as possible to BSI, and through other means proven at trial.  Accordingly, the Court should enter judgment against BSI and in favor of Connexus.

II.    **STATEMENT OF UNDISPUTED FACTS**

BSI, run by sole owner and employee Paul Wagner, is not an innocent victim of spam as it tried to portray at trial.  Instead, BSI/Paul Wagner knowingly collected as much spam as possible.  Specifically:

1.     On February 8, 2002, the Maryland Anti-Spam Statute ("MCEMA"), which "[f]orbids sending commercial e-mail with 'unauthorized, misleading, or false information,'" was introduced in the Maryland legislature.  (Ex. 1, DX. 36; Ex. 2, J. Wagner 6/26/12 Tr. at 157:3-158:9.)  The Maryland legislature signed MCEMA into law on May 6, 2002, and the law went into effect on October 1, 2002.  (Ex. 1.)

2.     After May 2002, Paul Wagner and his brother Joe Wagner of Hypertouch "talked about the law a lot."  (Ex. 2 at 156:4-9.)

3.     In 2002, BSI/Paul Wagner and Hypertouch/Joe Wagner entered into an agreement for BSI "to receive all the Hypertouch spam that you [Joe Wagner] routed to him."  (*Id.* at 171:24-172:1.)  Joe Wagner testified at trial:

> Q:  And you knew at that time that the e-mails, the Hypertouch dot com e-mails that you would be routing [to BSI] contained spam; is that right?
>
> A:  Absolutely.
>
> Q:  And you asked Beyond Systems to receive those e-mails, right?
>
> A:  Yes.
>
> Q:  And Beyond Systems said yes, correct?
>
> A:  Yes.
>
> Q.  Okay.  And according to you, Beyond Systems knew in 2002 when it agreed to receive those e-mails that those e-mails would receive spam, correct?

A:  Yes.

(*Id.* at 160:17-161:6, 171:24-172:1.)

4.      When problems arose with the sending of spam from Hypertouch to BSI, the

brothers were quick to resolve the issue to keep the spam "flooding" into BSI.  (*Id.* at 66:22-

67:24, 176:2-25; Ex. 3, DX. 112; Ex. 4, DX. 155; Ex. 5, DX. 132; Ex. 6, DX. 159; Ex. 7, DX.

185.)  For example:

> a.   In one e-mail between the brothers, Paul Wagner complained to Joe
>
>      Wagner that he hadn't received any Hypertouch spam in the previous
>
>      three days.  (Ex. 4, DX. 155.)
>
> b.   In another e-mail, Paul Wagner notified Joe Wagner, "I am once again not
>
>      receiving Hypertouch spam …. Can you check whether you are
>
>      forwarding me such emails, please …?"  (Ex. 6, DX. 159.)  When
>
>      questioned about this e-mail at trial, Joe Wagner testified:
>
>      Q:    And so, this [e-mail] isn't, your brother isn't
>      complaining here that he's receiving too much spam.  He's
>      complaining that he's not receiving any Hypertouch spam,
>      correct?
>
>      A:  He's giving me a heads up that there seems to be
>      something wrong.
>
>      Q:  And what's wrong is that he's not getting Hypertouch
>      spam?
>
>      A:  He's not getting the spam, yes, from my servers.
>
>      Q:   And he's not getting the Hypertouch spam that you
>      agreed to route to him, correct?
>
>      A:  That I asked him to, if I could route to him, yes.
>
>      (Ex. 2 at 176:16-25.)

c.   In an e-mail chain titled "mail is back to forwarding," Paul Wagner wrote
to Joe Wagner "Thanks.  Now that I think about it, the number of spams to
support@beyondsystems.net did slow to a virtual standstill for a few
hours.  I have noticed that it sometimes takes a couple of hours for a test
email message addressed to a Hypertouch recipient to arrive … at [BSI]
….  Not sure why …. , [but] As Steve's boss says: 'Good is good
enough.'"  (Ex. 3, DX. 112.)

d.   In another e-mail, whose subject line was "spam should be flowing again,"
Joe Wagner wrote to his brother "Hypertouch is forwarding to its new
server, which is forwarding to support@beyondsystems.net," to which
Paul Wagner responded, "No emails have arrived yet – but perhaps it
takes a moment.  Thanks – I'm heading to bed in a few minutes."  The
following day, Joe Wagner replied, "now?"  to which Paul Wagner
responded "It's a floodin' all right!  Thx …" (Ex. 5, DX. 132; Ex. 2 at
168:6-170:5.)

e.   In another e-mail, Joe Wagner noted that the "spam should be flowing
now …."  (Ex. 7, DX. 185.)

