## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BEYOND SYSTEMS, INC. | : | |
| | : | |
| Plaintiff, | : | Case No. 8:08-CV-00409-PJM |
| | : | |
| v. | : | The Honorable Peter J. Messitte |
| | : | |
| KRAFT FOODS, INC., et al., | : | Magistrate Judge Charles B. Day |
| | : | |
| Defendants. | : | |
| | : | |

## KRAFT'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR JUDGMENT AS A MATTER OF LAW

<u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ........................................................................................... i

**TABLE OF AUTHORITIES** ................................................................................. ii

**INTRODUCTION** ..................................................................................................... 1

**ARGUMENT** ............................................................................................................... 6

I.   THE ONLY SENSIBLE INTERPRETATION OF THE STATE STATUTES
     CONSISTENT WITH ESTABLISHED PRINCIPLES OF STATUTORY
     CONSTRUCTION IS TO LIMIT STANDING TO BONA FIDE PROVIDERS
     GENUINELY AFFECTED BY STATUTORY VIOLATIONS. ........................... 6

     A.   BSI Incorrectly Asserts That The "Plain Meaning" Rule Alone Must Govern The
          Court's Statutory Analysis. ........................................................................ 6

          1.   Applicable Rules Of Statutory Construction BSI Ignores............................. 6

          2.   California And Maryland Courts Routinely Infer Statutory Terms Or
               Conditions To Give Statutes Reasonable Interpretations. ............................. 8

     B.   A *Bona Fide* Requirement Is Consistent With Related Statutory Provisions,
          Common Law, And Federal Preemption. ............................................... 13

          1.   That The State Legislatures Intended To Limit Standing To *Bona Fide*
               Providers Adversely Affected, Is Implied By The Statutes' Damages
               Provisions. .............................................................................................. 13

          2.   Defendants' Interpretation Of The Terms EMSP and ICSP Is Supported By
               Related Enactments Of The State Statutes. .................................................. 16

          3.   BSI's Interpretation Is Inconsistent With, And Its Claims Barred By, The
               Common Law Principle *Volenti Non Fit Injuria*........................................... 23

          4.   Given Their Penal Nature, The State Statutes Must Be Strictly Construed As
               A Matter Of Law. ...................................................................................... 26

     C.   BSI's Proposed Interpretation Would Lead To Preemption. ................................ 28

II.  THE JURY'S PHASE I VERDICT DID NOT ESTABLISH THAT BSI IS A *BONA FIDE*
     PLAINTIFF. ............................................................................................................. 29

III. BSI FAILED TO ESTABLISH IT QUALIFIES AS AN EMSP OR ICSP UNDER ITS
     OWN THEORY OF THE CASE. ......................................................................... 30

**CONCLUSION** ...................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Ailers v. Tittsworth*, 269 Md. 677 (1973) ................................................................ 20

*AIU Ins. Co. v. Superior Court*, 799 P.2d 1253 (Cal. 1990)........................................ 15

*Anderson v. Council of Unit Owners of Gables on Tuckerman*, 404 Md. 560 (2008) ............ 6, 14

*ASIS Internet Serv. v. Subscriberbase, Inc.*, 2010 WL 1267763 (N.D. Cal. April 1, 2010)... 17, 22

*Ball v. University of Md.*, 137 Md.App. 229 (2001)..................................................... 17

*Balmoral v. Hotel Tenants Assn. v. Lee*, 226 Cal. App.3d 686 (1990)........................... 27

*Baltimore Nat'l Bank v. State Tax Comm'n of Maryland*, 297 U.S. 209 (1936)......................... 15

*Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1 (2005)................. 13, 15

*Brunswick Corp. v. Pueblo Bow-O-Mat, Inc.,* 429 U.S. 477 (1977) ........................................... 32

*Burns v. United States*, 501 U.S. 129 (1991)................................................................ 7

*Busching v. Superior Court of Ventura Co.*, 524 P.2d 369 (Cal. 1974) ................................. 13, 22

*California Teachers Assn. v. San Diego Community College Dist.*, 28 Cal.3d 692 (1981) ....... 3, 6

*Cattie v. Wal-Mart, Inc.*, 504 F. Supp.2d 939 (S.D. Cal. 2007) ..................................... 21

*Chesapeake & Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor & City Council of Baltimore,* 343 Md. 567 (1996).......................................................................... 7

*Cohen v. Goldstein*, 58 Md.App. 699 (1984)............................................... 8, 11, 12

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926)...................................... 26, 28

*Consumer Defense Group v. Rental Housing Indus. Members*, 137 Cal.App.4th 1185 (2006) .... 23

*Crews v. Hollenbach*, 358 Md. 627 (2000)........................................................... 23, 25

*Davis v. State*, 426 Md. 211 (2012) ................................................................ 19

*Dreyer's Grand Ice Cream, Inc. v. County of Alameda*, 178 Cal.App.3d 1174 (1986) ................ 7

*Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604 (2002).................................................. 19

*Ford Motor Land Dev. v. Comptroller*, 68 Md. App. 342 (1986) ................................. 14

*Gleaton v. State*, 235 Md. 271 (1964).............................................................. 13

*Gordon v. Virtumnundo, Inc.*, 573 F.3d 1040 (9th Cir. 2009) ...................................... 5

*Groh v. Cty. Comm'r. of Washington* ..................................................................... 26

*Guttman v. Wells Fargo Bank*, 421 Md. 227 (2011) ................................................. 7

*Hale v. Morgan*, 22 Cal. 3d 388 (1978)............................................................ 26, 28

*Hardy v. State*, 301 Md. 124 (1984) .................................................................. 13

*Jackson v. State*, 408 Md. 231 (2009)............................................................... 8, 12

*Janelsins v. Button*, 102 Md.App. 30 (1994) ........................................................ 24

*Jones v. Lodge at Torrey Pines Partnership*, 42 Cal.4th 1158 (2008) ......................... 10

*Jones v. Prince George's County*, 378 Md. 98 (2003) ......................................... 12, 14

*Kaczorowski v. City of Baltimore*, 309 Md. 505 (1987) ..................................... 3

*Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334 (2010)..................................... 28

*Kwikset Corp. v. Superior Ct.*, 51 Cal.4th 310, (2011)....................................... 21

*Lloyd v. General Motors Corp.*, 916 A.2d 257 (Md. 2007)....................................... 19

*Mackie v. Mayor of Comr's of Town of Elkton*, 265 Md. 410 (1972) ........................................... 13

*MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md. App. 481 (2006).................................... 13

*Maryland-Nat'l Capital Park & Planning Com'n v. Anderson*, 395 Md. 172 (2006) ................... 6

*Miller v. Collectors Universe, Inc.*, 159 Cal.App.4th 988 (2008) ................................................ 27

*Morgan v. AT&T Wireless Services, Inc.*, 77 Cal.App.4th 1235 (2009) ....................................... 21

*New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225 (4th Cir. 2012)................................... 17

*Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348 (4th Cir. 2006) ........ 13, 14, 20

*Palisades Collection LLC v. Shorts*, 522 F.3d 327 (4th Cir. 2008)............................................ 20

*Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.*, 21 Cal.3d 650 (1978) ...................................................................................................................................... 14

*Pan American Sulphur Co. v. State Dep't.*, 251 Md. 620 (1968) ................................................ 11

*Peery v. Superior Court*, 633 P.2d 198 (Cal. 1981)................................................................... 11

*People v. Arnold*, 6 Cal.App.4th 18, (1992) ............................................................................ 4, 6

*People v. Ventura Refining Co.*, 204 Cal. 286 (1928) ................................................................. 8

*Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2 (2007)............................................. 6

*Schroyer v. McNeal*, 323 Md. 275 (1991) ................................................................................ 25

*Sears, Roebuck & Co. v. Gussin,* 350 Md. 552 (1998) ................................................................. 7

*Smith v. Higinbothom*, 187 Md. 115, 130 (1946) ..................................................................... 26

*Solberg v. Municipal Court*, 561 P.2d 1148 (Cal. 1977) ........................................................... 11

*Starbucks Corp. v. Superior Court*, 168 Cal. App. 4th 1436 (2008) .................................... passim

*State Farm Mut. Auto Ins. Co. v. DeHaan*, 393 Md. 163 (2006)............................................... 32

*State v. Brantner*, 360 Md. 314 (2000) ..................................................................................... 7

*State v. Petrushansky*, 183 Md. 67 (1944) ................................................................................ 8

*Tos  v. Mayfair Packing Co.*, 160 Cal. App. 3d 67 (1984) ........................................................ 27

*Travernier v. Maes*, 242 Cal.App.532 (1966).......................................................................... 24

*Ventura County Ry. Co. v. Hadley Auto Transport*, 38 Cal. App. 4th 878 (1995) ...................... 10

*Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)............................................................. 17

*Walnut Creek Manor v. Fair Employment & Housing Com.*, 814 P.2d 704 (Cal. 1991) ............. 26

*Warner v. Markoe*, 189 A. 260 (Md. 1937)............................................................................. 25

*Whitman v. American Trucking Assn's, Inc.*, 531 U.S. 457 (2001) ............................................. 19

