EXHIBIT 4

Page 864

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


BEYOND SYSTEMS, INC.,     Case No. 8:08-CV-00409-PJM

        Plaintiff(s),

v.

KRAFT FOODS, INC., et al.,

        Defendant(s).


Volume 4

C O N F I D E N T I A L

DEPOSITION OF PAUL A. WAGNER

Washington, D.C.

Tuesday, June 16, 2009

9:30 a.m.


Job No. 1-156743

Pages 864-1090

Reported by:  Linda S. Kinkade, CSR, RMR, CRR, RDR

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 865

1

2          Confidential Deposition of PAUL A. WAGNER held

3     at the offices of:

4

5

6          Venable, LLP

7          575 Seventh Street, N.W.

8          Washington, D.C.

9

10

11

12

13          Pursuant to applicable Rules of Civil

14     Procedure, before Linda S. Kinkade, Certified

15     Shorthand Reporter, Registered Professional Reporter,

16     Registered Merit Reporter, Certified Realtime

17     Reporter, Registered Diplomate Reporter, and Notary

18     Public, in and for The District of Columbia.

19

20

21

22

23

24

25

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 866

1    APPEARANCES:

2        On Behalf of BEYOND SYSTEMS, INC.:

3            ANTHONY A. ONORATO, ESQUIRE

4            Steptoe & Johnson, LLP

5            750 Seventh Avenue

6            New York, New York 10019

7            Telephone: 212.506.3933

8

9        and

10

11           THOMAS M. BARBA, ESQUIRE

12           Steptoe & Johnson, LLP

13           1330 Connecticut Avenue, N.W.

14           Washington, D.C. 20036

15           Telephone:  202.429.3000

16

17       On Behalf of Defendant KRAFT FOODS, INC., et al.:

18           ARI N. ROTHMAN, ESQUIRE

19           Venable, LLP

20           575 Seventh Street, N.W.

21           Washington, D.C. 20004

22           Telephone: 202.344.4000

23

24    Also present:  Stephen Ring, Esquire and Erin Seder,

25    Venable Summer Associate

095e8604-823f-403e-af26-b29978dac893

Page 984

1        Q    No doubt.

2        A    I can't think of any doubt.

3            MR. ROTHMAN:  Okay.  Now we can take a lunch

4   break.

5        (Proceedings recessed.)

6        (Exhibit No. 141 marked for identification and

7   attached hereto.)

8   BY MR. ROTHMAN:

9        Q    I'm going to put before you what's been

10  marked as Exhibit 141.  Do you recognize Exhibit 141?

11       A    Yes.

12       Q    What is it?

13       A    This is Beyond Systems' spam-related costs

14  from February 2005 to July of 2008.

15       Q    Who created this document?

16       A    I did.

17       Q    Did anybody help you?

18       A    I think the attorneys finalized the

19  document for production.

20       Q    Anybody else help you?

21       A    Well, various vendors, of course,

22  contributed information that went into this document.

23       Q    For the purpose of generating this

24  document?

25       A    No.

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 985

1      Q    Okay.  So who contributed information for
2  the purpose of creating this document?
3      A    That's all.  That's all I can think of.
4      Q    So you generated this document.
5      A    Yes.
6      Q    And how did you generate it?
7      A    Well, I looked at the various costs to be
8  assigned over the years that I thought were spam
9  related and assembled them into this spreadsheet.
10      Q    How did you determine what costs were
11  related to spam?
12      A    Well, I went through each and every
13  expense.  I grouped them first by vendor or category.
14  And then went through each one and thought about
15  whether it related to spam.
16      Q    What do you mean by "thought about"?  What
17  criteria did you consider?
18      A    Well, a variety of criteria, including does
19  this particular or was this particular cost necessary
20  or at least in part due to spam received by BSI.
21      Q    And so the portion attributable to spam
22  means what in this spreadsheet?
23      A    Pardon?
24      Q    What does portion attributable to spam
25  mean?  What does that column mean?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 986

1      A    That reflects the degree to which it was
2 necessary to purchase or to incur that cost because --
3 because of spam versus other causes.
4      Q    So the first entry is dated August 14,
5 2006.  Do you see that?
6      A    Yes.
7      Q    And the portion attributable to spam is
8 100%.  Do you see that?
9      A    That's correct.
10     Q    So if I'm reading this correctly -- you
11 tell me if I'm wrong -- 100% of the purchase of the
12 computer supplies was attributable to spam?
13     A    Yes.
14     Q    If you could turn to page 4 of this
15 document.
16     A    Okay.
17     Q    Two-thirds down the page there is an entry
18 for January 4, 2006.  Do you see that?
19     A    Yes.
20     Q    And the merchant is Speakeasy.  Do you see
21 that?
22     A    Yes.
23     Q    The portion attributable to spam is 33%.
24 Do you see that?
25     A    Yes.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

1    Q    How did you come up with 33%?

2    A    Well, that's a weight of the proportion of

3    the burden of that -- due to spam necessitated

4    acquiring that resource.

5    Q    Okay.  How did you determine it was 33% and

6    not 50%, for example?

7    A    Based on bandwidth and latency, and we have

8    asserted over the years what the traffic to BSI

9    consists of -- sometimes it's me browsing -- but much

10   of the time it's spam that's coming in that's taking

11   up the traffic.  And we had saturated one of the DSL

12   lines roughly around that time period and were

13   basically at capacity or maxing out the line largely

14   due to spam.

15   Q    What's the 67% attributable to that's not

16   reflected on this exhibit?

17   A    So, 33% is perhaps a conservative estimate

18   of the spam load.  The remainder would be other

19   legitimate or desired uses of the network, such as

20   browsing webs, desired e-mail, downloading or

21   uploading files and so on.

22   Q    Okay.  Going back to the first page, the

23   title of the document reads, "Beyond Systems'

24   Spam-Related Costs."  What spam are you referring to

25   in that title?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 988

1        A    Spam that BSI has received during that
2    period.
3        Q    From whom?
4        A    From various -- various people.
5        Q    Connexus?
6        A    Including Connexus.
7        Q    Does it include Hydra?
8        A    Yes.
9        Q    Does it include anybody other than Connexus
10   or Hydra?
11       A    Yes.
12       Q    Who else does it include?
13       A    It includes Kraft.
14       Q    Who else?
15       A    World Avenue, MailCompanyX, Christian Home
16   Loans or whatever that concept or entity is called.
17       Q    Okay.
18       A    Et cetera.
19       Q    Well, I don't want et cetera.  I want the
20   full list.  Who else?
21       A    I'm not sure I could name everyone who has
22   contributed to that burden.  I can produce the e-mails
23   that reflect that -- reflect it, but --
24       Q    Does it include entities that you have not
25   yet identified?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 989

1      A    Yes.

2      Q    Can you name any other entities or people

3    that you can attribute to the spam that's referred to

4    in the title of this document?

5      A    Identify additional people?

6      Q    Yeah.

7      A    Sure.  OC-3 Networks would be a

8    contributor, "Accelerate Biz Spammer," the "M Camp

9    Spammer," as we call them.  A lot of these expenses

10   are necessary just to keep BSI's level of service at a

11   useful level.  So, the harm from any one spam is not

12   analogous to a bullet through a window that just

13   damages a portion of the window.  It is sort of

14   necessary to have a completely functional window.

15     Q    That's good to know.  I'm just interested

16   in who you can identify as associated with the spam

17   that's referred to on the first page of this document.

18     A    Well, Kinetics, Inc. comes to mind.  And

19   I'm sure there are others.  I'd have to think further.

20     Q    Okay.  Now, you seek $31,011.05 in actual

21   damages; is that right?

22     A    I'm not sure.  I see that figure at the end

23   of this exhibit.

24     Q    Okay.  Well, do you seek actual damages

25   from Connexus and Hydra in this lawsuit?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 990

1       A   I believe BSI is claiming actual damages.

2   I'm not sure what at trial we'll end up claiming, but

3   I think BSI is claiming actual damages, among other

4   things.

5       Q   Is Beyond Systems claiming actual damages

6   in its second amended complaint?

7       A   I can't remember specifically, but I

8   suspect it is.

9       Q   You've seen the second amended complaint?

10      A   Yes.

11      Q   If I showed it to you, would that refresh

12  your memory?

13      A   Yes.

14      (Exhibit No. 142 marked for identification and

15  attached hereto.)

16  BY MR. ROTHMAN:

17      Q   Putting before you what's been marked as

18  Exhibit 142.  Is this the second amended complaint

19  that Beyond Systems filed?

20      A   It appears to be.

21      Q   Do you have any reason to believe that it's

22  not?

23      A   No.

24      Q   Do you see any reference here to actual

25  damages?  How about page 23, item C?  Does that

Page 991

1    refresh your recollection?

2          A    Yes, I see it.  It says, and BSI's actual

3    damages.

4          Q    Okay.  So Beyond Systems is seeking actual

5    damages from Connexus and Hydra; is that right?

6          A    That's my understanding.

7          Q    Okay.  And do you know if the amount of

8    actual damages Beyond Systems is seeking is

9    $31,011.05?

10         A    Well, I believe BSI's actual damages were

11   at least $31,011.05, and I'm not sure what portion of

12   that, if not all of it, BSI will claim.

13         Q    Okay.  Let's assume that it's $31,000.

14   Okay?

15         A    Okay.

16         Q    And we'll just refer to Exhibit 141, the

17   total that appears on the last page.  We'll just

18   assume that for purposes of these questions.  All

19   right?

20         A    Okay.

21         Q    Now, how much of that $31,000 is

22   attributable to Connexus spam?

23         MR. ONORATO:  Objection to the extent it

24   calls for a legal conclusion.

25   BY MR. ROTHMAN:

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 992

1          Q    Let me ask you this.  Can you apportion

2     that $31,000 to arrive at a number that corresponds to

3     the actual damages of Beyond Systems for Connexus

4     spam?

5          A    Well, I actually don't know the full extent

6     of Connexus spam.  We're still waiting for information

7     we requested to determine the full extent and nature

8     of the damages BSI suffered from Connexus and its

9     associates.

10         Q    Okay.  Well, what about at the time you

11    created this document?  Given the information that you

12    had, could you determine how much of that $31,000 was

13    attributable to alleged Connexus spam?

14              MR. ONORATO:  Same objection.  I believe he

15    has also responded to an interrogatory to this effect.

16              THE WITNESS:  Well, I think, assuming there

17    are no other e-mails besides what BSI has detected so

18    far and put in issue in this case, assuming there are

19    no other e-mails involved with Connexus, I think it's

20    not realistic.  I think there are more e-mails; it's

21    just that BSI hasn't detected them yet.

