EXHIBIT 11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

BEYOND SYSTEMS, INC.,

    Plaintiff,

        v.

KRAFT FOODS, INC., *et al.*,

    Defendants.
_____

CONNEXUS CORP., *et al.*,

    Third-Party Plaintiffs,

        v.

JAMES JOSEPH WAGNER, *et al.*,

    Third-Party Defendants.
_____

Case No. 8:08-cv-00409 (PJM)(CBD)

**<u>EXPERT REPORT OF DR. JOHN C. KLENSIN</u>**

    I, John C. Klensin, Ph.D., state as follows:

## I.    INTRODUCTION

    1.    This report was prepared in the matter of *Beyond Systems, Inc. v. Kraft Foods, Inc., et al.* in connection with the "mini trial" scheduled by the Court to be held June 19-22, 2012. My CV listing all of my publications is attached. I have been compensated at the rate of $400 per hour for the time required to prepare it. The report is based on a my previous review in this case of the applicable electronic mail standards and requirements and normal industry practices, a preliminary survey of the collections of messages supplied by Plaintiff, and

representations from Plaintiff as to the configuration and operation of its email systems. My

compensation is not contingent upon the content of the testimony that I offer.

2.      I am over the age of eighteen years old and fully competent to testify to the

matters stated in this report as being true and correct based on my personal knowledge of such

matters unless otherwise stated herein.

**Qualifications**

3.      At present, I am an independent consultant. Prior to this time, I was the Internet

Architecture Vice President at AT&T, Distinguished Engineering Fellow at MCI WorldCom,

and Principal Research Scientist at MIT. Prior to joining AT&T, while I was at MCI and then

MCI WorldCom, I had lead responsibility for the design of many aspects of the internetMCI and

marketplaceMCI offerings (the latter was probably the first major commercial effort in

multivendor Internet business to consumer ecommerce), including their customer email systems.

Prior to coming to MCI in mid-1994, I was INFOODS Project Coordinator for the United

Nations University and, before that, was at MIT for nearly 30 years, holding Principal Research

Scientist appointments in several departments including Architecture, the Center for

International Studies, and the Laboratory of Architecture and Planning.

4.      I have been involved in the design of the Internet since the inception of the

predecessor ARPANET, working with the one of the key implementation groups at MIT and

participating in the first design of an network-based electronic mail protocol as part of the

ARPANET File Transfer Protocol in 1971. I have been using network-based electronic mail

since that time and electronic mail more generally on an almost continual basis since about 1967.

5.      I received an S.B. degree in Political Science and Mathematics from MIT,

focusing on political communications, opinion polling, and measurement, in 1967. From 1968

until 1976, I was effectively technical director of the Cambridge Project, a large MIT-Harvard project for research in computing applications in the social and behavioral sciences and its follow-on, the Overlap Project. That work included my early involvement with the ARPANET mentioned above, participation in the early Defense Messaging System initiative at the request of the Office of the Secretary of Defense, and development of systems used by a number of private and governmental entities (US and European) for data management and analysis (including the systems the DoD used to manage fuel supplies during the oil crisis of the 1970s). In 1976, I returned to school, completing an interdisciplinary Ph.D. at MIT in Computer Applications and Use in the Social and Policy Sciences in the spring of 1978.  After that degree was completed, I was appointed as a member of MIT's permanent research staff with the title of Principal Research Scientist, remaining at MIT with leadership responsibilities for a number of research projects at the boundary between computer science, the social and policy sciences, and statistics and data analysis until 1992.

6.      After a brief tenure with the United Nations University leading an international scientific database and data interchange project, I joined MCI in 1994, taking part of the lead in design of the user-facing aspects of internetMCI (including the first multi-store online shopping operation on the Internet). MCI recognized that and related work by appointing me its first Distinguished Engineering Fellow. At the beginning of 2000, I moved to AT&T Labs, taking the position of Internet Architecture Vice President. I resigned from AT&T at the end of 2001 and have subsequently been doing consulting work in a number of areas involving Internet applications, technology, and policy.

