# EXHIBIT 13

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BEYOND SYSTEMS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KRAFT FOODS, INC., *et al.*, ) <br> ) <br> Defendants. ) <br> _____) <br> ) <br> CONNEXUS CORP., *et al.*, ) <br> ) <br> Third-Party Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> JAMES JOSEPH WAGNER, *et al.*, ) <br> ) <br> Third-Party Defendants. ) <br> _____) | Case No. 8:08-cv-00409 (PJM)(CBD) |

## EXPERT REPORT OF DR. JOHN R. LEVINE

1. I, Dr. John R. Levine, submit the following report with regard to the above-referenced case.

2. This report was prepared in connection with the "mini trial" scheduled by the Court to be held June 19-22, 2012. I have been compensated at the rate of $400 per hour for the time required to prepare it. The report is based on my previous review of the applicable electronic mail standards and requirements and normal industry practices, a preliminary survey of the collections of messages supplied by Plaintiff, and representations from Plaintiff as to the

configuration and operation of its email systems. My compensation is not contingent upon the content of the testimony that I offer.

**Background and Qualifications**

3.  I am currently an independent computer industry consultant and author specializing in the Internet and Internet-related issues. I lecture to and consult for numerous clients including IBM Canada, CBS Television, Minnesota Power, the American Institute of Chemical Engineers, Alex, Brown & Sons, and Hewlett-Packard.

4.  I am the chair of the Internet Research Task Force (IRTF) Anti-Spam Research Group. Since 1997, I am President of the Coalition Against Unsolicited Commercial Email, a non-profit Internet user advocacy group. Also since 1997, I have run the Network Abuse Clearinghouse, also known as abuse.net, a free service that helps Internet users and service providers report and deal with abusive online behavior.

5.  I am a Senior Technical Advisor to the Messaging Anti-Abuse Working Group (MAAWG), the leading industry anti-spam forum, whose members include Google, Yahoo, Microsoft, AOL, Verizon, AT&T, Openwave, and many other large networks and mail software vendors.

6.  I have been a network manager for a private network that hosts over 300 Internet domains and web sites, totaling over 300,000 web pages, since 1995.

7.  I operate a variety of electronic mail servers for myself and as many as 1,000 other people. As part of running this service, I deal daily with issues of spam and other email abuse.

8. I have authored or co-authored over a dozen books on computer and electronic mail issues including: *The Internet for Dummies* (now in its 13th edition, with over eight million copies in print), *Internet Privacy for Dummies* (2002), Internet Secrets (2d Ed. 2000), *E-mail for Dummies* (2nd Ed, 1997), and *qmail* (2004).

9. I have been active in the computer industry for thirty years, working for Interactive Systems Corporation. (the first commercial provider of UNIX software) between 1979 and 1984 and Javelin Software (creators of an award winning PC modeling tool) from 1984 to 1987. In 1989, I co-founded Segue Software, currently the leading provider of web and client/server testing software, where I continued as a director and consultant until the company was sold in April 2006. I received a B.A. Computer Science with a minor in Mathematical Economics from Yale University in 1975, and a Ph.D. in Computer Science from Yale University in 1984.

### I. BSI Provides and Enables Interactive Computer Services

10. Based on the information that I have reviewed, BSI provides Internet connectivity for users, and provides access to email facilities, which are both common services carried out by ISPs.[1] Specifically, I have also reviewed the Maryland and California statutes and the definition of Interactive Computer Service Provider (ICSP) and Email Service Provider (ESP) contained, respectively, therein.

---

[1] While, I have never heard of BSI other than in the context of my work as an expert in litigation, this does not mean that BSI is not a legitimate ISP. There are thousands of small regional ISPs in the United States. Like most Internet users, I am familiar with the ISPs in the area where I live (upstate New York), and with some ISPs in other areas that provide services that I use, such as server hosting. Other than that, I'd have no reason to investigate an ISP, and for the vast majority of ISPs, I have not done so. Hence, my prior familiarity or lack thereof with BSI says nothing about BSI's legitimacy.

11. Although BSI is a small internet service provider, there is no minimum threshold size to be a service provider. BSI undisputedly has users who do receive their e-mail through BSI. Maryland law describes an ICSP as "an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service." (Md. Commercial Law §14-3001(c).) Sending and receiving e-mail are quintessential computer service. California law describes an ESP as "any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail." (Sec 17529.1(h)). Again, BSI's provision of e-mail service to its users clearly meets this definition of an ESP.

12. BSI's choice to locate some of its equipment in the houses of family members does not disqualify it from being a "real" provider. In fact, modern computers are small enough that it is entirely reasonable to run a small provider from one's house. I ran mail and web servers from my home office for many years for up to a thousand mail users, moving them out only when I spent a year abroad and nobody was home to tend them. Lightlink Internet, a small ICSP in Ithaca NY with whom I have worked for over a decade, was started in its owner's apartment, and still has significant facilities there.

13. An entity is an ISP based on the services that it provides to its users. A company cannot somehow lose its status as an ISP because it pursues other activities such as litigating against the spammers which send it unwanted email. The idea is that Plaintiff is somehow not an ISP due to some combination of its type of mail processing system, its President's ability to spend significant time pursuing litigation, it not incurring sufficient enough pain or damage from

the spam it received. None of these arguments hold up on closer examination. First, while Plaintiff's mail handling was somewhat different from the way some other mail systems work, it got the job done, and nowhere does any law prescribe a threshold of technical excellence needed to qualify as an ISP. Similarly, there's no requirement that Plaintiff spend full time managing its mail system. I've personally run a mail system for a thousand users, which generally required less than an hour per week of attention, all of which could be done remotely from wherever I happened to be. There is no inconsistency between running a mail system and having enough time to pursue other activities. Finally, the argument that Plaintiff suffered no damage or invited all the spam is simply untrue. Having examined the archive of the underlying mail at issue in this case, even if Plaintiff invited mail to a few addresses, vast amounts of spam were sent to addresses clearly made up or guessed by the spammers, burdening Plaintiff with its receipt and processing.

