EXHIBIT 14

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| _____ )<br>BEYOND SYSTEMS, INC.,                )<br>                                                )<br>        Plaintiff,                            )<br>                                                )<br>            v.                                )<br>                                                )<br>KRAFT FOODS, INC., *et al.*,          )<br>                                                )<br>        Defendants.                       )<br>_____)<br>                                                )<br>CONNEXUS CORP., *et al.*,            )<br>                                                )<br>        Third-Party Plaintiffs,        )<br>                                                )<br>            v.                                )<br>                                                )<br>JAMES JOSEPH WAGNER, *et al.*,  )<br>                                                )<br>        Third-Party Defendants.    )<br>_____) | Case No. 8:08-cv-00409 (PJM)(CBD) |

### EXPERT REPORT OF PETER W. RESNICK

1.      I, Peter W. Resnick, submit the following report with regard to the above-referenced case.

2.      This report was prepared in connection with the "mini trial" scheduled by the Court to be held June 19-22, 2012.  I have been retained by Plaintiff's counsel to do research, write reports, and provide expert testimony. I am being paid $400 per hour for the preparation of this report..  The report is based on my knowledge of the applicable electronic mail standards and normal industry practices, a preliminary survey of the collections of messages supplied by Plaintiff, and my review of (and representations from Plaintiff as to) the configuration and operation of Plaintiff's computer systems.

**Background and Qualifications**

3.      I have participated in the Internet Engineering Task Force ("IETF"), the

international volunteer protocol standards-setting body for the Internet, since 1992, and have

attended all face-to-face meetings but one since 1995.[1]  The IETF produces the Request For

Comments ("RFC") document series, the numbered series of documents that contains the

Internet protocol standards.[2]

4.      I am currently serving as an appointed member of the Internet Engineering

Steering Group ("IESG"), management body for the IETF. The IESG is responsible for the

management of each of the Working Groups in the IETF, the administration of the Internet

standards process, and for the actions associated with entry into and movement along the Internet

"standards track," including final approval of all specifications as Internet protocol standards.

The fifteen-member IESG comprises fourteen Area Directors, two from each of seven technical

areas of the IETF, and the IETF Chair. I serve as one of the two Area Directors for the

---

[1] The IETF is the internationally recognized body for Internet protocol standards. It is recognized by the International Telecommunications Union ("ITU") agency of the United Nations as one of its "Organizations Qualified for Including References in ITU-T Recommendations" (see <http://www.itu.int/ITU-T/lists/qualified.aspx>).  The IETF has liaison relationships with many standards bodies including the ITU, the International Standards Organization, the UN World Intellectual Property Organization, and the Institute of Electrical and Electronics Engineers, and is a signatory to the Internet Corporation For Assigned Names and Numbers Protocol Supporting Organization Memorandum of Understanding along with the ITU and the European Telecommunications Standards Institute.

[2] The IETF RFC documents are referenced as Internet protocol standards by the ITU, the World Wide Web Consortium ("W3C"), and several standards bodies in the cellular phone industry, including the Open Mobile Alliance ("OMA") and the Third Generation Partnership Project ("3GPP").  The RFC document series is recognized in the United States and worldwide as containing the protocol standards for the Internet. RFCs are written by industry and research engineers to document a common understanding of the way Internet computer programs should be written such that they interoperate. They define the agreed-upon protocol for interaction on the Internet and are considered "official standards" among industry experts, other standards organizations, and governmental bodies including the United States government and the United Nations.

Applications Area, the area in which (among other things) technical work regarding Internet electronic mail takes place. Currently I manage the chairs for eight Working Groups in the Applications Area, five of which work on protocol standards related to electronic mail, three specifically on protocols related to "spam". My current term on the IESG is from 2011 through 2013.

5.      I was an appointed member of the Internet Architecture Board ("IAB"), the twelve-member technical and architectural oversight committee for the IETF and Internet protocols, from 2004 to 2006.

