**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **BEYOND SYSTEMS, INC.** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | **Civil No. PJM 08-409** |
| | * | |
| **KRAFT FOODS, INC.,** *et al.* | * | |
| | * | |
| Defendants | * | |

**OPINION**

**I.**

Introduction

The advent of electronic mail has brought with it a flood of commercial advertising, some of it misleading, false, or deceptive, some even fraudulent, much of it unwanted. That in turn has given rise to federal and state legal initiatives intended to stem the flow of the unwanted, and especially the misleading, false, deceptive, and fraudulent e-mails, so-called anti-spam legislation. Federal legislation, notably the CAN-SPAM Act,[1] seeks to regulate commercial e-mail in general terms, i.e., any message whose primary purpose is the commercial advertisement or promotion of a product or service, and effectively pre-empts the field except for limited carve-outs for state laws providing for civil remedies where the e-mails can be shown to be deceptive or fraudulent in nature.

Typically, state statutes authorize internet service providers (ISPs), *i.e.* the entities that initially receive and then distribute the e-mails to end users, to sue suspected spamming companies and/or their agents for each offending e-mail, either for actual damages or for

---

[1] 15 U.S.C. § 7701, *et seq.*, titled "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003" (hence, "CAN-SPAM").

damages in a liquidated amount, such as $1,000.[2]  Both Maryland and California have such

statutes.  *See* Maryland Commercial Law, Commercial Electronic Mail Act § 14-3001, *et seq.*

and Cal. Bus. & Prof. Code § 17529, *et seq.*

Whether or not such statutes have been successful in deterring spam, their existence has

seen the emergence of the ostensible ISP whose primary purpose is to proactively attract and trap

potential spam, then sue the offending company and/or its agents for tens of thousands, if not

millions, of dollars, each purportedly offending e-mail carrying a statutory bounty of, for

example, $1,000.  Because the suspected spamming companies are exposed not only to

potentially enormous verdicts if they lose in court but to discovery of extraordinary dimension,

these suits frequently end with the companies entering into substantial dollar settlements with the

ISPs.

The present case tests the limits of how far an ostensible ISP can go in litigating claims

under state anti-spam statutes.

Is it enough that an entity meets the minimal requirements to qualify as an ISP, even if it

exists primarily to attract and trap spam and sue upon it?

Or, in order to be eligible to sue, must an ISP function primarily as an internet service

provider, making at least some effort to deflect spam, and suing under the anti-spam statutes, if

at all, only incidentally to its primary function as a service provider?  That is, must an ISP be

*bona fide*?

---

[2] These state statutes also typically allow for individual recipients to file such suits, again
authorizing recovery for either actual or statutory damages.  Since the focus of the present
litigation is upon ISPs, the matter of individual recipients has limited relevance. It will be
discussed briefly, however, in Section VI in connection with the Court's analysis of BSI's
standing to sue.

The answers to these questions occasion an expedition into the realm of certain legal arcana, including among other things the Plain Meaning Rule of statutory interpretation; the matter of how legislative intent should be discerned in the interpretation of statutes; the ancient maxim of tort law *volenti non fit injuria*; federal preemption law; concerns of public policy; and –no less – the common sense that ought to inform the analysis of any legal question.

## II.

### Procedural History

In broad brush, Hypertouch, Inc. is an ostensible ISP in California where, under the law of that State to be specific, it would arguably be termed an "Electronic Mail Service Provider" (EMSP).  Its owner and operator is James Joseph Wagner (sometimes referred to hereinafter as "Joe").[3]  While providing a limited number of typical ISP functions, Hypertouch's principal activity, especially between 2005-2011, has been to attract and harvest what it hopes will be spam e-mails and either sue on them itself under California law or sue on them, then route them to an entity known as Beyond Systems, Inc. (BSI), ostensibly a Maryland ISP, which would arguably be termed under Maryland law an "Interactive Computer Service Provider" (ICSP). The primary function of BSI, which also provides a modicum of actual internet services, is to gather in the e-mails sent by Hypertouch, then file its own suits under Maryland's anti-spam statute (sometimes the very same e-mails Hypertouch has sued upon in California).  BSI's owner and operator is Paul Wagner – brother of Hypertouch's Joe.  In recent years, BSI has earned approximately 90% of its annual revenue from litigation, a total in excess of $1 million, essentially all through negotiated settlements with suspected spammers and/or their agents.

_____

[3] For the sake of clarity and intending no disrespect, the Court will sometimes refer to Joe Wagner and his brother Paul by their first names.

In the present case, BSI has sued Kraft Foods, Inc. which, through various subordinate companies, produces Gevalia coffee, a product broadly advertised through e-mails by Connexus Corporation.[4]  BSI says that the Gevalia e-mails are materially misleading if not deceptive and fraudulent and maintains that in excess of 600,000 e-mails fit that description; hence, based on $1000 per item, Kraft's exposure is to more than $600 million.  Unlike several other BSI targets, Kraft, in the words of The Godfather, has "gone to the mattresses" on BSI's claims.  Sued by BSI, it filed a third party complaint against Joe Wagner and Hypertouch, alleging that BSI received most if not all of the e-mails it is suing upon from Joe Wagner and Hypertouch, including many that Hypertouch, by virtue of an earlier agreement with Kraft, promised Kraft it would not to sue upon.[5]  Kraft submits that, whatever their corporate forms, the Wagner brothers are literally in the business of manufacturing lawsuits.

---

[4]Hydra Corporation is also alleged to have participated in the sending of the allegedly offending e-mails, but it did not answer the suit, so default judgment has been entered against it.  The default judgment has been entered as to liability only, not damages.  For reasons that will hereafter become apparent, BSI's Renewed Motion for Default Judgment Damages [Dkt. 590] against Hydra LLC will be denied.

[5] Earlier in the case, the Court ruled that BSI could not sue Kraft upon any e-mails that Hypertouch had previously sued Kraft upon, which Hypertouch forwarded to BSI so that BSI could also sue Kraft upon them.  The reason for the exclusion was that, in its settlement agreement with Kraft in the prior litigation, Hypertouch agreed to forego suit with respect to the Gevalia e-mails not only on its behalf but on behalf of its assignees, which would obviously include BSI.  The Court also ruled that BSI could not sue Kraft on any e-mails sent through Hypertouch after the settlement agreement, where Hypertouch failed to notify Kraft of receipt so that Kraft could address the problem, as required in the settlement agreement. (See Dkt. 370.)

While Hypertouch's agreement with Kraft not to sue on *pre*-settlement e-mails also extended to Kraft's agents, with respect to *post*-settlement e-mails, the agreement not to sue applied only to certain named entities, and explicitly did not apply to Vendare Media, Connexus' predecessor in interest, among others.

Although it does not appear that Connexus has filed a separate motion to exclude the Hypertouch e-mails (either pre- or post-the Kraft settlement), inasmuch as the agreement with respect to *pre-*

When, given the 600,000 or so claims BSI has asserted,  it became apparent that discovery in the case would be of a very substantial magnitude,  the Court – after consulting the parties – determined that not only would it bifurcate the trial of liability and damages, it would hold a preliminary jury trial on the issue of whether BSI has standing to sue and whether the fact that BSI actively solicits, which is to say consents to receiving, suspected spam should result in termination of the proceeding in advance of discovery or trial as to liability or damages.

That preliminary jury trial, conducted as any jury trial would be, has now been held.

In Phase I of the trial, BSI was permitted to pursue its theory of the case, arguing that it satisfies the de minimis requirements of an "interactive computer service provider" under Maryland law as well as those of an "electronic mail service provider" under California law. The jury heard limited evidence and was instructed that it could consider several factors in determining whether BSI operates as an ISP, viz., its  revenue from operations; customer base; marketing efforts; types of services provided; location and type of offices; organization and configuration of computer equipment; types and uses of software to deliver/transfer e-mails;

---

settlement e-mails extended to Kraft's agents, including Connexus' predecessor in interest, Vendare Media, the *pre*-settlement Gevalia e-mails will also be excluded as to Connexus. The *post*-settlement e-mails sent by Connexus will be excluded for a different reason.  As will be discussed in Section VII, *infra,* since BSI consented to receive those e-mails from Hypertouch, BSI can claim no injury as to them either.