5.      BSI/Paul Wagner wanted to receive e-mails to file lawsuits.  In August 2002, Joe
Wagner e-mailed Paul Wagner, that "[a]fter more than a year of working on actions on
spammers, I've finally filed my first two in the small claims court of San Mateo County,
California. … My hope is to refine a collection of small claims motions so spammer suits are
well-nigh cut and paste."  (Ex. 1, DX. 36.)

4

6.      A few weeks later, on September 17, 2002, Paul Wagner purchased a MacIntosh

e-mail server, called the "Little Mac," from Joe Wagner for $1, knowing that it was running a

mail server that contained spam.  (Ex. 2 at 152:5-155:3; Ex. 8, DX. 39.)

7.      When BSI and Hypertouch discovered that a default setting on their server

application, CommuniGate Pro, was rejecting spam, both BSI and Hypertouch turned off the

setting so that all spam would be received and stored:

> Q:      So there was a setting in CG Pro that allowed you to
> bounce a fair bit of e-mail and specifically the fraudulent ones,
> correct?
>
> A:      That would include fraudulent ones, yes.
>
> Q:      And that setting was turned off?
>
> A:      Correct.
>
> Q:      By Beyond Systems?
>
> A:      Yes, it was turned off in both of our systems.

(Ex. 2 at 163:15-164:9; *see also id.* at 75:1-77:9; Ex. 9, DX. 135.)

8.      BSI/Paul Wagner and Hypertouch/Joe Wagner upgraded their computer

equipment so their respective companies could handle even more spam.  (Ex. 10, DX. 160; Ex. 2,

J. Wagner 6/26/12 Tr. at 173:4-176:1.)

9.      BSI does not use spam filters or any other mechanism to stop the receipt of

unwanted e-mails.  (Ex. 11, W. Marti 6/22/12 Tr. at 66:4-17.)

10.     BSI and Hypertouch set up wildcard accounts with the specific purpose of

collecting spam.  (Ex. 2 at 78:16-79:10, 81:3-83:13.)  Wildcard accounts capture e-mails that are

sent to a domain name, but are not addressed or destined for any specific customer.  (*Id.* at

158:10-20.)

11.     Hypertouch and BSI could have bounced or rejected e-mails sent to the wildcard accounts, but instead, made sure the e-mails could be sent to BSI 24 hours a day without requiring that anyone actually read the e-mails.  (*Id.* at 162:2-163:6.)   As with other e-mail directed to Hypertouch, when those wildcard e-mails were not reaching BSI's servers, Hypertouch made corrections so the e-mails could reach BSI.  (*Id.* at 82:5-83:13.)

12.     Hypertouch set spam traps by publishing fictitious e-mail addresses on its website knowing that spam would be delivered to those e-mail addresses and then delivered to BSI.  (*Id.* at 112:1-113:22.)  According to BSI's own expert, Peter Resnick, a spam trap is "an email address … whose sole purpose is to cause spammers to send spam to it."  (Ex. 12, P. Resnick 6/27/12 Tr. at 159:3-7.)

13.     BSI also employed a "systematic set of opt-outs" using spam traps, knowing that by clicking on opt-out links, those spam traps would "generate a huge volume more spam."  (Ex. 13, P. Wagner 6/27/12 Tr. at 111:5-25.)

14.     In one e-mail Joe Wagner wrote to Paul Wagner, "this is excellent … thanks a bunch … this really rocks.  Now I can say with firsthand knowledge that removes – just gets one's address signed up for more spam …."  (Ex. 14, DX. 50; Ex. 13, P. Wagner 6/27/12 Tr. at 110:12-111:25.)

15.     At trial, the Court instructed the jury that a "bona fide ICSP [Interactive Computer Service Provider] and EMSP [Electronic Mail Service Provider] is an entity that primarily and substantially provides the services set forth in the Maryland and California statutes …. An entity is not a bona fide ICSP or EMSP if it primarily or substantially engages in bringing anti-spam litigation."  (Ex. 15, 6/28/12 Tr. at 5:21-6:2.)