*Wright v. State*, 24 Md.App. 309 (1975).......................................................................... 13, 22

## Statutes

15 U.S.C. § 45.......................................................................................................................... 20

15 U.S.C. § 7706(d) .................................................................................................................. 20

Cal. Bus. & Prof. Code § 17535 ............................................................................................... 21

CAL. BUS. PROF. CODE § 17529.5 (a)(b)(1)(B) ........................................................................... 14

Md Code Com. Law § 13-408(a)........................................................................................ 16, 18

Md. Code Com. Law § 13- 301 (1)............................................................................................ 17

Md. Code Com. Law § 13-105 .................................................................................................. 20

Md. Code Com. Law § 14-3003(3) .......................................................................... 14
Md. Code Com. Law§ 14-3001 .............................................................................. 17

**Other Authorities**

Black's Law Dictionary (7th ed. 1999) .................................................................... 15
Black's Law Dictionary (8th ed. 2004) ................................................................... 15
Merriam-Webster's Collegiate Dictionary (11th ed. 2008) ................................... 15

**Treatises**

Aimee M. Aceto, et al., *Recent Decisions:  The Maryland Court of Appeals – XIII. Torts*, 58 Md.
    L. Rev. 1117, 1120 (1999) ................................................................................. 24
Prosser, The Law of Torts, § 108 at 714 (4th ed. 1971) ........................................ 22
Restatement (2d) of Torts § 902 ............................................................................ 14
Restatement (2d) of Torts, § 496A, comments b-c, § 892, comment a ....................... 24

Kraft's Post-Trial Brief And Memorandum of Law In Support Of Its Motion For

Summary Judgment ("Op. Br.") sets forth in detail the undisputed facts supporting the jury's

Phase II verdict and the reasons why, under any reasonable interpretation of the Maryland and

California statutes, BSI does not have standing to pursue its claims in this case.  (Op. Br. at 23-

38.)  We also demonstrated that the same undisputed facts entitle Defendants to summary

judgment under the long-standing rule of tort law barring manufactured claims based on self-

inflicted harm.  (Op. Br. at 41-43.)  Kraft's opposition below incorporates the arguments set forth

in its Opening Brief, while addressing additional reasons BSI's Motion should be denied, the

jury's Phase II verdict adopted, and BSI's claims dismissed.

## INTRODUCTION

BSI's position in this case is simple.  It contends that the State Legislatures intended to

grant BSI standing to pursue tens of millions of dollars in statutory damages, even though it is in

the business of litigating spam claims, manufactured and conspired to multiply the claims at

issue in this case, yet suffered no actual injury as a result of the statutory violations alleged.

There is nothing in the express language of the State statutes, related statutory provisions,

legislative history, common-law, or public policy that supports such an absurd interpretation or

result.

Beginning in at least 2003,[1] BSI has been primarily in the business of collecting spam

and suing anyone it believes has deep enough pockets to pay the onerous statutory damages the

---

[1]    BSI claims that the Court's jury instruction limiting its consideration of BSI's activities
to 2005-2011 "pre-ordained the verdict" because "it honed in on the 'litigation years.'"  (BSI
Mot. at 39.)  This is like saying that a jury instruction in a murder case would "pre-ordain" a
guilty verdict by instructing the jury to determine what happened the night of the shooting.
BSI's argument to this effect is easily disposed of, so we will deal with it here.  The jury was
instructed to consider BSI's activities beginning in 2005 because that was the time frame in
which it began collecting the Gevalia emails on which it is suing.  In all events, BSI did not

State statutes impose.  (Op. Br. at 5-7, 11-17.)  The evidence demonstrating this scheme was

undisputed, and included among other things Paul and Joe Wagner's own admissions, the

testimony of both parties' experts, and hundreds of contemporaneous emails and other

documents Defendants introduced into evidence.  This evidence revealed that BSI makes no

effort whatsoever to block, filter or otherwise stop its receipt of unsolicited emails.  (Op. Br. at

18.)  Instead, BSI invites and collects spam by setting "spam traps" consisting of thousands of

fictitious email addresses it publishes on the internet intending that they be harvested by

"spammers."  (*Id.* at 7-12.)  BSI then multiplies potential claims and enhances potential damages

by intentionally routing those emails between California and Maryland, first to servers operated

by Joe Wagner in California, which then automatically forwards them to Paul Wagner's servers

in Maryland.  (*Id.* at 7-10.)  The Wagner brothers then sue in tandem on the same emails,

typically Joe first followed by Paul, who if successful gives Joe a share of BSI's bounty.  (*Id.* at

12-17.)

 With respect to Kraft, BSI could have easily stopped any further transmission of Gevalia

emails by asking Kraft for help, which Kraft was contractually obligated to provide by its 2006

settlement with Paul's brother Joe.  But rather than address its spam "problem" this way, BSI

chose to multiply it as the basis for seeking the millions of dollars in statutory damages it alleges

in this case.  (*Id.* at 16-17.)

 In short, the Wagner brothers admitted at trial that BSI intentionally pursues as much

spam as it can, for the purpose of shaking as much money as it can out of defendants like Kraft

and Connexus.  The Phase II jury, having carefully considered the evidence, plainly agreed.  It

reached the same conclusion as the district and appellate courts did in *Gordon v. Virtumnundo,*

---

object to this aspect of the instruction following the charge conference, and thus has waived any
objection to it now.  (6/28 Tr. at 8-9.)

*Inc.*, 573 F.3d 1040, 1049, 53 (9th Cir. 2009):  BSI is not a *bona fide* EMSP or ICSP.[2]  It is not primarily or substantially engaged in the activities set forth in the State statute definitions of EMSP and ICSP.  It is instead in the business of pursuing anti-spam litigation.  (6/28 Tr. at 5-6, 82.)

BSI's response to the jury's Phase II verdict:  ignore it and allow BSI to proceed with its claim even though it was not a *bona fide* service provider, was not adversely affected by the statutory violations alleged, and instead was "an opportunistic plaintiff who has suffered no real injury."  (BSI Mot. at 29.)

To this end, BSI's various arguments in support of its Motion boil down to a single, meritless contention:  As a matter of law, the Court must adopt the jury's Phase I verdict because the "plain meaning" rule of statutory construction requires the Court to literally apply the statutes' definitions of ICSP and EMSP, regardless of whatever illogical or nonsensical result that ensues.

Such application of the plain meaning rule, however, has been repeatedly rejected by Maryland and California courts alike.  As we discuss below in Arg. §§ I.A-C., BSI's proposed interpretation is contrary to the language of the statutes, their legislative intent, well-established common-law principles, and would lead to federal preemption.  Accordingly, the *sin qua non* of BSI's entire argument – that the State statutes must be literally construed and applied – does not apply and does not support its claim.  *See, e.g.*, *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513-14 (1987) ("Of course, in our efforts to discover purpose, aim, or policy we look at the words of the statute . . . But the plain-meaning rule is not rigid."); *California Teachers Assn. v. San Diego Community College Dist.*, 28 Cal.3d 692, 710 (1981) (*en banc*) ("The Plain Meaning

---

[2]     "ICSP" refers to Interactive Computer Service Provider, under the Maryland Statute. "EMSP" refers to Electronic Mail Service Provider under the California Statute.

Rule fortunately has been discredited.  We should not now concoct a new rule . . . that relentlessly will lead us to the kinds of vagaries and absurdities that the discredited rule helped effect."); *People v. Arnold*, 6 Cal.App.4th 18, 24 (1992) ("Even if the language of the statute is unambiguous, it '"should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend"' (citation omitted).)

First, as BSI's own witnesses admitted, a literal interpretation of the State statutes would erase all statutory distinction between "recipient" and "service provider" by allowing anyone who has an internet connection and a cell phone to claim standing as an ICSP or EMSP.  (Op. Br. at 27-28.)  Under BSI's theory, Mr. Baldridge may sue on emails his neighbor received through the wireless internet connection Mr. Baldridge provided.  (6/20M, P. Wagner at 41-42.)  Not to be outdone, Mr. Graham could sue for emails transmitted through an internet connection he provides others through a Bluetooth device.  (6/20A, P. Resnick at 49-52.)  Under neither scenario would Mr. Baldridge or Mr. Graham in any way be adversely affected by the emails on which it sued, yet in BSI's view of the world the State statutes would allow them both to recover $1,000 for every email for which they were an intermediary.  For that matter, according to BSI, they could recover multiple times on the same email.

Second, BSI's proposed interpretation of the statutes is contrary to one of the most fundamental principles of our jurisprudence – that access to the courthouse be limited to those who have suffered a legitimate injury.  On this point, BSI certainly deserves credit for its candor. It makes no attempt to downplay the actual nature of its claims, but rather openly admits that it thinks the Court should construe the statutes to allow "opportunistic plaintiff[s] who [have] suffered no real injury" (BSI Mot. at 29) to do exactly what BSI has done here – manufacture claims for millions of dollars of statutory damages based on self-inflicted and otherwise

avoidable harms.  But therein lies the problem.  Absent a threshold *bona fide* requirement to separate genuine from disingenuous claims, BSI's interpretation would "turn the statute[s] into a veritable financial bonanza for litigants," like BSI, unaffected by the statutory violations they allege.  Such an interpretation not only violates fundamental principles of common law the statutes are presumed to incorporate, it is contrary to the meaning and purpose of the State statutes construed as a whole.  (*See* Arg. I.B.)