22              So I guess you also have to make the assumption

23    that all the other non-Connexus entities are going to

24    continue to spam and yet BSI still deems it necessary

25    to maintain a certain level of service.  So it

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 993

1   needs -- needs to expend the resources reflected here

2   to maintain that quality of service.

3   BY MR. ROTHMAN:

4        Q    What's the answer to my question?

5        A    That was the answer.

6        Q    Pardon?

7        A    That was the answer to your question.

8        Q    No.  My question is how much of that

9   $31,000 is attributable to Connexus?

10            MR. ONORATO:  Same objection.

11            THE WITNESS:  So all of it.  BSI needs to

12   expend all of this in order to maintain its level of

13   service given the various spam that it receives.

14   BY MR. ROTHMAN:

15        Q    How much of the $31,000 is attributable to

16   Hydra?

17        A    Same answer.

18        Q    How much of the $31,000 is attributable to

19   World Avenue?

20        A    Same answer.

21        Q    How much of the $31,000 is attributable to

22   MailCompanyX?

23        A    Same answer.

24        Q    So can you attribute or apportion any of

25   the damages, any of the $31,000 to the client, to the

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 994

1    specific clients and defendants?

2             MR. ONORATO:  Same objection.

3    BY MR. ROTHMAN:

4        Q   Well, strike it.  Let me ask you this

5    question.  Is it your testimony that each -- Connexus,

6    Hydra and Kraft -- should each pay $31,000 in actual

7    damages?

8             MR. ONORATO:  Same objection.

9             THE WITNESS:  I'm not sure what they ought

10   to do.

11   BY MR. ROTHMAN:

12       Q   Well, are you asking them to do that?

13       A   I don't know.  I'd have to consult with my

14   attorneys to know what is appropriate and desirable to

15   claim.

16       Q   Do you think it's fair that you would be

17   able to seek $31,000 for each -- from each of

18   Connexus, Hydra and Kraft?

19            MR. ONORATO:  Objection to form.  Objection

20   to the extent it calls for a legal conclusion.

21            THE WITNESS:  I think, given that the

22   affiliates that Connexus has hired, Barale, to send

23   out, for example, Barale sent out apparently 12

24   billion e-mails to an e-mail list obtaining roughly

25   650 million e-mail addresses, among them some 35,000

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 995

1    e-mail addresses either contain a stanford.edu or

2    mit.edu.  Given that some 35,000 recipients in those

3    two communities are getting similar traffic from

4    Connexus, I think it's appropriate that somebody

5    somewhere try to enforce the spam law someday.  And if

6    claiming these damages helps enable that, I think that

7    would be appropriate.

8    BY MR. ROTHMAN:

9        Q    What do you mean by "these damages"?

10       A    These actual damages.

11       Q    So do you think that you should recover

12   $31,000 from each of Kraft, Connexus and Hydra for a

13   total of $93 million -- or $93,000?

14            MR. ONORATO:  Objection to form.  Objection

15   to the extent it calls for a legal conclusion.

16   Objection, asked and answered.

17            THE WITNESS:  No, I think my answer is the

18   same as before.  I'd have to consult with my attorneys

19   to know what -- what I should do.

20   BY MR. ROTHMAN:

21       Q    So you don't know what you should do.

22       A    In this -- on this issue.

23            MR. ONORATO:  Same objections.

24   BY MR. ROTHMAN:

25       Q    Now, you testified that during the time

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 996

1    period between February 2005 and July 2008 you were

2    receiving on the order of 800,000 e-mails to a million

3    e-mails a day; is that right?

4         A    In the later time period, yes.

5         Q    Okay.  What about in the earlier time

6    period?

7         A    It was a smaller -- smaller number of spam.

8         Q    Okay.  And how much?

9         A    I'm not sure I recall now.  I believe we've

10   written it in written responses to defendants and I

11   probably testified to it earlier.  It's not fresh in

12   my mind now.

13        Q    Can you estimate?

14        A    Hundreds of thousands back for a number of

15   years.

16        Q    Okay.  So --

17        A    It's something easy to check, of course,

18   just by counting the e-mails received each day that

19   are contained in BSI's archive.

20        Q    Is it your testimony that you were

21   receiving hundreds of thousands of e-mails per day

22   between the time period February 2005 and July 2008?

23        A    Could you ask it again?

24        Q    Was Beyond Systems receiving hundreds of

25   thousands of e-mails between February 2005 and July

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 997

1    2008?

2            A    Yes.

3            Q    And how much of those e-mails constituted

4    spam?

5            A    The majority, well into the 90, 95%.

6            Q    Okay.  So is it fair to say, then, that

7    Beyond Systems was receiving hundreds of thousands of

8    spams per day between the time period February 2005

9    and July 2008?

10           A    Yes.

11           Q    How many e-mails are you suing Connexus and

12   Hydra over?

13           A    Hundreds of thousands of e-mails.

14           Q    In total?

15           A    Well, are attributable to Connexus and

16   Hydra.

17           Q    How many e-mails are you suing Connexus

18   over?

19           A    Let me retract that.  BSI is suing over

20   tens of thousands of e-mails as to each of those two

21   defendants.

22           Q    Do you know how many as to Connexus?

23           A    Roughly 30,000.

24           Q    And how many as to Hydra?

25           A    Roughly 50,000, I think.  And that number

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 998

1    is growing.

2         Q    So it's your testimony that Connexus and

3    Hydra -- strike it.

4         Your testimony that you're suing Connexus and

5    Hydra for tens of thousands of e-mails during this

6    time period, but your actual damages are $31,000 for

7    millions of e-mails received over this time period; is

8    that right?

9         A    They are related to millions of e-mails

10   over the time period, yes.

11        Q    And you think that Connexus and Hydra

12   should pay the full amount of actual damages; is that

13   right?

14             MR. ONORATO:  Objection to form.  Objection

15   to the extent it calls for a legal conclusion.

16             THE WITNESS:  Again, I'd have to consult

17   with my attorneys on what the defendants should pay.

18   BY MR. ROTHMAN:

19        Q    Okay.  Well, I want to know what you think

20   they should pay since you're suing them.

21             MR. ONORATO:  Same objections.

22             THE WITNESS:  My answer would be the same.

23   BY MR. ROTHMAN:

24        Q    Okay.  Assume that your attorneys haven't

25   told us what the amount of actual damages is.  How

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 999

1    would we know?

2        A    That would probably be difficult for you to

3    know what the size of the actual damages if you

4    weren't informed by BSI's counsel.

5        Q    Right.

6        A    As far as I can think of right now.

7        Q    Do you have an expert that's going to

8    testify as to actual damages?

9        A    I don't know.

10       Q    Who would know that if you don't?

11       A    Attorneys may have an idea of where things

12   are going.  I have a familiarity with the facts, so --

13       Q    Now, referencing Exhibit 141 again, I'm

14   trying to determine what all this stuff is.  Was any

15   of this -- strike it.  Was any of this stuff that you

16   bought used to store e-mails?

17       A    Yes, I think the first item relates to

18   storage.

19       Q    Okay.  And that's 300 gigabytes of storage?

20       A    Yes, and a few associated components.

21       Q    Okay.  Is it your testimony that the first

22   item was used to store the e-mails at issue in this

23   case?

24       A    I don't recall if I stored e-mails at issue

25   on that device or if I put other data onto it to make

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1000

1    room for the e-mails at issue on the first device.

2         Q    Is it possible that the first device has

3    nothing to do with the e-mails that you're suing over

4    as to Connexus and Hydra?

5         A    No.

6         Q    Why is that?

7         A    Because the e-mails at issue occupy storage

8    and I know that BSI needed more storage because of or

9    in large part due to the spam that's coming in.

10        Q    Okay.  So on Exhibit 141 I want you to

11   point to the items that you purchased to store spam.

12   So we have the first item, right?

13        A    Correct.

14        Q    Okay.  What else did you use to store spam?

15        A    Now, store, do you mean what's called

16   permanent storage or short-term volatile storage?

17        Q    Let's go with --

18        A    Computer memory, random access memory.

19        Q    Not RAM.  Let's use long-term.

20        A    Okay.  Well, there are computers and

21   various storage devices, all of which -- well, the

22   computers contain storage devices.  So the iMac listed

23   or purchased on December 15, 2007 would be used to

24   store, among other things, spam.

25        Q    Okay.  What else was used to store spam?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1001

1     A    Again, there are different notions of store
2    as far as servers go.  Servers can cue spam and pass
3    it on to other servers so it is temporarily storing
4    it.
5     Q    I thought we were going to talk about
6    long-term storage.
7     A    Earlier I was distinguishing between RAM
8    versus discs.  Some of these servers may actually
9    temporarily store things in discs.
10     Q    I'm not talking about temporarily storing.
11    We'll get back to that later.  Let's just talk about
12    long-term storage right now.
13     A    Okay.  I think the next two computers as
14    well, the Mac Mini and the iMac G5, both have been
15    used to, among other things, store spam.
16     Q    Okay.  What else?
17     A    And I think the fourth item, purchased
18    April 14, 2008, that also is a Mac Mini, I think that
19    also stores spam.
20     Q    What else?
21     A    Next item, which is Apricorn software and
22    hardware, that is used to transfer spam from one
23    storage device to another.  It's involved in storage
24    in a sense.
25     Q    Okay.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1002

1      A    The device doesn't actually store it
2  itself.  It transfers it.
3      Q    Okay.  What else?
4      A    The next item from buy.com purchased on
5  December 4, 2005, that, I believe, was used to store
6  and possibly deliver certain spam.
7      Q    Okay.  What else?
8      A    The hubs transfer e-mail, but they don't
9  store it for more than a moment.
10     Q    Okay.  What else was used to store it long
11 term?
12     A    The Seagate Cheetah hard drive.  That's
13 also used on a server that holds spam.
14     Q    What else was used to store spam?
15     A    The Bat! e-mail program.  That's not a
16 medium, but it's a program that causes e-mails to be
17 stored on media.
18     Q    Okay.  What else was used to store spam?
19     A    The Seagate 750-gigabyte ATA drive also
20 stores spam.
21     Q    Okay.  What else?
22     A    The hard drive enclosure contains some hard
23 drive that stores spam.
24     Q    Okay.  What else?
25     A    The Dell Dimension 9200 workstation

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1003

1    contains spam.

2         Q   Okay.  Now I'm going to stop you.  When

3    we're talking about spam, are you including the spam

4    that's routed from Hypertouch to Beyond Systems?

5         A   Yes.

6         Q   Okay.  So when you were testifying a moment

7    ago about the items that store spam, you're including

8    storage associated with the e-mails that Hypertouch

9    routes to Beyond Systems.