7.      I was involved in the design and implementation of a number of electronic mail systems since the mid-1970s including the gateway systems between the BITNET/EARN

3

network and the Internet, systems at MIT and the United Nations University, the mail system for

internetMCI (several million users), and the phase-out of MCI Mail. I made significant

contributions to the design of the MIME protocol and data formats for multimedia and

internationalized electronic mail and was the principal designer and later Working Group Chair

of the system for extensions of the "SMTP" protocol that enabled new features and mechanisms

in email transport. The latter work included formulation and naming of the "EHLO" command

that is now used in most contemporary electronic mail systems.  I have continued that work as

one of the design leads for the present standards for Internationalized Domain Names and as a

design lead and working group co-chair for the forthcoming standards for internationalized email

addresses.

8.      I am the principal author and editor of the current version of the SMTP Standard

for the transport of electronic mail on the Internet.

9.      I was Area Director for Applications of the Internet Engineering Task force in the

mid-1990s and oversaw the definition and standardization of the "HTTP" protocol that is now

the principal protocol used in the world wide web as well as a wide range of other work.

10.     I was a member of the Internet Architecture Board, which maintains general

oversight of the architecture of the Internet, from 1998 through 2002 and was returned to it for an

additional two year term from 2009 through 2011. I was elected by the other members and

served as the Chair of that body from 2000-2002.

11.     I have served in several capacities with the Internet Corporation for Assigned

Names and Numbers (ICANN), the US Government designee for administering and coordinating

the Internet's primary name and address spaces. Those roles included service on some of the

advisory groups that defined ICANN and its initial structures, advisory and review panels in

4

several specific matters, and membership in the ICANN Board of Directors and Liaison for the

Internet Engineering Task Force (IETF), the Internet's primary technical standards development

organization.

12.     I served as a member of the National Research Council Committee on The

Internet in the Evolving Information Infrastructure from 1998-2000 and on their Committee on

Internet Navigation and the Domain Name System from 2001-2005.

13.     I am a Senior Member of the IEEE, a member of the American Statistical

Association and the International Association for Statistical Computing, and a Fellow of the

ACM.

**Review of the Structure of Email and the Operation of Email Systems**

14.     Internet Electronic Mail (email) was closely modeled on the postal mail system,

although there are some important details where the analogy breaks down.  The differences that

are important to this discussion are noted below; the most important of them is that, under

normal circumstances, envelopes sent through the post do not contain identification of the

various post offices and sorting and routing facilities through which they pass.  Internet message

handling systems are required to obtain and document that information and record it in "trace"

information fields.  While the information provided and accessibility to it are different, those

fields more closely resemble the tracking systems of various express courier services (e.g.,

Federal Express and its competitors) then they do the USPS.

15.     There is a message envelope that is used to transport and deliver the message.  In

general, it contains the information needed to accept messages into the Internet, transport it

across the network, and deliver it to a destination.  Envelope information is also known as

"SMTP information" after the usual abbreviation of the protocol that specifies it and email

5

transport more generally, the Simple Mail Transfer Protocol[1].  The most important part of that information is the delivery address (known as the forward-pointing address or "RCPT TO" field), the sender address (known as the backward-pointing address or "MAIL FROM" field), which is roughly equivalent to a return address on an envelope, and an announcement of the identity of the sending system.  The latter, known as the "EHLO" or "HELO" field, is essentially an announcement of the identity of the sending system (not necessarily the originating one) and might be thought of as analogous to a postmark, albeit an undated one.

16.     Conceptually, the envelope also includes the "trace" information mentioned above: each system through which the message passes is required to include information about the system from which it received the message.  It is specified as part of SMTP, even though each one is stored at the top of the mail headers in what is known as a "Received:" field. That field contains several clauses, most of which are optional.  The "from" clause of the "Received:" field is one of those that are required[2].  That clause is normally required to contain both the domain name used in the EHLO (or HELO) command received by that server and the server's own information about the IP address from which the connection was initiated.