14.   Over the course of this case, counsel has asked me to comment on the parallels, if any, between this suit and *Gordon v. Virtumundo*. This is a false equivalence for two significant reasons. One is that unlike BSI, Gordon did not own any mail servers, but rented shared server capacity in a remote data center. It is undisputed that BSI owns and operates its own servers, and Paul Wagner has testified to the overload on those servers due to incoming spam. The other is that unlike BSI, Gordon bought domain names specifically because they were likely to receive spam, in anticipation of filing suits. In contrast, the spam in this case was sent to addresses in domains registered by BSI between 1997 and 2002, years before any of the spam in this case was sent, and long before any legal action was contemplated.

A. <u>Spam Traps, Wild Cards, and Management of Small Mail Systems</u>

15. A "spam trap" is an e-mail address that gets a lot of spam, but such traps can be created in a variety of different ways. In Plaintiff's case, its mail system was configured to receive all mail sent to addresses in its domain that were not assigned to individual recipients. This is also known as a "catch-all" address.

16. Small businesses such as Plaintiff quite commonly use such a catchall address - even if an address is misspelled, if it's addressed to the business' domain, it should be intended for someone at the business, and can be read and routed to the appropriate person, just like slightly misaddressed paper mail. For example, I have run a server that provided mail service to about 100 small businesses in upstate New York, customers of a local web host. I offered each of them the option of using a catchall address, and most of them did so.

17. In Plaintiff's case, spammers sent a great deal of mail to invented or guessed addresses, so the catchall functioned as a spam trap, without any direct action by Plaintiff to make it one. On my system, I have a domain name that has never been used for legitimate electronic mail, but gets spam from spammers who used address collection software that misinterpreted text strings that happened to include the domain name as email addresses. My domain, which I have configured to receive all mail sent to it, gets approximately 50,000 messages a day, all unsolicited, and I can easily believe that BSI would get a similar amount with no action on its part to encourage or solicit it.

18. A "spam trap" is merely an address that gets so much spam that it is useless for regular mail. Like mail sent to any other address, mail sent to a spam trap is received only

because the sender addressed it to the "trap." The idea that Plaintiff is to blame for receiving Defendants' spam, is a "blame the victim" defense: it would be as though the spam were floating freely in space, and Plaintiff created "spam traps" to pluck them from the ether. In reality, every e-mail message, spam or otherwise, is sent to specific recipient e-mail addresses.

19.  There is no duty or obligation on the part of Plaintiff to block all incoming spam, rather than receiving and archiving it, any more than a homeowner has an obligation to put bars on his windows to prevent a thief from entering. There is nothing unusual or improper about receiving spam and then keeping an archive of it. To the contrary, many systems that receive mail routinely keep copies of incoming spam. Google, for example, has a vast archive of spam received by its Gmail service, and I personally have an archive containing copies of over 20 million spam messages sent to my mail system in the past four years. Indeed, an ISP can receive several benefits from archiving email. Archiving mail allows an ISP to investigate spam complaints, facilitate the reporting of spam to other networks, fine-tune spam filtering for customers, and ensure that in the event errors occur or mail is inadvertently routed improperly, it can be retrieved.

## II.  BSI's Relationship with Hypertouch

20.  Counsel has asked me to comment on the way that mail was routed through a mail server belonging to Hypertouch, and whether that affects Plaintiff's status as an ICSP, either because the mail was allegedly addressed to Hypertouch, or because the mail was solicited from Hypertouch. Neither theory stands up under examination.

21. Internet e-mail is a "store and forward" system, designed from the beginning to allow messages to be routed from computer to computer on their way to the ultimate recipient. This principle is well enough established that the CAN SPAM law calls it out as "Routine Conveyance". BSI called on Hypertouch to handle its incoming mail since Hypertouch's servers were better able to deal with receipt of the large load of incoming mail. Hypertouch then automatically routed the mail to BSI at a rate that BSI could handle. This is not an unusual way to configure mail systems. I handle incoming mail for several friends the same way, my more capable server initially receives the mail, and then routes it to them automatically. In BSI's case, the mail legitimately passed through both Hypertouch and BSI, and both were affected by the flood of spam addressed to BSI. The argument that BSI "solicited" mail from Hypertouch willfully misunderstands Routine Conveyance. The unsolicited mail that BSI received was addressed to BSI by spammers, and its route through Hypertouch didn't change that.

22. The theory that BSI "solicited" mail from Hypertouch fails, since the transfer from one to the other was Routine Conveyance. The unsolicited mail that BSI received was addressed to BSI by spammers, and its route through Hypertouch didn't change that. I have examined many of the underlying messages at issue, including the technical Received: headers and other elements added by mail software during the messages' transit from sender to ultimate recipient. I have found that those elements consistently show Routine Conveyance from Hypertouch to BSI.

23. It is quite typical for small ISPs such as BSI to share equipment and facilities with other entities. For example, for nearly a decade I shared my home-based network with Spider Graphics, a small provider of web design and hosting, and my mail server handled both my users

and Spider's. Lightlink (mentioned above) and I have for many years provided backup DNS service for each other. (DNS is the Internet's "phone book" that translates names like google.com into numeric addresses.) When I moved abroad, I relocated my main server to Lightlink, continuing to manage it remotely, and arranged for a DNS server on another network. Lightlink and I still provide backup DNS to each other. Hence there is nothing inherently improper or unusual about the arrangement between BSI and Hypertouch.

Date: February 17, 2012

_____
John R. Levine