6.      In the course of my participation in the IETF, I have written the following RFC documents: RFC 1339, S. Dorner, P. Resnick, "Remote Mail Checking Protocol", 29 June 1992. Status: Experimental; RFC 1896. P. Resnick, A. Walker, "The text/enriched MIME Content-type", 19 February 1996. Status: Informational; RFC 2822. P. Resnick, Editor, "Internet Message Format", 24 April 2001. Status: Proposed Standard; RFC 4417. P. Resnick, P. Saint- Andre, Ed. "Report of the 2004 IAB Messaging Workshop", February 2006. Status: Informational; RFC 4469. P. Resnick, "Internet Message Access Protocol (IMAP) CATENATE Extension", April 2006. Status: Proposed Standard; RFC 5068. C. Hutzler, D. Crocker, P. Resnick, E. Allman, T. Finch. "Email Submission Operations: Access and Accountability Requirements", October 2007. Status: Best Current Practice; RFC 5322. P. Resnick, Editor, "Internet Message Format", 1 October 2008. Status: Draft Standard. RFC 5738. P. Resnick, C. Newman, "IMAP Support for UTF-8", March 2010. Status: Experimental; RFC 5895. P. Resnick, P. Hoffman, "Mapping Characters in Internationalized Domain Names in Applications (IDNA) 2008", September 2010. Status: Informational.

7.       I have also written the following World Wide Web Consortium (W3C) document: World Wide Web Consortium Note. E. Berman, P. Resnick, N. Shelness, "HTML Threading: Conventions for use of HTML in email", 5 January 1998. Status: NOTE.

8.       In the course of my participation in the IETF, I have also held the following chair appointments: IMAPEXT - The Internet Message Access Protocol Extension Working Group. 1999 – 2008; APEX - The Application Exchange Working Group. 2000 – 2003; BEEP – The Blocks Extensible Exchange Protocol Working Group. 2001; XMPP - Extensible Messaging and Presence Protocol Working Group. 2002 – 2004; USEFOR - Usenet Article Standard Update. 2003; FSM BOF Formal State Machine "Birds of a Feather" session. 2007; IEA BOF - Internationalizing Email Address "Birds of a Feather" session. 2003, 2004; WAE BOF – Web Authentication Enhancement "Birds of a Feather" session. 2006; PUFI BOF – Procedures Update For IETF "Birds of a Feather" session. 2008; IRI BOF – Internationalized Resource Identifiers "Birds of a Feather" session. 2009.

9.       From 1994 to the present, I have been employed by Qualcomm Incorporated, San Diego, California. My current title is Principal Engineer. From 2002 through the present I have held the titles of Staff Engineer, Senior Staff Engineer, and Principal Engineer in Qualcomm's Office of the Chief Scientist where I work as a research and development engineer. My current projects include leading the education effort to teach engineers at Qualcomm the proper use of open source libraries in Qualcomm products and coordinating IETF work at Qualcomm. Previously in this position, I worked with Qualcomm's IT department to help them implement Internet standard technology for email (including anti-spam mechanisms), I coordinated a research project between Qualcomm and the Beckman Institute at the University of Illinois on mobile phone usability and interaction, I participated in the Corporate Product Software Security

Initiative, and I have acted as a research programmer on a project in the field of authentication technology.

10. In 2001, I held the title of Staff Engineer in the Qualcomm Internet Services department. I was a research programmer on BREW (Binary Runtime Environment for Wireless), and I wrote prototype applications for cell phones.

11. From 1994 through 2000, I held the titles of Engineering Intern, Engineer, Senior Engineer, and Staff Engineer at Qualcomm. I worked as a programmer on the "Eudora" electronic mail (email) client. I wrote all the text-handling routines for the "Eudora" email client, including those for internationalization and the Hypertext Markup Language (HTML).

12. From 1989 to 1996, I was enrolled in the Doctorate program in the Department of Philosophy, University of Illinois Urbana-Champaign. I left the program to work for Qualcomm Incorporated before completing my dissertation. During my graduate studies, I performed research in philosophy of mind, philosophy of language, and psycholinguistics (child language acquisition).

13. Between 1987 and 1989, I earned a Master of Arts in the "Philosophy and Computer and Systems Sciences" program at State University of New York at Binghamton. My research was in philosophy of science, philosophy of mind, and artificial intelligence. Thesis title: "Intentionality is Phlogiston", subsequently published in (E. Dietrich, ed.) "Thinking Computers and Virtual Persons", 1994, Academic Press. Between 1983 and 1987, I earned Bachelor of Arts in Biological Sciences and Bachelor of Arts in Philosophy at State University of New York at Binghamton.