With the Hypertouch-to-BSI e-mails excluded from the case, there would seem to be no basis for BSI to sue for purported violation of the Maryland or California anti-spam laws with respect to those e-mails.  But insofar as BSI is claiming that Defendants themselves may have directly sent offending e-mails to Maryland from California (counsel, at oral argument, suggested that there were some 8,900 such e-mails), those e-mails would still be covered by the Court's rationale and conclusion developed *infra,* which is to say, they would go out by reason of BSI's lack of standing and its consent to harm.

In any event, evidence of the Hypertouch – Joe Wagner – BSI – Paul Wagner relationship remains relevant throughout on the issue of BSI's *bona fides* as an ISP under both Maryland and California law.

privacy policies, terms of service and customer agreements; hiring and use of employees; bookkeeping and billing practices; implementation of security and fire prevention methods; e-mail archiving; efforts to prevent or stop spam; customer complaints; digital security of data and redundancy; commercial insurance; incident response plan; and structured cabling.  The jury in Phase I, however, heard nothing about the litigation activities of BSI; the proportion that those activities bear in comparison to other activities of BSI; or the relationship between BSI and Hypertouch and the Wagner brothers, including the routing relationship between the entities, and how the brothers share the view that they can multiply litigation claims several times over with their server arrangement.  On this limited record, the jury in Phase I found that BSI was an "interactive computer service provider" under Maryland law and an "electronic mail service provider" under California law.

After the jury made its findings in Phase I of the trial, it returned in Phase II to consider evidence in support of Defendants' theory of the case that BSI is not a *bona fide* "interactive computer service provider" and "electronic mail service provider" under Maryland and California law respectively, because in terms of BSI's operations it exists primarily to attract, trap and sue upon suspected spam, in recent years garnering some 90% of its total revenues, approximately $1 million in total from settling such litigation.[6]   BSI was of course permitted to offer its own evidence in Phase II.  At the close of Phase II, the Court instructed the jury that a *bona fide* ISP is one that "primarily and substantially" provides the services set forth in the statutes, and that an entity is not a *bona fide* ISP if it primarily or substantially engages in attracting spam and bringing anti-spam litigation. The jury was told to consider the time period

_____

[6] The jury also considered whether BSI is a resident of the State of Maryland within the meaning of the MCEMA.  The jury found that BSI was a Maryland resident, an issue that is not being pursued by Defendants at this juncture.

from 2005 forward, when the activity in this case took place.[7]  It was also instructed that it could

consider all the evidence from Phase I, as well as the additional evidence it heard throughout

Phase II regarding BSI's litigation activities and its interaction with Hypertouch, as well as the

relationship of the Wagner brothers.

Deliberating a second time, in Phase II the jury found for Defendants, deciding, within

the parameters of the Court's instructions, that BSI was not a *bona fide* ISP under either

Maryland or California law.

Following trial, the Court invited the parties to file motions for judgment as a matter of

law, which they have done and which the Court now considers.  BSI has styled its motion as a

renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure

50(b).  Kraft Foods and Connexus have styled their motions as ones for summary judgment

under Rule 56.  BSI moves for judgment confirming that it is an "interactive computer service

provider" under Maryland law and an "electronic mail service provider" under California law,

and therefore has standing to maintain its suit.  BSI also moves to set aside the jury's finding that

it is not a *bona fide* plaintiff under the statutes.  Kraft, joined by Connexus, moves for judgment

on the grounds that BSI is not a *bona fide* interactive computer service provider or electronic

mail service provider, which they submit is required under Maryland and California law for

standing purposes as well as for purposes of invoking federal jurisdiction, and, additionally, on

the grounds that because BSI in effect consented to receive the e-mails on which it sues, its

claims are barred as a matter of law.  Connexus, joined by Kraft, has filed a separate motion

arguing BSI's consent to harm.

---

[7] Any potential objections BSI may have to the time-period or any other aspect of this instruction
has been waived, since BSI's sole objection to the instruction, as given, was that the Maryland
and California statutes do not have a *bona fide* requirement.

For the following reasons, the Court:

1) **DENIES** BSI's Motion for Judgment as a Matter of Law and to Set Aside Phase II Jury Verdict;

2) **GRANTS** Kraft's Motion for Summary Judgment as to BSI;

3) **GRANTS** Connexus' Motion for Summary Judgment as to BSI;

4) **DENIES** BSI's Renewed Motion for Default Judgment Damages as to Hydra LLC.

### III.

<u>The Maryland and California Statutes</u>

The anti-spam statutes at issue in this case are Maryland Commercial Law, Commercial Electronic Mail Act § 14-3001, *et seq.* ("CEMA") and Cal. Bus. & Prof. Code § 17529, *et seq.* Both statutes deal with e-mail that contains false and misleading information.  *See* CEMA §14-3002 and Cal. Bus. & Prof. Code § 17529.5.[8]  Both acts permit individual recipients as well as certain service provider entities (in Maryland, an "interactive computer service provider" (ICSP) and in California, an "electronic mail service provider" (EMSP)) to bring actions to recover actual or statutory damages for each false and misleading e-mail.  *See* CEMA § 14-3003; Cal. Bus. & Prof. Code § 17529.5.

In defining a service provider, the Maryland statute reads:

---

[8]  The Maryland and California statutes refer to "false and misleading" e-mails.  The U.S. Courts of Appeals for the Fourth Circuit and the Ninth Circuit, however, have held that CAN-SPAM preempts state statutes except to the extent those statues regulate fraudulent, materially false, or materially misleading e-mails.  *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1061-62 (9th Cir. 2009) ("Having independently analyzed the CAN–SPAM Act's text, structure, and legislative purpose, we reach the same conclusion as the district court and the Fourth Circuit, and interpret the CAN–SPAM Act's express preemption clause in a manner that preserves Congress's intended purpose—i.e., to regulate commercial e-mail 'on a nationwide basis,' 15 U.S.C. § 7701(b)(1), and to save from preemption only 'statutes, regulations, or rules that target *fraud or deception*,' S.Rep. No. 108–102, at 21 (emphasis added)").

> "'Interactive computer service provider' means an information service, system, or access software provider that provides or enables computer access by multiple users to a computer service. 'Interactive computer service provider' includes a service or system that provides access to the Internet and systems operated or services offered by a library or educational institution." CEMA, §14-3001(c).

Maryland establishes that for each offending e-mail, a service provider can recover the greater of $1000 or actual damages, which is double the statutory damages an individual recipient can recover. There is no limit to the amount of actual or statutory damages that can be recovered against a spamming company. CEMA § 14-3003.

The California statute defines a service provider as follows:

> "'Electronic mail service provider' means any person, including an Internet service provider, that is an intermediary in sending or receiving electronic mail or that provides to end users of the electronic mail service the ability to send or receive electronic mail." Cal. Bus. & Prof. Code § 17529.1(h).

The California statute provides that, for each offending e-mail, an electronic mail service provider or recipient may recover actual damages or liquidated damages of $1000, up to a total $1,000,000 "per incident." Cal. Bus. & Prof. Code § 17529.5 (b)(1)(B).