16.     The jury found that BSI is not a bona fide ICSP under Maryland law or a bona fide EMSP under California law, and thus, BSI is an entity that "primarily or substantially engages in bringing anti-spam litigation."  (*Id.* at 5:25-6:2, 82:6-14.)

## III.   LEGAL STANDARD

A party is entitled to summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Nader v. Blair*, 549 F.3d 953, 958-59 (4th Cir. 2008).  Connexus is entitled to summary judgment because the undisputed facts of this case show that BSI consented to receive the e-mails over which it sues.

## IV.   ARGUMENT

California law is clear: "He who consents to an act is not wronged by it." Cal. Civ. Code. § 3515.  § 3515 is "a codification of the maxim *volenti non fit injuria*, which is a basic tenet of [California] jurisprudence.  It precludes the maintenance of an action for a wrong by one who has 'consented to the act which has occasioned his loss.'"  *Pinney & Topliff v. Chrysler Corp.*, 176 F. Supp. 801, 810 (S.D. Cal. 1959) (applying California law) (citing *Edward Brown & Sons v. San Francisco*, 223 P.2d 231, 235 (Cal. 1950)). Thus, "[o]ne cannot deliberately incur an obvious risk of personal injury, especially when preventive measures are at hand, and then hold the author of the danger for the ensuing injury." *Hedding v. Pearson*, 173 P.2d 382, 385 (Cal. App. 1946).

Maryland law is equally clear: "[t]hose who, with full knowledge, assent to the invasion of their interests may not complain." *Janelsins v. Button*, 648 A.2d 1039, 1042 (Md. Ct. Spec. App. 1994) (plaintiff cannot recover for battery where the plaintiff consented to it) (citing *McQuiggan v. Boy Scouts of Am.*, 536 A.2d 137 (1988)); *Brazerol v. Hudson*, 262 Md. 269, 273

7

(Md. 1971) (plaintiff who moved her car to allow dump truck to enter onto her property could not sue dump truck operator for trespass). Consent "may be manifested by action or inaction and need not be communicated to the actor." Restatement (Second) of Torts § 892 (1965).

In *Brazerol*, the plaintiffs filed suit for trespass against the operator of a dump truck who entered the plaintiffs' property to perform work on the plaintiffs' neighbors' property. *Brazerol*, 262 Md. at 272. Plaintiffs testified that before the dump truck entered plaintiffs' property, one of the plaintiffs moved her car so that the fully loaded dump truck could enter the property, and after returning home, did nothing to have the dump truck removed. *Id.* at 273. The court entered judgment against the plaintiffs, noting that they "established by their own testimony that the entry by the truck was authorized." *Id.* at 274.

*Gordon* is also instructive, as it held that plaintiff lacked standing as an ISP under CAN-SPAM (the federal analog to the California and Maryland statutes at issue here) because plaintiff undertook efforts to receive the e-mails over which it sued and therefore fell outside of the class of entities to which Congress granted a private right of action. *Gordon v. Virtumundo*, 575 F.3d 1040, 1055-57 (9th Cir. 2009). Among other things, the *Gordon* plaintiff configured his computers to receive e-mails sent to "unused inboxes" and "refuse[d] to implement spam filters in a typical manner or otherwise make any attempt to block allegedly unwanted spam or exclude such messages from users' e-mail inboxes." *Id.* at 1045-46, 1055. The court found that plaintiff lacked standing as an ISP because it "purposefully avoided taking even minimal efforts to avoid or block spam messages. Instead, Gordon devotes his resources to adding his clients' e-mail addresses to mailing lists and accumulating spam through a variety of means for the purpose of facilitating litigation." *Id.* at 1052 (quotations and citations omitted). The court noted that "it is highly significant that the burdens Gordon complains of are almost exclusively self-imposed and

purposefully undertaken." *Id.* at 1057.  Thus, Judge Gould wrote in his concurring opinion that the common law "did not develop remedies for people who gratuitously created circumstances that would support a legal claim and acted with the chief aim of collecting a damage award," and that although plaintiff sued under a federal statute, "on close examination, many distinctions between common law and statutory law disappear."  *Id.* at 1067-68.