Implicit in the jury's Phase II verdict is that BSI failed to establish that it was in any way harmed or otherwise affected by the Defendants' emails at issue.  (Op. Br. at 35-38.)  There is no evidence that BSI's alleged receipt of those emails was the result of, or in any way related to, its nominal provision of internet-related services to alleged customers, nor is there any evidence that the email servers it used to route and collect the alleged emails at issue (namely, the "Mini-Mac" Paul Wagner bought from his brother for $1) were used for any other purpose than to collect the spam on which BSI sues.  Absent such a nexus between Defendants' emails and BSI's provision of email-related services, BSI cannot, as a matter of law, establish the "ISP-type harm" necessary to have standing, *Gordon*, 573 F.3d at 1049, 53, or for that matter qualify as an EMSP or ISCP under any definition of the State statutes.  Accordingly, as we address in Arg. § II, below, even under its own interpretation of the statute, BSI failed to demonstrate that it is an EMSP or ICSP for purposes of its claims in this case.

**ARGUMENT**

I.     **THE ONLY SENSIBLE INTERPRETATION OF THE STATE STATUTES CONSISTENT WITH ESTABLISHED PRINCIPLES OF STATUTORY CONSTRUCTION IS TO LIMIT STANDING TO *BONA FIDE* PROVIDERS GENUINELY AFFECTED BY STATUTORY VIOLATIONS.**

      **A.     BSI Incorrectly Asserts That The "Plain Meaning" Rule Alone Must Govern The Court's Statutory Analysis.**

The plain meaning rules does not apply in this case, and BSI ignores other well-established principles of statutory construction that do. Specifically, the statutes at issue are not unambiguous, and the incorporation of a *bona fide*, genuinely affected requirement is consistent with the statutory language, legislative intent, public policy, and common sense, and does not implicate separation of powers.

      **1.     Applicable Rules Of Statutory Construction BSI Ignores.**

First, it is a fundamental principle of statutory interpretation that the plain meaning rule may be invoked only where the statutory language at issue is clear and unambiguous. *Anderson v. Council of Unit Owners of Gables on Tuckerman*, 404 Md. 560, 571-72 (2008); *Maryland-Nat'l Capital Park & Planning Com'n v. Anderson*, 395 Md. 172, 182 (2006); *Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 33-34 (2007). California courts have begun abandoning the "plain meaning" rule altogether. *See California Teachers Assn. v. San Diego Community College Dist.*, 28 Cal.3d 692, 710 (1981) (*en banc*) ("The Plain Meaning Rule fortunately has been discredited. We should not now concoct a new rule . . . that relentlessly will lead us to the kinds of vagaries and absurdities that the discredited rule helped effect."); *People v. Arnold*, 6 Cal.App.4th 18, 24 (1992) ("Even if the language of the statute is unambiguous, it should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend")(citation and quotations omitted).

BSI's brief does not address this basic requirement of the rule, but simply presumes without saying so that the State statutes' definitions of ICSP and EMSP are unambiguous.  That is plainly not the case, as discussed at length in our Opening Brief.  (Op. Br. at 25-27.); *Cf. Gordon*, 573 F.3d at 1049, 53 (concluding that CAN-SPAM's comparable definition of internet access service provider to be "nebulous" and "ambiguous").  Accordingly, the authority on which BSI cites as support for its argument does not apply with these statutes.[3]

Second, not all statutory pauses are pregnant.  (BSI Mot. 22-27.)  To the contrary, courts have regularly cautioned against giving undue weight to statutory silence given the inherent uncertainty of what it means.  *See, e.g.*, *Burns v. United States*, 501 U.S. 129, 136 (1991) (rejecting claim that statute's failure to expressly state a notice requirement was dispositive: ("[n]ot every silence is pregnant.  In some cases Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said . . . In still other instances, silence may reflect the fact that Congress has not considered the issue at all."); *Dreyer's Grand Ice Cream, Inc. v. County of Alameda*, 178 Cal.App.3d 1174, 1181-82 (1986) (rejecting plaintiff's argument that statute's lack of limitations period "was evidence that no such limitation was intended" because it would "lead to an illogical

---

[3]     The cases BSI cites on this issue (BSI Br. pp.27-28) largely support Kraft's argument, and are in accord that the plain meaning rule applies only where the statute is unambiguous, and the proposed construction is consistent with its overall purpose.  *Sears,Roebuck & Co. v. Gussin,* 350 Md. 552, 561, 714 A.2d 188, 192 (1998) (recognizing that the plain meaning rule does *not* end the inquiry into legislative intent unless the plain meaning of the statute is both unambiguous *and* consistent with the broad purposes of the legislation); *State v. Brantner*, 360 Md. 314, 321, 758 A.2d 84, 88 (2000) ("if the words of the statute are ambiguous," then the court should ascertain  the Legislature's intent in the legislative history and other extraneous sources); *Guttman v. Wells Fargo Bank,* 421 Md. 227, 237, 26 A.3d 856, 861 (2011) (limiting the plain meaning rule to situations where the plain reading of an *unambiguous* statute disposes of the case at hand); *Chesapeake & Potomac Tel. Co. of Maryland v. Dir. of Fin. for Mayor & City Council of Baltimore,* 343 Md. 567, 579, 683 A.2d 512, 517 (1996) (plain meaning rule applies only where statutory language is "plain and unambiguous*"*).

and absurd result"); *Jackson v. State*, 408 Md. 231, 237-38 (2009) (statutory silence resulted in ambiguity requiring court to look to other indicia of legislative intent).  For the reasons explained below, *bona fide* and injury requirements are consistent with the statutory scheme as a whole.

Third, BSI's naked appeal to the separation of powers doctrine is misplaced.  A court's construction of ambiguous statutory language to infer or imply terms consistent with legislative intent, existing law, or common sense is fundamental to the judiciary's interpretive role, and in no way implicates the separation of powers doctrine.  "It is not judicial legislation for courts to construe acts according to their obvious intent and meaning, considering the purpose of their enactment.  That is one of the cardinal rules of construction of statutes.  *Real intent must prevail over literal intent.*"  *Cohen v. Goldstein*, 58 Md.App. 699, 715 (1984) (quoting *State v. Petrushansky*, 183 Md. 67, 71 (1944)) (emphasis in original)); *People v. Ventura Refining Co.*, 204 Cal. 286, 290 (1928) ("Where the interpretation claimed leads to . . . absurd consequences, the general terms used in a statute will be limited in their scope so as to avoid such a result.")

## 2. California And Maryland Courts Routinely Infer Statutory Terms Or Conditions To Give Statutes Reasonable Interpretations.

Contrary to BSI's claim, Maryland and California case law is replete with examples in which courts have inferred or implied statutory terms or conditions necessary to give the statutes a reasonable interpretation consistent with legislative intent.  Examples include:

California:

The California case most directly on point is *Starbucks Corp. v. Superior Court*, 168 Cal. App. 4th 1436 (2008).  At issue there was whether two plaintiffs had standing under a provision of the California Labor Code prohibiting employers from asking job "applicants" generally to disclose marijuana-related convictions, despite neither applicant having ever been convicted of such an offense.  *Id.* at 1444.

The *Starbucks* plaintiffs brought suit on behalf of a putative class, alleging that the company's application contained a *per se* "illegal question" about prior marijuana convictions. The plaintiffs claimed that the "plain meaning" of "applicant" made irrelevant whether an applicant had actually been convicted of a marijuana offense.  Accordingly, they claimed that by the act of applying for a position alone they were "automatically entitled to a minimum of $200 simply because they filled out the job application."  *Id.* at 1440, 1448, 1452.

The appellate court flatly rejected these arguments and dismissed the plaintiffs' claims for lack of standing.  Central to the court's decision was its finding that despite the statute's supposed "plain meaning" it implicitly required, for statutory standing, that the plaintiff must be an "aggrieved persons with an injury the statute was designed to remedy." *Id.* at 1440 ("Nothing in the statute [] authorizes job applicants to recover $200 per person without proof they were aggrieved persons with an injury the statute was designed to remedy.")  Otherwise, the court acknowledged, a literal interpretation would lead to the absurd consequence of "turn[ing] the statute into a veritable financial bonanza for litigants like plaintiffs who had no fear of stigmatizing marijuana convictions," *Id.* at 1449:

> Under well-settled rules of statutory construction, we resolve [ambiguities] according to the usual, ordinary import of the language, and to avoid absurd consequences, including an unconstitutionally excessive penalty.  It is a well-settled maxim of statutory construction that a statute is to be construed in such a way as to render it reasonable, fair and harmonious with [its] manifest [legislative] purposes . . . and the literal meaning of its words must give way to avoid harsh results and mischievous or absurd consequences.
>
> Applying these principles of statutory construction, we ***narrowly interpret*** [§ 432.7(c)] in accordance with the traditional principle that the applicant be a person who has been ***aggrieved*** by the statutory violation.  Any other construction would produce the absurd result of turning the statute into the veritable "adding machine" that has been decried by our Supreme Court . . . .  If the legislatures . . . intended to confer a right to automatic damages upon all job applicants, regardless of actual injury, we doubt they would have been so opaque in their draftsmanship.