10        A   Well, for the last item I was, but some of

11   these servers may be working primarily on behalf of

12   BSI, although they are also secondary servers for

13   Hypertouch.  So they will get incidental e-mails that

14   ultimately are received by Hypertouch.  So that it's

15   probably fair to -- I would -- yeah, I think all those

16   would contain e-mails that were routed by Hypertouch

17   or at least destined --

18        Q   Go to the second page.  Let me know when

19   you're there.  And it might be easier to tell me what

20   items on page 2 were not used to store spam.

21        A   Okay.  All right.  The Viking, 1-gigabyte,

22   unbuffered non-ECC memory only stores spam for a

23   moment, possibly hours, depending on the application,

24   or even days if the computer is up and running for a

25   while, but it's volatile memory, so I guess you're

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1004

1    asking me to exclude that.  So I'm mentioning that

2    now.

3         Stuff It Deluxe is a compression program that

4    allows us to transfer large files, such as e-mail

5    boxes, to other locations.  Those e-mail boxes often

6    contain spam.

7         The DNS mail server software enables storage of

8    e-mails, including spam.

9         Q    Okay.  My question is what is reflected on

10   page 2 that is not used to store spam?

11        A    Well, everything is related to spam, so --

12        Q    I'm not asking about related to spam.  I'm

13   just talking about the storage of spam now.  I want to

14   know what's reflected on page 2 that you did not use

15   to store spam.

16        A    Everything is related.  Everything I see so

17   far is related to storing spam.  Even antivirus

18   software, backup media, all that relates in some way

19   to BSI's receipt of and storage of spam.

20        Q    I'm not asking you about relating to spam

21   or relating to storage spam.  What actually stored the

22   spam?

23        A    What stored it or what did not store it?

24        Q    Whichever one is easier.  You tell me which

25   one you'd rather tell me about.  Is it easier to tell

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1005

1   me which of these items stored spam or which ones did

2   not?

3          A    Probably -- either one is fine, but I can

4   talk about what is used to store spam.  And we're

5   talking about non-volatile storage that persists after

6   power goes off ordinarily.

7          Q    That's fine.  If you just want to list the

8   date and the item, that's all I need.

9          A    Okay.  In fact, are you looking for just

10  media that stores spam or devices that do the storage?

11         Q    What's the difference?

12         A    Well, a program or --

13         Q    You're talking about causing the storage

14  now, right?

15         A    Right.

16         Q    No, I don't want causing the storage.  I

17  just want to know what the items were that stored the

18  spam, like a hard drive.

19         A    Okay.  So the media that store it includes

20  this backup media.

21         Q    The date?

22         A    I'm sorry.  July 11, 2006.  And the Maxtor

23  Diamond Max plus 9 EIDE hard drive on November 18,

24  2005.

25         The Adaptec 8-port serial ATA RAID controller

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1006

1   card stores spam in some sense in that it is essential

2   to uniting an array of discs in storing spam and other

3   content in a permanent way.

4        Q    What else is used to store spam?

5        A    Okay.  The backup media purchased on

6   page -- I'm sorry -- purchased on May 25, 2005

7   appearing on page 3 that also stores spam.

8        Q    What else?

9        A    The hardware components for custom server

10  purchased from Newegg Computers starting on January

11  13, 2006, those store spam.

12       Q    So when you say starting on January 13,

13  2006, that goes through June 1, 2006 on page 3?

14       A    That may have been later purchases

15  associated with that server.  That's all I see right

16  now.

17       Q    Okay.  What else was used to store spam?

18       A    One terabyte NewerTech Mini Stack consists

19  of storage that contains spam.

20       Q    Okay.  What else?

21       A    The Mac Mini purchased on August 27, 2005

22  contains or stores spam.

23       Q    What else?

24       A    The NewerTech Mini Stack Enclosure Kit

25  holds a hard drive that in turn stores spam.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1007

1    Q    Okay.  Was else stores spam?

2    A    The 250-gigabyte Western Digital Scorpio

3    notebook drive contains or stores spam.

4    Q    Okay.  What else was used to store spam?

5    A    On page 4 the items from Fookes software,

6    F-O-O-K-E-S, purchased beginning on January 14, 2008,

7    that converts data prior to storage, and data consists

8    of e-mails which are largely spam.

9    Q    So that would hold true for the February

10   23rd, 2008 entry as well as the February 12, 2007

11   entry on page 4?

12   A    February 12 is a different product, but,

13   yes, it's the same.  It also converts data which

14   consists of e-mails including spam.

15   Q    I'm not looking for conversion.  I'm just

16   looking for storage right now.

17   A    For storage.

18   Q    Is there anything on page 4 that you use to

19   store spam?

20   A    That's all I see on page 4.

21   Q    Okay.  Continuing on to page 5, is there

22   anything on page 5 that you use to store spam?

23   A    On page 5 the backup media purchased on May

24   17, 2005.

25   Q    Okay.  What else?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1008

1          A    Stored spam.   The DOCK and SATA multi-drive
2    module holds hard drives that store e-mails including
3    spam.
4          Q    That's on page 5?
5          A    Yes.
6          Q    What are the dates of those purchases?
7          A    That was purchased on August 31, 2006.
8          Q    Okay.
9          A    The Maxtor 300-gigabyte external hard drive
10   purchased on May 10, 2005 stores a copy of e-mails
11   including spam.
12         Q    Okay.  What else, if anything, on page 5?
13         A    The ARECA 8-port PCI Express to SATA-II
14   RAID 6 adaptor is an integral part of the permanent
15   data storage system.
16         Q    What's the date on that?
17         A    That was purchased on April 20, 2007.
18         Q    Okay.  Is there anything else on page 5?
19         A    That's it.
20         Q    Okay.  Page 6 is all primary Internet
21   connections, right?
22         A    Yes.
23         Q    That wasn't used to store spam, was it?
24         A    Not permanently.
25         Q    Okay.  Going on to page 7, primary Internet

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1009

1    connection, none of that was used to store spam, was

2    it?

3            A    Same answer.

4            Q    Okay.  Going on to page 8, was anything on

5    page 8 used to store spam?

6            A    Well, the last item relates to -- there was

7    an effort to recover a server whose RAID system had

8    failed.

9            Q    That's not what I'm asking.  I'm just

10   asking for storage now.

11           A    I mean, it directly concerns maintenance

12   and retention of e-mails, including spam.

13           Q    So are you saying the spam was saved with

14   tech support?

15           A    Tech support or BSI thought tech support

16   was crucial to retain that spam.

17           Q    I'm just asking where the spam was stored.

18   Was it stored with tech support?

19           A    I don't know what you mean by "with tech

20   support."

21           Q    Well, I'm just asking where the spam was

22   stored.  Was it stored with something called tech

23   support for failed RAID array on server?  Is that like

24   a hard drive?  Is that a technical term I'm missing?

25   What is that?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1010

1         A    The e-mails, including spam, were stored on

2    a RAID system which was failing, and with tech support

3    assistance BSI hoped to recover that storage system.

4         Q    Did BSI recover it?

5         A    No.

6         Q    Were there any Connexus or Hydra e-mails on

7    it?

8         A    I don't recall.  I still have the -- I

9    think I still have that server and it's sitting on a

10   server rack gathering dust.

11        Q    Okay.  Page 8 or page 9.  Anything on page

12   9 that was used to store spam?

13        A    On May 2, 2007, there was a purchase of PC

14   power and cooling, 750-watt ATX power supply, which

15   was a direct physical component needed to keep the

16   storage of e-mails operational.  Those e-mails

17   included spam.

18        Q    I'm not asking about what was used to

19   assist a storage device in storing it.  I'm asking for

20   what actually stored it.  Cooling device didn't store

21   it, did it?

22        A    That's just the brand name, the maker.  It

23   was actually Power Supply.

24        Q    Okay.  Power Supply didn't store the spam,

25   did it?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1011

1      A    Well, I mean, certain components of a hard

2    drive store it.  The other components shield it,

3    provide it power and can transform the power, and this

4    is another power transformer.

5          So I'm not sure how you define where it's

6    stored, but, strictly speaking, it is some component

7    of a hard drive that magnetic discs store it.  So I

8    would regard that as a key part of storing, necessary

9    part.

10     Q    Okay.  What else was used to actually store

11   the e-mail, house it, in other words?

12     A    Okay.  The Western Digital 300-gigabyte

13   hard drive purchased on December 8, 2005, that will

14   hold e-mails, including spam.

15     Q    What else?

16     A    Same goes for the two Maxtor One Touch

17   500-gigabyte external hard drives purchased on August

18   11 and August 23, 2006.

19     Q    Okay.  What else?

20     A    The Seagate Barracuda, 500-gig hard drive

21   purchased on October 27th, 2006.  That and the three

22   similar drives purchased on June 29, 2007, those all

23   hold e-mail, including spam.

24     Q    You're still on page 9, right?

25     A    Yes.

095e8604-823f-403e-af26-b29978dac893

Page 1012

1          Q    Anything else on page 9?

2          A    That's it.

3          Q    Okay.  Now, of the items that you

4     identified that you used to store spam, which of those

5     items stored Connexus spam?

6          A    I don't think I can give you a complete

7     answer sitting here today.  I can identify a few

8     items.

9          Q    Identify what you can identify.

10         A    Okay.

11         Q    And to be clear, I'm asking about what was

12    used to actually store it permanently, not transitory

13    storage or not with something else hooked up to

14    storage like a power supply.  I want those items that

15    actually held or housed or stored the e-mail.

16         A    In a non-volatile sense.

17         Q    Correct, non-volatile sense.

18         A    And you're asking about the June 2008

19    e-mails attributable to Connexus or Hydra.  Are you

20    also including the March 2009 e-mails?

21         Q    No.  Actually I was just concerning the

22    June 2008 e-mails as to Connexus.  I'm going to ask

23    the same question for Hydra.

24         A    Okay.

25         Q    But first I want to do the June 2008

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1013

1    e-mails as to Connexus only.

2          A    Okay.  Well, I think the first item on page

3    1, purchased on August 14, 2006, I think that stored

4    Connexus spam.

5          Q    Do you still have that item?

6          A    I can't remember.  Some of these drives

7    have failed and had to be replaced.

8          Q    So you don't remember that one.

9          A    I don't remember that one.

10         Q    Okay.  What are the other items that you

11   used to store Connexus spam that you produced in June

12   2008?

13         A    Okay.  The iMac 24-inch computer purchased

14   on December 15, 2007, that has stored Connexus spam.

15         Q    Do you still have that computer?

16         A    Yes.

17         Q    Is it in your possession?

18         A    It is at one of BSI's points of presence.

19         Q    Where is that?

20         A    That's in Silver Spring.

21         Q    Okay.  What else did you use to store

22   Connexus spam?

23         A    Okay.  The Mac Mini purchased on August 30,

24   2005, that, I believe, has stored Connexus spam.