17.     Just as business letters within an envelope normally contain header information that shows name and address information about the message author, the date, the name and address of the recipient, often the message subject, and other identifying information, electronic mail messages contain header information.  While that information in a business letter may be

---

[1] Klensin, J., Ed., "Simple Mail Transfer Protocol", RFC 2821, April 2001. Updated and clarified by Klensin, J., Ed., "Simple Mail Transfer Protocol", RFC 5321, October 2008.  This report references the earlier document (RFC 2821), since it has been widely available for over a decade.  For the purposes of the report, the newer version provides some clarifications and a few updated recommendations (both consistent with general practice since RFC 2821 was published) but no substantive changes.  Section numbers cited in this report are the same in both versions. All of the "RFC"s cited in this report, with the exception of some that are cited to establish historical context, define Standards for the Internet that are generally accepted and widely implemented and used.  The historical ones defined the Standards at the time they were published.

[2] Klensin, J., "Simple Mail Transfer Protocol", op cit, Section 4.4.

formatted in a number of ways, the electronic mail equivalent is highly structured and some of it

is required.  Common Mail User Agents (MUAs) – programs that provide an interface between

the user and the stored electronic form of electronic mail messages – display some of the header

information, typically including the presumed message originator, the date, and the subject line,

as part of a mailbox table of contents.  As with the envelope information, there are no technical

impediments to inventing the header information.


**BSI's Status as an ICSP/EMSP**

18.     Defendants have questioned whether BSI is actually an ISP and raised questions

about the quality of its operations.  The only practical definition of an ISP is someone who

provides Internet services to customers.  Just as there are small neighborhood grocery stores as

well as multi-state supermarket chains, there are small ISPs and large ISPs.  No one reasonably

expects the smaller and larger members of either group to behave or be organized in the same

way: for example, the supermarket chain may have dedicated shipping and receiving

departments while the person who works the cash register at the neighborhood grocery may also

be in charge of packing and unpacking boxes.  Similarly, a very large ISP may have a dedicated

and highly skilled operations staff available 24 hours a day and seven days a week while a

smaller one may rely on the principals or a small, multi-purpose staff who are available only by

pager outside normal working hours.  These differences do not make the neighborhood store "not

a grocery store" (although it may not be a large supermarket with a presence in several states),

nor does it make a small ISP "not an ISP" (even if it is not a giant provider with direct national

or international presence).  Defendants' observations that Plaintiff does not operate the way I

have found many large-scale, international ISPs operate demonstrates nothing other than that

Plaintiff is not a large-scale, international ISP.  That does not make it "not an ISP," any more than the neighborhood store is not in the grocery business because it does not maintain a large and separate receiving department.

19.     The view that neither size, number of customers, nor operational style or sophistication affects whether or not an enterprise is an ISP is clearly consistent with the definition in the Maryland statute.  By defining an ICSP as "an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service," the statute does not establish conditions for particular business models, a particular profile of services, or a minimum number of users (or customers) as long as there are "multiple" of them.  California's definition of an Electronic Mail Service Provider is similar in this regard: it requires that "the provider either be an intermediary in sending or receiving electronic mail or that it provide end users …the ability to send or receive mail."   BSI qualifies under both of those conditions; again, there are no requirements for particular business models, or services other than handling email as an intermediary or providing email services, or a particular minimum number of users.

20.     Likewise, the comparatively smaller scale of the plaintiff's operation does not mean that it is not a party injured by spam.  Almost everyone running email systems across the country is injured by spam, because the volume of spam received causes the service provider to incur costs and requires arrangements which would not be required if the volume of spam was much lower, a fact recognized by both the Maryland and California legislatures.  As stated elsewhere in this report, the costs of processing spam are incurred at the moment that the message is received at any of the mail servers operated for or by the provider for the recipient email address(es).  I note that, in the last few years, many large enterprises and universities have

outsourced parts of their mail systems to third parties and have done so largely because of the

costs of dealing internally with spam and malware.  Far from showing that the institutions to

which the addresses belong are not victims, those decisions highlight the rising costs of

victimization by spammers.   In my deposition, I did identify various aspects of the plaintiff's

systems which, in my view, indicate that the plaintiff is not running a highly professional

operation.[3]  But as I also stated, there are many such ISPs operating at similar scales and levels

of sophistication.  I see no reason why these characteristics should detract from the legitimacy of

such entities' status as service providers.