**Email messages**

14.     An email message contains a series of lines of text that are divided into two parts: the header section and the body.  The header section contains information about the message (e.g. who sent it, when it was written, etc.), whereas the body of the message contains the content of the message.  The header section is divided into header fields (or simply "fields"), each of which contains particular information about the message.  For example, the following might be the destination field for a message:

To: Mary Smith <mary@example.net>

A field is made up of a field name (in this case the "To"), followed by a colon, followed by the field body.  The field body in the above example, which specifies the destination of an email, contains what is called the "display name" (the name of the person or entity, in this case "Mary Smith") followed by the email address of the recipient of the email.  The email address, which is normally in angle brackets, has a "local part" (the part before the "@" sign) and a domain (the part after the "@" sign, which I discuss below).  Although header fields are often seen by the end-users of email programs, they are specifically designed to be machine-readable.  They appear in a specified format, and each element of the field has a well-defined syntax and meaning, as documented by RFC 5322, the "Internet Message Format" specification.[3]  Many email programs parse the fields that are to be presented to the user (like the "To:" field) and present the information in a more easy-to-view format (for instance, bold-facing the name, or

---

[3] RFC 5322 documents the currently accepted formats and practices for Internet email messages. It is an update to the previously released RFC 2822, incorporating fixes for errata and making clarifications. Currently, RFC 5322 is at the Draft Standard level, which means that its predecessor, RFC 2822, has seen successful implementation and there have been no significant substantive changes since RFC 2822's publication. Do note that the IETF recently changed its procedures and collapsed the "Draft Standard" and "Standard" levels into a single "Internet Standard" level, so RFC 5322 may change its designation to "Internet Standard" in the near future.

turning an email address into a button that the user may click to send a return email to that

address). Email programs also use the information to do other handling on messages (for

example, to sort messages by date using the "Date:" field, or to take a message that contain

pictures and display them specially).

15.     The "From:" field of an email message identifies the author of the email message.

It provides the name of the author along with the author's email address. The combination of the

name and the email address is referred to in RFC 5322 as a "mailbox". Every email message has

a "From:" field, and it must contain at least one "mailbox". Normally, the "From:" field contains

the name and email address of a human (i.e., the person who wrote the message), but that's not

required; email messages can be authored by all sorts of entities ( a corporation, a computer

program that generates automated messages, etc.). In all cases, the "From:" field ought to

contain a name and email address for whoever or whatever is the author of the message. As RFC

5322 states:

> The "From:" field specifies the author(s) of the message, that is, the mailbox(es) of the
> person(s) or system(s) responsible for the writing of the message.
>
> […]
>
> In all cases, the "From:" field SHOULD NOT contain any mailbox that does not belong
> to the author(s) of the message.

This specification for the "From:" field is important operationally. Email programs (and users)

rely on the fact that the "From:" field contains the name and email address of the author in order

to do things like properly reply to the message, display the name of the author to the user, save

the name and email address in the user's address book, filter messages to allow the user to sort

through messages they want to keep or discard, etc.. There is no legitimate reason to put things

into the "From:" field other than the author's name and email address (again, whether that author

is a human or otherwise). The only purpose would be to thwart the recipient's ability to discover

who actually wrote the message, to know how to reply to the message, and to sort the message according to the author information.  Using false information of this sort is deceptive, both for the email program as well as its user.  For example, putting a non-existent email address in a "From:" field will make it impossible for the recipient to reply to the author using their email program.  Putting something other than an identifying name of the author (e.g., some sort of sentence or phrase) in the place where the author's name belongs makes it not only impossible for an email program to display the author's name properly to the recipient, but will also cause it to add the wrong information to the recipient's address book and may cause other operational problems for the recipient.

16.    Where the "From:" field specifies the author of the email message, the "Sender:" field specifies the transmitter of the email message.  The absence of a "Sender:" field in a message means that the transmitter is identical to the author (that is, that the transmitter's address is identical to the one in the "From:" field).  Messages may have both a "From:" field and a "Sender:" field so that the recipient can easily distinguish between who or what is responsible for the authorship of the email message and who or what is responsible for the transmission of the email message.  Again, this is operationally important.  Email programs and users rely on these meanings of the "From:" and "Sender:" field to properly reply to a message (by being able to contact the author or the transmitter, depending on the circumstance), to accurately display information to the user, to filter messages as desired, etc..  As I stated above, intentionally putting information in the "From:" and "Sender:" fields that does not correspond to the author or transmitter, respectively, only serves to thwart the recipient's ability to discover this information easily or to evade filters that are set up to act on this information.