In the background of the state statutory landscape is the federal anti-spam statute, the Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM" or "Act"), 15 U.S.C. § 7701, *et seq.* CAN-SPAM, enacted in 2003 after many states had already taken positions with respect to the challenge of spam, was Congress' effort to bring some uniformity and clarity to the several state spam laws, at the same time addressing the growing national concern over spam. *See Omega World Travel, Inc. v. Mummagraphics, Inc.,* 469 F.3d 348, 354-55 (4th Cir. 2006) ("patchwork" of state laws was "ineffective"); *Gordon v. Virtumondo, Inc.,* 575 F.3d 1040, 1047-48 (9th Cir. 2009). The Act establishes a code of conduct for commercial e-mail and prohibits the sending of certain deceptive and fraudulent

messages. *Id., see also* 15 U.S.C. § 7704(a). The Federal Trade Commission, federal and state agencies are all authorized to enforce the Act. In addition, a "provider of Internet access service adversely affected" by violations of the Act is authorized to bring a civil action. *Gordon,* 575 F.3d at 1047-48; *see also* 15 U.S.C. § 7706. The U.S. Court of Appeals for the Fourth Circuit has observed that CAN-SPAM provides a "careful balance between preserving a potentially useful commercial tool and preventing its abuse." *Omega,* 469 F.3d at 354.

CAN-SPAM contains an express preemption provision superseding "any statute, regulation, or rule of a State … that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707(b)(1). In addition, Congress stated that the preemption clause should not be construed to preempt the applicability of state laws that are not specific to e-mail or "[s]tate laws to the extent that those laws relate to acts of fraud or computer crime." *See* 15 U.S.C. § 7707(b)(2); *see also discussion in Gordon,* 575 F.3d at 1061. Discussing CAN-SPAM's preemption provision, the Fourth Circuit in *Omega* reasoned that harsher state laws (which in *Omega* involved an Oklahoma law imposing strict liability) would, by virtue of the way e-mail travels around the country, become their own de facto national standards. This, the Fourth Circuit stated, would "permit an exception to preemption to swallow the rule and undermine the regulatory balance that Congress established" and its attempt to create a national standard. *Omega,* 469 F.3d at 356 (ultimately finding Oklahoma statute at issue preempted). The Ninth Circuit has similarly observed that CAN-SPAM's express language indicates Congressional intent to "broadly preempt state regulation of commercial e-mail with limited, narrow exception." *Gordon,* 575 F.3d at 1061.

**IV.**

The Parties

A)  Beyond Systems and Paul Wagner and Hypertouch and Joe Wagner

Paul Wagner formed BSI as a Maryland corporation in 1996 and began providing internet services and consulting to a handful of companies and individuals.  As of 2002, BSI was listed in filings as being based in the District of Columbia.  Paul's brother Joe owns and operates what is ostensibly an ISP, Hypertouch, Inc., out of the State of California. Prior to 2002, BSI and Paul Wagner were extensively engaged in suing companies in the District of Columbia for violations of a law that establishes civil liability for the sending of misleading transmission by facsimile machines, so-called "junkfaxes," presumably the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227(b)(1).

In 2002, Maryland enacted its anti-spam statute, and Paul Wagner and BSI shifted their focus to Maryland and anti-spam litigation since, as Paul told Joe, junk fax lawsuits were "truly small potatoes compared to the spam cases."  (Def. Trial Ex. 64.)  Especially with respect to the years 2005-2011, as Paul Wagner testified at trial, "[a]ll of BSI's activity sort of relates to litigation."  (Trial Tr. 6/27/12 at 107.)  Indeed, Paul himself spends at least 40 hours a week working on litigation.  He has filed more than two-dozen spam-related lawsuits of his own and, together with his brother Joe, some 70 lawsuits over a five year period. The brothers have consistently engaged the same litigation counsel.  They have entered into a joint defense agreement, and have acted as consultants in each other's cases.  Since 2005, BSI's total gross revenue from litigation has been over $1 million.  In contrast, its total gross revenue from other

business operations over the same period has been just over $300,000.  In other words, BSI's

spam-suit payouts represent over three times its revenue from all other sources.

    In August 2002, knowing that the Maryland spam statute was about to go into effect, Paul

purchased a computer full of spam from Joe for $1. Although he lived in the District of

Columbia and had been filing his junk fax suits from there, Paul placed his Macintosh computer

in his parents' home in Silver Spring, Maryland.  An e-mail between Paul and Joe Wagner

emphasizes why—"[f]or the Maryland spam law protection afforded there." (Trial Tr. 6/26/12 at

103.)  The Wagners also came to an agreement as to how they would route e-mails. Suspected

spam would go through Joe's Hypertouch servers in California, then be routed by Hypertouch's

routing tables to Paul at BSI in Maryland.  Paul also suggested to Joe that subsequent copies of

the same e-mails could be sent to additional California and District of Columbia servers. (Trial

Tr. 6/26/12 at 172-173.)  According to BSI's own expert, Dr. Peter Resnick, whom BSI

presented as being very familiar with e-mail providers and their services, this routing relationship

was not a "standard set-up,"  but rather, he conceded,  "an uncommon arrangement."  Indeed, Dr.

Resnick could not identify any other service provider that configures its deliveries this way.

(Trial Tr. 6/21/12 Aft. at 77-78, 80.)

    One of the more remarkable features of this case, as noted earlier,[9] is that Hypertouch

previously sued Kraft over Gevalia coffee e-mails under California's anti-spam statute, and the

parties reached a settlement agreement.  In exchange for a substantial cash payment, Hypertouch

agreed for itself and its assigns not to pursue any claims for certain identified e-mails

(presumably the universe of claims in that suit) and also agreed to notify Kraft in the future if

---

[9] *See supra* note 5.

Hypertouch received any further Gevalia e-mails it suspected of being spam so that Kraft could take appropriate steps to cure any problems.

Hypertouch, however, which is to say Joe Wagner, either had already sent or would go on to send to BSI and Paul Wagner in Maryland some if not all of the very same e-mails it had foresworn not to sue Kraft for, and at no time gave notice of any kind to Kraft as to what it had done so that Kraft might cure any problems.

BSI knew that the e-mails it agreed to receive from Hypertouch would contain spam. The testimony at the preliminary jury trial was crystal clear—Joe was asked if he knew at the time of the routing agreement in 2002 that the e-mails he would be routing to BSI contained spam, and he said "Absolutely."  When asked if BSI knew in 2002 when it agreed to receive the e-mails that those e-mails contained spam, he also responded in the affirmative. (Trial Tr. 6/26/12 at 160-61.)  Joe testified that the "the whole point" of setting up the routing tables was because he and Paul "want[ed] to collect [ ] spam"  (Trial Tr. 6/26/12 at 80-81, 170-72), especially in states where it mattered, such as Maryland and California.

Numerous examples of the brothers' efforts to attract and trap spam were demonstrated at trial.  BSI, for example, has no meaningful filters in place to block or reject spam; indeed, although both Hypertouch's and BSI's software have these settings, both have routinely been turned off.   BSI, moreover, upgraded its computer system so that it could retain even more spam which, it may be noted, it archives indefinitely.  Again, BSI's own expert, Dr. Resnick, was unable to identify a single e-mail provider that makes no attempt to block or filter mail or that archives e-mail indefinitely.  In its quest to garner spam, BSI also created "spam-trap" addresses for hundreds of accounts that Dr. Resnick described as accounts "whose sole purpose is to cause spammers to send spam to it."  (Trial Tr. 6/27/12 at 159.)