As in *Brazerol* and *Gordon*, the undisputed facts here show that BSI consented to the alleged harm about which it complains.  Beginning in 2002 (the year the Maryland legislature passed MCEMA), BSI entered into an agreement with Hypertouch/Joe Wagner for Hypertouch to send e-mails to BSI, knowing that the e-mails contained spam.  (Statement of Undisputed Facts ("SUF") ¶¶ 1-3.)  BSI quickly worked with Hypertouch to resolve issues that arose with the sending of e-mails to ensure the spam kept "flooding" into BSI.  (*Id.* at ¶ 4.)  BSI/Paul Wagner also purchased the "Little Mac" from Joe Wagner for $1, knowing that its mail server contained spam.  (*Id.* at ¶ 6.)  BSI failed to use spam filters or any other mechanism to stop the receipt of unwanted e-mails.  (*Id.* at ¶ 9.)  Indeed, when BSI/Paul Wagner and Hypertouch/Joe Wagner discovered that a setting on their server application, CommuniGate Pro, was rejecting spam, they both turned off the setting.  (*Id.* at ¶ 7.)  BSI/Paul Wagner and Hypertouch/Joe Wagner also upgraded their computer equipment so their servers could handle even more spam. (*Id.* at ¶ 8.)  Additionally, BSI deployed spam traps to capture as much spam as possible by setting up wildcard e-mail accounts and clicking on opt-out links, knowing that the spam traps would "generate a huge volume more spam."  (*Id.* at ¶¶ 10-13.)  Unquestionably, the undisputed facts are that BSI knowingly consented to receive the e-mails for which it seeks to hold Connexus liable, thereby precluding BSI from pursuing its claims against Connexus as a matter of law.

## V.    <u>CONCLUSION</u>

For these reasons, the Court should enter judgment against BSI and in favor of Connexus.


Respectfully submitted,


Dated:  October 1, 2012                    _____/s/_____
                                           J. Douglas Baldridge (US DC-MD Bar No. 11023)
                                           Lisa Jose Fales (US DC-MD Bar No. 08141)
                                           Ari N. Rothman (US DC-MD Bar No. 17560)
                                           Lauren E. Ingebritson (US DC-MD Bar No. 18266)
                                           VENABLE LLP
                                           575 7th Street, N.W.
                                           Washington, D.C.  20004-1601
                                           (202) 344-4000 (phone)
                                           (202) 344-8300 (fax)
                                           jdbaldridge@venable.com
                                           ljfales@venable.com
                                           anrothman@venable.com
                                           *Attorneys for Connexus Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of October, 2012, a copy of the foregoing

*Defendant Connexus Corp.'s Joinder in Kraft Food Inc.'s Post Trial Motion for Summary*

*Judgment and Supplemental Post Trial Motion for Summary Judgment as to Consent* was filed

electronically in accordance with the Court's CM/ECF procedures, and served electronically on

the below-named parties by the Court's electronic notification system:

Thomas M. Barba
John J. Duffy
Jeffrey E. McFadden
Roger W. Yoerges
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
tbarba@steptoe.com
jduffy@steptoe.com
jmcfadden@steptoe.com
ryoerges@steptoe.com

Anthony A. Onorato
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY  10036
tonorato@steptoe.com

Stephen H. Ring
Law Offices of Stephen H. Ring, P.C.
506 Main Street, Suite 215
Gaithersburg, MD  20878
shr@ringlaw.com

Mike Rothman
Law Office of Michael S. Rothman
401 E. Jefferson Street, Suite 201
Rockville, MD  20850
mike@mikerothman.com

*Counsel for Plaintiff BSI, Inc.,*
*Joe Wagner/Hypertouch, Inc.*

John K. Roche
Barry J. Reingold
John M. Devaney
PERKINS COIE LLP
607 14th Street, N.W.
Suite 800
Washington, D.C.  20005-2003
jroche@perkinscoie.com
breingold@perkinscoie.com
jdevaney@perkinscoie.com

Darrell J. Graham
ROESER BUCHEIR & GRAHAM LLC
20 N. Wacker Drive
Suite 1330
Chicago, IL  60606
dgraham@djgrahamlaw.com

*Counsel for Defendants Kraft Foods Inc.*
*& Vict. Th. Engwall & Co.*

_____/s/_____
Lauren E. Ingebritson