9

*Id.* at 1449, 1451-52. (emphasis added) (citations and quotations omitted.)  A contrary outcome, the court observed, would impermissibly sanction "'the use of the very process of litigation to precipitate payoffs by private businesses for alleged violations of having no real relationship to a true public interest.'"  *Id.* at 1451 (citation omitted) ("There are better ways to filter out impermissible questions on job applications than allowing "lawyer bounty hunter" lawsuits brought on behalf of tens of thousands of unaffected job applicants.")

Similarly, in *Ventura County Ry. Co. v. Hadley Auto Transport*, 38 Cal. App. 4th 878 (1995), the court addressed an equally broad standing provision under the Americans with Disabilities Act.  There, the court denied ADA standing to a railroad despite the fact it fell within the literal definition of "any person" under the ADA's standing provision.  *Id.* at 880-81.  The court concluded that, while "[t]here may be nothing expressed in the enforcement section of the ADA to eliminate such a conclusion," construing the Act to grant the railroad standing "would surely lie well outside the boundaries of common sense.  A statute must be construed to render it reasonable; the literal meaning of its words must give way to avoid absurd consequences."  *Id.* at 881.

The California Supreme Court in *Jones v. Lodge at Torrey Pines Partnership*, 42 Cal.4[th] 1158 (2008) is in accord.  The court held that individual supervisors are not subject to liability for retaliation under the Fair Employment Housing Act, despite the language of the statute holding liable any "person" who engages in retaliation.  The court rejected plaintiff's arguments that the statute's "plain language – specifically, the use of the word 'person' . . . to describe who may not retaliate – compels the conclusion that all persons who engage in prohibited retaliation are personally liable," and that the court "must follow the plain meaning without engaging in other kinds of statutory interpretation."  *Id.* at 1162.  In doing so, the court expressly overturned

several appellate court decisions that had adopted the literal interpretation of the statute the plaintiff sought. *Id; see also Solberg v. Municipal Court*, 561 P.2d 1148, 1160 (Cal. 1977) (construing statute to imply requirement not expressly stated: "Although our statute does not call for a specific allegation of the affiant's good faith, we have repeatedly held that the motion nevertheless 'requires a good faith belief . . .'"); *Peery v. Superior Court*, 633 P.2d 198, 202 (Cal. 1981) (same).

<u>Maryland</u>:

Maryland case law is in accord. In *Pan American Sulphur Co. v. State Dep't.*, 251 Md. 620 (1968), the Court of Appeals held that the statutory phrase "used . . . in connection with manufacturing" implied the requirement that the plaintiff "must be the one using the property for manufacturing purposes." *Id.* at 625 (supplier not entitled to exemption). Addressing the same argument BSI makes here, the court observed that "[i]t may be contended that this Court is reading something into . . . the ordinance which is not there . . . However, if the ordinance is not so construed, an almost absurd result is reached . . . One of the cardinal rules of statutory construction is that wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences." *Id.* at 626.

And in *Cohen*, 58 Md. App. 699 (1984), the court was confronted with whether the mandatory retirement ages for state court judges also applied to masters, even though the constitutional and statutory provisions requiring judges to retire at age 70 did not cover them. Similar to BSI's claim here, the plaintiff's argument there was "simple and direct. There is nothing in the law, says he, that required him to retire at age seventy." *Id.* at 704. The court framed the argument presented as follows: whether, given the absence of any statutory language to the contrary, "under any rational hypothesis the General Assembly could possibly have

intended to confer on these ministerial employees of the court a benefit that neither they nor the judges then enjoyed.  We think not."  *Id.* at 715 ("This is not a novel doctrine . . . '[s]tatutes are to be construed reasonably and with reference to the purpose to be accomplished.  Results that are unreasonable, illogical, or inconsistent with common sense should be avoided.'") (citations omitted).  *See also Jones,* 378 Md. at 118 (turning to common law where statute silent as to standing requirement for wrongful death action: "because no current Maryland rule or statute covers standing to bring a wrongful death action . . . the issue would logically seem to be governed by Maryland common law standing principles"); *Jackson*, 408 Md. at 237 (statutory silence as to whether death of appellate panel member required panel to be disolved resulted in ambiguity requiring Court to look beyond statutory language).

\* \* \*

As these and many other decisions (Op. Br. at 24-25) reflect, the rules of statutory construction are simple.  If a statute is clear and unambiguous, its "plain meaning" should be applied.  If ambiguous, or if a literal interpretation would lead to an absurd or nonsensical result, courts must look to other sources of legislative intent, including other statutory provisions, legislative history, common law and public policy, necessary to give the statute a reasonable and common-sense construction.  Here all of these considerations support the application of a *bona fide*, genuinely affected requirement in the statutes at issue.

12

**B.      A *Bona Fide* Requirement Is Consistent With Related Statutory Provisions, Common Law, And Federal Preemption.**

      **1.      That The State Legislatures Intended To Limit Standing To *Bona Fide* Providers Adversely Affected, Is Implied By The Statutes' Damages Provisions.**

It is a well-established principle of statutory construction that, unless a contrary intent is clearly expressed, statutory terms are to be construed in accordance with settled principles of common-law.  *Busching v. Superior Court of Ventura Co.*, 524 P.2d 369, 374 (Cal. 1974) ("it is not to be presumed that the legislature . . . intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication"); *Hardy v. State*, 301 Md. 124, 131 (1984) ("statutes are not to be construed to alter the common law by implication"); *Wright v. State*, 24 Md.App. 309, 319 (1975) ("[A] legislative change in the common law should never be presumed except where the change is specifically and plainly pronounced by the legislature.")  Statutes that are "in degradation of the common law are strictly construed."  *Gleaton v. State*, 235 Md. 271, 277 (1964); *Mackie v. Mayor of Comr's of Town of Elkton*, 265 Md. 410, 418 (1972) ("[A]ny statute permitting such operations would be in derogation of the common law. Nothing is more firmly established than the rule that such statutes must be strictly construed.")

BSI's claim here is in the nature of tort and, therefore, must be construed in accordance with common-law principles of tort law.  *MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md. App. 481, 528 (2006) (claims under Maryland's Commercial Electric Mail Act ("CEMA") are tort in nature); *Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 352 (4th Cir. 2006) (state anti-spam statutes must be construed in accordance with traditional tort law); *Beyond Systems, Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 16 (2005) (CEMA was enacted to "provide[] for a private cause of action to seek redress for tortious injury arising from

13

the receipt of misleading or fraudulent, unsolicited, commercial email.")  The common law

generally, and tort law in particular, require a showing of injury and an aggrieved victim.  *E.g.,*

*Jones*, 378 Md. at 118 ("Under Maryland common law, standing to bring a judicial action

generally depends on whether one is "aggrieved" . . . .)[4]

The concept of injury and an aggrieved victim ties directly into the State statutes use of

the term "damages."  Because statutes must be construed as a whole, the State statutes' standing

provisions must be read in conjunction with their damages provisions.  *See*, *e.g.*, *Anderson v.*

*Council of Unit Owners of Gables on Tuckerman Condo.,* 404 Md. 560, 572 (2008); *Palos*

*Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist.*, 21 Cal.3d 650, 659 (1978);

*Ford Motor Land Dev. v. Comptroller*, 68 Md. App. 342, 346-47 (1986).  The Maryland statute

provides that: "A person who violates this subtitle is liable for reasonable attorney's fees and for

damages . . . (3) To an interactive computer service provider, in an amount equal to the greater of

$1,000 or the interactive computer service provider's actual damages."  MD. CODE COM. LAW §

14-3003(3)  The California statute similarly states:  "A person or entity bringing an action . . .

may recover either or both of the following: (i) Actual damages.  (ii) Liquidated damages of one

thousand dollars ($1,000 for each unsolicited commercial e-mail advertisement transmitted in

violation of this section . . . ."  CAL. BUS. PROF. CODE § 17529.5 (a)(b)(1)(B).

Both statutes, therefore, define the statutory penalties they provide as "damages," a term

that denotes the existence of "injury" within the context of tort law.  The Restatement of Torts

defines "damages" as "a sum of money awarded to a person injured by the tort of another."

Restatement (2d) of Torts § 902 (explaining in comments that "[d]amages flow from an injury").

---

[4]        Indeed, under the Fourth Circuit's analysis in *Omega World Travel, Inc.*, 469 F.3d at 354, an action that is not grounded in tort and the common law would be preempted under CAN-SPAM.

Black's Law Dictionary gives a similar definition:  "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury."  BLACK'S LAW DICTIONARY (8th ed. 2004); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2008) (defining damages as "1: loss or harm resulting from injury to person, property, or reputation.  2: *plural*: compensation in money imposed by law for loss or injury.")  As the California Supreme Court observed in *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1267 (Cal. 1990), "[w]hatever their semantic differences, the statutory and dictionary definitions of 'damages' share several basic concepts. Each requires there to be 'compensation' in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has suffered through the acts of another."