25         Q    Do you still have -- strike it.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1014

1      Do you still have that computer?

2      A    Yes, I think so.

3      Q    Where is that?

4      A    I think that's at the Silver Spring office.

5      Q    What about the next item, did you use that

6  to store Connexus spam?

7      A    Yes.  And I mixed the two iMac's.  The iMac

8  G5 purchased on August 30, 2005, that is located at

9  the Silver Spring office.  The iMac 24-inch screen is

10  in the Rockville location.  And I would have to check

11  the e-mails at issue to see when -- that was a fairly

12  recent purchase.  And I'd have to see, check the

13  e-mails at issue to see whether they had passed

14  through or were therefore stored on that server.

15      Q    Okay.  What about the Mac Mini on April 14,

16  2008, do you use that computer to store the Connexus

17  e-mails that were produced in June 2008?

18      A    There, too, I would have to check the

19  e-mails to see if any had gone through that server.

20  I'd have to check that.

21      Q    What's the name of that server?

22      A    I forget what its name is.  I think it's --

23  it's an IP address at the Rockville location, I

24  believe.

25      Q    What's the IP address?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1015

1      A    66.93.97.1 something.  I don't remember --
2 I don't remember what the -- what the exact IP was.
3 That's my best guess.
4      Q    Okay.  What else did you use to store the
5 Connexus e-mails?
6      A    I believe the Seagate Cheetah hard drive
7 purchased on March 8, 2007 stored some Connexus
8 e-mails.
9      Q    Do you still have that hard drive?
10      A    I have the hard drive.  I think it was on
11 the server that had failed, the failed RAID system.
12      Q    What does that mean?
13      A    So it is one of an array of drives and I
14 lost -- basically I lost synchrony between the drives
15 and I was not able to recover the data that was on
16 those drives.  But the e-mails, I believe, I do have
17 and are at issue in this case potentially.
18      Q    How did you get them?
19      A    At some point I copied over those e-mail
20 files from that server.  I made a backup copy
21 basically at some point.
22      Q    Before or after it failed?
23      A    Before it failed.
24      Q    Okay.  So you have this Seagate drive that
25 was purchased on March 8, 2007; it's just not in

095e8604-823f-403e-af26-b29978dac893

Page 1016

1    usable form?

2         A    That's right.  The drive, I think, still

3    spins.  Some of the drives have failed, but have been

4    swapped in in time to recover.  Basically there is

5    some redundancy in these arrays.  So if any one drive

6    fails, you can swap in a new drive.

7         Q    Going to September 27, 2007, the Seagate

8    750-gigabyte drive, did you use that to store the

9    Connexus e-mails?

10         A    Yes.

11         Q    Did you use that to store the Hydra

12    e-mails?

13         A    Yes.

14         Q    Do you still have that drive?

15         A    Yes.

16         Q    Now, with respect to the items or -- strike

17    it.

18         Going back to December 15, 2007, the iMac 24,

19    is that a screen only or is that also a computer?

20         A    That's a computer.

21         Q    Okay.  Was that used to store the Hydra

22    e-mails?

23         A    That's one I have to check on the dates.  I

24    believe so.  I need to check on the recent most

25    e-mails sent on behalf of Connexus to see which

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1017

1    servers they went through.

2           Q    I just asked about Hydra.

3           A    Oh, Hydra.  Excuse me.  So, yes, those

4    definitely.

5           Q    What about the August 30th, 2005 Mac Mini,

6    was that used to store Hydra e-mails?

7           A    Yes.

8           Q    What about the August 30th, 2005 iMac, was

9    that used to store Hydra e-mails?

10          A    Yes, I think so.

11          Q    What about or -- strike it.

12          A    I'm sorry.  You asked about the iMac G5

13   just now?

14          Q    Correct.

15          A    Okay.  That's correct.

16          Q    Yes, you did use it to store --

17          A    I think so, yes.

18          Q    What about the May 9, 2007 processor with 4

19   megabyte cache.  Is that a RAM -- is 4 megabytes RAM

20   or is that permanent storage, at the bottom of page 1?

21          A    That's permanent storage.

22          Q    Okay.  Was that used to store the Connexus

23   e-mails?

24          A    Yes.

25          Q    Was that used to store the Hydra e-mails?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1018

1      A    Yes.

2      Q    Does that still exist?

3      A    Yes.

4      Q    Is it in your possession?

5      A    It's at the Rockville site.

6      Q    Going to the next page, did you use the

7   Hitachi Travelstar hard drive to store the Connexus

8   e-mails?

9      A    Yes, I think so.

10     Q    Well, do you know?

11     A    That went on a laptop, and, yes, I had

12  Connexus e-mails for some time.

13     Q    That you're suing over in this case, right?

14     A    Yes, I think so.

15     Q    Do you know?

16     A    At some point I weeded out some false

17  positives, but there's so many Connexus e-mails on it

18  that I'm confident and reasonably certain that some of

19  the e-mails were actually put at issue in this case.

20     Q    Does that also hold true for Hydra?

21     A    I'm not sure of that.

22     Q    Do you still have that hard drive?  And I'm

23  referring to the Hitachi Travelstar purchased on

24  December 16th, 2005.

25     A    Right.  I don't think so.  I think I gave

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1019

1    it to a friend.

2         Q    Who did you give it to?

3         A    I upgraded --

4         Q    No.  I just asked you who you gave it to,

5    not whether or not you upgraded it.  Who did you give

6    that drive to?

7         A    I can't remember.  I've given several of

8    these high-performance drives to friends or

9    non-profits after migrating the data to even bigger

10   drives on my own laptop.

11        Q    What about the -- strike it.

12        What about the July 14, 2006 external hard

13   drive?  Did you use that to store Connexus spam?

14        A    I think so.

15        Q    Do you know?

16        A    I don't know for certain.  I believe so.

17        Q    What about with respect to Hydra, did you

18   use that device to store Hydra spam?

19        A    I think so as well.  I'm little less

20   certain than for Connexus.

21        Q    Do you still have that drive?

22        A    I believe so.  That's the -- I think I do.

23        Q    Has that drive crashed?  Is it operational

24   or --

25        A    That's what I'm not -- several of the

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1020

1    Maxtor One Touch drives have crashed and some are
2    kicking around.  They sometimes work; sometimes don't.
3         Q    But you have this in your possession,
4    correct?
5         A    I believe so.
6         Q    Now at the bottom of page 2 reference is
7    made to computer memory in those last three entries.
8    Do you see that?
9         A    Yes.
10        Q    What kind of memory was that?
11        A    I don't recall right now.  I'd have to look
12   at the receipt from the vendor to see what type of
13   memory it is and then figure out what type of platform
14   it's appropriate for and then recall which computer of
15   BSI's that would be.
16        Q    Turning to page 3.  Did you use any of the
17   items on page 3 to store Connexus spam?
18        A    Yes, some of the Newegg Computers'
19   equipment stores Connexus e-mails.
20        Q    Which ones?  Just give me the dates.
21        A    I don't remember.  It went to -- I believe
22   it went to the assembly of two separate custom
23   servers, and I can't tell looking at this which server
24   got which components.
25        Q    Do you have all these servers still?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1021

1       A    Yes, or I have access to them.

2       Q    What do you mean you have access to them?

3       A    They are at various sites around the DC

4  area.

5       Q    Okay.  And you're talking about the Newegg

6  entries on January 13, 2006; March 28, 2006; April 5,

7  2006; and April 19, 2006?

8       A    Can you say those again, please?

9       Q    Well, why don't you tell me which Newegg

10 Computers you're talking about that you're not sure of

11 whether they store Connexus or Hydra spam?

12      A    Well, these are all the Newegg Computer

13 entries on page 3 of Exhibit 141.

14      Q    Okay.  So that corresponds to the dates

15 January 13, 2006; March 28, 2006; April 5, 2006; April

16 19, 2006 and June 1, 2006.  Is that right?

17      A    That's right.

18      Q    Okay.  What about the other World Computing

19 entries, did any of those items store Connexus spam?

20      A    Yes, I think the one terabyte NewerTech

21 Mini Stack has contained Connexus spam.

22      Q    And Hydra spam as well?

23      A    Yes, I think so.

24      Q    Do you still have that Mini Stack?

25      A    I believe so.  I need to verify the dates.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1022

1    I'm a little bit uncertain on Connexus because this
2    was acquired fairly recently, but I'm reasonably
3    certain there was Connexus spam on it.
4          Q    And you still have that?
5          A    I think so, yes.
6          Q    Okay.  Anything else on page 3 that you use
7    to store Connexus or Hydra spam?
8          A    I think the Mac Mini purchased on August
9    27, 2005 contained Connexus spam.
10         Q    What about Hydra spam?
11         A    Yes, Hydra spam as well.
12         Q    Do you still have that Mac Mini?
13         A    Yes, I think so.
14         Q    Where is it?
15         A    I think it's in Silver Spring.
16         Q    Okay.  What about the NewerTech Mini Stack
17   December 7, 2005, was that used to store Connexus
18   spam?
19         A    I think you're referring to the enclosure
20   kit.
21         Q    Oh, I see.  You're right.  Let's skip that
22   one.
23         What about the last entry, the 250-gigabyte
24   Western Digital?  That's a storage device, isn't it?
25         A    Yes.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1023

1      Q    Was that used to store Connexus spam?

2      A    Yes.

3      Q    Was it used to store Hydra spam?

4      A    Yes.

5      Q    Do you still have it?

6      A    Yes.

7      Q    Where is it?

8      A    That's in Washington, DC.

9      Q    Is it functional?

10     A    Yes.

11     Q    Turn the page.  I don't believe there are

12  any storage devices on page 4.  Is that right?  It's

13  all software and --

14     A    I don't see non-volatile storage.

15     Q    All right.  Go on to page 5.  What about

16  the May 17, 2005 backup media?  Do you see that?

17     A    Yes.

18     Q    Was that used to store Connexus spam?

19     A    Some was, but I'm not certain which backup

20  media did, so I'm --

21     Q    So you don't know?

22     A    I don't know.

23     Q    What about Hydra, was it used to store

24  Hydra spam?

25     A    Same answer.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1024

1      Q    You don't know?

2      A    I don't know.

3      Q    What about the Super Good Deal multi-drive

4    module?  Is that even a storage device?

5      A    That is a storage device.

6      Q    Was that used to store Connexus spam?

7      A    I think so, yes.

8      Q    Was it used to store Hydra spam?

9      A    Yes.

10      Q    Do you still have it?

11      A    I think so.

12      Q    Where is it?

13      A    That might be in California.

14      Q    Where in California?

15      A    In Menlo Park or some town near Menlo Park.

16      Q    Is your brother storing that?

17      A    I think he has that now.

18      Q    Why does he have it?

19      A    I think I no longer needed it and he did

20    need it, so I sent it his way at some point.