21.    Perhaps obviously, one business decision faced by ISPs is whether to try to

minimize total costs by getting rid of undesired messages as quickly as possible (as suggested

below, that may not be immediate except for a very small number of cases) or to try to reduce the

costs of protective and classification measures by instituting legal actions under appropriate

statutes in the hope of stopping (or considerably reducing) the amount of spam at the source, i.e.,

by discouraging it from being sent.  Ultimately, the latter approach is the only way to reduce the

otherwise ever-increasing costs for additional bandwidth to tolerate spam, in addition to

legitimate messages, and of filtering and classifying messages.  The observation that some ISPs

(and mail-receiving enterprises) are unwilling or unable, even temporarily, to invest the

resources to both handle the incoming spam load for the relatively short term and to try to use

means clearly contemplated by various statutes to stop spam production and sending at the

source cannot reasonably be taken as suggesting that ISPs who make particular decisions about

the long term are somehow behaving badly.

22.    At my September 24, 2009 deposition, counsel for the Defendant inquired at some

length into whether there were "legitimate" reasons for the plaintiff to accept all email messages

---

[3] E.g., Depo. Of John C. Klensin, Sept. 24, 2009, 54:11-62:15.

that were delivered to its mail servers, and for its decision to save and archive those messages "indefinitely."[4]  The implication of this line of questions seemed to be that, in the Defendant's view, an email service provider's decision to accept and archive spam messages addressed to its network, as opposed to adopting all conceivable measures to block the receipt of such spam, somehow erodes that service provider's legitimacy.  Certainly, the administrator of an email system makes decisions as to what messages to keep and what not to keep, and those decisions are made for a variety of reasons, but are irrelevant to whether an entity is providing the services, email, Internet access, and the like that make an entity an ICSP/EMSP, such as is the case here.  Arguing that storing emails so that they might be used for, among other things, researching who is abusing the system is akin to misguidedly criticizing whistleblowers for doing the same.

23.     There are huge quantities of unsolicited email on the Internet today, with common estimates ranging from 75% to 95% of total email traffic.  The mere existence of this quantity of unwanted traffic imposes significant burdens on those—both ISPs and end users and enterprises—who operate server systems that receive mail.  Even if such an operator could somehow magically distinguish between wanted and unwanted messages ("spam" or otherwise) at the time a connection was opened to deliver it, costs would still be incurred for additional bandwidth and server capacity above and beyond that required to receive and process desired mail.  These burdens are presumably at least a large part of the reason why various jurisdictions have created statutes or regulations that restrict or prohibit the sending of such messages and provide for redress if they are sent: the only way to completely eliminate the costs of receiving and processing unwanted messages is for those messages not to be sent.  Certainly one cannot make the assertion that, in operating an email system with sufficient capacity to receive legitimate messages in spite of the volume of undesired ones, an ISP or other enterprise is

---

[4] Klensin Depo, 149:2-151:23.

soliciting those undesired messages, but defendants appear in some of their arguments to take exactly that position.

24.     In our current world, an ISP or mail-receiving enterprise has to make decisions about what to do about the volume of spam. Those decisions are driven by both business and technical factors. One can, for example, decide to spend processing resources doing message classification during message delivery so as to be able to reject inappropriate messages early. One can instead accept all messages and later "bounce" or discard those that are considered inappropriate, or adopt mixtures of those two strategies. Over the years, the conventional wisdom in the technical community has shifted from "better to receive and process" to "better to immediately reject when possible," mostly because of the risk of what has become known as "blowback" – spreading spam by sending error messages to incorrect destinations. At the same time, that shift generally applies only to rejecting messages because of incorrect addresses or similar factors that are immediately obvious to the receiving system: when faced with mail that is deliverable but whose content in problematic, many enterprises and most ISPs will choose to accept the message and deliver it to the user, possibly identifying it as probable spam with special inserted headers or placing it in a special folder (often known as "junk" or the equivalent). In any event, all of these approaches are appropriate, they just represent different decisions about the tradeoffs in dealing with unsolicited, undesired, and possibly malicious email.