17.     Similarly, email programs and users also rely on the fact that the "To:" field contains the name and email address(es) of the primary recipient(s) of an email message, again, to properly display the message, filter the message, parse the address for storage in an address book, etc.. There is no legitimate reason to put other than the recipient's name and email address into that field except to evade filters and obscure this information.

18.     An email message also contains one or more trace header fields (also called "Received:" header fields). Each of these fields contains information about the transfer of an email message from the originating email system (often called "the client" or colloquially the "sending system") to the receiving email system (often called "the server" or colloquially the "receiving system"). Email messages may be passed through several "relay" systems on their way from the source to the destination. "Relaying" refers to the transfer of an email message from one server to another to bring it to its final destination. Each relay system (and the destination system) along the way put a "trace record" (or "time stamp") at the top of the message with information identifying the receiving system, the sending system, and the date and time the message was received. All of this information goes into a "Received:" header field. For example:

Received: from x.y.test ([10.5.6.7]) by example.net; 1 Nov 1997 1:05:43 -0600
When an email message is sent, the sending system connects to the receiving system using the Simple Mail Transfer Protocol or SMTP. After a connection is established, the receiving system starts the protocol by sending a code indicating that it is OK for the sending system to proceed. To continue the protocol, the sending system sends a "greeting" using the HELO command or the more modern EHLO command. Then, after the exchange of the originator address and the recipient address, the content of the email message is sent. The HELO or EHLO command sent by the sending system contains the fully-qualified domain name ("FQDN") of the sending

system or, at a minimum, the address literal containing the IP address of the sending system, which the receiving system is then required to record in a "Received:" field in the email message content.

19.     RFC 5321, the SMTP protocol specification, defines the components of the "Received:" field. The "Received:" field is composed of several "clauses". Each clause starts with a special word (like "from" or "by" or "for") followed by some data.  In the above example, the "BY" clause ("by example.net") indicates that the message was received by the receiving system with the domain name "example.net".  The "FROM" clause in the example indicates that the message was received from a client whose IP address was "10.5.6.7" and who gave the domain name "x.y.test" as the argument to the HELO/EHLO command when it connected to the server.

20.     Each system on the Internet has a numeric Internet Protocol ("IP") address, and almost all systems (and certainly those used to send and receive email across the Internet) have a domain name, a textual name to use instead of the numeric address.  A domain name is a series of individual names, or "labels", separated by periods (e.g., "mailserver.example.com").  There are Internet protocols where it is permissible to use a shortened, or unqualified domain name (e.g., "mailserver"); however, SMTP requires the use of the longer, fully-qualified domain name ("FQDN").  A properly configured email system that is connected to the Internet should never have to use other than its own FQDN to send email.

21.     In some rare cases, an SMTP system might not have a domain name assigned to it. This happens when, for example, a personal computer that is only temporarily attached to the Internet or gets a new address assigned each time it is attached, is used to send email.  In those instances, the sending system may send its numeric IP address as part of the HELO/EHLO

command instead of a domain.  That said, any legitimate SMTP sending system used for commercial purposes would not have this problem and would use its assigned domain name. These fully-qualified domain names and IP addresses go into the clauses of the "Received:" field.

22.     There are specific requirements on the contents of each clause of the "Received:" field.  RFC 5321 says:

> The FROM clause, which MUST be supplied in an SMTP environment, SHOULD contain both (1) the name of the source host as presented in the EHLO command and (2) an address literal containing the IP address of the source, determined from the TCP connection.

The formal syntactic definition of the FROM clause in section 4.4 of RFC 5321 makes it clear that what belongs there is the domain name and/or address literal given in the SMTP HELO or EHLO command (described above) followed by the actual domain name and/or IP address of the sending mail system, as determined by the receiving mail system, in parentheses.  The IP address is important when the information from the HELO or EHLO command is false or otherwise not useful for traceability.  Note that not putting useful traceability information into the HELO or EHLO command is a situation that should never occur for a properly configured Internet SMTP system.  Even in the case of an SMTP host that uses private IP address space behind a network address translator, that system can be configured to use the domain name assigned to the public address that it will be using when it connects to the outside world.