The Wagner brothers' focus on receiving as much spam as possible was dramatically portrayed by Paul's frustration when he was not getting enough of it.  In September 2004, for example, he wrote to Joe saying he was not receiving spam from Hypertouch, asking if Joe could please check whether he was in fact forwarding the e-mails.  As Joe explained at trial, Paul wrote to him because something was "wrong."  (Trial Tr. 6/27/12 at 176.)  Paul made similar requests of Joe on several occasions, whenever BSI was "not getting the spam… from [Joe's] servers." (*See, e.g.,* Trial Tr. 6/26/12 at 176; Def. Trial Ex. 112; Def. Trial Ex. 155; Def. Trial Ex. 159.) Then, when spam from Hypertouch began "flowing" again, it was greeted by Paul with what can only be described as unbridled enthusiasm.  ("It's a floodin' all right! Txs."; Def. Trial Ex. 132.) Each e-mail, particularly as routed by Hypertouch and BSI, held the promise of one or more payouts—because, again, as was conceded at trial, the brothers believed that each e-mail could be sued on multiple times after it had bounced back and forth between servers. As Joe Wagner explained, one e-mail bounced between servers in California and Maryland could provide an opportunity to sue at least three times, under California, Maryland, and federal law.[10]

In late 2002, the Wagner brothers began searching for potential spamming companies to sue.  E-mails and documents from the time show that part of their strategy was to identify appropriate defendants, while another was to maximize the payout on every piece of spam.  In addition, because the brothers had stored all the spam they harvested indefinitely, they were in a position to sue on 2006 e-mails in 2008, even if by that point the spam sender had ceased sending anything offensive.   The Wagners implemented a multi-jurisdictional strategy: Hypertouch would sue in California first, then BSI would sue in Maryland.  They carried out this

---

[10] The Wagner brothers also concede – and the thrust of their argument clearly implies – that the same e-mail could be deliberately trapped and routed to every state that has an anti-spam statute to be sued upon there. Since dozens of states have enacted anti-spam laws, one offending e-mail by itself could lead to a substantial payout, several such e-mails to a veritable bonanza.

plan of action in a number of cases, including lawsuits against Kennedy-Western University and World Avenue (both of which BSI filed in this Court).  They have pursued the same strategy in the present case against Kraft and Connexus, Hypertouch suing first in California, followed by BSI in Maryland.  The previous cases resulted in settlements before trial.  Now, with BSI's claims against Kraft and Connexus, especially insofar as they are the same claims Kraft believed it had already settled with Hypertouch, Kraft and Connexus have chosen to stand and fight.

Notwithstanding BSI's extensive litigation activity, it is true that since approximately 2000 BSI has had at least 20 paying customers for its services, including services for e-mail, back-up e-mail and listservs. BSI has also provided a few web services, including, for one non-profit, a web redirection service from an old home page to a new one, and, for another nonprofit, assistance with online donations.   Additionally, BSI has set up wireless and other routers to provide at least a few companies with access to the internet by connecting them with local internet service providers Verizon and Comcast.  This has included, for example, helping the Young Woman's Christian Home ("YWCH") connect to the internet via Verizon.  As of the time of the preliminary jury trial, BSI was "hosting" e-mail for four customers, two of whom BSI called to testify at the preliminary jury trial.  For one of those customers, St. Lukes House, BSI was providing services on a volunteer basis at no charge.

### B)  Kraft and Connexus

Kraft Foods Global, Inc and Vict. Th. Engwall & Co. are subsidiaries of Kraft Foods, Inc. The Kraft entities own and advertise Gevalia brand coffee, whose e-mails are at issue here.  Kraft Foods Global, Inc. has worked with Connexus to advertise Gevalia products.  Connexus has allegedly been involved in sending the e-mails at issue in this case.

**V.**

Contentions of the Parties

Defendants assert two principal reasons why they believe they should be granted summary judgment.  First, they say, BSI is neither a *bona fide* "interactive computer service provider" under Maryland law nor a *bona fide* "electronic mail service provider" under California law, and therefore lacks standing to sue.  In other words, Defendants ask the Court to embrace the finding of the jury in Phase II of the preliminary jury trial.  Further, say Defendants, given the undisputed evidence in Phase II of the preliminary trial that BSI intentionally invited and consented to receive the e-mails it seeks to sue upon, its suit should be blocked as a matter of law.

In contrast, BSI maintains that it is an "interactive service provider" under Maryland law and an "electronic mail service provider" under California law and therefore has standing to pursue this cause of action.  It submits that neither the Maryland nor the California statutes incorporates a "bona fide" requirement as an element of standing.  It also argues that the issue of consent vel non is irrelevant, but even if relevant, that BSI has not consented to receive spam or, at a minimum there is a genuine issue of material fact as to whether it has consented.

**VI.**

Standing

A.  Standing In General

Standing, as it relates to the present case, has at least two aspects: First, to bring a claim in federal court a party must have a recognized right to be in federal court.  Second, to pursue a claim under a state statute, a party must establish that it qualifies as one who is eligible to sue under the state statute.

-16-

A plaintiff must have "constitutional standing to invoke the authority of an Article III court." *See.*, *e.g.*, *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996). Article III requires plaintiffs to satisfy three elements: (i) they must have suffered a concrete "injury-in-fact"; (ii) the injury must be "fairly traceable to the challenged action of the defendant;" and (iii) "it must be likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

The reason for this, as the Supreme Court recently noted in *Hollingsworth v. Perry,* is "to prevent the judicial process from being used to usurp the powers of the political branches." 133 S. Ct. 2652, 2661 (2013)*, citing Clapper v. Amnesty Int'l USA,* 133 S. Ct. 1138, 1146 (2013).

Maryland and California standing requirements are essentially in accord. *See Norman v. Borison*, 994 A.2d 1019, 1027 (2010) ("In order to have standing, a party must demonstrate an 'injury-in-fact'. . ."). In California, the standing requirements imposed by the Cal. Bus. & Prof. Code are even more stringent.  In 2003 California voters passed Proposition 64 which prohibits previously-allowed actions by "private attorneys general" in unfair competition and false advertising cases; plaintiffs must now show that they have "suffered injury in fact *and* [] lost money or property as a result of a violation of this chapter." Cal. Bus. & Prof. Code § 17535 (emphasis added); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324 (2011) ("because economic injury is but one among many types of injury in fact, the Proposition 64 requirement that injury be economic renders standing under section 17204 substantially narrower than federal standing under [A]rticle III . . . which may be predicated on a broader range of injuries" (citation omitted).

The requirement of standing continues to apply when a state cause of action is sued upon in federal court.

In order to have standing in federal diversity cases (such as the present case), a plaintiff must satisfy both state *and* federal standing requirements. *See, e.g.*, *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005) ("Where [] jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action"); *Cantrell v. City of Long Beach*, 241 F.3d 674, 683 (9th Cir. 2001) ("California's lenient taxpayer standing requirements do not relieve the [plaintiffs] of the obligation to establish direct injury under the more stringent federal requirements"); *Metropolitan Express Serv., Inc. v. City of Kansas*, 23 F.3d 1367, 1369 (8th Cir. 1994) (same).

Accordingly, even if a diversity plaintiff has standing under state law, its claim must be dismissed if Article III standing is lacking. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) ("Standing to sue in any Article III court is, of course, a federal question which does not depend on the party's [] standing in state court."); *Goode v. City of Philadelphia*, 539 F.3d 311, 321 (3d Cir. 2008) ("[E]ven if Pennsylvania state law would have afforded appellants standing if they had brought this action in state court, we must ensure that they satisfy the federal requirements for standing as well.").

The overarching question before the Court is whether BSI has standing to sue on Maryland and California causes of action in federal court. BSI says yes, Defendants say no. Parsing the question, Does BSI qualify as an ICSP under the Maryland anti-spam statute or an EMSP under the California anti-spam statute so as to be able to maintain actions under those statutes? What defines an ISP for purposes of the state statutes? Can a company provide de minimis e-mail and internet services while actually existing primarily to attract and trap spam and sue upon it, or, in order to qualify and sue, is the company obliged to provide substantial

*bona fide* internet services, suing if at all only incidentally to such operations, while making at least some reasonable effort to deflect suspected spam. Beyond that, has BSI alleged appropriate injury-in-fact to be able to proceed in federal court?

B. BSI's Standing in the Present Case

1. Contentions of the Parties

As for state standing, BSI argues that the verdict in Phase I of the preliminary jury trial established as a matter of law to show that it has standing, and that the evidence demonstrates and Defendants themselves concede that BSI has in fact provided at least some e-mail services and enabled some computer access by multiple users to a computer service. BSI submits that both the Maryland and California statutes are unambiguous: There is no statutory requirement that it demonstrate that it is "bona fide." Defendants, BSI says, are seeking to impose an extra-statutory requirement on the basis the Ninth Circuit's opinion in *Gordon v. Virtumundo,* a decision BSI submits does not apply because the case dealt with the federal CAN-SPAM Act. BSI additionally maintains that even if there are extra-statutory requirements, it nonetheless is a *bona fide* ICSP and EMSP because the Phase I jury verdict considered all the factors except BSI's litigation history, and a company's litigation activities are not relevant as a matter of either law or policy. BSI also suggests that one is adversely affected simply by the receipt of spam, which is why the statutes provide liquidated damages, and that no element of reliance or actual damages is required under the statutes because these are in essence strict liability consumer protection statutes.