The Maryland and California statutes, therefore, contemplate proof of "injury" as an element of recovery.  The Maryland Court of Appeals agrees.  The court observed, in the context of a BSI lawsuit against Realtime Gaming, that CEMA was enacted to "provide[] for a private cause of action to seek redress for tortious injury arising from the receipt of misleading or fraudulent, unsolicited, commercial email."  *Beyond Systems, Inc.*, 388 Md. at 16 (2005) (emphasis added).

The State Legislature's specific use of the term "damages" – *i.e.*, "injury", "loss", or "detriment" – to describe its remedies carries with it far more weight than the statutory "silence" on which BSI relies.[5]  *Baltimore Nat'l Bank v. State Tax Comm'n of Maryland*, 297 U.S. 209, 215 (1936) (specific statutory terms covering a subject matter prevail over general language of the same statute).  BSI's proposed construction would require the Court to redefine "damages" to

---

[5]     The fact the California statute uses, in addition to "actual damages," the phrase "liquidated damages" to describe its statutory penalty is of no consequence.  Liquidated damages are defined by Black's as the "reasonable estimation of ***actual*** damages."  Black's Law Dictionary (7th ed. 1999) (emphasis added).  Implicit in this definition, therefore, is the requirement that any plaintiff entitled to liquidated damages must have suffered actual damages.

be inconsistent with the established understanding of "damages" and "injury" within the common law of torts.

Accordingly, the State statutes plainly include the same type of "*bona fide*" and "adversely affected" requirement for standing for service providers under CAN-SPAM.  As *Gordon* recognized, given that ISP's are not end recipients of the email they deliver, the adverse effect necessary to support standing must be both "real" (*i.e.*, the plaintiff must be a *bona fide* service provider) and of the type "uniquely encountered by IAS providers."  *Gordon*, 575 F.3d at 1053-54 (holding that such harm includes "network crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades").  BSI's claim that it has standing as an EMSP or ICSP fails on both accounts.

### 2. Defendants' Interpretation Of The Terms EMSP and ICSP Is Supported By Related Enactments Of The State Statutes.

Defendants' interpretation of EMSP and ICSP to require a *bona fide*, adversely affected component to standing is also supported by related provisions of the California and Maryland enactments.

### a) CEMA And The Maryland Consumer Protection Act.

BSI claims that § 13-408 of the Maryland Consumer Protection Act ("MCPA") – amended shortly after CEMA's enactment to limit "standing . . . to those who suffer actual injury" – supports by negative inference a broad interpretation of CEMA's standing provision. BSI Mot. 24-25; MD CODE COM. LAW § 13-408(a) ("Any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.")  According to BSI, the fact the General Assembly did not similarly amend CEMA to expressly state the same injury-in-fact requirement must be construed to mean it did not intend such a requirement for anti-spam claims.  BSI has it exactly backwards.

It is axiomatic that, absent a clear legislative intent to the contrary, related statutes covering the same subject matter must be read consistently by giving them the same meaning. To that end, under the rule of statutory construction *in pari materia*, "statutes addressing the same subject matter should be read as if they were one law." *New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 249 (4th Cir. 2012) (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)); *see also Ball v. University of Md.*, 137 Md.App. 229 (2001) (statutes that relate to same general subject matter should be construed together to harmonize with each other and be consistent with their general object, even though they were passed at different times and contain no reference to each other). This rule plainly applies here.

CEMA appears under Title 14 of the Maryland Commercial Law, which is entitled "Miscellaneous Consumer Protection Provisions." *See* MD. CODE COM. LAW§ 14-3001, *et seq.* It is clear from Title 14's structure, purpose and subject matter that the General Assembly enacted its provisions to be an extension of and supplement to the Maryland Consumer Protection Act's general proscriptions against "unfair or deceptive trade practices." CEMA's own legislative history makes this point clear with respect to email practices by referencing the MCPA's general provisions governing deceptive trade practices that it intended CEMA to supplement. *See* BSI Mot. Ex. 1, Floor Report, House Bill 915, Commercial Law – Electronic Mail – Prohibitions at 2 ("Background: No provision [of the MCPA] specifically prohibits the transmission of misleading email. However, under the Maryland Consumer Protection Act, a person may not engage in any unfair or deceptive trade practice in . . . (2) the offer for sale . . . of any consumer goods . . . or consumer service.");[6] *see also* MD. CODE COM. LAW § 13- 301 (1),

---

[6]      BSI's claim that CEMA's legislative history supports its interpretation insofar as it states that a violation of the statute "occurs 'regardless of whether a consumer in fact has been misled, deceived, or damaged as a result of the practice'" is meritless. First, the language BSI quotes

(9) (defining unfair or deceptive trade practices to include false or misleading statements "of any kind" that have the capacity or effect of deceiving or misleading consumers" and "deception, fraud, false pretense, false premise, [or] misrepresentation . . . in connection with: (i) The promotion or sale of any consumer goods . . . or consumer service").  In that regard, the Court of Appeals in *Beyond Systems* acknowledged that CEMA "was enacted . . . in an effort to curb the dissemination of false or misleading information through unsolicited, commercial email, as a deceptive business practice."  *Beyond Systems*, 388 Md. at 16.

The Court cannot conclude that, because the General Assembly did not similarly amend CEMA when it added the MCPA's standing requirement, CEMA's standing was intended to be broader.  Indeed, because both statutes are part of the same legislative scheme, a more compelling inference is that the General Assembly did not independently amend CEMA, or any of Title 14's 38 other sub-titles relating to "consumer protection," because it either intended the MCPA's new standing requirement to apply to them as well, or believed that it already did – as reflected with CEMA by its use of the language "damages" (*i.e.*, injury, loss or detriment) that paralleled the same language the General Assembly incorporated into the MCPA.  *See* MD CODE COM. LAW § 13-408(a) ("Any person may bring an action to recover for *injury or loss* sustained

---

was referring to the MCPA, prior to its amendment, not CEMA.  The legislative history that BSI quotes makes clear that CEMA was to be interpreted consistently with the MCPA.  After the passage of CEMA, the MPCA was amended to add the injury in fact standing requirement.  Second, such an expansive interpretation of CEMA would be preempted by CAN-SPAM, as discussed in our Opening Brief and below in Arg. § I.C.  *See Omega*, 469 F.3d at 353-355 (preempting state prohibitions not based on traditional common-law tort theories of fraud and misrepresentation); *Gordon*, 575 F.3d at 1064 (CAN-SPAM preempts state claims not based on "traditionally tortious or wrongful conduct").  Finally, the referenced legislative history dealt with the requirement of reliance.  Even if not preempted, the absence of reliance as part of a claim is not inconsistent with, nor does it exempt a plaintiff from, the requirement that an ICSP prove "ISP-type" harm to recover.  Indeed, such a broad interpretation of CEMA's substantive cause of action would make a showing of ISP-related injury all the more imperative given the opportunity for mischief it would otherwise create.

by him as the result of a practice prohibited by this title.")  If the General Assembly had intended

to exclude from CEMA the long-standing common-law requirement that tort plaintiffs must as

an element of standing show a loss, detriment, or injury, it would have made that intent clear.

*See Whitman v. American Trucking Assn's, Inc.*, 531 U.S. 457, 468 (2001) (legislatures should

not be presumed to have changed existing law with "vague terms or ancillary provisions";

Congress does not "hide elephants in mouseholes.").

Indeed, it would be entirely incongruous for one part of a related statute (the MCPA) to

require "injury or loss" to bring an unfair or deceptive trade practices claim, but not another

(CEMA) intended to address the same basic claim, particularly when the General Assembly

enacted that standing provision to prevent lawsuits by "aggressive plaintiffs  . . . not personally

harmed by the prohibited conduct . . . 'as self-constituted private attorneys general,'" or from

using the statute as a "powerful weapon" "for harassment and improper coercive tactics.'"  *Lloyd*

*v. General Motors Corp.*, 916 A.2d 257, 280 (Md. 2007)(citations omitted).  Nothing in CEMA's

language or legislative history demonstrates that the General Assembly intended to exempt

plaintiffs from the same standing requirements as the MCPA when pursuing the same basic

claim based on the same type of misconduct, *i.e.,* unfair or deceptive trade practices.

Moreover, *in pari materia* is not limited to statutes enacted by the same legislature, and

may apply as between state and federal statutes relating to the same subject matter.  *Davis v.*

*State*, 426 Md. 211, 214 (2012) ("We have read analogous provisions in our statute to be *in pari*

*materia* with [the Federal Omnibus Crime and Safe Streets Act], as interpreted by federal

courts."); *cf Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 621 (2002) ("state constitutional

provisions are *in pari material* with their federal counterparts").  This is critical given that the

MCPA expressly instructs Maryland courts to look to federal law, specifically the Federal Trade

Commission Act, for interpretive guidance.  MD. CODE COM. LAW § 13-105 ("It is the intent of

the General Assembly that in construing the term "unfair or deceptive trade practices", due

consideration and weight be given to the interpretations of § 5 (a)(1) of the Federal Trade

Commission Act by the Federal Trade Commission and the federal courts.")  Section 5(a)(1) of

the FTCA, 15 U.S.C. § 45 (a)(1), in turn states that "unfair methods of competition . . . and

unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.")