21      Q    Did you erase the data from it before you

22    sent it to him?

23      A    I copied it to other media BSI had.  I

24    don't think I deleted it, but --

25      Q    Do you know if he did?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - (800) 292-4789
CONFIDENTIAL

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1025

1          A    I'm not sure.

2          Q    Do you know if he made use of the data that

3    was on that drive?

4          A    I don't recall.

5          Q    Was there confidential information on that

6    drive?

7               MR. ONORATO:  Objection to form.

8               THE WITNESS:  I don't know what was on

9    there.

10   BY MR. ROTHMAN:

11         Q    Well, what was on there when you

12   transferred it to him besides apparently Connexus and

13   Hydra e-mails?

14         A    Right.  Those, I guess, were designated

15   confidential and so -- I believe those are on there at

16   some point.

17         Q    Were they on there when you transferred the

18   hard drive to your brother?

19         A    I can't remember.

20         Q    Did your brother pay you for that drive?

21         A    I don't think so.

22         Q    What about the May 10, 2005 Maxtor?  Do you

23   see that on page 5?

24         A    Yes.

25         Q    Was that used to store Hydra spam?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1026

1          A    I don't think so, but I'm not -- I'm not
2     sure.
3          Q    Okay.  What about Connexus spam?  Was it
4     used to store Connexus spam?
5          A    I think it might have contained Connexus
6     spam.
7          Q    Do you still have that drive?
8          A    I believe it's the drive, one of the
9     external drives that failed.
10         Q    Do you still have it?
11         A    I have a couple of dead drives kicking
12    around.  I can't remember if I retained that one or
13    not.
14         Q    Okay.  What about the April 20th, 2007 RAID
15    6 adaptor?  Do you see that?
16         A    Yes.
17         Q    Is that a storage device?
18         A    Yes.
19         Q    Did that store any of the Connexus e-mails?
20         A    Yes.
21         Q    Did that store any of the Hydra e-mails?
22         A    Yes.
23         Q    Do you still have that?
24         A    Yes, I do.
25         Q    Where is it?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1027

1      A    That's in DC.

2      Q    If you turn to the last page, page 9.  Let

3   me know when you're there.

4      A    Okay.

5      Q    Do you see the December 8, 2005 entry for

6   the Western Digital -- strike it.

7           It's December 8, 2005, Western Digital

8   320-gigabyte drive.  Do you see that?

9      A    Yes, I see it.

10      Q    Do you use that drive to store Connexus

11   e-mails?

12      A    I don't recall.

13      Q    Did you use it to store any of the Hydra

14   e-mails?

15      A    I don't recall.

16      Q    You do not recall?

17      A    I don't recall.

18      Q    Do you still have that drive?

19      A    I think I do.  I don't believe it's in use

20   at the present.

21      Q    Where is it?

22      A    I think it's in one of the out-of-service

23   computers.

24      Q    Where is it?

25      A    Probably be in DC.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - (800) 292-4789
CONFIDENTIAL

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1028

1    Q    The next entry is an August 11, 2006 entry
2    for the Maxtor One Touch 500-gigabyte drive.  Do you
3    see that?
4    A    Yes.
5    Q    Was that used to store the Connexus
6    e-mails?
7    A    And by the Connexus e-mails I was meaning
8    at least one Connexus e-mails.  I didn't mean
9    necessarily containing all Connexus e-mails.
10   Q    Fair enough.  At least one Connexus e-mail
11   over which you are suing.
12   A    Okay.  Right.
13   Q    Did that Maxtor One Touch device from
14   August 11, 2006 store at least one Connexus e-mail
15   over which you are suing?
16   A    I think at least one of the two Maxtor
17   drives did -- one of the two on this page.  I can't
18   remember which one based on this exhibit alone.
19   Q    Do you have both of those drives?
20   A    I'm not sure if I still have both of them.
21   Q    Do you have one of them?
22   A    I think I have at least one Maxtor One
23   Touch 500-gig drive.
24   Q    Okay.  Which one of these two is the one
25   you have the August 11, 2006 drive or the August 23rd,

095e8604-823f-403e-af26-b29978dac893

Page 1029

1    2006 drive?

2         A    I can't remember.  It could be that one

3    replaced the other one.

4         Q    It could be anything.  I'm just asking

5    which one you think you have.

6         A    Yeah.  I don't recall.

7         Q    And you don't recall whether or not both of

8    them stored Connexus e-mails or one but not the other;

9    is that your testimony?

10        A    I think at least one of them stored

11   Connexus e-mails.  I don't recall that the other

12   one --

13        Q    Did either -- strike it.  Did one of them

14   store Hydra e-mails?

15        A    I think so as well.

16        Q    Do you know which one?

17        A    I don't know which one.

18        Q    You don't know which one of these two

19   drives you have in your possession; is that right?

20        A    That's right.

21        Q    Going to the October 27, 2006 Seagate

22   drive, do you see that?

23        A    Uh-huh.

24        Q    That's a storage device, isn't it?

25        A    Yes.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1030

1      Q    Was that used to store Connexus e-mails?

2      A    I think the Seagate Barracuda 500-gigabyte

3   drive contained both Connexus and Hydra e-mail.

4      Q    Do you still have that drive in your

5   possession?

6      A    I don't think so.  I think that's in

7   California.

8      Q    Did you give that to your brother?

9      A    That's my best guess.

10      Q    When did you give it to your brother?

11      A    Over -- roughly a year ago.

12      Q    Why did you give it to him?

13      A    Maybe two years ago.  I think I moved on to

14   a bigger storage system and I think he had a RAID

15   system that used 500-gigabyte drives, and I moved on

16   to one that used 750-gigabyte drives, if I'm not

17   mistaken.

18      Q    Did you erase the data on the drive before

19   giving it to him?

20      A    I would have made a copy to my own system,

21   and then, yes, I think we're -- we attempted to

22   reformat it several times, had trouble with the RAID

23   unit, as I recall.  And he spent a bit of time with

24   tech support.  And I got it to work reasonably well,

25   as I recall, but it was reformatted several times.  We

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1031

1    attempted to rebuild the array, the RAID array,

2    several times.

3         Q    Was it reformatted before or after you gave

4    it to him?

5         A    Before and after, as I recall.

6         Q    So reformatted means everything was deleted

7    from it?

8         A    Or reset to some constant value.

9         Q    Well, I don't want the or.  Was everything

10   deleted from it before you gave it to your brother?

11        A    Yes.  It's the same -- same thing.  You're

12   resetting all the values.

13        Q    So was everything deleted from that drive

14   before you gave to it your brother?

15        A    All the original content was or at least --

16   statistically roughly every second bit was changed.  I

17   mean, everything was reset to some value.  So I

18   presume roughly half the bits were actually left the

19   way they were because they were already zero and the

20   others were zeroed out.

21        Q    Okay.  Now what items on Exhibit 141 were

22   used or -- strike it.

23        What servers on Exhibit 141 were used to handle

24   the Connexus and Hydra e-mails over which you're

25   suing?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1032

1        A    You're excluding server software.

2        Q    Correct.   Excluding server software, what

3   servers were you using?

4        A    And just the Connexus 2000 -- Connexus June

5   2008 e-mails?

6        Q    And the Hydra 2008 e-mails.

7        A    And the Hydra.   Okay.   And you don't mean

8   server -- components of servers, just those devices

9   that contain a CPU.

10       Q    Correct.

11       A    Okay.   So the iMac 24-inch with a super

12  drive purchased on December 15th, 2007, that

13  handles -- was that your -- handled Hydra e-mails and

14  I think it also handled Connexus, but I would need to

15  check the dates of the most recent Connexus e-mails to

16  confirm that.

17       Q    What else?

18       A    The Mac Mini purchased on August 30, 2005

19  would have contained both Connexus -- would have

20  handled both Connexus and Hydra e-mails.

21       Q    We're talking about handles in the sense of

22  the e-mail passing through the server?

23       A    Right.

24       Q    Okay.   Good.   What else?

25       A    It also retained or also stored the

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1033

1    e-mails.

2         Q    I gotcha.  What else was used to handle the

3    e-mails?

4         A    The iMac G5 purchased on August 30, 2005 --

5         Q    Okay.  What else?

6         A    -- would have handled both Connexus and

7    Hydra e-mails.

8         Q    What else was used?

9         A    Well, the Mac Mini purchased on April 14,

10   2008 I'm not sure about.

11        Q    Okay.  You're not sure about that.  What

12   else?

13        A    I think the Dell Dimension 9200 at the

14   bottom of page 1 would have at some point or another

15   been used to handle Connexus and Hydra e-mails.

16        Q    Okay.  What else?

17        A    I think at least some of the components on

18   page 3 purchased from Newegg Computers would have

19   comprised a server that handled both Connexus and

20   Hydra e-mails.

21        Q    Okay.  What else?

22        A    I believe the server on page 3 -- rather

23   the Mac Mini purchased on August 27, 2005 -- was

24   involved in the handling of Connexus and Hydra

25   e-mails.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1034

1        Q    Okay.  What else?  I'm sorry.  With that
2   Mac Mini, August 27, 2005, you still have that one,
3   right?
4        A    Yes, I think so.
5        Q    Okay.  Well, what do you mean you think so?
6   Do you have it or not?
7        A    Well, it still exists.  I think I know -- I
8   think I know where it's -- I think it's in Silver
9   Spring.
10       Q    Okay.  What else is on page 3 that handled
11  the e-mails that you haven't already testified about?
12       A    And that's it as far as I see for computers
13  that handled Connexus or Hydra e-mails as of June
14  2008.
15       Q    How does Beyond Systems measure bandwidth
16  utilization?
17       A    Often we contacted the ISP that we were
18  using, access provider, and asked what our utilization
19  was, and they would say that you're at 40% or 50% or
20  30%.  And we would examine the different processes we
21  had running and could figure out which process was
22  using which fraction of that consumption.
23       Q    Who were your access providers between
24  February 2005 and July 2008?
25       A    Speakeasy, Verizon FIOS, MegaPath Networks,

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1035

1    I think Verizon DSL, Verizon Wireless.

2         Q    Verizon Wireless was an access provider for

3    Internet services?

4         A    Yes.

5         Q    Okay.  What else?

6         A    I believe we used Capital Air Internet

7    Service, CAIS for short.

8         Q    Okay.  What else?

9         A    And you're asking just about access,

10   Internet access, not other services.

11        Q    I'm asking about whomever you've inquired

12   to about bandwidth utilization.  I believe you

13   answered your access providers provided you with that

14   information.  So then I asked who are the access

15   providers who provided you with that information.  I'm

16   now asking that question.  Who were the access

17   providers that provided you with bandwidth utilization

18   information?