25.     Moreover, operators of mail systems may legitimately adopt different preferences concerning whether it is appropriate for the service provider to reject, bounce, or accept messages suspected to be spam. One reason is that the decision of when to conduct the necessary analysis has tradeoffs concerning the use of computing resources. Deciding to reject

messages initially (at first connection time) consumes greater processing capacity at the time of receipt of the transmission, whereas deciding to receive all incoming messages (and possibly to bounce suspected spam later) consumes less immediate processor capacity but requires greater storage capacity.  Perhaps more importantly, because of the risk of false positives in spam-detection procedures, some mail system operators have concluded that they have no choice other than to deliver any message that can possibly be delivered (possibly adding scores or other estimates of how likely the message is to be spam) and let the recipient make the final decision about disposition.  Depositing a message in a "likely junk" folder is delivery nonetheless, albeit with a special kind of scoring: while there may be a significant difference to the user, to the ISP, exactly the same costs of receiving the message, processing and evaluating it, and depositing it in a folder are incurred for spam as are incurred for legitimate mail.  At the same time, many would-be recipients expect ISPs somehow to perform that classification function to "protect them" from spam.  That expectation actually increases the costs to the ISP as a consequence of receiving the spam because delivery without any evaluation process would be less expensive.

26.     The evaluation process is based on many different techniques, with different ISPs using different ones in different combinations.  There are no established industry standards for classifying and filtering email, partially because such standards would simply enable the spammers to design methods to evade the standardized techniques and apply their methods to all ISPs.  What we see instead is an "arms race"-like situation, in which new countermeasures by ISPs and enterprises are met with newer counter-countermeasures by spammers, after which the cycle repeats and escalates.  Some spammer techniques have fallen into disuse because the countermeasures were good enough, but that observation doesn't reduce the costs of maintaining those countermeasures.  Not only is the volume of spam much higher today than it was a decade

ago, but, because of increasingly effective techniques to avoid detection, the resources needed to effectively identify and classify messages have increased on a per-message basis.

27.    The technical community involved in trying to identify spam-style messages and reduce its effect on users has developed a vocabulary for talking about the measures involved that reflects an engineering style and occasionally a certain odd sense of humor. Trying to read legal interpretations into those terms merely increases confusion.  For example, the term "filter" may be used, not only for processes that block messages out, but also for ones that merely identify messages and supply that additional information to the proposed recipient.  The term "trap" may imply a mechanism for capturing messages that are sent and that meet certain criteria: to build a trap does not imply a desire to receive spam, or acceptance of the spam, only part of a mechanism for identifying and capturing spam that is being sent to, and received by, one's mail servers.  In fact, it is a common practice among many ISPs to create mailboxes the purpose of which is to identify incoming messages as spam in order to aid in detecting spam. These so-called "spam trap" mailboxes use addresses that have never been used on those servers or have not been used on those servers for a very long time, or that in some cases have been deliberately and carefully unsubscribed from mailing lists, in order to act as a detector.  As a crude analogy, while I might keep mouse traps in my house in the hope of snagging any mice that might somehow bypass other mechanisms and get in, my deployment of those traps is certainly not a wish for more mice in my house (trapped or otherwise). However, even that mouse trap analogy may itself be misleading if not understood in context.  One normally puts bait in mouse traps in the hope of luring a mouse who happens to be in the immediate vicinity into the trap.  Bait or no bait, if there are no mice, nothing will be trapped.  In the email case, there is no bait unless one makes the very strange assumption that the mere fact of running a mail

server is a request to be spammed.  These so-called "spam traps" are merely tools for identifying

unsolicited messages that were sent to addresses that could not have requested them.

      28.     So-called "wild cards" or "wild card addresses" have a long history of usage in

email environments, either as part of a routing strategy or in order to intercept typing or

addressing errors in messages and direct those messages to the correct party.  For example,

before email became as commonplace as it is today, it was common at some institutions to

accept all undeliverable mail via a wildcard or its equivalent, look up names and, if they matched

someone at the institution, print the messages out and deliver them via interdepartmental mail.