**Email Transfer Operations**

23.     Email messages are normally created by a mail user agent ("MUA"), a computer program designed to allow a user to enter text or other contents of the message and address the message to its recipients, and normally also contains features to format a message appropriately for transmission including adding some of the automatically generated header fields (e.g., the

- 11 -

"Date:" field).  After preparing the message for transmission, an MUA hands the email message

off to a mail submission agent ("MSA"), a computer program that is actually responsible for the

initial transmission of the message onto the Internet.  An MSA often determines the initial

routing of the message based on the addressees.  The MSA then hands off the email message to a

mail transport agent ("MTA"), a computer program responsible for routing of the email message

through the Internet toward its final destination.  One or more MTAs transfer the message,

getting the message closer to its destination.  The last MTA in the chain hands off the message to

a mail delivery agent ("MDA"), a computer program responsible for depositing the email

message into mail storage for a user to eventually pick up and read.  Finally, another MUA will

come along and retrieve the email message from the mailbox, displaying it to the user and

allowing them to read it, reply to it, or perform other operations.  Each of the MUA, MSA,

MDA, and MTA functions may be separate computer programs, or some of these functions may

be combined together (e.g., an originating MUA and MSA may be combined into a single

program running on a single system).

     24.     Analogizing to paper mail: One can think of the originating MUA as the person

who writes a letter, putting a date and address at the top of the letter and providing the content.

The MSA might be someone who puts the letter in an envelope, addressing it with the

destination and return address, putting on the stamp, and dropping it into the mailbox or handing

it to a postal worker.  The MTAs might be the post offices, one at the sending end, one or more

along the way routing the letter, eventually getting to the post office at the receiving end.  The

MDA is analogous to the letter carrier that collects the mail from the final post office and places

it into the recipient's mailbox.  And, again, the receiving MUA would be like the person who

pulls the letter out of their mailbox, opens the letter, and reads it.

**Email Contents that Identify the Sender of the Email**

25.     Part of the purpose of the header information of an email message is to allow the recipient to identify where the email came from so that the recipient can respond or determine the origin of the email.  Normally, it is relatively simple to determine the origin and path of an email message.  Each email message contains "From:" and, at times, "Sender:" header fields that contain the email address of the party or parties responsible for the authorship and transmission of the message, as well as trace information in the form of "Received:" header fields containing the domain names of the servers through which the message was sent.  Discovering the origin and path of an email message is normally a matter of finding the contact information for each of the email addresses and domain names in those header fields.

26.     Legitimate commercial enterprises that send large numbers of marketing email messages have the means and incentive to clearly identify such email messages in the header fields of those messages and would keep easy to access records of the recipients of their email (along with records of their business relationship with those recipients), and records of any contractors who sent email on their behalf and to whom the contractor sent messages. This is not the case with entities that send spam.  Entities who send spam do everything possible to hide the identity of the party or parties responsible for the authorship and transmission of a message, including using and then discarding different domain names, using email addresses which are not easily traceable back to a particular author or sender, having other entities transmit messages on their behalf without properly indicating this in the header fields of the email message, hiding contact information in graphics which are not downloaded until the message is actually opened in an email user agent by the end-user recipient, etc.

27.     In general, Internet Service Providers ("ISP") like Plaintiff do not, in the normal course of business, examine the contents of the bodies of messages for contact information,

especially if that contact information is purposefully hidden in graphics and other data in the body of an email message. Information in graphics and other places in the body of the email message is normally seen only by an end-user recipient who opens and downloads the message using an email user agent. Indeed, some or all of that graphical information may not even be available to end-user recipients who use simple email clients which do not download graphics, or users who read their email offline or on a mobile phone. Therefore, ISPs which need to discover the origins and transmission path of a message instead use the machine-readable information contained in the header fields of messages. This allows them to do so without having to download remote information and read each message individually in order to discover this information.

28.     In order to retain all of the information to precisely identify the origin and path of messages sent by someone trying to evade identification, it would require the recipient's service provider, at the time of receipt of all messages, to use a tremendous amount of resources, collecting not only the domain names and addresses attached to each message, but to query the registries of each of the domain names to get contact information and then logging that information, as well as to save not only the header fields and textual content of every message, but download and save every graphic associated with every piece of email. Note that this sort of overly burdensome data collection requirement would mean that such data collection must be done with all email messages, not just ones that are suspected of being spam, because there is no way to determine at the time of reception that any given message is spam, especially given attempts of spammers to evade the very mechanisms designed to identify them. No service provider could be expected to expend such resources. Indeed, it would seem utterly bizarre for a law regulating the sending of spam to increase, rather than decrease, the burden on recipient

service providers to receive email messages.  Therefore, indirect means are often necessary to trace such messages back to their source, including looking up domain names identified in the email header and body to determine who owns the domain and is responsible for the email.