In contrast, Defendants argue that the Maryland and California statutes are indeed ambiguous and, properly construed, they require BSI to be a *bona fide* ICSP or EMSP which has suffered at least some injury-in-fact from spam in the course of providing service to its

customers. While Defendants acknowledge that the statutes do not expressly use the term "bona

fide," they argue that the term "service provider," must have some meaning in order to

differentiate the entity that provides broadscale internet services to a broad customer base from

the single individual who is able to connect one or a very few persons to e-mail service, such as a

neighbor who gives his friends use of his wireless router. Defendants argue that BSI's de

minimis definition of an ICSP or EMSP leads to absurd results at odds with any conceivable

legislative intent. As to the meaning of the jury's findings in Phase I versus Phase II of the

preliminary jury trial, Defendants argue that only in Phase II were the issues the Wagner's

unique server alignment and claim multiplication strategy brought to the jury's attention, and that

the jury in Phase II was expressly instructed to consider all the evidence from Phase I when

making its decision in Phase II. Defendants once again invite attention to the "daisy chain" of

the Hypertouch to BSI e-mails; the fact that one Wagner brother could take an e-mail, forward it

to multiple servers, and thereafter sit back and watch as multiple claims would be brought on the

same e-mail, as indeed BSI, in tandem with Hypertouch, originally sought to do in this case.[11]

Defendants argue that the Court should construe the state statutes consistently with parallel

provisions in the CAN-SPAM Act, the legislative history of which if not the statute itself clearly

requires an ISP to provide *bona fide* services.[12] Moreover, Defendants argue that there is an

injury-in-fact requirement that BSI cannot meet—that while a statutory amount, such as $1000

per offending e-mail, may be awarded in lieu of BSI having to prove actual damages, there still

---

[11] But, as indicated previously, the Court has expressly excluded from the case all Kraft e-mails
Hypertouch sent to BSI. See *supra* note 5.

[12] *See* 150 Cong. Rec. E72–02 (Jan. 28, 2004) (remarks of Rep. Dingell) "[Section 7706](g) [of
CAN-SPAM] provides for a limited right of action by *bona fide* Internet service providers."
(Emphasis added.)

must be demonstrable injury of some kind, even if it is not capable of being quantified with precision.  In other words, say Defendants, what the statutes contain are basically liquidated damages provisions.  Indeed, say Defendants, if BSI is permitted to recover without having to demonstrate at least some kind of injury, serious preemption questions arise under *Omega.*  Connexus joins in these arguments.

2. The Plain Meaning Rule

The Plain Meaning Rule of statutory interpretation holds that, if the language of a statute is unambiguous, a court applying the statute should not, many say must not, delve beyond that meaning in interpreting the statute.  *Hillman v. IRS,* 263 F.3d 338, 342 (4th Cir. 2001) ("The general rule is that unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language (the Plain Meaning Rule)"), *citing Caminetti v. United States,* 242 U.S. 470, 485 (1917).

But Maryland courts have rejected plain-meaning arguments when such constructions would violate common sense and legislative intent. *See, e.g., Della Ratta v. Dyas*, 996 A.2d 382, 388-89 (2010) (throughout statutory interpretation process, court "'must always be cognizant of the fundamental principle that statutory construction is approached from a 'commonsensical' perspective" and "'seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense.'"), *citing Frost v. State,* 647 A.2d 106, 112 (1994); *Barbre v. Pope*, 935 A.2d 699, 708 (2007)("whenever possible, an interpretation should be given to the statutory provisions which does not lead to absurd consequences."); *Brown v. State,* 753 A.2d 84, 88 (2000) ("when there is some question as to whether a literal interpretation of the language used in the statute really would be consistent with the purpose of the legislation, [courts] may look beyond that literal meaning. In such a circumstance, 'the court, in seeking to ascertain legislative

intent, may consider the consequences resulting from one meaning rather than another, and adopt

that construction which avoids an illogical or unreasonable result, or one which is inconsistent

with common sense.'"), *citing Kaczorowski v. Mayor & City Council of Baltimore,* 525 A.2d

628, 632 (1987).

California courts have likewise read statutes to accord with common-sense, reasonable

meanings on numerous occasions, even if a text, literally read, could have led to some other

result. *E.g., Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158 (2008), *Ventura County Ry.

Co. v. Hadley Auto Transport*, 38 Cal. App. 4th 878 (1995). This has included situations where

the result has been to restrict standing to those the statute on its face might otherwise be

supposed to protect. *See, e.g., Starbucks Corp. v. Superior Court,* 168 Cal. App. 4th 1436, 1449

(Cal. Ct. App. 2008) (finding that though the statute by its literal terms allowed any "applicant"

to sue, allowing someone to obtain legal standing after merely filling out a job application when

that person was not at all aggrieved, would "turn the statute into a veritable financial bonanza for

litigants"). Furthermore, in dealing with essentially the same definition that is at issue in the

present case, the Ninth Circuit in *Gordon* found the definition of "internet service provider"

under the CAN-SPAM act to be ambiguous, thus requiring the Court to interpret the term.

*Gordon,* 575 F.3d at 1051 (noting that in the most general terms, a service enabling users to

access online content or e-mail "could encompass the proprietor of an Internet coffee shop" or

"any person who allows another person to use their computer to access the Internet." ) (citation

omitted).

3. The Plain Meaning Rule Does Not Control: An ISP Must Be *Bona Fide*

BSI contends that requiring a company to be a *bona fide*, which is to say an ICSP or

EMSP that primarily and substantially functions as such, adds an "extra statutory" requirement to

what BSI contends is plain statutory text.  But requiring an entity to actually be what it purports

to be in order to qualify for benefits under a statute is not in reality adding an extra-statutory

requirement at all.  A legislature need not insert the equivalent of "real," "genuine," or "actual"

as a pre-qualifier for every type of entity it invests with a private cause of action.  As a matter of

common sense, legitimacy of the entity is presumed.

 As already observed, an overlay of *bona fide* existence has been recognized in the

context of the federal CAN-SPAM law.  While it is true that the legislative history of CAN-

SPAM is more extensive and clearer than the legislative history available for the two state

statutes in issue here, the language of the Act itself, like the language here, does not specifically

say that an entity must be *bona fide*.  The *Gordon* court, to be sure, found a "bona fide"

requirement in the legislative history of CAN-SPAM.  But the Court in this case agrees with the

reasoning of Judge Gould who, concurring in *Gordon*, stated that he would presume a *bona fide*

requirement even without CAN-SPAM's legislative history. According to Judge Gould,

"statutory standing should be denied to plaintiffs such as Gordon who purposely structure

themselves to look like one of the limited entities eligible to sue but do so for the primary

purpose of collecting damages and settlement from litigation.  Such individuals trying to game

the system … ordinarily … should be denied statutory standing."  *Gordon,* 575 F.3d at 1068

(Gould, J., concurring).