That leads here, of course, to CAN-SPAM, *Gordon*, and *Omega*.

CAN-SPAM was enacted as part of the same Title as the Federal Trade Commission Act

(Title 15, "Commerce and Trade"), and is enforced by the FTC.  15 U.S.C. § 7706(d) ("all

applicable terms and provisions of the Federal Trade Commission Act [are] incorporated into

and made a part of this chapter.  Any entity that violates any provision of that subtitle is subject

to the penalties  . . . provided in the Federal Trade Commission Act.")  The first sentence of the

Act's enforcement provision, Sec. 7706, states that it is intended to apply to the same subject

matter as the MCPA and CEMA:  a "[v]iolation is [an] unfair or deceptive act or practice."  15

U.S.C. § 7706(a).

CEMA was enacted 27 years *after* the General Assembly expressed its intent in Sec. 13-

105 that the MCPA be construed in accordance with federal law.  Because CEMA and the

MCPA are in effect "one statute," it must be presumed that this intent applies with equal force to

the MCPA's sister provisions of the Miscellaneous Consumer Protection statute, including

CEMA.  *See, e.g.*, *Ailers v. Tittsworth*, 269 Md. 677, 684 (1973) (General Assembly "is

presumed to have had, and acted with respect to, full knowledge and information as to prior and

existing law and legislation"); *Palisades Collection LLC v. Shorts*, 522 F.3d 327, 337 (4th Cir.

2008) ("Congress is presumed to know the current legal landscape against which it legislates").

Construing them together, the only reasonable interpretation of the two statutes is that the General Assembly intended courts to look to CAN-SPAM and federal case law to interpret its own anti-spam statute.

### b) The California Act And Proposition 64.

BSI's claim that Proposition 64 supports its construction of the California statute is equally without merit. To begin with, its suggestion that Prop. 64 did not amend the standing provisions of the CAL. BUS. & PROF. CODE'S false advertising statute (of which its anti-spam regulations are a part) is simply incorrect. *Morgan v. AT&T Wireless Services, Inc.*, 77 Cal.App.4th 1235, 1258 (2009) ("Proposition 64 made identical changes to the standing requirements to bring an action under the [False Advertising Law] as it made to the requirements under the [Unfair Competition Law]"). As with the UCL, Prop. 64 amended the provision of the FAL authorizing injunctive and other equitable relief to limit standing to plaintiffs who have "suffered injury in fact and ha[ve] lost money or property as a result of a violation of the [FAL]." CAL. BUS. & PROF. CODE § 17535. The amendment's intent, California courts have repeatedly acknowledged, was "to confine standing to those actually injured by a defendant's business practices." *Kwikset Corp. v. Superior Ct.*, 51 Cal.4th 310, 322 (2011); *see also Cattie v. Wal-Mart, Inc.*, 504 F. Supp.2d 939, 948 (S.D. Cal. 2007) (the purpose of Prop. 64 was to "curb abusive lawsuits by plaintiffs who had not suffered actual harm" by "forclos[ing] the ability of an 'unaffected plaintiff' . . . to bring frivolous lawsuits with no public benefit . . . .").

Prior to Prop. 64, the FAL expressly allowed suits by "private attorneys general" not affected by the statutory violations alleged. *See* Ex. 1, pg. 2, Text of Prop. 64, § 17325 (deleting previous language of statute authorizing claims for equitable relief by "any person acting for the interests of itself, its members or the general public"). In that regard, the FAL constituted an

express departure by the California Legislature from the traditional common-law tort requirement of injury-in-fact, which the California Legislature clearly articulated in the statute itself. PROSSER, THE LAW OF TORTS, § 108 at 714 (4th ed. 1971) ("The causal connection between the wrongful conduct and resulting damage [is] essential throughout the law of torts"). The California anti-spam statute, in contrast, did not. The statute was originally enacted in September 2003, two months before Prop. 64 abolished the FAL's private attorneys general standing provision, and did *not* express the same intent to deviate from the common law's injury-in-fact requirement that the FAL's general remedies provision did. The correct presumption, therefore, was that the California Legislature intended that standing under the anti-spam act be construed in accordance with traditional common law, which requires a showing of injury. *Busching*, 524 P.2d at 374 ("it is not to be presumed that the legislature . . . intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication"); *Wright* 24 Md.App. at 319 ("[A] legislative change in the common law should never be presumed except where the change is specifically and plainly pronounced by the legislature.")

This point is critical and applies with equal force to the relationship between CEMA and the MCPA discussed above. If the anti-spam statute and FAL's general remedies provision are to be construed separately, as BSI suggests, the anti-spam statute's silence must be construed to mean that the pre-Prop. 64's private attorneys general standing provision was never intended to apply to it.[7] Otherwise, the California Legislature would have expressly stated its intent to

---

[7]     For this reason, the only California court to address this this, the federal district court in *ASIS Internet Serv. v. Subscriberbase, Inc.*, 2010 WL 1267763, *7 (N.D. Cal. April 1, 2010), was wrongly decided. There are several problems with *ASIS*. With respect to this issue in particular, the court merely assumed the premise of BSI's argument – *i.e.*, that because the anti-spam statute is silent on the point the Prop. 64 standing amendments do not apply – without any reasoned

depart from the common law, as would have the General Assembly with respect to CEMA.  By amending the statutes' general provisions to abolish suits by unaffected plaintiffs, the California Legislature and General Assembly did not add a new requirement to the statutes, but simply expressed their intent that the FAL and MCPA be realigned with traditional tort law. Conversely, if the States' general consumer protection provisions and anti-spam regulations are construed together as part of the same statutory scheme – as we believe the rules of statutory construction require – the injury-in-fact standing requirements of the general consumer protection provisions plainly apply to the anti-spam statutes.[8]  In either case, the result is the same.  BSI must establish that it was adversely affected by the statutory violations alleged to have standing.

**3.      BSI's Interpretation Is Inconsistent With, And Its Claims Barred By, The Common Law Principle *Volenti Non Fit Injuria*.**

Construing the State statutes to create what in effect would be a *per se* cause of action to the benefit of opportunistic plaintiffs like BSI would, in the absence of an express legislative mandate, also contravene the long-standing common law principle *volenti non fit injuria – i.e.*, "there is no injury to one who consents."  *Crews v. Hollenbach*, 358 Md. 627, 641 (2000).  This basic principle, that "no wrong is done to one who consents," resonates throughout tort law

---

statutory analysis or construction.  Its conclusion is inconsistent with the language of Prop. 64, established principles of statutory construction, and the many California decisions denouncing claims by unaffected plaintiffs.

[8]      Indeed, under either State statute it would be illogical to presume, as BSI asks the Court to do, that the State Legislatures intended to impose more stringent standing requirements on general consumers seeking equitable relief, than on EMSPs or ICSPs seeking millions of dollars in statutory damages.  *Consumer Defense Group v. Rental Housing Indus. Members*, 137 Cal.App.4[th] 1185 (2006) (denouncing "shake-down" lawsuits by plaintiffs not affected by the statutory violations they alleged); *Starbucks*, 168 Cal.App.4th at 1449 ("[W]e decline to adopt an interpretation of statute's standing requirements that would turn the statute into a veritable financial bonanza for litigants like plaintiffs.")

generally, and is manifested in the common-law doctrines of consent and assumption of the risk. *Janelsins v. Button*, 102 Md.App. 30, 40-42 (1994) ("[T]he distinctions between the doctrines of assumption of the risk and consent are only semantic" and "the two doctrines substantively amount to flip sides of a single conceptual principle.")  The purpose and effect of both doctrines are the same – to bar claims where the plaintiff has given his "consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone."  *Travernier v. Maes*, 242 Cal.App. 532, 583 (1966) (quoting PROSSER, LAW OF TORTS (3d ed. 1964) p. 450); *Janelsins*, 102 Md.App. at 40-41 (1993; Restatement (2d) of Torts, § 496A, comments b-c, § 892, comment a.

To allow BSI standing here would abrogate these venerable common law principles, which date back to English common law.  Aimee M. Aceto, et al., *Recent Decisions:  The Maryland Court of Appeals – XIII. Torts*, 58 MD. L. REV. 1117, 1120 (1999) ("The assumption of the risk defense is embedded in early English common law and is defined most accurately by the maxim *volenti non fit injuria* which means, "[t]o one who is willing no harm is done.").  The undisputed facts demonstrating that BSI openly consented to and/or assumed the risk of receiving the emails at issue could not be more apparent from the record.  Contrary to all industry custom and practice, BSI intentionally accepted and archived indefinitely all incoming emails, knowing that 99% were spam.  (Op. Br. at 18.)  Paul Wagner made no effort to block or filter any of the emails at issue in this case, despite the relative ease and nominal expense of doing so.  (*Id.* at 7.)  He intentionally set his servers to receive spam emails that were not addressed to anyone in particular, knowing that these email advertisements would have otherwise been rejected by the email delivery software on his servers.  (*Id.* at 8-9.)  Finally, he refused to avail himself of contractual measures available to stop the emails, ignoring Kraft's

cooperation agreement with Hypertouch and instead suing on the same emails his brother Joe

had released under the agreement as well as others Joe forwarded BSI after his settlement with

Kraft.  (*Id.* at 16.)