19        A    Okay.  I was answering who are -- your

20   access providers been.

21        Q    Right.  And now I'm asking a different

22   question.  Of your access providers, who has provided

23   you with bandwidth utilization data?

24        A    Speakeasy is one that immediately comes to

25   mind.

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1036

1      Q    Who else?

2      A    MegaPath Networks.

3      Q    Okay.  Who else?

4      A    I think Verizon FIOS also, we discussed

5   utilization with them.

6      Q    Okay.  Who else?

7      A    That's all I can think of right now.

8      Q    Do you have any documents reflecting Beyond

9   Systems' bandwidth utilization from these entities?

10     A    I think the vast majority of communications

11  took place over the phone.

12     Q    Do you have any written documents

13  reflecting Beyond Systems' bandwidth utilization?

14     A    There might be.  There might be documents

15  when we're trying to increase --

16     Q    Let me be clear.  I'm not asking what might

17  exist.  I want to know what you know exists that

18  reflects Beyond Systems' bandwidth utilization?

19     A    I can't think of anything right now

20  specifically.

21     Q    You said that you had conversations with

22  your providers concerning Beyond Systems's bandwidth

23  utilization?

24     A    Yes.

25     Q    Who were those conversations with, the

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1037

1    names of people?

2         A    They are tech support people at Speakeasy.

3         Q    Okay.  What are their names?

4         A    I don't remember offhand.

5         Q    Do you remember any of the names for the

6    people you spoke with at Verizon, if any?

7         A    No.  Same answer.

8         Q    Did you speak with anybody at Verizon

9    concerning network bandwidth utilization?

10        A    I think we did at some point.

11        Q    But you don't remember who they were,

12   right?

13        A    Correct.

14        Q    Do you remember when those conversations

15   took place?

16        A    Last couple years.

17        Q    Did you take any notes of your

18   conversations with them?

19        A    No, I don't think so.

20        Q    Did you take any notes -- strike it.

21        Do you have any notes reflecting any

22   conversations with any of your access providers

23   concerning bandwidth utilization?

24        A    There might be.

25        Q    I'm not asking what might exist.  Do you

Page 1038

1   have any documents reflecting your conversations with

2   your access providers concerning bandwidth

3   utilization?

4        A    I'm trying to think -- I can't think of a

5   specific document.  I recall we were trying to

6   provision the lines using different twisted pair from

7   the central office to the Silver Spring site,

8   different lengths, different through-puts.  And we

9   ended up going back and forth between different lines

10  to try to get a little more bandwidth since the line

11  was largely saturated, but I don't recall what

12  specific documents might reflect that.

13       Q    And you can't name any specific individual

14  at any of your access providers with whom you spoke

15  about bandwidth utilization?

16       A    That's correct, not sitting here today.

17       Q    You testified a few questions ago that you

18  measured bandwidth utilization in terms of a

19  percentage.  I think the numbers you might have used

20  were 30%, 50%.  You might have used a different number

21  or some different number, but you ended it with a

22  percentage.  Do you recall that?

23       A    Yes.

24       Q    What is that a percentage of?

25       A    The percentage of the maximum available

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1039

1    utilizable bandwidth.

2         Q    Your utilizable bandwidth or the world's

3    utilizable bandwidth or whose utilizable bandwidth are

4    you referring to?

5         A    The bandwidth that is available for BSI to

6    use on the line as provisioned.

7         Q    Does Beyond Systems measure spam loads?

8              MR. ONORATO:   Objection to form.

9              THE WITNESS:   You mean can it quantify the

10   burden due to spam?

11   BY MR. ROTHMAN:

12        Q    Well, let me ask it differently.   Have you

13   ever used the phrase "spam loads"?

14        A    I can't recall.   That's a fairly colloquial

15   phrase.   We certainly use phrases similar to that.

16        Q    In what context?

17        A    To discuss -- and it's possible we've used

18   that phrase just to discuss the rate of flow of spam

19   to BSI.

20        Q    Okay.   And does Beyond Systems measure the

21   rate of flow of spam to itself?

22        A    Periodically.

23        Q    And how does it do that?

24        A    It counts the number of e-mails in a given

25   day's mailbox, for example, or it might count the

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1040

1    number of e-mails in a year accumulation and then

2    divide by the number of days in the year.

3         Q    Is that a statistic that Beyond Systems

4    maintains?

5         A    I probably have it written down somewhere

6    what the estimate to the flow rate was at that time

7    period.

8         Q    You said "probably."  Did you?

9         A    I can't recall a specific communication,

10   but I'm pretty sure I wrote one million spams per day

11   as an average recently, but I can't recall a specific

12   document that contained that.

13        Q    What do you mean "recently"?

14        A    Within the last year or so I would have

15   written that.

16        Q    Let's go back to 2005.  Did you generate

17   any documents measuring spam loads to Beyond Systems?

18        A    I can't think of a particular document, but

19   it's likely -- it's likely that I gave some tally of

20   the spam that was coming in.

21        Q    Did Beyond Systems ever generate any

22   documents on a routine basis measuring spam loads to

23   itself?  Like weekly reports?  Monthly reports?

24   Yearly reports on spam loads?

25        A    Weekly -- I don't think we did anything at

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1041

1  regular intervals that precisely.

2       Q   Sitting here today can you recall any

3  documents that measure spam loads to Beyond Systems

4  during the time period February 2005 to July 2008?

5       A   Any specific document reflecting spam

6  burden?  I mean, there is a lot of documents --

7       Q   Well, your calculation of spam loads that

8  you were talking about earlier.

9       A   That reflect the calculation of the number

10  of spams per day or per year.

11       Q   Correct.

12       A   I mean, the e-mails themselves would

13  reflect that, of course.

14       Q   Other than the e-mails themselves.

15       A   I can't think of any specific document that

16  would contain that today --

17       Q   Does --

18       A   -- sitting here today.

19       MR. ONORATO:  Counsel, can we take a break

20  at some point?

21       MR. ROTHMAN:  Yeah, couple more quick

22  questions.

23  BY MR. ROTHMAN:

24       Q   Does Beyond Systems measure server

25  response?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1042

1      A    Yes, there are a number of ways to quantify
2   that that BSI has done.
3      Q    Okay.  How has Beyond Systems done that?
4      A    So you can look at various task managers or
5   Mac OS environment.  You can look at a utility called
6   Tops, T-O-P-S.  You also get word from users who are
7   complaining the server is either slow or not
8   responsive and we observe the same ourselves.
9      Q    What documents reflect the server
10  responses?
11     A    Again, I can't identify a specific one.  I
12  believe we produced documents from Guy Genilloud in
13  which he's complaining about slow response or
14  nonresponse.
15     Q    Are there any reports that Beyond Systems
16  generates on a routine basis that measures server
17  response?
18     A    You mean at precise interval times?
19     Q    Either at precise intervals, yearly,
20  monthly reports that it generates that measure server
21  responses?
22     A    All those that -- sounds like precise
23  intervals, so nothing at precise intervals.
24     Q    Other than the documents from Guy, do you
25  have any other documents that reflect server

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1043

1    responses?

2         A    The e-mails themselves will reflect servers

3    that had been backlogged, but whether your client or

4    one of the servers, you know --

5         Q    Other than the e-mails themselves and the

6    e-mails from Guy.

7         A    I mean, there are various proofs of

8    purchase that we have that reflects our need to

9    upgrade equipment to handle the load that we -- that

10   the computers have faced and the networks have

11   undergone.

12        Q    Anything else?

13        A    And by server burden, do you mean just sort

14   of the CPU cycles or do you mean also storage or --

15        Q    I didn't use the phrase "server burden."

16   I'm just asking what documents Beyond Systems has that

17   reflects server responses.

18        A    Server responses.

19        Q    Right.  Server response or SERP.

20        A    I guess my previous answer would apply.

21   Also, documents showing disc space being maxed out and

22   crashes that result when you have no additional -- no

23   further storage available.

24        Q    How is BSI's measurement of server response

25   reflected in the e-mails at issue?

095e8604-823f-403e-af26-b29978dac893

Page 1044

1      A    There may be specific communications about

2  it.  Besides that, you can see patterns of delay at

3  times between one computer and another that would

4  reflect this slowed response.

5      Q    But can you determine if it was a

6  Hypertouch computer that was down or a Beyond Systems

7  computer that was down just by looking at the header

8  if you have a delayed response?

9      A    If you examine a series of e-mails, you

10  often can identify with high likelihood which computer

11  is bogged down.

12      Q    I'm talking about if you just look at one

13  e-mail.

14      A    One e-mail?  Just from the header of one

15  e-mail only, it's difficult for me to think of how to

16  pinpoint which computer is suffering an outage.

17      Q    Has Beyond Systems lost any customers

18  because of high spam loads?

19      A    Yes.

20      Q    Who has it lost?

21      A    Peter Wagner.

22      Q    Who else?

23      A    I guess you're asking customers BSI has

24  lost at least in part due to high spam --

25      Q    Well, Peter Wagner is your brother, right?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1045

1        A   Yes.

2        Q   And he told you he wanted to not be a BSI

3    customer anymore because he was getting too much spam;

4    is that right?

5        A   Essentially.

6        Q   What do you mean "essentially"?  Is that

7    what he said or not?

8        A   He no longer uses his e-mail account

9    because it was just saturated with spam every time he

10   tried to use it.

11       Q   And he told you that, right?

12       A   Yes.

13       Q   Did any of your other customers cease being

14   BSI customers after telling you they receive too much

15   spam?

16       A   Well, I recall Guy and colorvivofilms.com

17   had to take a lot of -- some extreme measures to try

18   to thwart or ward off spam, including changing all

19   their e-mail addresses.

20       Q   Is he still a customer of yours?

21       A   Yes, but I don't know if all the staff --

22   I'm not even sure if Color Vivo is.

23       Q   You don't know if Color Vivo is a customer

24   of yours anymore?

25       A   A few of their employees might be, but I

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1046

1    don't know if they are -- I don't think all of them

2    are customers of BSI anymore.

3         Q    Well, if you don't know, who would?

4         A    Well, whoever is providing the e-mail

5    service now.  BSI is not providing e-mail service.

6         Q    Okay.  So BSI is not providing Color Vivo

7    Films any Internet service right now; is that right?

8         A    Not to some of the users who formerly were

9    using it.

10        Q    Okay.  But is Color Vivo Films an entity?

11        A    Yes.

12        Q    And is that entity a BSI customer?

13        A    I think so, yes.

14        Q    Okay.  And Guy is a BSI customer as well?

15        A    He's a client, yes.

16        Q    What's the difference between a client and

17   a customer?

18        A    Well, he's using BSI's services, so he's a

19   client in a technical sense.  He's receiving --

20        Q    Is he a paying customer for Beyond Systems?

21        A    No.

22        Q    Okay.  But he's still using BSI's services

23   right now; is that right?