While such "accept all messages for the domain and then determine what they are and how to

handle them" approaches can be used as part of a spam identification and filtering strategy, they

are often less effective in that regard than the use of specific addresses to help identify messages

that are unsolicited and that could not have been requested as discussed in the previous

paragraph.  "Wild cards" are not the same thing as "spam traps."  They can be used, as "spam

traps" can be used, as part of the process of identifying, classifying, and capturing unsolicited

messages that are sent to mail addresses that are not expected to receive legitimate, solicited,

messages.  I do not distinguish between the two mechanisms when used for that purpose because

they are just two different techniques for doing substantially the same thing, more or less

effectively.  Regardless of what it is called, what they are doing is benign and passive: neither

involves somehow finding, attracting, or authorizing spam that was not sent to Plaintiff's servers.

      29.     Many current techniques for classifying messages depend on recognition of

patterns in those messages.  They can range from the trivial (e.g., misleading or deceptive

mismatches between a mailbox address and a display name –the plain-text string associated with

a mailbox name in a mail header-- or a display name that is entirely missing) to recognizing

behaviors specific to particular bulk-mail sending tools (e.g., in the case of messages at issue in this case, frequent appearances of phrases like "insert publisher name here").  Doing that detection requires that someone, or some system, capture and study the actual messages, looking for those patterns.  The methods of capturing all messages that are not deliverable to a known user (a so-called "wildcard") or of setting up specific mailboxes that have never been used to send or solicit mail of any sort (a "spam trap") are well-known and established in the industry.  A message that arrives in the associated mailboxes might just be an error in spelling or typing of an address by a live user (in which case an extremely diligent mail-receiving site might want to study it, determine the correct address, and deliver it), but, in recent years, it is statistically much more likely to be an unsolicited spam message with the address derived from a dictionary or similar attack. Not only can such a message be studied for characteristics that will help to identify and classify others, but messages with similar content, but destined for user mailboxes, can be classified as likely spam based on the similarities to the "trapped" message alone.  Several large mail service providers, including Microsoft ("hotmail"), have indicated that they use just such a technique, with a large number of mailboxes that are used only as "spam traps," as one of their tools.

30.     Against the backdrop of the necessity of receiving mail in order to classify it, of delivering spam (or suspect) mail to recipient mail folders (whether "inbox", "junk", or otherwise), and of maintaining records of messages, some of the positions taken by Defendants are contradictory or even nonsensical.  They apparently argue that, if Plaintiff is able to detect unsolicited messages and reject them, failure to do so increases Plaintiff costs, may constitute inviting that traffic, and should bar Plaintiff from this litigation.  For the reasons discussed above, Plaintiff's main costs are incurred as soon as a message arrives and must be processed by

Plaintiff's mail servers.   Messages can be safely rejected only when they are incorrectly addressed; Defendants distort my observation that rejection is usually the preferred practice today by claiming it applies to rejection for any characteristic that might cause a message to be classified as "probable spam," even if other considerations require its delivery.   Conversely, if all "possible spam" messages could somehow be rejected at transmission time, Defendants would presumably argue that Plaintiff had no basis for complaint because the messages themselves could not be produced and exhibited.

31.     Because of the problems posed by false positives in message classification and of discarding messages as a result, most messages that can be classified as possible spam on the basis of their headers or content are, as discussed above, actually delivered to user folders with the classification information added or rerouted to special "junk" folders as part of the delivery process.   "Classify and deliver" is even more important for an ISP than for a mail-receiving enterprise: the latter might be able to adopt rules for discarding questionable messages while ISPs are under some obligation to deliver anything that might possibly be a user-desired message.   Defendants argue that the added header information needed to carry the classifications and the traces left by the rerouting somehow damage the messages.   That claim is nearly equivalent to claiming that Plaintiff cannot try to classify messages as spam, or capture messages that are so classified (for either delivery, study and filter-improvement, or both) without giving up any ability to recover under the statutes but, again, Defendants' "if they can filter, they are required to filter" position contradicts that claim.