**Activities of BSI as an Electronic Mail or Interactive Computer Service Provider**

29.     I have been provided the text of the California and Maryland statutes by Plaintiff's counsel and was asked to evaluate whether, and if so how, the activities of Plaintiff establish it as an "Electronic Mail Service Provider" (ESP) or an "Interactive Computer Service Provider" (ICSP) as defined by those statutes, respectively.

30.     The text in the California statute says in § 17529.1(h) ""Electronic mail service provider" means any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail." This, like much of the rest of the California statute, uses technical terminology that is common in the email community and is therefore quite straightforward for me to understand. It is written broadly, defining as an ESP any intermediary in the sending or receiving of email, as well as including anyone who provides end-user email services. The definition, as far as I can tell, does not limit itself to corporations of a certain size, or even describe the number of end-users required. It appears that simply the act of being an intermediary or a provider of end user electronic mail services is sufficient under the definition.

31.     The text of the Maryland statute says in § 14-3001(c), ""Interactive computer service provider" means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service" and ""Interactive computer service provider" includes a service or system that provides access to the Internet and systems operated or services offered by a library or educational institution." This is not technical terminology as it is used in the email community and I take it to be more lay language. Still, I

- 15 -

easily understand the text. The first part of the definition provides that an ICSP includes anyone who provides computer services to multiple users, where I take "information service, system, or access software" to include email services, web services, and the like. The second part of the definition simply expands the category to include libraries and educational institutions. Like the California statute, the Maryland statute does not limit itself to corporations of a certain size, and it only requires that the ICSP enables "multiple users" to use the computer services.

32.    I had the opportunity to examine the activities of computer servers operated by Plaintiff.  Entirely at my direction, Plaintiff displayed the activity of processes presently running on his computer systems using common Unix commands available on the system.  I observed the activities of this computer in real-time (live), watching actions that took place with regard to SMTP email traffic, Post Office Protocol ("POP") email traffic and Internet Message Access Protocol ("IMAP") email traffic, as well as examining File Transfer Protocol ("FTP") statistics and Hyper-Text Transfer Protocol ("HTTP") web server log entries.  From my observations, especially given the information gleaned from watching the live email traffic, I can easily conclude that Plaintiff falls under the definition in the California statute of an ESP. The SMTP traffic alone clearly demonstrated to me that Plaintiff provides those "intermediary" email services described in the statute, and the POP and IMAP traffic demonstrated to me that they also provide the "ability to send and receive electronic mail" to end users of an electronic mail service. With regard to the Maryland statute, the POP and IMAP traffic as well as the FTP statistics I examined allow me to conclude that Plaintiff is in fact providing "information services", and is providing "access by multiple users to [its] computer service", and therefore falls under the definition in the Maryland statute of an ICSP. I have concluded that the activities

of Plaintiff's computer systems are normal activities associated with a small ISP, and certainly

fall under the definitions in the provided statutes.

**Use of Wildcard Email Addresses**

33.      I have been asked by Plaintiff's counsel to explain the use of "wild card" email

addresses. When I refer to a "wildcard email address", I am referring to the ability to configure a

receiving system to receive email messages addressed to an email address that partially matches

a particular address.  For example, I might have a wildcard email address of "resnick-

*@example.com". Such an email address would accept email addressed to "resnick-

work@example.com", "resnick-ietf@example.com", etc.  Wildcard email addresses can be made

to match either a part or the whole of the address.

34.      There are many reasons that wildcard email addresses can be used and their use is

quite common on Internet email systems.  In the example above, wildcards can be used to

distinguish different roles: colleagues from work might send email to "resnick-

work@example.com", whereas IETF colleagues would send to "resnick-ietf@example.com."

Wildcard addresses are also used to receive messages with accidental misspellings in the address.

So, a company might wish to receive and store messages addressed to

"castomerservice@example.com" even though the correct address is

"customerservice@example.com".  A company might even wish to receive mail addressed to

"helpdesk@example.com" even if the correct address is "techsupport@example.com".  In order

to accomplish the latter (i.e., preserving even completely misdirected email), the company would

be required to receive and store all email messages, and therefore would use a wildcard that

matched any left-hand side of an email address.  Of course, storing such messages in a mailbox

for later review could also be used to examine messages that are misdirected and attempt to

discover from where they are being sent. In any case, using a wildcard address to receive email

does not mean that the email addresses that make their way to the recipient through that wildcard process are not "real" email addresses.  They correspond to a mailbox, which is the definition of what an address is, as defined by RFC 5322.