That the Maryland legislature was specifically concerned with *bona fide* ICSPs, as

opposed to companies purporting to be ICSPs, is fairly inferable from the available legislative

history as well as by reference to other aspects of the statutory text.  Thus, in explaining the

MCEMA in bill form, proponents of the bill stated that: "Interactive Computer Service

Providers, whose servers can be clogged to the point of being shut down by large amounts of

'spam,' can sue the perpetrators for the greater of $1000 or actual damages for each occurrence."
(*See* "S.B. 538 – Commercial Law Electronic Mail – Prohibitions" explanation sheet; Plaintiff's
Motion Ex. 10.)  To seek to protect service providers whose "servers can be clogged" by spam,
thereby disrupting the services they provide, hardly describes a simultaneous desire or intention
to protect a service provider whose very aim is to cram its server with spam.  Indeed, MCEMA,
as enacted, provides an ICSP statutory damages in an amount twice that of individual recipients.
If a single individual with a router can qualify a service provider, the distinction would be largely
meaningless.[13]

For the same reasons, BSI's argument as to who qualifies as an ISP leads to patently
unreasonable results.  As the Ninth Circuit noted in *Gordon*, anyone who provides other users
the ability to send e-mail, in whatever way, would qualify an ICSP or EMSP, including, for
example, a student who sets up the wireless router in her parents' home, thereby connecting her
family to the internet.  At trial, BSI's own expert, Dr. Resnick, was obliged to agree: A literal
interpretation of the Maryland Act would mean anyone who allows neighbors access to the
Internet through a wi-fi router would be an ICSP, and a literal interpretation of both statutes
would mean that anyone who provides internet access through a Bluetooth-computer or cell
phone would be an ICSP or EMSP.  Defendants' experts, not surprisingly, testified to similar
effect.  In the Court's view this simply cannot be what "service provider" means in the Maryland

---

[13]   The California legislature, while providing EMSPs and individual recipients with
identical monetary recoveries, nonetheless expressed concern over the cost of spam to
organizations and the lost productivity it occasions.  *See* Cal. Bus. & Prof. Code § 17529
legislative findings ("spam will cost United States organizations more than ten billion dollars
($10,000,000,000) this year, including lost productivity and the additional equipment, software,
and manpower needed to combat the problem. California is 12 percent of the United States
population with an emphasis on technology business, and it is therefore estimated that spam
costs California organizations well over 1.2 billion dollars ($1,200,000,000)").

and California statutes, or what the Maryland and California legislatures reasonably intended, if indeed they gave any thought to the matter at all.

If this were not enough, allowing a non-*bona fide* service provider, whether a professional plaintiff or a student who sets up as an internet service provider in the corner coffee shop, to bring suit under the state statutes may well implicate preemption concerns under CAN-SPAM.  The Ninth Circuit in *Gordon* and the Fourth Circuit in *Omega* both emphasized that the preemption exception to CAN-SPAM is narrow, that the intent of Congress was to create a more uniform, national standard.   *See, e.g., Gordon,* 575 F.3d at 1063 ("the CAN-SPAM Act was designed to ensure that 'legitimate businesses would not have to guess at the meaning of various state laws when their advertising campaigns ventured into cyberspace.") (citation omitted). *Gordon* cautioned that "[i]t would be logically incongruous to conclude that Congress endeavored to erect a uniform standard but simultaneously left states and local lawmakers free to manipulate that standard to create more burdensome regulation." *Id.* at 1063.  *Omega* expressed concern that the most strict state standards would become de facto national standards, and thereby "permit an exception to preemption to swallow the rule and undermine the regulatory balance that Congress established."  *Omega,* 469 F.3d at 356.  Here, allowing non-*bona fide* service providers not only to sue but allowing them to make suing their very livelihood would create precisely the manipulated state standard that Congress sought to abjure.

The Court finds that the Plain Meaning rule does not apply in this case because the statutes in question are ambiguous.  Further, the Court holds that for an ISP to be eligible to sue under either the Maryland or California statute, it must function primarily and substantially as an ISP, which is to say, it must be *bona fide*.

4. BSI Is Not a *Bona Fide* ISP, Hence Lacks Standing to Sue

Contrary to BSI's post-trial urging, the jury's finding in Phase I did not establish that BSI is *bona fide*. Any finding about BSI that failed to take into account over 90% of BSI's activities could not fairly encapsulate what BSI truly is.

In Phase II of the preliminary trial the jury was asked to consider whether BSI was a *bona fide* ICSP or EMSP. It was explicitly instructed that all evidence from the first phase was before it for consideration. There was unquestionably sufficient evidence from which the jury could infer that BSI is not *bona fide* and the Court need only recap it briefly. Paul Wagner, BSI's principal operative, testified that virtually all of BSI's time is spent in litigation. BSI chose to structure its e-mail routing and servers for the purpose of accumulating and trapping suspected spam (including creating bogus e-mail addresses) and in order to maximize the number of lawsuits it could generate based on the offending communication. In recent years, BSI has made over three times as much money in suing on spam as it has on any sort of valid business operation. It was therefore hardly a stretch for the jury to have found that BSI is not a *bona fide* ICSP or EMSP.

Given the court's limited purpose in evaluating the sufficiency of the evidence—courts are "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them"—the jury verdict as to BSI's lack of *bona fides* as an ISP must stand. *See Wallace v. Poulos,* 861 F. Supp. 2d 587, 597 (D. Md. 2012), *citing Lack v. Wal-Mart Stores, Inc.,* 240 F.3d 255, 259 (4th Cir. 2001).

5. BSI Has Not Shown Injury-In-Fact, Hence Lacks Standing to Sue

Apart from whether BSI qualifies as an ISP under the Maryland and California statutes, it still needs to show injury-in-fact in order to be eligible to sue under both the state statutes and

Article III.   BSI submits that it need not show any injury beyond its mere receipt of the offending e-mails—that how the e-mails came to it, its reliance, or actual injury are essentially irrelevant.  Defendants argue that BSI must show at least some real injury to have standing and that it cannot manufacture the injury-in-fact necessary to establish standing.

In support of its mere-receipt argument, BSI suggests that because it does not have to prove actual damages under the statutes and can recover statutory damages, it need not demonstrate that it sustained any injury-in-fact.

But the availability of statutory damages does not necessarily mean that the state legislature did not intend that a prospective litigant demonstrate at least some sort of actual adverse impact as a pre-requisite to suit. [14]   As is often the case, statutory damages may well be intended to equate with liquidated damages where actual damages are simply too difficult to prove.  Injury-in-fact may still be required. *Cf. Restatement (Second) of Contracts* § 356 (1981*)* ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of anticipated or actual loss caused by the breach and the difficulties of proof of loss," noting however in Comment b. that "If … it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages in unenforceable.").

The Court concludes that, for both state and federal standing purposes in the present case, BSI must show injury-in-fact, and that entitlement to statutory damages, in and of itself, does not establish the requisite injury-in-fact, even if reliance and actual damages need not be shown.  But even if it is allowed for present purposes that the mere invasion of deceptive or fraudulent

---

[14] In an earlier phase of the proceedings, in discussing whether specific reliance had to be shown under the Maryland and California statutes, the Court stated that damages did not need to be "shown" because statutory damages were provided.  ((*See* Hearing Tr. 6/14/10 at 94-95.) However, that one need not "show," which is to say does not need to prove, damages when statutory damages are provided does not mean that one does not need to have been actually injured in some way or another.

commercial e-mail into one's system constitutes appropriate injury-in-fact—incapable of precise proof, hence compensable in a liquidated statutory amount—the fact that the suitor has itself caused the invasion to occur is an entirely different proposition.  As the Court will discuss presently, a party may not deliberately act to cause injury to itself, then rely on that injury to satisfy standing requirements.

There is one further argument related to the injury-in-fact issue that the Court must address, namely BSI's suggestion that both the Maryland and California anti-spam statutes are in effect strict liability statutes so that all that apparently matters is that the spam is sent, not why or how it is sent or whether an ISP is actually injured.