These undisputed facts alone are basis enough to bar BSI's claims as a matter of law.

Op. Br. at 41-43; *Crews,* 358 Md. at 640 ("[A] plaintiff who voluntarily consents, either

expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from

exposure to that risk"); *cf Warner v. Markoe*, 189 A. 260, 264 (Md. 1937) ("assumption of the

risk defeats recovery because it is a previous abandonment of the right to complain if an accident

occurs"); *Schroyer v. McNeal*, 323 Md. 275, 283-84 (1991) ("[I]f a person of normal

intelligence, in the same position as the plaintiff, would clearly have comprehended the danger,

whether consent/assumption of the risk bars the claim is a question for the court.")

BSI's conduct, however, went far beyond simply not filtering out spam.  It is undisputed

that Paul Wagner *wanted* "to collect spam" and, to that end, knowingly agreed to accept the

transmission of spam from his brother Joe while taking additional, affirmative steps to collect

even more spam by, *inter alia*, posting on websites thousands of fictitious email addresses with

the hope and expectation that "spammers" would send emails to those addresses.  (6/26  J.

Wagner at 80-81, 170; Op. Br. at 7-12.)  This is the very definition of *volenti non fit injuria.*

Defendants are plainly entitled to judgment as a matter of law for this reason.  (Op. Br. at

41-43.)  But in all events, BSI's interpretation of the State statutes to allow it standing as a non-

*bona fide* service provider that manufactured its claims would violate the basic principle of

statutory construction requiring that statutes be interpreted to incorporate established common

law principles and doctrines.

### 4.      Given Their Penal Nature, The State Statutes Must Be Strictly Construed As A Matter Of Law.

BSI's overly broad definition is contrary to the well-known rule that statutes which are penal in nature must be strictly construed.  *See*, *e.g.*, *Connally v. General Constr. Co.*, 269 U.S. 385 (1926) (well-established maxim of common law that statutes penal in nature must be strictly construed); *Walnut Creek Manor v. Fair Employment & Housing Com.*, 814 P.2d 704, 734 (Cal. 1991) (same); *Hale v. Morgan*, 22 Cal. 3d 388 (1978) (same); *Starbucks Corp.*, 168 Cal.App. at 1450 (same); *Smith v. Higinbothom*, 187 Md. 115, 130 (1946) (same);  *Groh v. Cty. Comm'r. of Washington*, 245 Md. 441, 447 (1967)(same).

California courts in particular have repeatedly declined broad interpretation of civil statutes imposing burdensome statutory damages.  *Hale*, 22 Cal. 3d at 383 ("Uniformly, we have looked with disfavor on ever-mounting penalties and have narrowly construed the statutes which either require or permit them.")  In *Hale*, for example, the California Supreme Court vacated an award of $17,300 as unconstitutionally excessive by narrowly construing a civil statute providing for a $100 a day penalty to tenants whose landlords "deprived" them of utility services.  *Id.* at 385-86 (given the penal nature of the statute, "we adopt the narrowest construction of its penalty clause to which it is reasonably susceptible in light of its legislative purpose.")  In doing so, the court construed the statutory term "deprived" narrowly to exclude from plaintiff's damages any periods of time in which he did not suffer an actual injury.  *Id.* ("If for example, the tenant actually succeeds in restoring service, or, by reasonable effort, could have done so, he cannot thereafter be considered to have been 'deprived' of it.  Moreover, if the tenant abandons the premises permanently . . . or . . . is absent for substantial periods . . . the landlord's conduct can hardly be said to have 'deprived' the tenant of service at the premises . . . .").  Any other interpretation, the court concluded, would result in "[t]he exercise of a reasoned discretion

[being] replaced by an adding machine." *Id.* at 384; *see also Starbucks Corp.*, 168 Cal.App.4[th] at 1450 (observing that *Hale* "refused to sanction an interpretation that was wholly disproportionate to any discernible legislate goal:); *Balmoral v. Hotel Tenants Assn. v. Lee*, 226 Cal. App.3d 686, 695, 697 (1990) (ruling that, even though statutory term "actual damages" included mental anguish, refusing to automatically treble damages as required by statute because "the statutory context tends to favor a narrower meaning." "No doubt the chance of securing a windfall judgment might provide some incentive for representing low-income tenants, but such an aleatory incentive is offensive to the policy of equal justice); *Miller v. Collectors Universe, Inc.*, 159 Cal.App.4th 988, 1005-06 (2008) (rejecting plaintiff's claim he was entitled to statutory damages of $750 per violation for each of the 14,060 alleged unauthorized uses of his name because damages under the statute were "based upon the *injury* to the plaintiff" and were intended to compensate him for "the alleged injury to his mental feelings and peace of mind").

The Court of Appeal in *Tos  v. Mayfair Packing Co.*, 160 Cal. App. 3d 67 (1984), similarly applied the doctrine to reject a literal interpretation of a statute requiring that contracts for the sale of "edible nuts" expressly state the price to be paid because the plaintiff was not injured by the defendant's violation. *Id.* at 75. ("[S]tatutes which "impose[ ] a new and unusual liability which partakes of the nature of a penalty . . .  must be strictly construed in favor of the persons sought to be subjected to their operation." (citations and quotation marks omitted). Although the parties' contract violated the statute, plaintiff was nonetheless paid a "reasonable value" for his crop and, therefore, could not establish any resulting injury.  Rejecting plaintiff's argument that the statute expressly entitled him to "twice the reasonable value" of his crop, the court observed: "The language of a statute must be interpreted in a practical, common sense manner which will meet changed conditions and the people's growing needs. Obviously, the

"'literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers.'"  *Id.* at 78-79 (citations omitted).

The Maryland and California statutes here are unquestionably penal, imposing a penalty of up to $1000 per *each* unlawful email sent.  To avoid questions of constitutionality, therefore, the statutes must be narrowly construed.  *Hale*, 584 P.2d at 520 (excessive statutory penalty violative of substantive due process); *Connally*, 269 U.S. at 391 (penal statutes are construed narrowly to protect due process rights).  Granting unaffected, non-*bona fide* service providers that manufacture claims for the chance to recover tens of millions of dollars in statutory damages serves no "discernible legislative goal," and would impose a potential penalty disproportionate to any legitimate objective contrary to the requirements of substantive due process.  *Hale*, 22 Cal. 3d 388; *Starbucks*, 168 Cal.App.3d at 1450.

### C.     BSI's Proposed Interpretation Would Lead To Preemption.

Although we addressed the issue of federal preemption in our Opening Brief, we briefly raise the issue here again to emphasize the extent to which BSI's proposed interpretation of the State statutes is contrary to applicable rules of statutory construction.  *See*, *e.g.*, *Kleffman v. Vonage Holdings Corp.*, 49 Cal.4th 334, 346 (2010) (noting that statutes should be construed to avoid any doubt regarding their constitutional validity and rejecting broad interpretation of "misleading" under California anti-spam statute to include domain names that did not identify sender because, *inter alia*, it would "raise significant preemption problems" ).

The interpretation of CAN-SPAM's express preemption provision is governed in this Circuit by the Fourth Circuit's *Omega* decision, which stands for the proposition that, in order to survive preemption, state statutes regulating commercial email must be construed in accordance with traditional principles of tort law.  Plaintiff in *Omega* claimed that the Oklahoma statute

under which he brought his spam suit did not expressly require him to prove the existence of a "material" misrepresentation.  The Court rejected that argument, holding that claims based on *immaterial* misrepresentations would be preempted by CAN-SPAM.  *Omega*, 469 F.3d at 353-54.  Plaintiff's interpretation, the court reasoned, would "undermine[] to the point of near irrelevancy," the national standard that Congress intended to establish for the regulation of unsolicited email.  *Id.* at 355.

Injury as an element of any claim is well grounded in traditional tort law.  Accordingly, the "national standard" Congress intended CAN-SPAM to create, which requires a showing of materiality, also requires the showing of a "real" adverse impact to a genuine, *bona fide* service provider.  *Gordon* 575 F.3d at 1040, 1053-54.  BSI's attempt to circumvent this requirement is in direct conflict with the Fourth Circuit's decision in *Omega*.