24        A    Yes.

25        Q    All right.  Who has stopped using BSI's

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1047

1    services after communicating to you that they receive

2    too much spam or the spam load was too high other than

3    Dr. Peter Wagner?

4              MR. ONORATO:   Objection to form, compound.

5              THE WITNESS:   I'm trying to think of which

6    clients have mentioned there is a lot of spam coming

7    through and they might have just silently stopped

8    using the account BSI has provided.

9    BY MR. ROTHMAN:

10        Q    I don't want silently.  I want them to tell

11   you the reason why they are no longer using BSI's

12   services is because of spam.  Who else other than

13   Peter Wagner told you that?

14        A    And you mean said it explicitly, not that

15   BSI would contend or concluded that that was why they

16   terminated.

17        Q    That's right.  That's right.

18        A    Because we have lost some customers we

19   think that was the reason.

20        Q    I'm not interested in your thoughts.  Right

21   now I'm just interested in who told you that they are

22   no longer using BSI's services because of spam.

23        A    I can't think of anyone else right now.

24        Q    Who else would know other than you?

25        A    Well, some of BSI's clients who were having

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1048

1    problems with spam.

2        Q    I'm asking if they told you -- well, strike

3    it.

4        Peter Wagner used the e-mail address

5    peter@castalia.net; is that right?

6        A    Yes.

7        Q    And when he told you he no longer wanted to

8    use that e-mail address, what did you do with that

9    account?

10       A    We reclaimed it.

11       Q    What do you mean by "reclaimed it"?

12       A    I'm not sure what you mean by "account," I

13   guess, but the e-mail address -- BSI now receives any

14   e-mails to that account.

15       Q    So if you knew that -- why is that?  Why is

16   Beyond Systems receiving e-mails addressed to that

17   account if your brother doesn't want to use it

18   anymore?

19       A    Well, I would cite BSI's various business

20   purposes that have been discussed in the past at depos

21   and BSI's policy to receive e-mails to any e-mail

22   address at the domain names to which it receives

23   e-mail.

24       Q    But if that one received a lot of spam, why

25   didn't you just turn it off or deactivate it?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1049

1      A    Well, it wouldn't have prevented -- all the
2  harm that BSI is getting anyway.  It may still have
3  some value to Peter.  If there is an e-mail that
4  somebody inadvertently sent to that account or
5  belatedly sent to it, he might still want to receive
6  that e-mail.
7      Q    Have you ever sent e-mails addressed to
8  peter@castalia.net after you, I take it, redirected
9  the e-mails to yourself and then sent them to your
10 brother?
11     A    I might well have done that.
12     Q    I'm not asking what you might have done.
13 I'm asking did you?
14     A    I don't recall a specific instance.  I
15 think I could probably check that.
16          MR. ONORATO:  Is this a good time for a
17 break?
18          MR. ROTHMAN:  That's fine, yeah.
19     (Discussion was had off the record.)
20     (Proceedings recessed.)
21 BY MR. ROTHMAN:
22     Q    Did any of the e-mails that you produced in
23 June 2008 cause any physical damage to your computers
24 or other equipment?
25          MR. ONORATO:  Objection to form.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1050

1            THE WITNESS:  I guess I'm not sure what you

2    mean by "physical damage."  Physical harm?  I mean, I

3    would -- I would think that anything that reduces a

4    machine's ability to function -- to perform its

5    desired function would be a harm, a physical harm.  I

6    mean, it's all physical related.

7    BY MR. ROTHMAN:

8            Q    Anything else, any other physical harm?

9            A    I mean, the burdens that we discussed that

10   spam imposes are covered pretty well.

11           Q    What do you mean?

12           A    I mean the various burdens that are cited,

13   that are alleged in the amended complaint.

14           Q    Anything else that's not alleged in the

15   amended complaint or that you just now testified

16   about?

17           A    There are specific harms to each and every

18   e-mail which are not specified with particularity in

19   the amended complaint.  So each and every e-mail has a

20   certain harm, certain number of bytes, certain

21   characteristics that constitute a unique harm.

22           Q    And you can measure that unique harm?

23           A    In some regards, yes.

24           Q    Have you done so in this case?

25           A    In a sense, yes.  I've broken apart all the

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1051

1   e-mails into individual e-mails and through the

2   computer I was using determined how many bytes each

3   and every e-mail contains.

4        Q    And then after you determine how many bytes

5   each e-mail contains, how do you measure the harm?

6        A    So that would be -- so one component of the

7   harm would be the disc space, the number of bytes of

8   storage occupied on the disc drive or that were

9   transmitted across a network.  So those would be a

10  couple ways to quantify the harm.

11       Q    Is there any other way you can quantify the

12  harm?

13       A    I mean, these costs due to spam,

14  spam-related costs in this exhibit we've been

15  reviewing, staff time.

16       Q    How do you measure staff time?

17       A    Well, with a clock.

18       Q    Okay.  Do you write it down anywhere?

19       A    Not in general, but it might be reflected

20  in daily communications.

21       Q    I'm sorry.  Did you say in general or not

22  in general?

23       A    Not in general.

24       Q    So you do not in general record staff time;

25  is that correct?

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1052

1    A    Yeah, not -- not by minute-by-minute

2    activity.

3    Q    What about hour by hour?

4    A    Well, staff activity is reflected in

5    e-mails to some extent that describe or reflect the

6    activity that that staff member was performing leading

7    to the e-mail.

8    Q    But you don't complete time sheets or

9    anything like that, do you?

10   A    No.

11   Q    Okay.  How else can you quantify time --

12   strike it.  Go ahead.

13   A    Not presently.  For something -- with some

14   consulting gigs, BSI completed time sheets.

15   Q    And you submitted or you're paid on an

16   hourly basis; is that why you do that?

17   A    Yes, in some cases.

18   Q    How else can you quantify harm?

19   A    Well, some of the harm to BSI comes in the

20   form of increased costs from services it receives from

21   service providers, law firms and others who have

22   received spam.  So when Barale, for example, lists in

23   his e-mail list several hundred -- I believe several

24   hundred e-mail addresses at steptoe.com is what I'm

25   hearing or heard second-hand, that, I believe,

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1053

1    translates in some sense to higher -- harms BSI and

2    those attorneys are tied up and --

3         Q    So your testimony is that there is Steptoe

4    law -- strike it.

5         There is steptoe.com e-mail addresses in the

6    Barale data?

7         A    I'm hearing that second-hand, yes.

8         Q    Who are you hearing that second-hand from?

9         A    From -- well --

10        MR. ONORATO:  Paul, if you don't -- don't

11   discuss potentially attorney-client privileged

12   information.  Okay?

13        THE WITNESS:  Okay.  Apart from

14   communications with attorneys, I have not heard from

15   anybody.

16   BY MR. ROTHMAN:

17        Q    Is there any other way you can quantify

18   harm?

19        MR. ONORATO:  If you can answer without

20   speculating, please answer.

21        THE WITNESS:  By "quantify," you mean

22   quantify in terms of dollars or in terms of number of

23   complaints or --

24   BY MR. ROTHMAN:

25        Q    Measure your physical harm.  However you

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1054

1    were quantifying it earlier.

2         A    I was quantifying in terms of -- in terms

3    of resources or performance.  There is also -- I

4    suppose you can try to quantise it in terms of

5    inconvenience or annoyance to clients.

6         Q    Have you measured that or quantified that?

7         A    You can count the number of e-mails

8    produced --

9         Q    No, wait, stick with my question.  Have you

10   quantified the harm you just testified about?

11        A    Yes.

12        Q    How have you done that?

13        A    If you count the number of e-mails sent by

14   Guy to BSI, for example, each of those reflects an

15   instance of annoyance and it could be quantified.

16        Q    How many is that, do you know?

17        A    I don't recall right now.

18        Q    Is it over a hundred?

19        A    Dozens of e-mails, I think.

20        Q    Is it over a hundred?

21        A    I don't recall.

22        Q    Is it over 50?

23        A    Not sure.

24        Q    Is it over 20?

25        A    Not sure.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1055

1       Q    Is it over ten?

2       A    I think so.

3       Q    Is it somewhere between 10 and 20?

4       A    That's possible.

5       Q    Okay.  How else can you quantify

6   frustration, I guess, to customers?  Is that what

7   you're testifying about now?

8       A    Right.  I mean, there's potential business

9   that could have been acquired --

10      Q    I'm not asking --

11      A    -- and that's a harm, too.

12      Q    Potential business opportunities?

13      A    Yes, BSI is not being able to acquire.

14      Q    Okay.  And what business opportunities do

15  you contend you've lost?

16      A    A number have come by where BSI staff is

17  not available to help -- help those persons or is not

18  able to offer robust spam-filtering capabilities.

19      Q    Okay.  Who were they?

20      A    One is called Sports and Spinal.

21      Q    Who approached you from Sports and Spinal?

22      A    Sara Thorpe.

23      Q    Is this the Sara Thorpe that lives in

24  Silver Spring?

25      A    I don't know -- I don't recognize that

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1056

1    name.

2              Q    You don't recognize that name at all?

3              A    Sara Thorpe in Silver Spring?

4              Q    Okay.  Where does Sara Thorpe live?

5              A    I'm not sure.  I think she lives in DC in

6    DuPont Circle.

7              Q    Okay.  How do you know her?

8              A    Friend of a friend.

9              Q    Okay.  And when did she approach you?

10             A    BSI has done one or two minor consulting

11   gigs for her in the last year or two, and she -- that

12   company has more work BSI could do, but BSI's staff

13   and myself are tied up doing other things.

14             Q    What work did she want you to do that you

15   cannot do?

16             A    One was providing a video recording and

17   analysis capability for physical therapy patients.

18             Q    What does that have to do with the

19   Internet?

20             A    And -- it might not actually.  Well, it

21   might make that available on the Internet.

22             Q    Well, is that why she came to you because

23   she wanted to make video recording available on the

24   Internet?

25             A    Well, it was a general consulting

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1057

1   engagement so --

2           Q    Did she come to you for Internet services?

3           A    Her requirements involved providing

4   Internet services.

5           Q    Okay.  And when did she come to you and ask

6   you this?

7           A    That was a couple year -- couple years ago.

8   And more recently they approached BSI about helping

9   them set up a blog of some sort.

10          Q    And you were unable to do that either,

11  right?

12          A    Not yet.

13          Q    Why not?

14          A    I've been tied up.

15          Q    Doing what?

16          A    In part contending with spam, trying to

17  defend BSI against spam and just mitigate its effects.

18          Q    So you are choosing to do that instead of

19  helping out Ms. Thorpe?