32.     In fact, Defendants' claims that BSI consented to receive the emails at issue is contradicted by the emails themselves, as I have commented on in earlier reports.   Evidence of harvesting and dictionary techniques appears in many Defendant messages, even though most of

those same messages make the explicit claim that the recipient had opted-in to the messages.

The use of dictionary techniques can be deduced when messages are sent to addresses that are

never actually used to originate email.  In some cases, I reviewed with plaintiffs whether certain

addresses had ever existed and been used by people, and received negative answers.  This creates

a strong presumption that those (non-existent) people could not have opted in to receiving

messages and hence a claim that they did opt-in is clearly false.  In addition, some of the emails

display patterns of names being used in local parts of email addresses in multiple messages.  This

leads me to infer that the sender sent messages to several common personal names, which is one

common symptom of a dictionary attack.  Finally, the messages sampled all contain statements

indicating that the recipient "registered" to receive them, thereby opting in (see, e.g., SPAM-

K011121).  In many cases, the mail distributor did not even bother to fill a list name into what

was presumably a template supplied to them. In SPAM-K011121 and many other messages, we

see:

> You have received this advertisement because you have registered with
> (Publisher List Name Entered Here).  If you believe this e-mail message was
> sent in error or if you would like to stop receiving e-mail advertisements from
> (Publisher List Name Entered Here), follow the opt-out instructions below.

This fairly obviously does not represent a careful extract from a legitimate list of recipients

registered to receive the messages.


**The "Relationship Between Hypertouch and BSI"**

33.     Since at least the mid-1980s, it has been a common email management practice

for ISPs and mail service operators to reach agreements with other operators to receive mail as

an intermediary, perform a greater or lesser amount of processing, and then pass the messages

along.  This was done initially to create more robustness in the email system against the

possibility of network or system outages, fragile connectivity, and various types of target system failure or capacity problems.  These administrative arrangements are normally reflected in the structuring of "MX" Domain Name System records and corresponding mail routing.[5]  In more recent years, the same mechanisms have been used to route mail to third-party providers for message analysis and filtering.[6]  My analysis of the relationship between the Hypertouch and BSI mail servers indicates that it is entirely consistent with the general character of that model.  My understanding is based on the DNS records that describe the mail servers set up for Beyond Systems, and partially based on discussions with BSI and Hypertouch about how those arrangements were configured to operate.  Based on that data, it appears that Hypertouch was and/or is providing intermediate relay and backup mail services for Beyond Systems.

34.     Based on my understanding of the manner in which Beyond Systems configured its email system, its reliance on Hypertouch to provide intermediate routing services was reasonable, even if other configurations might have been implemented.  Plaintiff explained that its reasons for adopting this configuration were in part economical, owing to differences in server capacities between BSI and Hypertouch, and also that the arrangement made sense as a load sharing convenience.  These decisions reflected BSI's and Hypertouch's determination as how best to manage limited computing resources.  Whether BSI's network would have been configured differently by one who possessed either greater technical sophistication or more resources of other types does not detract from the legitimacy of BSI's operation.

35.     A review of Internet mail routing and comparison between it and systems that may be more familiar will perhaps make the relationships even more clear.  The destination of a

---

[5] The technical arrangements are described in the Internet standard for mail transport.  Klensin, J., "Simple Mail Transfer Protocol", op cit.

[6] For example, the Google "postini" email hosting and archiving service, described at http://www.google.com/postini/index.html, is often set up this way, with mail ultimately forwarded to a destination enterprise server after processing.

message is determined entirely by the address which the message originator specifies, just as is the case with postal mail and express packages.  The message originator has no control over the message or package routing other than what is specified in the destination address; the routing does not change the message or create a new originator.   Certainly, if a package were handed to Federal Express in California for delivery in Maryland, no one would claim that the carrier's decision to route that package through Memphis either turns Federal Express into the message originator or means that the package originated in Tennessee.  Internet mail differs from this in that the final recipient has some control (actually, just about as much control as desired) over routing.  But that changes nothing as far as the relationship between sender and recipient, or even sender and the delivery EMSP and its systems are concerned: the message originator is still the message originator and the recipient in the address is still the recipient.