35.     Some ISPs do not "block" (that is, refuse to accept) email messages when they are sent to email addresses that do not match specific email addresses, even in the absence of wildcard addresses. For security reasons, it is often unacceptable to reveal to the sending system the existence or non-existence of a specific email address.  Rejecting email gives an attacker valuable information as to potentially valid account names on the receiving system and the general topology of the receiving system's environment that can be later used to break into the system.  In addition, the rejecting of email messages may cause unintended recipients to receive non-delivery reports:  Because some spammers use other people's email addresses instead of their own email address as part of the SMTP protocol exchange, non-delivery reports might end up being sent not to the spammer, but instead to an innocent third party.

36.     If an ISP does not "block" emails for the reasons discussed above, the ISP has already used system resources, even if the message is not stored.  From the standpoint of an ISP, a good deal of the harm from spam is complete as soon as the connection occurs between the sending system and the ISP's receiving system, the connection is made, and an email message is transmitted.  Once that process occurs, the costs associated with the need for high bandwidth to receive that email and other email like it has been incurred, some amount of network time has been used, and receiving system time has been used.  Additionally, if the receiving system also stores messages to deal with those that might be misdirected, then spam messages will also have to be stored and storage resources will be spent on those as well.

**Filtering Messages**

37.     Many email systems, both at the transport level and at the user level, employ filters to categorize email messages, sometimes to remove unwanted messages and to allow through desirable messages on behalf of the recipient.  Filters may simply remove certain messages before the user is able to see them, or may rate the message as more or less likely to be undesirable, allowing the user to remove only those over a certain rating, or allow the user to review messages with those ratings.  Bulk email senders employ several techniques to evade these filters.  A few of them include the following.

38.     Many filters look for particular words or phrases in the "Subject:" header field and block, or mark as spam, messages with those terms.  Bulk senders often purposely misspell words, or surround the words with punctuation to avoid detection.  For instance, a filter that looked for the term "coffee" might be fooled by a "Subject:" that included the word "c0ffee" (using the numeral zero instead of the letter "o"), "c-o-f-f-e-e" (punctuation between each letter), "c o f f e e" (spaces between each letter), or "coffee*maker" (making sure that the word "coffee" is not surrounded by white space, thereby making it indistinguishable as a single word).  The repeated patterns of these sorts of items in "Subject:" fields have no legitimate purpose other than what they are designed to do: evade filters and otherwise avoid detection.

39.     Conversely, many filters look for particular words, either in the "Subject:" field or in the display name of a "From:" field, and allow messages through based on those terms.  A bulk sender may include those terms simply to get a filter to let a message pass through even if the rest of the message is undesirable.

40.     Email users normally wish to have replies to messages they have previously sent shown to them and filters can be configured to mark replies so that the recipient can easily identify them.  Almost all reply messages have a "Subject:" field that begins with "Re:".  Some

filters have been set up to always identify messages where the "Subject:" field begins with "Re:" as less likely to be spam. Some bulk emailers have taken to putting "Re:" at the beginning of the "Subject:" field to fool such filters.

41.     Many filters keep a list of "known bad addresses."  That is, they keep track of addresses that appear in the "From:" field of messages that the user has indicated are undesirable. A filter might additionally keep a list of "known bad domains," where all addresses that appear in the "From:" field which have a domain name in the list, regardless of whatever is to the left of the "@" sign, are considered undesirable.  To evade such filters, bulk emailers often use randomly generated email addresses, including using random domain names that will not have been previously marked by the recipient as "bad."

42.     Automated systems that send email often do not include a display name in the address fields of messages.  To avoid messages from such systems, many filters watch for address fields with missing display names.  To avoid these filters, bulk mailers will put random (often familiar sounding) names in the display name in order to evade these filters.

43.     Of course, the most used filter is the "manual filter": Almost all MUA programs have a "mailbox view" where the user sees a list of messages, normally displaying the "display name" of the author contained in the "From:" field of the message, the date the message was sent, and the subject of the message from the "Subject:" field.  Users are then able to scan through their messages and decide which messages are desirable and which should be discarded without first having to download and display the entire body content of the message.  In order to evade the user's ability to hand filter messages, bulk emailers will often use "Subject:" fields that contain phrases which would be of interest to the user, even if they have nothing to do with the contents of the message.  Alternatively, bulk emailers often put familiar sounding, though

fictitious, names in the display name of the "From:" field to make the recipient believe that the message came from a real person.  Often, these names come from generated lists of relatively common first names and last names, combined randomly so that patterns don't emerge that can be automatedly filtered later.