To the extent BSI would make the Maryland statute one of strict liability, it faces an insurmountable obstacle.  In determining whether a statute establishes strict liability, Maryland courts look closely to both the text of a statute and to legislative intent.  *See e.g., Bd. of Cty. Commissioners of Garrett Cnty., Maryland v. Bell Atlantic-Maryland, Inc.,* 695 A.2d 171 (1997)*; see also Antonio v. Sec. Servs. of America, LLC,* 701 F. Supp. 2d 749 (D. Md. 2010). Here, neither the text of the Maryland statute, which speaks of "damages", nor legislative intent, which talks of "victims" and "clogged servers", indicates that Maryland's anti-spam statute is intended to be a strict liability statute, nor has any Maryland court so held.  *See* CEMA § 14-3003, *"*S.B. 538 – Commercial Law Electronic Mail – Prohibitions" explanation sheet (Plaintiff's Motion Ex. 10).

Indeed, in *Omega,* the Fourth Circuit rejected an Oklahoma anti-spam statute which would have imposed strict liability, finding that this would lead to preemption concerns with CAN-SPAM, because the strict liability state statute would become the de facto national standard. *Omega,* 469 F.3d at 356.

-28-

BSI suggests that a California Appeals Court has in fact held that the California statute is a strict liability one. *See Hypertouch, Inc. v. ValueClick, Inc.,* 192 Cal. App. 4th 805, 822 (Cal. Ct. App. 2011). It is true that in that case the court used the term "strict liability" in terms of the statute not requiring proof of the traditional elements of fraud, including reliance and damages, and even went so far as to suggest that harm need not be shown ("First, the statute permits a recipient of a deceptive commercial email to bring suit regardless of whether they were actually mislead *or harmed* by the deceptive message." *Id.* at 829.) (Emphasis added). But the case did not involve, nor did the court have anything at all to say about, the extent to which Hypertouch or any putative ISP could, without the least restraint, actively seek to manufacture its receipt of spam. And it is of no small interest to note what Hypertouch told the California Appeals Court in the *Hypertouch* case: "Hypertouch alleges that it *has been forced* to spend a considerable amount of money on 'hardware and software as a direct result of the yearly increasing onslaught of spam e-mails.'" *Id.* at 814. (Emphasis added). The California case, accordingly, offers little guidance in the present circumstances. In any event, the present case is ultimately concerned with whether BSI is a *bona fide* ISP, whether it has standing to be in federal court, and whether it has proactively sought to receive the spam it is suing upon and should, on that account, be precluded from going forward.

## VII.

### Consent to Harm

#### A.      Contentions of the Parties

Assuming, arguendo, either that *bona fides* as an ISP is not an element of standing under either the Maryland or California statutes or that it is and that BSI is deemed *bona fide* under

both statutes, the issue remains whether BSI in effect consented to the injury it sues upon, such that it should be precluded from doing so.

Defendants submit that BSI did consent to the harm it claims and is therefore estopped from suing upon them.  They argue that the statutes in question in effect create actions in tort, an ancient tenet of which is *volenti non fit injuria*, which essentially translates as, "The man who is the author of his own hurt has no right to complain."  John D. Lawson, "*The Principal Maxims of the Law," in Leading Cases Simplified* (1882).[15]  BSI counters that consent is not a defense under the Maryland and California statutes or alternatively that there are at least genuine issues of material fact that preclude summary judgment on the issue.

B.      The Defense of *Volenti Non Fit Injuria* Applies

1.   The Statutes Are in the Nature of a Tort

Maryland law is clear.  "MCEMA violations, like violations of the Consumer Protection Act, are 'in the nature of a tort.'  Indeed, both statutes regulate[ ] false and deceptive trade practices … the same principles that when faced with questions of individual liability for torts apply here."  *MaryCLE, LLC v. First Choice Internet, Inc.,* 890 A.2d 818, 846 (Md. Ct. Spec. App. 2006).

California law is equally clear that statutory violations may be deemed as being in the nature of torts.  For example, the Supreme Court of California has stated that, "Proposition 64 clearly was intended to abolish the portions of the UCL [Bus. & Prof. Code § 17200, et seq.] and false advertising law [§ 17500, et seq.] that made suing under them *easier* than under other comparable statutory and common law torts."  *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310,

---

[15] The principle underlying this defense has been traced back to Aristotle, Roman law, and Justinian's *Corpus Juris Civilis*, with the first English case using the phrase appearing in 1304. *See* Terence Ingman, *A History of the Defence of Volenti Non Fit Injuria,* 26 Jurid. Rev. 1 (1981).

335 (2011). *Compare with Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000) ("[A UCL action] is not an all-purpose substitute for a tort or contract action.").

It is, moreover, a fundamental principle of tort law that "[o]ne who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it." *Restatement (Second) of Torts* § 892A (1979). The Restatement defines consent as "willingness in fact for conduct to occur." *Restatement (Second) of Torts* § 892(1) (1979).

Maryland law is in accord: "[t]hose who, with full knowledge, assent to the invasion of their interests may not complain." *Janelsins v. Button*, 648 A.2d 1039, 1042 (Md. Ct. Spec. App. 1994) (plaintiff cannot recover for battery where the plaintiff consented to it) (citation omitted); *Brazerol v. Hudson*, 277 A.2d 585 (1971) (plaintiff who moved her car to allow dump truck to enter onto her property could not sue dump truck operator for trespass). Consent "may be manifested by action or inaction and need not be communicated to the actor." *Restatement (Second) of Torts* § 892(1) (1979).

California law is to identical effect: "He who consents to an act is not wronged by it." Cal. Civ. Code. § 3515. Section 3515 is "a codification of the maxim *volenti non fit injuria*, which is a basic tenet of [California] jurisprudence. It precludes the maintenance of an action for a wrong by one who has 'consented to the act which has occasioned his loss.'" *Pinney & Topliff v. Chrysler Corp.*, 176 F. Supp. 801, 810 (S.D. Cal. 1959) (applying California law) (citing *Edward Brown & Sons v. San Francisco*, 223 P.2d 231, 235 (Cal. 1950)). "One cannot deliberately incur an obvious risk of personal injury, especially when preventive measures are at hand, and then hold the author of the danger for the ensuing injury." *Hedding v. Pearson*, 173 P.2d 382, 384 (Cal. Dist. Ct. App. 1946).

2.   The *Volenti* Defense Applies; BSI Consented to Its Own Harm

There is no reason why the *volenti* defense should not apply in the context of an anti-

spam statute. [16]   The *Gordon* opinion is particularly instructive in this regard, holding that

plaintiff lacked standing as an ISP under CANSPAM because he undertook efforts to receive the

e-mails over which he sued and therefore fell outside of the class of persons to which Congress

granted a private right of action. *Gordon*, 575 F.3d at 1055-57. Gordon had configured his

computers to receive e-mails sent to "unused inboxes" and "refuse[d] to implement spam filters

in a typical manner or otherwise make any attempt to block allegedly unwanted spam or exclude

such messages from users' e-mail inboxes." *Id.* at 1045-46, 1055. The court found that Gordon

lacked standing as an ISP because he "purposefully avoided taking even minimal efforts to avoid

or block spam messages. Instead, Gordon devotes his resources to adding his clients' e-mail

addresses to mailing lists and accumulating spam through a variety of means for the purpose of

---

[16]   Common law defenses routinely apply against statute-based claims, absent express legislative intent to the contrary. *See, e.g.*, *Shager v. Upjohn Co*, 913 F.2d 398, 404 (7th Cir. 1990) (common law rules are "usually [ ] carried over to statutory torts, because statutes creating torts rarely bother to set forth all the ancillary doctrines . . . that are necessary to compose a complete regime of tort liability"); *Seller Agency Council, Inc. v. Kennedy Ctr. For Real Estate Educ., Inc.*, 621 F.3d 981, 988-89 (9th Cir. 2010) (common law defense of acquiescence applied to Lanham Act claims); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758-65 (1998) (construing Title VII in accordance with common law agency principles and adopting common-law based defense to harassment claims).