## II.  THE JURY'S PHASE I VERDICT DID NOT ESTABLISH THAT BSI IS A *BONA FIDE* PLAINTIFF.

BSI's argument (BSI Motion §III, pp. 35-37) that the jury's findings in the Phase I constituted a finding of *bona fide* status in Phase II is nonsensical because (i) the jury was not asked to make such a finding, (ii) Defendants were not allowed to introduce substantial evidence about the arrangement that the Wagner brothers had to harvest spam and then multiply claims, and (iii) Defendants were not allowed to mention BSI's litigation activities in Phase I, let alone discuss the two dozen lawsuits it had conspired with Hypertouch over the past several years.  Contrary to BSI's claim, the evidence that was so damaging to BSI in Phase II, and which Defendants were restricted or limited in introducing in Phase I, were the emails and testimony that showed that the Wagner brothers were attracting, collecting and processing spam, and then forwarding it to one another in order to bring multiple claims on the same email.  (Op. Br. at 7-12.)  This evidence went far beyond simply showing that BSI and Hypertouch were a litigation

factory.  It showed that BSI and Hypertouch were not in any way burdened by the spam.  To the contrary, they wanted the spam and complained to one another when "fraudulent" email were being "bounced" by spam filters, or the spam was not "flowing" from one brother to another.  (Op. Br. at 11-12.)  Moreover, the evidence introduced in Phase II and not allowed or restricted in Phase I showed that the greatest burden to BSI's servers from spam was attributable to Hypertouch intentionally forwarding spam that it received to BSI.  (Op. Br. at 9-11.)  This evidence, among other evidence, was only permitted in Phase II, and it illustrated the scheme that BSI, Hypertouch and the Wagner brothers were engaged in and convinced the jury that BSI was not a *bona fide* service provider and did not suffer any real harm from the spam they were exchanging among each other.[9]

### III.    BSI FAILED TO ESTABLISH IT QUALIFIES AS AN EMSP OR ICSP UNDER ITS OWN THEORY OF THE CASE.

 BSI has not met its burden under even the minimalist definition it claims governs the standing analysis.  The definitions of EMSP under the California Act and ICSP under CEMA use the terms "service provider."  The California Act further makes clear that the type of service that must be provided is email service.  Although the ICSP does not refer to email service, it is both illogical and inconceivable that the Maryland Legislature intended to give standing to a company that had nothing to do with email when the statute's purpose is to protect against false and misleading email.  Accordingly, to have standing, BSI must be (i) a "service provider" with respect to (ii) email.

---

[9]     BSI's assertion that its litigation activities are not relevant as a matter of law and policy has been rejected by this court multiple times.  Nevertheless, BSI's litigation activities were not the only facts introduced in Phase II.  As explained, in Phase II Defendants were allowed to describe the entire scheme, including, for the first time, how BSI and Hypertouch sent spam to each others' servers in order to multiply claims.

Both the California Act and CEMA were intended to remedy harm suffered as a result of processing spam while acting as a "service provider."  Thus, in order to have standing under both state statutes, BSI must be (iii) affected by spam while providing email service to its customers. For example, assume that BSI has two email servers, one server is for processing customer email and the other is for exclusively servicing Paul Wagner's email.  Assume, further, that the server that BSI uses for providing email service to its customers is not burdened by spam, and that the only spam BSI processes comes through the server that handles Paul Wagner's email.  In such a situation, the service provided to customers is unrelated to the email received, and BSI should not be allowed standing to bring a claim because it did not suffer any impact as a result of it being an alleged "service provider."  Its only impact was as a provider of a service to itself. There is no reasonable interpretation of "service provider" as a provider of service to oneself.[10]

Although in the context of the two statutes at issue no case has addressed whether BSI must prove that the injury or burden it suffered was the type the statutes were intended to remedy, this concept is well founded in the law.  For example, in *Starbucks Corp.*, 168 Cal. App. 4th at 1440, discussed above, in construing the standing requirement of a California employment law, the Court stated that plaintiffs must be "aggrieved persons with an injury the statute was designed to remedy."  Similarly, under the Federal Antitrust Laws, the Supreme Court has repeatedly held that in order to bring a claim, the plaintiff must show more than mere injury; it must show "antitrust injury."  In other words, it must be the type of injury the antitrust laws were

---

[10]      In both statutes, the Legislatures clearly intended there to be a meaningful distinction between "service providers" and mere "recipients" of unsolicited emails by distinguishing between them.  If BSI could qualify as a "service provider" by providing a service to itself then anyone could qualify as an EMSP or ICSP and  the distinction between "service provider" and "recipient" in the statutes would be meaningless.. (*See* Op. Br. 28-29.)

intended to guard against.  *See, e.g., Brunswick Corp. v. Pueblo Bow-O-Mat, Inc.,* 429 U.S. 477, 488 (1977).  *See also State Farm Mut. Auto Ins. Co. v. DeHaan*, 393 Md. 163, 188 (2006) (limiting the application of Maryland's Uninsured Motorist Act to the type of injuries contemplated by the Act).

BSI has not and cannot satisfy the necessary elements for standing: that it suffered harm as a "service provider" of email services to customers.  In fact, BSI spends twelve pages describing all of the internet services that it provides to customers, which have nothing to do with email, such as web hosting and file transfer protocol services.  *See* BSI's Motion, pp. 7-19. It is inconceivable how BSI could have standing to challenge spam under either State's statute, if all it provides is web hosting services or FTP services, yet that is BSI's position.  Moreover, BSI never even tries to show that it suffered any impact as a result of providing these services.  All of the evidence it cites is simply immaterial to the issue of standing.[11]

The only evidence that is material to standing is the provision of email services by BSI to customers, and whether BSI suffered any harm or was burdened by Defendants' spam in providing those services.  BSI discusses the email services it provides in its Motion, §I.A.1.a, pp. 4-7.  Nowhere in the evidence that BSI references, however, is there any mention that it suffered an impact from Defendants' purported spam in providing email services to BSI's customers.  For example, BSI cites several clients for whom it provides email services, including hosting email in-boxes, but nowhere does BSI reference any evidence that it was burdened by spam from Defendants in hosting the email in-boxes.  Accordingly, even if BSI can show that it was a

---

[11]    The irrelevant and immaterial evidence on which BSI relies includes the following: web hosting, redirection services, DNS services, streaming media, e-commerce, internet access, and file transfer protocol services.  (*See* BSI's Motion, pp. 7-12.)  None of these services involve the processing of email for customers and none involve any impact on BSI in providing email service to BSI customers.  Accordingly, none of this evidence supports BSI's standing.

provider of email services to customers, it did not show that it suffered any impact as a by-product of the provision of those services.  In other words, it cannot show and has not shown the type of harm the statutes at issue were intended to address.  Therefore, it has no standing to bring this claim.

What BSI did show is that it intentionally solicited, collected and mined email directed to the many fictitious email address that the Wagner brothers set up to attract spam.  BSI was not burdened by spam in providing email services as a service provider. Instead, it expressly wanted spam as a raw material in its litigation business.  In no sense was BSI burdened by anything Defendants did.  It was burdened by its own actions in collecting spam.

## CONCLUSION

For the foregoing reasons, BSI's Motion should be denied.  The court should adopt the jury's  Phase II verdict, enter judgment in Defendants' favor, and dismiss BSI's claims in their entirety.

Dated:  October 22, 2012

/s/ Darrell J. Graham

Darrell J. Graham (*pro hac vice*)
John E. Bucheit (*pro hac vice*)
ROESER BUCHEIT & GRAHAM LLC
20 N. Wacker Dr., Ste. 1330
Chicago, IL  60606
(312) 621-0301
(312) 621-0306 (facsimile)
dgraham@rbglegal.com
jbucheit@rbglegal.com

John K. Roche (USDC-MD Bar No. 17531
John M. Devaney (*Pro Hac Vice*)
PERKINS COIE LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005-3960
(202) 434-1627
(202 654-9106 (facsimile)
jdevaney@perkinscoie.com
jroche@perkinscoie.com

*Attorneys for Defendants Kraft Foods Inc.,
Kraft Foods Global Inc., and Vict. Th.
Engwall & Co., Inc*

## Certificate of Service

I hereby certify that on October 22, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following individuals:

Anthony Cavanaugh
Thomas M. Barba
John J. Duffy
Anthony A. Onorato
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C.  20036
(202) 429-3000
(202) 429-3902 (facsimile)
acavanaugh@steptoe.com
tbarba@steptoe.com
jduffy@steptoe.com
tonorato@steptoe.com
Stephen H. Ring
Law Offices of Stephen H. Ring, P. C.
506 Main Street, Suite 215
Gaithersburg, Maryland 20878
301-563-9249
301-563-9639 (fax)
shr@ringlaw.us

Mike Rothman
Law Office of Michael S. Rothman
401 E. Jefferson St., Suite 201
Rockville, MD  20850
(301) 251-9660
(301) 251-9610 (facsimile)
mike@mikerothman.com
*Attorneys for Plaintiff Beyond Systems, Inc.*

J. Douglas Baldridge
Lisa Jose Fales
Ari N. Rothman
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1601
(202) 344-4000 (phone)
(202) 344-8300 (fax)
jdbaldridge@venable.com
ljfales@venable.com
anrothman@venable.com

*Attorneys for Defendants Connexus Corp.*

/s/ Darrell J. Graham

John E. Bucheit (*pro hac vice*)
ROESER BUCHEIT & GRAHAM LLC
20 N. Wacker Dr., Ste. 1330.
Chicago, IL 60606
(312) 621-0302
(312) 621-0306 (facsimile)
jbucheit@rbglegal.com

*Attorneys for Defendants Kraft Foods Inc., Kraft Foods Global Inc., and Vict. Th. Engwall & Co., Inc.*