20          A    Yes.  Correct.

21          Q    And does defending against spam include

22  prosecuting lawsuits?

23          A    I don't know about prosecuting, but being

24  engaged in a lawsuit does take up staff time.

25          Q    Are you engaged in any lawsuits that you

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1058

1   decided -- strike it.

2          Are you engaged in any lawsuits that you did

3   not agree to file?

4          MR. ONORATO:  Objection to form.

5   BY MR. ROTHMAN:

6      Q   Are you in any lawsuits that you are

7   participating in involuntarily?

8          MR. ONORATO:  Objection to form.

9          THE WITNESS:  Well, I think the third-party

10  claim against Joe Wagner and Hypertouch sort of

11  involuntarily involves BSI.

12  BY MR. ROTHMAN:

13     Q   Okay.  What other claims?

14     A   BSI has been sued and threatened suit by

15  affiliate -- affiliates of what BSI contends are

16  affiliate spammers.

17     Q   Who are they?

18     A   Jeffrey Mulligan in New Hampshire sued BSI

19  a year or two ago -- 2006, 2007.

20     Q   Did you ever sue Mulligan or his company?

21     A   Yes.

22     Q   Okay.  What other lawsuits has Beyond

23  Systems participated in that were not voluntary?

24         MR. ONORATO:  Objection to form again.

25  BY MR. ROTHMAN:

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY - (800) 292-4789
CONFIDENTIAL

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1059

1      Q    Did you ever participate in a lawsuit that
2  you didn't want to participate in?
3      A    I'm thinking.  I can't think of anything in
4  particular.
5      Q    Okay.  Where does Ms. Thorpe live?  You
6  said Washington, DC?
7      A    I think she lives in DC, yeah.
8      Q    Do you have her phone number?
9      A    No.
10     Q    Do you know her phone number?
11     A    No.
12     Q    Do you know her e-mail address?
13     A    No, not offhand.
14     Q    How do you get in contact with her if you
15  wanted to get in contact with her?
16     A    I would look it up on some of my records.
17     Q    What records would you consult?
18     A    Probably past e-mails with her.
19     Q    Okay.  Who else has approached you to do
20  business that you had to turn down because you've been
21  involved defending spam?
22          MR. ONORATO:  Objection to form.
23          THE WITNESS:  Either turn down or delay.
24  BY MR. ROTHMAN:
25     Q    Well, before we go there, did Ms. Thorpe

095e8604-823f-403e-af26-b29978dac893

Page 1060

1  offer you money to perform the services that she

2  wanted you to perform?

3       A    I think it was understood.  She has paid

4  me -- her company has paid BSI in the past.

5       Q    Well, with respect to this video and

6  Internet project, did she offer you money?

7       A    Yes.

8       Q    How much?

9       A    I forget.  She has paid BSI a few hundred

10  dollars.

11       Q    Okay.

12       A    Yeah.  It was a gift by BSI -- well,

13  figurative, but BSI gave her a deep discount.

14       Q    Okay.  And who else has approached you for

15  business opportunities that you had to turn down

16  because of spam?

17       A    Again, even with Ms. Thorpe, I would say

18  either I turned down or deferred, postponed.

19       Q    Fine.

20       A    It's possible we might still be working for

21  her, but it's been delayed.

22       Q    I'm done with Ms. Thorpe.  Who else

23  approached you?

24       A    But I was clarifying my answer.  You were

25  mischaracterizing my answer, I think, so I was undoing

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1061

1    your characterization.

2            Q    Are you done with Ms. Thorpe?

3            A    Now I'm finished.

4            Q    Okay.  Who else approached you with

5    business opportunities that you had to turn down

6    because you were defending spam?

7            A    Because of defending spam or otherwise

8    grappling with spam?

9            Q    Grappling with spam, defending spam,

10   whatever verb you want to use in front of spam.  You

11   tell me which one you're going to use, though.

12           A    Alex Faschenko, another paying client.  He

13   has had Internet-related needs that I've not been able

14   to -- BSI has not been able to attend to.

15           Q    Okay.  What were those needs?

16           A    Various needs, but getting e-mail service,

17   getting e-mail client to work on a laptop, to send or

18   receive e-mail through BSI, making backup copies of

19   data including e-mails.

20           Q    And how much money did Mr. Fa --

21           A    Faschenko.

22           Q    -- offer you to do that?

23           A    And there are more things BSI has done for

24   him.

25           Q    I'm not asking what you've done for him.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1062

1    I'm asking what opportunities you had to pass up.

2         A    Right.  Also, you know, he sometimes uses

3    BSI's computers like at a cyber cafe for basic

4    Internet access and basic Internet functions.

5         Q    You're not following my question.

6         A    And so sometimes he has issues there and

7    I'm not able to help him.

8         Q    Have you ever passed up a business

9    opportunity that Mr. Faschenko offered Beyond Systems?

10        A    Those are business opportunities.

11        Q    Okay.  How much money did Mr. Faschenko

12   offer you for those business opportunities?

13        A    I believe Alex is paying BSI $20 a month

14   for a specific service and we never discuss -- I don't

15   recall ever discussing any other -- any other payment

16   for service.

17        Q    Okay.  So he's paying you $20 a month for

18   the services you're now providing him, right?

19        A    Right.

20        Q    Okay.  Who else made a business proposal to

21   you that you had to turn down?

22        A    Or have been delayed in responding to?

23        Q    Let's talk about turned down first.

24        A    There is a colleague/friend named Alex

25   Filanfonte (phonetic), who is roughly 65, 70 years

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1063

1    old.  He's a member of Mensa.  He sends out an e-mail

2    newsletter of events going on in DC and is having

3    capacity issues.  And BSI offered to provide him

4    service on his servers for free at least initially,

5    which would allow him to address his problems, the

6    problems he was having sending his e-mail.  And BSI

7    was slow in responding to him.  I think we're still on

8    good terms.  We may still initiate a relationship, but

9    BSI has been delayed in responding to him.

10          Q    Okay.  Anything else?

11          A    There is another person who is better

12   acquainted with Mike Whitley than myself.  I forget

13   his name.  And he's also interested in using BSI

14   services.

15          Q    Okay.  Anybody else you can remember,

16   names?

17          A    Bonfacir Yep (phonetic) that lives next

18   door to me in DC.  He has had a number of Internet

19   access issues and various problems with various

20   applications.  I ultimately have been able to help him

21   on several occasions but have been delayed in

22   responding to his requests for assistance because of

23   the burdens contending with spam, among other burdens.

24          Q    And he's a current customer, right?

25          A    Yes.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1064

1      Q    And has he ever come to you and wanted to

2  do more business with you and offer you either more

3  money than he might already be paying you for

4  additional services?

5      A    Well, I hear several questions there.  I

6  don't think he's offered me more money --

7      Q    Okay.

8      A    -- explicitly.

9      Q    Okay.  Who else has come to you with a

10  business proposal that you've had to turn down?

11      A    There is a company called Barcroft Cycles.

12  I think their website is barcroftcycles.com.  They

13  were a paying customer of BSI's and eventually

14  terminated the service, I think, in part, because BSI

15  is not able to respond to some of their requests for

16  service -- to problems they were having quickly enough

17  due in part to the burdens of spam.

18      Q    Who at Barcroft Cycles is your contact

19  person?

20      A    I think his name is Bill Cook.

21      Q    When was the last time you talked to

22  Mr. Cook?

23      A    It's been a while.

24      Q    Two years, five years?

25      A    It's been a good two, three years.

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1065

1      Q    Where is Barcroft Cycles located?

2      A    I think Virginia or Maryland -- I think

3  he's in Virginia.  He also mentioned his son became an

4  employee at some other service provider, so that may

5  also be a factor in his migrating to that service

6  provider.

7      Q    Okay.  But did Barcroft ever come to you

8  and make a business proposal that you had to turn down

9  as opposed to coming to you with a customer service

10  issue, which is what you just described, I believe?

11  Correct me if I'm wrong.

12      A    Well, I'm discussing a loss of business.

13      Q    Okay.  I'm not interested in loss of

14  business.  What I'm interested in now is did anybody

15  come to you and make a business proposal that you had

16  to turn down because of spam?

17      A    I regard most customers as prospective

18  proposals for additional services, if we had the time

19  and it might be worth money to them.

20      Q    Okay.  I want the names of customers or

21  anybody on this planet that has come to you and made a

22  business proposal that you had to turn down because of

23  spam, not for current services but for future

24  services.

25      (Mr. Ring exited the conference room.)

095e8604-823f-403e-af26-b29978dac893

CONFIDENTIAL DEPOSITION OF PAUL A. WAGNER, VOLUME 4
CONDUCTED ON TUESDAY, JUNE 16, 2009

Page 1066

1        THE WITNESS:  I'm sure there are others.  I
2   can't think of any at the moment.
3   BY MR. ROTHMAN:
4        Q    Okay.  If you could reference back to
5   Exhibit 139.  I'm going to put before you what's been
6   previously marked as Exhibit 99.
7        With respect to Exhibit 99, do you recognize
8   that document?
9        A    Yes, I think I recognize it.
10        Q    Okay.  Before we go to Exhibit 99, I forgot
11   to ask a question.
12        In the time period February 2005 through July
13   2008, do you contend that Connexus sent an e-mail to
14   Beyond Systems every calendar day during that time
15   period?
16        A    Each and every day between February 2005 to
17   June 2008?
18        Q    July 2008.  Between February 2005 and July
19   2008.
20        A    I don't know.  I don't think so.  There's
21   probably been at least a day of peace.
22        Q    Okay.  And during those days of peace is it
23   your contention that Connexus, notwithstanding, caused
24   damage to Beyond Systems' system on those days where
25   they did not send e-mail to Beyond Systems?

095e8604-823f-403e-af26-b29978dac893

Page 1067

1      MR. ONORATO:  Object to form.

2  BY MR. ROTHMAN:

3      Q   So on a day when Connexus didn't send an
4  e-mail to Beyond Systems, did Connexus cause damage to
5  Beyond Systems on those days?

6      MR. ONORATO:  Objection to form.

7      THE WITNESS:  Yes, in the same sense that
8  Connexus causes damage to BSI at one second after the
9  e-mail is received as it did one day after e-mail is
10  received.

11  BY MR. ROTHMAN:

12      Q   Okay.  Going back now to Exhibit 99, if you
13  could turn, I believe it's page 4, where it says,
14  response 1f and response 1g.  Are you there on Exhibit
15  99?

16      A   On which page?

17      Q   I think it's 4.  Response 1f and response
18  1g.

19      A   Yes.

20      Q   Okay.  And then also at the same time
21  reference Exhibit 139 and let me know when you're
22  there.

23      A   Yes.

24      Q   In the "To:" line, it says
25  sam.tellerine@has-it.com.  Do you see that?