36.     Defendants' implication is that none of this mail would wind up at BSI's servers were it not for Hypertouch.  However, even if Hypertouch never existed, mail directed to BSI-held addresses by the senders, such as Defendants, would still arrive at its destination – BSI – over some other ISP's network.  That BSI might subsequently store mail directed to real or imaginary BSI-held addresses does nothing to detract from its status as an ICSP/EMSP, nor does any action performed by a BSI-designated intermediary (explicitly or implicitly at BSI's direction) change BSI's status.

37.     If a company or mail service provider wants to operate a mail service that is as robust as possible, an obvious way to do so is to arrange for secondary or intermediate servers that could share load, provide different connections to the Internet, and be physically far from the provider's destination systems.  These intermediate servers can take on some of the processing load under a wide variety of circumstances or merely (but critically) be available if the

destination servers become unavailable or overloaded.  The problem with making those provisions is that the additional hardware, Internet connection, and operation costs can be considerable.

38.     Since almost the time the current mail routing architecture was standardized in 1986[7], it became common for different providers to work out reciprocal arrangements for mail services, for exchanging mail services for some other type of service, or for one provider to buy the additional service from another one.   The least formal, but easiest to configure, of those arrangements, in which one party simply received mail traffic for another when the latter's systems were unavailable or congested and then forwarded all of that traffic when the target systems were more available, is proportionately less common today than it was a decade or two below.  In large measure because of a desire to identify and isolate problematic messages (e.g., spam and messages carrying malware) as early as possible, many providers have shifted some responsibility toward the intermediates servers, requiring them to do some mail processing (not just holding and forwarding) and necessitating different trust relationships.  The simple reciprocal models still exist and are common, but have been replaced in many situations with more formal outsourcing relationships in which a third party is placed under contract to provide specific services on intermediate systems.   However, those changes in operational relationships do not change the basic situation discussed in paragraph 35: the intended recipient (addressee) of the message, as specified in the email address, remains the recipient of the message no matter what paths the message traverses.

39.     These variations on relationships are also consistent with another point on which Defendants appear to have conflated irrelevant issues of whether routing is done by an MTA (e.g., an SMTP server) or an MUA (e.g., Eudora).   An MTA takes on some MUA functions the

---

[7] Partridge, C., "Mail routing and the domain system", RFC 974, January 1986.

moment it even inspects more of a message than the envelope.  Once the operator of the destination server arranges for an intermediate one to do some processing beyond simple receipt, storing, and forwarding of messages, the mechanisms used do not change the essential character of what is being done – some functions are being performed on a different system at the request of the provider of the address-specified mailbox or system.   Based on my observations and as discussed in my depositions, the automated routing between Hypertouch and BSI is typical in function and appropriate.  The involvement of an MUA in that process, i.e., moving a message from Eudora to a storage folder, is unremarkable and has no bearing on routing or relationships between the entities.

40.       Defendants also claim that the agreements between BSI and Hypertouch for the latter to receive messages on BSI's behalf and provide some services before forwarding them to BSI's servers inherently makes those messages solicited in nature by BSI.  Certainly BSI agreed to have Hypertouch receive messages as an intermediary for it with the understanding that those messages would ultimately be delivered to and received by BSI.  That arrangement is completely consistent with the model outlined in Paragraph 33.  The routing path has nothing to say about the addressing of the email in the first instance by the spammer to, in this case, BSI's domains.  To claim that those arrangements constitute agreement on BSI's part to receive Defendant's messages, or that they somehow turn Hypertouch into the spammer, is inconsistent with good sense.  The same argument, if applied to an arrangement with a third-party anti-spam provider such as Postini for that provider to classify messages but deliver them (possibly some of them to "junk" folders) would mean that the decision to use Postini's classification services meant that I agreed to receive spam while, if I used no such service, I might not have agreed.

Date: February 17. 2012

John C. Klensin, Ph.D