44.     Attempting to evade a filter is quite simply an attempt to deceive both the computer program that a user has employed as well as the user of that program.

45.     Also, it is simply not the case that the only function of filters is to either facilitate or block the receipt of emails.  Many spam filters simply categorize and mark email messages for later processing.  While that processing sometimes involves blocking, more often it involves particular kinds of display or placement of email messages into special storage locations. Blocking messages using spam filters runs the risk of accidentally blocking messages that are not spam, and therefore many spam filters are configured to save suspected spam for later review instead of discarding messages outright.

**Spam Traps**

46.     In order to aid in the filtering of spam, some service providers create one or more specific email addresses that they can confirm are not used to send email and are not used to sign up for the reception of email messages from mailing lists, commercial sites, or other people who might be solicited to send email. The email address is then placed on a web page, normally hidden from view of a person who might visit that page, by covering it with a graphic or placing it in the underlying Hypertext of the web page, such that it would only be discovered if an automated search tool was used to look through the Hypertext code. Because spammers use these kinds of tools in order to search for email addresses to send spam, these designated email addresses are known as "spam traps". If a service provider receives a piece of email sent to such a spam trap, it will know that the email in question was unsolicited, can potentially update its

filters to identify the sending server as potentially a sender of spam, and even (in the case of some sophisticated filters) identify subsequent messages that have similar content and flag them as potentially spam. Obviously the presence of an email address on any web page does not by itself constitute an invitation to send email, and certainly in the case of spam trap email addresses that are hidden from a user reading a web page, no such consent is implied. Indeed, it is precisely because spammers do not get permission to send their email messages that spam traps are used as an effective tool to discover spam messages.

## BSI's Relationship with Hypertouch

47.     My understanding is that Plaintiff provides certain message handling services for Hypertouch, Inc. of California.  In that capacity, email messages are first routed through a server with a "hypertouch.com" domain name, certain messages are removed and delivered locally, and then the remaining messages are routed to a BSI server controlled by the Plaintiff.  The fact that the messages at issue in this case were routed through a "hypertouch.com" server does not change the party that actually authored the messages and caused them to be sent. I see nothing to indicate that the Plaintiff received the messages in question through other than normal mechanisms from the original sender. In particular, it cannot be legitimately claimed that Hypertouch was the sender of the message, let alone that because of the message routing that Plaintiff gave permission to receive these messages. This simply misconstrues the nature of how the email messages arrived at Plaintiff's servers and therefore incorrectly concludes that this constitutes consent to receive these messages.  First, of the messages that I have examined that passed through Hypertouch's systems on their way to Plaintiff's systems, there is no indication that Hypertouch ever took delivery of these messages.  As is consistent with my analysis of these messages, Hypertouch's systems were configured to route messages, without consideration of their content, to Plaintiff's systems for processing.

48.     It is not unusual for ISPs to route email messages to each other.  ISPs often accept email messages on behalf of others for further processing, sending on some of those messages for final delivery.  For example, there are businesses that take messages destined for a customer's domain, filter them looking for spam, archive some of them without sending them on for final delivery, and mark up the rest indicating the nature of the contents of the messages.  Other providers (for example, universities that provide email forwarding service for their alumni) allow users to have email addresses that are not delivered locally, but rather are forwarded for final delivery to a different ISP. For instance, I have an email address at Binghamton University that simply forwards messages for final delivery to my personal email address.  It is simply contrary to the operational realities of Internet email to claim that, if I receive into my personal email mailbox an unsolicited commercial email message from someone that is addressed to my Binghamton University email address, I have somehow consented to receive that email and it is not unsolicited because I have agreed to receive email from Binghamton University.  It is certainly true that if an entity takes delivery of an email message and then subsequently forwards it on to a third party, I would consider that a different circumstance.  But to claim that an ISP that receives email routed through another ISP's systems somehow has consented to receive the email on the basis of that routing relationship is simply a misunderstanding of how Internet email works.

17 February 2012, Urbana, Illinois

_____

Peter W. Resnick

- 23 -