Apart from the *volenti* defense, the common law defense of failure to mitigate damages also bears on what BSI has done here.  Instead of seeking to mitigate its damages from spam, BSI has done everything it could to augment its damages. *See, e.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986) (duty to mitigate damages under Sherman Act); *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 399 (2d Cir. 1980) (same); *Binder v. Disability Group, Inc.*, 772 F. Supp. 2d 1172, 1185 (C.D. Cal. 2011) (duty to mitigate under Lanham Act). The mitigation doctrine bars recovery to plaintiffs who idly sit by and knowingly allow their damages to accumulate while doing nothing to avoid them. *See, e.g.*, *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal.App. 4th 1559, 1568 (Cal. Ct. App. 1996) ("A plaintiff has a duty to mitigate damages and cannot recover losses [he] could have avoided through reasonable efforts"); *M&R Contractors & Builders, Inc. v. Michael*, 138 A.2d 350, 358 (1958) ("A plaintiff is not entitled to a judgment for damages for a loss that he could have avoided by reasonable effort.")

facilitating litigation." *Id.* at 1052 (quotation and citation omitted). The court noted that "it is highly significant that the burdens Gordon complains of are almost exclusively self-imposed and purposefully undertaken." *Id.* at 1057. As Judge Gould wrote in his concurring opinion, the common law "did not develop remedies for people who gratuitously created circumstances that would support a legal claim and acted with the chief aim of collecting a damage award," and that, although Gordon had sued under a federal statute, "on close examination, many distinctions between common law and statutory law disappear." *Id*. at 1067-68 & n.2 (Gould, J., concurring).

As in *Gordon*, the undisputed facts here show that BSI consented to the alleged harm about which it complains.

The evidence from Phase II of the preliminary trial was overwhelming to the effect that, either through Hypertouch or independently, BSI actively sought to receive and trap Kraft's Gevalia e-mails.  With respect to some 99.8% of the e-mails attributable to Connexus, which arrived to BSI via Hypertouch, the trial testimony was explicit that BSI (Paul Wagner) knowingly consented to accept what it believed was spam from Hypertouch (Joe Wagner).  And, as to all the e-mails in this case, it need only be recalled that BSI created hundreds of fictitious e-mail addresses and essentially maintained no filtering devices, while engaging in a pattern and practice of suing multiple mailers of suspect commercial e-mail.

The Court concludes that consent to harm precludes any claim for the harm and that BSI's consent to ("solicitation of" says it better) harm precludes it from going forward with the present action.

3.   The Are No Genuine Issues of Material Fact as to BSI's Consent

Alternatively, BSI argues that at the very least there are genuine issues of material fact that make summary judgment inapposite on the issue of consent.  Thus, it says that: (1) BSI and

Hypertouch each broadcast a "No UCE"[17] message with respect to all incoming connections; (2) sending an opt-out request does not constitute consent to receive even more spam;[18] (3) a spammer's transmission of mail to a spam trap or to a wildcard entry in a routing table does not mean that the service provider consents to receipt of the spam; (4) BSI's filtering or block of e-mail in no way means it consented to receive spam; (5) the routing relationship between BSI and Hypertouch does not prove that BSI consented to receive spam from Defendants.

The first and most obvious answer to these arguments, of course, is that BSI has already had a trial on the issue of consent. That is the core of what Phase II of the preliminary jury trial was about. Defendants introduced ample evidence that BSI's modus operandi was to gather in spam to permit it to function as a litigation machine rather than as a *bona fide* ISP. At the same time, evidence with respect to all the supposed issues BSI now urges as presenting genuine

---

[17] "UCE" stands for "unsolicited commercial e-mail", and is synonymous with "spam." *See Unsolicited Commercial Email: Hearing Before the Subcomm. on Communications of the S. Comm. on Commerce, Science and Transportation,* 107 Cong. 1 (2001) (statement of Eileen Harrington, Federal Trade Commission Bureau of Consumer Protection).

[18] In fact, BSI argues that signing up to "opt out" of spam is the opposite of consenting to spam, and that it is particularly unfair that Defendants, who send even more spam once someone attempts to "opt out", should be able to use this as proof of "consent." BSI's argument is flatly contradicted by the record. The evidence shows that the Wagner brothers knew full well that "opting out" would result in the receipt of more, rather than less spam, and, indeed, that they elected to "opt out" for the express purpose of receiving more spam. *See* Def. Trial Ex. 50:

> *Joe e-mail to Paul (11/25/2002):* "Now I can say with first hand knowledge that removes just get one's address signed up for more spam. That same removes url, "av" is on about 40 mortgage spams I got. Now if only they would answer my email plant and identify themselves. If you haven't received any, I wonder if your safemailbox.net is flagged as a trap address?"

> *Paul response to Joe (11/26/2002):* "You bet. In fact, if you want to add to my list of removal sites, I'll submit opt-out requests to them as well."

issues of material fact was introduced by BSI by way of counterpoint.  The jury implicitly

accepted Defendants' view and rejected BSI's—BSI, it found, was not a *bona fide* ISP.

It is difficult to conceive how in future BSI would propose to try the consent issue in a

manner different from the manner in which it tried the issue during the preliminary jury trial.

Be that as it may, the Court agrees with Defendants that a party may not defeat summary

judgment by disputing its own evidence. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.

1984) ("A genuine issue of material fact is not created where the only issue of fact is to

determine which of the two conflicting versions of the plaintiff's testimony is correct"), *citing*

*Radobenko v. Automated Equipment Co.,* 520 F.2d 540, 544 (9th Cir.1975).

That, in effect, is what BSI is doing here:  After candidly admitting that attracting,

trapping, and suing on spam is nothing less than its raison d'être, BSI now says that there are at

least some things it does that make the issue of its "consent" to harm triable.  But this is not only

a case of a party undertaking to contradict one version of its evidence with a contradictory

version.  In an important respect the contradictory evidence it cites is not even accurately

portrayed.  As Defendants point out, BSI has not disputed that the so-called "SMTP[19] banner"

Joe Wagner used purportedly to prevent spam for Hypertouch was wholly ineffectual. No human

being apparently ever sees that banner, which is incapable of stopping or otherwise filtering the

transmission of an e-mail. To the Court, this seems a bit like a homeowner posting a sign on his

rear basement window saying "No housebreaking," while leaving the doors and windows wide

open and silverware and jewelry in open sight.  There is no reason to assume that commercial e-

mailers, spammers or otherwise, would be deterred by a simple request that they not send it.

---

[19] "SMTP" stands for "Simple Mail Transfer Protocol" and is one of the three principal protocols
for e-mail.  Computers use protocols to determine how to format and reassemble packets of
information.  *See United States v. Syzmuszkiewicz,* 622 F.3d 701, 704-05 (7th Cir. 2010).

Ultimately, BSI's position in this case, in the Court's view, would result in precisely the sort of outcome CAN-SPAM seeks to prohibit and therefore pre-empts: the several states could authorize nominal, non-*bona fide* ISPs to actively solicit spam, then permit them to defend merely by posting simple warnings against UCE.  So much for CAN-SPAM's hope to regulate commercial e-mail "on a nationwide basis."  15 U.S.C. § 7701(b)(1).

The Court concludes as a matter of law that BSI consented to the harm it is suing upon and, based on the jury verdict in Phase II of the preliminary trial, finds no further issue of consent to be heard by another jury.

## VIII.

### Conclusion

Having concluded that BSI lacks standing to sue under either the Maryland or California statutes or in federal court because it is not a *bona fide* ISP and has suffered no injury-in-fact, and further because BSI consented to the harm it seeks to sue upon in that it actively sought to attract and trap the e-mails it found offensive, all of Defendants' post trial motions are **GRANTED** and those of BSI are **DENIED.** Thus, the Court:

1)  **DENIES** BSI's Motion for Judgment as a Matter of Law and to Set Aside Phase II Jury Verdict;

2)  **GRANTS** Kraft's Motion for Summary Judgment as to BSI;

3)  **GRANTS** Connexus' Motion for Summary Judgment as to BSI;

4)  **DENIES** BSI's Renewed Motion for Default Judgment Damages as to Hydra LLC.

A separate Final Order of Judgment will **ISSUE.**


_____
**/s/**
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**August 9, 2013**